Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
901 New York Ave., NW
Washington, DC 20001
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>          Plaintiff,<br><br>     v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELESERVICES, INC.; EFOLKS, LLC; CREDITREPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PLLC, D/B/A/ LEXINGTON LAW,<br><br>          Defendants. | Case No. 2:19-CV-00298-BJS<br><br>**<u>Defendants' Motion to Dismiss the Complaint</u>**<br><br><br>**Oral Arguments Requested** |

**Contents**

RELIEF SOUGHT AND GROUNDS FOR MOTION ................................................ 1

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 7

   I.    THE COMPLAINT DOES NOT STATE A CLAIM THAT ANY OF THE
       PROGREXION COMPANY DEFENDANTS ENGAGED IN "DECEPTIVE ACTS"
       (COUNT II), MADE "FALSE OR MISLEADING STATEMENTS" (COUNT III), OR
       SUBSTANTIALLY ASSISTED THOSE WHO ALLEGEDLY MADE
       MISREPRESENTATIONS (COUNTS IV AND V). ............................................. 7

      A.   There Can Be No Recovery Under Counts II-V Based On The Conduct Of, Or With
            Respect To, Unnamed Introducers. ................................................................ 8

      B.   Counts II and III Assert Direct Liability, But Do Not Identify Any Specific
            Actionable Statements By One Of The Defendants. .......................................... 9

          1.   The Complaint Does Not Allege Liability for Any Statement by Any
               Defendant. ......................................................................................... 9

          2.   There Is No Viable Basis For Any Indirect Liability, But Even If There Were
               The Complaint Does Not State A Claim. .......................................... 12

      C.   The Claims for Substantially Assisting HSP1's Allegedly Deceitful Acts In
            Violation of the CFPA (Count IV) or TSR (Count V) Should Be Dismissed Because
            the Complaint Does Not Allege that Any Progrexion Company Defendant Knew
            HSP1 Deceived Consumers and Does Not Plead Substantial Assistance. ............. 16

          1.   CFPB Has Not Pled That Any of the Defendants Had a Culpable State of Mind
               About HSP1's Alleged Bad Acts. .................................................... 17

          2.   The Complaint Does Not Allege That Any Progrexion Company Defendant
               Provided Substantial Assistance in Furtherance of HSP1's (or any other
               introducer's) Alleged Misconduct. ................................................. 22

  II.   COUNT I SHOULD BE DISMISSED AS TO ANY CONDUCT THAT OCCURRED
       BEFORE MARCH 8, 2016 AS UNTIMELY. ................................................. 25

  III.  THE COMPLAINT RESTS ON IMPERMISSIBLE GROUP PLEADING. ................... 26

  IV.  THE CFPB'S STRUCTURE IS UNCONSTITUTIONAL, AND SO THE COMPLAINT
       MUST BE DISMISSED. ............................................................................ 28

      A.   The CFPB Director's For-Cause Removal Provision Unconstitutionally Restricts
            the President's Duty to "Faithfully Execute" the Laws. ......................... 29

      B.   The CFPB's Unchecked Ability to Spend Its Funds Fatally Undermines Congress's
            Power of the Purse, Violating Article I. ............................................. 31

CONCLUSION ................................................................................................. 32

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott v. Equity Grp., Inc.*,
 2 F.3d 613 (5th Cir. 1993) ...................................................................17

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)....................................................................8, 28

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
 No. 12-cv-00381-DB, 2015 WL 9412537 (D. Utah Dec. 22, 2015) ........................12

*Bayless v. Christie, Manson & Woods Int'l, Inc.*,
 2 F.3d 347 (10th Cir. 1993) ...............................................................14

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 554 (2007)................................................................ *passim*

*Bowsher v. Synar*,
 478 U.S. 714 (1985).........................................................................29

*Burlington Ind., Inc. v. Ellerth*,
 524 U.S. 742 (1998).........................................................................15

*Burnett v. Mortg. Elec. Registration Sys., Inc.*,
 706 F.3d 1231 (10th Cir. 2013) .............................................................9

*Cannon v. PNC Bank, N.A.*,
 No. 2-15-cv-00131-BSJ, 2016 WL 9779290 (D. Utah Aug. 31, 2016)
 (Jenkins, J.) ........................................................8, 10, 11, 19

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
 511 U.S. 164 (1994)........................................................................12

*CFPB v. Howard*,
 No. 8:17-cv-00161-JLS-JEM, 2018 WL 4847015 (C.D. Cal. May 3, 2018) ........................25

*CFPB v. Nationwide Biweekly Admin., Inc.*,
 No. 15-cv-02106-RS, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017)......................25

*CFPB v. Prime Mktg. Holdings, LLC*,
 No. CV 16-07111-BRO (JEMx), 2016 WL 10516097 (C.D. Cal. Nov. 15,
 2016) .......................................................................10, 18

*CFPB v. RD Legal Funding, LLC,*
    332 F. Supp. 3d 729 (S.D.N.Y. 2018)........................................................................17, 29, 31

*CFPB v. Universal Debt & Payment Sols., LLC,*
    No. 1:15-CV-00859-RWS, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015).....................17, 21

*CFPB v. Universal Debt & Payment Sols., LLC,*
    No. 1:15-CV-0859-RWS, 2019 WL 1295004 (N.D. Ga. Mar. 21, 2019) ........................17, 22

*CIG Expl., Inc. v. Hill,*
    824 F. Supp. 1532 (D. Utah 1993), *aff'd sub nom. CIG Expl., Inc. v. Tenneco*
    *Oil Co.*, 83 F.3d 431 (10th Cir. 1996)....................................................................................15

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937)...............................................................................................................32

*Collins v. Mnuchin,*
    896 F.3d 640 (2018) *reh'g en banc granted*, 908 F.3d 151 (5th Cir. 2018) ...........................31

*Commonwealth of Penn. v. Think Fin., Inc.,*
    No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).................................................27

*Fed. Election Comm'n v. Swallow,*
    304 F. Supp. 3d 1113 (D. Utah 2018)....................................................................................13

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010)...................................................................................................29, 30, 31

*FTC v. Chapman,*
    714 F.3d 1211 (10th Cir. 2013) .......................................................................................18, 22

*FTC v. E.M.A. Nationwide, Inc.,*
    767 F.3d 611 (6th Cir. 2014) .................................................................................................27

*Green v. Beer,*
    No. 06 Civ. 4156(KMW)(JCF), 2009 WL 911015 (S.D.N.Y. Mar. 31, 2009) .....................15

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935)...............................................................................................................30

*Int'l Fid. Ins. Co. v. La Porte Constr., Inc.,*
    No. 2:16-cv-00032, 2017 WL 876261 (D. Utah Mar. 3, 2017)..............................................14

*Integrated Bus. Techs., LLC v. Netlink Sols., LLC,*
    No. 16-CV-048-TCK-PJC, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016).........................10

*Koch v. Koch Indus., Inc.*,
   203 F.3d 1202 (10th Cir. 2000) ........................................................................10, 11

*U.S. ex rel. Lacy v. New Horizons, Inc.*,
   348 F. App'x 421 (10th Cir. 2009) ..........................................................................10

*Lewis v. Hermann*,
   775 F. Supp. 1137 (N.D. Ill. 1991) ..........................................................................17

*Licari v. Best W. Int'l, Inc.*,
   No. 2:11-cv-603, 2013 WL 3716523 (D. Utah July 12, 2013)................................15

*Myers v. Dr. Phil Org.*,
   No. 1:14-CV-007-TC, 2015 WL 476073 (D. Utah Feb. 5, 2015) ...................27, 28

*Myers v. United States*,
   272 U.S. 52 (1926)...................................................................................................29

*NLRB v. Canning*,
   573 U.S. 513 (2014).................................................................................................30

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16,
   2017), *on reh'g en banc,* 881 F.3d 75 (D.C. Cir. 2018) .........................................31

*Proctor & Gamble Co. v. Haugen*,
   222 F.3d 1262 (10th Cir. 2000) .........................................................................13, 14

*Reliance Steel & Aluminum v. Telling Indus., LLC*,
   No. 2:11CV369DAK, 2013 WL 594737 (D. Utah Feb. 15, 2013)..........................14

*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) ..............................................................................27

*Rochez Bros. v. Rhoades*,
   527 F.2d 880 (3d Cir. 1975)....................................................................................23

*SEC v. Blackburn*,
   No. 15-2451, 2015 WL 5307424 (E.D. La. Sept. 10, 2015)....................................19

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ................................................................................29

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ..................................................................................21

*St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*,
    309 F.3d 680 (10th Cir. 2002) ...........................................................................15

*UBS Bank USA v. Wolstein Business Enters., L.P.*,
    No. 2:08-cv-0911 CW-SA, 2011 WL 129868 (D. Utah Jan. 14, 2011) ..................16

*United States v. Dish Network, LLC*,
    75 F. Supp. 3d 942 (C.D. Ill. 2014) .................................................................20

*United States v. MacCollom*,
    426 U.S. 317 (1976)..........................................................................................32

*United States v. Realty Co.*,
    163 U.S. 427 (1896)..........................................................................................32

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) .......................................................................21

*United States v. Swingline, Inc.*,
    No. 71-C-1236, 1972 WL 596 (E.D.N.Y. July 11, 1972).......................................27

*Valdez v. Nat'l Sec. Agency*,
    228 F. Supp. 3d 1271 (D. Utah 2017)...............................................................7

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .........................................................................10

*Wiener v. United States*,
    357 U.S. 349 (1958)..........................................................................................30

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998) .....................................................................29

*Yocum v. Utah*,
    No. 1:16-cv-00098, 2017 WL 448586 (D. Utah Feb. 2, 2017)..............................27

**Constitution, Statutes, and Rules**

16 C.F.R. § 310.2 ..................................................................................................28

16 C.F.R. § 310.3 ...............................................................................................7, 17

16 C.F.R. § 310.4 ..............................................................................................5, 7, 28

60 FR 43842 (Aug. 23, 1995) ..................................................................................5

12 U.S.C. § 5481 ...........................................................................................................28

12 U.S.C. § 5491 ...........................................................................................................30

12 U.S.C. § 5497 ......................................................................................................29, 32

12 U.S.C. § 5531 .............................................................................................................7

12 U.S.C. § 5536 .........................................................................................................7, 16

12 U.S.C. § 5564 ...........................................................................................................25

15 U.S.C. § 1679 *et seq.*.................................................................................................5

Fed. R. Civ. P. 8 ....................................................................................................... *passim*

Fed. R. Civ. P. 9(b) .................................................................................................. *passim*

U.S. Const. art. I, § 8 ....................................................................................................32

U.S. Const. art. II, § 1 ...................................................................................................29

U.S. Const. art. II, § 3 ..............................................................................................28, 29

## Other Authorities

1 Joseph Story, *Commentaries on the Constitution of the United States*, § 531............................32

CFPB Bulletin 2012-03, *Service Providers*, *available at*
www.consumerfinance/gov/policy-compliance/guidance/supervisory-
guidance/compliance-bulletin-and-policy-guidance-2016-02-service-
providers/ .........................................................................................................................24

CFPB Compliance Bulletin and Policy Guidance: 2016-02, *Service Providers*,
*available at* www.consumerfinance/gov/policy-
compliance/guidance/supervisory-guidance/compliance-bulletin-and-policy-
guidance-2016-02-service-providers/ ...................................................................................24

*CFPB Monthly Snapshot Spotlights Credit Reporting Complaints*, CFPB (Feb. 28,
2017), *available at* https://www.consumerfinance.gov/about-
us/newsroom/cfpb-monthly-snapshot-spotlights-credit-reporting-complaints/ ........................2

*Consumer Response Annual Report January 1 - December 31, 2018*, CFPB
(March 2019), *available at*
https://files.consumerfinance.gov/f/documents/cfpb_consumer-response-
annual-report_2018.pdf...................................................................................................2

Respondent's Opposition to Petition for Writ of Certiorari, *State Nat'l Bank of
    Big Spring, et al., v. Munichin*, No. 18-307 (U.S. Dec. 10, 2018)..........................................31

Statement by Congresswoman Maxine Waters, Chairwoman of the House
    Financial Services Committee, at the Hearing Titled *Who's Keeping Score?*
    *Holding Credit Bureaus Accountable and Repairing a Broken System* (Feb.
    26, 2019), *available at*
    https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=
    402368..............................................................................................................................2

Statement of Commissioner Brill on the FTC's Sixth and Final Report to
    Congress Under Section 319 of the Fair and Accurate Credit Transactions Act
    of 2003 (Jan. 21, 2015), *available at* https://www.ftc.gov/public-
    statements/2015/01/statement-commissioner-brill-federal-trade-commissions-
    sixth-final-report ...............................................................................................................1

*What are common credit report errors that I should look for on my credit report?*,
    CFPB (June 8, 2017), *available at* https://www.consumerfinance.gov/ask-
    cfpb/what-are-common-credit-report-errors-that-i-should-look-for-on-my-
    credit-report-en-313/.......................................................................................................1

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Defendants move to dismiss the Complaint in its entirety, pursuant to Fed. R. Civ. P. 8, 9(b) and 12(b)(6), on the grounds that (a) Counts II-V fail to state a claim, including for failure to allege fraud with particularity; (b) Count I is barred, in part, by the applicable statute of limitations; (c) the allegations as to all of the Defendants other than Lexington Law are impermissibly grouped together and so no claim is stated against any of them, and the holding company defendant, PGX Holdings, is not the subject of any operative allegations; and (d) Plaintiff is an unconstitutionally-constituted agency, which has no authority or standing to sue in its present form.

## INTRODUCTION

According to a Congressionally-mandated study by the Federal Trade Commission, one in five consumers have "a potentially material error" on his or her credit report, which could prevent him or her from obtaining a car loan, insurance, a home, or even a job.[1]  These errors arise because of identity theft, incorrect reporting by credit providers, or other life circumstances, such as divorce, military service or medical debt.[2]  It is unfortunate but unsurprising, then, that Plaintiff Bureau of Consumer Financial Protection ("CFPB") has received over 250,000 complaints from consumers about errors, inaccuracies and confusion with their credit reports—

---

[1]  Statement of Commissioner Brill on the FTC's Sixth and Final Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 (Jan. 21, 2015), *available at* https://www.ftc.gov/public-statements/2015/01/statement-commissioner-brill-federal-trade-commissions-sixth-final-report.

[2]  *See What are common credit report errors that I should look for on my credit report?*, CFPB (June 8, 2017), *available at* https://www.consumerfinance.gov/ask-cfpb/what-are-common-credit-report-errors-that-i-should-look-for-on-my-credit-report-en-313/.

1

over 60,000 in the last year alone.[3]  Congress has taken notice because these errors materially

and negatively impact consumers' finances and lives—as the current House Financial Services

Committee Chair recently observed: "credit reports are routinely filled with errors that are

difficult for consumers to correct . . . [and which] directly impact" credit and employment

opportunities.[4]

Millions of consumers have sought assistance with this problem from Defendants and

their collective 3,000 employees.  For over 15 years, the Salt Lake law firm of Lexington Law

(that is, Defendant John C. Heath, PLLC), has educated its consumer clients around the country

on how to read, interpret and understand their credit report and credit score, helped them

challenge and seek correction of inaccurate information reported in their credit history, and

advised consumers on how to manage their credit profile.  Compl. ¶¶ 29, 9-15.  Since 2012,

consumers also have turned to Defendant CreditRepair.com for Internet-based assistance that

aids consumers' efforts to make sure their credit histories are accurate, fair, and substantiated.

Both Lexington Law and CreditRepair.com price their personalized credit repair services at an

affordable cost—as little as $79.95 per month (under contracts cancelable at any time, without

additional charges).  Compl. ¶¶ 125-126.

---

[3]  *See CFPB Monthly Snapshot Spotlights Credit Reporting Complaints*, CFPB (Feb. 28, 2017), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-monthly-snapshot-spotlights-credit-reporting-complaints/;*Consumer Response Annual Report January 1 - December 31, 2018*, CFPB (March 2019), *available at* https://files.consumerfinance.gov/f/documents/cfpb_consumer-response-annual-report_2018.pdf.

[4]  Statement by Congresswoman Maxine Waters, Chairwoman of the House Financial Services Committee, at the Hearing Titled *Who's Keeping Score?  Holding Credit Bureaus Accountable and Repairing a Broken System* (Feb. 26, 2019), *available at* https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=402368.

While consumers can and do find Lexington Law and CreditRepair.com on their own, many others are introduced with and through the assistance of other Defendants: Progrexion Marketing, Inc. (alleged to provide advertising and lead generation services for the two organizations), Progrexion Teleservices, Inc. (alleged to receive telephone calls and conduct outgoing telemarketing), or eFolks, Inc. (alleged to be a lead generator and telemarketer). Compl. ¶¶ 10-13.  Some of those introductions start after a third party (like a consumer mortgage, auto or other lender) identifies a potential consumer client, the client applies for a financial product or service, but the third party denies the consumer the requested product or service because of the consumer's credit history, and so that company recommends the consumer consider credit repair from Lexington Law or from CreditRepair.com.  Compl. ¶¶ 51-55.  These third parties are referred to in the Complaint as "marketing affiliates" and "Hotswap Partners" (*e.g.*, Compl. ¶¶ 24, 31-35), but they are third parties not owned or effectively controlled by any of the Defendants; for clarity, this motion will refer to them collectively as "introducers".

The advertisements for Lexington Law and CreditRepair.com describe their track record of success, one that has made them "two of the largest credit repair companies (sic) in the country" (Compl. ¶¶ 2, 28):  Lexington Law has helped over 500,000 clients with their credit profiles in the past year alone (Compl. ¶ 113); and consumers using CreditRepair.com's services for just 4 months have seen an average of 11.6 negative items removed from their report and a 40-point improvement in their TransUnion credit score.  Compl. ¶ 117.  CFPB does not dispute the truthfulness of how Lexington Law and CreditRepair.com describe their past successes for consumers.  CFPB also does not dispute that Lexington Law and CreditRepair.com do a good job, help consumers, and leave consumers very satisfied with their services.  It is telling, then,

3

that of the millions of consumers helped by Lexington Law and CreditRepair.com over the years, CFPB does not identify any complaint by any consumer and does not allege that the credit repair services were not delivered or that the introduction made to Defendants otherwise led to any actual consumer injury.

Instead, most of the Complaint, and four of the counts (Counts II-V), seeks to hold the "Progrexion" Defendants (not Lexington Law) liable for alleged misrepresentations allegedly made by independent third-party introducers *before any of those Defendants were involved or even knew of the consumer*.  The only detailed allegations of this alleged deceptive conduct are about what one introducer—dubbed in the Complaint as "HSP1"—allegedly said to consumers that it dealt with.  Specifically, the Complaint alleges that HSP1 held itself out falsely as a financing source, when it had no money to lend, and then introduced disappointed consumers to credit repair with overblown guarantees of success.  Compl. ¶¶ 74-85.[5]

Notably, whatever the truth or falsity of the Complaint, CFPB does not complain in the slightest about how any of the Defendants, particularly Lexington Law and CreditReport.com, treated those consumers referred for credit repair help.  In any event, as explained below, these fraud claims cannot be sustained against any party here—CFPB did not join (or, sue) HSP1— under either Rule 8 or Rule 9(b).  Defendants are not alleged to have made any deceptive statements, only one introducer (HSP1) is the subject of any specific allegations, and all of the allegations of deception are too vague to support relief.

---

[5] The Complaint does not inform the Court that none of the Defendants do business with HSP1 any longer.  Nor does CFPB point out that it has chosen not to sue or otherwise shut down HSP1, even though the Complaint expresses significant concern about that company.

The remainder of the Complaint, including the only claim against Lexington Law, is in Count I. That claim accuses Defendants of violating a sub-part of the FTC's Telemarketing Sales Rule known as the "advance fee" provision. Designed by the FTC over 25 years ago to protect against a breed of credit repair companies who promise unattainable success, the regulation generally provides that under certain circumstances when a telemarketer promises to remove derogatory items on a credit report it faces a six-month waiting period before it can collect its fee. 16 C.F.R. § 310.4(a)(2). The rule arises out of "bogus credit repair services" scams from many years ago (60 FR 43842, 43854 (Aug. 23, 1995)), where companies sold consumers on bogus promises to challenge credit report items successfully when, in fact, their contests were insubstantial and the challenged items were always quickly relisted by reporters on the consumer's credit history. As such, the rule has rarely been used in recent years. Instead, a federal statute enacted a year later, the Credit Repair Organizations Act (15 U.S.C. § 1679 *et seq.*), provides the fundamental guidelines for how credit repair companies can charge consumers. (Notably, CFPB makes no claim that Defendants violated that law, the sole federal statute that specifically and directly regulates credit repair.)

Neither Lexington Law nor CreditRepair.com, nor any Defendant, engage in the type of conduct or make the type of promises that would trigger the advance-fee rule. Indeed, Count I does not recite any such promises being made or allege that removed derogatory items are relisted by credit furnishers (i.e., are "reinserted") after Lexington Law and CreditRepair.com help consumers successfully challenge those items. Given the limits of a Rule 12 motion, Defendants do not independently move to dismiss Count I—other than to dismiss alleged conduct barred by the three-year statute of limitations—but will seek summary judgment on that

claim on a balanced factual record, if the Complaint otherwise survives.

Separately from the count-by-count analysis, two more broadly-applicable deficiencies in the Complaint require the dismissal of each of the Progrexion Company Defendants.[6]  First, CFPB pleads essentially all of its case as against "Progrexion Defendants" or "Progrexion," impermissibly lumping together the five Defendants other than Lexington Law because they are in the same corporate family.  This group pleading is impermissible and requires dismissal of each count, as the problem infects them all.  Compl. ¶ 9.  *See, e.g.*, ¶¶ 60-70, 129-167 (Counts I – V).  Second, and flowing from that same defect, the holding company, PGX Holdings Inc., is improperly joined because it is not alleged to have actually done anything (other than to be a holding company).  Compl. ¶ 9.

Finally, the Court should dismiss the action because the plaintiff, CFPB, is unconstitutionally-structured and so has no authority even to sue.  Even the Solicitor General and the Department of Justice agree that Congress violated the Constitution in its invention of the agency, which concentrates enormous power over a large segment of the economy in a single Director who sits outside of meaningful democratic control and cannot be removed except for cause.  This and other defects prevent the Bureau from maintaining this lawsuit.

The Complaint was filed on May 2, 2019.  Dkt. No. 2.  In accordance with this Court's order for extension of time (Dkt. No. 26), the Defendants file this Motion to Dismiss on July 19, 2019.

---

[6]  The Progrexion Company Defendants are Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC and CreditRepair.com, Inc..

6

# ARGUMENT[7]

**I.      THE COMPLAINT DOES NOT STATE A CLAIM THAT ANY OF THE PROGREXION COMPANY DEFENDANTS ENGAGED IN "DECEPTIVE ACTS" (COUNT II), MADE "FALSE OR MISLEADING STATEMENTS" (COUNT III), OR SUBSTANTIALLY ASSISTED THOSE WHO ALLEGEDLY MADE MISREPRESENTATIONS (COUNTS IV AND V).**

The entire Complaint, except Count I, consists of related claims of deceptive conduct for which CFPB seeks relief under its organic statute, the Consumer Financial Protection Act, 12 U.S.C. §§ 5531 and 5536 ("CFPA"), or under a Federal Trade Commission regulation that the CFPB can enforce, the Telemarketing Sales Rule, 16 C.F.R. §§ 310.3 and 310.4 ("TSR").  In relevant part, both the CFPA and the TSR generally prohibit deceptive acts or practices.  12 U.S.C. § 5536; 16 C.F.R. § 310.3.  Count II (under the CFPA) and Count III (under the TSR) assert claims against the "Progrexion Defendants" for allegedly engaging directly in deception.  Count IV (under the CFPA) and Count V (under the TSR) seek to hold the "Progrexion Defendants" liable for rendering substantial assistance to introducers' alleged deceptive conduct, under provisions in each law that recognize indirect liability for certain types of substantial assistance to another.  12 U.S.C. § 5536(a)(3); 16 C.F.R. § 310.3(b).

The Complaint relies entirely on only two alleged actionable statements.  Neither concern things like representations about the credit repair services themselves, or their quality and cost, or the qualifications of Lexington Law or CreditRepair.com.  Instead, both purported representations entirely concern only the availability to the consumer of *the introducer's*

---

[7] To the extent the CFPB alleges specific facts underlying its legal claims, the Court is required to accept them as true solely for purposes of the motion to dismiss stage. *See Valdez v. Nat'l Sec. Agency*, 228 F. Supp. 3d 1271, 1274 (D. Utah 2017). Accordingly, Defendants save their (numerous) factual disputes with the CFPB's allegations for a later stage, if necessary.

financial product: (1) that the product offered by the introducer was not, in fact, available at all, and (2) that the offered product was guaranteed to become available, or had a high likelihood of becoming available, if the consumer availed herself of credit repair services.  Compl. ¶¶ 138 (Count II), 147 (Count III), 157 (Count IV), 164 (Count V).

As we explain now, each of these causes of action must be dismissed in their entirety.

### A.   There Can Be No Recovery Under Counts II-V Based On The Conduct Of, Or With Respect To, Unnamed Introducers.

While the Complaint purports to be far-reaching, including asserting that Defendants had an entire customer referral program that was "deceptive," (Compl. at 20), CFPB does not allege *specific* acts by any introducer other than HSP1, and does not allege any specific acts by the Defendants with relation to any *specified* introducer other than HSP1.  Tellingly, the Complaint all but expressly admits that CFPB does not have any facts that enable it to challenge any introducer relationship other than HSP1: alleging, in paragraph 71 at the start of the Complaint's section on alleged deception by introducers, "[a]t least one, if not more, of Progrexion's Hotswap Partners have made misrepresentations to consumers."  Compl. ¶ 71.  Elsewhere, the Complaint continually refers to underlying violations by "at least one affiliate" (i.e., introducer) without ever naming any of them other than HSP1.  Compl. ¶¶ 93, 138, 141, 147, 150, 155-57.  Rule 9(b) (and Rule 8) do not permit CFPB to rely in its allegations of deceptive conduct upon the acts of unnamed entities or upon non-specific conduct and transactions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Cannon v. PNC Bank, N.A.*, No. 2-15-cv-00131-BSJ, 2016 WL 9779290, at *8 (D. Utah Aug. 31, 2016) (Jenkins, J.) (allegations that "unnamed individuals at [defendant] 'instructed' Plaintiff's 'agent' . . . fail to satisfy the pleading requirements for fraud" under Rule 9(b)).  Accordingly, Counts II-V do not

state a claim to the extent any are based on the conduct of, or with respect to, any introducer

other than HSP1.

**B.     Counts II and III Assert Direct Liability, But Do Not Identify Any Specific
        Actionable Statements By One Of The Defendants.**

CFPB's allegations that "the Progrexion Defendants" engaged in deceptive acts, in

violation of the CFPA (Count II), and made misleading statements to induce consumers to

purchase credit repair, in violation of the TSR (Count III), are without substance.  While each of

the CFPA and TSR do prohibit deception in certain ways, neither is implicated as to any of the

Defendants, principally because there are no specific allegations that any of them made

misstatements.  Dismissal is required.

**1.     The Complaint Does Not Allege Liability for Any Statement by Any
        Defendant.**

CFPB does not state a claim for deceptive conduct by any of the Defendants because it

does not actually allege that any of them actually made *any* statements about the availability of

the introducer's financial product or provided any sort of guarantee.  In both counts, the

Complaint offers no substance at all as to what the Defendants actually did, only vaguely

alleging "the Progrexion Defendants, directly or through at least one affiliate, acting on

Progrexion's behalf and for its benefit" made both statements "expressly or by implication".

Compl. ¶¶ 138, 147.  This does not actually say that Defendants did anything deceptive, but

instead hides behind the disjunctive "or" in identifying the speaker of the fraud and then throws

in the catchall that statements were made (by someone) either expressly or impliedly.  In doing

so, the CFPB has failed to plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Burnett v. Mortg. Elec.*

*Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted).  Counts II and III do not provide a short plain statement that alleges a plausible liability theory of deception against the Defendants, and thus should be dismissed.  Fed. R. Civ. P. 8; *Twombly*, 550 U.S. at 570.

Moreover, because the Complaint's allegations concern alleged false statements, Rule 9(b)'s heightened pleading requirements apply.  Fed. R. Civ. P. 9(b); *CFPB v. Prime Mktg. Holdings, LLC*, No. CV 16-07111-BRO (JEMx), 2016 WL 10516097, at *6 (C.D. Cal. Nov. 15, 2016) (applying Rule 9(b) to CFPB deceptive practices claim, including misrepresentations about guarantees); *see also Integrated Bus. Techs., LLC v. Netlink Sols., LLC*, No. 16-CV-048-TCK-PJC, 2016 WL 4742306, at *4 (N.D. Okla. Sept. 12, 2016) (applying Rule 9(b) to claim that defendant made false statements about a competitor's product); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (citation omitted) (applying Rule 9(b) to any claim that "is said to be 'grounded in fraud' or to 'sound in fraud'").  The Complaint's allegations fall far from meeting the Rule's requirements for specific allegations of the "who, what, when, where, and how" of an alleged fraud.  *U.S. ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 424 (10th Cir. 2009) (citation omitted).  For example, the allegations do not even identify the "Progrexion" Defendant that made either alleged misrepresentation, and instead lumps the five Progrexion Company Defendants under one "defendants" umbrella.  That alone violates Rule 9(b) and requires dismissal.  *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1237 (10th Cir. 2000) (affirming judgment for defendant under Rule 9(b) where the complaint "failed to identify any specific Defendant who made these alleged fraudulent misrepresentations or omissions"); *Cannon*, 2016 WL 9779290, at *8.  Further, the allegations are fatally non-specific to the extent they seek to hold Defendants liable for misrepresentations by an "affiliate" because that too does

10

not sufficiently identify the person who allegedly engaged in the deception.  Compl. ¶¶ 138, 147.

Then, by relying on the assertion that the representations may have been made "by implication"

the Complaint is further muddied.  *Id.*  Rule 9(b) requires much more of the "who, what, when,

where, and how" to state a claim against the Defendants.

      The rest of the Complaint does not add appreciably to specificity of the charges of

deceptive acts and practices allegedly committed by Defendants.  The Complaint provides no

actionable allegations that any Defendant made an express representation, at a specified point in

time, at a specified place, to a consumer, to the effect either that (a) HSP1 (or anyone else)

actually had a product available to the consumer or (b) that credit repair was more or less

guaranteed to enable the consumer to obtain that product.

      The only allegations in the Complaint about what "Progrexion" or CreditRepair.com

represented to consumers appear in paragraphs 56-58, 117-118, and 120-121.  With the

exception of statements attributed in paragraph 117 to CreditRepair.com, the allegations are

general in nature.  And those in paragraph 117 do not address the availability of an introducer's

products and are not promises by CreditRepair.com that its services would guarantee the

consumer would obtain a product or service from the introducer.  Tellingly on this front, the

Complaint never even suggests CreditRepair.com had any connection to HSP1, which is the

Complaint's entire underlying theory as to all Progrexion Company Defendants.

      The barebones allegations offer no specificity on the issue of when, where and how a

Progrexion Company Defendant's own statements were false, and so cannot suffice to establish

direct liability.  Rule 9(b) thus requires dismissal.  *Koch*, 203 F.3d at 1237 (complaint's broad

allegations that alleged "misrepresentations were made 'during 1982 and continuing to the

present time,'" failure "to mention at all the place at which any misrepresentations were made,"

and recitation of "a general statement that the Defendants 'fail[ed] to disclose the existence,

location, ownership, condition and true value of [KII] assets and property,'" did not meet Rule

9(b) pleading requirements); *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, No. 12-cv-

00381-DB, 2015 WL 9412537, at *4-5 (D. Utah Dec. 22, 2015) (complaint that "fail[ed] to

identify, beyond sweeping generality, any individual who made a false statement," made

"general allegations of the timing of Defendants' illicit activity" over an eight-year period

"implicat[ing] a multitude of transactions," and alleged only that Defendants "have been

shipping 'banned U.S. beef products'" internationally but "d[id]n't identify the specific type of

beef shipped," failed to meet Rule 9(b)'s requirements).

### 2. There Is No Viable Basis For Any Indirect Liability, But Even If There Were The Complaint Does Not State A Claim.

The Complaint also appears to allege that the Progrexion Company Defendants are liable

indirectly, because they made one or both statements "through at least one affiliate, acting on

Progrexion's behalf and for its benefit."  Compl. ¶¶ 138, 147.  There is no legal basis for holding

any Defendant liable on such a theory.  Neither Section 5531 of the CFPA (at issue in Count II),

nor Section 310.3(a)(4) of the TSR (at issue in Count III), allow for liability on an indirect basis

or where one is the beneficiary of someone else's conduct.  Instead, potentially-liable parties are

spelled out in great detail in the CFPA (defining liability based on whether one is a "covered

person," "related person," or "service provider") and the TSR (defining liability based on

whether one is a "telemarketer" or "seller").  If the Defendants could be held indirectly liable in

Counts II and III on a derivative or beneficiary basis, then the intent of Congress and FTC in

framing quite-exacting party liability rules for the CFPA and TSR would be frustrated.  *See Cent.*

*Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (no

aiding and abetting liability when Congress defined the scope of liability and potential party

defendants); *Fed. Election Comm'n v. Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018)

(following *Central Bank of Denver* and holding that "the government cannot infer secondary

liability when the statute in question is silent on that subject").  Unless and until there is a law or

regulation that creates "beneficiary liability" under similar circumstances, the Complaint does

not state a claim to recover for conduct by third parties who purportedly were "acting on [the

defendant's] behalf and for its benefit."

 Elsewhere in the Complaint, CFPB tries something similar by asserting in a wholly-

conclusory fashion that HSP1 and other introducers are agents of the Defendant Progrexion

Marketing.  Compl. ¶ 25.[8]  To the extent Counts II and III seek to use that allegation to hold that

Defendant liable as principal, it fails for the same reason: neither the CFPA nor the TSR embrace

agency liability.

 Even if Defendants could be liable under an agency theory, CFPB still fails to state a

claim.  Agency is a matter of appointment, and can be based on a grant of express or implied

authority.  *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1278 (10th Cir. 2000).  "Express

authority exists whenever the principal directly states that its agent has the authority to perform a

particular act on the principal's behalf."  *Id.* (citing *Zions First Nat'l Bank v. Clark Clinic Corp*.,

762 P.2d 1090, 1094–95 (Utah 1988)).  Implied authority, by contrast, arises when "the

performance of certain business is confided to an agent" and includes "by implication authority

---

[8] Because the Complaint does not make any allegations that any of the other Progrexion
Company Defendants were HSP1's principals, Defendants only address the CFPB's vague
agency theory as to Progrexion Marketing.

to do collateral acts which are the natural and ordinary incidents of the main act or business authorized."  *Id.*  Here, as to either type of authority, CFPB does not identify any circumstance where Progrexion Marketing appointed HSP1 or any other introducer to make statements about that introducer's products or their availability "on its behalf."  *Int'l Fid. Ins. Co. v. La Porte Constr., Inc.*, No. 2:16-cv-00032, 2017 WL 876261, at *6 (D. Utah Mar. 3, 2017) (stating that the instructions must state "that the act under scrutiny is to be done") (quoting 2A C.J.S. *Agency* § 147 (2016)).  The Complaint does not allege a single instance where Progrexion Marketing inserted itself into HSP1's own offerings, or how it described those offerings, or as to whether and under what circumstances those offerings would be or become available.  Since those are the only type of alleged misrepresentations at issue, agency issues cannot save the Complaint.

There is also no claim that could be premised on an implied grant of authority for the further reason that the Complaint alleges only that Progrexion Marketing suggested to HSP1 (and other introducers) how it might describe Lexington Law and CreditRepair.com's services to consumers should the introducer choose to do so.  *See, e.g.*, Compl. ¶¶ 48, 50, 52.  Even taking that as true, HSP1's alleged (mis)descriptions of its own products and their availability certainly are not "incidental to, or necessary, usual, and proper" to the making of statements about credit repair availability.  *Reliance Steel & Aluminum v. Telling Indus., LLC*, No. 2:11CV369DAK, 2013 WL 594737, at *3 (D. Utah Feb. 15, 2013) (citation omitted).  And even if it was, there is no basis to find plausible that Progrexion Marketing impliedly authorized HSP1 (or any other introducer) to act corruptly, by for example misrepresenting the introducer's products or whether those products would be delivered.  *See, e.g.*, *Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2

14

F.3d 347, 352 (10th Cir. 1993) (where agent had actual authority to consign a painting, he did not have actual authority to misdirect the consignment).[9]

Moreover, any claim of agency is deeply flawed because the Complaint has no allegations to suggest that Progrexion Marketing in any sense controlled HSP1 or any introducer. *Green v. Beer*, No. 06 Civ. 4156(KMW)(JCF), 2009 WL 911015, at *11 & *n.22 (S.D.N.Y. Mar. 31, 2009) (dismissing agency claim as it did not "allege any facts from which the Court could infer . . . that [one party] controlled [the other's] fraudulent actions"). Above all, the hallmark of agency is the appointment of an agent and the exercise or right of control by the principal. *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." (quoting Restatement (Second) of Agency § 1)); *CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532, 1540 (D. Utah 1993), *aff'd sub nom. CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996) ("[A] necessary precondition to the establishment of an agency relationship is that the principal have control over the conduct and activities of the agent."). Here, no such control or right of control is alleged.

---

[9] To the extent a third party could assert that one party acts with apparent authority of another, potentially leading to derivative liability of the apparent principal, that is not relevant here. The alleged misstatements made by the putative agent, HSP1 (or another introducer), are made before any of the Defendants are even introduced to the consumer. As such, the Complaint fails to identify the first element to apparent authority—that the putative principal has done something that "causes third parties to believe that the agent is clothed with apparent authority," *Licari v. Best W. Int'l, Inc.*, No. 2:11-cv-603, 2013 WL 3716523, at *11 (D. Utah July 12, 2013) (citation omitted), such that "it is reasonable for the third person dealing with the agent to believe the agent is authorized" to act on the principal's behalf. *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) (quoting Restatement (Second) of Agency § 8, Comment c).

15

In a larger sense, the Complaint does not overcome the inherent implausibility of an agency theory that would make Progrexion Marketing liable for how HSP1 marketed its own loan products.  Simply put, it is nonsensical to assert that HSP1 marketed its own products on Progrexion Marketing's "behalf" or under Progrexion Marketing's control.  Companies do not customarily rely on the authority of independent entities to make their own sales.  *See UBS Bank USA v. Wolstein Business Enters., L.P.*, No. 2:08-cv-0911 CW-SA, 2011 WL 129868, at *12 (D. Utah Jan. 14, 2011).  The Complaint's sparse, conclusory allegations do nothing to overcome this implausibility, and the CFPB does not satisfy its burden of alleging facts to support its claim.

**C.      The Claims for Substantially Assisting HSP1's Allegedly Deceitful Acts In Violation of the CFPA (Count IV) or TSR (Count V) Should Be Dismissed Because the Complaint Does Not Allege that Any Progrexion Company Defendant Knew HSP1 Deceived Consumers and Does Not Plead Substantial Assistance.**

In addition to claiming that the Progrexion Company Defendants directly violated the CFPA and the TSR as charged in Counts II and III, Plaintiff restates these claims as ones for "substantial assistance" in Counts IV and V, asserting that the Progrexion Company Defendants substantially assisted HSP1 in its violations of the CFPA and the TSR respectively.  These claims fare no better.

Under the CFPA,

> It shall be unlawful for . . . any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title [which include the prohibition on deceptive practices] . . .

12 U.S.C. § 5536(a)(3).  The TSR states that it is a deceptive act or practice "to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that

16

violates §§ 310.3(a), (c), or (d), or § 310.4 of this Rule."  16 C.F.R. § 310.3(b).  Courts have

determined this type of liability requires (1) a primary violation, (2) a culpable state of mind, and

(3) "substantial assistance" of the primary violation.  *CFPB v. Universal Debt & Payment Sols.,*

*LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *15 (N.D. Ga. Mar. 21, 2019) (CFPA);

*Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 621 (5th Cir. 1993) (emphasis added) (citation omitted)

("To establish liability, the plaintiff must show (1) that the primary party committed a [] 

violation; (2) that the aider and abettor had 'general awareness' of its role in the violation; and

(3) that the aider and abettor knowingly rendered 'substantial assistance' *in furtherance* of it.").[10]

"A boilerplate allegation . . . that a defendant 'knew or acted in reckless disregard' of the alleged

fraud will not suffice to state a claim for aiding and abetting."  *Lewis v. Hermann*, 775 F. Supp.

1137, 1153 (N.D. Ill. 1991) (citation omitted) (discussing the analogous provisions of the

Securities and Exchange Act).  None of the elements are met here.

### 1. CFPB Has Not Pled That Any of the Defendants Had a Culpable State of Mind About HSP1's Alleged Bad Acts.

The CFPB fails to allege a substantial assistance claim because the Complaint alleges no

specific facts (none) to meet the requisite scienter.  Under the CFPA, the allegations must show

that each relevant Progrexion Company Defendant had at least a "'general awareness' of the

roles they were playing in the primary [violation] and that they knowingly contributed to it."

*Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *15 (internal quotation marks and

---

[10] *Abbott* involves an analogous substantial assistance provision under the Securities & Exchange Act of 1934.  *Id.*  Several courts interpreting substantial assistance liability claims have looked to cases applying this Securities and Exchange Act provision. *CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-00859-RWS, 2015 WL 11439178, at *7 (N.D. Ga. Sept. 1, 2015) (holding that § 20(e) of the Securities and Exchange Act of 1934 is similar to the CFPA's substantial assistance provision, and applying the same scienter standard); *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 771-72 (S.D.N.Y. 2018) (same).

17

citation omitted).  The TSR is even stricter, requiring proof that a defendant knew or consciously

avoided knowing of the deceptive conduct that is the subject of the suit.  *FTC v. Chapman*, 714

F.3d 1211 (10th Cir. 2013).  Rule 9(b)'s specificity requirements apply to any substantial

assistance claim where the primary violation sounds in fraud, as it does here.  *Prime Mktg.*

*Holdings*, 2016 WL 10516097, at *6 (CFPA claim).  Despite that requirement, the Complaint

largely parrots the knowledge elements of the CFPA and TSR—"[t]he Progrexion Defendants

had the requisite knowledge of or reckless disregard for the deceptive conduct" (Compl. ¶ 159);

"[t]he Progrexion Defendants knew or consciously avoided knowing that the affiliate made false

or misleading statements" (Compl. ¶ 166)—or just baldly asserts knowledge—"Progrexion also

had knowledge that HSP1 did not offer or provide the products and services it advertised".  *Id*.

¶ 100.  Conclusory allegations are not enough to move the substantial assistance claim across the

line from possible to plausible.  *Twombly*, 550 U.S. at 555 ("a formulaic recitation of the

elements of a cause of action will not do.").

　　　　Where the Complaint does a little more, it does not plausibly allege that any Progrexion

Company Defendant knew that HSP1 lied to people about fictitious lending products and made

guarantees.  Those allegations of scienter appear interspersed among ¶¶ 86-108 of the Complaint.

Many of them are wholly conclusory or refer generally to knowledge by an unidentified

Defendant about alleged conduct of an unidentified introducer.  *E.g.,* Compl. ¶¶ 90, 92-93, 96,

98, 105-107.  Thus, none of them support CFPB's attempt to state a claim in Counts IV and V.

　　　　For example, the CFPB allegations in paragraph 107 fail to demonstrate knowledge that

HSP1 claimed to offer products that were in fact fictitious.  It alleges:

> [I]n a December 2014 email, Progrexion's Senior Director of Compliance
> reported that "[m]any [clients] have claimed that [a marketing affiliate] is

18

guaranteeing loan approval as long as they sign up for Lexington's services." In response, one of Progrexion's marketing directors noted that the affiliate "is one of our largest Hotswap Partners" and that the company had previously heard the same complaint before.

The deficiencies of this allegation are many.  On its face, it fails to meet the specificity standards of Rule 9(b), omitting the particulars of the alleged primary violation and knowledge by an identified Defendant.  Nor does this passing vignette even set forth an example of the charged deceptive practice—the Complaint's allegations that consumers were told products were available when they were not and that guarantees were made that were not delivered upon.

The allegations that immediately precede paragraph 107 are a good further example.  In ¶¶ 105-06, CFPB alleges that "Progrexion was aware that other Hotswap Partners marketing rent-to-own housing engaged in questionable marketing activities" and making "implicit guarantees" based on a single email sent by an unnamed employee of an unspecified Progrexion Company Defendant.  But this allegation fails to specify who made this statement, which Progrexion entity the person worked for and the position the person held, which Hotswap Partner the email discussed, or the precise nature of the "questionable marketing activity."  *SEC v. Blackburn*, No. 15-2451, 2015 WL 5307424, at *9 (E.D. La. Sept. 10, 2015) (applying heightened pleading standard and dismissing aiding and abetting claim under the Securities and Exchange Act when complaint "fail[ed] to allege sufficient facts to show Schlesinger's general awareness and knowing substantial assistance"); *see also Cannon*, 2016 WL 9779290, at *8 (citation omitted) (dismissing claim for failure to "state with the particularity required under Rule 9(b) the 'circumstances constituting the fraud'").

The remaining allegations fare no better. Although they each concern HSP1, none specify an instance where someone at a Progrexion Company Defendant knew that HSP1 lied about the existence of fictitious loans or guaranteed their delivery.[11]

One set of allegations concern supposed "falsehoods" on HSP1's website and in ads, which "Progrexion" monitored and was concerned about. Compl. ¶¶ 87-89. The allegations, however, are vague and generic. CFPB says "Progrexion" knew "HSP1 used the fake ads described in Paragraph 79(c)" but the Complaint does not 'describe' such ads such as required by Rule 9(b)—it simply says "HSP1's ads offered housing that was not actually available." *Id.* at ¶¶ 79, 89. *See United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1020 (C.D. Ill. 2014) (granting summary judgment to Defendant on substantial assistance claim under TSR when "evidence does not support the inference that Dish avoided knowing that Dish TV Now was abandoning calls and does not support the inference that Dish continued to pay Dish TV Now to make abandoned calls"). No details are offered about "who" knew "what" about the truth of the advertisements, and how, which frustrates both Rule 9(b) and Rule 8.

Separately, the Complaint claims eFolks had knowledge that HSP1 did not offer certain unspecified rent-to-own products because HSP1 purportedly did not collect location information for some "leads." The allegation is utterly irrelevant because it has nothing to do with the rest of the Complaint—which is based on consumers who were referred to credit repair by a direct call transfer from HSP1 (Compl. ¶¶ 54-55), and not "leads" eFolks needed to call on its own. As such, the Complaint's allegations of misrepresentations (the primary violation) are disconnected

---

[11] While scienter does not always require "knowledge" per se, the Complaint rests on allegations of actual knowledge. This Motion addresses scienter as it has been pled.

to this circumstance.  Along with the failure to allege what eFolks knew about the consumer-HSP1 relationship and how the "lead" was generated, the causes of the missing data, and other relevant facts mean this allegation falls short of the mark in alleging the requisite knowledge of alleged misconduct by HSP1.

The final example of scienter concerns the Complaint's allegations about HSP1's "90-Day Blitz" campaign, but this too fails to allege facts supporting scienter of HSP1's offer and guarantee of allegedly fictitious products.  Compl. ¶ 94.  Commenting on the 90-day blitz, a Progrexion employee allegedly noted that many clients might need more than "3 months of credit repair" and so HSP1 might be "setting 'unreal expectations.'"  *Id.*  Whatever the significance of that exchange, none of it has anything to do with this case: the alleged primary violations are purported promises that HSP1's products were not even available and that those products would become available after credit repair was provided.  The 90-day blitz allegations bear no relation to that alleged deceptive practice.  Instead, there is a complete disconnect between the employee's knowledge (that a client might need more than 90-days credit repair) and the alleged primary violation (HSP1 lied about the existence of fictitious loans).

Aside from all of these deficiencies, scienter must be pled separately as to each Defendant.  *Universal Debt & Payment Sols., LLC*, 2015 WL 11439178, at *2.  And knowledge must be pled as to an employee of that Defendant who provided substantial assistance to HSP1's behavior, because a theory of "collective knowledge" does not (and should not) support a substantial assistance claim.  *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1273–75 (D.C. Cir. 2010) (vacating False Claims Act judgment against defendant; "'collective knowledge' provides an inappropriate basis for proof of scienter"); *Southland Sec. Corp. v.*

*INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366-67 (5th Cir. 2004) (rejecting theory of "corporate scienter" and applying "general common law rule" that "the required state of mind must actually exist in the individual making . . . the misrepresentation, and may not simply be imputed to that individual on general principles of agency"). That this Complaint does neither is an independent basis to dismiss Counts IV and V. *See* Compl. ¶¶ 86-108 (alleging "Progrexion's" knowledge of HSP1's deceptive practices).

### 2. The Complaint Does Not Allege That Any Progrexion Company Defendant Provided Substantial Assistance in Furtherance of HSP1's (Or Any Other Introducer's) Alleged Misconduct.

Counts IV and V also fail to state a claim for substantial assistance because the allegations do not plausibly show how any Defendant furthered the alleged fraud—the introducer's misstatements that products were actually being offered and that the products were guaranteed to become available to the particular consumer after credit repair had been pursued. "[I]n order to prove substantial assistance against a defendant, the CFPB must establish 'that [the Defendant] in some sort associated himself with the venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed.'" *Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *6 (CFPA) (*quoting SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012); *see also FTC v. Chapman*, 714 F.3d at 1216 (upholding TSR substantial assistance claim where defendant was "integral" to scheme because she provided the products and services, worked directly to support marketing efforts, and was aware of government concerns but did nothing). In contrast to these standards, the Complaint alleges that the Progrexion Company Defendants, without specifying which one, "substantial[ly] assist[ed]" HSP1 by doing four things: "providing advice and content for the affiliate's

telemarketing scripts, advice regarding its websites and other marketing vehicles, the means and

mechanisms for live-transferring consumers between the affiliate and Progrexion, and payment

for each lead that resulted in a Lexington Law or CreditRepair.com sale."  Compl. ¶ 158.

These allegations (and the related ones made earlier in the pleading) are insufficient to

support either Count IV or V because they do not show how any of this purported assistance was

in furtherance of the challenged conduct: HSP1's alleged misrepresentations about its products.

*Rochez Bros. v. Rhoades*, 527 F.2d 880, 888 (3d Cir. 1975) (affirming no aiding and abetting

liability under the Securities and Exchange Act when there was "no evidence that shows [the

primary violator] used [defendant's] 'facilities, premises or personnel' *to further* the fraud")

(emphasis added).  The Complaint does not allege, for example, that any Defendant approved

scripts, websites, or other "marketing vehicles" containing the purported lies or even any

representations about HSP1's products or their availability.[12]  The pleading does not even

explain whether and how HSP1 found the "advice" it was given of any assistance whatsoever.

On its face, the Complaint does not demonstrate any manner in which Defendants substantially

assisted the fraud.

The allegations of substantial assistance are deficient for the further reason that they are

jarringly inconsistent with repeated, public admonitions from CFPB.  In a series of guidance

materials, CFPB has explicitly instructed companies that have third-party relationships that they

should monitor those third parties' contacts with consumers, review the third parties' training

_____

[12] The claim that accepting introductions to possible customers or paying for them is a form of
substantial assistance is wholly in-substantial and without logic.  There is nothing in the CFPA or
the TSR that sanctions a lawsuit against a recipient of consumer referrals or of "leads" simply
based on the fact that the recipient answered the phone or paid for the introduction.  Here, of
course, there is even less reason to entertain such an assertion because there is no sufficient
allegation that Defendants knew of misdeeds by an introducer (if such was actually true).

and marketing materials, and "[t]ak[e] prompt action" with the third parties to address any issues

observed.  CFPB Compliance Bulletin and Policy Guidance: 2016-02, *Service Providers*; CFPB

Bulletin 2012-03, *Service Providers* (each available at www.consumerfinance/gov/policy-

compliance/guidance/supervisory-guidance/compliance-bulletin-and-policy-guidance-2016-02-

service-providers/).  Incredibly, the Complaint nevertheless alleges Defendants are liable for

providing "substantial assistance" in the form of, among other things, "providing advice and

content for the affiliate's telemarketing scripts [and] advice regarding its websites and other

marketing vehicles."  Compl. ¶ 158.  The Bureau simply cannot have it both ways.  It cannot be

that when Defendants allegedly provided input to introducers, in compliance with CFPB's

Bulletins, they unwittingly subjected themselves to being sued for being too close to the

introducer.  To harmonize CFPB's allegations and its policy demands, the "substantial

assistance" test must mean more than what is alleged here.  The test should require allegations

that the defendant knew there was a fraud (or other misconduct) and chose to help it along with

assistance that was substantial.  Otherwise, ordinary due diligence and good compliance conduct

of the type CFPB commands outside of court would be enough to put even the most well-

meaning company into legal jeopardy.

*        *        *

In sum, Counts II-V must be dismissed against the Progrexion Company Defendants

because (a) liability cannot lie for the conduct of unidentified introducers; (b) there are no

actionable statements by any of the Defendants to permit liability for deceptive conduct under

Counts II and III, indirect liability is not permissible and agency liability is not adequately

alleged for those counts; and (c) the complaint fails to sufficiently plead any Defendant

24

knowingly provided substantial assistance to support a claim under either the CFPA or TSR in Counts IV and V.

## II.   COUNT I SHOULD BE DISMISSED AS TO ANY CONDUCT THAT OCCURRED BEFORE MARCH 8, 2016 AS UNTIMELY.

The CFPA limits the time period within which the CFPB may bring claims to three years from the date of discovery of the alleged violation.  12 U.S.C. § 5564(g)(1).  Although the CFPA provides that claims under laws for which authorities were transferred, as with the TSR, may be brought in accordance with those laws' requirements, the TSR does not include its own statute of limitations and the CFPB has acceded to the application of a three-year limitation to TSR claims. *See, e.g.*, *CFPB v. Howard*, No. 8:17-cv-00161-JLS-JEM, 2018 WL 4847015, at *2-3 (C.D. Cal. May 3, 2018) (CFPB disputing whether Section 5564(g)(1) applied to TSR claim, but limiting its claims to violations occurring within three years of complaint); *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106-RS, 2017 WL 3948396, at *10 (N.D. Cal. Sept. 8, 2017) (assuming application of three-year statute of limitations for TSR claim).  Thus, the same three-year statute of limitations applies to each of the CFPB's claims.

Despite the limitation period, the Complaint is not limited to conduct from and after three years prior to the filing of the Complaint (*i.e.*, May 2, 2016); instead, CFPB relies on allegations of acts dating back at least to 2012.  *E.g.*, Compl. ¶¶ 74, 75, 79, 120, 129; *see also* ¶¶ 107 (purporting to describe a "December 2014" email); 70 (purporting to describe a "December 9, 2015" email). The CFPB fails to plead when it "discovered" the alleged violations, much less that it did not know about them over three years ago.  Thus, it pleads no grounds for challenging such a wide time period of conduct.  Because the Complaint was filed on May 2, 2019, and

taking the brief tolling period[13] into account, only conduct after March 8, 2016 falls within the statute of limitations.

## III.     THE COMPLAINT RESTS ON IMPERMISSIBLE GROUP PLEADING.

Under each of the five counts, the Complaint consistently elides or obscures which party it alleges to have violated the TSR (in Count I) or which Progrexion Company Defendant allegedly engaged or assisted in misstatements under the CFPA and TSR (under Counts II-V). For example, with respect to the TSR advance fee claim, the Complaint repeatedly alleges that customers were charged, but in most of these instances the Complaint merely alleges this was done by "Progrexion" or "Defendants." *See* Compl. ¶¶ 4, 123, 126-28, 133. This pleading by aggregation is even more pervasive as to Counts II-V, which refer collectively to "the Progrexion Defendants" engaging in actionable conduct (Compl. ¶¶ 136-167), and the earlier underlying allegations related to those counts (*id*. ¶¶ 28-108) that in most instances adopt the same vague collective allegations. The arguments made elsewhere in this brief respectively point this out.

This type of "group pleading" is impermissible and requires the dismissal of all five causes of action, which each rest on collective allegations. The purpose of Rule 8's requirement of a "short and plain statement of the claim" is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citations omitted). However, where a complaint relies on "use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular . . . acts they are

---

[13] In this case, the CFPB entered into tolling agreements with Defendants to suspend the running of the statute of limitations as of March 8, 2019. Thus, the three-year period should run from March 8, 2016.

alleged to have committed." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008); *see also Yocum v. Utah*, No. 1:16-cv-00098, 2017 WL 448586, at *3 (D. Utah Feb. 2, 2017) (dismissing claim for group pleading because "it is simply not plausible that all of the numerous defendants simultaneously" engaged in the alleged conduct).[14]

The Complaint's reliance on group pleading creates a particular concern as to PGX Holdings, a passive holding company to which no conduct has been attributed. Compl. ¶ 9. Courts routinely dismiss holding or parent companies absent clear allegations that the remote entity actually participated in the relevant conduct. *See, e.g.*, *Myers v. Dr. Phil Org.*, No. 1:14-CV-007-TC, 2015 WL 476073, at *3 (D. Utah Feb. 5, 2015) (dismissing corporate parent; "nothing in the proposed complaint would lead the court to stray from the well-settled legal proposition that a corporation is not liable for the acts of its subsidiary"); *United States v. Swingline, Inc.*, No. 71-C-1236, 1972 WL 596, at *2 (E.D.N.Y. July 11, 1972) (dismissing parent company, as no evidence it had done "anything"). Because the Complaint impermissibly relies only on group pleading and makes no allegations that PGX Holdings undertook any conduct whatsoever, that entity cannot not possibly be liable and should be dismissed.

PGX Holdings should be dismissed in any event because it is not subject to either the CFPA or the TSR. The CFPA in relevant part applies to a "covered person," which is "any

---

[14]  The CFPB exacerbates the defect, rather than cures it, by baldly asserting that PGX Holdings, Progrexion Marketing, Progrexion Teleservices, eFolks, and CreditRepair.com constitute a "common enterprise" that is jointly and severally liable for each other's actions. Compl. ¶ 19. This threadbare allegation falls flat because the common enterprise theory does not even apply to these claims. *Commonwealth of Penn. v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) ("We agree with the Defendants that the common enterprise theory should not be superimposed on a claim under the [CFPA]."). It also fails because the Complaint again alleges no facts, rather than conclusory assertions, to support the existence of a common enterprise that "disregards corporateness." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014) (citation omitted).

person that engages in offering or providing a consumer financial product or service," (12 U.S.C. § 5481(6)), and a "related person," which is one "who materially participates in the conduct of the affairs of such covered person" (12 U.S.C. § 5481(25)).  The Complaint alleges PGX Holdings is a "related person" because it is a corporate parent—and, apparently, parents always participate in the conduct of their subsidiaries.  Compl. ¶ 18.  But there is no support of which Defendants are aware that Congress in the CFPA abrogated "the well-settled legal proposition that a corporation is not liable for acts of its subsidiary."  *Meyers*, 2015 WL 476073, at *3

The Complaint's allegations that PGX Holdings is somehow subject to the TSR are even less plausible.  The TSR applies to "seller[s]," those who "provide[], offer[] to provide, or arrange[] for others to provide goods or services," and "telemarketer[s]," those who make or receive telephone calls.  16 C.F.R. §§ 310.2(dd), (ff) and 310.4.  The Complaint does not allege that PGX Holdings did either (and, of course, a holding company would never do either). *Twombly*, 550 U.S. at 557; *Iqbal*, 556 U.S. at 678.

## IV.    THE CFPB'S STRUCTURE IS UNCONSTITUTIONAL, AND SO THE COMPLAINT MUST BE DISMISSED.

Finally, the lawsuit should be dismissed because the agency that brought the case is unconstitutional and therefore unable to sue.  When Congress created the CFPB at the height of the recent financial crisis, it badly mis-stepped in its zeal to satisfy public demands that a super agency be created in response to perceived failings of then-existing regulations.  To insulate the agency head, the CFPB Director, Congress gave her tenure protection such that she could not be terminated by the President at will.  That violated the President's constitutional charge to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, § 3), which historically has been understood to give the executive power to control all agency heads.  The CFPA further denied

28

Congress's ability to oversee the CFPB's spending, giving it authority to self-fund by

withdrawing appropriations at will from the Federal Reserve, no questions asked.  12 U.S.C.

§ 5497(a)(1)-(2).  This structural oddity runs afoul of Article I of the Constitution, which grants

Congress exclusive power over appropriations and oversight of expenditures.

Individually and together, these provisions render the CFPB an unconstitutional agency.

Since CFPB is unconstitutionally structured, the agency has no power to bring an enforcement

action and the case should be dismissed.  *RD Legal Funding*, 332 F. Supp. 3d at 784-85.

### A.   The CFPB Director's For-Cause Removal Provision Unconstitutionally Restricts the President's Duty to "Faithfully Execute" the Laws.

The Constitution vests "[t]he executive Power" in "a" single President, who "shall take

Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  Because of the

Founders' decision to adopt a unitary executive, not a plural one, "administrative agencies

remain under presidential control and . . . subject to the President's responsibilities."  *Wilkinson*

*v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 57 n.43 (D.D.C. 1998); *see also Sierra Club v. Costle*,

657 F.2d 298, 405 (D.C. Cir. 1981).  The Constitution grants the President alone the power to

control and supervise the Executive Branch.  The President's attendant "powers of appointment

and removal," (*Costle*, 657 F.2d at 405), necessarily mean that the President has exclusive

authority to decide which individuals will assist him in enforcing the law, *Myers v. United States*,

272 U.S. 52, 121 (1926).  "[I]f any power whatsoever is in its nature Executive, it is the power of

appointing, overseeing, and controlling those who execute the laws."  *Free Enter. Fund v. Public*

*Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (citation omitted).  *See Myers*, 272 U.S.

at 122, 134 (the President has "exclusive power of removal," which must be exercisable "without

delay"); *Bowsher v. Synar*, 478 U.S. 714, 726 (1985) (same).

Even though the CFPB Director is a principal officer in charge of an "Executive agency," 12 U.S.C. § 5491(a), the President may not remove the Director except for "inefficiency, neglect of duty, or malfeasance in office," or at the end of a five-year term—a term that is longer than the President's own. *Id.* § 5491(c)(3). Thus, the President cannot dismiss the CFPB Director even when the President vehemently disagrees with the Director's actions or policies. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 619, 625 (1935) (for-cause dismissal does not include policy disagreements). This denies the President the ability to appoint a Director of his choosing who agrees with him and restricts his Constitutional mandate to ensure faithful execution of the laws. *See*, *e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958). This means that when the public votes a president in office, he or she is not able to control the supposedly-junior officer whose charge touches the entire United States financial system. To see how surprising that result is in practice, this means that the current incumbent Director, who took office on December 1, 2018, will serve until December 11, 2023—nearly three-quarters of the length of the four-year term of the person who might be elected President in 2020.

In more than two centuries of practice under our Constitution, the Supreme Court has upheld material constraints on the Presidential removal power for only one type of appointee: a member of a multi-member "body of experts 'appointed by law and informed by experience.'" *Humphrey's Ex'r*, 295 U.S. at 624 (citation omitted). The CFPB obviously does not meet this requirement. The limitation on the President's core executive powers thus knows no historical precedent, a fact that weighs against finding the constitutionality of a new type of agency. *Free Enter. Fund*, 561 U.S. at 505; *see also NLRB v. Canning*, 573 U.S. 513, 514 (2014) ("The

30

longstanding 'practice of the government' can inform this Court's determination of 'what the law is' in a separation-of-powers case.") (internal citations omitted).

While the case authorities on the point are split, several courts—including a unanimous D.C. Circuit panel in an opinion authored by now Justice Kavanaugh—have found that this structural anomaly "violates the Constitution's separation of powers" by housing executive power in a unitary entity insulated from the control of the nation's Executive. *PHH Corp. v. CFPB*, 839 F.3d 1, 35 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16, 2017), *on reh'g en banc,* 881 F.3d 75, 164 (D.C. Cir. 2018) (Kavanaugh, J., dissenting); *RD Legal Funding*, 332 F. Supp. 3d at 784-85.[15]  The Solicitor General, arguing on behalf of the President and the United States, is on record in the Supreme Court that the CFPB is unconstitutional.  Respondent's Opposition to Petition for Writ of Certiorari*, State Nat'l Bank of Big Spring, et al., v. Munichin*, No. 18-307 (U.S. Dec. 10, 2018).  The CFPB's executive structure unconstitutionally restricts the President, who cannot exercise his power to remove, cannot control the policies that are promulgated, and is effectively bound by a single appointment decision of his predecessor.  This is impermissible under well-established separation precedents on Executive authority.  *See Free Enter. Fund*, 561 U.S. at 496.

### B.   The CFPB's Unchecked Ability to Spend Its Funds Fatally Undermines Congress's Power of the Purse, Violating Article I.

The CFPB's unchecked power to dictate and control its own budget, without oversight, is an independent constitutional basis for voiding the Bureau's actions.

---

[15] The Fifth Circuit has also held that the similarly-structured Federal Housing Finance Agency violates Article II because of the grant of tenure protection to its Director.  *Collins v. Mnuchin*, 896 F.3d 640, 675-76 (2018) *reh'g en banc granted*, 908 F.3d 151 (5th Cir. 2018).

31

The President does not request, and Congress does not appropriate, set sums of money each year for the CFPB; instead, the Director instructs the Federal Reserve to transfer an amount of money that he determines is appropriate to carry out the CFPB's functions, up to 12 percent of the Federal Reserve's multi-billion dollar operating expenses for the year.  By statute, the House and Senate Appropriations Committees are barred from reviewing how the CFPB spends the money it appropriates to itself.  12 U.S.C. § 5497(a)(2)(C).

This arrangement, one under which the CFPB is fiscally accountable to no branch of Government, unconstitutionally blocks the appropriations and oversight authority attendant to Congress's exclusive power to direct federal spending in the first instance.  The Appropriations Clause, U.S. Const. art. I, § 8, cl. 1, gives to Congress "a controlling influence over the executive power."  1 Joseph Story, *Commentaries on the Constitution of the United States*, § 531 p. 384.  It is intended as "a restriction upon the disbursing authority of the Executive department," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937), with the "established rule" being that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress," *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion).  The power to appropriate monies from the general treasury is a non-delegable right that belongs to Congress alone.  *See United States v. Realty Co.*, 163 U.S. 427, 440-41 (1896).  This delegation of power unconstitutionally removes the CFPB from requisite checks and balances of Congressional oversight.

## **CONCLUSION**

For the foregoing reasons, this Court should grant the Motion and dismiss the Complaint.

Dated:  July 19, 2019                    Respectfully submitted,

                                         /s/ Karra J. Porter
                                         Karra J. Porter
                                         Christensen & Jensen
                                         257 East 200 South, Suite 1100
                                         Salt Lake City, UT 84111
                                         (801) 323-5000
                                         karra.porter@chrisjen.com

                                         Thomas M. Hefferon*
                                         W. Kyle Tayman*
                                         Goodwin Procter LLP
                                         901 New York Ave., NW
                                         Washington, DC 20001
                                         (202) 346-4000
                                         thefferon@goodwinlaw.com
                                         ktayman@goodwinlaw.com

                                         William J. Harrington*
                                         Goodwin Procter LLP
                                         620 Eighth Avenue
                                         New York, NY 10018
                                         (212) 459-7140
                                         wharrington@goodwinlaw.com

                                         *Attorneys for Defendants*
                                         (*admitted *pro hac vice*)

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2019, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ Karra J. Porter
Karra J. Porter