MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>*Plaintiff*,<br>v.<br><br>PROGREXION MARKETING, INC., *et al*.,<br><br>*Defendants*. | Case No. 2:19-cv-00298-BSJ |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. STANDARD OF REVIEW ........ 3

III. ARGUMENT ........ 3

A. Rule 9(b) Does Not Govern the Claims in this Case ........ 3

B. Counts II and III State Claims that Progrexion Engaged in Deceptive Acts or Practices in Violation of the CFPA and TSR ........ 7

1. The Complaint states a claim against Progrexion for knowingly participating in or having the authority to control deceptive marketing campaigns. ........ 8

2. The Complaint states a claim against Progrexion for the marketing misrepresentations of its agents under the doctrine of principal/agent liability. ........ 11

3. The deceptive representations used as bait to sell Progrexion's credit repair services are actionable. ........ 15

C. Counts IV and V State Claims that Progrexion Substantially Assisted and Facilitated its Marketing Affiliates' Deceptive Practices ........ 18

1. The Complaint alleges Progrexion's knowledge or recklessness. ........ 18

2. The Complaint alleges Progrexion's substantial assistance or support. ........ 22

D. The Complaint Need Not Name Additional Marketing Affiliates to State a Claim ........ 24

E. The Bureau Is Not Required to Plead the Date of Discovery for Purposes of the Statute of Limitations ........ 25

F. The Complaint Sufficiently Pleads a Common Enterprise and Does Not Rest on Impermissible Group Pleading ........ 26

G. Defendants' Constitutional Challenge Lacks Merit; the Bureau Is Constitutionally Structured ........ 30

1. The removal provision is constitutional under binding precedent. ........ 31

2. The Bureau's method of funding is constitutional. ........ 34

IV. CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Cases**


*Advanced Recovery Sys. v. Am. Agencies*,
923 F.3d 819 (10th Cir. 2019) .......... 12
*Asebedo v. Kansas State University*,
559 Fed. App'x 668 (10th Cir. 2014) .......... 26
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 3
*Astoria Fed. Savings & Loan Ass'n v. Solimino*,
504 U.S. 104 (1991) .......... 12
*Bavardo Palace, S.A. v. Vacation Tours, Inc.*,
203 Fed. App'x 252 (11th Cir. 2006) .......... 15
*Bell Atl. Corp. v Twombly*,
550 U.S. 544 (2007) .......... 3
*Bielicki v. Terminix Int'l Co.*,
225 F.3d 1159 (10th Cir. 2000) .......... 13
*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) .......... 26
*Cannon v. PNC Bank, N.A.*,
No. 2-15-cv-00131-BSJ, 2016 WL 9779290 (D. Utah Aug. 31, 2016) .......... 7
*CFPB v. All American Check Cashing, Inc.*,
No. 16-cv-356 (S.D. Miss. July 15, 2016) .......... 4
*CFPB v. All American Check Cashing, Inc.*,
No. 16-cv-356 (S.D. Miss. March 21, 2018) .......... 32
*CFPB v. CashCall, Inc.*,
No. 2:15-cv-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) .......... 32
*CFPB v. D&D Mktg.*,
No. 15-09692, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) .......... 4, 5
*CFPB v. Frederick J. Hanna & Assocs.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) .......... 3, 4, 5
*CFPB v. Future Income Payments, LLC*,
252 F. Supp. 3d 961 (C.D. Cal. 2017) .......... 32
*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) .......... 4, 6, 8, 9
*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) .......... 4, 32
*CFPB v. Morgan Drexen, Inc.*,
60 F. Supp. 3d 1082 (C.D. Cal. 2014) .......... 32
*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-2106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) .......... 32
*CFPB v. Navient Corp.*,
No. 17-cv-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) .......... 4, 5, 32, 34
*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......... 25, 27, 28, 29

*CFPB v. Prime Mktg. Holdings, LLC*,
No. 16-07111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) .......... 5
*CFPB v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018).......... 32
*CFPB v. Seila Law LLC*,
923 F.3d 680 (9th Cir. 2019) .......... 32, 33
*CFPB v. Seila Law, LLC*,
No. 8:17-cv-1081, 2017 WL 6536586 (C.D. Cal. Aug. 25, 2017) .......... 32
*CFPB v. TCF Nat'l Bank*,
No. 17-cv-00166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017).......... 32
*CFPB v. Think Fin.*,
No. CV-17-127, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) .......... 4, 5, 27, 28, 32
*CFPB v. Universal Debt & Payment Solutions*,
No. 15-cv-00859, 2015 WL 11439178
(N.D. Ga. Sept. 1, 2015) ("*Universal Debt I*") .......... 19, 21, 22, 23
*CFPB v. Universal Debt & Payment Solutions*,
No. 15-CV-0859, 2019 WL 1295004
(N.D. Ga. March 21, 2019) ("*Universal Debt II*").......... 5, 20, 24, 27, 28, 29
*Collins v. Mnuchin*,
896 F.3d 640 (5th Cir.) .......... 32
*Commod. Future Trading Comm'n v. Wall Street Underground*,
128 Fed. App'x 726 (10th Cir. 2005) .......... 27
*Erickson v. Pardus*,
551 U.S. 89 (2007).......... 3
*Fernandez v. Clean House, LLC*,
883 F.3d 1296 (10th Cir. 2018) .......... 26
*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010).......... 32, 34
*FTC v. AFD Advisors*,
No. 13CV6420, 2014 WL 274097 (N.D. Ill. Jan. 24, 2014).......... 4
*FTC v. Affiliate Strategies, Inc.*,
No. 09-4104, 2010 WL 11470099 (D. Kan. June 4, 2010).......... 4, 5, 25
*FTC v. Affiliate Strategies, Inc.*,
No. 09-4104, 2011 WL 4352411 (D. Kan. Sept. 16, 2011).......... 22
*FTC v. Chapman*,
714 F.3d 1211 (10th Cir. 2013) .......... 19, 20, 22, 24
*FTC v. City W. Advantage, Inc.*,
No. 2:08CV00609, 2008 WL 2844696 (D. Nev. July 22, 2008).......... 16
*FTC v. Consumer Health Benefits Ass'n*,
No. 10-CIV-3551, 2012 WL 1890242 (E.D.N.Y. May 23, 2012).......... 22, 27
*FTC v. Credit Bureau Ctr.*,
235 F. Supp. 3d 1054 (N.D. Ill. 2017) .......... 12, 13, 14, 16
*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) .......... 8, 15

*FTC v. Five-Star Auto Club, Inc.*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000) .......... 12
*FTC v. Freecom Comm., Inc.*,
401 F.3d 1192 (10th Cir. 2005) .......... 3, 4, 5, 6, 7, 8, 9
*FTC v. HES Merchant Srvs. Co., Inc.*,
No. 6:12-cv-1618, 2014 WL 083506 (M.D. Fla. Nov. 18, 2014) .......... 22
*FTC v. IAB Marketing Associates, LP*,
746 F.3d 1228 (11th Cir. 2014) .......... 8, 10
*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016) .......... 8, 9
*FTC v. LifeWatch, Inc.*,
176 F. Supp. 3d 757 (N.D. Ill. 2016) .......... 12, 13, 14, 16, 17
*FTC v. LoanPointe, LLC*,
No. 2:10-cv-225DAK, 2011 WL 4348304 (D. Utah Sept. 16, 2011) .......... 27, 30
*FTC v. Loanpointe*,
*LLC*, 525 Fed. App'x 696 (10th Cir. 2013) .......... 6, 8
*FTC v. MacGregor*,
360 Fed. App'x 891 (9th Cir. 2009) .......... 11, 12
*FTC v. Nat'l Urological Grp.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) .......... 29
*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) .......... 9
*FTC v. Network Servs. Depot*,
617 F.3d 1127 (9th Cir. 2010) .......... 29
*FTC v. Partners in Health Care Assoc.*,
189 F. Supp. 3d 1356 (S.D. Fla. 2016) .......... 13, 14
*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) .......... 11, 12
*FTC v. Tax Club, Inc.*,
994 F. Supp. 2d 461 (S.D.N.Y. 2014) .......... 27
*FTC v. Washington Data Resources*,
856 F. Supp. 2d 1247 (M.D. Fla. 2012) .......... 5, 8
*FTC v. Wyndham Worldwide Corp.*,
No. 13-1887, 2014 WL 2812049 (D.N.J. June 23, 2014) .......... 27
*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .......... 31, 32
*In re Initial Public Offering Securities Litigation*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......... 7
*In re Nationsmart Corp. Sec. Litig.*,
130 F.3d 309 (8th Cir. 1997) .......... 4
*Integrated Bus. Techs. v. Netlink Sols.*,
No. 16-CV-048, 2016 WL 4742306 (N.D. Okla. Sept. 12, 2016) .......... 6
*Intermountain Stroke Centr., Inc. v. Intermountain Health Care, Inc.*,
638 Fed. App'x 778 (10th Cir. 2016) .......... 6

*Koch v. Koch Indus., Inc.*,
203 F.3d 1202 (10th Cir. 2000) .......... 7
*Life Alert Emergency Response, Inc., v. LifeWatch Inc.*,
601 Fed. App'x 469 (9th Cir. 2015) .......... 14
*Milligan v. Anderson*,
522 F.2d 1202 (10th Cir. 1975) .......... 25
*Morissette v. United States*,
342 U.S. 246 (1952) .......... 28
*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 32, 33
*P.F. Collier & Son Corp. v. FTC*,
427 F.2d 261 (6th Cir. 1970) .......... 27
*Pennsylvania v. Think Finance*,
No. 14-CV-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) .......... 28, 29, 30
*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) .......... 31, 33, 34, 35
*Rochez Bros. v. Rhoades*,
527 F.2d 880 (3d Cir. 1975) .......... 23, 24
*Safeco Ins. Co. of Amer. v. Burr*,
551 U.S. 47 (2007) .......... 19
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) .......... 21
*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*,
376 F.3d 664 (7th Cir. 2004) .......... 13
*Standard Distributors v. FTC*,
211 F.2d 7 (2d Cir. 1954) .......... 11
*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) .......... 6
*Systems Amer., Inc. v. Providential Bancorp, Ltd.*,
No. 05-C-2161, 2006 WL 463314 (N.D. Ill. Feb. 24, 2006) .......... 7
*Temple v. Synthes Corp.*,
498 U.S. 5 (1990) .......... 25
*The CBE Group, Inc. v. John C. Heath, Attorney at Law, PLLC*,
No. 3:17-CV-2594 (N.D. Tex. July 3, 2019) .......... 2
*Townsend v. Daniel, Mann, Johnson & Mendenhall*,
196 F.3d 1140 (10th Cir. 1999) .......... 12
*U.S. ex rel. Lacy v. New Horizons, Inc.*,
348 Fed. App'x 421 (10th Cir. 2009) .......... 7
*United States v. Ackerman*,
831 F.3d 1292 (10th Cir. 2016) .......... 12
*United States v. Sci. Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) .......... 21
*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .......... 6, 7

*Wolfe v. Texas Co.*,
83 F.2d 425 (10th Cir. 1936) .......... 13
*Woodmont, Inc. v. Daniels*,
274 F.2d 132 (10th Cir. 1959) .......... 21

**Statutes**

1 Stat. 354 (May 8, 1794) .......... 35
12 U.S.C. § 16 .......... 35
15 U.S.C. § 41 .......... 32
12 U.S.C. § 243 .......... 35
21 U.S.C. §§ 379f–379j-62 .......... 35
12 U.S.C. § 1815(d) .......... 35
12 U.S.C. § 1820(e) .......... 35
12 U.S.C. § 5302 .......... 34
12 U.S.C. § 5481(25)(C)(i) .......... 29
12 U.S.C. § 5491(c)(3) .......... 31, 32
12 U.S.C. § 5497(a) .......... 34
12 U.S.C. § 5497(e) .......... 34
12 U.S.C. § 5497(e)(4) .......... 35
12 U.S.C. § 5536(a) .......... 7
12 U.S.C. § 5536(a)(3) .......... 18, 19, 23
12 U.S.C. § 5564(g)(1) .......... 25, 26
15 U.S.C. §§ 6101–08 .......... 1
16 U.S.C. § 6802 .......... 35
16 U.S.C. § 6806 .......... 35
Pub. L. 103-297 (Aug. 16, 1994) .......... 1

**Regulations**

16 C.F.R. § 310.3(a)(4) .......... 2, 7
16 C.F.R. § 310.3(b) .......... 18, 19, 22, 23
16 C.F.R. § 310.4(a)(2) .......... 2
16 C.F.R. pt. 310 .......... 1, 35

**Rules**

Fed. R. Civ. P. 8 .......... *passim*
Fed. R. Civ. P. 9(b) .......... 1, 3–6, 20

**Other Authorities**

U.S. Const. art. I .......... 31
U.S. Const. art. II .......... 31, 32
67 Fed. Reg. 4492 (Jan. 30, 2002) .......... 2

## I. INTRODUCTION

The Bureau of Consumer Financial Protection (Bureau), which is charged with enforcing Federal consumer financial protection laws, filed this action because Defendants violated the Consumer Financial Protection Act (CFPA) and Telemarketing Sales Rule (TSR) by using deceptive representations to market their products and services and by charging fees that violate the TSR's upfront fee ban.

Defendants' arguments seeking dismissal of the Bureau's lawsuit lack merit. Defendants argue that Federal Rule of Civil Procedure 9(b) applies to the deception claims, but Tenth Circuit precedent makes clear that Rule 8 governs. Defendants move to dismiss four claims (Counts II-V) for failure to state a claim, but the claims are well pleaded and supported by ample, credible facts. Defendants move to limit one claim (Count I) on statute of limitations grounds, but that issue is not ripe.[1] Finally, Defendants move to dismiss the entire Complaint on constitutional grounds, but the Bureau's structure does not violate any constitutional provision.

Defendants telemarket credit repair products and services. Twenty-five years ago, Congress flagged telemarketing as a sales technique that poses a high risk of consumer injury due to a variety of deceptive and abusive tactics employed over the telephone to induce a sale. Pub. L. 103-297 (Aug. 16, 1994), Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–08. In 1995, the Federal Trade Commission (FTC) promulgated the TSR, 16 C.F.R. pt. 310, to prohibit particular abusive and deceptive telemarketing activities. The FTC identified a heightened risk of abuse among a few specific industries, including the credit

---

[1] Notably, Defendants do not argue that Count I fails to state a claim upon which relief can be granted. *See* Defs.' Mot. to Dismiss the Compl. (Mot.) p. 5, ECF No. 30, July 19, 2019.

repair industry. It concluded that the risks to consumers from telemarketing credit repair services could be averted only by regulating companies' ability to request and receive payment for these services. 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002). For this reason, the FTC imposed a fee regulation, which requires companies to delay billing until more than six months after they have performed their services and demonstrated that the promised results have been achieved. 16 C.F.R. § 310.4(a)(2). The FTC also prohibited telemarketers and sellers from making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4). Unfortunately, contrary to Defendants' suggestion that misconduct in this industry sunsetted "many years ago" (Mot. 5), abuses by credit repair firms persist and continue to harm large numbers of American consumers each year.[2] Defendants' unlawful billing practices and reliance on bogus advertising, as detailed in the Complaint, fall squarely within the conduct prohibited by the TSR.

Defendants try to shift the focus away from their telemarketing activities by spending four pages of their brief elaborating on the fact that errors are prevalent on consumer credit reports and many consumers struggle to challenge the inaccurate information. Mot. 1–4. These issues, Defendants claim, are the reason they operate. But the difficulties consumers face in this regard also make them especially vulnerable to deceptive marketing and wrongful fee practices, which is precisely what the Bureau seeks to stop here. Indeed, consumer protection statutes give

---

[2] Defendants are aware that problems persist in this market. Last month a federal jury issued a verdict against John C. Heath, Attorney at Law, PLLC d/b/a Lexington Law Firm and Progrexion ASG, Inc., finding that they committed fraud in the drafting, signing, and mailing of dispute correspondence purportedly by consumers without the consumers' knowledge or consent. *See* Jury Verdict, *The CBE Group, Inc. v. John C. Heath, Attorney at Law, PLLC*, No. 3:17-CV-2594 (N.D. Tex. July 3, 2019) (available at https://www.insidearm.com/documents/2244/CBE_v_Lexington_Law_Jury_Verdict.pdf).

consumers "the right to rely upon representations of facts as the truth." *FTC v. Freecom Comm., Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005). This case seeks to vindicate that right for consumers.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure require that the Bureau provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Defendants' motion must be denied if the Bureau has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 545 (2007). In reviewing the Bureau's Complaint, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The Complaint is sufficient if it "give[s] the defendant fair notice of what the … claim is and the grounds upon which it rests." *Id.*

## III. ARGUMENT

### A. Rule 9(b) Does Not Govern the Claims in this Case

Despite Defendants' arguments to the contrary, the claims in the case are not subject to the heightened pleading standard of Rule 9(b) because, as "the Tenth Circuit and several district courts have reasoned, consumer protection claims are not claims for fraud, even if there is a deceptive dimension to them." *CFPB v. Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d 1342, 1372 (N.D. Ga. 2015) (citing *FTC v. Freecom Comm., Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005), and applying its reasoning to the CFPA). Thus, most courts to address this issue have

concluded that Rule 9(b) does not apply to deception claims brought under the CFPA and TSR. *Hanna*, 114 F. Supp. 3d at 1371–74; *CFPB v. D&D Mktg.*, No. 15-09692, 2016 WL 8849698, at *10–11 (C.D. Cal. Nov. 17, 2016) (unpublished); *CFPB v. Navient Corp.*, No. 17-cv-101, 2017 WL 3380530, at *24–25 (M.D. Pa. Aug. 4, 2017) (unpublished); *CFPB v. Think Fin.*, No. CV-17-127, 2018 WL 3707911, at *7–8 (D. Mont. Aug. 3, 2018) (unpublished); *CFPB v. All American Check Cashing, Inc.*, No. 16-cv-356, slip op. at 6–7 (S.D. Miss. July 15, 2016) (unpublished, attached as Ex. A); *FTC v. Affiliate Strategies, Inc.*, No. 09-4104, 2010 WL 11470099, at *7 (D. Kan. June 4, 2010) (TSR) (unpublished); *FTC v. AFD Advisors*, No. 13CV6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014) (TSR) (unpublished).

The Tenth Circuit has ruled that civil consumer protection claims for deceptive acts or practices under the FTC Act are "simply not claim[s] of fraud as that term is commonly understood or as contemplated by Rule 9(b)." *Freecom*, 401 F.3d at 1203 n.7.[3] While the statute at issue in *Freecom* was the FTC Act, because of the marked similarity between the prohibition on unfair and deceptive acts and practices under the CFPA and FTC Act, courts rely on FTC Act precedent to interpret and apply the deception standard under the CFPA. *See, e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (FTC Act cases inform the analysis for CFPA deception claims); *see also Navient*, 2017 WL 3380530, at *21 n.10; *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 903 (S.D. Ind. 2015) (because of "the near-identical language of the

---

[3] By its terms, Rule 9(b) only applies to claims for "fraud or mistake," and "the United States Supreme Court has consistently cautioned against extending [Rule 9(b)'s] heightened pleading standard beyond claims of fraud or mistake." *Hanna*, 114 F. Supp. 3d at 1372; *see also In re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) ("The Supreme Court has held that federal courts may not apply … Rule 9(b) outside the two specific instances – fraud and mistake – explicitly found in the Rule.").

two statutes … longstanding interpretations of the [FTC Act] should inform interpretation of the CFPA"); *CFPB v. Universal Debt & Payment Solutions*, No. 15-CV-0859, 2019 WL 1295004, at *14 (N.D. Ga. March 21, 2019) (unpublished, referred to herein as "*Universal Debt II*") ("[T]he CFPA was designed, in many ways, to parallel the FTC Act. And as a result, time and again, courts have embraced the meaning of words in the FTC Act when interpreting the CFPA."). Similarly, courts look to FTC Act precedent for deception cases under the TSR. "Identical principles of deception from Section 5 of the FTC Act apply to the TSR." *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012) (citations omitted).

Most of the courts that have considered whether to apply Rule 9(b) to deception claims under the CFPA or TSR have cited *Freecom* in deciding to apply Rule 8 to these claims. *See Hanna*, 114 F. Supp. 3d at 1371; *D&D Marketing*, 2016 WL 8849698, at *10; *Navient Corp.*, 2017 WL 3380530, at *25; *CFPB v. Think Fin.,* 2018 WL 3707911, at *7; *Affiliate Strategies*, 2010 WL 11470099, at *5–7.

Rather than addressing the Tenth Circuit's reasoning in *Freecom*, or the extensive case law cited above, Defendants rely primarily on a single district court decision from another circuit. *See* Mot. 10, 18 (citing *CFPB v. Prime Mktg. Holdings, LLC*, No. 16-07111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) (unpublished)). Defendants provide no argument why this Court should disregard the reasoning of *Freecom* and follow a California district court's contrary holding.[4] As noted by the Tenth Circuit, Rule 9(b) is inconsistent with the purpose of consumer protection statutes and inapplicable to this type of deception claim because the elements of the

[4] Whether the *Prime Marketing* case even states the correct pleading standard for the Central District of California is called into question by the contrary holding by the same court in *D&D Marketing*, 2016 WL 8849698, at *10–11.

claim are unlike those of common law fraud. *Freecom*, 401 F.3d at 1203 n.7.

Further, the other cases cited by Defendants (Mot. 10) do not involve "government action brought to deter deceptive acts and practices aimed at the public," *Freecom*, 401 F.3d at 1203 n.7, or the consumer protection statutes at issue here. Instead, Defendants rely on a district court case involving the Lanham Act, *Integrated Bus. Techs. v. Netlink Sols.*, No. 16-CV-048, 2016 WL 4742306, at *4 (N.D. Okla. Sept. 12, 2016) (unpublished). Claims of false advertising under the Lanham Act, however, differ significantly from the deception claims at issue in this case. To state a deception claim under the CFPA or TSR, the Bureau must identify representations that were likely to mislead consumers acting reasonably under the circumstances. *Gordon*, 819 F.3d at 1192–93 (applying the CFPA); *FTC v. Loanpointe*, *LLC*, 525 Fed. App'x 696, 700 (10th Cir. 2013) (applying the FTC Act). But the Lanham Act requires a private plaintiff to show, among other things, that the defendant's materially false or misleading representations *actually caused that plaintiff's* injury. *Intermountain Stroke Centr., Inc. v. Intermountain Health Care, Inc.*, 638 Fed. App'x 778, 784 (10th Cir. 2016). As such, Lanham Act claims much more closely resemble private or common law fraud claims "designed to remedy a singular harm"—exactly the types of claims distinguished by the Tenth Circuit in *Freecom*. 401 F.3d at 1203 n.7. Moreover, the court in *Netlink* conceded that the Tenth Circuit has not decided whether Rule 9(b) applies even to Lanham Act claims. 2016 WL 4742306, at *4. Likewise, Defendants cite *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003),[5] *U.S. ex rel. Lacy v. New Horizons, Inc.*,

---

[5] *Ciba-Geigy* also runs contrary to Supreme Court precedent regarding the scope of Rule 8(a) and application of heightened pleading standards to statutory claims. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–15 (2002) ("A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." (internal punctuation and citations omitted)). Other federal courts have criticized

348 Fed. App'x 421, 424 (10th Cir. 2009), *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1237 (10th Cir. 2000), and *Cannon v. PNC Bank, N.A.*, No. 2-15-cv-00131-BSJ, 2016 WL 9779290, at *8 (D. Utah Aug. 31, 2016), which involved fraud allegations under laws not at issue here. These cases are neither analogous nor persuasive in light of clear instruction from the Tenth Circuit in *Freecom* that the Rule 8 pleading standard applies to deception claims.

### B. Counts II and III State Claims that Progrexion Engaged in Deceptive Acts or Practices in Violation of the CFPA and TSR

Counts II and III allege, respectively, that PGX Holdings, Progrexion Marketing, Progrexion Teleservices, eFolks, and CreditRepair.com (referred to collectively as Progrexion), engaged in deceptive acts or practices in violation of the CFPA, 12 U.S.C. § 5536(a), and made false or misleading statements to induce another person to pay for goods or services in violation of the TSR, 16 C.F.R. § 310.3(a)(4), by using the misleading statements of at least one marketing partner, HSP1, to market and sell its credit repair services. Progrexion obtained hundreds of thousands of paying customers from these marketing efforts.

Under well-established law discussed below, Progrexion may be held liable for the deceptive statements of a marketing affiliate under at least two different doctrines. First, Progrexion is liable because it had actual knowledge of, was recklessly indifferent to, or consciously avoided knowing that its marketing affiliate was making deceptive statements, and Progrexion was participating in or had the authority to control the process through which the statements were made. Second, Progrexion is liable for the acts of a marketing affiliate acting as

---

or distinguished *Ciba-Geigy* on these grounds. *See, e.g.*, *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281, 340–42 (S.D.N.Y. 2003); *Systems Amer., Inc. v. Providential Bancorp, Ltd.*, No. 05-C-2161, 2006 WL 463314, *4 (N.D. Ill. Feb. 24, 2006) (unpublished).

Progrexion's agent. For Counts II and III to be dismissed for failure to state a claim, Progrexion would have to show that the Bureau failed to allege sufficient facts to support Progrexion's liability under *either* theory. Progrexion has not come close to doing so.

**1. The Complaint states a claim against Progrexion for knowingly participating in or having the authority to control deceptive marketing campaigns.**

Under the CFPA, an "act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Gordon*, 819 F.3d at 1192–93 (internal quotation marks omitted); *see also Loanpointe*, 525 Fed. App'x at 700 (applying the FTC Act); *Freecom*, 401 F.3d at 1203 (same). Moreover, an act or practice is deceptive "if the first contact or interview with a consumer is secured by deception," regardless of whether or not a consumer is later provided with accurate information. *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 632 (6th Cir. 2014) (citing cases); *Gordon*, 819 F.3d at 1194. The same principles apply to a claim of misleading telemarketing under the TSR. *Washington Data Resources*, 856 F. Supp. at 1273.

The Bureau may establish Progrexion's liability for Counts II and III by showing that Progrexion: (1) knew about its partners' misrepresentations; and (2) either participated directly in the deceptive practices or "ha[d] the authority to control those deceptive acts or practices, but allow[ed] the deception to proceed." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 169–70 (2d Cir. 2016); *FTC v. IAB Marketing Associates, LP*, 746 F.3d 1228, 1232–33 (11th Cir. 2014). Under this legal standard, Progrexion's liability would not be as an aider or abettor. Rather, "a defendant acting with knowledge of deception who either directly participates in that deception or has the authority to control the deceptive practice of another, but allows the practice to

proceed, engages, *through its own actions*, in a deceptive act or practice that causes harm to consumers." *LeadClick*, 838 F.3d at 170 (emphasis in original); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010).

A defendant's knowledge can be proven through evidence that it had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Freecom*, 401 F.3d at 1207 (applying the FTC Act); *Gordon*, 819 F.3d at 1193, n.8 (applying the CFPA). A defendant's awareness that misrepresentations are "prevalent in affiliate marketing," combined with knowledge that one or more of its affiliate marketers used such deception, suffices. *LeadClick Media*, 838 F.3d at 171.

In *LeadClick Media*, the government sought to hold a marketing company liable for third-party advertisers' misrepresentations used in marketing weight loss products. 838 F.3d 158. The defendant arranged for the products to be advertised through third-party affiliate marketers, some of whom used fake news sites and fabricated news stories. The defendant argued that because it did not author the deceptive content or run the fake news sites, it should not be held liable for its affiliates' marketing statements. The Second Circuit disagreed and adopted the same standard for holding individual defendants liable for the acts of a corporation: knowing participation or control. *Id*. at 169–70. The defendant had a legal "responsibility to ensure that the advertisements produced by its affiliate network were not deceptive or misleading." *Id.* at 172.

Likewise, in the Eleventh Circuit, the FTC sued a company that hired third-party telemarketers who misrepresented that the trade association memberships being sold by the defendants were "functionally equivalent to major medical insurance." *IAB Marketing*, 746 F.3d

at 1231. The court held that the defendant could be held liable under the TSR and the FTC Act even though it had not instructed the telemarketers to make the deceptive statements, because the defendant knew the statements were being made, continued to hire the telemarketers to make the statements, and did nothing to stop them. *Id*. at 1232–33.

The Complaint clearly alleges that Progrexion had the requisite knowledge and either participated in or controlled its affiliates' marketing activities. First, the Complaint dedicates an entire section, paragraphs 86–108, to facts supporting the Bureau's allegation that Progrexion knew about deceptive practices in its Hotswap Program.[6] These facts include Progrexion's review of advertisements and websites containing the alleged misrepresentations (Compl. ¶¶ 87–89, 94); its knowledge of consumer complaints reporting deceptive bait advertisements, including guaranteed loans (*id*. ¶¶ 89–90, 107); its review, authorship, and recommendation of misleading scripts for its partners' use (*id*. ¶¶ 47, 96–99); its employees discussing that Hotswap Partners were making implicit guarantees that credit repair would result in obtaining rent-to-own housing (*id*. ¶ 106); and its apparently willful disregard for red flags, like the fact that HSP1, while purporting to assist consumers to obtain rent-to-own housing contracts, did not take note of where consumers were looking for homes (*id*. ¶¶ 101–04). Defendants spend four pages contorting the Bureau's cohesive narrative in order to press alternative explanations for the facts alleged (Mot. 18–21), but their interpretations are not plausible and, regardless, fact disputes are not ripe at this stage. The Bureau's allegations are sufficient to plead that Progrexion had actual knowledge of, was recklessly indifferent to, or intentionally avoided actual knowledge of its

[6] Progrexion uses the terms "Hotswap Program" and "Hotswap Partner" in connection with its program for receiving live telephone transfers from certain marketing affiliates. The terms are explained in the Complaint, paragraphs 32–36.

marketing partners' deceptive practices.

Second, paragraphs 47–58, 60–70, 96–99, and others describe how Progrexion controlled, or had the right to control, the advertising its Hotswap Partners performed for Progrexion and how Progrexion directly participated in at least one partner's deceptive practices. Progrexion reviewed, approved, modified, and drafted the content of Hotswap Partners' advertisements and telemarketing scripts used to generate leads for Progrexion. Compl. ¶¶ 47–53, 63, 68, 96–99. It provided the means for live call transfers, such as dedicated phone lines, and other key assistance to Hotswap Partners. *Id*. ¶¶ 54, 63. Progrexion also affirmatively, systematically, and strategically integrated the Hotswap Partners' marketing practices into its own marketing practices, intertwining the representations made to the consumer at each stage to maximize the likelihood of a credit repair sale. *Id*. ¶¶ 55–58, 60–70. These allegations are sufficient to plead that Progrexion had the authority to control its marketing partner's deceptive practices or directly participated in the deceptive practices.

**2. The Complaint states a claim against Progrexion for the marketing misrepresentations of its agents under the doctrine of principal/agent liability.**

Contrary to Defendants' unsupported assertion (Mot. 13), courts have repeatedly held that federal consumer-protection statutes, including the FTC Act and the TSR, incorporate common-law principles of agency liability. *See, e.g.*, *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (corporation liable for the telemarketing misrepresentations of its agent, a third-party marketing company); *FTC v. MacGregor*, 360 Fed. App'x 891, 894 (9th Cir. 2009) (corporations liable where "the third party call centers had the apparent authority to engage in the acts that were improper under the FTC Act and the TSR"); *Standard Distributors v. FTC*, 211 F.2d 7, 13 (2d Cir. 1954) (common law agency principles applied to FTC Act claims). Indeed, it is well

established that corporations, as legal persons, can act *only* through their agents. *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 828 (10th Cir. 2019).[7]

"The existence of an agency relationship is generally a question of fact." *Townsend v. Daniel, Mann, Johnson & Mendenhall*, 196 F.3d 1140, 1146 (10th Cir. 1999). "An agency relationship is usually said to 'result[ ] from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *United States v. Ackerman*, 831 F.3d 1292, 1301 (10th Cir. 2016) (quoting Restatement (Second) of Agency § 1). But this "manifestation and consent doesn't have to be formalized in any particular way," and the "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." 831 F.3d at 1301. A principal need not exercise "constant supervision or awareness of every discrete act"; "the question is usually simply whether the agent acts with the principal's consent and (in some way) to further the principal's purpose." *Id*.

Under this doctrine, principals are liable for the misrepresentations of their agents. *Stefanchik*, 559 F.3d at 930; *MacGregor*, 360 Fed. App'x at 894; *FTC v. Credit Bureau Ctr.*, 235 F. Supp. 3d 1054, 1060 (N.D. Ill. 2017), *vacated in part on other grounds* No. 18-2847, 2019 WL 3940917 (7th Cir. Aug. 21, 2019); *FTC v. LifeWatch, Inc.*, 176 F. Supp. 3d 757, 779 (N.D. Ill. 2016); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 527 (S.D.N.Y. 2000).

---

[7] Congress legislates against the backdrop of the common law. *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 504 U.S. 104, 108 (1991). "[W]here a common-law principle is well established, … the courts may take it as given that Congress has legislated with an expectation that the principle will apply" absent contrary indications. *Id*.

Courts considering whether telemarketers are agents for purposes of holding companies liable for their misrepresentations have examined: (1) whether the telemarketers act on behalf of the company; and (2) whether the telemarketers are subject to the company's control. *Lifewatch*, 176 F. Supp. 3d at 773; *see also FTC v. Partners in Health Care Assoc.*, 189 F. Supp. 3d 1356, 1365–66 (S.D. Fla. 2016) (company liable for marketing affiliates' misrepresentations where contracts authorized affiliates to advertise on company's behalf). For the principal to be found liable, the agent must have either actual or apparent authority, or the principal must ratify the agent's actions. *Credit Bureau Ctr.*, 235 F. Supp. 3d at 1054. Ratification can be shown through evidence of "long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co*., 376 F.3d 664, 677 (7th Cir. 2004); *see also Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1164 (10th Cir. 2000) (a "corporation can ratify the acts of its agents by acquiescence in or acceptance of the unauthorized acts"); *Wolfe v. Texas Co*., 83 F.2d 425, 430–31 (10th Cir. 1936) ("One who with knowledge of the material facts concerning an act, done by one assuming to act as his agent without authority, voluntarily accepts the benefits flowing therefrom, thereby ratifies the act and makes it his own as though he had authorized it from the beginning."). For purposes of ratification, silence may be "evidence from which assent may be inferred" and the "[k]nowledge requisite to ratification need not embrace every detail of the transaction." *Wolfe*, 83 F.2d at 431.

To determine whether a company controls a telemarketer, courts have focused on whether the company reviews, edits, or otherwise controls the telemarketing script used to solicit consumers. *See LifeWatch*, 176 F. Supp. 3d at 776; *Partners in Health Care Assoc.*, 189 F. Supp. 3d at 1361; *Life Alert Emergency Response, Inc., v. LifeWatch Inc.*, 601 Fed. App'x 469, 473

(9th Cir. 2015) (company controlled telemarketer where it "had the power and practice of approving scripts" and suggested changes to the marketing message when it heard something it did not like). Another indicator of control is the ability to terminate the advertising agreement with the marketer at any time. *Credit Bureau Ctr.*, 235 F. Supp. 3d at 1062.

The Bureau has more than adequately alleged an agency relationship between Progrexion and at least one marketing partner, HSP1. *See, e.g.*, Compl. ¶¶ 31–70, 74–77, 86–104; *see also id.* ¶¶ 24–25 (summarizing theory for notice purposes). For example, HSP1 acted as—in its own words—"an affiliate call center that transfers potential clients to Lexington Law" (*id.* ¶ 77); it received and followed instructions from Progrexion regarding what to say to consumers during the initial marketing pitch, what questions to ask consumers in order to prequalify them for Progrexion, and what to say to consumers when live-transferring them to Progrexion, for a seamless credit repair sales pitch (*id.* ¶¶ 46–55, 68, 96–99); it received and followed instructions from Progrexion regarding how to directly transfer consumers to Progrexion through dedicated phone lines (*id.* ¶ 54); and it received and followed instructions from Progrexion regarding how to integrate its advertising of other purported products or services—rent-to-own housing and mortgages—with the advertising of Lexington Law's credit repair services (*id.* ¶¶ 63, 68–70, 96–97). All of HSP1's representations to consumers discussed herein were made for the purpose of selling Lexington Law subscriptions.

Progrexion's notice of, and continued benefit from, HSP1's marketing activities, constitute ratification. As discussed throughout this brief, the Bureau's factual allegations describe Progrexion's knowledge of the material facts (Compl. ¶¶ 47, 86–108) and its long-term, voluntary acceptance of benefits that flowed from HSP1's actions (*id.* ¶¶ 3, 30–32, 39, 75).

Finally, Defendants' argument that "it is nonsensical to assert that HSP1" was marketing on Progrexion's behalf (Mot. 16), mischaracterizes its business model. Progrexion invited HSP1 and other entities to market on its behalf for their mutual benefit; instructed them how to pre-qualify consumers for Lexington and CreditRepair.com's credit repair services; and provided them with advice and assistance to increase revenues for all involved. Compl. ¶¶ 31–32, 40, 47–50, 63–66, 69–70. HSP1's only purpose was to market Progrexion's products. *Id*. ¶¶ 76–77. It did not provide "its own loan products," as Defendants suggest (Mot. 16); the only relevant service it provided was generating leads and transfers for Progrexion. The purpose of each deceptive statement described in the Complaint was to help close a credit repair sale. *See E.M.A. Nationwide*, 767 F.3d at 632 (violation of FTC Act occurs when first contact with consumer is secured by deception).

**3. The deceptive representations used as bait to sell Progrexion's credit repair services are actionable.**

Progrexion appears to take the view that it could only be held legally responsible for the marketers' statements directly about Lexington Law or CreditRepair.com. Mot. 7–8. But Progrexion cites no case law in support of this view. In fact, contrary to Progrexion's assertions, the concept of "bait advertising"[8] or deceptive door-openers is well established under federal law, and a corporation can be held liable for marketing misrepresentations even if those misrepresentations are not directly about the corporation's product or service. *E.g.*, *Credit Bureau Ctr.*, 235 F. Supp. 3d at 1059; *FTC v. City W. Advantage, Inc.*, No. 2:08CV00609, 2008

[8] "Bait advertising" is "an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else…." *Bavardo Palace, S.A. v. Vacation Tours, Inc*., 203 Fed. App'x 252, 257 (11th Cir. 2006).

WL 2844696, at *3 (D. Nev. July 22, 2008) (unpublished). In *Credit Bureau Center*, for example, the defendant hired a marketing affiliate, who in turn hired other contractors, who used false real estate advertisements to draw in credit monitoring customers. The affiliates posted ads on Craigslist purporting to offer attractive rental properties, and when a consumer responded to an ad, the affiliates directed the consumer to sign up for the defendant's credit score and monitoring services. 235 F. Supp. 3d at 1059. The affiliates presented the defendant's credit score services as a first step in getting access to the illusory rental property. *Id*. Both the affiliates and the defendant benefitted from this scheme, as the affiliates were paid for the leads they generated, and the false advertising generated substantial credit monitoring business. *Id*. The court held that such facts were sufficient to show the FTC was likely to succeed on the merits of its deception claim and issued a preliminary injunction. *Id*. at 1060–63.

Likewise, a corporation can be held liable for a third party's marketing misrepresentations that are generic and do not pertain specifically to the corporation's product or service. *Lifewatch*, 176 F. Supp. 3d at 760–61 (corporation liable for third-party affiliates' telemarketing misrepresentations about generic medical alert devices).

Here, the alleged misrepresentations—and resulting liability—are similar to those in *Credit Bureau Center* and *Lifewatch*. When HSP1 made misrepresentations about consumers' likelihood of obtaining a mortgage and posted false real estate advertisements on Craigslist and Facebook, it was doing so in order to generate leads for Progrexion, for Progrexion's benefit. Compl. ¶¶ 3, 35–39, 69–70. HSP1 offered consumers a valuable credit-related product, and connected or conditioned access to it on signing up for Lexington Law. *Id*. ¶¶ 76–85. Progrexion benefitted directly from the fact that consumers' interest in a favorable mortgage or rent-to-own

contract generated significant credit repair business. *Id.* ¶¶ 39–40, 69–70, 75.

Like the affiliates in *Lifewatch*, Progrexion's Hotswap Partners made statements about credit repair that oversold its benefits before transferring the consumer to Progrexion for the credit repair sales pitch. Compl. ¶¶ 47, 82, 84–85, 96–97, 99. For example, with Progrexion's approval, HSP1 told consumers that its credit repair partner would "put a plan together to eliminate any negative items to boost your score," and that "you'd be the perfect candidate for a [mortgage, refinance, RTO, or car], but your credit is the only thing holding you back – this makes you a great match for credit repair." *Id.* ¶¶ 81–85, 97. These statements were scripted and were not tied to any individualized determination that the consumer's credit report contained inaccurate or out-of-date tradelines that could be removed, or other eligibility factors. *Id.* ¶ 84. Like the principal in *Lifewatch*, Progrexion benefitted from the fact that its Hotswap Partners' general and specific overstatements about the value of its services generated significant interest in Lexington Law and resulted in large numbers of new customers. *Id.* ¶¶ 39–40, 66–70, 74–75, 82–85.

In addition, Progrexion integrated its affiliates' marketing representations into its own sales pitches in a way that perpetuated or magnified the affiliates' misrepresentations. For example, when Progrexion telemarketers received a live-transfer call from HSP1, they made note of the consumer's goal—the illusory credit product offered by (and deceptively guaranteed by) HSP1—and reinforced the idea that Progrexion's credit repair services could help the consumer achieve that goal. Compl. ¶¶ 55–56. Progrexion integrated HSP1's marketing representations into its sales pitches with the explicit aim of increasing sales of its credit repair products. *Id.* ¶¶ 69–70. While Progrexion stopped short of repeating HSP1's false offers and guarantees, it did

nothing to dispel them and instead, as alleged in the Complaint, perpetuated the deception and used it to expand its credit repair business.

### C. Counts IV and V State Claims that Progrexion Substantially Assisted and Facilitated its Marketing Affiliates' Deceptive Practices

To state a claim for substantial assistance under the CFPA (Count IV), the Bureau must allege that a covered person or service provider violated the CFPA's prohibition on deceptive acts or practices and that Progrexion (1) knowingly or recklessly (2) provided substantial assistance to that covered person or service provider. 12 U.S.C. § 5536(a)(3). The person who provides substantial assistance is liable to the same extent as the person to whom such assistance is provided. *Id*. To state a claim for assisting or facilitating under the TSR (Count V), the Bureau must allege that a seller or telemarketer was making false or misleading statements to induce consumers to pay for goods and services and that Progrexion (1) knew or consciously avoided knowing about that conduct while (2) providing substantial assistance or support to the seller or telemarketer. 16 C.F.R. § 310.3(b).

Defendants do not contest that HSP1, or their other Hotswap Partners, are covered persons under the CFPA, or sellers or telemarketers under the TSR. Instead, in arguing for the dismissal of the substantial assistance claims, Counts IV and V (Mot. 16–24), Defendants fail to acknowledge the well-pleaded facts, invoke the wrong pleading standard, rely inappropriately on cases decided after summary judgment or trial, and make other unsupported legal assertions.

#### 1. The Complaint alleges Progrexion's knowledge or recklessness.

Defendants wrongly state that "the Complaint alleges no specific facts (none) to meet the requisite scienter." Mot. 17. The opposite is true. The Complaint alleges that Progrexion acted

knowingly or recklessly[9] by reviewing and approving misleading ads and scripts; receiving consumer complaints regarding the misrepresentations; receiving notice of a regulatory investigation regarding the misrepresentations; and being aware that HSP1, and likely other Hotswap Partners, were merely lead generators, but were offering—or even guaranteeing—illusory products and services to bait potential credit repair customers. *Supra* pp. 8–10; Compl. ¶¶ 47, 86–108.[10]

These allegations are similar to the facts deemed relevant to knowledge in two cases cited by Defendants. In the first, *FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013), the Tenth Circuit affirmed a judgment rendered after a bench trial holding the defendant liable under the "assisting and facilitating" provision of the TSR, 16 C.F.R. § 310.3(b). In *Chapman*, a defendant with no direct involvement in the deceptive telemarketing representations, was found to have actually known or consciously avoided knowing about the misrepresentations of another entity. 714 F.3d at 1216. The Tenth Circuit noted that the FTC had proven conscious avoidance through evidence that the defendant had an opportunity to review the unlawful marketing materials and chose not

---

[9] Defendants cite *CFPB v. Universal Debt & Payment Solutions*, No. 15-cv-00859, 2015 WL 11439178, at *6–7 (N.D. Ga. Sept. 1, 2015) (unpublished, referred to herein as "*Universal Debt I*"), for the principle that the Bureau must plead and prove "severe" recklessness for a substantial assistance claim. But the phrase "severe recklessness" is a term of art used by the Eleventh Circuit that "is identical to that used by other courts to describe what conduct they considered reckless." *Id*. The statute itself uses the term "recklessly," 12 U.S.C. § 5536(a)(3), and Defendants show no basis for departing from that text. Recklessness is "generally understood [] in the civil liability sphere as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Amer. v. Burr*, 551 U.S. 47, 68 (2007) (citations and internal punctuation omitted).

[10] Defendants incorrectly state (without citation) that "the Complaint rests on allegations of actual knowledge." Mot. 20 fn. 11. To the contrary, the Complaint explicitly rests on allegations of actual knowledge, reckless indifference, and conscious avoidance, as the statute and regulation allow. *See* Compl. ¶¶ 141, 150, 159, 162.

to. *Id.* at 1219. Quoting the FTC's TSR Compliance Guide, the court stated that "taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability." *Id.* (citation omitted). The second case, *Universal Debt II*, involved "warning signs" of misconduct that "were too numerous and too obvious" not to have alerted the defendant. 2019 WL 1295004, at *16. Here, Progrexion actually reviewed and edited HSP1's telemarketing scripts, had a stated policy of reviewing its Hotswap Partner's websites, and discussed taking actions to remain ignorant of its Hotswap Partners' representations to consumers. Compl. ¶¶ 87, 96–98, 106.

Defendants' argument for dismissal of the substantial assistance claims suffers from four fatal flaws. First, Defendants again base their argument on an assertion that Rule 9(b) applies, without addressing the Tenth Circuit authority holding that deception claims under the CFPA's analog, the FTC Act, are subject to Rule 8, not Rule 9(b). The Bureau addresses this issue *supra*, at pp. 3–7. Second, Defendants selectively cite to the legal counts, *e.g.*, Compl. ¶¶ 159, 166, and ignore the detailed allegations that illustrate how Progrexion was on notice of the deceptive representations made to its potential customers in the process of recruiting them to Progrexion's credit repair services. Compl. ¶¶ 86–108. Third, Defendants rely almost exclusively on cases decided at summary judgment and trial to argue that the Bureau has not pleaded a sufficient wealth of facts in its Complaint to allege knowledge. But at this stage, the Bureau is not required to prove knowledge; it is only required to allege knowledge, which it has done.

Finally, Defendants assert that, for the substantial assistance claims, "scienter must be pled separately as to each Defendant" and that, for each Defendant, the Bureau must show that an individual employee both knew about the deceptive conduct and provided substantial

assistance to it. Mot. 21. Neither their cited authorities, nor any other case the Bureau is aware of, support such an onerous pleading standard. *Universal Debt I*, 2015 WL 11439178, at *10–14, upheld substantial assistance claims that were pleaded in the same way and with the same level of detail as the instant claims, including one count against six individuals (as a group) and one count against four payment processor defendants (as a group).[11] Notably, none of the entities alleged to have provided substantial assistance were alleged to be subsidiaries of one another or members of a common enterprise, unlike the Progrexion entities here. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1273–75 (D.C. Cir. 2010), also cited by Defendants, concerned a *jury instruction* in a False Claims Act case regarding a "collective knowledge" theory that the court described as allowing "a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." No such innocent knowledge is involved here: the Bureau alleges that Defendants had actual knowledge, were recklessly indifferent, or consciously avoided knowing about deceptive conduct by their affiliates. Finally, Defendants cite *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366–67 (5th Cir. 2004), for the proposition that there is no "corporate scienter," but that was a case involving Rule 10b-5 under the Securities Exchange Act of 1934, which requires an intent to defraud, which is not at issue here. Knowledge and intent are not the same thing. *See*, *e.g.*, *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959) (distinguishing evidence of corporate knowledge from evidence of intent).

[11] The Complaint is available at: http://files.consumerfinance.gov/f/201504_cfpb_complaint-universal-debt.pdf.

**2. The Complaint alleges Progrexion's substantial assistance or support.**

To satisfy the "substantial assistance or support" requirement under 16 C.F.R. § 310.3(b), "there must be a connection between the assistance provided and the resulting violations of the core provisions of the TSR." *Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *6 (citation omitted) (substantial assistance found where defendant paid dealers to engage in telemarketing that violated TSR and allegedly knew or consciously avoided knowledge of violations). But the "threshold for what constitutes 'substantial assistance' is low." *FTC v. Consumer Health Benefits Ass'n*, No. 10-CIV-3551, 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012) (unpublished). The Bureau "must identify something more than a 'casual or incidental' help to the telemarketer,' but does not have to show a 'direct connection' between the assistance and the misrepresentation for an entity to be liable …." *FTC v. HES Merchant Srvs. Co., Inc.*, No. 6:12-cv-1618, 2014 WL 083506, *7 (M.D. Fla. Nov. 18, 2014) (unpublished) (citing *Chapman*, 714 F.3d at 1216). Thus, "[f]or example, cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator." *FTC v. Affiliate Strategies, Inc.*, No. 09-4104, 2011 WL 4352411, *8 (D. Kan. Sept. 16, 2011), *aff'd sub nom. Chapman*, 714 F.3d at 1217. On the other hand, "a third party who provides sellers or telemarketers with … help in creating sales scripts or direct mail pieces … while knowing or deliberately avoiding knowing that the seller or telemarketer is engaged in a Rule violation may be violating the Rule." *Id.* at *9. Likewise, "providing the products and services that formed the basis of the [telemarketers'] misrepresentations" constitutes substantial assistance. *Id.*

The *Universal Debt I* court held that to satisfy the "substantial assistance" requirement

under 12 U.S.C. § 5536(a)(3), the Bureau must show that the defendant: (1) "in some sort associated himself with the venture"; (2) "participated in it as in something that he wished to bring about"; and (3) "sought by his action to make it succeed." 2015 WL 11439178, at *12.

Here, the Bureau has met the requirements for pleading substantial assistance under the TSR, 16 C.F.R. § 310.3(b), and CFPA, 12 U.S.C. § 5536(a)(3), by pleading facts that show that:

- Progrexion associated itself with the venture by engaging in a closely-coordinated, high-volume, and long-term affiliate marketing relationship with HSP1 (Compl. ¶¶ 28–89);

- Progrexion participated in the venture as something that it wished to bring about by providing scripting materials, advertising content, designated phone lines, live-transfer mechanisms, and substantial monetary compensation for HSP1's marketing activities, and by training its own personnel and tailoring its own marketing materials to the Hotswap Partners' alleged offerings. (Compl. ¶¶ 47–48, 50, 52–53, 55–56, 59–63, 96–99); and

- Progrexion sought to make the venture succeed through the activities described above, and through providing strategic assistance and sales incentives for HSP1's employees, to maximize the substantial revenue it earned from the leads generated by HSP1 and other Hotswap Partners (Compl. ¶¶ 39, 62–64, 69–70, 75).

Defendants argue that the Complaint fails to allege that HSP1 or other Hotswap Partners used Progrexion's "facilities, premises, or personnel" to further the deception (Mot. 23, citing *Rochez Bros. v. Rhoades*, 527 F.2d 880, 888 (3d Cir. 1975)), but that is precisely what the Complaint alleges. The Hotswap Partners that engaged in deception used Progrexion's scripts, the strategic advice of its personnel, its live-transfer phone system, and its ability to consummate a sale, take payment from consumers (including through credit and debit cards) and distribute a share of those funds to the Hotswap Partner.[12] Compl. ¶¶ 59–65, 98–99, 123–26. Without

[12] Defendants' assertion that their payments to Hotswap Partners could not possibly constitute substantial assistance (*e.g.*, Mot. 23 fn. 12) overlooks the enormous value, especially to a bogus or high-risk business, of having another entity take the consumers' payments. *See, e.g.*, *Universal Debt*, 2015 WL 11439178, at *13–16 ("Without the ability to obtain payment processing accounts, the Debt Collectors could not have succeeded in their scheme.").

Progrexion, or another entity playing a similar role and providing similar assistance, a Hotswap Partner's deceptive marketing would not generate revenue and would have no reason to continue.

Moreover, as with their argument concerning knowledge or recklessness, Defendants rely exclusively on cases decided after summary judgment and trial, erroneously suggesting that the Bureau's Complaint should be as factually developed and detailed as the records in those cases. Mot. 22–23 (citing *Universal Debt II*, 2019 WL 1295004, at *6; *Chapman*, 714 F.3d at 1216; *Rochez Bros.*, 527 F.2d at 888).

Finally, Defendants argue for dismissal because "CFPB has explicitly instructed companies that have third-party relationships that they should monitor those third parties' contacts with consumers, review the third parties' training and marketing materials, and '[t]ak[e] prompt action' with the third parties to address any issues observed." Mot. 23–24 (citing CFPB Bulletin 2016-02 and CFPB Bulletin 2012-03). Defendants state: "The Bureau simply cannot have it both ways." Mot. 24. But there are no two ways about it. Here, Progrexion had knowledge that its affiliates were engaging in deception in obtaining customers for Progrexion, and continued to seek more customers through those channels. If Progrexion had followed the Bureau's bulletin, it would have instead taken prompt action to address those issues.

### D. The Complaint Need Not Name Additional Marketing Affiliates to State a Claim

Defendants assert that Counts II-V should be limited to HSP1's misrepresentations, because the Complaint contains more specificity with respect to HSP1 than other Hotswap Partners.[13] Mot. 8. But the Complaint provides more than enough factual support for the claim

[13] The Bureau need not name any Hotswap Partner as a defendant. *See Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) (not necessary to name all joint tortfeasors); *Milligan v. Anderson*, 522 F.2d 1202, 1204 (10th Cir. 1975) (not necessary to name agent in action against principal).

that one *or more* of Progrexion's Hotswap Partners engaged in deceptive marketing practices that Progrexion knew about and either participated in, controlled, ratified, or provided substantial assistance to. In addition to the allegations specific to HSP1, the Complaint describes how other Hotswap Partners made similar pitches and used similar telemarketing scripts (Compl. ¶¶ 46–47, 53, 68–70, 96, 106), and used "fake real estate ads, fake rent-to-own housing opportunities, fake relationships with lenders, false credit guarantees, and false and unsubstantiated statements about past consumer outcomes" to generate leads and sales for Progrexion (*id.* ¶ 72). The Complaint further alleges that Progrexion had knowledge of these deceptive practices among other Hotswap Partners. *Id.* ¶¶ 90–93, 105–08. The Federal Rules do not require more. *See* Fed. R. Civ. P. 8; *Affiliate Strategies*, 2010 WL 11470099, at *6 (claims for deceptive telemarketing survive where "plaintiffs have alleged sufficient facts to … rais[e] these claims to the level of plausibility").

### E. The Bureau Is Not Required to Plead the Date of Discovery for Purposes of the Statute of Limitations

Defendants state that the Bureau must bring claims under the CFPA and the TSR within three years from the date of discovery of the alleged violation. Mot. 25; 12 U.S.C. § 5564(g)(1).[14] However, the determination of the "date of discovery" for purposes of § 5564(g)(1), and any resulting limitations, is a question of fact that has not been determined, and that is appropriately dealt with later in this litigation. *Bistline v. Parker*, 918 F.3d 849, 876 n.12 (10th Cir. 2019) ("[Q]uestions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations

[14] Notably, each deceptive representation and each instance of illegal billing would constitute a new and separate cause of action under the CFPA or TSR. *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *20 (S.D.N.Y. Dec. 2, 2016). The Complaint plausibly alleges a continuing series of discrete violations that extended well past March 8, 2016. *See id.*

based on a more complete factual record." (citations omitted)).

Dismissal under Rule 12(b)(6) is only appropriate "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1298–99 (10th Cir. 2018) (citations omitted). Here, as Defendants concede, the Complaint does not state when the Bureau "discovered" Defendants' alleged violations. Mot. 25. Nor was the Bureau under any obligation to plead such facts. *Bistline*, 918 F.3d at 876 ("A complaint need not anticipate any affirmative defenses that may be raised by the defendant, including the statute of limitations; it is the defendant's burden to plead. . . ."); *Fernandez*, 883 F.3d at 1298–99; *Asebedo v. Kansas State University*, 559 Fed. App'x 668, 671–72 (10th Cir. 2014) (no obligation to plead against affirmative defenses). Therefore, there is not yet a "factual basis" for the elements of a statute of limitations defense under § 5564(g)(1) of the CFPA, and dismissal of any claim, in full or in part, is unwarranted.

### F. The Complaint Sufficiently Pleads a Common Enterprise and Does Not Rest on Impermissible Group Pleading

Defendants claim that each of the five causes of action must be dismissed because the Complaint relies on "impermissible" group pleading, Mot. 26–28, and they argue in a footnote that the common enterprise doctrine does not apply. Mot. 27 fn. 14. Defendants are incorrect.

The common enterprise doctrine holds that "[w]hen one or more corporate entities operate as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. LoanPointe, LLC*, No. 2:10-cv-225DAK, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011) (unpublished) (citations omitted); *see also FTC v. Wyndham Worldwide Corp.*, No. 13-1887, 2014 WL 2812049, at *4 (D.N.J. June 23, 2014) (unpublished). It is an exception to the general requirement that pleadings "specify which defendant is alleged to have committed

a particular act." *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (internal citations and punctuation omitted). Where a complaint "adequately alleges wrongdoing by the common enterprise … it is immaterial whether [the complaint] alleges that each [c]orporate [d]efendant 'specifically engaged in deceptive [practices].'" *Id.* at 470. Additionally, the status of one entity, such as being a "seller" or "telemarketer" under the TSR, may be imputed to the other defendants. *Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *10. The core tenet is that corporations "are liable for the conduct of other entities in the enterprise, regardless of whether the particular entity engaged in the behavior at issue." *Tax Club*, 994 F. Supp. 2d at 470.

Common enterprise liability reflects courts' recognition that, "where the public interest is involved … a strict adherence to common law principles is not required in the determination of whether a parent should be held [liable] for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970). This logic has led courts to apply common enterprise liability to the CFPA. *NDG Fin.*, 2016 WL 7188792, at *16; *CFPB v. Think Fin.*, 2018 WL 3707911, at *7; *Universal Debt II*, 2019 WL 1295004, at *14.[15]

In extending common enterprise doctrine to the CFPA, courts have noted that it serves the same public purpose as the FTC Act, as "[b]oth statutes are designed to protect the public from practices that unfairly exploit the imbalance of power between the individual consumer and the corporation … [and] empower watchdog agencies … to enforce their standards through

[15] Applying the same logic, the Tenth Circuit and other courts have applied the common enterprise doctrine to other financial protection statutes, like the Commodity Exchange Act. *Commod. Future Trading Comm'n v. Wall Street Underground*, 128 Fed. App'x 726, 728 (10th Cir. 2005).

investigation and litigation." *NDG Fin.*, 2016 WL 7188792, at *16. Likewise, courts have held that the parallel language of the CFPA and FTC Act necessitate interpreting the acts in the same way. *See supra* pp. 4–5 (citing cases). And it is well established that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Given the similarities in the statutory purpose and provisions, courts must presume that Congress, in borrowing the FTC Act's language in the CFPA, intended to adopt the associated common enterprise liability as well.

Defendants ignore the weight of authority on this issue and cite only to *Pennsylvania v. Think Finance*, No. 14-CV-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) (unpublished), for the proposition that common enterprise liability does not apply to claims brought by the Bureau. Mot. 27 n.14.[16] Since *Pennsylvania v. Think* was decided, the other courts that have examined this issue have criticized its reasoning. *See NDG Fin.*, 2016 WL 7188792, at *16; *CFPB v. Think Fin.*, 2018 WL 3707911, at *7; *Universal Debt II*, 2019 WL 1295004, at *14 n.11. In rejecting the holding in *Pennsylvania v. Think*, *the NDG Financial* court questioned the relevance of the factors cited in *Pennsylvania v. Think*, and observed that the court there "did not attempt to explain its reasoning." *NDG Fin.*, 2016 WL 7188792, at *16.[17] Rather, "[w]hat appears relevant are the two statutes' public interest purposes and Congress's use of parallel language and

[16] The Bureau was not a party. To avoid confusion with the Bureau's separate case against the same defendant, the cases are referred to as *Pennsylvania v. Think* and *CFPB v. Think Finance*.
[17] The factors cited in *Pennsylvania v. Think* and questioned in *NDG Financial* were: (1) the CFPA is enforced by multiple state and federal agencies, while the FTC Act is only enforced by the FTC; and (2) the CFPA allows suit against "unfair, deceptive, and abusive" practices, whereas the FTC Act only covers "unfair" and "deceptive" ones. 2016 WL 7188792, at *16.

structure." *Id.*; *see also Universal Debt II*, 2019 WL 1295004, at *14 n.11 ("In this Court's opinion, the reasoning in [*Pennsylvania v. Think*] is not particularly persuasive.").

To determine whether a common enterprise exists, courts consider such factors as whether the companies: "were under common ownership and control; whether they pooled resources and staff; whether they shared … employees, and email systems; and whether they jointly participated in a 'common venture' in which they benefited from a shared business scheme or referred customers to one another." *FTC v. Network Servs. Depot*, 617 F.3d 1127, 1142–43 (9th Cir. 2010). None of these factors is dispositive, and when determining whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008).

The Complaint sufficiently pleads a common enterprise among the Defendants. PGX Holdings wholly owns and controls Progexion Marketing, Progrexion Teleservices, eFolks, and CreditRepair.com. Compl. ¶¶ 9, 26.[18] Using an interconnected structure, they operate under common control, have common business functions, officers, employees, and office locations, and share advertising and marketing. *Id.* ¶19. Progrexion Marketing provided marketing services to Heath PLLC and CreditRepair.com, directed and controlled the telemarketing and sales activities of Progrexion Teleservices and eFolks, and contracted with consumer reporting agencies to provide essential aspects of the credit repair services offered by Lexington Law and CreditRepair.com. *Id.* ¶¶ 10, 22. Progrexion Teleservices telemarketed and sold the credit repair services. *Id.* ¶¶ 11, 56–58. eFolks generated leads for and telemarketed on behalf of Lexington

[18] PGX Holdings is the controlling shareholder of covered persons Progrexion Marketing, Progrexion Teleservices, eFolks, and CreditRepair.com, and is therefore a "related person" under 12 U.S.C. § 5481(25)(C)(i).

Law and CreditRepair.com. *Id*. ¶¶ 12, 44. And CreditRepair.com received leads from Progrexion Marketing and eFolks. *Id*. ¶¶ 13, 44. These allegations describe a tangled and interlocking network of intra-company affiliates. These facts, if proven, will be sufficient to demonstrate the existence of a common enterprise. *LoanPointe*, 2011 WL 4348304, at *10.

Finally, even if this Court were to conclude that the common enterprise doctrine is not available, the Complaint still meets the requirements of Rule 8. In *Pennsylvania v. Think*, despite rejecting common enterprise, the court concluded that the complaint was *not* deficient because of group pleading. The court stated that "[i]t is not group pleading per se … that violates the standard of Rule 8 … [r]ather, it is group pleading that fails to provide defendants with fair notice of what they are being accused." 2016 WL 183289, at *11 (citations omitted). Noting that each defendant was alleged to be part of the same scheme, and that "[t]he individual Defendants are aware of what services they provide," the court found that they were provided "sufficient factual detail to … [satisfy] the requirements of Rule 8." *Id.* at 12. The same is true here, where the Complaint describes the roles of the several Progrexion entities (Compl. ¶¶ 9–18, 22–27, 38, 44, 60, 70, 101–04, 110, 117–18) who are well aware of the services each provides.

### G. Defendants' Constitutional Challenge Lacks Merit; the Bureau Is Constitutionally Structured

In a last effort to avoid answering the allegations in this case, Defendants seek to turn the focus onto the Bureau itself, arguing that aspects of the Bureau's statutory structure violate the Constitution, rendering this Complaint—and most everything else the Bureau has done in its eight-year existence—invalid. That argument, however, has been rejected by two courts of appeals and nearly all the district courts that have addressed it. Those courts have agreed that the removal provision applicable to the Bureau's Director—which tracks verbatim the removal

protection for FTC Commissioners that the Supreme Court unanimously upheld in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)—is constitutional under *Humphrey's Executor* and other controlling Supreme Court precedent. This Court should do the same.

Defendants' related claim that the Bureau's method of funding violates Article I falls even further short of the mark. It has long been recognized that Congress may choose to fund agencies in whole or in part outside the annual appropriations process, and Defendants do not muster a single case to support their view that the Constitution in fact prohibits Congress from doing so. Nor does the Bureau's organic statute in any way preclude Congress from altering the Bureau's method of funding if it should see fit to do so.

**1. The removal provision is constitutional under binding precedent.**

The CFPA provides that the Bureau's Director may be removed only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). Defendants contend that this "for-cause" removal restriction unduly interferes with the President's Article II responsibility to take care that the laws be faithfully executed and that, as a result, the Bureau's Complaint must be dismissed. That argument, however, is foreclosed by controlling Supreme Court case law, as nearly every court to consider the question—including the D.C. Circuit sitting en banc and the Ninth Circuit—has concluded. *See PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc); *CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir. 2019), *petition for cert. pending*, No. 19-7 (U.S. June 28, 2019).[19]

---

[19] *See also CFPB v. Think Fin.,* 2018 WL 3707911, at *2; *CFPB v. All American Check Cashing, Inc.*, No. 16-cv-356, slip op. at 4–5 (S.D. Miss. March 21, 2018) (unpublished, attached as Ex. B), *appeal pending*, No. 18-60302 (5th Cir.); *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-2106, 2017 WL 3948396, at *10 n.23 (N.D. Cal. Sept. 8, 2017) (unpublished), *appeal pending*, No. 18-15431 (9th Cir.); *CFPB v. TCF Nat'l Bank*, No. 17-cv-00166, 2017 WL

Under the Supreme Court's precedents, restrictions on the President's authority to remove executive officers violate the constitutional separation of powers if they are "of such a nature that they impede the President's ability to perform his constitutional duty" to ensure the faithful execution of the laws. *Morrison v. Olson*, 487 U.S. 654, 691 (1988); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496 (2010) (applying this same test).

The Supreme Court has established that ordinary for-cause removal protection for the head of an agency like the Bureau passes this test. In *Humphrey's Executor*, the Court approved a for-cause removal protection for FTC Commissioners identical to the one here. 295 U.S. at 619–20, 623; *compare* 15 U.S.C. § 41 (FTC), *with* 12 U.S.C. § 5491(c)(3) (Bureau). As *Morrison* later explained, *Humphrey's Executor* reflected the Court's "judgment" that, in light of the FTC's functions, "it was not essential to the President's proper execution of his Article II powers that [the agency] be headed up by individuals who were removable at will." 487 U.S. at 691. This is because the ability to remove such an official for cause gives the President "ample authority to assure that the [official] is competently performing his or her statutory responsibilities." *Id.* at 692. "This reasoning … applies equally to the CFPB, whose Director is

---

6211033, at *6 (D. Minn. Sept. 8, 2017) (unpublished); *CFPB v. Seila Law, LLC*, No. 8:17-cv-1081, 2017 WL 6536586, at *2–3 (C.D. Cal. Aug. 25, 2017) (unpublished); *Navient Corp*., 2017 WL 3380530, at *9–19; *CFPB v. Future Income Payments, LLC*, 252 F. Supp. 3d 961, 970–75 (C.D. Cal. 2017), *vacated in part*, No. 17-cv-00303, 2018 WL 7502720 (C.D. Cal. Dec. 18, 2018); *CFPB v. CashCall, Inc*., No. 2:15-cv-7522, 2016 WL 4820635, at *13 (C.D. Cal. Aug. 31, 2016) (unpublished), *appeal pending*, No. 18-55479 (9th Cir.); *ITT*, 219 F. Supp. 3d at 890–99; *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086–92 (C.D. Cal. 2014).

Defendants simply ignore these cases, citing instead the vacated 2-1 panel opinion in *PHH*, a vacated 2-1 panel decision involving a different agency, *Collins v. Mnuchin*, 896 F.3d 640, 672–73 (5th Cir.) (holding unconstitutional the Federal Housing Finance Agency while expressly distinguishing the Bureau), and a lone district court decision that relied on reasoning the en banc D.C. Circuit rejected in *PHH*, *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729 (S.D.N.Y. 2018), *appeal pending*, No. 18-2743 (2d Cir.).

subject to the same for-cause removal restriction at issue in *Humphrey's Executor*," *Seila Law*, 923 F.3d at 683, and which performs a "remarkably similar" consumer-protection function as the FTC, *PHH Corp.*, 881 F.3d at 94.

The fact that the Bureau is headed by a single Director while the FTC is headed by a commission makes no difference under the controlling test established by the Supreme Court. "If anything, the President's for-cause removal prerogative may allow more efficient control over a solo head than a multi-member directorate." *Id.* at 98; *accord Seila Law*, 923. F3d. at 684. In contrast to a multimember body, where responsibility is more diffuse, "the CFPB Director's line of accountability to the President is clear and direct." *PHH Corp*., 881 F.3d at 98. "[I]f the President finds consumer protection enforcement to be lacking or unlawful, he knows exactly where to turn," and he need only replace a single official to change the direction of the agency rather than undertake the more difficult task of effectuating multiple for-cause removals. *Id.* For-cause removal thus gives the President at least as much (if not more) ability to oversee the Bureau's single Director as it does the five Commissioners who lead the FTC.[20]

Finally, even if Defendants were correct on the merits, dismissal of the Complaint would not be the proper remedy in this case because the removal provision can instead be severed from the rest of the statute. "[W]hen confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem." *Free Enterprise*, 561 U.S. at 508. Further, "[b]ecause the

---

[20] Defendants err in claiming that, because the Court referred to the FTC as a "body of experts" in the first part of its opinion in *Humphrey's Executor*, the opinion's constitutional holding is limited to commissions. *See* Mot. 30. In fact, the Court "made no mention of the agency's multi-member leadership structure when analyzing the constitutional validity of the for-cause removal restriction." *Seila Law*, 923 F.3d at 684. Defendants' view also "flies in the face of *Morrison*, which … upheld the constitutionality of for-cause removal protection for an individual agency head who exercised substantial executive authority." *PHH Corp*., 881 F.3d at 96.

unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial, invalidation is the required course." *Id.* (internal citation, quotation marks, and alterations omitted). These principles apply with even greater force here, because Congress expressly provided in the Dodd-Frank Act, of which the CFPA is one part, that "[i]f any provision of this Act … is held to be unconstitutional, the remainder of this Act … shall not be affected thereby." 12 U.S.C. § 5302.

Thus, even if this Court were to conclude that the for-cause removal provision is unconstitutional, it should simply sever that provision from the remainder of the statute and allow this case to move forward, as the vacated panel decision in *PHH* would have done. *See PHH Corp. v. CFPB*, 839 F.3d 1, 55 (D.C. Cir. 2016); *cf. Navient Corp.*, 2017 WL 3380530, at *18–19 (affirming Bureau's constitutionality while also stating that, "in the event that the Bureau's structure is found to be unconstitutional and the problematic provisions are severed …, the severance would not affect the CFPB's ability to maintain the present suit").

**2. The Bureau's method of funding is constitutional.**

Congress chose to fund the Bureau primarily outside of the annual appropriations process by authorizing it to draw upon the earnings of the Federal Reserve System, up to a specified cap. 12 U.S.C. § 5497(a). If the Bureau wants to exceed that amount, it must obtain any additional funding through the ordinary appropriations process. *See id.* § 5497(e). The statute also requires the Bureau's Director to report annually to the House and Senate Appropriations Committees about the Bureau's financial operating plans and use of funds. *Id.* § 5497(e)(4).

Defendants contend that the Bureau's funding runs afoul of the "established rule" that spending public funds "is proper only when authorized by Congress." Mot. 32. That argument

makes little sense because Congress *did* authorize the Bureau's funding when it enacted the CFPA. Having done so, Congress remains entirely free to change the Bureau's method of funding at any time through the ordinary legislative process.

Nor is there any constitutional requirement that agencies be funded through annual appropriations. It is instead well settled that Congress can "create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process." *PHH*, 881 F.3d at 95; *accord Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004). Indeed, Congress has done so since the Founding. *See* 1 Stat. 354 (May 8, 1794) (establishing a United States Post Office funded through rates of postage). Today, numerous agencies receive some or all of their funding outside of annual appropriations, and it is particularly common for Congress to choose to fund financial regulatory agencies that way. *See, e.g.*, 12 U.S.C. § 16 (Office of the Comptroller of the Currency); *id*. § 243 (Federal Reserve Board); *id.* §§ 1815(d), 1820(e) (Federal Deposit Insurance Corporation); 16 U.S.C. §§ 6802, 6806 (National Park Service); 21 U.S.C. §§ 379f–379j-62 (Food and Drug Administration). The Bureau is unaware of, and Defendants have not identified, any case holding that this commonplace method of agency funding is unconstitutional.[21] It isn't.

## IV. CONCLUSION

For the reasons stated, Defendants' motion to dismiss should be denied in full.

---

[21] Defendants hint in passing that the for-cause removal provision and the Bureau's method of funding might somehow "together" create a constitutional problem. Mot. 29. But because Defendants nowhere articulate why that would be so, they have waived this argument. In any event, it is without merit. *See PHH Corp.*, 881 F.3d at 96 (rejecting argument that Bureau's removal protection and method of funding combine to create a constitutional problem).

Dated: August 30, 2019

Respectfully submitted,

CARA PETERSEN
*Acting Enforcement Director*

DAVID RUBENSTEIN
*Deputy Enforcement Director*

CYNTHIA GOOEN LESSER
*Assistant Deputy Enforcement Director*

/s/ Maureen McOwen
MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*