Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELE-SERVICES, INC.; EFOLKS, LLC; CREDIT-REPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**DEFENDANT JOHN C. HEATH, P.C.'S (D/B/A LEXINGTON LAW) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I** |

**DEFENDANT JOHN C. HEATH, P.C.'S (D/B/A LEXINGTON LAW)
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I**

Pursuant to Federal Rule of Civil Procedure 56, Defendant John C. Heath, P.C. (d/b/a

Lexington Law) ("Heath P.C."), hereby moves for partial summary judgement for the reasons

detailed in the accompanying Memorandum of Law, Statement of Undisputed Material Facts,

and Appendix of Evidence.

WHEREFORE, Heath P.C. respectfully requests that the Court grant its Motion for Par-

tial Summary Judgment on Count I, for the reasons detailed in the accompanying Memorandum

of Law, Statement of Undisputed Material Facts, and Appendix of Evidence.

Dated:  August 20, 2021                    Respectfully submitted,

                                           /s/ Karra J. Porter
                                           Karra J. Porter
                                           Christensen & Jensen
                                           257 East 200 South, Suite 1100
                                           Salt Lake City, UT 84111
                                           (801) 323-5000
                                           karra.porter@chrisjen.com

                                           Thomas M. Hefferon*
                                           W. Kyle Tayman*
                                           Christina Hennecken*
                                           Virginia McCorkle*
                                           Goodwin Procter LLP
                                           1900 N Street, N.W.
                                           Washington, D.C. 20036
                                           (202) 346-4000
                                           thefferon@goodwinlaw.com
                                           ktayman@goodwinlaw.com

                                           William J. Harrington*
                                           Goodwin Procter LLP
                                           620 Eighth Avenue

New York, NY 10018
(212) 459-7140
wharrington@goodwinlaw.com

Courtney Hayden*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
chayden@goodwinlaw.com

*Attorneys for Defendants*
(*admitted *pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ Karra J. Porter
Karra J. Porter

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELE-SERVICES, INC.; EFOLKS, LLC; CREDIT-REPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN C. HEATH, P.C.'S (D/B/A LEXINGTON LAW) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I** |

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF SOUGHT ............................................................... 1

REGULATORY BACKGROUND ............................................................................. 4

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 9

   I.   Credit Report Errors and Consumer Complaints ............................................ 9

   II.   John C. Heath P.C.'s Services ...................................................................... 10

   III.   Heath P.C.'s Billing Practices ...................................................................... 12

   IV.   Heath P.C.'s Policies and Practices Concerning Promises or Guarantees of Specific Results ............................................................................................... 15

   V.   Former Lexington Client Stanford Littleman ............................................... 17

   VI.   Guidance to Credit Repair Companies ........................................................ 17

LAW AND ARGUMENT ......................................................................................... 17

   I.   Legal Standard .............................................................................................. 17

   II.   The TSR Advance Fee Provision does not cover a contractual agreement to provide credit repair services; it covers only promises to achieve certain results with respect to credit history. ......................................................... 18

       A.   The plain text requires that "results" be "promised" for the six-month limitation to apply, and "results" does not mean "services." ................... 19

       B.   The FTC's commentary on the TSR Advance Fee Provision confirms that the Provision applies only to promises to deliver specific results with respect to a consumer's credit record, not to provide credit repair services more generally. ..... 22

       C.   The CFPB's reading of the TSR Advance Fee Provision exceeds the scope of the Provision's purpose and statutory authority. ......................... 25

       D.   The CFPB's reading of the TSR Advance Fee Provision leads to absurd results. .. 29

   III.   The CFPB's interpretation of the TSR Advance Fee Provision imposes unconstitutional burdens on commercial speech. ........................................ 30

       A.   The TSR Advance Fee Provision is a content-based restriction on truthful, non-misleading speech. ......................................................... 32

       B.   There is no evidence to support the notion that imposing the TSR Advance Fee Provision on *all* credit repair service providers who provide services over the telephone will directly advance the government's interests in protecting consumers from unfair conduct ......................... 34

   IV.   Defendants do not "promise results," i.e., guarantee they will remove accurate derogatory information or improve credit. ................................... 36

       A.   Heath P.C. tells every client that it cannot and does not promise results. .............. 36

i

B.    As an example, a Heath P.C. client was not promised results and the CFPB cannot state a claim regarding him. ...................................................................................... 37

CONCLUSION ........................................................................................................................ 39

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Agnew v. Granite Seed Co.*,
   No. 2:16-cv-00887-BSJ, 2017 WL 8776902 (D. Utah Dec. 11, 2017) .................................17

*Aptive Envt'l, LLC v. Town of Castle Rock*,
   959 F.3d 961 (10th Cir. 2020) ...........................................................................31, 32, 34, 35

*Barnhart v. Walton*,
   535 U.S. 212 (2002).........................................................................................................25

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012).........................................................................................................19

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*,
   138 S. Ct. 960 (2018).......................................................................................................18

*Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co.*,
   972 F. Supp. 1379 (D. Utah 1997) (Jenkins, J.)..............................................................19

*DuCharme v. Heath*,
   No. 10-02763, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010)...........................................8

*Edenfield v. Fane*,
   507 U.S. 761 (1993).........................................................................................................34

*Ellis v. J.R. 's Country Stores, Inc.*, 779 F.3d 1184 (10th Cir. 2015) .......................................22

*Henderson v. Stanton*,
   76 F. Supp. 2d 10 (D.D.C. 1999).....................................................................................22

*In re Investment Bankers, Inc.*,
   4 F.3d 1556 (10th Cir. 1993) ...........................................................................................29

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018).......................................................................................................31

*Martin v. Occupational Safety & Health Review Comm'n*,
   499 U.S. 144 (1991)..........................................................................................................18

*Martin v. Occupational Safety Health & Review Comm'n,*
   941 F.2d 1051 (10th Cir. 1991) ...................................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)......................................................................................28

*New York v. U.S. Dep't of Labor,*
   363 F. Supp. 3d 109 (D.D.C. 2019), *appeal docketed,* No. 19-5125 (D.C. Cir.
   filed Apr. 30, 2019)...................................................................................29

*Pac. Frontier v. Pleasant Grove City,*
   414 F.3d 1221 (10th Cir. 2005) .................................................................34

*SEC v. Chenery,*
   318 U.S. 80 (1943).....................................................................................28

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
   502 U.S. 105 (1991)...................................................................................32

*Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human
   Servs.,*
   742 F.3d 1239 (10th Cir. 2014) .................................................................29

*Time Warner Entm't Co., L.P. v. Everest Midwest Licensee L.L.C.,*
   381 F.3d 1039 (10th Cir. 2004) .................................................................19

*United Rentals Nw., Inc. v. Yearout,*
   573 F.3d 997 (10th Cir. 2009) ...................................................................17

*Usery v. Kennecott Copper Corp.,*
   577 F.2d 1113 (10th Cir. 1977) .................................................................25

*Utah Licensed Beverage Ass'n v. Leavitt,*
   256 F.3d 1061 (10th Cir. 2001) .................................................................31

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio,*
   471 U.S. 626 (1985)...................................................................................33

STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 1679a(3)(A)...................................................................................21

15 U.S.C. § 1679b.............................................................................................21

15 U.S.C. § 1679b(b) ..........................................................................................8

15 U.S.C. § 1681i ........................................................................................24

15 U.S.C. § 6102(a)(1) ..................................................................................5

15 U.S.C. § 6102(b) ....................................................................................18

15 U.S.C. § 6105(d) ......................................................................................3

16 C.F.R. § 310 .............................................................................................4

16 C.F.R. § 310.4(a)(i)-(ii) ...........................................................................5

16 C.F.R. § 310.4(a)(2)(ii) ...............................................................21, 32, 38

16 C.F.R. § 310.4(a)(3) ...............................................................................22

Fed. R. Civ. P. 56(c) ...................................................................................17

## LEGISLATIVE AND REGULATORY HISTORY

*Oversight of Telemarketing Practices and the Credit Repair Organizations Act:*
   *Hrg. Before the S. Comm. Commerce, Science & Transp.*, 110th Cong. 110-
   1170 (July 31, 2007) ...............................................................................8

60 Fed. Reg. 8,313 (Feb. 14, 1995) ............................................................25

60 Fed. Reg. 43,841 (Aug. 25, 1995) .......................................................6, 25

67 Fed. Reg. 4,492 (Jan. 30, 2002) ................................................... *passim*

## OTHER AUTHORITIES

CFPB, *What are Common Credit Report Errors that I Should Look for on My
   Credit Report?* (June 8, 2017), https://www.consumerfinance.gov/ask-
   cfpb/what-are-common-credit-report-errors-that-i-should-look-for-on-
   myRcredit-report-en-313/ ......................................................................28

FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Jan.
   2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-
   telemarketing-sales-rule#creditrepair ...................................................6, 24

*Promise*, Black's Law Dictionary (11th ed. 2019) .....................................20

*Promising*, Merriam-Webster Dictionary (11th ed. 2003) ...........................21

*Result*, Black's Law Dictionary (11th ed. 2019) .......................................20

*Service*, Black's Law Dictionary (11th ed. 2019)..........................................................................20

## INTRODUCTION AND RELIEF SOUGHT

For decades, credit repair service providers have operated on the understanding that it is permissible to invoice customers in arrears on a monthly basis for work that the provider has completed, provided that, when offering their services to potential customers over the phone, they do not make specific promises or guarantees that the customer's credit will get better, or that accurate negative information will be removed from the customer's credit report.  That understanding springs from the Telemarketing Sales Rule ("TSR") promulgated by the Federal Trade Commission ("FTC"), under which the making of such promises over the phone forces the service provider to wait six months after the "promised results" are achieved before requesting or collecting payment.  This rule is known as the "Advance Fee Provision."  The FTC has consistently articulated the view that the Advance Fee Provision's six-month waiting period was an appropriate consumer protection measure because a promise or guarantee to improve credit is potentially abusive; such a promise often cannot be fulfilled and such empty promises were historically used by scammers offering illusory assistance.  Companies and law firms providing credit repair services like Defendant John C. Heath, Attorney at Law P.C. ("Heath P.C.") have built their businesses around that understanding of the law, promising nothing except good faith efforts to review their clients' credit record and to communicate with creditors and consumer reporting agencies (i.e., the credit bureaus).

The Bureau of Consumer Financial Protection ("CFPB")—which has no regulatory authority to interpret the TSR—now seeks to apply the TSR in a way that threatens to drive legitimate companies and law firms out of business.  Despite the plain terms of the Advance Fee Provision, and the purpose of its limited billing restriction, the CFPB now says *anyone* who offers credit

1

repair services over the phone cannot send a bill for services for at least six months and only after the services are rendered. In Count I of its Complaint, and during discovery, the CFPB has made clear that it is taking the novel position that "promised results," as that phrase is used in the TSR, means "promised services," and that the mere mention of "credit repair" over the telephone is enough for the TSR Advance Fee Provision (and the corresponding six-month restriction) to apply.

The consequence of this reading of the TSR would be catastrophic for Heath P.C. and its legal clients. Unlike practically any other law firm providing advice and advocacy on its clients' behalf, Heath P.C. would have to wait at least six months when offering services over the telephone before it billed for those services—and it could *never* bill someone for whom it worked unless the client actually prevailed. To avoid this obviously untenable result, Heath P.C. would have to take the equally untenable step of greatly restricting client interaction over the telephone. This may be the result the CFPB wants to achieve—making credit repair services widely *unavailable* by telephone—but it is neither a required nor even a permissible reading of the TSR.

Indeed, the CFPB's reading of the Advance Fee Provision is wrong for at least five reasons.

First, the CFPB's interpretation is ***atextual***. The TSR's billing rules simply do not apply unless the consumer was "promised results." If no result is guaranteed, then the restriction does not apply. Despite the CFPB's preferred result, the TSR does not provide billing requirements when there are "promised services," or restrict the collection of payment to six months after "promised services are achieved"—the Advance Fee Provision says "promised results." And the plain reading of the TSR is that "promised results" means a promise that the service will improve a person's credit record (e.g., by raising a credit score or by removing negative information from a credit record). There is no evidence that Heath P.C. routinely promised its clients that it would

2

actually succeed in improving their credit record, so there is no basis for relief under Count I.

Second, the CFPB's interpretation is ***unsupported by the regulatory history***. The FTC implemented the uniquely restrictive billing rules to go after "fundamentally bogus" schemes purporting to offer credit repair. The six-month rule targeted a specific practice cited in the rulemaking record, where fraudsters would promise results and then use unsavory tricks to cause the credit agencies to temporarily remove even accurate negative items. After then being billed and having paid the scam artists, consumers would learn months later that the negative items only had been temporarily removed but were then reinserted. The six-month restriction responds to this "fundamentally bogus" practice. Broadening the TSR Advance Fee Provision and its six-month restriction so that they indiscriminately apply to all credit repair services would sweep in legitimate providers like Heath P.C., a result that the FTC did not intend.

Third, the CFPB's interpretation ***exceeds the Advance Fee Provision's purpose and source of statutory authority***. Although the CFPB has the ability to enforce the TSR, *see* 15 U.S.C. § 6105(d), the Rule was enacted by the FTC. The FTC wanted the six-month restriction to apply to credit repair schemes that made illusory promises of guaranteed outcomes, with no intent to ever deliver—schemes that amounted to "outright theft." The FTC imposed such a harsh restriction because it believed there were *no* benefits to be had for such services. By contrast, legitimate credit repair services *do* offer a benefit, so imposing the restriction on them cannot be justified under the same rationale. Indeed, nothing in the rulemaking record suggests that the FTC ever contemplated regulating such services, and the Rule cannot be justified post hoc on that basis now.

Fourth, the CFPB's interpretation leads to ***absurd results***. The restriction places credit repair service providers in circumstances where they may never be paid for legitimate services

3

rendered.  Forcing credit repair providers to delay the collection of payment would put them out of business, at least in the significant telephone credit repair market.

Finally, the CFPB's interpretation is ***unconstitutional, and thus should be avoided.***  The undisputed fact is that such a rule effectively prohibits credit repair companies from marketing by phone.  Because the CFPB's purported six-month restriction would impose this unconscionable restriction on any business that truthfully describes its services as intended to help with credit repair—and only on such businesses—it is a content-based limitation on commercial speech.  The CFPB's interpretation renders the rule an unconstitutional content-based restriction because there is no evidence that imposing such a restriction indiscriminately on all credit repair services will advance the government's aims of preventing fraudsters from tricking people into buying "services" for *promised* results that the fraudsters would never deliver.

This Court should hold that the TSR's six-month limitation for requesting or receiving payment for credit repair services applies only where the service provider *promises* (i.e., guarantees) specific results.  It is undisputed that Heath P.C. explicitly told every client relevant to this case that it could not and did not guarantee results.  As a result, the TSR's restrictions on the collection of advance fees does not apply to Heath P.C.'s conduct and communications with its clients.  Accordingly, this Court should enter summary judgment on Count I in favor of Heath P.C.

## **REGULATORY BACKGROUND**

Count I of the CFPB's Complaint alleges a violation of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.  The Federal Trade Commission (FTC) promulgated the TSR to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's mandate to "prescribe rules

prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1) ("Telemarketing Act").

One of the TSR's restrictions includes a restriction on asking for, or receiving, payment for certain credit repair services for "promised results." Specifically, the Rule says, in pertinent part ("TSR Advance Fee Provision" or "Provision"):

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> . . .
>
>> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>>
>>> (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and
>>>
>>> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose.

16 C.F.R. § 310.4(a)(i)-(ii).

The requirement to show that "promised results" had still been achieved six months later arose from a particular type of fraudulent scheme perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. The FTC's commentary on the purpose of the

Provision when it finalized the TSR noted that the Provision was intended to target "deceptive credit repair services," *i.e.*, which "promise consumers that, for a fee paid in advance, they will improve the consumer's credit record by removing negative information from that record."  60 Fed. Reg. 43,841, 43,853 (Aug. 25, 1995).  The FTC viewed such offerings as deceptive because "[o]nce the fee is paid," "the seller fails to deliver the promised services or achieve the promised results, and the consumer's credit record does not improve."  *Id.*  The FTC's current guidance further explains the deceptive behavior that the Provision targets:  a fraudster may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the accuracy of [legitimate] negative entries," with the credit bureau temporarily removing the negative entries pending an investigation.  FTC, *Complying With the Telemarketing Sales Rule*, (June 2016, last updated Jan. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair.   Faced with so many challenges, the credit repair companies cannot complete the investigations within the statutorily required 30-day period, so the negative items are provisionally removed.  *Id.*  The temporary removal of the negative entries makes it seem as if the consumer's credit record has improved.  *Id.*  The fraudster takes the consumer's money, the negative entries resurface once the investigation is complete (as there is no basis for their removal), the consumer's credit record plummets back to its baseline, and the fraudster will have achieved nothing for the consumer.  *See id.*[1]

One entity commenting on the TSR Advance Fee Provision, the United States Postal Service, shed additional light on the sort of credit repair services that the FTC intended to target with

---

[1] Heath P.C. did not offer this "fundamentally bogus" service, and the CFPB does not allege that it does.

the Advance Fee Provision.  The Postal Service made clear that there was a need to distinguish "[s]o-called credit repair services" and "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer."  **Exhibit Q**, U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. 411001.  The "[s]o-called credit repair services" would usually provide just "written advice to customers on how to obtain copies of their credit reports," and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with other borrowed funds)," but do nothing else.  *Id.*

The National Consumer League also encouraged the FTC to adopt a rule that restricts "collection of fees before services are rendered."  **Exhibit R**, Nat'l Consumer League, Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 28, 1995), FTC File No. 411001.  "[M]ost fraudulent operations have no intention of fulfilling their obligation," the League observed, so "the denial of up front money will become an important consumer protection."  *Id.*

In 2002, the FTC revisited the TSR Advance Fee Provision, not to change its terms but to further explain the Provision's underlying rationale.  The FTC believed that the Provision served the aims of the Telemarketing Act and "consumer privacy" "less distinctly" than other prohibitions in the TSR.  67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002).  Thus, the FTC determined that it was "appropriate and prudent" to place the TSR Advance Fee Provision within "the purview of its traditional unfairness analysis," as provided by the Federal Trade Commission Act.  *Id.*  The restricted credit repair services, the FTC reasoned, were "unfair" because such services had no benefits to offer.  *Id.*  "An important characteristic common to credit repair services" schemes prohibited by the TSR, "is that in each case the offered service is fundamentally bogus."  *Id.*  "[T]he

7

essence of these schemes," the Commission reasoned, was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.*  In other words, the Provision was meant to prohibit unfair conduct by placing conditions on services that the Commission viewed as "outright theft." *Id.*

Shortly after the FTC promulgated the TSR, Congress enacted the Credit Repair Organizations Act (CROA) in 1996, which set forth a statutory construct for the operation of legitimate credit repair services.  CROA contains its own restriction on the collection of upfront payment before any service is rendered, stating that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."  15 U.S.C. § 1679b(b).  At least one court has held that, under CROA, credit repair organizations may bill customers for services already performed on a periodic basis. *DuCharme v. Heath*, No. 10-02763, 2010 WL 5211502, at *6 (N.D. Cal. Dec. 16, 2010).  Congress subsequently considered whether to amend CROA to prohibit the practice of billing monthly in arrears (which Heath P.C. does), whereby service providers comply with the statute by performing upfront services and then "separately charge a set-up fee . . . and a monthly report fee," but Congress did not enact any legislation on that issue. *Oversight of Telemarketing Practices and the Credit Repair Organizations Act:  Hrg. Before the S. Comm. Commerce, Science & Transp.*, 110th Cong. 110-1170, at 34 (July 31, 2007) (prepared statement of Joanne Faulkner, Attorney, Nat'l Ass'n of Consumer Advoc., Nat'l Consumer L. Ctr., U.S. PIRG, and Consumer Fed. of Am.).

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**I.      Credit Report Errors and Consumer Complaints**

1.      Credit reports frequently contain erroneous information that hurts consumers.  *See* **Exhibit A**, CFPB-PGX-221265, FTC, *Report on Credit Education and the Credit Repair Organizations Act* (describing results of FTC studies showing "documented problems with the accuracy of the information in the credit reporting system.").  One FTC study, conducted at Congress's instruction, "showed that one in four consumers identified inaccuracies in their credit reports." *Id.* The FTC found "that a large number of errors persist in credit reports and in many instances have a significant impact on consumers' credit scores." *See id.*; *see also* **Exhibit B**, CFPB-PGX-141436,  CFPB Credit Reporting Whitepaper (explaining "inaccuracies in [] credit files inevitably occur" and that a consumer's "credit score may be unfairly reduced by a negative trade line that belongs to another consumer"); **Exhibit C**, CFPB-PGX-132009 at 132015, Lexington Law: The Case for Credit Repair, *Credit Reporting Errors* (summarizing testimony to a Congressional committee concerning furnishers continuing to be a source of great numbers of credit reporting errors).

2.      The CFPB frequently receives consumer complaints regarding such errors.  In 2020, the number-one category of complaints cataloged in the CFPB's Consumer Complaint Database were complaints relating to "incorrect information on [a consumer's credit] report." **Exhibit D**, Admissions by CFPB, Admission No. 51.  And between December 1, 2011 and December 8, 2020, the Bureau received more than 80,000 consumer complaints characterized as  "[the credit reporting agency's] investigation did not fix an error on [a consumer's] report." *Id.*, Admission No. 52; *see also* **Exhibit E**, CFPB-PGX-215935 at 215943, CFPB & Credit Repair (showing credit

or consumer reporting errors accounting for 38% of consumer complaints handled by the CFPB in 2018).

**II.     John C. Heath P.C.'s Services**

3.     Defendant Heath P.C., which does business as Lexington Law Firm, is a law firm based in Salt Lake City, Utah.  **Exhibit F**, Heath Decl.¶ 1.

4.     Heath P.C. provides a wide range of credit repair services to help its clients enforce their legal rights to ensure that items on the clients' credit reports are fair, accurate and substantiated.  These services are intended to address the problems recognized by the FTC and the CFPB: there are errors and inaccuracies in a consumer's credit report that need to be corrected.  *Id.* ¶ 2.

5.     On behalf of its clients, Heath P.C. submits communications to the three major consumer reporting agencies, asking them to verify that the information reported by the furnisher is accurate, or explaining that the tradeline (a) is not the client's, (b) was "never late," or (c) was not appropriately reported.  **Exhibit F**, Heath Decl. ¶ 3; **Exhibit G-1**, Ulzheimer Report, at 20.

6.     Heath P.C. works with and has contracts with all three major credit reporting agencies—Equifax, Experian, and TransUnion—and uses an established process to submit challenges to the agencies electronically.  **Exhibit F**, Heath Decl. ¶ 4; **Exhibit G-1**, Ulzheimer Report, at 18-19; **Exhibit H**, Heath Dep. 61:25-62:5; 286:7-10; 287:5-14.

7.     Heath P.C. also submits "intervention" letters on behalf of clients, which include: (a) account information requests, which ask furnishers to verify that the information in the tradeline provided to the bureaus can be substantiated; and (b) goodwill interventions, which ask that creditors forgive a client's mistake in being late by less than 30 days.  **Exhibit F**, Heath Decl. ¶ 5; **Exhibit G-1**, Ulzheimer Report, at 20-21.

8.      Heath P.C.'s "focus tracks" allow clients to tailor the content and personalize challenges and intervention letters based on whether the client is facing a credit issue related to military service, student debt, divorce, medical bills, and identity theft.  **Exhibit F**, Heath Decl. ¶ 6; **Exhibit G-1**, Ulzheimer Report, at 20.  The focus tracks are tailored to certain laws that protect individuals who have experienced these events, such as the Servicemembers Civil Relief Act.  **Exhibit F**, Heath Decl. ¶ 7; **Exhibit G-1**, Ulzheimer Report, at 20.

9.      Where appropriate, Heath P.C. will use "escalated approaches" on behalf of a client.  **Exhibit F**, Heath Decl. ¶ 8.  This includes, but is not limited to, "hot document" review, in which attorneys review documentary evidence and determine whether it supports a claim that a negative item on a credit report is being inaccurately or improperly reported, and notarized challenges and dispute letters, which are designed to encourage an investigation by the credit reporting agency. *Id*.

10.     Heath P.C. also provides legal advice to its clients on issues such as wrongful repossessions, liens, and the Fair Credit Reporting Act.  **Exhibit F**, Heath Decl. ¶ 11.

11.     Heath P.C. educates its clients on how to improve their credit record and overall creditworthiness.  **Exhibit F**, Heath Decl. ¶ 12; **Exhibit G-1**, Ulzheimer Report, at 21.

12.     Since March 2016, Heath P.C. has helped clients identify and remove more than 16 million negative entries from their credit reports.  **Exhibit G-1**, Ulzheimer Report, at 21.  "These removals are overwhelmingly of items that can negatively impact consumer credit scores, such as collection accounts, late payments, and charged off accounts."  **Exhibit G-1**, Ulzheimer Report, at 24.

13.     From March 2016 onward, over 87% of Heath P.C.'s clients have seen at least one negative item removed, with more than half of the firm's clients seeing five or more removals. **Exhibit G-1**, Ulzheimer Report at 21.  32% of Heath P.C.'s clients obtained removals of one to four negative items, 18% of clients obtained between five and eight removals, and 29% of clients— roughly 1,161,497 clients—obtained more than eight removals.  *Id.* at 22.

14.     Heath P.C.'s data demonstrates that the longer a client uses its services, the more removals that client is likely to obtain.  *Id.* at 23-24.  In particular, clients obtained an average of 3.64 removals after one month of using Heath P.C.'s services.  *Id.* at 23.  By the end of the second month, that number goes up to an average of 5.48 removals.  *Id.*  By the end of the third and fourth months, clients obtained an average of approximately 6.99 and 8.32 removals, respectively. *Id.*  At six months, the average number of removals increased to 9.86.  *Id.*  Finally, after a year of engaging Heath P.C., clients obtained an average of 14.36 removals.  *Id.* at 24.

15.     Historically, only a small fraction of a percentage of all removals obtained by Heath P.C. clients were reinserted into a client's credit report.  **Exhibit V**, LEX0004324 (showing rein- sertion rate of 0.0059% for data set of "nearly two million Removals" during two-month span in 2015); *see also* **Exhibit G-1**, Ulzheimer Report at 21 ("Additionally, Lexington Law clients rarely see removed items reinserted onto their credit reports.").

## III.    Heath P.C.'s Billing Practices

16.     Heath P.C. employs a monthly subscription model, in which it charges in arrears for its services, generally in monthly increments.  **Exhibit F**, Heath Decl. ¶ 13; *see also* **Exhibit F-2**, LEX0000540, Engagement Agreement.  In addition to the monthly subscription fee, Heath P.C. charges its clients a "first work" fee, which is a one-time charge that ranges from $49.95 to

$129.95.  **Exhibit F**, Heath Decl. ¶ 16; *see also* **Exhibit F-2**, LEX0000540, Engagement Agreement.  The "first work" fee covers initial services rendered by Heath P.C., including (1) an initial interview to set up the client's case and record; (2) analysis of a credit report and identification of potentially inaccurate tradelines; and, (3) preparing the initial round of letters challenging the potentially inaccurate tradelines (if any are found).  **Exhibit F**, Heath Decl. ¶ 17.

17.     The "first work" fee is not charged until Heath P.C. completes its "first work" services.  **Exhibit H**, Heath Dep. at 116:8-117:9; **Exhibit F**, Heath Decl. ¶ 18; **Exhibit O**, Heath P.C. Interrogatory Responses, No. 10; **Exhibit J**, PGX0060515, Master Script.

18.     The monthly service fees range from $89.95 to $129.95 per month depending on the different service level or product chosen by the client.  **Exhibit F**, Heath Decl. ¶ 14; *see also* **Exhibit F-2**, LEX0000540, Engagement Agreement.  The monthly service fee is not charged until after Heath P.C. completes work on the client's behalf.  **Exhibit H**, Heath Dep. at 123:25-124:10; **Exhibit F**, Heath Decl. ¶ 15; **Exhibit O**, Heath P.C. Interrogatory Responses, No. 10; **Exhibit J**, PGX0060515, Master Script; **Exhibit K-1**, DelPonti Report ¶ 61.

19.     Every month, Heath P.C. conducts "Value Reconciliation" (or "ValueRec") analyses for its clients to determine whether the value of services received by an individual client is equal to, or exceeds, the amount that the client will be billed for that month.  **Exhibit F**, Heath Decl. ¶ 19.

20.     If a client's "Value Rec" analysis shows that the client has not received the full value of his or her upcoming monthly payment, Heath P.C. will not bill the client until sufficient services are performed.  **Exhibit F**, Heath Decl. ¶ 20.  Heath P.C. may also recommend that the

13

client either switch to a lower price product (such as credit monitoring), or cancel his or her monthly subscription altogether. *Id*.

21.     Clients may cancel Heath P.C.'s services at any time. **Exhibit F**, Heath Decl. ¶ 21; **Exhibit F-2**, LEX0000540, Engagement Agreement; **Exhibit J**, PGX0060515, Master Script.

22.     Not all clients who sign up end up paying for services. **Exhibit K-1**, DelPonti Report ¶ 106. Heath P.C.'s billing model allows it to determine (within 30 days of an invoice) whether a client will pay for its services. *Id.* ¶ 69. If the client does not pay the invoice, Heath P.C. attempts to collect payment for services rendered over a predetermined period of time once services have been performed and payment has not been received. *Id.* ¶ 106. After 30 days of nonpayment, when this time period has expired, Heath P.C. discontinues providing services. *Id.*

23.     A delayed billing model would require Heath P.C. to continue providing months' worth of services to clients without knowing whether a customer will pay. *Id.* ¶ 69. Under that approach, Heath P.C. would not be able to effectively evaluate the collection risk amongst those that are able to pay to those that cannot until after the six-month timeframe. *Id.*

24.     If Heath P.C. delayed accepting payments by a total of seven months, it would result in significant losses and render the telephone aspect of its business inoperable. *Id.* ¶ 83.

25.     No credit repair company has established a viable telephone business model in which it waited six months before charging fees for its services. **Exhibit F**, Heath Decl. ¶ 34; *see generally* **Exhibit K-1**, DelPonti Report ¶ 57.

**IV.      Heath P.C.'s Policies and Practices Concerning Promises or Guarantees of Specific Results**

26.      Heath P.C. tells and has told each of its clients that it does not guarantee or promise results.  **Exhibit F**, Heath Decl. ¶ 22; **Exhibit J**, PGX0060515, Master Script; **Exhibit O**, Heath P.C. Interrogatory Responses, No. 16.

27.      At the intake stage, every client is told orally that Heath P.C. does not and cannot promise results.  Every client is told that Heath P.C. "do[es] not promise any specific outcome" and that "every case is unique which is why [Heath P.C.] can't promise or guarantee any specific result from our work."  **Exhibit F**, Heath Decl. ¶¶ 22-23**; Exhibit F-1**, PGX0028796, Script; **Exhibit J**, PGX0060515, Master Script**; Exhibit L**, PGX0028460, Script.  Agents are required to read these disclosures verbatim. **Exhibit F**, Heath Decl. ¶ 24.

28.      Every client signs an engagement agreement with Heath P.C.  **Exhibit F**, Heath Decl. ¶ 25; *see also* **Exhibit F-2**, LEX0000540, Engagement Agreement.  That agreement explicitly states that Lexington does not promise results:  "[Heath P.C.] cannot guarantee and you are not paying for a particular credit report outcome or result." **Exhibit F**, Heath Decl. ¶ 25; **Exhibit F-2**, LEX0000540, Engagement Agreement.  In signing the engagement agreement, each client represents that they "understand and acknowledge that [they] are not paying for, and that [Heath P.C.] does not make, any representation, warranty, promise or guarantee as to any particular outcome or result."  **Exhibit F**, Heath Decl. ¶ 25; **Exhibit F-2**, LEX0000540, Engagement Agreement.

29.      Heath P.C.'s website informs potential clients that "credit repair companies cannot guarantee results."  **Exhibit F**, Heath Decl. ¶ 27; **Exhibit F-3**, PGX0027751, Heath P.C.'s Website.

30.     Heath P.C.'s website also informs potential clients that no results are promised or guaranteed by former client testimonials, explaining: "[w]hile this testimonial may be exciting, [Heath P.C.] promises only to perform the steps we've agreed to in each client's case and to charge each month only for steps already completed.  As with any legal work, no outcome is promised. Your results will vary."  **Exhibit F**, Heath Decl. ¶ 28; **Exhibit F-4**, PGX0050478, Heath P.C.'s Website.

31.     Heath P.C.'s website also includes representations describing its services.  For example:  "[Heath P.C.] is here to help you meet your credit score goals.  Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report." **Exhibit F**, Heath Decl. ¶ 29; **Exhibit F-5**, PGX0028285, Heath P.C.'s Website; *see also* Compl. ¶ 112.b.  This is an accurate, factual description of the aspirational objective of Heath P.C.'s services.  **Exhibit F**, Heath Decl. ¶ 29.  Importantly, it informs consumers that Heath P.C.'s services are designed to *help* consumers meet their credit score goals; it does not promise that any particular goal or outcome *will* be achieved.  *Id.* ¶ 30.

32.     The website has also included accurate representations of Heath P.C.'s work with former clients.  *Id.* ¶ 31. For example, the website states:  "The efforts of [Heath P.C.] have successfully assisted clients in obtaining deletion and correction of many hundreds of thousands of questionable credit listings."  **Exhibit F-6**, PGX0027986, Heath P.C.'s Website.  This describes Heath P.C.'s past client success; it makes no promise to prospective clients.  **Exhibit F**, Heath Decl. ¶ 31.

## V.        Former Lexington Client Stanford Littleman

33.       Stanford Littleman enrolled in Heath P.C.'s services twice, remaining a client for approximately two years each time. **Exhibit M**, Littleman Decl. ¶ 2.

34.       According to Mr. Littleman, Heath P.C. never promised or guaranteed him any result from its credit repair services. *Id.* ¶ 12.

## VI.       Guidance to Credit Repair Companies

35.       In its discovery responses, the CFPB expressly admits having offered no guidance that would have advised credit repair companies of its position that simply using the phone to offer "credit repair" alone triggers the Provision.  **Exhibit D**, Admissions by CFPB, Admission No. 2.

## LAW AND ARGUMENT

## I.        Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," and "all facts and reasonable inferences" are construed "in the light most favorable to the nonmoving party."  *Agnew v. Granite Seed Co.*, No. 2:16-cv-00887-BSJ, 2017 WL 8776902, at *3 (D. Utah Dec. 11, 2017) (Jenkins, J.) (citations and internal quotation marks omitted).  Once that initial burden has been met, "the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial," *i.e.*, "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* (citation and internal quotation marks omitted).

The key question on Count I is a question of law:  how to interpret the TSR Advance Fee Provision's restrictions on payment for "promised results."  *See United Rentals Nw., Inc. v.*

17

*Yearout*, 573 F.3d 997, 1001 (10th Cir. 2009) ("Statutory interpretation presents a question of law, and the facts of an individual case will not affect a court's interpretation of a statute."). How that interpretation applies to the facts of this case is a mixed question of law and fact. *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018) (mixed questions of law and fact "ask[] whether 'the historical facts . . . satisfy the statutory standard, or put it another way, whether the rule of law as applied to the established facts is or is not violated'" (citation and internal quotation marks omitted)).

## II.    The TSR Advance Fee Provision does not cover a contractual agreement to provide credit repair services; it covers only promises to achieve certain results with respect to credit history.

The TSR Advance Fee Provision imposes a six-month delay in receiving payment for credit repair services only when a credit repair company promises (*i.e.*, guarantees) over the phone the removal of derogatory credit information or the improvement of a consumer's credit record. While the CFPB construes the TSR Advance Fee Provision as reaching *all* credit repair services offered over the telephone, that reading is belied by (1) the plain text of the Provision, (2) the regulatory history underlying the Provision, (3) the limitations placed on the source of authority for the Provision, and (4) the absurd consequences that would follow if the CFPB's interpretation were valid.

In the twenty-plus years between the TSR Advance Fee Provision's promulgation and the filing of this case, neither the FTC nor the CFPB ever publicly took the position the CFPB now advances in this litigation:  that the offer of credit repair services necessarily implies a "promised result."  The CFPB's interpretation of the Provision is entitled to no deference, as the CFPB lacks any authority to promulgate rules under the Provision.   15 U.S.C. § 6102(b); *Martin v.*

*Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152 (1991) (the promulgating authority "is in a better position" to interpret promulgated regulations).[2]

> ### A.    The plain text requires that "results" be "promised" for the six-month limitation to apply, and "results" does not mean "services."

Interpreting a regulation begins with "the plain language of the regulation[]." *Time Warner Entm't Co., L.P. v. Everest Midwest Licensee L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004). "As with statutory interpretation, in interpreting regulations, [courts] strive to construe the text so that all of its provisions are given effect and no part is rendered superfluous." *Id.* And when interpreting a statute or regulation, "a dictionary is a valuable resource for interpretation." *Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co.*, 972 F. Supp. 1379, 1384 (D. Utah 1997) (Jenkins, J.).

The CFPB's case hinges on the notion that "promised results" means "promised services." The CFPB has expressed this view numerous times, asserting:

- "[A]ny Heath PC advertisement, representation, telemarketing statement, or other statement describing [Heath P.C.'s] services as 'credit repair' and/or representing, explicitly or implicitly, alone or in combination, that [Heath P.C.'s] credit repair service removes derogatory or negative information from, or improves, a consumer's credit history, credit record, or credit rating promises a result within the meaning of 16 C.F.R. § 310.4(a)(2)." **Exhibit I**, CFPB Interrogatory Responses, No. 1; **Exhibit N**, Kim Dep. at 176:3-17.

- "[T]he name Credit Repair itself conveys that this company repairs credit" and is a promise "[t]hat the company repairs credit." **Exhibit N**, Kim Dep. at 175:21-176:19.

- "[I]f [a] script or representation identifies the service as credit repair . . . that's promising results." **Exhibit N**, Kim Dep. at 180:16-23.

---

[2] Moreover, the CFPB's interpretation of the Provision here is entitled to no deference because the interpretation is merely "a convenient litigating position" and a "post hoc rationalization advanced by an agency seeking to defend past agency action under attack"—indeed, an interpretation of an agency rule that it did not promulgate, and a rule for which the CFPB does not profess to have issued any guidance to assist credit repair companies on how to comply. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012).

That view is completely untethered from the plain meaning of the regulation. A "promise" is "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." *Promise*, Black's Law Dictionary (11th ed. 2019). A "result" is a "consequence, effect, or conclusion." *Result*, Black's Law Dictionary (11th ed. 2019). Read together, a "promised result" is the "manifestation of an intention to act . . . in a specified manner" to render "a consequence, effect, or conclusion."

"Result" does not mean "service," because a "service" is the *act* of doing something useful to provide a "consequence, effect, or conclusion." *See Service*, Black's Law Dictionary (11th ed. 2019) (defining "service" as "the performance of some useful act or a series of acts for the benefit of another," *i.e.*, "an intangible commodity in the form of human effort, such as labor, skill, or advice"). Indeed, many services are provided with the intent of helping someone—such as services provided by lawyers, doctors and financial analysts—without a promised result or a guarantee of success. If the FTC wanted to say "promised services" as part of the TSR Advance Fee Provision, it knew exactly how to say so—the subsection begins by limiting when a seller or telemarketer may "[r]equest[] or receiv[e] payment of any fee or consideration for goods *or services*." But the TSR Advance Fee Provision does not say a seller must wait six months after providing services before requesting or receiving payment; it requires a seller to wait six months after "the promised results have been achieved," with the understanding that "results" must be "promised" in the first place.

Contrast the TSR Advance Fee Provision to CROA's advance fee provision. CROA places restrictions *specifically* on the charging or receipt of money "for the performance of any service

which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b.[3] There is no mention of results, only the "service which the credit repair organization has agreed to perform." CROA also defines "credit repair organization" as a person that agrees to "sell, provide, or perform . . . any service . . . for the express or implied purpose of—(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)." *Id.* § 1679a(3)(A). If the FTC intended for the TSR Advance Fee Provision to cover promised *services*, not promised *results*, it would have written a rule that looks like CROA. It did not; it imposed a six-month waiting period for "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating" for which there are "promised results" that can be "achieved." 16 C.F.R. § 310.4(a)(2)(ii).

The CFPB says a "promise" need not be a guarantee, but only "good grounds for expecting a particular outcome." **Exhibit N**, Kim Dep. at 177:2-8. In other words, the CFPB contends that merely giving the *impression* that a result is likely can constitute a "promise." But again, that interpretation would be wrong for at least two reasons. First, a "promise" can mean "expectation that something will turn out well," but the adjectival form of promise-as-expectation is "promising," not "promised." *See Promising*, Merriam-Webster Dictionary (11th ed. 2003) (defining "promising" as "likely to succeed or to yield good results"). The TSR Advance Fee Provision does not apply to credit repair services offering "promising results"; it says "promised results," meaning something has been guaranteed. Second, if the FTC wanted to restrict even giving the

---

[3] Heath P.C. fully complies with CROA's advance fee provision, and this lawsuit does not assert otherwise.

*impression* that a credit improvement or removal of derogatory information would result, it knew how to do so.  The FTC imposed such a prohibition for advance fees for "obtaining a loan or other extension of credit"—the prohibition applies when the seller "guarantee[s] or *represent[s] a high likelihood of success* in obtaining or arranging a loan or other extension of credit."  16 C.F.R. § 310.4(a)(3) (emphasis added).  There is no such language for credit repair services.

**B.    The FTC's commentary on the TSR Advance Fee Provision confirms that the Provision applies only to promises to deliver specific results with respect to a consumer's credit record, not to provide credit repair services more generally.**

The FTC's pronouncements on the TSR Advance Fee Provision confirm that the Provision was intended to prohibit only promises to deliver specific results with respect to a person's credit history—namely, promises to improve a credit report or score, or to remove an accurate, negative tradeline.

Agency commentary that accompanies a promulgated regulatory provision often sheds light on what the provision is supposed to mean.  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1199 (10th Cir. 2015) (acknowledging "the propriety of seeking guidance from [the agency's] preambles to its regulations"); *Martin v. Occupational Safety Health & Review Comm'n*, 941 F.2d 1051, 1056 (10th Cir. 1991) ("As [a] secondary source of interpretation, we may consult the preamble accompanying a regulatory enactment.").  "The preamble, which gives official interpretive guidance to the regulation, should be accorded due deference unless clearly erroneous or contrary to the terms of the regulation."  *Henderson v. Stanton*, 76 F. Supp. 2d 10, 15-16 (D.D.C. 1999).

The FTC makes clear in the commentary accompanying the TSR Advance Fee Provision that it intended for the Provision to cover chimerical promises to repair credit, such as promises to

22

remove *accurate*, derogatory information.  These promises were illusory (and thus deceptive) be-

cause they could never be delivered—neither the Fair Credit Reporting Act, nor any other law,

allows for promises to remove *accurate*, fairly reported derogatory information from a credit re-

port.  As the FTC explained in a 1996 action involving an earlier billing practice for credit repair

services involving Heath P.C's predecessor:

> Credit repair services that promise, in return for an advance fee, to help improve a
> consumer's credit rating, without regard to the reasons why the customer's credit
> rating is unfavorable, necessarily abuse the vast majority of their customers, *be-*
> *cause the vast majority of those customers cannot be helped.*  Consumers have no
> right to expunge accurate, albeit unfavorable, information from their credit records
> until the seven to ten year period specified in the Fair Credit Reporting Act
> ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, has elapsed.

**Exhibit S**, Mem. of Points and Authorities in Support of Intervenor Federal Trade Commission's

Motion for Partial Summary Judgment at 6-7, *Tennessee v. Lexington Law Firms*, No. 3-96-0344

(M.D. Tenn. Dec. 16, 1996).  Indeed, the ultimate resolution of that case was reached against the

backdrop of the FTC's articulation of what was permitted:  Heath P.C.'s predecessor was permitted

to "invoice and receive payments for specific work already performed, provided that [it] disclosed

to the client the work that [it] will perform and the fee to be charged for such work in advance of

performing such work, ***without providing any kind of promised results***."  **Exhibit T**, *Tennessee*

Consent Order, at 5 (emphasis added).

Over the last two decades, the FTC's views regarding the purpose of the TSR Advance Fee

Provision have not changed.  In its current guidance on the Provision, the FTC states:

> This prohibition is directed at the deceptive marketing and sale of bogus credit re-
> pair services; it is not directed at the non-deceptive telemarketing of secured credit
> cards or legitimate credit monitoring services.  No one can permanently remove or
> "erase" negative entries on a consumer's credit report if the information is accurate
> and current.  Deceptive credit repair services may be able to cause negative credit
> information to disappear from a consumer's credit report temporarily by flooding a

credit bureau with letters disputing the accuracy of the negative entries. But once
the credit bureau verifies with creditors that the negative items are accurate, they
will reappear on a consumer's credit report and stay there for up to seven years and,
in the case of a bankruptcy, for 10 years. . . . No one can do anything to "repair" a
bad credit report that is accurate and up to date.

FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Jan. 2021),

https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-

rule#creditrepair.

Put differently, the FTC intended for the TSR Advance Fee Provision to target scammers

who took advantage of a statutory mechanism that took derogatory information off of a consumer

report while it was in the process of being challenged and reinvestigated.[4]

---

[4] As the FTC explained in another early TSR Advance Fee Provision case:

The six-month payment delay required by the Telemarketing Rule is necessary
because of the dispute resolution procedures of Section 611 of the FCRA. 15 U.S.C.
§ 1681i. Under that section, if an item in a credit report is disputed, the consumer
reporting agency must reinvestigate the item. If the investigation is not completed
within 30 days, industry practice has been to delete the item until the investigation
is completed. (This practice has been made mandatory by Section 2409 of the
Consumer Credit Reform Act of 1996, P.L. 104-208, 110 Stat. 3009-1286.) A
credit repair service may take advantage of this situation by disputing every
unfavorable item in a consumer's report. Many such disputes, regardless of their
merit, are unlikely to be resolved within 30 days. As a result, the disputed items
will be removed temporarily from the consumer's report. By this means, a credit
repair service may be able to produce a report that appears to have been "repaired."
Such "repairs" will, however, be short-lived because unfavorable items will be
restored to the consumer's credit report once investigations have been completed.
The six-month delay prevents credit repair services from using such interim reports
as evidence of having improved a consumer's credit.

**Exhibit U**, Mem. of Points & Authorities of Amicus Curiae Federal Trade Commission at 6 n.7,
*Illinois v. National Credit Management Group*, No. 96-C-2073, 1997 WL 35410876 (N.D. Ill.
filed Jan. 8, 1997) ("*National Credit* FTC Amicus Br.").

When the FTC promulgated the TSR Advance Fee Provision, it made clear that the Provision covered "promise[s] that, for a fee paid in advance, [the seller or telemarketer] *will* improve the consumer's credit record by removing negative information from the record." 60 Fed. Reg. at 43,853 (emphasis added). It wanted to prevent circumstances where, "[o]nce the fee is paid, . . . the seller fails to deliver the promised services or achieve the promised results, and the consumer's credit record does not improve." *Id.* In other words, the FTC viewed "promised services" and "promised results" to be distinct concepts, rather than the same as the CFPB argues now. As the FTC later explained, the Provision exists because, "in *each case* the offered *service* is fundamentally bogus." 67 Fed. Reg. at 4,511 (emphasis added).

## C. The CFPB's reading of the TSR Advance Fee Provision exceeds the scope of the Provision's purpose and statutory authority.

An agency rule may not "exceed[] the bounds of the permissible." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). "Administrative regulations are not absolute rules of law and should not be followed when they conflict with the design of the statute or exceed the administrative authority granted." *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1118 (10th Cir. 1977).

The CFPB's reading of the TSR Advance Fee Provision places the Provision well beyond the purpose and scope of the TSR, which is to regulate abusive conduct over the telephone. The FTC initially promulgated the TSR Advance Fee Provision as a means of implementing Congress's directive in the Telemarketing Act to implement rules to prevent abusive practices in telemarketing that intruded on consumer privacy. Telemarketing Sales Rule, 60 Fed. Reg. 8,313 (Feb. 14, 1995). Later, however, the FTC realized that the TSR Advance Fee Provision could not be justified under that source of legislation because the TSR Advance Fee Provision did little to move the needle on consumer privacy. 67 Fed. Reg. at 4,511. So the FTC reexamined the regulation and determined

that it was "appropriate and prudent" to justify the TSR Advance Fee Provision as a regulation on *per se* unfair activity. *Id.*

The FTC determined that the scams prohibited by the Advance Fee Provision were unfair because they simply had no benefits to offer: "in each case the offered service is fundamentally bogus." *Id.* "It is the essence of these schemes to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* Fraudsters would use the FCRA's dispute-resolution mechanism to deliver the illusion of rehabilitated credit; the fraudster would challenge a tradeline, get it temporarily removed from a credit report (and improve a score accordingly), and take the consumer's money, only to have the tradeline returned it was confirmed to be accurate. *See supra* pp. 5-8, 22-24, n.4. Because the conduct targeted by the TSR Advance Fee Provision amounted to "outright theft," and because consumers had "no way to know these offered services were illusory" when communicating with service providers solely over the phone, the FTC concluded that the practices targeted by the TSR Advance Fee Provision met the statutory criteria for unfairness. *Id.*

That is not the conduct that the CFPB seeks to regulate here. Unlike a "promise" to remove accurate, derogatory credit information, which is what the FTC intended to target because it amounted to "outright theft," the offering of a *service* for credit repair—with no guarantees as to results—that assist a consumer in identifying inaccurate or unsubstantiated tradelines *has* value. Not even Congress took the view that credit repair services had no intrinsic worth and were *per se* fraudulent; CROA imposes certain protections, but does not prohibit credit repair outright, let alone through the use of particular media. And the benefits are not hypothetical, but proven: Heath P.C. has a track record of removing inaccurate, negative tradelines from client credit reports.

**Exhibit G-1**, Ulzheimer Report, at 4, 21.  Moreover, unlike the fraudulent conduct targeted by the FTC as part of the TSR Advance Fee Provision, which resulted in the vast majority of challenged tradelines being restored once the credit bureau's investigation was complete, Heath P.C.'s track record shows historically that the removals it obtains on behalf of its clients stick, with an immaterial amount that ever reappear.  **Exhibit V**, LEX0004324 (showing reinsertion rate of 0.0059% for data set of "nearly two million Removals" during two-month span in 2015); *see also* **Exhibit G-1**, Ulzheimer Report at 21 ("Additionally, Lexington Law clients rarely see removed items reinserted onto their credit reports.").  The services go beyond the identification and challenging of inaccurate tradelines; Heath P.C. educates clients on how to maintain an excellent record if credit repair efforts are successful.  **Exhibit G-1**, Ulzheimer Report, at 21.

Indeed, Heath P.C.'s credit repair services are valuable given the widespread errors in credit reports that hurt consumers, a feature of credit reports that the FTC and the CFPB have repeatedly detailed.  According to the FTC, "one in four consumers identified inaccuracies in their credit reports."  **Exhibit A**, CFPB-PGX-221265, FTC, *Report on Credit Education and the Credit Repair Organizations Act.*  Further, data from the FTC studies "suggest[s]  that a large number of errors persist in credit reports and in many instances have a significant impact on consumers' credit scores."  *Id.; see also* **Exhibit B**, CFPB-PGX-141436 at 14123, 14126, CFPB Credit Reporting Whitepaper (explaining "inaccuracies in [] credit files inevitably occur" and that a consumer's "credit score may be unfairly reduced by a negative trade line that belongs to another consumer"); **Exhibit C**, CFPB-PGX-132009 at 132015, Lexington Law: The Case for Credit Repair, *Credit Reporting Errors* (summarizing Sandra Braunstein's 2007 testimony to a Congressional committee concerning furnishers continuing to be a source of great numbers of credit reporting errors).

The CFPB's own website also informs consumers that "[i]ncorrect reporting of account status," "[d]ata management errors," and "[b]alance [e]rrors" are "common errors in credit reports." CFPB, *What are Common Credit Report Errors that I Should Look for on My Credit Report?* (June 8, 2017), https://www.consumerfinance.gov/ask-cfpb/what-are-common-credit-report-errors-that-i-should-look-for-on-myRcredit-report-en-313/.

Had the FTC held out the TSR's Advance Fee Provision as a regulation on legitimate credit repair services, rather than a regulation on scams amounting to "outright theft," the Provision would doubtless have been considered arbitrary and capricious. All of the evidence that the FTC discussed in promulgating the Advance Fee Provision concerned *illegitimate* fraudsters holding themselves out as credit repair providers willing to make an illusory promise for a quick buck; the FTC did not consider at all whether *legitimate* credit repair service providers, who did not make any promises or guarantees, were also worth regulating. There would thus be no "rational connection" between a regulation that sought to restrict payments to legitimate credit repair service providers and the "relevant data" relating only to fraudsters purporting to tout (but not actually offering) credit repair. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Put plainly, there is no basis in the rulemaking record to suggest that the regulation of legitimate credit repair providers offering services without promises is what the FTC intended to regulate, and the CFPB cannot supply that rationale for the TSR Advance Fee Provision now. *See SEC v. Chenery*, 318 U.S. 80, 94 (1943) ("The Commission's action cannot be upheld because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. There is no such finding here.").

The TSR and its Advance Fee Provision are ultimately protections for consumers with respect to use of the telephone; they are not an invitation for the CFPB to regulate how an entire industry does business.  Nothing in the Telemarketing Act nor the TSR allows the CFPB to turn the TSR Advance Fee Provision from a telephone-conduct rule into a fee rule that requires all credit repair services to operate on contingency when offering their services over the phone, especially where there are no deception or illusory promises involved.  The CFPB's interpretation of the TSR Advance Fee Provision marks a far departure from the TSR's purpose of prohibiting abusive conduct over the telephone, and in the case of the TSR Advance Fee Provision, to shield telephone callers from "fundamentally bogus" schemes that offered no benefits.

### D.   The CFPB's reading of the TSR Advance Fee Provision leads to absurd results.

Courts must avoid interpreting regulations in a way that "would produce an absurd and unjust result." *Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs.*, 742 F.3d 1239, 1250 (10th Cir. 2014); *e.g.*, *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1564 (10th Cir. 1993) (rejecting a reading of a statute "because it would lead to an absurd result clearly at odds with the intention of Congress").  An absurd interpretation may serve as "further evidence" that the regulation "fails to carry out congressional intent." *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 141 (D.D.C. 2019), *appeal docketed*, No. 19-5125 (D.C. Cir. filed Apr. 30, 2019).

The CFPB's reading of the TSR Advance Fee Provision—that a credit repair business can only charge six months after showing improvement in a client's credit—is unworkable and absurd, as the CFPB would put credit repair providers in a position where they may *never* be able to be paid even where valuable services are rendered.  This is because client conduct outside the control of credit repair providers like Heath P.C. could prevent the providers from demonstrating that their

29

services improved a client's credit record, even if they did.  This can happen in at least two ways.

First, a client may engage Heath P.C. to challenge items on her credit report that she believes are

inaccurate, but after Heath P.C. provides its services (with a disclaimer that no results can be guar-

anteed), a furnisher could refuse to remove the inaccurate item or the challenged items are deter-

mined to be accurate and remain on the report.  In such circumstances, Heath P.C. could never be

paid because the client's credit report would not show six months later the results of the services

provided by Heath P.C.

Second, the consumer could successfully work with Heath P.C. over the phone to identify

inaccuracies in his tradelines, have inaccurate derogatory information removed, and see an im-

proved credit score—only to engage in other activity in the six-month waiting period that the

CFPB's interpretation would impose that would impair the consumer's credit report.  Because the

consumer (and the consumer's furnishers) control the credit report and Heath P.C. does not, the

consumer would reap the benefits of Heath P.C.'s successful services and engage in conduct that

results in a credit record that is just as marred as the one he had before engaging the service pro-

vider's credit repair services.  Through no fault of Heath P.C., it could not charge for the valuable

services it rendered.[5]

### III.   The CFPB's interpretation of the TSR Advance Fee Provision imposes unconstitutional burdens on commercial speech.

"Under the constitutional-avoidance canon, when statutory language is susceptible of mul-

tiple interpretations, a court may shun an interpretation that raises serious constitutional doubts

---

[5] There are other practical reasons the CFPB's interpretation is unworkable. For instance, during the six month (or longer) period Heath P.C. must wait to bill, a client could move, or change their contact information or even name (as is common in the case of marriage), making it difficult to even deliver (let alone collect on) a request for payment.

and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).  There are two potential interpretations of the Provision:  the one advanced by Heath P.C. here, which requires a specific promise to remove derogatory information or improve a credit record before the TSR Advance Fee Provision applies, or the one advanced by the CFPB, where the mere provision of credit repair services offered over the phone triggers the Provision.

The CFPB's formulation of the TSR Advance Fee Provision would proscribe lawful commercial speech:  it would punish credit repair service providers for choosing to communicate with customers over the telephone by forcing them to wait six months after the services are rendered for payment to be made.  Indeed, there is no dispute that such a rule, while masquerading as a timing rule, in fact amounts to a complete prohibition on the use of telephone marketing by credit repair providers, because no company can commercially provide credit repair services if they have to wait for six months before billing.  Because the CFPB's proposed interpretation of the Provision would prohibit credit repair companies from marketing to prospective clients by telephone, it impinges on Heath P.C.'s First Amendment rights to engage in commercial speech.

Commercial expression that "concern[s] lawful activity and [is] not . . . misleading" is protected by the First Amendment.  *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir. 2001).  "Speech . . . is protected," "even though it may involve a solicitation to purchase or otherwise pay or contribute money."  *Aptive Envt'l, LLC v. Town of Castle Rock*, 959 F.3d 961, 981 (10th Cir. 2020) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420-21 (1993)).  Courts must consider three factors in determining whether the proscription of commercial speech is lawful:  "[1] whether the State's interests in proscribing it are substantial, [2] whether

31

the challenged regulation advances these interests in a direct and material way, and [3] whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Aptive*, 959 F.3d at 986-87 (10th Cir. 2020) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)).

The CFPB's construction of the TSR Advance Fee Provision is unconstitutional because there is no evidence that applying the Provision to *all* credit repair services marketed and offered over the telephone, regardless of whether one promises results, will directly and materially advance the FTC's stated interest in protecting consumers from deceptive conduct.

### A. The TSR Advance Fee Provision is a content-based restriction on truthful, non-misleading speech.

The TSR Advance Fee Provision is a content-based restriction on speech.  The First Amendment applies not only to restrictions that prevent a person from speaking, but also restrictions that "impose[] a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). The TSR Advance Fee Provision is a content-based restriction because it applies only to those sellers who offer credit repair services over the telephone (among other services restricted by the TSR).  It is a restriction on speech because, under the CFPB's proposed interpretation, it penalizes every credit repair companies by prohibiting "[r]equesting" payment of a fee until six months after "promised results" have been "achieved," 16 C.F.R. § 310.4(a)(2)(ii), a restriction that effectively means this class of speakers cannot use the telephone to market at all.

Moreover, the TSR Advance Fee Provision is subject to the full weight of constitutional scrutiny for commercial speech.  If the TSR Advance Fee Provision were limited to illusory promises to obtain certain results—the removal of accurate, derogatory information or the sudden improvement of a credit score or record—the Provision would regulate only false, misleading speech,

and thus the government would have more leeway in regulating that speech.  After all, the FTC sought only to regulate the offering of a service that was "fundamentally bogus" or impossible to render—the erasure of accurate, substantiated tradelines, which the FCRA does not allow.  67 Fed. Reg. at 4,511.  That is how the FTC justified the constitutionality of the TSR Advance Fee Provision in the Provision's early days:  as a restriction on *deceptive* speech, specifically promises to deliver "a benefit (improved credit) that few, if any, will receive."  **Exhibit U**, *Nat'l Credit* FTC Amicus Br. at 14.  The government's ability to restrict commercial speech reaches its peak when it concerns "the dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985).

But the CFPB's interpretation does not stop at speech concerning an "essentially bogus" service; it goes after *legitimate* credit repair services, too.  The Bureau's capacious reasoning strips the Provision of its constitutional moorings.  The FTC once justified the TSR Advance Fee Provision because it served to address "the problem created by service providers who make a promise that, by its nature, cannot be kept for most consumers."  **Exhibit U**, *Nat'l Credit* FTC Amicus Br. 15.  Now, the CFPB proposes a reading of the Provision that serves as an attack on *non-deceptive* commercial speech.  If a credit repair service chooses to offer its honest services over the telephone, it is penalized for *how* it chooses to speak with a six-month waiting period for payment.[6] (And that is *only* if the service is offered over the telephone; the CFPB has made no suggestion that offering the service online or in person warrants the same sort of restriction.)  Moreover, there

---

[6] Heath P.C., for example, expressly disclaims the ability to guarantee results and says up front that the services rendered may lead to nothing, thus quashing any potential for the deception that concerned the FTC when it promulgated the TSR in 1994.  There would be nothing misleading about the speech in question, yet under those circumstances, the CFPB would seek to restrict that speech.

is no dispute of fact that such a waiting period actually amounts to a complete prohibition, because no company can profitably abide by the waiting period. **Exhibit F**, Heath Decl. ¶ 10; **Exhibit K-1**, DelPonti Report ¶ 85.

The TSR Advance Fee Provision, as the CFPB interprets it, is not a regulation of deceptive speech and thus, the scrutiny ordinarily afforded to restrictions on commercial speech should apply to the CFPB's interpretation of the TSR Advance Fee Provision here.

   **B.    There is no evidence to support the notion that imposing the TSR Advance Fee Provision on *all* credit repair service providers who provide services over the telephone will directly advance the government's interests in protecting consumers from unfair conduct.**

A restriction on commercial speech can only stand if it "directly advance[s] th[e] substantial interest[s]" asserted by the government. *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005). The government bears the burden of "demonstrat[ing] that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. This requirement, which is "critical," means that a regulation "must do more than provide only ineffective or remote support for the government's purpose." *Aptive*, 959 F.3d at 988 (citations and internal quotation marks omitted).

A restriction on commercial speech can survive constitutional scrutiny only if there is *evidence* showing that the restriction would "directly advance" the government's cited interests in addressing a specific problem. *Id.* at 989. In *Aptive*, for example, the Tenth Circuit considered a city's 7 p.m. curfew on commercial solicitation, citing two distinct governmental interests: public safety and protecting homeowner privacy. *Id.* at 989-90. To prove that the curfew supported its public safety interest, the city provided evidence that the police had received complaints about door-to-door solicitations. *Id.* at 990. Only one of the complaints about evening solicitations,

however, was about *commercial* solicitations, and there was no record suggesting that any of the solicitations led to criminal charges.  *Id.*  In holding that this evidence was inadequate to justify the curfew, the court observed that the curfew was "not crafted well to materially alleviate [the city's] posited threat to public safety."  *Id.*  "[T]he *possibility* of a connection between crime and commercial door-to-door solicitation," the court held, was "insufficient to establish a 'concrete, nonspeculative harm' to public safety."  *Id.* at 992 (emphasis in original).  The Tenth Circuit also held that the privacy interest was unsubstantiated; common sense that 7 p.m. was a "reasonable time" to expect privacy provided "no basis to infer that the privacy 'harms'" were real.  *Id.* at 997-98.

Much like the city in *Aptive*, the CFPB cannot offer any evidence that even suggests the FTC thought placing restrictions indiscriminately on *all* credit repair services offered over the telephone would "directly advance" the FTC's stated interest of protecting consumers from unfair conduct.  67 Fed. Reg. at 4,511.  The only evidence that the FTC considered was complaints about "fundamentally bogus" schemes where fraudsters "take consumers' money for services *that the seller has no intention of providing* and in fact does not provide."  *Id.* (emphasis added).  The FTC did not consider whether deception existed where, as here, a legitimate credit repair service *did not* promise specific results, but instead offered to help the consumer find and challenge inaccurate tradelines and educate the consumer about how to maintain a healthy credit record.  Indeed, a key commenter, the Postal Service, remarked that there was a distinction between such legitimate services and "so-called credit repair services" that did nothing for the consumer.  **Exhibit Q**, U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995),

FTC File No. 411001.  The CFPB cannot plausibly say that the FTC considered evidence that credit repair services *as a whole* were unfair to consumers.

Thus, there is no evidence that the FTC even considered, never mind studied, the possibility that the mere offering of credit repair services over the telephone would subject consumers to unfair conduct.  As a result, there is no basis for concluding that the TSR Advance Fee Provision, as applied to *all* credit repair service providers who reach out to consumers by telephone, directly advances the government's asserted interest.

**IV.      Defendants do not "promise results," i.e., guarantee they will remove accurate derogatory information or improve credit.**

**A.      Heath P.C. tells every client that it cannot and does not promise results.**

The TSR Advance Fee Provision does not apply to Heath P.C. because it did not promise results to its clients.  To the contrary, Heath P.C. communicated plainly to every prospective client that no result could be guaranteed.  Every telemarketer of Heath P.C.'s services follows mandatory scripting that requires them to read to every consumer a statement that informs them that Heath P.C. "does not promise any specific outcome" and that "every case is unique which is why [Heath P.C.] can't promise or guarantee any specific result from our work."  **Exhibit F**, Heath Decl. ¶ 24; **Exhibit F-1**, PGX0028796, Script.  Every client also signs an engagement letter with Heath P.C. that repeats this "no-promised-result" representation.  In its engagement agreements, Heath P.C. stated that it "cannot guarantee [and the consumer is] not paying for a particular credit report outcome or result; . . . only . . . for Lexington's efforts on [the consumer's] behalf."  **Exhibit F**, Heath Decl. ¶ 25; **Exhibit F-2**, LEX0000540, Engagement Agreement.

Heath P.C.'s website also states "credit repair companies cannot guarantee results."  **Exhibit F**, Heath Decl. ¶ 27; **Exhibit F-3**, PGX0027751, Heath P.C.'s Website.  The testimonials on

that website note that "[w]hile this testimonial may be exciting, [Heath P.C.] promises only to perform the steps we've agreed to in each client's case and to charge each month only for steps already completed. As with any legal work, no outcome is promised. Your results will vary." **Exhibit F**, Heath Decl. ¶ 28; **Exhibit F-4**, PGX0050478, Heath P.C.'s Website.

Because there is no dispute that Heath P.C. told every client that it did not promise results, Heath P.C. was not required to wait six months before billing its clients and the TSR Advance Fee Provision did not apply to its billings.

### B. As an example, a Heath P.C. client was not promised results and the CFPB cannot state a claim regarding him.

The example of client Stanford Littleman illustrates the inapplicability of the TSR Advance Fee Provision to Heath P.C. Mr. Littleman is a two-time client of Heath P.C., having used Heath P.C.'s services initially for about two years, then later on in 2017, for another period of about two years. **Exhibit M**, Littleman Decl. ¶ 2. While Mr. Littleman had a positive experience with Heath P.C., with the firm able to secure an improvement in Mr. Littleman's credit score, *id.* ¶¶ 7, 10, he "understood that [Heath P.C.] could not guarantee any results," *id.* ¶ 12. Mr. Littleman recognized that Heath P.C.'s "efforts might not be successful." *Id.* "[Heath P.C.] did not promise [Mr. Littleman] anything different before [he] signed up or while [he] was a client." *Id.* Given these facts, there is no basis to have required that Heath P.C. wait six months before billing Mr. Littleman. Mr. Littleman readily understood the common sense distinction between a commitment to provide services aimed at achieving a certain purpose and a guarantee that those services would be successful.

\*      \*      \*      \*      \*

These undisputed facts show that Heath P.C. told every client it could not promise results when offering services to its clients over the telephone.  The TSR Advance Fee Provision therefore does not apply; it is intended only for instances where "results" to remove derogatory information, or improve a person's credit history, credit record, or credit rating, are "promised."  16 C.F.R. § 310.4(a)(2)(ii).  Accordingly, Heath P.C. is entitled to summary judgment on Count I, which alleges a violation of the TSR Advance Fee Provision.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant summary judgment in Defendant John

C. Heath, P.C.'s favor on Count I.

Dated:  August 20, 2021                    Respectfully submitted,

                                           /s/ Karra J. Porter
                                           Karra J. Porter
                                           Christensen & Jensen
                                           257 East 200 South, Suite 1100
                                           Salt Lake City, UT 84111
                                           (801) 323-5000
                                           karra.porter@chrisjen.com

                                           Thomas M. Hefferon*
                                           W. Kyle Tayman*
                                           Christina Hennecken*
                                           Virginia McCorkle*
                                           Goodwin Procter LLP
                                           1900 N Street, N.W.
                                           Washington, D.C. 20036
                                           (202) 346-4000
                                           thefferon@goodwinlaw.com
                                           ktayman@goodwinlaw.com

                                           William J. Harrington*
                                           Goodwin Procter LLP
                                           620 Eighth Avenue
                                           New York, NY 10018
                                           (212) 459-7140
                                           wharrington@goodwinlaw.com

                                           Courtney Hayden*
                                           Goodwin Procter LLP
                                           100 Northern Avenue
                                           Boston, MA 02210
                                           (617) 570-1000
                                           chayden@goodwinlaw.com

                                           *Attorneys for Defendants*
                                           (*admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ Karra J. Porter
Karra J. Porter