MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov
1700 G Street, NW
Washington, DC 20552
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>*Plaintiff*,<br>v.<br><br>PROGREXION MARKETING, INC., *et al.*,<br><br>*Defendants.* | Case No. 2:19-cv-00298-BSJ |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT JOHN C. HEATH, P.C.'S (D/B/A LEXINGTON LAW) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I**

# TABLE OF CONTENTS


I. Introduction .......... 1

II. Response to Heath's Statement of Facts .......... 2

III. Statement of Additional Undisputed Material Facts .......... 22

IV. Alternative Statement of Disputed Facts Regarding Marketing Promises ... 24

V. Argument .......... 34

A. Heath is covered by Section 310.4(a)(2). .......... 34

B. Heath's erroneous interpretation of Section 310.4(a)(2) contradicts its text, history, and purpose. .......... 36

1. Heath's interpretation lacks textual support .......... 36

2. Heath's interpretation conflicts with the TSR's rulemaking history. .......... 41

3. Heath's interpretation conflicts with the Provision's enforcement history. .......... 45

4. Other TSR provisions further undermine Heath's interpretation. .......... 51

C. The Provision is well within the FTC's statutory authority. .......... 53

D. The Provision does not unconstitutionally burden commercial speech. .......... 55

1. The Provision regulates conduct, not speech. .......... 56

2. Even if the Provision did regulate commercial speech, it would survive First Amendment scrutiny .......... 59

E. If proof that promises were made were an element of the claim, a material dispute of fact exists as to whether Heath promised results. .......... 63

VI. Conclusion .......... 65

## TABLE OF AUTHORITIES

**Cases**

*Almendarez-Torres v. United State*s,
523 U.S. 224 (1998)......56
*Aptive Envt'l, LLC v. Town of Castle Rock*,
959 F.3d 961 (10th Cir. 2020)......61, 62
*Canyon Fuel Co. v. Sec'y of Lab.*,
894 F.3d 1279 (10th Cir. 2018)......36
*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980)......56, 59
*CFPB v. Commonwealth Equity Grp.*,
No. 20-CV-10991, 2021 WL 3516690 (D. Mass. Aug. 10, 2021)...40, 41, 54, 57
*CFPB v. Prime Mktg. Holdings, LLC*,
No. CV-1607111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016)......40
*Clark v. Martinez*,
543 U.S. 371 (2005)......56
*DuCharme v. Heath*,
No. 10-02763, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010)......41
*Fla. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995)......59, 60
*Illinois v. Nat'l Credit Mgmt. Grp.*,
No. 96-C-2073, 1996 WL 351196 (N.D. Ill. June 24, 1996)......49
*In re Nat'l Credit Mgmt. Grp.*,
21 F. Supp. 2d 424 (D.N.J. 1998)......57, 58
*Lexington Law Firm v. S.C. Dep't of Consumer Affs.*,
382 S.C. 580, 677 S.E.2d 591 (2009)......3,6
*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)......60
*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991)......57
*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)......57
*Rannis v. Recchia*,
380 F. App'x 646 (9th Cir. 2010)......53
*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
547 U.S. 47 (2006)......57

*Scalia v. Wynnwood Refining Co.*,
978 F.3d 1175 (10th Cir. 2020)....................................................................34
*Tennessee v. Lexington Law Firms*,
No. 3:96-CV-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997)...... 40, 47, 54
*Wine & Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005) ..........................................................................58
*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985).......................................................................................56

**Statutes**

15 U.S.C. § 1679a(3)(A)......................................................................................40
15 U.S.C. § 1679b(b) ..........................................................................................57
15 U.S.C. § 1681i ................................................................................................55
15 U.S.C. § 6101 *et seq.* ......................................................................................54
21 U.S.C. § 355....................................................................................................58

**Rules**

Fed. R. Civ. P. 56.................................................................................................63

**Regulations**

12 C.F.R. § 1015.5...............................................................................................59
14 C.F.R. pt. 21 ...................................................................................................58
16 C.F.R. § 310.2(dd)...........................................................................................45
16 C.F.R. § 310.2(ff).............................................................................................45
16 C.F.R. § 310.3(a)(2)....................................................................................51, 52
16 C.F.R. § 310.4(a)(2)....................................................................................*passim*
16 C.F.R. § 310.4(a)(2)(i) .................................................................................. 1, 35
16 C.F.R. § 310.4(a)(2)(ii) ......................................................................1, 35, 37, 40
16 C.F.R. § 310.4(a)(4).........................................................................................38
16 C.F.R. § 310.4(a)(5)....................................................................................44, 59
21 C.F.R. pt. 314 .................................................................................................58

**Regulatory Material**

Decl. Donald S. Clark, Attachment D, Tennessee v. Lexington Law Firms, No. 3-96-0344 (M.D. Tenn. Dec. 16, 1996)........................................................42
FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Jan. 2021)
https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair.........................................................44

U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. 411001 .......... 42
60 Fed. Reg. 8313 (Feb. 14, 1995) .......... 42, 52
60 Fed. Reg. 30,406 (June 8, 1995) .......... 52
60 Fed. Reg. 43,842 (Aug. 23,1995) .......... 41, 52, 60
65 Fed. Reg. 10,428 (Feb. 28, 2000) .......... 43, 54
67 Fed. Reg. 4,492 (Jan. 30, 2002) .......... 43, 44, 54, 61

**Litigation Documents**

Am. Compl., *FTC v. Cap. Choice Consumer Credit, Inc.*, No. 02-21050-CIV, 2002 WL 32670291 (S.D. Fla. April 18, 2002) .......... 38
Compl., *CFPB v. Commonwealth Equity Grp.*, No. 20-CV-10991 (D. Mass. May 22, 2020) https://files.consumerfinance.gov/f/documents/cfpb_commonwealth-equity-group-dba-key-credit-repair-nikitas-tsoukales_complaint.pdf .......... 51
Compl., *CFPB v. Daniel A. Rosen, Inc.*, No. 21-cv-07492 (C.D. Cal. Sept. 20, 2021) https://files.consumerfinance.gov/f/documents/cfpb_credit-repair-cloud_complaint_2021-09.pdf .......... 51
Compl., *CFPB v. Fed. Debt Assistance Assoc.*, No. 17-cv-02997 (D. Md. Oct. 12, 2017) https://files.consumerfinance.gov/f/documents/201710_cfpb_FDAA-complaint.pdf .......... 51
Compl., *CFPB v. Prime Mktg. Holdings, LLC*, No. 2:16-cv-07111 (C.D. Cal. Feb. 10, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_prime-market-holdings_complaint.pdf .......... 51
Compl., *FTC v. 1263523 Ontario, Inc.*, No. 99 CIV 8679, 1999 WL 34770693 (S.D.N.Y. Aug. 5, 1999) .......... 38
Compl., *FTC v. Luebke Baker*, No. 1:12-CV-01145 (C.D. Ill. May 11, 2012) .......... 50
Compl., *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1996 WL 35048521 (N.D. Ill. April 10, 1996). .......... 48
Compl., *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn.) .......... 45, 46
Intervenor FTC's Mot. for Partial Summary Judgment, *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn. Dec. 16, 1996) .......... 48
Mem. of Amicus Curiae FTC, *Illinois v. Nat'l Credit Mgmt Grp.*,

No. 96C-2073, 1997 WL 35410876 (N.D. Ill. Jan. 8, 1997)............................49
Mem. in Reply of Amicus Curiae FTC,
*Illinois v. Nat'l Credit Mgmt. Grp*,
No. 96C-2073, 1997 WL 35410875 (N.D. Ill. Feb. 18, 1997)..........................49
Pl.'s Mem. in Reply to Def.'s Opp'n to Mot. for Summary Judgment,
*Illinois v. Nat'l Credit Mgmt. Grp.*
1996 WL 35048520 (N.D. Ill. Aug. 30, 1996).............................................48

**Other Authorities**

Black's Law Dictionary..........................................................................35, 63
Merriam-Webster Dictionary........................................................................39
Oxford English Dictionary.......................................................................40, 63

## I. Introduction

The partial motion for summary judgment filed by Defendant John C. Heath, Attorney-at-Law, PC (d/b/a Lexington Law) ("Heath") must be denied because Heath is not entitled to judgment as a matter of law. Heath sells credit repair services through telemarketing, and it systematically charges its customers before satisfying the criteria required by law in 16 C.F.R. § 310.4(a)(2)(i) and (ii). Heath's motion is premised on a fundamental mischaracterization of the law.

Heath, a prolific telemarketer, twists the plain text of the Telemarketing Sales Rule (TSR or "Rule") to argue that the self-styled "leaders in credit repair"[1] are not covered by the Rule's restrictions on sales of credit repair goods and services. But 16 C.F.R. § 310.4(a)(2) of the TSR ("the Provision" or "Section 310.4(a)(2)") clearly covers the services that Heath offers. Nothing in the TSR's text, its regulatory history, or its enforcement history supports Heath's incorrect assertion that the Provision only covers entities that guarantee particular credit repair outcomes. Moreover, Heath's interpretation would sanction unlawful activity and expose consumers to abusive telemarketing practices, upending the purpose of the TSR.

[1] Ex. 6, PGX0028357.

## II. Response to Heath's Statement of Facts

Plaintiff reserves its objections to the authenticity or admissibility of any exhibit cited by Heath.

Heath Assertion 1: "Credit reports frequently contain erroneous information that hurts consumers. *See* Exhibit A, CFPB-PGX-221265, FTC, *Report on Credit Education and the Credit Repair Organizations Act* (describing results of FTC studies showing 'documented problems with the accuracy of the information in the credit reporting system.'). One FTC study, conducted at Congress's instruction, 'showed that one in four consumers identified inaccuracies in their credit reports.' *Id*. The FTC found 'that a large number of errors persist in credit reports and in many instances have a significant impact on consumers' credit scores.' *See id.; see also* Exhibit B, CFPB-PGX-141436, CFPB Credit Reporting Whitepaper (explaining 'inaccuracies in [] credit files inevitably occur' and that a consumer's 'credit score may be unfairly reduced by a negative trade line that belongs to another consumer'); Exhibit C, CFPB-PGX-132009 at 132015, Lexington Law: The Case for Credit Repair, *Credit Reporting Errors* (summarizing testimony to a Congressional committee concerning furnishers continuing to be a source of great numbers of credit reporting errors)."

Response: Immaterial. The existence or frequency of credit report errors has no bearing on Defendants' liability under Section 310.4(a)(2). Heath's quotation from Heath Ex. B is materially misleading because it omits the word "some." Heath Ex. B, p. 23 ("inaccuracies in some credit files inevitably occur").

Heath Assertion 2: "The CFPB frequently receives consumer complaints regarding such errors. In 2020, the number-one category of complaints cataloged in the CFPB's Consumer Complaint Database were complaints relating to 'incorrect information on [a consumer's credit] report.' Exhibit D, Admissions by CFPB, Admission No. 51. And between December 1, 2011 and December 8, 2020, the Bureau received more than 80,000 consumer complaints characterized as '[the credit reporting agency's] investigation did not fix an error on [a consumer's] report.' *Id.*, Admission No. 52; *see also* Exhibit E, CFPB-PGX-215935 at 215943,

CFPB & Credit Repair (showing credit or consumer reporting errors accounting for 38% of consumer complaints handled by the CFPB in 2018)."

Response: Immaterial. The existence or frequency of consumer complaints regarding credit reporting has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 3: "Defendant Heath P.C., which does business as Lexington Law Firm, is a law firm based in Salt Lake City, Utah. Exhibit F, Heath Decl.¶ 1."

Response: Immaterial. Whether or not Heath is a law firm has no bearing on Defendants' liability under Section 310.4(a)(2). No party asserts that law firms are exempted from Section 310.4(a)(2).

Heath Assertion 4: "Heath P.C. provides a wide range of credit repair services to help its clients enforce their legal rights to ensure that items on the clients' credit reports are fair, accurate and substantiated. These services are intended to address the problems recognized by the FTC and the CFPB: there are errors and inaccuracies in a consumer's credit report that need to be corrected. *Id*. ¶ 2."

Response: In the first sentence, Plaintiff agrees that Heath provides credit repair services and that consumers have certain rights concerning the accuracy of their consumer reports. The assertion that Heath "help[s] its clients enforce their legal rights" is immaterial; it has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff disputes the implication that Lexington Law's credit repair services are legal services, which is false. *Lexington Law Firm v. S.C. Dep't of Consumer Affs.*, 382 S.C. 580, 588, 677 S.E.2d 591, 595 (2009) (Heath conceded:

"the providing of credit counseling services does not constitute the practice of law"). In the second sentence, Plaintiff does not dispute that Lexington Law's services are "intended to" remove derogatory items, including errors and inaccuracies, from credit reports. Plaintiff agrees that some consumer credit reports contain errors and inaccuracies, but disputes as unsupported the implication that all credit reports contain such problems, Heath Ex. B, p. 23 ("inaccuracies in some credit files inevitably occur"), and any implication about what proportion of credit reporting errors or inaccuracies materially lower a consumer's credit score.

Heath Assertion 5: "On behalf of its clients, Heath P.C. submits communications to the three major consumer reporting agencies, asking them to verify that the information reported by the furnisher is accurate, or explaining that the tradeline (a) is not the client's, (b) was 'never late,' or (c) was not appropriately reported. Exhibit F, Heath Decl. ¶ 3; Exhibit G-1, Ulzheimer Report, at 20."

Response: Plaintiff does not dispute that Heath has submitted communications to the three major consumer reporting agencies regarding certain tradelines on certain customers' credit reports. The assertion is immaterial to Defendants' liability under Section 310.4(a)(2) except to the extent Heath references these communications to market Lexington Law as a service to remove negative items from consumer reports or improve consumers' credit scores.

Heath Assertion 6: "Heath P.C. works with and has contracts with all three major credit reporting agencies—Equifax, Experian, and TransUnion—and uses an established process to submit challenges to the agencies electronically. Exhibit F,

Heath Decl. ¶ 4; Exhibit G-1, Ulzheimer Report, at 18-19; Exhibit H, Heath Dep. 61:25-62:5; 286:7-10; 287:5-14."

Response: Immaterial. The existence of contracts with credit reporting agencies or a process to submit challenges electronically has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 7: "Heath P.C. also submits 'intervention' letters on behalf of clients, which include: (a) account information requests, which ask furnishers to verify that the information in the tradeline provided to the bureaus can be substantiated; and (b) goodwill interventions, which ask that creditors forgive a client's mistake in being late by less than 30 days. Exhibit F, Heath Decl. ¶ 5; Exhibit G-1, Ulzheimer Report, at 20-21."

Response: Plaintiff does not dispute that Heath submits "intervention" letters to certain creditors on behalf of certain customers. The assertion is immaterial to Defendants' liability under Section 310.4(a)(2) except to the extent Heath references these letters to market Lexington Law as a service to remove negative items from consumer reports or improve consumers' credit scores.

Heath Assertion 8: "Heath P.C.'s 'focus tracks' allow clients to tailor the content and personalize challenges and intervention letters based on whether the client is facing a credit issue related to military service, student debt, divorce, medical bills, and identity theft. Exhibit F, Heath Decl. ¶6; Exhibit G-1, Ulzheimer Report, at 20. The focus tracks are tailored to certain laws that protect individuals who have experienced these events, such as the Servicemembers Civil Relief Act. Exhibit F, Heath Decl. ¶7; Exhibit G-1, Ulzheimer Report, at 20."

Response: Immaterial. Whether or not Heath offers "focus tracks" has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 9: "Where appropriate, Heath P.C. will use 'escalated approaches' on behalf of a client. Exhibit F, Heath Decl. ¶8. This includes, but is not limited to, 'hot document' review, in which attorneys review documentary evidence and determine whether it supports a claim that a negative item on a credit report is being inaccurately or improperly reported, and notarized challenges and dispute letters, which are designed to encourage an investigation by the credit reporting agency. *Id*."

Response: Immaterial. Whether or not Heath uses "escalated approaches" in unspecified scenarios has no bearing on Defendants' liability under Section 310.4(a)(2). The assertion is also unsupported by admissible evidence. No document or testimony produced in this litigation references the asserted "hot document" review except the self-serving Heath Declaration (Heath Ex. F), which is inadmissible for this purpose. Pl.'s Evid. Objs., ECF 227.

Heath Assertion 10: "Heath P.C. also provides legal advice to its clients on issues such as wrongful repossessions, liens, and the Fair Credit Reporting Act. Exhibit F, Heath Decl. ¶11."

Response: Immaterial. Whether or not Heath provides legal advice to certain clients has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff disputes any implication that Lexington Law credit repair services constitute legal advice. *Lexington Law Firm*, 382 S.C. at 580.

Heath Assertion 11: "Heath P.C. educates its clients on how to improve their credit record and overall creditworthiness. Exhibit F, Heath Decl. ¶12; Exhibit G-1, Ulzheimer Report, at 21."

Response: Plaintiff does not dispute that Heath advertises its services as educating customers on how to improve their credit record and overall creditworthiness. Whether or not Heath *succeeds* in educating customers is immaterial; it has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 12: "Since March 2016, Heath P.C. has helped clients identify and remove more than 16 million negative entries from their credit reports. Exhibit G-1, Ulzheimer Report, at 21. 'These removals are overwhelmingly of items that can negatively impact consumer credit scores, such as collection accounts, late payments, and charged off accounts.' Exhibit G-1, Ulzheimer Report, at 24."

Response: The asserted removal figures were withdrawn by Heath's proffered expert and are unsupported by admissible evidence. Ulzheimer Supplemental Expert Report (Oct. 25, 2021) ("Ulzheimer Supp. Rep.") (withdrawing Section B, pp. 21-24, of the August 19, 2021 Expert Report of John Ulzheimer); ECF 222, Plaintiff's Motion to Exclude Expert Report of John Ulzheimer and Related Testimony ("Pl.'s Mot. to Exclude Ulzheimer"). Any cumulative number of negative entries that Heath claims to have "helped clients identify and remove" is immaterial and has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff does not dispute that Lexington Law is a service represented to remove negative entries from consumer credit reports, and that Heath tracks and tallies negative item removals for marketing purposes. But Plaintiff disputes that

Defendants caused the purported removals. Ex. 13, Report of Dr. Shane Frederick Rebutting the Expert Reports of John DelPonti ("Frederick Rebuttal Report").

Heath Assertion 13: "From March 2016 onward, over 87% of Heath P.C.'s clients have seen at least one negative item removed, with more than half of the firm's clients seeing five or more removals. Exhibit G-1, Ulzheimer Report at 21. 32% of Heath P.C.'s clients obtained removals of one to four negative items, 18% of clients obtained between five and eight removals, and 29% of clients—roughly 1,161,497 clients—obtained more than eight removals. *Id*. at 22."

Response: The asserted removal figures were withdrawn by Heath's proffered expert and are unsupported by admissible evidence. Ulzheimer Supp. Rep. (withdrawing these figures); ECF 222, Pl.'s Mot. to Exclude Ulzheimer. Any percentage of customers who have "seen" a negative item removed, and the number of negative entries that "clients have seen . . . removed," are immaterial; they have no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff does not dispute that Lexington Law is a service represented to remove negative items from consumer reports, and that Heath tracks and tallies negative item removals to use in marketing. But Plaintiff disputes that Defendants caused the purported removals. Ex. 13, Frederick Rebuttal Report.

Heath Assertion 14: "Heath P.C.'s data demonstrates that the longer a client uses its services, the more removals that client is likely to obtain. *Id*. at 23-24. In particular, clients obtained an average of 3.64 removals after one month of using Heath P.C.'s services. *Id*. at 23. By the end of the second month, that number goes up to an average of 5.48 removals. *Id*. By the end of the third and fourth months, clients obtained an average of approximately 6.99 and 8.32 removals, respectively. *Id*. At six months, the average number of removals increased to 9.86. *Id*. Finally,

after a year of engaging Heath P.C., clients obtained an average of 14.36 removals. *Id*. at 24."

Response: The number of removals that a "client is likely to obtain" is immaterial and has no bearing on Defendants' liability under Section 310.4(a)(2) except to the extent Heath uses such figures to market Lexington Law as a service to remove negative items from consumer reports or improve consumers' credit scores. Plaintiff does not dispute that Lexington Law is a service represented to remove negative entries from consumer credit reports, and that Heath tracks and tallies negative item removals for marketing purposes. The specific numbers asserted by Heath were withdrawn by its proffered expert and are unsupported by admissible evidence. Ulzheimer Supplemental Expert Report (Oct. 25, 2021) (withdrawing these figures); ECF 222, Pl.'s Mot. to Exclude Ulzheimer. Plaintiff disputes that any correlation between customer tenure and claimed removals is attributable to Defendants' services. Ex. 13, Frederick Rebuttal Report.

Heath Assertion 15: "Historically, only a small fraction of a percentage of all removals obtained by Heath P.C. clients were reinserted into a client's credit report. Exhibit V, LEX0004324 (showing reinsertion rate of 0.0059% for data set of 'nearly two million Removals' during two-month span in 2015); *see also* Exhibit G-1, Ulzheimer Report at 21 ('Additionally, Lexington Law clients rarely see removed items reinserted onto their credit reports.')."

Response: The number of negative items that are reinserted into Heath's customers' credit reports is immaterial and has no bearing on Defendants' liability

under Section 310.4(a)(2) except to the extent Heath uses such figures to market Lexington Law as a service to remove negative items from consumer reports or improve consumers' credit scores. Plaintiff does not dispute that Lexington Law is a service represented to remove negative entries from consumer credit reports, and that Heath tracks and tallies negative item removals for marketing purposes. The specific numbers asserted by Heath are unsupported by admissible evidence. ECF 222, Pl.'s Mot. to Exclude Ulzheimer (ECF 222); Pl.'s Evid. Objs. (ECF 227). Plaintiff disputes the claimed reinsertion rates because Defendants do not have access to consumer reports after customers cancel and therefore Defendants lack the necessary data to determine reinsertion rates. Ex. 21, Lam Dep. at 130:1-131:15; Ex. 14, Nigrinis Decl.

Heath Assertion 16: "Heath P.C. employs a monthly subscription model, in which it charges in arrears for its services, generally in monthly increments. Exhibit F, Heath Decl. ¶ 13; *see also* Exhibit F-2, LEX0000540, Engagement Agreement. In addition to the monthly subscription fee, Heath P.C. charges its clients a 'first work' fee, which is a one-time charge that ranges from $49.95 to $129.95. Exhibit F, Heath Decl. ¶ 16; *see also* Exhibit F-2, LEX0000540, Engagement Agreement. The 'first work' fee covers initial services rendered by Heath P.C., including (1) an initial interview to set up the client's case and record; (2) analysis of a credit report and identification of potentially inaccurate tradelines; and, (3) preparing the initial round of letters challenging the potentially inaccurate tradelines (if any are found). Exhibit F, Heath Decl. ¶ 17."

Response: Plaintiff does not dispute that Heath has charged customers what it calls a "first work fee" of between $49.95 and $129.95 and monthly service fees

thereafter. Plaintiff disputes that these are Lexington Law's only charges: at sign-up, consumers must agree to pay approximately $13 to $15, ostensibly for a credit report, in order to enroll. Ex. 7, PGX0002572 (Pricing, Lexington Law); Ex. 8, PGX0028802, PGX0028805-06; Ex. 9, PGX0028746, PGX0028750; Ex. 15, Johnson Dep. 165:3-166:24. Heath's description of the services each fee covers, or purports to cover, is immaterial and has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 17: "The "first work" fee is not charged until Heath P.C. completes its 'first work' services. Exhibit H, Heath Dep. at 116:8-117:9; Exhibit F, Heath Decl. ¶ 18; Exhibit O, Heath P.C. Interrogatory Responses, No. 10; Exhibit J, PGX0060515, Master Script."

Response: Plaintiff does not dispute that Heath has charged customers what it calls a "first work fee" typically on "day 5 to 6." Heath Ex. J, PGX0060521. Heath's description of the work purportedly completed before charging that fee is immaterial and has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 18: "The monthly service fees range from $89.95 to $129.95 per month depending on the different service level or product chosen by the client. Exhibit F, Heath Decl. ¶ 14; *see also* Exhibit F-2, LEX0000540, Engagement Agreement. The monthly service fee is not charged until after Heath P.C. completes work on the client's behalf. Exhibit H, Heath Dep. at 123:25-124:10; Exhibit F, Heath Decl. ¶ 15; Exhibit O, Heath P.C. Interrogatory Responses, No. 10; Exhibit J, PGX0060515, Master Script; Exhibit K-1, DelPonti Report ¶ 61."

Response: Plaintiff does not dispute that Heath has charged customers monthly service fees that vary depending on the service level. Ex. 2, Service Feature

Matrix. Heath's assertion that the "monthly service fee is not charged until after Heath P.C. completes [some unspecified quantum of] work on the client's behalf" is immaterial and has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 19: "Every month, Heath P.C. conducts 'Value Reconciliation' (or 'ValueRec') analyses for its clients to determine whether the value of services received by an individual client is equal to, or exceeds, the amount that the client will be billed for that month. Exhibit F, Heath Decl. ¶ 19."

Response: Immaterial. Whether or not Heath conducts a "Value Reconciliation" analysis has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff disputes that such valuations were reliable, accurate, or conducted every month for every customer. Ex. 23, D. Jacobs Decl.; Ex. 24, J. Jacobs Decl., Ex. 25, Woods Decl.; Ex. 26, Parker Decl.; Ex. 27, Williams Decl.; Ex. 28, McQuiller Decl. Heath's assertion is not supported by admissible evidence. Pl.'s Evid. Objs., ECF 227.

Heath Assertion 20: "If a client's 'Value Rec' analysis shows that the client has not received the full value of his or her upcoming monthly payment, Heath P.C. will not bill the client until sufficient services are performed. Exhibit F, Heath Decl. ¶ 20. Heath P.C. may also recommend that the client either switch to a lower price product (such as credit monitoring), or cancel his or her monthly subscription altogether. *Id*."

Response: Immaterial. Whether or not Heath's internal assessment of the value of its services equals the monthly service fee has no bearing on Defendants' liability

under Section 310.4(a)(2). Plaintiff disputes that Heath's own valuation of its services is reliable or accurate. Ex. 23, D. Jacobs Decl.; Ex. 24, J. Jacobs Decl., Ex. 25, Woods Decl.; Ex. 26, Parker Decl.; Ex. 27, Williams Decl.; Ex. 28, McQuiller Decl. Heath's assertion is not supported by admissible evidence. Pl.'s Evid. Objs., ECF 227. Heath offers no evidence that any customers were *not* charged as a result of Heath's "Value Rec" analysis, nor that it recommended that customers cancel.

Heath Assertion 21: "Clients may cancel Heath P.C.'s services at any time. Exhibit F, Heath Decl. ¶ 21; Exhibit F-2, LEX0000540, Engagement Agreement; Exhibit J, PGX0060515, Master Script."

Response: Immaterial. Whether or not customers can cancel Heath's services has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 22: "Not all clients who sign up end up paying for services. Exhibit K-1, DelPonti Report ¶ 106. Heath P.C.'s billing model allows it to determine (within 30 days of an invoice) whether a client will pay for its services. *Id*. ¶ 69. If the client does not pay the invoice, Heath P.C. attempts to collect payment for services rendered over a predetermined period of time once services have been performed and payment has not been received. *Id*. ¶ 106. After 30 days of nonpayment, when this time period has expired, Heath P.C. discontinues providing services. *Id*."

Response: Immaterial. Whether or not some customers do not end up paying for services has no bearing on Defendants' liability under Section 310.4(a)(2). At most, the asserted fact pertains to the amount of redress owed to consumers for Defendants' violations.

Heath Assertion 23: "A delayed billing model would require Heath P.C. to continue providing months' worth of services to clients without knowing whether a customer will pay. *Id*. ¶ 69. Under that approach, Heath P.C. would not be able to effectively evaluate the collection risk amongst those that are able to pay to those that cannot until after the six-month timeframe. *Id*."

Response: Immaterial. Whether or not Heath faces a collection risk has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff disputes that a delayed billing model would require the continued provision of "months' worth of services"; there is no such requirement in Section 310.4(a)(2). Plaintiff additionally objects that the statement is speculative and unsupported by admissible evidence for the reasons stated in Plaintiff's Motion to Exclude Aug. 20, 2021 Expert Report of John DelPonti, Jr., and Related Testimony ("Pl.'s Mot. to Exclude DelPonti"), ECF 224.

Heath Assertion 24: "If Heath P.C. delayed accepting payments by a total of seven months, it would result in significant losses and render the telephone aspect of its business inoperable. *Id*. ¶ 83."

Response: Immaterial. Whether or not compliance with the law would cause Heath to incur losses has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff disputes the assertion as unsupported. Heath has not shown through competent, admissible evidence that it could not alter its business model to comply with the law and continue operating. Pl.'s Mot. to Exclude DelPonti, ECF 224.

Heath Assertion 25: "No credit repair company has established a viable telephone business model in which it waited six months before charging fees for its services. Exhibit F, Heath Decl. ¶ 34; *see generally* Exhibit K-1, DelPonti Report ¶ 57."

Response: Immaterial. Other companies' compliance or noncompliance with the law, and other companies' financial viability, has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff objects that this assertion is unsupported by admissible evidence. Pl.'s Mot. to Exclude DelPonti, ECF 224; Pl.'s Evid. Objs., ECF 227. Heath's statements that he is personally "unaware of" companies that delay billing and "do[es] not believe any credit repair company could" delay billing do not support Heath's assertion that no credit repair company has done so.

Heath Assertion 26: "Heath P.C. tells and has told each of its clients that it does not guarantee or promise results. Exhibit F, Heath Decl. ¶ 22; Exhibit J, PGX0060515, Master Script; Exhibit O, Heath P.C. Interrogatory Responses, No. 16."

Response: Immaterial. Whether or not Heath tells clients that it does not guarantee or promise results has no bearing on Defendants' liability under Section 310.4(a)(2). *See infra* Section V(A)-(B). Plaintiff disputes the assertion as inaccurate and unsupported. Heath expressly or implicitly promises that its services remove derogatory information from, or improve, customers' credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Finally, Heath Declaration paragraph 22 is inadmissible, Pl.'s Evid. Objs. (ECF 227), and Heath cannot demonstrate that "each of its clients" was told these statements.

Heath Assertion 27: "At the intake stage, every client is told orally that Heath P.C. does not and cannot promise results. Every client is told that Heath P.C. 'do[es] not promise any specific outcome' and that 'every case is unique which is why [Heath P.C.] can't promise or guarantee any specific result from our work.' Exhibit F, Heath Decl. ¶¶ 22-23; Exhibit F-1, PGX0028796, Script; Exhibit J, PGX0060515, Master Script; Exhibit L, PGX0028460, Script. Agents are required to read these disclosures verbatim. Exhibit F, Heath Decl. ¶ 24."

Response: Immaterial. Whether or not Heath tells clients that it does not promise a specific result has no bearing on Defendants' liability under Section 310.4(a)(2). *See infra* Section V(A)-(B). Plaintiff disputes the assertion. Heath expressly or implicitly promises that its services remove derogatory information from, or improve, customers' credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV. Finally, Paragraphs 22-24 of the Heath Declaration are inadmissible, *see* Pl.'s Evid. Objs. (ECF 227), and Heath cannot demonstrate that "every client" was told these statements.

Heath Assertion 28. "Every client signs an engagement agreement with Heath P.C. Exhibit F, Heath Decl. ¶ 25; *see also* Exhibit F-2, LEX0000540, Engagement Agreement. That agreement explicitly states that Lexington does not promise results: '[Heath P.C.] cannot guarantee and you are not paying for a particular credit report outcome or result.' Exhibit F, Heath Decl. ¶ 25; Exhibit F-2, LEX0000540, Engagement Agreement. In signing the engagement agreement, each client represents that they 'understand and acknowledge that [they] are not paying for, and that [Heath P.C.] does not make, any representation, warranty,

promise or guarantee as to any particular outcome or result.' Exhibit F, Heath Decl. ¶ 25; Exhibit F-2, LEX0000540, Engagement Agreement."

Response: Immaterial. Whether or not Heath's engagement agreement disclaims a guarantee of a "particular outcome or result" has no bearing on Defendants' liability under Section 310.4(a)(2). *Infra* Section V(A)-(B). Plaintiff does not dispute the text of the engagement agreement. Notwithstanding that text, through its advertising and telemarketing representations, Heath expressly or implicitly promises customers that its services remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 29: "Heath P.C.'s website informs potential clients that 'credit repair companies cannot guarantee results.' Exhibit F, Heath Decl. ¶ 27; Exhibit F-3, PGX0027751, Heath P.C.'s Website."

Response: Immaterial. A website statement that "credit repair companies cannot guarantee results" has no bearing on Defendants' liability under Section 310.4(a)(2). *See infra* Section V(A)-(B). Even if the Court finds that Plaintiff must prove that Heath promised results to customers, this assertion remains immaterial, as Plaintiff need not prove that Defendants or other credit repair companies can or do guarantee results. Plaintiff does not dispute that this statement appeared on a page of Lexington Law's website in a blog post dated October 21, 2019 (Heath Ex. F-3); Heath has not established that the statement appeared throughout the relevant

time period from March 8, 2016, to the present. Notwithstanding the website statement, through its advertising and telemarketing representations, Heath expressly or implicitly promises customers that its services remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 30: "Heath P.C.'s website also informs potential clients that no results are promised or guaranteed by former client testimonials, explaining: '[w]hile this testimonial may be exciting, [Heath P.C.] promises only to perform the steps we've agreed to in each client's case and to charge each month only for steps already completed. As with any legal work, no outcome is promised. Your results will vary.' Exhibit F, Heath Decl. ¶ 28; Exhibit F-4, PGX0050478, Heath P.C.'s Website."

Response: Immaterial. The quoted website statement has no bearing on Defendants' liability under Section 310.4(a)(2). *See infra* Section V(A)-(B). Plaintiff does not dispute that this statement appeared on a Lexington Law website, but Heath has not established that the statement appeared throughout the relevant time period from March 8, 2016, to the present. Notwithstanding the website statement, through its advertising and telemarketing representations, Heath expressly or implicitly promises customers that its services remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 31: "Heath P.C.'s website also includes representations describing its services. For example: '[Heath P.C.] is here to help you meet your credit score

goals. Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report.' Exhibit F, Heath Decl. ¶ 29; Exhibit F-5, PGX0028285, Heath P.C.'s Website; *see also* Compl. ¶ 112.b. This is an accurate, factual description of the aspirational objective of Heath P.C.'s services. Exhibit F, Heath Decl. ¶ 29. Importantly, it informs consumers that Heath P.C.'s services are designed to help consumers meet their credit score goals; it does not promise that any particular goal or outcome will be achieved. *Id*. ¶ 30."

Response: As to the first two sentences, Plaintiff does not dispute that the Lexington Law website has included a statement that "Lexington Law is here to help you meet your credit score goals. Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report," and variations of that statement (*see* Compl. ¶ 112(b), ECF 2). Plaintiff does not dispute that Lexington Law is represented as a service to remove negative items off people's credit reports, or that the "aspirational objective" of Defendants' credit repair services is the removal of negative items and the improvement of people's credit records. The third sentence of the assertion is immaterial. Whether or not the quoted text "promise[s] that any particular goal or outcome *will* be achieved" has no bearing on Defendants' liability under Section 310.4(a)(2). *See infra* Section V(A)-(B). Plaintiff disputes it as an inaccurate and argumentative characterization of the text on the website, unsupported by admissible evidence. *See* Pl.'s Evid. Objs., ECF 227. Heath expressly or implicitly promises customers that its services

remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 32: "The website has also included accurate representations of Heath P.C.'s work with former clients. *Id.* ¶ 31. For example, the website states: 'The efforts of [Heath P.C.] have successfully assisted clients in obtaining deletion and correction of many hundreds of thousands of questionable credit listings.' Exhibit F-6, PGX0027986, Heath P.C.'s Website. This describes Heath P.C.'s past client success; it makes no promise to prospective clients. Exhibit F, Heath Decl. ¶ 31."

Response: The first sentence is immaterial. Whether or not Heath's representations about former clients are accurate has no bearing on Defendants' liability under Section 310.4(a)(2). Regarding the second sentence, Plaintiff does not dispute that Lexington Law's website includes the quoted text; the truth or falsity of that text is immaterial. The third sentence is also immaterial. Whether or not the quoted text "makes no promise to prospective clients" has no bearing on Defendants' liability under Section 310.4(a)(2). *Infra* Section V(A)-(B). Plaintiff disputes it as an inaccurate and argumentative characterization of the text on the website, unsupported by admissible evidence. Pl.'s Evid. Objs., ECF 227. Heath expressly or implicitly promises customers that its services remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 33: "Stanford Littleman enrolled in Heath P.C.'s services twice, remaining a client for approximately two years each time. Exhibit M, Littleman Decl. ¶ 2."

Response: Immaterial. Whether or not Stanford Littleman enrolled in Heath's services, how many times, or for how long, has no bearing on Defendants' liability under Section 310.4(a)(2).

Heath Assertion 34: "According to Mr. Littleman, Heath P.C. never promised or guaranteed him any result from its credit repair services. *Id*. ¶ 12."

Response: Immaterial. Whether or not Heath promised or guaranteed a consumer a result has no bearing on Defendants' liability under Section 310.4(a)(2). *Infra* Section V(A)-(B). Plaintiff does not dispute that one individual, Stanford Littleman, declared that he "understood that [Lexington Law] could not guarantee any results" and "did not promise [him] anything different." But Plaintiff disputes that most or even many consumers would agree with Mr. Littleman, and Heath offers no admissible evidence that they would. Heath expressly or implicitly promises customers that its services remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. Pl.'s App'x C; *infra* Section IV.

Heath Assertion 35: "In its discovery responses, the CFPB expressly admits having offered no guidance that would have advised credit repair companies of its position that simply using the phone to offer 'credit repair' alone triggers the Provision. Exhibit D, Admissions by CFPB, Admission No. 2."

Response: Immaterial. Whether or not the CFPB has offered regulatory guidance has no bearing on Defendants' liability under Section 310.4(a)(2). Plaintiff's claims are based on Defendants' violation of the regulation, not a violation of any guidance.

## III. Statement of Additional Undisputed Material Facts

1. Heath offers credit repair services for a fee. Ex. 1, Heath Dep. 40:3-13; Ex. 2, Service Feature Matrix.
2. Heath markets and sells its credit repair services over the telephone, through inbound and outbound interstate telephone calls. Ex. 1, Heath Dep. 19:9-12, 129:20-24; Ex. 3, Progrexion Teleservices Dep. 41:24-42:22, 52:5-13.
3. Heath's credit repair services are marketed as services to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating. Compl. ¶ 111 (ECF 2); Heath Answer (ECF 66) ¶ 111; *see also id.* ¶¶ 112-116.
4. According to Lexington Law's website, "Credit repair is the process of improving a poor score by addressing or removing negative items that could be listed on your reports inaccurately." Ex. 4, DelPonti0000371; *see also* Ex. 5, PGX0028285 (Lexington Law website: "Credit Repair is the process of addressing and removing the questionable negative items that are impacting

your credit profile."); Ex. 6, PGX0028357.

5. Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in Heath's credit repair services. Ex. 7, PGX0002572 (Pricing, Lexington Law); Ex. 8, PGX0028802, PGX0028805-06; Ex. 9, PGX0028746, PGX0028750; Ex. 10, Progrexion Marketing Dep. 75:4-76:19.

6. After signup, Heath charges customers an initial work fee, also dubbed a Service Interval Fee. The initial work fee is typically between $79.95 and $119.95. Ex. 2, Service Feature Matrix. It is typically charged 5 to 15 days after the customer agrees to sign up. Ex. 11, LEX0000426 (customer agreement); Ex. 7, PGX0002572.

7. Heath charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level, and is typically [redacted]. Ex. 2, Service Feature Matrix. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires. Ex. 1, Heath Dep. 43:25-46:7.

8. Heath does not set a time frame in which all of the services will be provided to

a customer. Ex. 1, Heath Dep. 43:25-45:8, 169:14-170:3; Ex. 12, Heath Resp. to Interrog. No. 3 (Apr. 7, 2021); Ex. 11, LEX0000428 (customer agreement).

9. Heath charges consumers without waiting at least six months after Heath has demonstrated that the promised results have been achieved. Ex. 1, Heath Dep. 122:18-124:10.

## IV. Alternative Statement of Disputed Facts Regarding Marketing Promises

The following facts are only material to Heath's liability if the Court rejects the Bureau's interpretation of Section 310.4(a)(2) and holds that liability only attaches if a seller or telemarketer "promises" to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. They are offered to show that there is a genuine dispute as to whether Heath made such promises.

10. Lexington Law promised customers that their credit reports and credit ratings would improve if they enrolled in Lexington Law's services. Ex. 27, Decl. Timothy Williams ¶ 7 ("The agent said that Lexington Law could help me…. he said this over and over…."); Ex. 26, Decl. Susie Parker ¶ 6 ("[T]he Lexington Law agent … told me that he had helped hundreds and hundreds of people and there were only three or four people he wasn't able to help. He … made me feel confident that Lexington Law would improve my credit and get

me to my goal of getting a home."); Ex. 25, Decl. Maryellen Woods ¶ 10 ("[T]he [Lexington Law] agent made me believe she could improve my credit."); Ex. 24, Decl. Jacqueline Jacobs ¶ 11 (Lexington Law "said they could repair my credit and increase my score. They said they could remove the hospital collections I have. They said they could challenge all the items and remove most, and they said this would make my score go up. I trusted them when they said this."); Ex. 23, Decl. David Jacobs ¶ 6 (the Lexington Law agent "explain[ed] that he could help my wife and I improve our credit so we would be eligible to purchase a home we started off renting"), ¶ 10 ("Lexington Law ... made me believe they would improve my credit score so that I would be able to qualify for the rent-to-own home."); Ex. 28, Decl. Lorenzo McQuiller ¶ 12 ("[T]he representative … [told] me that Lexington Law has proven techniques in place to get potential creditors to remove a negative item…. She told me that … staying enrolled and improving my credit score could help me to rent a home, get a new job, or get a new car in the future."); Ex. 60, Lichtblau Decl. Regarding Consumer Complaints ¶¶ 17-21 & Attach. A.

11. Lexington Law's website promised that its services could and would cause the removal of negative items from customers' credit reports and improve customers' credit scores. Ex. 4, DelPonti0000371 ("Credit repair is the process

of improving a poor credit score by addressing or removing items that could be listed on your reports inaccurately" and "Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report."); Ex. 29, CFPB-PGX-154419 ("Fortunately, the removal of questionable negative items is an effective way to improve your credit . . . . Lexington Law has developed tools and strategies that have proven to be effective at removing unfair, inaccurate, and unsubstantiated negative items."); Ex. 5, PGX0028285 ("Lexington Law is here to help you meet your credit score goals. Our credit repair services can help you work to remove the inaccurate or unfair negative items listed on your credit report," and "In 2017 alone, our clients saw 10 million negative items removed from their credit reports.").

12. Lexington Law's online advertisements promised the removal of negative credit report items and improvements in consumers' credit scores. Ex. 1, Heath Dep. 95:23-96:19 ([redacted]

[redacted]; Ex. 30, Lichtblau Decl. Regarding Lexington Law Ads and Webpages; ECF 66, Heath's Answer (admitting Complaint ¶¶ 111-116, ECF 2); Ex. 31, PGX0038604 (repeated references to 40-point credit score improvement); Ex. 32, PGX0041339 Excerpts ([redacted]

[redacted]

13. Lexington Law's telemarketing scripts promised the removal of negative credit report items and improvements in consumers' credit scores. [redacted]

14. Lexington Law's affiliate telemarketing scripts promised the removal of negative credit report items and improvements in consumers' credit scores. [redacted]

[redacted]

15. Lexington Law's training materials [redacted]

[redacted]

16. Lexington Law devised a formula to sell credit repair services, which it called [redacted] It trained its telemarketers on this formula as follows:

[redacted]

Ex. 40, PGX0000441 (slide 2).

17. Lexington Law's training materials explained: [redacted] Ex. 40, PGX0000441 (slide 2 notes). The trainer's notes explained:

[redacted]

Ex. 40, PGX0000441 (slide 2 notes).

18. Another training document for Lexington Law telemarketers explained:

[redacted]

Ex. 39, PGX0001095.

19. The Lexington Law telemarketing script contained this formula:

[redacted]

[redacted]

Heath Ex. J., PGX006515-16.

20. Lexington Law's own review of telemarketing calls revealed [redacted] Ex. 44, Lichtblau Decl. Regarding Defendants' Call-Monitoring Records. According to Defendants' records, [redacted]

21. Recordings and transcripts of telemarketing calls between Lexington Law and potential customers reveal how telemarketing representatives promised consumers that it could improve their credit reports, and used that promise to

close the sale. Ex. 45, 1559245345.315333.mp4; Ex. 46, Transcript 1559245345.315333 at 15:18-19 [redacted]); Ex. 47, 1567783503.7831769.mp4; Ex. 48, Transcript 1567783503.7831769 at 18:15-19 ([redacted]; Ex. 49, LEX0001461; Ex. 50, LEX0001490; Ex. 51, Transcript LEX0001490 at 23:23-24:2 [redacted]); Ex. 52, LEX0001505; Ex. 53, LEX0001517; Ex. 54, LEX0001523; Ex. 55, LEX0001524; Ex. 56, LEX0001525; Ex. 57, LEX0004452; Ex. 59, Transcript LEX0004452 at 10:23-24 [redacted]

22. Lexington Law was [redacted] Ex. 10, Progrexion Marketing Dep. 144:2-15; *e.g.*, Ex. 35, PGX.CFPB.II.00449062. And companies that advertised for Heath [redacted] Ex. 3, Progrexion Teleservices Dep. 132:10-14; Ex. 59, One Loan Place Dep. 102:5-10. But it never had that power. Ex. 1, Heath Dep. 162:2-

163:8; Ex. 10, Progrexion Marketing Dep. 97:25-98:6.

## V. Argument

### A. Heath is covered by Section 310.4(a)(2).

The Tenth Circuit instructs that regulatory interpretation should "begin with the text of the regulation, and, if the meaning is clear, look no further." *Scalia v. Wynnwood Refining Co.*, 978 F.3d 1175, 1181 (10th Cir. 2020) (citations omitted). Section 310.4(a)(2) states:

> It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> . . .
>
> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>
>> (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and
>>
>> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose.

The Provision consists of two parts: a coverage clause and two requirements that must be satisfied before charging the customer.

The Provision's meaning is clear: covered companies are those that sell or telemarket "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. . . ." And covered companies must satisfy both of the Provision's preconditions before requesting or receiving payment. First, the time frame for providing *all* of the services must have expired. 16 C.F.R. § 310.4(a)(2)(i). Second, the company must have provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2)(ii).

The Provision operates much like a contingency fee arrangement. There must be an agreement between the seller and its customer about the time frame for services and what credit enhancement—the "promised result"—must be achieved in order to trigger the payment obligation.[2] The seller can request payment only *after* achieving a successful result for the customer.

[2] In defining the term "promise," Black's Law Dictionary notes that a "binding promise — one that the law will enforce — is the essence of a contract." Black's Law Dictionary (11th ed. 2019).

The material facts establishing that Heath is covered by, and has violated, the Provision are indisputable. Heath is indisputably a telemarketer and seller. Lexington Law credit repair services indisputably are represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. And Heath indisputably requested or received payment from consumers (i) before the time frame for services had expired and (ii) before Heath demonstrated that the promised results had been achieved and maintained for six months. *Supra* Section IV ¶¶ 1-9; Pl.'s App'x A. Thus, based on the plain reading of the Provision, Heath is not entitled to judgment on Count I.

**B. Heath's erroneous interpretation of Section 310.4(a)(2) contradicts its text, history, and purpose.**

**1. Heath's interpretation lacks textual support.**

Heath attempts to evade liability by conflating two distinct parts of Section 310.4(a)(2), arguing that it is covered by the Provision only if it *guaranteed* customers specific results, such as the removal of a specific number of negative items or a specific increase in credit score. Heath's reading distorts the Provision's clear meaning and should be rejected. *Canyon Fuel Co. v. Sec'y of Lab.*, 894 F.3d 1279, 1287 (10th Cir. 2018).

As shown above, Heath is a seller or telemarketer, and Lexington Law credit repair services are "represented to" remove derogatory information from, or

improve, a person's credit history, credit record, or credit rating, as described in Section 310.4(a)(2). The coverage provision notably does *not* reference goods or services *guaranteed* to remove derogatory information.

Heath seeks to introduce ambiguity into the Provision's unambiguous coverage provision by focusing on the phrase "promised results" found in the second precondition for payment, Section 310.4(a)(2)(ii). Before a covered company can lawfully request or receive payment, the Provision requires that two events occur, the second of which is that "[t]he seller has provided … a consumer report … demonstrating that the promised results have been achieved … six months after the results were achieved." *Id.* This part of the Provision unambiguously requires sellers of credit repair services to provide their customers with a consumer report that shows that the promised results of their services, *i.e.*, improvements to their credit record, have been achieved, and maintained for at least six months, before they charge those customers.

Ignoring the regulation's text, Heath argues that the phrase "promised results" does not describe the required contents of the consumer report that must be provided to the consumer, nor an event that must occur prior to requesting payment, but rather is a component of the coverage clause. Under Heath's unsupported reading, the second precondition for payment functions as an

exception, dramatically narrowing the scope of the Provision and effectively rewriting the coverage clause. But the regulation does not allow a reading limiting its application to sellers and telemarketers that guarantee specific results. Instead, by its terms, the Provision applies to sellers or telemarketers offering services that are "represented to" remove derogatory information or otherwise improve a person's credit record. That describes Heath.

The absence of such limiting language in the Provision is conspicuous given the text of another provision in the same section of the TSR. Section 310.4(a)(4) prohibits advance fees for credit products "when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan…." Had the FTC intended to include the same limitation in Section 310.4(a)(2), it could have done so.[3]

Heath incorrectly asserts that "[t]he Bureau's case hinges on the notion that 'promised results' means 'promised services.'" Heath Br. 2. The Bureau's position, consistent with that of the FTC and state agencies that have enforced the Provision,

[3] As one would expect given the regulation's text, FTC actions enforcing Section 310.4(a)(4) contain explicit allegations that a guarantee was made. *E.g.*, Am. Compl., *FTC v. Cap. Choice Consumer Credit, Inc.*, No. 02-21050-CIV, 2002 WL 32670291 (S.D. Fla. April 18, 2002); Compl., *FTC v. 1263523 Ontario, Inc.*, No. 99 CIV 8679, 1999 WL 34770693 (S.D.N.Y. Aug. 5, 1999). But actions under Section 310.4(a)(2) do not. *Infra* Section V(B)(3).

is that credit repair, by its commonly understood definition, encompasses promises of improved, enhanced, or restored credit. The promised result of these services is that the consumer will have a better credit record for having retained the credit repair service provider. Heath, the self-proclaimed leader in credit repair, markets its services in just this way, stating that "[c]redit repair is the process of improving a poor credit score by addressing or removing negative items that could be listed on your reports inaccurately,"[4] and telling potential customers [redacted]."[5] "Solution" means "something that is used or done to deal with *and end* a problem: something that solves a problem."[6] The promised result of credit repair—the "solution" — according to Heath's public representations, is the improvement of a poor credit score.[7] Under the TSR, the "promised result" that must be demonstrated and maintained for six months, before payment can be requested, is the improvement, enhancement, or credit restoration offered and agreed to by the consumer as a precondition to payment.[8]

---

[4] *E.g.*, Ex. 4, DelPonti0000371.
[5] Ex. 8, PGX0028797; *see* Ex. 9, PGX0028742; Heath Ex. J, PGX0060516.
[6] *Solution*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/solution (emphasis added).
[7] *E.g.*, Ex. 4, DelPonti0000371; *see also* Ex. 5, PGX0028285.
[8] For example, the consumer could agree to pay per derogatory item removed from

Heath attempts to equate "promised results" with a guarantee by referencing the definitions of "promise" and "result" in Black's Law Dictionary (11th ed. 2019). But the resulting formulation supports the Bureau's position, not Heath's. Heath asserts that "a 'promised result' is the 'manifestation of an intention to act … in a specified manner' to render 'a consequence, effect, or conclusion.'" Heath Br. 20. The Bureau agrees. The "promised result" referred to in Section 310.4(a)(2)(ii) is a credit report or credit score improvement that the credit repair company has sought to achieve for the customer, and for which the customer has agreed to pay if it is in fact achieved.[9]

As other courts presented with the issue have concluded,[10] the Provision also aligns with the requirements of the Credit Repair Organizations Act (CROA). CROA—a law enforced by the FTC and others, but not the Bureau—imposes a variety of restrictions on "credit repair organizations." 15 U.S.C. § 1679a(3)(A).

---

their credit report or for a certain credit score increase, such as demonstrated movement from the near-prime to the prime credit tranche.

[9] This plain reading also comports with the additional definition of "promise" as "to give good grounds for expecting (a particular occurrence or situation)." https://en.oxforddictionaries.com/definition/promise.

[10] *CFPB v. Commonwealth Equity Grp.*, No. 20-CV-10991, 2021 WL 3516690, at *2 (D. Mass. Aug. 10, 2021); *CFPB v. Prime Mktg. Holdings, LLC*, No. CV-1607111, 2016 WL 10516097, at *9 (C.D. Cal. Nov. 15, 2016); *Tennessee v. Lexington Law Firms*, No. 3:96-0344, 1997 WL 367409, *6 (M.D. Tenn. May 14, 1997).

Heath admits that it is a credit repair organization bound to follow CROA. Because Heath telemarkets its services, it must also comply with Section 310.4(a)(2).[11] "The TSR simply adds a precondition to requesting payment, namely that the organization provide proof that the services were rendered more than six months after performance." *CFPB v. Commonwealth Equity Grp.*, No. 20-CV-10991, 2021 WL 3516690, at *2 (D. Mass. Aug. 10, 2021).

**2. Heath's interpretation conflicts with the TSR's rulemaking history.**

The FTC's statements on the Provision, during and after the TSR's promulgation, reflect its intention to impose a payment delay on all telemarketed credit repair goods and services, not merely those involving guarantees. The Provision is calibrated to protect consumers from paying for services that do not yield results. 60 Fed. Reg. 43,842, 43,854 (Aug. 23 1995) ("§ 310.4(a)(2) is directed [against] the deceptive marketing and sale of bogus credit repair services").[12]

[11] While one court cited by Heath has held that monthly service fees are permitted under CROA, if charged in arrears (*DuCharme v. Heath*, No. 10-02763, 2010 WL 5211502, at *6 (N.D. Cal. Dec. 16, 2010)), another district court in the same circuit has held that CROA does not conflict with or supersede the TSR (*Prime Mktg. Holdings, LLC*, 2016 WL 10516097, at *9), so if a credit repair company sells its goods or services through telemarketing, it must comply with both.

[12] The FTC invited comment on the question: "Are there any legitimate services that could not be provided, or would be more costly to provide, if this [provision]

In first proposing the TSR, the FTC explicitly stated that the Provision "restricts the telemarketing of credit repair services," and explained that

> two events must occur before payment can be requested or received for these services: first, either the term of the contract or the time frame in which the seller has represented the goods or services will be provided has expired; and second, the seller has provided the purchaser with documentation showing that the promised results have been achieved.

60 Fed. Reg. 8313, 8318 (Feb. 14, 1995). The proposed Provision's general applicability to all telemarketed credit repair services was evident to commenters. Thirty-seven State Attorneys General joined a comment observing that a "ban on advance payments should have the effect of limiting the lawful scope of these forms of telemarketing to offers of services where the offeror is confident enough that the service will be provided that there is a willingness to defer payment until after the service has been performed." Ex. 22, Decl. Donald S. Clark, Attachment D, *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn. Dec. 16, 1996). The Postal Inspection Service similarly observed that the provision would, by requiring "actual results be accomplished," drive "those who do not actually repair credit to cease operating (at least by telemarketing)." Ex. 16, U.S. Postal Serv.,

---

were promulgated?" 60 Fed. Reg. 8313, 8325 (Feb. 14, 1995). There is no indication that any comments identified such an impact on legitimate services.

Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. 411001.

The FTC's intention that the Provision apply to all telemarketed credit repair goods and services was further reflected in subsequent TSR rulemaking activities, which reviewed but did not alter the Provision. The FTC's description of the Provision in a rule review and request for public comment in 2000 indicates its general applicability: "Section 310.4(a) specifies that four listed activities (i.e., threats, intimidation or profane or obscene language, and *requesting or receiving payment for credit repair, advance fee loan, or recovery room services before the consumer has received the services*) are abusive telemarketing acts or practices, in violation of the Rule." 65 Fed. Reg. 10,428, 10,432 (Feb. 28, 2000) (emphasis added). Similarly, in proposing to amend other provisions of the TSR, the FTC stated that it imposed a delayed payment requirement on credit repair services "because there are no disclosures that could effectively remedy the problems that arise from the telemarketing of those illusory services; *the harm to consumers could be averted only by specifying that the seller's performance of [these services] must precede payment by the consumer*." 67 Fed. Reg. 4492, 4504 (Jan. 30, 2002) (emphasis added). In that same 2002 Notice of Proposed Rulemaking, the FTC described the payment restriction with respect to credit repair services as

"requesting or receiving payment for credit repair services prior to delivery and proof that such services have been rendered," with no mention of guarantees or promises. *Id.* at 4,511. And it further noted, "the Rule bans telemarketers who offer to … provide credit repair services … from seeking payment before rendering the promised services …." *Id.* at 4,493.[13]

The FTC's published TSR guidance, "Complying with the Telemarketing Sales Rule,"[14] agrees. The guidance makes no reference to guarantees or promises of specific credit repair outcomes, but states plainly that "[t]he TSR prohibits sellers and telemarketers from requesting or receiving payment for credit repair services before two events occur…," and then proceeds to explain the two payment condition clauses in the Provision. *Id*. In stark contrast, the FTC's guidance regarding a different TSR subsection, Section 310.4(a)(5), states: "The Rule prohibits seller and telemarketers who guarantee or represent a high likelihood of success in obtaining or arranging a loan … from asking for or accepting payment

---

[13] Contrary to Heath's assertion that in January 2002 "the FTC realized that the TSR Advance Fee Provision could not be justified under [the authorizing legislation]," the FTC stated in the Federal Register that credit repair services "were included in the rule under the Telemarketing Act's grant of authority for the Commission to prescribe rules prohibiting other unspecified abusive telemarketing acts or practices." 67 Fed. Reg. at 4511.

[14] FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Jan. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair.

until a consumer gets the extension of credit promised." *Id.* Like its rulemaking statements, the FTC's guidance presents the Provision as applicable to all telemarketers[15] or sellers[16] of credit repair services, without qualification.

### 3. Heath's interpretation conflicts with the Provision's enforcement history.

In the TSR's 26-year history, the Federal government has interpreted the Provision consistently with the Bureau's position here and has never suggested that liability for a violation requires proof that a seller or telemarketer guaranteed specific results. Heath cannot point to a single Federal enforcement pleading that includes the element it asserts is an essential component of a Section 310.4(a)(2) claim.

The Bureau's interpretation of the Provision today is the same as the FTC's in *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn.) (complaint filed April 10, 1996).[17] There, Tennessee sued Lexington Law for violating Section 310.4(a)(2), among other things. Tennessee's complaint did not allege that Lexington Law guaranteed or promised specific results related to its credit repair services. Ex. 18, Compl., *Tenn. v. Lexington Law*. Instead, the State's claims under

[15] 16 C.F.R. § 310.2(ff).
[16] 16 C.F.R. § 310.2(dd).
[17] [redacted] x. 17, Heath Factual Stipulation (Apr. 8, 2021).

the Provision—count one (taking fees before the expiration of the time frame for the services) and count two (taking fees before providing a consumer report confirming the promised results were achieved)—alleged that Lexington Law was charging monthly fees for services advertised as follows:

> **LEGALLY FIX BAD CREDIT**
> **Legal Credit, Debit, and IRS resolution. 15 years in practice – 75,000 negative credit items deleted. Complimentary Consultation. Lexington Law Firms – Call 800-653-9529.**

Ex. 18 ¶¶ 6-9, 13-14 & Ex. A thereto.[18] Then, as now, Lexington Law's offer to "fix" people's bad credit—combined with reliance on telemarketing—subjects them to the Provision.

The FTC intervened to seek summary judgment on three of Lexington Law's affirmative defenses and articulated the scope of the Provision. Ex. 19, Intervenor FTC's Mot. for Partial Summary Judgment, *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn.) (filed Dec. 16, 1996). The FTC's motion explained that "the Rule prohibits a telemarketer from requesting or receiving payment for a

[18] Heath continues to use similar language in its advertisements. *E.g.*, Ex. 30, Lichtblau Decl. Regarding Lexington Law Ads and Webpages.

credit repair service until six months after the promised 'credit repair' has been achieved." *Id*. at 6.

The FTC described the harm that the Provision was designed to prevent:

> Credit repair services that promise, in return for an advance fee, to help improve a consumer's credit rating, without regard to the reasons why the customer's credit rating is unfavorable, necessarily abuse the vast majority of their customers, because the vast majority of those customers cannot be helped.… By prohibiting the collection of a fee for credit repair services until actual credit improvement has been shown, the Rule prevents this telemarketing abuse.

*Id*. at 6-7.[19]

The district court agreed. Notwithstanding the absence of any guarantee in the record, the court found that "the FTC properly interpreted the Act to apply to Defendant's conduct." *Tennessee v. Lexington Law Firms*, No. 3:96-0344, 1997 WL 367409, *6 (M.D. Tenn. May 14, 1997).

Here, Heath characterizes its service exactly as the FTC described—as a service to help improve a consumer's credit rating; offers it without regard to the reasons why the customer's credit rating is unfavorable; and collects payment before any actual credit improvement has been shown. Ex. 1, Heath Dep. 166:21-

---

[19] The FTC's motion also refuted Lexington Law's challenges to the agency's "authority to promulgate restrictions on credit repair services" and its "authority to apply the rule to lawyers." *Id.* at 10-11.

167:6, 100:14-101:11, 122:18-124:10, 268:15-269:7. The Provision applied to Lexington Law in 1997, and it continues to apply today.[20]

Every other action to enforce the Provision has included the elements alleged in the Bureau's Complaint and omitted the "guarantee" element Heath improperly seeks to insert. In 1996, Illinois filed suit against National Credit Management Group ("National Credit") for violating the Provision. Compl., *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1996 WL 35048521 (N.D. Ill. April 10, 1996). The complaint contained no allegations that the defendant promised any specific outcome or guaranteed any results.[21]

The court rejected arguments similar to Heath's and found the State was not required to show that defendant made particular representations regarding the removal of derogatory information or credit improvement. In denying the motion to dismiss, the court stated:

> Plaintiff…alleges that defendant received payment to improve a person's credit record before providing the person with a report from a consumer reporting agency issued more than six months

---

[20] The FTC was not a party to Lexington Law's settlement agreement with Tennessee that ended the litigation, and the terms of that agreement have no bearing on this action.

[21] *See also* Pl.'s Mem. in Reply to Def.'s Opp'n to Mot. for Summary Judgment, *Illinois v. Nat'l Credit Mgmt. Grp.*, 1996 WL 35048520, p. 3-4 (N.D. Ill. Aug. 30, 1996) ("To be sure, in light of the FTC's Rule and state laws…companies such as [National Credit], striving to maintain a lucrative operation, often do not expressly promise consumers that the services they offer will improve their credit.").

> after such results were achieved. Because the allegations track the language of the regulation, plaintiff sufficiently alleges violations of the Telemarketing Rule….

*Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1996 WL 351196, at *2 (N.D. Ill. June 24, 1996).

As amicus curiae, the FTC filed an opening and reply brief discussing the purpose and coverage of the Provision.[22] The FTC explained that while National Credit was not making express guarantees or promises of particular consumer outcomes, it was still subject to the Provision. The FTC noted that it is the claim of "repair" that has the potential to abuse consumers, and not any particular practice by credit repair companies.[23] In its reply, the FTC stated:

> [The State's] motion makes clear, we think, that while [National Credit] (like any reasonably sophisticated perpetrator of a credit repair scam) may avoid making express 'untrue statements indicating that accurate credit information can be removed from credit reports' [citation omitted], the clear implication of its selling message is that purchase of the [National Credit] package will help the consumer repair his or her credit. That claim necessarily

---

[22] At the court's invitation, the FTC also briefed the constitutionality of the advance fee provision. *Id.*, DK #35 (filed Dec. 3, 1996).

[23] "Because credit repair services simply cannot 'repair' accurate derogatory information in a credit report, services that charge individuals large sums for the prospect of an improved credit report merely compound the misfortune of their victims." Mem. of Amicus Curiae FTC, *Illinois v. Nat'l Credit Mgmt. Grp*., No. 96C-2073, 1997 WL 35410876 (N.D. Ill. Jan. 8, 1997).

> misleads the vast majority of those it attracts – to their great financial detriment.[24]

The Bureau takes precisely the same position here: while Heath (like any reasonably sophisticated entity) may avoid making express untrue statements or guarantees, the clear implication of its sales message is that the purchase will help the consumer repair his or her credit. This position is entirely consistent with the FTC's longstanding interpretation of the Provision.

The FTC's own enforcement actions also make clear that a guarantee is not a necessary element of a Section 310.4(a)(2) violation. For example, in *FTC v. Luebke Baker*, the FTC described the defendants' credit repair practices as sales of a '"CD-ROM with an easy to understand information packet that includes step-by-step instructions,' [that] was designed, among other things, to help consumers with credit problems 'build [their] credit score back up.'" Ex. 20 ¶ 40, Compl., *FTC v. Luebke Baker*, No. 1:12-CV-01145 (C.D. Ill. May 11, 2012). Neither the complaint nor the attached sales script makes any mention of the defendants guaranteeing or promising specific results. *Id*. ¶ 40, 51-55 & "Ex. F" thereto. The element that Heath claims is essential to a Section 310.4(a)(2) claim was not pleaded in the FTC's case.

---

[24] Mem. in Reply of Amicus Curiae FTC, *Illinois v. Nat'l Credit*, No. 96C-2073, 1997 WL 35410875, p.7 (N.D. Ill. Feb. 18, 1997).

Finally, the Bureau's cases enforcing the Provision align with the standards of the FTC and state cases that preceded them. The Section 310.4(a)(2) allegations in the Bureau's complaints against Prime Marketing Holdings,[25] Key Credit,[26] Federal Debt Assistance Association,[27] and Credit Repair Cloud[28] contain no reference to guarantees or promises of specific results. Thus, what Heath seeks to portray here as a vital element of any claim under the Provision is in fact something the Bureau, the FTC, and states have never alleged as an element of such claims in decades of bringing them.

4. **Other TSR provisions further undermine Heath's interpretation.**

Heath argues that telemarketers and sellers are subject to the Provision only when they guarantee the results of their credit repair services. But such guarantees are deceptive statements prohibited by a different TSR provision: 16 C.F.R. §

---

[25] Compl., *CFPB v. Prime Mktg. Holdings, LLC*, No. 2:16-cv-07111 (C.D. Cal. Feb. 10, 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_prime-market-holdings_complaint.pdf.

[26] Compl., *CFPB v. Commonwealth Equity Grp.*, No. 20-cv-10991 (D. Mass. May 22, 2020), https://files.consumerfinance.gov/f/documents/cfpb_commonwealth-equity-group-dba-key-credit-repair-nikitas-tsoukales_complaint.pdf.

[27] Compl., *CFPB v. Fed. Debt Assistance Assoc.*, LLC, No. 17-cv-02997 (D. Md. Oct. 12, 2017 ), https://files.consumerfinance.gov/f/documents/201710_cfpb_FDAA-complaint.pdf.

[28] Compl., *CFPB v. Daniel A. Rosen, Inc.*, No. 21-cv-07492 (C.D. Cal. Sept. 20, 2021), https://files.consumerfinance.gov/f/documents/cfpb_credit-repair-cloud_complaint_2021-09.pdf.

310.3(a)(2). Removal of tradelines and improvements to a consumer's credit record are not within the capability of any entity but the consumer reporting agencies.[29] Therefore, any other entity explicitly or implicitly guaranteeing improvements to a consumer's credit report would be misrepresenting the service, in violation of Section 310.3(a)(2).

In fact, the FTC initially proposed to include a subsection under Section 310.3 to specifically prohibit "misrepresentations that certain goods or services can or are likely to improve a person's credit history, credit record, or credit rating, or that certain goods or services can result in a person obtaining credit,"[30] but it ultimately removed this language from the Final Rule as redundant, stating that such representations "are subsumed in the general prohibitions against misrepresentations set forth in § 310.3(a)(2) of the Final Rule." 60 Fed. Reg. at 43,848. Notably, the FTC made clear that such misrepresentations were "subsumed in . . . § 310.3(a)(2)" (the ban on deceptive representations), not in section 310.4(a)(2) (the credit repair Provision).

---

[29] The original proposed rule banning advance fees for credit repair permitted proof of results to be obtained from the original furnisher or provider of the information to the consumer reporting agency, but the FTC omitted that option as it progressed toward the final rule because "the original furnisher of such information cannot control the actions of the consumer reporting agencies." 60 Fed. Reg. 30,406, 30,415 (June 8, 1995).

[30] 60 Fed. Reg. at 8316.

The fact that credit repair guarantees are prohibited under Section 310.3(a)(2) is fatal to Heath's argument that the Provision imposes a 6-month payment delay only on companies making such representations. Under Heath's interpretation, the Provision would at best be wholly superfluous, as it would impose a payment delay on an already-illegal practice. At worst, Heath's interpretation would *permit* credit repair companies to engage in deceptive conduct, provided they delayed their billing as the Provision requires. Both possibilities lead to an absurd result that undermines the TSR's core purpose to protect consumers from deceptive, unfair, and abusive telemarketing practices.[31]

**C. The Provision is well within the FTC's statutory authority.**

Heath, citing no authority, wrongly claims that the FTC exceeded its authority in promulgating Section 310.4(a)(2). But both courts that have considered this argument have rejected it and upheld the Provision's validity. *See*

[31] Similar objections to CROA—that the law should only apply to those entities engaged in deception or fraud—have been raised and rejected. *E.g.*, *Rannis v. Recchia*, 380 F. App'x 646, 649-50 (9th Cir. 2010). Like CROA, the TSR both *prohibits* deceptive representations and *restricts* the non-deceptive offering of credit repair services.

*Commonwealth Equity Grp.*, 2021 WL 3516690, at *3; *Tennessee v. Lexington Law Firms*, 1997 WL 367409, at *5.

The Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. § 6101 *et seq.*, directed the FTC to promulgate the TSR. Its purpose "was to combat telemarketing fraud by providing law enforcement agencies with powerful new tools, and to give consumers new protections." 65 Fed. Reg. at 10,429-30. As the FTC stated during Tennessee's prosecution of Lexington Law, "Congress directed the Commission to define the abusive … telemarketing activities that should be prohibited, in accordance with 'its experience regarding telemarketing activities.'"[32]

As noted above, the Provision was carefully designed to provide an additional layer of protection to consumers, as intended by the Telemarketing Act, without wholly banning the telemarketing of credit repair services. By prohibiting credit repair providers from charging fees until after the contracted-for promised results have been achieved, the Provision provides consumers a means to know whether the offered services are illusory or not, and thus provides a reasonable means to avoid the harm that the FTC had observed in the marketplace.[33] The six-

[32] Ex. 19, FTC's motion (internal citation omitted).
[33] *See* 67 Fed. Reg. at 4511 ("having no way to know the offered services were

month waiting period is necessary because of the dispute resolution procedures of Section 611 of the Fair Credit Reporting Act, 15 U.S.C. § 1681i, in order to assess whether changes on the consumer's credit report are durable, or whether items have been temporarily removed, only to be reinserted.

**D. The Provision does not unconstitutionally burden commercial speech.**

Relying on the unsupported statement that Section 310.4(a)(2) serves as a "complete prohibition" on the telemarketing of credit repair services because "no company can profitably abide by the waiting period,"[34] Heath argues that the Provision unconstitutionally burdens its commercial speech. But every court to have resolved similar arguments has rejected them—and for good reason.

Heath's argument fails because the Provision regulates conduct—the timing of and conditions precedent to charging for credit repair services—not speech. Even if the Court were to find that the Provision regulates commercial speech, it would nonetheless survive First Amendment scrutiny under either the standard

---

illusory, consumers had no reasonable means to avoid the harm that resulted from accepting the offer").

[34] In support, Heath cites the Heath Declaration (Heath Ex. F) and the DelPonti Report (Heath Ex. K-1). The Bureau disputes the validity of Mr. DelPonti's financial forecast, the admissibility of Mr. Heath's opinions about credit repair business models, and the materiality of the statement itself. *See* Pl.'s Mot. to Exclude DelPonti, ECF 224 at 7-10; Pl.'s Evid. Objs., ECF 227, at 8-9; Resp. to Statement of Undisputed Material Facts ¶¶ 24-25.

articulated in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), which Heath incorrectly asserts governs in this case, or the standard articulated in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), which in fact governs. Moreover, because the Provision is unambiguous and does not raise "serious constitutional doubts," as Heath suggests, Heath's invocation of the canon of constitutional avoidance to urge the Court to "shun" the Bureau's interpretation is inapt. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction [one of which raises serious constitutional doubts]; and the canon functions as a means of choosing between them." (emphasis removed)); *Almendarez-Torres v. United State*s, 523 U.S. 224, 238-39 (1998) (explaining that the Court need not apply the canon of constitutional avoidance where the Court does not gravely doubt that the statute is constitutional, even where the statute poses a constitutional question).

**1. The Provision regulates conduct, not speech.**

Section 310.4(a)(2) does not prohibit credit repair companies from marketing over the telephone, it merely imposes restrictions on when they can charge customers for those services. "[I]t has never been deemed an abridgment of

freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.").

The District Court for the District of Massachusetts recently rejected the precise argument that Heath advances here, that Section 310.4(a)(2) imposes a content-based restriction on speech, holding instead that "the restriction is on conduct—the timing of payment—not on speech." *Commonwealth Equity Grp.,* 2021 WL 3516690, at *3. Another district court reached a similar conclusion concerning the CROA provision that prohibits credit repair companies from charging or receiving a fee for a service before "such service is fully performed."[35] *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 459-60 (D.N.J. 1998) (holding the CROA provision "merely regulates when payment may be collected," and thus did not implicate the First Amendment). As in this case, the defendants in *National Credit Management Group* relied on *Simon & Schuster, Inc. v. Members of New*

[35] *See* 15 U.S.C. § 1679b(b).

*York State Crime Victims Board*, 502 U.S. 105 (1991) to argue that CROA's advance fee prohibition financially burdened them based on the content of their speech. The Court rejected that analogy, noting "[u]nlike the 'Son of Sam Law' [at issue in *Simon & Schuster*] which prohibited profiting from a crime, the Defendants are not prohibited from offering their services; they are merely required to perform the services before customers incur a resulting charge. This does not impinge on the rights of the Defendants under the First Amendment." *Id.* at 460.

Heath may find compliance with the regulation to be less lucrative than non-compliance, but that does not transform the Provision into a content-based restriction on speech. *See Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 48 (1st Cir. 2005) ("The First Amendment's core concern is with the free transmission of a message or idea from speaker to listener, not with the speaker's ability to turn a profit[.]"). Indeed, many industries are subject to regulations that prevent firms from receiving immediate payment for their work. For example, pharmaceutical companies[36] and airplane manufacturers[37] face lengthy regulatory processes and contingencies before they can sell a new product and earn revenue

[36] 21 U.S.C. § 355; 21 C.F.R. pt. 314.
[37] 14 C.F.R. pt. 21.

therefrom. And regulations restrict debt-relief[38] and mortgage relief[39] service providers' ability to charge upfront fees. Many industries also function under contingent payment models. For example, realtors, mortgage brokers, and lenders typically earn fees if and when the loan closes, which is often a months-long process if it closes at all, and certain legal services are commonly offered on a contingent-fee basis. Heath's assertion that it is constitutionally entitled to immediate payment is false.

**2. Even if the Provision did regulate commercial speech, it would survive First Amendment scrutiny.**

Even if the Court were to find that the Provision regulates commercial speech, Heath's First Amendment arguments would nonetheless fail. As a preliminary matter, Heath incorrectly asserts that the Court should apply the standard articulated in *Central Hudson.* But a threshold requirement for the application of that standard is that the speech at issue be non-misleading. *Id.* at 564; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623-24 (1995). In contrast, regulations targeted at misleading commercial speech are subject to the "less exacting scrutiny" articulated in *Zauderer*, and are permissible so long as they are "reasonably related to the [government's] interest in preventing deception

[38] 16 C.F.R. § 310.4(a)(5).
[39] 12 C.F.R. § 1015.5.

of consumers." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010) (citing *Zauderer*, 471 U.S. at 651).

A stated purpose of the Provision is to "limit the telemarketing of deceptive credit repair services," which charge consumers up front yet fail to remove derogatory information from, or improve, the consumers' credit records. 60 Fed. Reg. at 43,853. Because the Provision is targeted at preventing consumer deception, *Zauderer* applies here. The Provision meets the *Zauderer* standard because requiring credit repair companies to wait six months and demonstrate results before requesting or receiving payment protects consumers from having to pay up front for services which may ultimately prove illusory, and is thus reasonably related to preventing consumer harm stemming from the types of deception that the FTC sought to combat in promulgating the Provision.

Even applying the *Central Hudson* standard, Section 310.4(a)(2) survives First Amendment scrutiny. Under *Central Hudson*, a regulation on non-deceptive commercial speech is permissible so long as the government: (1) asserts a substantial interest in support of its regulation; (2) establishes that the restriction directly and materially advances that interest; and (3) demonstrates that the regulation is narrowly drawn. *Went For It*, 515 U.S. at 624 (applying the *Central*

*Hudson* standard to uphold a 30-day ban on targeted direct-mail solicitation by attorneys). Heath appears to contest only the second element.

To establish that a regulation directly and materially advances a substantial interest, the government must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 626. In doing so, it may rely on "studies and anecdotes," as well as "history, consensus, and simple common sense." *Id.* at 628 (internal quotation marks omitted). Here, the FTC analyzed large volumes of consumer complaints; commentary from law enforcement agencies, public interest groups, and members of the credit reporting industry; its prior enforcement history; and the fact that the vast majority of consumers cannot be helped by credit repair services. It concluded that the credit repair industry as a whole had caused substantial injury to consumers by offering services that were "fundamentally bogus" and failed to actually repair consumers' credit. 67 Fed. Reg. at 4511. The Provision materially alleviates the economic harm to consumers because it relieves consumers of the obligation to pay for credit repair services unless and until they have been assured that their credit was in fact repaired.

Heath's reliance on *Aptive Environmental, LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020), is misplaced. *Aptive* involved a challenge to an

ordinance prohibiting commercial solicitation after 7:00PM, with stated justifications of protecting public safety and privacy. *Id.* at 966. The Court of Appeals found that the municipality lacked sufficient evidence that commercial solicitation in the evening in fact threatened public safety and privacy, and thus the ordinance failed to directly and materially advance its stated purposes. *Id.* at 989-99. Here, in contrast, the FTC identified real and substantial economic harm to consumers caused by the credit repair industry, and promulgated a regulation which materially alleviates that harm by requiring credit repair companies to wait more than six months to bill their customers and, in turn, providing consumers the opportunity to verify that credit repair was in fact achieved before becoming obligated to pay.

Heath's current business model makes no effort to determine which customers are likely to benefit or to market to those more likely to benefit. Ex. 1, Heath Dep. 100:14-101:11, 268:15-269:7. By restricting credit repair telemarketers to charging only those customers who obtain positive results, the Provision may pressure companies like Heath to select customers based on an assessment that they are likely to benefit from the services—such as consumers with identifiable, *material* errors on their reports and sufficient means to afford Heath's services and

not fall behind on other bills. This is a reasonable restriction that directly and materially advances a substantial interest.

**E. If proof that promises were made were an element of the claim, a material dispute of fact exists as to whether Heath promised results.**

Summary judgment must be denied if the movant does not meet its burden to show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56. If the Court rejects the Bureau's interpretation of the Provision and holds that Defendants are only covered if they were promising results, then the Court must deny Heath's motion, because whether or not Heath promised results to consumers is a factual matter strenuously disputed by the parties.

Neither the Telemarketing Act nor the TSR defines "promise" or "promised results." Black's Law Dictionary defines "promise" as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." Black's Law Dictionary (11th ed. 2019). The Oxford English Dictionary defines "promise," in the context of results, as "to give strong or reasonable grounds for expecting (future achievements or good results)." Oxford English Dictionary (3d Ed., June 2007).

In support of its factual assertion that Lexington Law promised no results, Heath points to one consumer declaration[40] and some disclaimer language it used in certain advertising materials, like certain telemarketing scripts. The Bureau counters with six consumer declarations, 100 examples of consumer complaints, [redacted] internal company call reviews, and dozens of statements regularly used to market Lexington Law's credit repair services—all of which show that Heath regularly promised consumers that it could and would remove negative items from their credit reports or improve their credit scores. Pl.'s App'x C; *infra* Section IV. It did so by assuring consumers it had accomplished these results for thousands of customers, and was confident it could do so for the consumer at hand; by committing to do so, verbally, on telemarketing calls; and by giving consumers good grounds to expect those results through its representations about past successes, expertise, methods, and process.

Rule 56 does not permit a ruling on this factual dispute at summary judgment. For the reasons stated above, the Court should reject Heath's erroneous assertion that proving a promise or guarantee is a necessary element of a Section

---

[40] Heath incorrectly asserts that its example customer, Stanford Littleman, illustrates the inapplicability of Section 310.4(a)(2). To the contrary, Heath could have complied with the Provision—but did not—by charging Mr. Littleman only upon satisfying the regulation's conditions, after his results were achieved.

310.4(a)(2) claim. But if the Court accepts Heath's legal argument, the parties' dispute about whether Heath made promises to customers is a factual question for trial.

## VI. Conclusion

Heath's motion is without merit and should be denied.

Dated: November 15, 2021

Respectfully submitted,

/s/ Maureen McOwen
MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above memorandum complies with the word-count limit of 15,000 words set by Order of this Court, ECF 212, according to the word count function of Microsoft Word, excluding the face sheet, table of contents, table of authorities, signature block, and exhibits.

Dated: November 15, 2021

/s/ Maureen McOwen
MAUREEN MCOWEN
*Enforcement Attorney*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov