Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELE-SERVICES, INC.; EFOLKS, LLC; CREDIT-REPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN C. HEATH, ATTORNEY AT LAW, P.C.'S (D/B/A LEXINGTON LAW) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I** |

# TABLE OF CONTENTS

INTRODUCTION ..... 1
REPLY TO THE BUREAU'S RESPONSE TO HEATH'S STATEMENT OF MATERIAL UNDISPUTED FACTS ..... 2
RESPONSE TO THE BUREAU'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ..... 5
ALTERNATIVE STATEMENT OF DISPUTED FACTS REGARDING MARKETING PROMISES ..... 6
ARGUMENT ..... 9
- I. The Bureau's reading of the AFP is untenable, because it requires this Court to read the word "promised" out of the regulation. ..... 9
  - A. The plain text of the AFP shows that "promised results" means a credit repair provider must *guarantee* results. ..... 9
  - B. The Bureau's structural argument is misplaced. ..... 13
  - C. There is no basis for concluding that FTC thought all credit-repair services necessarily promised results. ..... 13
- II. The Bureau's recollection of the rulemaking history and FTC's interpretive guidance is incomplete, inaccurate, and uninformative. ..... 14
  - A. The rulemaking history demonstrates that FTC wanted to restrict payments when promises, *i.e.*, guarantees, of credit improvements were made. ..... 14
  - B. FTC's enforcement history, which has only limited interpretive value, supports Heath's interpretation of the AFP, not the Bureau's. ..... 19
- III. FTC never conducted the inquiry necessary to support the Bureau's interpretation of the AFP. ..... 22
- IV. The Bureau's interpretation of the AFP raises serious constitutional concerns and therefore should be avoided. ..... 23
  - A. The Bureau's reading of the AFP would burden speech, not conduct. ..... 23
  - B. The Bureau's proposed interpretation of the AFP would not materially advance the objectives articulated by FTC. ..... 25
- V. The Bureau has failed to establish a genuine dispute of material fact regarding whether Heath complied with the AFP for all of its clients. ..... 27

CONCLUSION ..... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aptive Env't, LLC v. Town of Castle Rock*,
959 F.3d 961 (10th Cir. 2020) ....................24, 25, 27

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)....................24

*Brewer v. City of Albuquerque*,
--- F. 4th ----, 2021 WL 5499452 (10th Cir. Nov. 24, 2021)....................26

*Carter v. Welles-Bowen Realty, Inc.*,
736 F.3d 722 (6th Cir. 2013) (Sutton, J., concurring) ....................12

*Cowdrey v. City of Eastborough*,
730 F.2d 1376 (10th Cir. 1984) ....................28

*Emery Mining Corp. v. Sec'y of Labor*,
744 F.2d 1411 (10th Cir. 1984) ....................14

*Grant v. Meyer*,
828 F.2d 1446 (10th Cir. 1987) (en banc), *aff'd sub nom. Meyer v. Grant*, 486 U.S. 414 (1988)....................25

*Illinois v. Nat'l Credit Mgmt. Grp.*,
No. 96-C-2073, 1996 WL 351196 (N.D. Ill. June 24, 1996)....................20, 21

*Int'l Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977)....................28

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)....................23

*Liu v. SEC*,
140 S. Ct. 1936 (2020)....................11

*N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*,
645 F. App'x 795 (10th Cir. 2016) ....................29

*S. Utah Wilderness All. v. Dabney*,
222 F.3d 819 (10th Cir. 2000) ....................19

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ..........14

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ..........24

*SFF-TIR, LLC v. Stephenson*,
262 F. Supp. 3d 1238 (N.D. Okla. 2017) ..........2

*Tennessee v. Lexington Law Firms*,
No. 96-cv-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997) ..........20, 21

*Time Warner Ent. Co., L.P. v. Everest Midwest Licensee L.L.C.*,
381 F.3d 1039 (10th Cir. 2004) ..........9

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) ..........26

*Utah Native Plant Soc'y v. U.S. Forest Serv.*,
No. 16-cv-56, 2017 WL 822098 (D. Utah. Mar. 2, 2017), *aff'd as modified*
923 F.3d 860 (10th Cir. 2019) ..........9, 10

**Statutes**

15 U.S.C. § 45(n) ..........22

15 U.S.C. § 6102(a) ..........19

15 U.S.C. § 6102(b) ..........22

15 U.S.C. § 6107(a) ..........12

**Other Authorities**

16 C.F.R. § 310.3(a)(2) ..........13

16 C.F.R. § 310.4 ..........29

16 C.F.R. § 310.4(a)(2) .......... *passim*

16 C.F.R. § 310.4(a)(4) ..........11, 12, 17

60 Fed. Reg. 8,313 (Feb. 14, 1995) ..........16

60 Fed. Reg. 43,842 (Aug. 23, 1995) ..........14, 15

65 Fed. Reg. 10,428 (Feb. 28, 2000) ....................17

67 Fed. Reg. 4,492 (Jan. 30, 2002) ....................17, 22, 26, 27

DUCivR 56-1(c)(3) ....................2

FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Aug. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair ....................18, 19

FTC News Release, *FTC and States Launch Another Crackdown on Telemarketers Offering Credit Cards and Loans That Never Arrive*, 1999 WL 606877 (Aug. 12, 1999) ....................12

FTC, Staff Advisory Op. for the Hon. David Vitter, 2016 WL 11701785 (Dec. 8, 2016) ....................12

# INTRODUCTION

The Bureau's 15,000-word opposition makes clear that its case against Heath requires re-writing the Telemarketing Sales Rule's (TSR) Advance Fee Provision ("AFP"), 16 C.F.R. § 310.4(a)(2) through litigation, construing it to cover *all* credit repair regardless of whether the provider "promised results" to consumers. The Bureau's position lacks any support in the regulation's text or regulatory history, and would expand the AFP well beyond "so-called" credit-repair companies that attempt to scam consumers with illusory promises of undelivered services or impossible results. Indeed, every interpretive indicator—the plain text of the AFP, the AFP's regulatory history, the FTC's justification for the AFP, and the constitutional concerns raised by the Bureau's interpretation—favors Heath's position and the industry's decades-long understanding—that the six month waiting period only applies where a credit repair provider promises a consumer that it *will* remove derogatory information or improve a credit score, guaranteed. By reading the phrase "promised results" out of the regulation, the Bureau seeks a gross, unlawful expansion of its regulatory authority.

In the absence of its desired regulatory rewrite, the Bureau adds a new fallback position that Heath regularly promised results to all of its clients. It lacks evidence to support such a sweeping contention. The Bureau relies heavily on just six clients, out of literally millions, whom the Bureau contends were promised specific results by Heath, as if such a thin record could prove that Heath had a regular and routine practice of guaranteeing results to all clients. Confusingly, the Bureau even tries to twist Heath's compliance efforts to prevent employees from guaranteeing results as evidence of a "regular" and "routine" practice that Heath did the opposite. Even drawing all inferences in the Bureau's favor, these facts are legally insufficient to support the Bureau's sole

demand that Heath repay every dollar received from every client since March 8, 2016, a total of $1.7 billion.

Moreover, the Bureau has never pled or disclosed a theory that it demands something less than every clients' payments or that it seeks remedies for a subset of clients who were sporadically promised results. For the Bureau to advance this new claim now would amount to an improper and untimely effort to amend its Complaint after two-and-a-half years.

This Court should enter summary judgment in Heath's favor.

## REPLY TO THE BUREAU'S RESPONSE TO HEATH'S STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

**Facts 1, 2, 3, 5, 6, 7, 8, 11, 16, 17, 18, 21, 22, 33, and 35** are undisputed. The Bureau's response that each fact is "[i]mmaterial" and has "no bearing on Defendants' liability" is an admission that the fact is undisputed, *SFF-TIR, LLC v. Stephenson*, 262 F. Supp. 3d 1238, 1242 n.6 (N.D. Okla. 2017) ("arguing a proposed fact at the summary-judgment stage is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact"), non-responsive to the fact asserted by Heath, and does not comply with DUCivR 56-1(c)(3)'s requirement to include "a concise statement explaining *why* the fact is…immaterial." (emphasis added). The Bureau's reference to "Defendants' liability" is unintelligible and irrelevant as Heath's Motion for

[1] Heath provides here its responses to the Bureau's statements in opposition to the undisputed material facts in support of Heath's Motion. Heath does not repeat its original undisputed facts or the Bureau's opposition arguments based on its understanding that no such repetition is required by DUCivR 56-1 for reply briefs. If Heath were required to repeat its facts and the Bureau's opposition thereto, the volume would consume the overwhelming majority of the 10,000 words allotted for Heath's reply (ECF No. 214).

Summary Judgment seeks judgment on behalf of Heath only (not "Defendants") and proof of its liability is not before the Court. ("Reply 1").

***

For the reasons stated in Reply 1, and the additional reasons below, the following facts are undisputed and the response regarding "Defendants' liability" is irrelevant.

**Facts 4 and 10** are undisputed. Plaintiff's dispute of "implications" of facts that are not asserted is non-responsive and improper. *See* Heath P.C.'s Evidentiary Objections Related to Plaintiff's Response to Heath, P.C.'s Motion for Summary Judgment on Count (filed concurrently, ECF No. 248) (hereinafter "Evid. Objs.") at 10-12.

**Fact 9** is undisputed and supported by admissible evidence, *see* Heath P.C.'s Response to Plaintiff's Evidentiary Objections Related to Heath P.C.'s Motion for Summary Judgment on Count I, (filed concurrently, ECF No. 245) (hereinafter "Response to Pls. Evid. Objs.") at 7-8, and Plaintiff's failure to uncover the fact in discovery does not render the fact objectionable.

**Facts 12, 13, and 14** are undisputed. The facts are supported by **Exhibit W**, DelPonti Supplemental Report at 9, tbl. 5 and **Exhibit X**, Ulzheimer Supplemental Report at 1-2, 4. Plaintiff's dispute that removals seen by Heath's clients are not the result of Heath's services is based only its expert's theory and not supported by evidence.

**Fact 15** is undisputed and supported by admissible evidence. *See* Response to Pl.'s Evid. Objs. at 8-10 . Exhibit V specifies the method by which reinsertion rates were calculated with data available to Plaintiff. **Exhibit V**, Impact Study, LEX0004303 at 4324-4326. The Nigrinis Declaration does not discuss cancellation or reinsertion rates and is irrelevant.

**Facts 19 and 20** are undisputed and supported by admissible evidence. Response to Pl.'s Evid. Objs. at 7-8. Plaintiff's "disputes" are non-responsive and unsupported by admissible evidence because Value Reconciliation is an internal business process outside the personal knowledge of the declarants.

**Fact 23** is undisputed. With respect to the third sentence, Plaintiff's "dispute" is unsupported (DUCivR 56-1(c)(3), and the assertion that Section 310.4(a)(2) does not require monthly services is non-responsive to the fact asserted regarding Heath's current business model and has no bearing on the effects of delayed billing. **Exhibit K-1**, DelPonti Report ¶ 69.

**Facts 24 and 25** are undisputed. Plaintiff's "disputes" rest on its incorrect interpretation of the law, and Plaintiff refused discovery to prove any company is capable of operating under its interpretation of Section 310.4(a)(2) and waived any challenge to these facts. Plaintiff's Opposition to Defendants' Short Form Motion to Compel Rule 30(b)(6) Deposition Testimony (ECF No. 119).

**Facts 26, 27, and 28** are undisputed. Citing its opposition for legal argument does not create a dispute of fact. The fourth sentences are non-responsive, argumentative, and do not create a genuine dispute of fact. The cited evidence establishes that telemarketing agents are instructed to tell each client verbatim that Heath does not guarantee results, *see* Mot. Fact 26, and each client signs an engagement agreement which explicitly acknowledges that Heath does not promise results, *see* Mot. Fact 28. Fact 28 is also undisputed because Plaintiff admits the facts asserted.

**Facts 29, 30, 31, 32, and 34** are undisputed. Plaintiff admits the facts asserted and has not proffered admissible evidence establishing a dispute. The last sentences are non-responsive, argumentative, and unsupported by admissible evidence. Evid. Obj. at 10-12.

## **RESPONSE TO THE BUREAU'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

3. Heath's credit repair services are marketed as services to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating.

**Response**: Disputed. Heath provides services that "*assist* consumers in removing derogatory information from, or improving, [their] credit history, credit record, or credit rating." Heath P.C.'s Answer and Jury Demand (ECF No. 66) ¶ 111.

5. Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in Heath's credit repair services.

**Response**: Disputed. Clients are not required to purchase their TransUnion credit report for all products, in all circumstances, or for certain states. **Exhibit Y**, Heath Dep. at 120:4-9.

6. After signup, Heath charges customers an initial work fee, also dubbed a Service Interval Fee. The initial work fee is typically between $79.95 and $119.95. It is typically charged 5 to 15 days after the customer agrees to sign up.

**Response**: Disputed. The initial work fee is not charged for certain returning clients. **Exhibit F-2**, Engagement Agreement at LEX0000553.

7. Heath charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level and is typically $79.95 to $119.95 for the company's "Tier 1" credit repair services and $19.95 to $59.95 for the company's lower-tier credit repair services. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires.

**Response**: Disputed. Heath does not charge a full monthly fee after a client suspends or cancels. **Exhibit F-2**, Engagement Agreement at LEX0000553.

8. Heath does not set a time frame in which all of the services will be provided to a customer.

**Response**: Undisputed, because clients decide the time frame for when services are completed. Opp. Ex. 1 at 43:25-44:19; Opp. Ex. 11 at LEX0000428.

9. Heath charges consumers without waiting at least six months after Heath has demonstrated that the promised results have been achieved.

**Response:** Disputed. Heath does not promise results. **Exhibit F**, Heath Decl. ¶ 22; **Exhibit J**, PGX0060515, Master Script; **Exhibit O**, Heath Interrogatory Responses, No. 16. Its fees are charged in arrears after services are performed by Heath, and in certain cases fees are charged more than six months after clients have seen results. Opp. Ex. 1 at 122:18-124:10.

**ALTERNATIVE STATEMENT OF DISPUTED FACTS REGARDING MARKETING PROMISES**

10. Lexington Law promised customers that their credit reports and credit ratings would improve if they enrolled in Lexington Law's services.

**Response:** Disputed. Each declarant signed an engagement agreement acknowledging they understood "Lexington cannot guarantee, and you are not paying for a particular credit report outcome or result." **Exhibit Z**, Griffin Decl. ¶¶ 3-8. Each declarant with a complete sign-up call recording was also verbally informed that Heath does not promise results. **Exhibit Z**, Griffin Decl. ¶¶ 3, 5, 9-18. The cited declarations do not state that Heath made a "promise" that their credit score would improve. A handful of clients out of millions does not establish the asserted fact. The Lichtblau Declaration does not contain admissible evidence to support the asserted fact. Evid. Objs. at 8-10.

11. Lexington Law's website promised that its services could and would cause the removal of negative items from customers' credit reports and improve customers' credit scores.

**Response:** Disputed. The asserted "fact" that promises were made is a legal conclusion and argumentative. The cited website define credit repair generally, accurately describes Heath's services and past results, and does not make a promise about the results of Heath's services. Opp. Ex. 4, DelPonti0000371; Opp. Ex. 29, CFPB-PGX-154419; Opp. Ex. 5, PGX0028285.

12. Lexington Law's online advertisements promised the removal of negative credit report items and improvements in consumers' credit scores.

**Response:** Disputed. The asserted "fact" that promises were made is a legal conclusion, argumentative, and the cited evidence shows that no online advertisements made any "promise" as to the results of its services.

13. Lexington Law's telemarketing scripts promised the removal of negative credit report items and improvements in consumers' credit scores.

**Response:** Disputed. The asserted "fact" that promises were made is a legal conclusion, argumentative, and the cited scripts inform potential clients that Heath cannot and does not "promise or guarantee any specific result." **Exhibit J**, PGX0060515 at 60541; Opp. Ex.8, PGX0028796 at 28818; Opp. Ex. 9, PGX0028741 at 28773.

14. Lexington Law's affiliate telemarketing scripts promised the removal of negative credit report items and improvements in consumers' credit scores.

**Response:** Disputed. The asserted "fact" that promises were made is a legal conclusion, argumentative, and the cited evidence does not show any "promise" as to the result of its services. The asserted fact is also immaterial because Heath did not use the cited scripts, which are outside the coverage of Section 310.4(a)(2) and the Complaint's Count I allegations.

15. Lexington Law's training materials instructed telemarketing representatives to convince potential customers that if they enrolled in Lexington Law's services, they would get negative credit report items removed and would experience a material credit score improvement.

**Response:** Disputed. The cited evidence does not establish the fact asserted. Telemarketing representatives were instructed to not make "statements or affirm[] caller's assumptions that their item(s)…will likely be removed." **Exhibit AA**, PGX0005826, Q-Tips LLF-Guarantees.

16. – 19. Facts 16 through 19 are immaterial to Heath's Motion.

20. Lexington Law's own review of telemarketing calls revealed more than 6,600 documented instances in which a company representative made an express or implied guarantee or promise to a consumer—fully 14% to 20% of the calls that were found to include a non-compliant statement during that time period. According to Defendants' records, more than half of the telemarketing representatives who were found to have made a non-compliant statement made a guarantee or promise statement.

**Response:** Disputed. The asserted fact is misleading and not supported by the cited evidence, and the cited declaration is not admissible. Evid. Obj. at 9-10. The cited "6,600 documented instances" do not each concern promises or guarantees relevant to Section 310.4(a)(2), but include matters on Heath's internal policies and quality performance standards, such as professionalism and decorum. The cited category addresses "promises or guarantee of any kind," including failing to set customer expectations "of any kind," "giving specific time frames" "of any kind" and other matters with no bearing on Heath's Motion or this lawsuit. The cited 6,600 instances also include varying degrees of quality issues, including minor and non-egregious matters that do not support the Bureau's asserted facts or show promises within the scope of Section 310.4(a)(2). **Exhibit BB**, Compliance Policy, PGX0005842 at 5844.

21. Recordings and transcripts of telemarketing calls between Lexington Law and potential customers reveal how telemarketing representatives promised consumers that it could improve their credit reports, and used that promise to close the sale.

**Response:** Disputed. The cited evidence does not support that telemarketing representatives made promises. Rather, for each of the complete recordings of the initial call with the client declarants, the telemarketing representative told the client that it does not and cannot make a promise or guarantee, and each client signed an agreement acknowledging Heath does not promise or guarantee outcomes. **Exhibit Z**, Griffin Decl. ¶¶ 3-18. Further, the language quoted by Plaintiff belies the assertion promises were made—for example, no promise is made by an agent who acknowledges a potential client's "goal." Opp. Ex. 48, Tr. 1567783503.7831769 at 18:15-19 (Consumer: "[W]hat

you guys do at Lexington I'm sure could get me on up to a 700 or 800, so I'm listening." Sales representative: "Yeah, I mean – yeah, that's definitely the goal.")

22. Lexington Law was falsely marketed as a service that had the legal ability to remove negative items from people's credit reports. And companies that advertised for Heath falsely believed that Lexington Law had that ability. But it never had that power.

**Response:** Disputed. With respect to the first sentence, disputed as an inaccurate and argumentative characterization of the cited evidence, which does not support the assertion. Opp. Ex. 3 at 132:10-14; Opp. Ex. 10 at 141:15-25; Opp. Ex. 59 at 102:5-10. For Exhibit 35, the Bureau has proffered no evidence that the statements in cited the script were ever made to consumers. With respect to the second sentence, disputed as an inaccurate and argumentative characterization of the cited testimony, which concerns removal of negative items that are "inaccurate, unfair, or unsubstantiated," Opp. Ex. 3 at 132:10-14, or "questionable negative items." Opp. Ex. 59 at 102:5-10. As to the third sentence, disputed as an argumentative and inaccurate characterization of Exhibit 1, in which the deponent stated, "Lexington Law Firm has the ability to *assist* [its] clients in requesting the removal of items from their credit reports." Opp. Ex. 1 at 162:2-8 (emphasis added).

## ARGUMENT

### I. The Bureau's reading of the AFP is untenable, because it requires this Court to read the word "promised" out of the regulation.

#### A. The plain text of the AFP shows that "promised results" means a credit repair provider must *guarantee* results.

A court interpreting a regulation must begin with "the plain language of the regulation[]." *Time Warner Ent. Co., L.P. v. Everest Midwest Licensee L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004) and interpret the regulation in a manner that "gives effect to every clause and word." *Utah Native Plant Soc'y v. U.S. Forest Serv.*, No. 16-cv-56, 2017 WL 822098, at *9 (D. Utah Mar. 2,

2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013)), *aff'd as modified* 923 F.3d 860 (10th Cir. 2019). Here, the only reading of the AFP that gives effect to the plain meaning of every word is to construe the phrase "promised results" as requiring a specific guarantee—the credit repair service provider must state that it *will* be able to deliver a credit improvement or the removal of negative credit information before it is required to wait a minimum of six months after the "promised results" have been "achieved" before requesting or receiving payment. In other words, the AFP's six-month waiting period does not apply if the credit repair provider does not make specific promises (*i.e.*, guarantees) that the consumer's credit will improve.

The Bureau rejects this plain textual reading, asserting it "conflat[es] two distinct parts" of the AFP—the "coverage clause" and "two requirements that must be satisfied before charging the customer" (the "payment preconditions"). Opp. 35-36. Rather, the Bureau argues that the six-month waiting period applies indiscriminately to *all* credit repair service providers who offer their services over the telephone. Opp. 35. According to the Bureau, *all* credit repair companies, even those that do not "promise[] results," must satisfy two conditions before asking for payment: (1) "the time frame for providing all of the services must have expired"; and (2) "the company must have provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." Opp. 35-38.

This leads the Bureau to impose the illogical and impossible reading: a firm like Heath must wait six months until after achieving "promised results" even though it never promised results in the first instance.

The Bureau's reading of the regulation requires the Court to ignore the plain text by ignoring the phrase "promised results" and replacing it with "goods or services represented to remove derogatory information." 16 C.F.R. § 310.4(a)(2). That goes against the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020) (citation and internal quotation marks omitted). If FTC wanted to enact the regulation that the Bureau seeks to enforce, it would have conditioned a credit repair service provider's ability to "[r]equest[] or receiv[e] payment" until after "[t]he seller has provided…documentation in the form of a consumer report from a consumer reporting agency demonstrating that *the services have been delivered*," or even "the *services* have been achieved." It did not, requiring only sellers that "promised results" wait six months after those results "have been achieved" before billing. 16 C.F.R. § 310.4(a)(2).

The Bureau argues that "promised results" could not mean that a credit repair service must promise specific credit outcomes in exchange for payment because, if FTC wanted to condition the six-month waiting period only when a provider says it *will deliver* a credit improvement or the removal of derogatory credit information, FTC would have said "guaranteed," as it did in 16 C.F.R. § 310.4(a)(4). The Bureau says FTC's decision to use two different words in two different provisions ("promised" in § 310.4(a)(2), "guaranteed" in § 310.4(a)(4)) demonstrates "promised" and "guaranteed" must mean two different things.

The problem with the Bureau's argument is that FTC does not agree with it. In discussing § 310.4(a)(4), FTC has viewed "promise" and "guarantee" as interchangeable terms. For example, FTC has stated that § 310.4(a)(4) "prohibits sellers and telemarketers who guarantee or represent a high likelihood of success in obtaining or arranging a loan or other extension of credit from

asking for or accepting payment until *a consumer gets the extension of credit* ***promised***." FTC, Staff Advisory Op. for the Hon. David Vitter, 2016 WL 11701785, at *55 (Dec. 8, 2016) (emphasis added); *see also id.* (explaining that § 310.4(a)(4) is intended to target "advance-fee loan schemes [where] a telemarketer, in exchange for a fee paid in advance, ***promises*** to get a loan or a credit card for a consumer" (emphasis added)). Another example: in the early years of enforcing the TSR, FTC described § 310.4(a)(4) as a tool to "stop[] lenders who illegally charge consumers a fee for the ***promise*** of a loan." FTC News Release, *FTC and States Launch Another Crackdown on Telemarketers Offering Credit Cards and Loans That Never Arrive*, 1999 WL 606877, at *1 (Aug. 12, 1999). FTC's treatment of "promise" and "guarantee" as interchangeable concepts confirms what is apparent in the plain text: "promised results" means a credit repair service provider has actually guaranteed that it will achieve a certain result.

Although the text of the AFP demonstrates unambiguously that "goods or services" and "results" are distinct requirements, the rule of lenity would require that any ambiguity must be decided in favor of Heath's proffered interpretation. The TSR carries potential criminal consequences; under the Telemarketing Act, FTC "may bring a criminal contempt action for violations" for any defendant that disobeys a court order relating to a violation of the TSR. 15 U.S.C. § 6107(a). "The rule of lenity tells all interpreters to resolve uncertainties in laws with criminal applications in favor of the defendant," even if the law is one that is traditionally enforced in a civil context. *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729 (6th Cir. 2013) (Sutton, J., concurring); *id.* at 736 ("Agencies, no less than courts, must honor the rule of lenity.").

**B. The Bureau's structural argument is misplaced.**

The Bureau says Heath's reading of the AFP—one that gives the word "promised" in "promised results" meaning—is wrong because "misrepresentations that certain goods or services can or are likely to improve a person's credit history, credit record, or credit rating" are prohibited by 16 C.F.R. § 310.3(a)(2), and FTC intended for claims about guaranteed results to be "subsumed" in § 310.3(a)(2). Opp. 52. The Bureau suggests that, if Heath's reading of § 310.4(a)(2) is right, § 310.3(a)(2) and § 310.4(a)(2) would cover the exact same conduct, making one of the provisions "wholly superfluous." Opp. 53.

But the Bureau is wrong that these two provisions completely overlap: § 310.3(a)(2) *does not* cover all representations about credit repair. It covers only *mis*-representations, *i.e.*, inaccurate statements about what a credit repair service is able to deliver. *Id.* ("It is a deceptive telemarketing act or practice…to engage in the following conduct: (2) Misrepresenting, directly or by implication…"). In contrast, § 310.4(a)(2) covers promised results, even if the promise is not deceptive. For example, a service provider could adopt the familiar "guaranteed results or your money back" formulation, which would not violate § 310.3(a)(2)'s prohibition on misrepresentations (it does not predict the future), but it would trigger the AFP waiting period for "promised results."

**C. There is no basis for concluding that FTC thought all credit-repair services necessarily promised results.**

With no basis in either the plain text of the AFP or the structure of the TSR as a whole to argue that the AFP covers every offering of a credit repair service, the Bureau makes the extraordinary argument that *all* credit repair services necessarily "promise" the "result" of improving credit. Notably, despite claiming its view is "consistent with that of the FTC and state agencies that have enforced the Provision," Opp. 38-39, the Bureau does not actually cite anything in the

rulemaking record or FTC interpretive guidance to suggest that FTC ever thought all credit repair services necessarily "promised results." That is because FTC never said such a thing, as demonstrated below. *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## II. The Bureau's recollection of the rulemaking history and FTC's interpretive guidance is incomplete, inaccurate, and uninformative.

Agency interpretations are entitled to deference when the interpretation is a "contemporaneous construction" made at the time of the rulemaking. *Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1415 (10th Cir. 1984). Here, FTC's interpretation flatly contradicts the position advanced by the Bureau.

### A. The rulemaking history demonstrates that FTC wanted to restrict payments when promises, *i.e.*, guarantees, of credit improvements were made.

When FTC promulgated the AFP, it made clear that it viewed "promised services" and "promised results" as distinct concepts and that it expected credit repair services to wait six months only if *results* were promised. In the TSR's final-rule notice, FTC stated that the credit-repair services targeted by the AFP "promise consumers that, for a fee paid in advance, they *will* improve the consumer's credit record by removing negative information from that record. Once the fee is paid, however, the seller fails to deliver ***the promised services*** or achieve ***the promised results***, and the consumer's credit record does not improve." 60 Fed. Reg. 43,842, 43,853 (Aug. 23, 1995) (emphasis added). Notably, FTC distinguished between "promised services" and "promised results," with each being a distinct concern animating the AFP. The preamble to the final rule goes

on to state that the AFP is "directed [to] the deceptive marketing and sale of ***bogus*** credit repair services." *Id.* at 43,854 (emphasis added).

The FTC's distinction between "promised services" and "promised results" sinks the Bureau's proposed interpretation. The Bureau tries to justify its position—that "services" and "results" mean the same thing—by misconstruing later FTC statements, Opp. 41, none of which support the Bureau's view that "services" and "results" are interchangeable.

First, the Bureau says that the AFP must apply to *all* telemarketed credit repair because it is "calibrated to protect consumers from paying for services that do not yield results." Opp. 41. The fundamental flaw in the Bureau's argument is FTC's actual statement—"§ 310.4(a)(2) is directed [against] the deceptive marketing and sale of *bogus* credit repair services"—supports Heath's interpretation. 60 Fed. Reg. at 43,854 (emphasis added). FTC considered "bogus" credit repair services as those in which fraudsters "*promise* consumers that, for a fee paid in advance, they *will* improve the consumer's credit record by removing negative information from that record." 60 Fed. Reg. at 43,853 (emphasis added). These "bogus" services used procedural sleights of hand, such as abusing the credit dispute process, to temporarily remove even accurate negative items, collect a consumer's money while the dispute was pending, and then scram before the dispute is resolved and the negative item is restored. If the Bureau is correct that FTC "inten[ded] to impose a payment delay on *all* telemarketed credit repair goods and services," it would have simply said so—it would not have been so focused on such "bogus" credit repair schemes. Mot. 22-25. The Bureau has no response to this plain point.

The Bureau next asserts (at 42) that the notice of proposed rulemaking for the AFP supports its interpretation because the notice anticipated that the AFP would apply when "the contract

for the services has expired ***and*** the promised results have been achieved." 60 Fed. Reg. 8,313, 8,318 (Feb. 14, 1995) (emphasis added). But the notice demonstrates that, from the outset, FTC viewed promised services and promised results as two distinct concepts, with both being necessary components for the AFP to apply.

The comments submitted to FTC confirm that, despite the Bureau's assertions to the contrary, not *all* credit repair services were illegitimate, and the AFP targeted only a subset of so-called "credit repair services." Commenters, including the Postal Inspection Service and the National Consumer League, recognized that there was a need to distinguish between "bogus" credit repair companies offering false promises with "no intention of fulfilling their obligation" and "actual services in which a company will interact with creditors and credit reporting services as an advocate for a consumer." **Exhibit Q**, U.S. Postal Serv., Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. 411001; **Exhibit R**, Nat'l Consumer League, Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 28, 1995), FTC File No. 411001.

Attempting to re-write this regulatory history, the Bureau cherry-picks comment submissions to FTC (by the Postal Inspection Service and state attorneys general), but even those submissions, when viewed in context, do not support the Bureau's views. For example, the Bureau highlights the Postal Inspection Service's support for the requirement that "actual results be accomplished" for credit repair services, but fails to mention the fact that the Postal Inspection Service supported that requirement for a certain vein of "so-called" credit repair services that do not "actually repair credit," rather than *all* credit repair services, legitimate or not. Opp. Ex. 22 at PageID 6207. The comment from the state attorneys general also does not help the Bureau,

because the state attorneys general viewed the credit-repair provision and the advance-loan provision as one and the same and, as the Bureau concedes, the advance-loan provision requires a "guarantee" or a "promise" to achieve a specific result. Opp. Ex. 22 at PageID 6215 (addressing the proposed rule's provisions for "credit repair, loss recovery, and advance fee loans" in one fell swoop).

Finding no support in the rulemaking history, the Bureau turns to statements that FTC made about the AFP in the years following its enactment. One example is a brief mention made during a 2000 rulemaking to modify the TSR (Opp. 43), where FTC paraphrased the Rule's existing provisions regarding payment for "offer[s] to arrange loans,…credit repair services, or [the] recover[y] [of] money consumers lost in a prior telemarketing scam." 65 Fed. Reg. 10,428, 10,429 (Feb. 28, 2000). There was no further discussion about credit repair services specifically, or what "promised results" means. If anything, FTC's view expressed in that cursory comment is that the advance-loan provision in § 310.4(a)(4) and the credit repair provision in § 310.4(a)(2) can be treated as the same, and thus supports the notion that "promise" and "guarantee" are interchangeable and Heath's reading of the plain text, not the Bureau's attempted rewrite.

Another example is a set of statements FTC made when it considered revisions to the TSR in 2002. The Bureau (at 43) flags language by FTC stating that "the harm to consumers could be averted only by specifying that the seller's performance of [credit repair services] must precede payment by the consumer." 67 Fed. Reg. 4,492, 4,504 n.106 (Jan. 30, 2002). But the preceding language the Bureau ignores is incredibly important: FTC intended to target only those credit repair services that were "illusory." *Id.* In any event, the FTC's 2002 commentary does not include

guidance at all on the interpretive question raised in this case: the meaning of "promised results."

As for FTC's present-day guidance on the AFP, the Bureau does not accurately state FTC's position there, either. The Bureau's opposition states that one guidance document "makes no reference to guarantees or promises of specific credit repair outcomes," but "proceeds to explain the two payment conditions clauses in the Provision." Opp. 44. According to the Bureau, those two conditions are: (1) "the time frame for providing *all* of the services must have expired"; and (2) "the company must have provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." Opp. 35.

But the guidance document's discussion of the second payment condition, which the Bureau glosses over, is important. It explains that "the seller must provide the consumer with evidence that ***the improvement promised*** in the consumer's credit record has been achieved," and provides context as to why. FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Aug. 2021) (emphasis added), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair. This demonstrates the Bureau's faulty reading of the AFP that "promised results" refers to "services represented." The prohibition, as FTC explains, is "directed at the ***deceptive*** marketing and sale of ***bogus*** credit repair services," which are "able to cause negative credit information to disappear from a consumer's credit report by temporarily flooding a credit bureau with letters disputing the accuracy of the negative entries." *Id.* (emphasis added).[2]

[2] It is also noteworthy that FTC's most recent guidance also describes the advance-fee loan provision as covering "***promises*** to get a loan or a credit card," reaffirming FTC's view that the word

That is not the business that Heath runs.[3] Heath does not promise results, but instead aids consumers in navigating their credit reports and inquiring about questionable items. This process is legitimate; as FTC acknowledges, "[i]f an item is inaccurate, incomplete, or more than seven or 10 years old, consumers can remove or correct the information themselves at no charge if they follow the dispute procedures in the FCRA." *Id.*

### B. FTC's enforcement history, which has only limited interpretive value, supports Heath's interpretation of the AFP, not the Bureau's.

In the twenty-plus years between the AFP's promulgation and the filing of this case, FTC has never publicly taken the position that the Bureau advances in this litigation. The Bureau disagrees, suggesting FTC's enforcement history demonstrates that the AFP does not require that results be "promised," *i.e.*, guaranteed. At the outset, it is worth noting that even FTC cannot establish binding, deferential interpretations of the Telemarketing Sales Rule through its enforcement pleadings. 15 U.S.C. § 6102(a); *cf. S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000) ("A position taken by an agency during litigation…is not sufficiently formal that it is deserving of *Chevron* deference.").

But even if this Court were to consider it, FTC's prior litigation positions do not support the Bureau's position that a promise (i.e., guarantee) to provide a credit improvement is not necessary for the AFP's six-month waiting period to apply. The Bureau first suggests that there were no express promises made in *Illinois v. National Credit Management Corp.*, No. 96-C-2073 (N.D. Ill.) and *Tennessee v. Lexington Law Firms*, No. 96-cv-344 (M.D. Tenn.), yet FTC took the

---

"promise" and "guarantee" are interchangeable. *Complying With the Telemarketing Sales Rule*, *supra* (emphasis added).

[3] Nor has the Bureau alleged that Heath offers this "fundamentally bogus" service.

position that the AFP applied to the defendants in those cases. The Bureau's statement misrepresents what FTC said in each of those cases.

In *National Credit*, for example, FTC expressly reiterated its position that the AFP was intended to target the companies that promised results. FTC Amicus Mem., *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1997 WL 35410876 (N.D. Ill. Jan. 8, 1997) ("Promising to help improve a consumer's credit rating,…necessarily abuses most customers with negative credit records."). Targeting promises of results, FTC explained, was consistent with the problematic behavior motivating the enactment of the AFP to target "scam operators," such as "deceptive [credit repair] ads [] characterized by promises to…erase a bad credit history." *Id.* at n.5. FTC did not say anything suggesting the AFP would apply in the absence of a promise to provide credit improvement. Opp. 49. Indeed, FTC's goal was to respond to an argument that promises must be ***untruthful*** or ***deceptive*** in order to be actionable under the AFP—that response is what the Bureau misleadingly quotes to support its argument. FTC responded that the promise that the "purchase of [National Credit's] package will help the consumer repair his or her credit" was actionable regardless of whether there was any deception in that promise. FTC Reply Amicus Mem., *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1997 WL 35410875 (N.D. Ill. Feb. 18, 1997).

The Bureau's recollection of *Tennessee v. Lexington Law* is also wrong. The Bureau says the representations in the *Lexington Law* case were "exactly" like the ones in this case, and that FTC had endorsed the application of the AFP to those representations. But at that time, Lexington Law offered different services than Heath does today, and those included guaranteed results. The Bureau simply ignores the resolution in the matter, which explicitly permitted Lexington Law to bill without waiting six months so long as it did not specifically offer its clients "promised" results

from the credit repair services. Mot. 23. FTC was an intervenor in that case, and surely could have objected to the settlement if it thought the resolution ran afoul of the AFP.

Despite the Bureau's assertions to the contrary, the *National Credit* and *Lexington Law* courts did not hold that an express guarantee is unnecessary for the AFP to apply. Opp. 47-48. In *National Credit*, the court merely held that Illinois had adequately pleaded violations of the AFP by having its allegations "track the language of the regulation." *Illinois v. Nat'l Credit Mgmt. Grp.*, No. 96-C-2073, 1996 WL 351196, at *2 (N.D. Ill. June 24, 1996). That holding came during the pre-*Twombly* era of notice pleading, so it sheds no light on whether an express promise-as-guarantee to fix credit is necessary. And in *Lexington Law*, the district court did not suggest that FTC could allege a violation of the AFP absent "any guarantee." Opp. 47. Rather, the *Lexington Law* court held that "the FTC properly interpreted the Act to apply to Defendant's conduct" in response to Lexington Law's argument that CROA preempted the AFP, such that only the former could apply. *See Tennessee v. Lexington Law Firms*, No. 96-cv-0344, 1997 WL 367409, at *6 (M.D. Tenn. May 14, 1997).

The Bureau's remaining examples are similarly unavailing. It cites FTC's filing of a complaint with barebones allegations about the AFP in *United States v. Luebke Baker & Assocs.*, No. 12-cv-1145 (C.D. Ill. May 11, 2012), but the *Baker* court never held that a credit repair "system" that would help customers "build [their] credit score back up to a point where creditors will look at [them] and want to lend [them] money at a lower interest rate" was sufficient to meet the requirements of the AFP. *See* Compl. Ex. F (ECF No. 1-6), *United States v. Luebke Baker & Assocs., Inc.*, No. 12-cv-1145 (C.D. Ill. May 11, 2012). And the Bureau's *own* very recent enforcement actions (Opp. 51) certainly do not carry any interpretive weight, as FTC alone is charged with

promulgating rules under the Telemarketing Act. 15 U.S.C. § 6102(b) (granting to FTC the "authority to prescribe rules" relating to the Telemarketing Act, and relegating the Bureau to a consulting role).

### III. FTC never conducted the inquiry necessary to support the Bureau's interpretation of the AFP.

FTC first promulgated the AFP under the authority provided to FTC by the Telemarketing Act, citing a need to protect consumer privacy. Later, FTC concluded instead that the AFP had to be justified by FTC's broader powers to regulate unfair conduct, 67 Fed. Reg. at 4,511, which necessarily requires FTC to consider whether a practice "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). For the AFP, that analysis was straightforward: because the particular vein of so-called "credit repair" services targeted by the AFP were "fundamentally bogus," with their providers offering "no intention of providing" the results they promised, there were no "countervailing benefits" to consider. 67 Fed. Reg. at 4,511. FTC did not conduct a consumer benefits-versus-burdens analysis for legitimate credit repair providers such as Heath, which have every intention of providing their service and carefully avoid making a guarantee as to results.

In other words, if the Bureau's novel interpretation of the provision—as opposed to Heath's reading—were correct, FTC did not have authority to enact the rule. The Bureau has no rejoinder. Instead, the Bureau offers a non-sequitur: courts have held that the AFP was within FTC's statutory authority to promulgate. Opp. 53-54 (citing *CFPB v. Commonwealth Equity Grp. LLC*, --- F. Supp. 3d ----, 2021 WL 3516690, at *3 (D. Mass. Aug. 10, 2021); *Tennessee*, 1997 WL 367409, at *5).

The Bureau's response misses the point—Heath is not arguing that FTC lacked authority to promulgate the AFP. Rather, Heath's argument is that FTC did not undertake the regulatory analysis necessary to support *the Bureau's novel reading* of the AFP, one that would sweep in legitimate providers that do not promise results with "fundamentally bogus" ones that guarantee outcomes. The Bureau's reading of the AFP cannot be corrected because FTC never considered whether services offered by *all* credit repair service providers—including legitimate ones who give services without making a promise they cannot deliver—tendered a benefit to consumers that justified treating those services as "unfair."

## IV. The Bureau's interpretation of the AFP raises serious constitutional concerns and therefore should be avoided.

### A. The Bureau's reading of the AFP would burden speech, not conduct.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Here, the parties each proffer distinct interpretations of the AFP: Heath's interpretation, which requires a specific promise to remove derogatory information or improve a credit record before the AFP applies, or the one advanced by the Bureau, where all providers of credit repair services offered over the phone can charge clients only six months after showing improvement in a client's credit.

If the Bureau's take on the AFP were reality,[4] it would impose two substantial burdens on non-misleading commercial speech. Most concerningly, the AFP would effectively prohibit credit

[4] It is important to note that Heath is not challenging the constitutionality of the AFP itself, just the Bureau's interpretation of it.

repair providers from using the telephone. Facially, the AFP imposes a six-month waiting period on collecting payment, but as interpreted by the Bureau it effectively serves as a ban on telephone use by all credit repair providers. It is an undisputed fact that legitimate providers like Heath could not viably stay in business if they telemarketed. **Exhibit K-1**, DelPonti Report ¶¶ 57, 83; **Exhibit F**, Heath Decl. ¶ 34; Hennecken Decl. (ECF No. 246), Ex. 2, Revised Heath Decl. ¶ 34. The AFP therefore prohibits the use of telephones by credit repair providers by making such use so financially unpalatable that it serves as an outright prohibition. That is not, as the Bureau describes it, a condition of payment; it is a prohibition on an entire method of communication for all credit-repair providers, based solely on the content of their speech (*i.e.*, credit repair). *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 982 (10th Cir. 2020) (noting that even "time, place, and manner restrictions remain subject to First Amendment scrutiny"). Moreover, a credit repair provider cannot "request" payment during the designated six-month window. That is a restraint on speech itself. *Cf. Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 959-60 (1984) ("[s]oliciting financial support" is protected speech).

The Bureau argues that there is no restraint on speech, just conduct—specifically, the "timing of payment." Opp. 57. Setting aside the Bureau's failure to address the burdens described above, the Bureau's conduct-versus-speech distinction falls short. Heath's offering of credit repair services over the telephone "fall within the core notion of commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). Even taking for granted the Bureau's argument that the restriction here is on the collection of payment, and not the seeking of it (or on the initial offer to provide credit repair services), there can be no dispute that payment is closely connected to Heath's offering of legitimate credit repair services, and that the Bureau's interpretation of the

AFP would "impede[]" Heath's dissemination of commercial speech to offer its services. *Grant v. Meyer*, 828 F.2d 1446, 1453-54 (10th Cir. 1987) (en banc) ("absolute ban on compensation of solicitors" imposes "a direct restriction which 'necessarily reduces the quantity of expression'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 19 (1976)), *aff'd sub nom. Meyer v. Grant*, 486 U.S. 414 (1988).[5]

### B. The Bureau's proposed interpretation of the AFP would not materially advance the objectives articulated by FTC.

Restrictions on commercial speech can survive constitutional scrutiny only if there is *evidence* showing that the restriction would "directly advance[]" the government's cited interests in addressing a specific problem. *Aptive,* 959 F.3d at 989. Accordingly, to proceed with its burdensome interpretation of the AFP, the Bureau must demonstrate the constitutionality of that interpretation by showing that the "interests in proscribing [the burden on speech] are substantial,…the challenged regulation advances these interests in a direct and material way, and…the restriction on protected speech is" reasonably proportionate to "the interests served." *Id.* at 986-87 (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)).

The Bureau cannot show that its interpretation of the AFP "advances [FTC's stated] interests in a direct and material way," because FTC never looked at the problem the Bureau claims the AFP addresses. As explained above, FTC sought to tackle the problem of "illusory" and "bogus"

[5] To justify its constitutionally burdensome interpretation of the AFP, the Bureau also points to examples where regulated entities such as pharmaceutical companies and airplane manufacturers must receive regulatory approval before selling their products, and examples of industries operating on contingency. Opp. 58-59. The Bureau's argument is a baffling irrelevancy. The safety and efficacy review that airplane and drug manufacturers undergo certainly constitutes a regulation of conduct, not speech, to protect lives. The Bureau is attempting to draw an apples-to-oranges comparison between safety standards and restraints on speech.

"scam" credit-repair offerings, where an operator would take the money and run. *See* pp. 14-19, *supra*; Mot. 26. It did not consider regulating *all* credit repair providers, especially legitimate ones. The Bureau cannot argue that its interpretation of the regulation "advances [FTC's] interests in a direct and material way" when there is no evidence that FTC considered those interests at all. *Brewer v. City of Albuquerque*, --- F. 4th ----, 2021 WL 5499452, at *14 (10th Cir. Nov. 24, 2021) (narrow tailoring must be established by "evidence of non-speculative harms or interests").

The Bureau says the "direct and material" standard of intermediate scrutiny does not apply because its reading of the AFP targets "***misleading*** commercial speech," so the Bureau need only show that the burden is "reasonably related to the [government's] interest in preventing deception." Opp. 59-60 (discussing the *Zauderer* standard and quoting *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010), for that standard). That is wrong and the Bureau cannot have it both ways. It takes the contradictory positions that the Court should follow its interpretation of the AFP to be analyzed under the First Amendment as if it targets misleading speech, yet the Bureau's liability theory is that the TSR AFP applies to all credit repair companies, and is not limited to just "bogus" companies that mislead consumers or guarantee results. As Heath outlines in its opening motion, the AFP targets "misleading speech" ***only if*** Heath's (and the FTC's) narrower interpretation of the AFP is correct: that FTC intended to restrict telephone communications by so-called credit repair providers offering a "fundamentally bogus" service, one where the seller guarantees a credit improvement that cannot be delivered. 67 Fed. Reg. at 4,511. The more deferential *Zauderer* framework also does not apply because the AFP (as the Bureau interprets it) does not "require[] disclosure only of factual and uncontroversial information," *United States v.*

*Wenger*, 427 F.3d 840, 849 (10th Cir. 2005), but instead is restricting a credit repair provider's ability to speak, even when it has provided only truthful information.

And under *Aptive*, the Bureau does not seriously attempt to satisfy its "burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." 959 F.3d at 989 (citation and internal quotation marks omitted). Despite the Bureau's assertions, FTC did not review "large volumes" of material to "conclude[] that the credit repair industry ***as a whole*** had caused substantial injury to consumers by offering services that were 'fundamentally bogus.'" Opp. 61 (emphasis added). Rather, FTC focused on "fundamentally bogus" schemes that amounted to "outright theft"—"illusory" offerings in which a provider would "take consumers' money for services that the seller has no intention of providing and in fact does not provide." 67 Fed. Reg. at 4,511. The AFP was intended for instances where a credit repair provider makes a promise, *i.e.*, guarantee, that it could not keep. There is no support the Bureau's argument that the AFP was intended for the credit repair industry as a whole.

## V. The Bureau has failed to establish a genuine dispute of material fact regarding whether Heath complied with the AFP for all of its clients.

At the outset of this case, the Bureau alleged that Heath "routinely requested and received payment of a fee or consideration for [its] credit repair services" and did so before six months after the "promised results were achieved." Compl. ¶ 133. Two and a half years later, and through discovery and its eventual disclosures of the damages it seeks to recover, the Bureau has made clear that its claim in Count I is that *all* credit repair services are automatically subject to the six-month requirement. As a fallback argument, however, the Bureau says that, even if there is an obligation for the Bureau to prove that Heath guaranteed results to clients, there is a genuine dispute of material fact as to whether Heath did so for *all* of its clients.

The Bureau falls well short of that mark: it has established that, at best, there is a genuine dispute of material fact that Heath "promised results" to *six* clients.

Furthermore, this is not the lawsuit the Bureau has brought. The Bureau's Complaint—and its sole damages demand—seeks to recover a full refund for every single client that Heath served, Compl. ¶ 169(d). Yet it has failed to proffer evidence demonstrating that Heath "***regularly*** promised consumers that it could and would remove negative items from their credit reports or improve their credit scores." Opp. 64. In order to show any sort of company-level "regularity," *i.e.*, a policy or practice, the Bureau has to provide more than individual anecdotes—the Court cannot simply infer from a handful of deviations that there was a company-wide practice to make promises about credit results, as the AFP so requires. *E.g.*, *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (in a Title VII case, to show "systemwide pattern or practice…the Government ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," and had to "establish…that racial discrimination was the company's standard operating procedure the regular rather than the unusual practice"); *Cowdrey v. City of Eastborough*, 730 F.2d 1376, 1379 (10th Cir. 1984) (*Monell* claim alleging that a city had an "unarticulated" policy authorizing the use of excessive force cannot be proven with "isolated instance of police misconduct"). The Bureau has not provided a single shred of evidence showing that Heath's standard operating procedure was to make individual promises to clients that the firm could achieve a particular credit outcome for that client. Indeed, the reason the Bureau tries so hard to rewrite the AFP in litigation is to make up for its stark evidentiary deficiency.

As a last-ditch effort to gin up some basis for a genuine dispute of material fact as to all of Heath's clients, the Bureau says a "promise" can be made by implication, *i.e.*, by giving "strong

or reasonable grounds for expecting (future achievements or good results)." Opp. 63 (citing Oxford English Dictionary (3d ed., June 2007)). But as noted in Heath's opening motion, that definition is grammatically unsound—if FTC wanted to treat an implication of good results as a "promise" under the AFP, it would have made the six-month waiting period contingent on delivery of "promising results," not "promised results." Mot. 21. And if FTC wanted to make "reasonable grounds for expecting good results" the relevant trigger, it could have made the AFP contingent on the representation of a "high likelihood of success," as FTC did in § 310.4.

The AFP requires a showing that Heath made a promise of a specific credit-related outcome (removal of derogatory information or an improvement in credit score) for each individual borrower. A smattering of advertisements suggesting that working with Heath might lead to "promising" results is not good enough to satisfy that requirement, *see* pp. 6-9, *supra* (addressing the Bureau's counterstatement of facts relating to Heath's advertisements), especially given Heath regular practice of repeatedly telling every client that results are not guaranteed.

The Bureau also says proof that Heath "regularly" promised certain credit-related outcomes can be found in "six consumer declarations, 100 [sic] examples of consumer complaints, more than 6,600 internal company call reviews, and dozens of statements," Opp. 64, but, aside from the six declarations, does nothing to explain how these sources of proof show that Heath "regularly" promised results. "[I]t is emphatically not this court's duty to scour without guidance a voluminous record for evidence supporting [the Bureau's] theory." *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 803 (10th Cir. 2016) (citation and internal quotations omitted).

Even assuming that the Bureau's lumped-together evidentiary arguments were properly made (and supported by specific evidence, which they were not, *see* Pl.'s Evid. Objs. to Heath P.C.'s Mot. for Summary Judgment on Count I (ECF No. 227), those arguments would have still fallen far short of proving Heath "regularly" promised results. As to the six consumer declarations, the Bureau misrepresents their contents; none of the declarations supports the assertion that Heath regularly promised its clients that their credit reports and credit ratings would improve. Moreover, each client signed an engagement agreement acknowledging he or she understood "that Lexington does not make, any representation, warranty, promise or guarantee as to any particular outcome or result," and were told as much. **Exhibit Z**, Griffin Decl. ¶¶ 3-8. The Bureau's reliance on complaints fares no better: Heath had millions of clients. The fact that a handful of them filed a complaint (100, each of whom was also told that Heath does not promise a particular outcome), **Exhibit F**, Heath Decl. ¶¶ 22-26; Hennecken Decl. (ECF No. 246), Ex. 2, Revised Heath Decl. ¶¶ 22-26, is plainly insufficient to establish Heath "regularly" guaranteed results for the rest of the millions of clients. Even taking the complaints at face value, complaints about promised *services* fail to establish that Heath guaranteed a specific credit-related outcome to *anyone*. Opp. Ex. 60 at 9 ("We were promised a certain service"); *id.* at 10 ( "the service I was promised"); *id.* at 29 ("the services I was originally promised"); *id.* at 35 ("the services they promised"); *id.* at 36 ("the services that were promised to me"). Finally, the Bureau's reference to "6,600 internal company call reviews" is meaningless as the Bureau relies on the inadmissible Declaration of a Bureau employee which exceeds the bounds of lay witness testimony, misinterprets Defendants' records, and is not based on any personal knowledge. *See* Evid. Objs. at 8-10. In any event, the mere fact that Heath undertakes compliance reviews to ensure that clients are not promised results undermines the

Bureau's position entirely. It underscores the undisputed fact that Heath's policy and regular practice is to prohibit promises or guarantees and to enforce that policy through regular monitoring of telephone calls.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Heath's opening motion, this Court should grant summary judgment in Defendant John C. Heath, P.C.'s favor on Count I.

Dated: December 6, 2021

Respectfully submitted,

/s/ William J. Harrington
Thomas M. Hefferon*
W. Kyle Tayman*
Christina Hennecken*
Virginia McCorkle*
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
thefferon@goodwinlaw.com
ktayman@goodwinlaw.com

William J. Harrington*
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7140
wharrington@goodwinlaw.com

Courtney Hayden*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
chayden@goodwinlaw.com

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

*Attorneys for Defendant John C. Heath, Attorney at Law, P.C. (d/b/a Lexington Law Firm)*
(*admitted *pro hac vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ William J. Harrington
William J. Harrington

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above memorandum complies with the word-count limit of 10,000 words as set by Order of this Court, ECF 212, according to the word count function of Microsoft Word, excluding the cover page, table of contents, table of authorities, signature block, and exhibits.

Dated: December 6, 2021

/s/ William J. Harrington
William J. Harrington