MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>    *Plaintiff*,<br><br>          v.<br><br>PROGREXION MARKETING, INC., *et al.*,<br><br>    *Defendants*. | Case No.  2:19-cv-00298-BSJ |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I AGAINST ALL DEFENDANTS AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF SOUGHT ........................................................... 1

REGULATORY BACKGROUND ........................................................................ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS (SUMF) .......................... 8

ARGUMENT ..................................................................................................... 17

   I.  Legal Standard ......................................................................................... 17

      A. Summary Judgment ......................................................................... 17

      B. Regulatory Interpretation ................................................................ 18

   II.  Statutory Authority ................................................................................... 18

   III. Defendants Are Liable for Charging Illegal Fees for Telemarketed Credit
      Repair Services ........................................................................................ 19

      A. Defendants are telemarketers and sellers under the TSR. .............. 19

      B. Defendants are covered by Section 310.4(a)(2). ............................. 20

      C. Defendants violated Section 310.4(a)(2). ........................................ 20

            1. Defendants failed to set a time frame for all of their services ........ 22
            2. Defendants failed to wait six months before requesting or
               receiving payment ..................................................................... 23

   IV.  Defendants' Affirmative Defenses Are Unsupported and Meritless ............ 25

      A. Defendants' Second Defense should be dismissed because the TSR
         remains valid. ................................................................................. 25

      B. Defendants' Third Defense should be dismissed because Defendants
         had no reasonable basis in fact or law to violate the TSR. ..................... 27

      C. Defendants' Fifth and Sixth Defenses should be dismissed because
         Defendants' equitable defenses lack evidentiary support. .......................... 29

      D. Heath's Ninth Defense and Progrexion's Tenth Defense should be
         dismissed because Defendants had fair notice of the TSR. ....................... 32

      E. Heath's Eleventh Defense and Progrexion's Twelfth Defense should be
         dismissed because the TSR is enforceable ................................................ 35

F. Heath's Fifteenth Defense and Progrexion's Thirteenth Defense should be dismissed because the First Amendment does not shield Defendants from liability for charging illegal fees. ...................................38

    1. The Provision regulates conduct, not speech...................................38

    2. Even if the Provision regulates speech, it survives First Amendment scrutiny........................................................................39

G. Heath's Seventeenth Defense should be dismissed because Heath's credit repair services are not exempt from Section 310.4(a)(2)'s requirements. ..........................................................................................41

CONCLUSION ....................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................... 17

*Bd. of Cnty. Comm'rs v. Isaac*,
18 F.3d 1492 (10th Cir. 1994) ...................................................... 30

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)..................................................................... 39

*Canyon Fuel Co. v. Sec'y of Lab.*,
894 F.3d 1279 (10th Cir. 2018) .................................................... 18

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
No. CV157522-JFW (RAOx), 2016 WL 4820635
(C.D. Cal. Aug. 31, 2016)............................................................ 28

*Consumer Fin. Prot. Bureau v. Commonwealth Equity Grp., LLC*,
No. 20-cv-10991, 2021 WL 3516690 (D. Mass. Aug. 10, 2021).... 25, 34, 37, 39

*Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*,
No. 14-1967 JVS (ANx), 2016 WL 1056662 (C.D. Cal. Feb. 5, 2016)............ 34

*Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*,
No. 16-cv-07111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ......................................................................... 22, 25, 26, 38

*Estate of Golz*,
No. 17-cv-01152-RBJ-MEH, 2018 WL 4090866 (D. Colo. Aug. 28, 2018) ......................................................................... 30, 42

*F.D.I.C. v. Hulsey*,
22 F.3d 1472 (10th Cir. 1994) ...................................................... 29

*Fla. Bar v. Went for It, Inc.*,
515 U.S. 618 (1995)..................................................................... 40

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ........................................................ 37

*FTC v. Lalonde*,
545 F. App'x 825 (11th Cir. 2013) ................................................ 37

*In re Nat'l Credit Mgmt. Grp., L.L.C.*,
   21 F. Supp. 2d 424 (D.N.J. 1998) ................................................................. 38, 39

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.*,
   534 U.S. 124 (2001) ............................................................................................ 26

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010) ............................................................................................ 27

*Lexington Law Firm v. S.C. Dep't of Consumer Affairs*,
   677 S.E.2d 591 (S.C. 2009) ............................................................................... 41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..................................................................................... 17, 32

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
   559 U.S. 229 (2010) ............................................................................................ 40

*Morton v. Mancari*,
   417 U.S. 535 (1974) ............................................................................................ 25

*N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*,
   946 F.3d 1138 (10th Cir. 2019) ......................................................................... 36

*Nat'l Fed'n of the Blind v. FTC*,
   420 F.3d 331 (4th Cir. 2005) ....................................................................... 35, 37

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978) ............................................................................................ 39

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ............................................................................................ 25

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
   547 U.S. 47 (2006) .............................................................................................. 38

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) .............................................................................................. 37

*SEC v Elecs. Warehouse, Inc.*,
   689 F. Supp. 53 (D. Conn. 1988), *aff'd*, 891 F.2d 457 (2d Cir. 1989) ............. 30

*SEC v. Cuban*,
   798 F. Supp. 2d 783 (N.D. Tex. 2011) ............................................................. 30

*SEC v. KPMG LLP*,
   No. 03-Civ-671(DLC), 2003 WL 21976733 (S.D.N.Y. Aug. 20, 2003) .......... 30

*Tennessee v. Lexington Law Firms*,
  No. 96-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997) ......... 25, 26, 28, 37

*United States v. Dish Network LLC*,
  954 F.3d 970 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 729 (2021) .................. 34

*United States v. Magnesium Corp. of Am.*,
  616 F.3d 1129 (10th Cir. 2010) ........................................................................ 34

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) .......................................................................................... 40

**Statutes**

12 U.S.C. § 5481(5)(A) ........................................................................................ 19

12 U.S.C. § 5565 .................................................................................................. 32

12 U.S.C. § 5565(a)(2) ......................................................................................... 31

12 U.S.C. §§ 5481–5603 ...................................................................................... 28

15 U.S.C. § 1679 *et seq.* ...................................................................................... 25

15 U.S.C. § 1679b(b) ........................................................................................... 26

15 U.S.C. § 1681 .................................................................................................... 3

15 U.S.C. § 1681a(d)(1) ....................................................................................... 37

15 U.S.C. § 6101 *et seq.* ................................................................................... 2, 27

15 U.S.C. § 6102(b) ............................................................................................... 2

15 U.S.C. § 6102(c)(2) ......................................................................................... 31

15 U.S.C. § 6105(d) ......................................................................................... 18, 31

**Regulations**

16 C.F.R. § 310.2(dd) .......................................................................................... 19

16 C.F.R. § 310.2(ff) ............................................................................................ 19

16 C.F.R. § 310.3(a)(2) ...................................................................................... 6, 37

16 C.F.R. § 310.4(a)(2) .................................................................................. *passim*

16 C.F.R. § 310.4(a)(4) ........................................................................................ 38

16 C.F.R. § 310.4(a)(5) ........................................................................ 37

16 C.F.R. § 310.6(b)(5) ......................................................................... 6

16 C.F.R. § 310.6(b)(6) ......................................................................... 6

16 C.F.R. pt. 310 ........................................................................... 27, 28

## Federal Register

60 Fed. Reg. 8313 (Feb. 14, 1995) ............................................... 6, 7, 33

60 Fed. Reg. 30,406 (June 8, 1995) ............................................... 7, 8, 36

60 Fed. Reg. 43,842 (Aug. 23, 1995) ...................................... 2, 5, 6, 33, 39

65 Fed. Reg. 10,428 (Feb. 28, 2000) ............................................... 7, 33

67 Fed. Reg. 4492 (Jan. 30, 2002) ................................................. *passim*

68 Fed. Reg. 4580 (Jan. 29, 2003) ...................................................... 5

74 Fed. Reg. 41,988 (Aug. 19, 2009) ................................................. 5, 6

79 Fed. Reg. 46,732 (Aug. 11, 2014) ................................................... 33

## Other Authorities

Black's Law Dictionary (10th ed. 2014) ................................................ 41

FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last
updated Jan. 2021), https://www.ftc.gov/tips-advice/business-
center/guidance/complying-telemarketing-sales-rule#creditrepair ....................... 21

## INTRODUCTION AND RELIEF SOUGHT

Plaintiff Bureau of Consumer Financial Protection ("Bureau") seeks summary judgment on Count I of its Complaint (ECF 2) against all Defendants. The undisputed material facts establish that from March 8, 2016 to the present, Defendants, through the brands Lexington Law and CreditRepair.com, have unlawfully telemarketed and sold credit repair services to millions of consumers in violation of the Telemarketing Sales Rule's credit repair provision, 16 C.F.R. § 310.4(a)(2) ("the Provision" or "Section 310.4(a)(2)"). Specifically, in contravention of the Provision, Defendants have requested and received payments for services represented to remove derogatory items from, or improve, consumers' credit history, record, or rating without (i) providing consumers a time frame in which all of the services will be provided; and (ii) waiting more than six months after achieving the promised results of their services, as demonstrated by a consumer report provided to the consumer. Because this conduct is undisputed and clearly violates the law, the Bureau is entitled to judgment in its favor against all Defendants on Count I.

The Bureau further seeks summary judgment dismissing Heath's Second, Third, Fifth, Sixth, Ninth, Eleventh, Fifteenth, and Seventeenth, and Progrexion's

1

Second, Third, Fifth, Sixth, Tenth, Twelfth, and Thirteenth Affirmative Defenses. These defenses are unsupported and fail as a matter of law.

At this time, the Bureau seeks summary judgment on Count I regarding all Defendants' liability for violating Section 310.4(a)(2) during the period March 8, 2016 to the present, reserving the question of monetary relief, injunctive relief, and civil money penalties for later determination.

## REGULATORY BACKGROUND

The Telemarketing and Consumer Fraud and Abuse Preventions Act, 15 U.S.C. §§ 6101 *et seq.* ("Telemarketing Act") was enacted to "offer consumers necessary protection from telemarketing deception and abuse," given Congress's finding that consumers "are victimized by… telemarketing deception and abuse" and "lose $40 billion a year" due to it. At Congress's direction,[1] and following notice and comment, the Federal Trade Commission ("FTC" or "Commission") promulgated the Telemarketing Sales Rule ("TSR").[2] The FTC issued Section 310.4(a)(2) to combat "the deceptive marketing and sale of bogus credit repair services." 60 Fed. Reg. 43,842, 43,854 (Aug. 23, 1995).

---

[1] 15 U.S.C. § 6102(b) (1994).

[2] The text of the Rule and its rulemaking history are available on the FTC's website at https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings/telemarketing-sales-rule.

Section 310.4(a)(2) states, in pertinent part:

(a) *Abusive conduct generally*. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

. . .

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

> (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose[.]

The Provision consists of two parts: a coverage clause and two preconditions (subsections (a)(2)(i) and (a)(2)(ii)) that must be satisfied before charging the customer.

The Provision's meaning is clear: covered companies are those that sell or telemarket "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." And covered companies must satisfy both of the Provision's preconditions before requesting or

3

receiving payment. First, the time frame for providing *all* of the services must have expired. 16 C.F.R. § 310.4(a)(2)(i). Second, the company must demonstrate through a consumer report that the promised results have been achieved *and maintained for six months*. 16 C.F.R. § 310.4(a)(2)(ii).

The Provision operates much like a contingency fee arrangement. The seller must specify the time frame for services and the outcome—the "promised result"—and achieve that outcome before any payment obligation arises. Because derogatory items may be reinserted shortly after their removal, the seller cannot request payment until six months *after* achieving the successful result for the customer. Thus, the Provision prohibits "requesting or receiving payment for credit repair services prior to *delivery and proof* that such services have been rendered." 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) (emphasis added).

The Provision's preconditions for payment reflect the FTC's abiding concern that for credit repair services, "there are no disclosures that could effectively remedy the problems," and instead, "the harm to consumers could be averted only by specifying that the seller's performance of [these services] must precede payment by the consumer." 67 Fed. Reg. 4492, 4504 n.106 (Jan. 30, 2002). The preconditions directly prevent consumer abuse. As the FTC explained in a state lawsuit under the Provision against Lexington Law:

4

> Credit repair services that promise, in return for an advance fee, to help improve a consumer's credit rating, without regard to the reasons why the customer's credit rating is unfavorable, necessarily abuse the vast majority of their customers, because the vast majority of those customers cannot be helped…. By prohibiting the collection of a fee for credit repair services until actual credit improvement has been shown, the Rule prevents this telemarketing abuse.[3]

Without the protections afforded by the preconditions, in the FTC's view, "so-called 'credit repair' services" are a type of "purported services that the Commission determined to be 'fundamentally bogus.'" 67 Fed. Reg. 4492, 4512 n.181 (Jan. 30, 2002); 74 Fed. Reg. 41,988, 41,990 (Aug. 19, 2009). The FTC called credit repair services that do not satisfy the Provision "illusory," "outright theft," "bogus," and "fundamentally bogus" again and again. *See, e.g.*, 67 Fed. Reg. 4492, 4504 n.106, 4511 (Jan. 30, 2002) ("illusory"); 74 Fed. Reg. 41,988, 42,006 (Aug. 19, 2009) (same); 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) ("outright theft"); 68 Fed. Reg. 4580, 4614 (Jan. 29, 2003) ("outright theft" and "fundamentally bogus"); 60 Fed. Reg. 43,842, 43,854 (Aug. 23, 1995) ("bogus"); 74 Fed. Reg. 41,988, 41,990 (Aug. 19, 2009) (same); 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) ("fundamentally bogus").

---

[3] Ex. 19, Intervenor FTC's Mot. For Partial Summary Judgment at 6-7, *Tennessee v. Lexington Law Firms*, No. 96-0344 (M.D. Tenn.) (filed Dec. 16, 1996) (internal citation omitted). ████████████████████████████████████████

Indeed, the very structure of the TSR—and its exemptions—evince the FTC's concern that credit repair customers need heightened regulatory protection. For example, the TSR exempts from its purview telephone calls initiated by consumers in response to general media advertisements and in response to direct mail advertisements that truthfully disclose all material information. 16 C.F.R. § 310.6(b)(5), (6). But credit repair services are *excluded* from these exemptions. *Id.* § 310.6(b)(5)(i), (6)(i). The FTC created this exclusion because, in its experience, even truthful initial "solicitations often provide the opening for subsequent deception and abuse" by credit repair companies, 60 Fed. Reg. 43,842, 43,860 (Aug. 23, 1995), and "significant numbers" of deceptive credit repair telemarketers use "general advertising to entice their victims to place an inbound telemarketing call." 74 Fed. Reg. 41,988, 42,010 (Aug. 19, 2009).

Other aspects of the TSR's regulatory history reflect the FTC's longstanding concerns about deceptive credit repair marketing and services. The initially proposed TSR specifically prohibited misrepresenting that "services can or are likely to improve a person's credit history, credit record, or credit rating," and it prohibited misrepresenting "that, a person, regardless of that person's credit history, will obtain a loan or other credit-related service." 60 Fed. Reg. 8313, 8330 (Feb. 14, 1995) (proposed 16 C.F.R. § 310.3(a)(2)(xxi)-(xxii)). Although the final

6

TSR "drop[ped] the lengthy enumeration of specific prohibited misrepresentations," including both of these prohibitions, it specified that these misrepresentations still "violate the FTC Act as well as the [TSR]." 60 Fed. Reg. 30,406, 30,412-13 (June 8, 1995). Thus, misrepresentations that a person's credit rating or credit access will improve remain unlawful, even under the final TSR's "more concise regulatory approach." *Id.* at 30,413.

Commenters have consistently endorsed the FTC's regulatory approach in the Provision. Before the Provision was finalized, the public was invited to comment on whether the Provision was "appropriate" and whether there were "any legitimate services that could not be provided, or would be more costly to provide," due to the Provision. 60 Fed. Reg. 8313, 8324-25 (Feb. 14, 1995). Diverse "commenters strongly supported" the Provision. 60 Fed. Reg. 30,406, 30,415 (June 8, 1995). Five years after its adoption, the public was again asked to comment on the Provision. 65 Fed. Reg. 10,428, 10,432 (Feb. 28, 2000). No "comments recommended that changes be made to the" Provision; nor did the FTC find anything "that would warrant amendment." 67 Fed. Reg. 4492, 4512 (Jan. 30, 2002). Indeed, the only changes ever made to the Provision strengthened it— expanding the final Provision to encompass the removal of derogatory information

and to require more reliable proof of the outcome of the services through a

consumer report. *See* 60 Fed. Reg. 30,406, 30,415-16 (June 8, 1995).

**STATEMENT OF UNDISPUTED MATERIAL FACTS (SUMF)**

**Defendants' Identities and Roles**

1.       Defendants Progrexion Marketing, Inc. ("Progrexion Marketing"), PGX

Holdings, Inc. ("PGX Holdings"), Progrexion Teleservices, Inc.

("Progrexion Teleservices"), eFolks, LLC ("eFolks"), and CreditRepair.com,

Inc. ("CreditRepair.com") (collectively, "Progrexion") ██████████████

████████████████████████████████████████████████

███████████████████████.

2.       Progrexion Marketing, Progrexion Teleservices, eFolks, and

CreditRepair.com are wholly-owned subsidiaries of PGX Holdings. Compl.

¶ 9 (ECF 2); Progrexion Answer ¶ 9 (ECF 65).

3.       Defendant John C. Heath, P.C., Attorney at Law, d/b/a Lexington Law

("Heath") licenses the Lexington Law trademark from Progrexion. Ex. 14,

LEX00000028; Ex. 1, Heath Dep. 37:18-23. Heath has licensed the

trademark "Lexington Law" since at least 2004. Compl. ¶ 14 (ECF 2); Heath

Answer ¶ 14 (ECF 66).

4.       Progrexion Marketing provides advertising and marketing services to Heath

8

under contract. Compl. ¶ 10 (ECF 2); Heath Answer ¶ 10 (ECF 66); Ex. 1,

Heath Dep. 106:4-7, 145:6-10; Ex. 15, LEX00000001.

5.   Progrexion Marketing provides advertising and marketing services to

CreditRepair.com under contract. Compl. ¶ 10 (ECF 2); Progrexion Answer

¶ 10 (ECF 65); Ex. 16, PGX.CFPB.00000113.

6.   Progrexion Teleservices provides telemarketing services to Heath under

contract. Ex. 1, Heath Dep. 19:9-12; Ex. 3, Progrexion Teleservices Dep.

41:24-42:22, 52:5-13; Ex. 37, LEX00000066.

7.   Progrexion Teleservices has, at times, provided telemarketing services to

CreditRepair.com. Ex. 18, CreditRepair.com Dep. 30:12-24; Ex. 3

Progrexion Teleservices Dep. 41:24-42:22, 52:15-53:9.

8.   In connection with the sale of Lexington Law and CreditRepair.com credit

repair services, eFolks provides telemarketing services to Progrexion. Ex.

36, eFolks Dep. 23:1-13, 128:9-15, 183:7-18.

**Defendants Are Telemarketers and Sellers**

9.   Progrexion and Heath market and sell Lexington Law credit repair services

over the telephone, through inbound and outbound interstate telephone calls.

Ex. 1, Heath Dep. 19:9-12, 129:20-24; Ex. 3, Progrexion Teleservices Dep.

41:24-42:22, 52:5-13; Ex. 20, PGX0048433.

10.  Progrexion markets and sells CreditRepair.com credit repair services over the telephone, through inbound and outbound interstate telephone calls. Ex. 18, CreditRepair.com Dep. 29:9-30:11, 33:3-8, 117:8-16, 157:18-158:4; Ex. 21, CreditRepair.com State Coverage Map; Ex. 22, PGX0048184.

**Defendants Offer and Provide Consumer Financial Products or Services**

11.  Heath, doing business as Lexington Law, offers or provides financial advisory services and services relating to consumer report information that are for use by consumers primarily for personal, family, or household purposes, or that are delivered, offered, or provided in connection with such a consumer financial product or service. Compl. ¶ 15 (ECF 2); Heath Answer ¶ 15 (ECF 66).

12.  Progrexion markets, telemarkets, and sells Lexington Law's products and services to consumers in most states nationwide. Compl. ¶ 14 (ECF 2); Progrexion Answer ¶ 14 (ECF 65); Ex. 1, Heath Dep. 55:12-15.

13.  CreditRepair.com offers and provides financial advisory services and services relating to consumer report information and engages in telemarketing and telesales. Compl. ¶ 13 (ECF 2); Progrexion Answer ¶ 13 (ECF 65).

14.  Progrexion markets, telemarkets, and sells CreditRepair.com's products and

services to consumers in most states nationwide. Compl. ¶ 13 (ECF 2);

Progrexion Answer ¶ 13 (ECF 65); Ex. 21, CreditRepair.com State

Coverage Map.

**Lexington Law Credit Repair Services**

15.   Heath offers credit repair services for a fee. Ex. 1, Heath Dep. 40:3-13; Ex.

2, Lexington Law Service Feature Matrix.

16.   Heath's credit repair services are marketed as services to remove negative

items from consumer reports or to improve a person's credit history, credit

record, or credit rating. Compl. ¶ 111 (ECF 2); Heath Answer ¶ 111 (ECF

66); *see also id.* ¶¶ 112-116.

17.   According to Lexington Law's website, "Credit repair is the process of

improving a poor score by addressing or removing negative items that could

be listed on your reports inaccurately." Ex. 4, DelPonti0000371; *see also* Ex.

5, PGX0028285 (Lexington Law website: "Credit Repair is the process of

addressing and removing the questionable negative items that are impacting

your credit profile."); Ex. 6, PGX0028357.

18.   Progrexion markets Lexington Law as "the industry leaders in credit repair."

Ex. 33, PGX0040901 at PGX0040961; *see also* Ex. 23, PGX0028231

(Lexington Law website: "If you need assistance repairing your credit, rest

assured that Lexington Law is a trusted leader in credit repair and credit solutions.").

19.     On its website, Lexington Law claims that "[s]tatistically, 89% of Past Lexington Law clients who saw a credit score increase had an average increase of 40 points in six months." Ex. 24, DelPonti0000357. Another page of Lexington Law's website states "Our results speak for themselves. Past clients have seen an average credit score increase of 40 points in just four months of service." Ex. 30, Decl. Jacob Lichtblau Regarding Lexington Law Ads and Webpages ¶ 10.

20.     Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in Heath's credit repair services. Ex. 7, PGX0002572 (Pricing, Lexington Law); Ex. 8, PGX0028796 at PGX0028802, PGX0028805-06; Ex. 9, PGX0028741 at PGX0028746, PGX0028750; Ex. 10, Progrexion Marketing Dep. 75:4-76:19.

21.     After signup, Heath charges customers an initial work fee, also dubbed a Service Interval Fee. The initial work fee is typically between $79.95 and $119.95. Ex. 2, Lexington Law Service Feature Matrix. It is typically charged 5 to 15 days after the customer signs up. Ex. 11, LEX0000421 at

LEX0000426 (customer agreement); Ex. 7, PGX0002572.

22. Heath charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level, and is typically $79.95 to $119.95 for the company's "Tier 1" credit repair services and $19.95 to $59.95 for the company's lower-tier credit repair services. Ex. 2, Lexington Law Service Feature Matrix. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires. Ex. 1, Heath Dep. 43:25-46:7.

23. Heath does not set a time frame in which all of the services will be provided to a customer. Ex. 1, Heath Dep. 43:25-45:8, 169:14-170:3; Ex. 12, Heath Resp. to Interrog. No. 3 (Apr. 7, 2021); Ex. 11, LEX0000421 at LEX0000428 (customer agreement).

24. Heath charges consumers without waiting at least six months. Ex. 1, Heath Dep. 122:18-124:10; Ex. 25, Heath Supp. Resp. to RFA No. 4 (July 6, 2021)

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ .

25. Heath charges consumers before Heath has provided a consumer report

13

demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved. Ex. 1, Heath Dep. 122:18-124:10; Ex. 25, Heath Supp. Resp. to RFA No. 4 (July 6, 2021).

**CreditRepair.com Credit Repair Services**

26.    CreditRepair.com offers credit repair services for a fee. Ex. 10, Progrexion Marketing Dep. 80:1-18; Ex. 26, CreditRepair.com Service Feature Matrix; Ex. 27, PGX0000555 (Product Knowledge Training).

27.    CreditRepair.com's credit repair services are marketed as services to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating. Compl. ¶ 111 (ECF 2); Progrexion Answer ¶ 111 (ECF 65); *see also id.* ¶¶ 118.

28.    According to CreditRepair.com's website, "Credit repair is used by those who want to improve their credit score by removing and correcting negative or inaccurate items on their credit report…. [A] credit repair professional, like CreditRepair.com, is trained to use all the tools allowable by law to get the bureaus to remove and correct negative or inaccurate items on your credit report quickly (for a monthly fee)." Ex. 28, PGX0027706.

29.     CreditRepair.com's credit repair services are marketed as having increased

14

past members' credit scores "40 points in 4 months." *See e.g.,* Ex. 29, PGX0040984 at PGX0041063. CreditRepair.com advertises that "Our Members Average 11.6 Removals in Just 4 Months. Call and Learn More!" Ex. 30, Decl. Jacob Lichtblau Regarding Lexington Law Ads and Webpages, Attach. A (LEX0029013) pp. 17, 107, 558; *see also* Ex. 18, CreditRepair.com Dep. 80:4-14, 90:11-17.

30. Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in CreditRepair.com's credit repair services. Ex. 26, CreditRepair.com Service Feature Matrix; Ex. 27, PGX0000555 (Product Knowledge Training); Ex. 31, PGX0028638 at PGX0028644, PGX0028647-48; Ex. 10, Progrexion Marketing Dep. 75:4-76:19.

31. After signup, CreditRepir.com charges customers an initial work fee, also dubbed a Service Interval fee. The initial work fee is typically between $59.95 and $119.95. Ex. 26, CreditRepair.com Service Feature Matrix. It is typically charged 5 to 15 days after the customer signs up. Ex. 32, PGX0047444 at PGX0047456 (customer agreement).

32. CreditRepair.com charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level. It is typically $99.95

15

to $119.95 for the company's "Tier 1" credit repair services and $24.95 to $59.95 for the company's lower-tier credit repair services. Ex. 26, CreditRepair.com Service Feature Matrix. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires. *See id.*; Ex. 32, PGX0047444 at PGX0047458-59 (customer agreement); Ex. 18, CreditRepair.com Dep. 119:4-23.

33.   CreditRepair.com does not set a time frame in which all of the services will be provided to a customer. Ex. 34, CreditRepair.com Resp. to Interrog. No. 2 (Apr. 7, 2021); Ex. 32, PGX0047444 at PGX0047458-59.

34.   CreditRepair.com charges consumers without waiting at least six months. Ex. 35, CreditRepair.com Supp. Resp. to RFA 1 (July 6, 2021)

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ .

35.   CreditRepair.com charges consumers before Heath has provided a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved. Ex. 26, CreditRepair.com Service Feature Matrix; Ex. 32, PGX0047444 at

16

PGX0047456 (customer agreement); Ex. 35, CreditRepair.com Supp. Resp.

to RFA 1.

## ARGUMENT

I.    **Legal Standard**

      **A. Summary Judgment**

Summary judgment shall be granted where "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, under governing

law, it could affect the lawsuit's outcome; "[f]actual disputes that are irrelevant or

unnecessary will not be counted." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242,

248 (1986). The existence of some "metaphysical doubt" as to alleged factual

disputes will not defeat a properly supported summary judgment motion; rather,

the non-movant must provide specific facts showing that there is a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

(1986). "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no genuine issue for trial." *Id.* at 587

(quotation omitted).

## B. Regulatory Interpretation

The Tenth Circuit instructs courts interpreting a regulation to

> apply the same rules we use to interpret statutes…. We examine the plain language of the regulation and give each word its ordinary and customary meaning. Thus, in determining the plain meaning of a regulation, we do not consider the regulatory history or anything outside the text. If the language of the regulation is clear, we enforce the regulation in accordance with its plain meaning[.]

*Canyon Fuel Co. v. Sec'y of Lab.*, 894 F.3d 1279, 1287 (10th Cir. 2018) (citations omitted). And "where the regulation is ambiguous, we defer to the [agency]'s reasonable interpretations, even those advanced in [its] legal brief, unless plainly erroneous or inconsistent with the regulations, or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question…. In making this determination, we may look beyond the plain language, examining regulatory intent and overall statutory construction." *Id.* at 1287-88 (citations and quotations omitted).

## II.    Statutory Authority

Under 15 U.S.C. § 6105(d), the Bureau has authority to enforce the TSR with respect to the offering or provision of a consumer financial product or service.

Lexington Law's and CreditRepair.com's credit repair services are "consumer financial product[s] or service[s]" under the CFPA because they are

18

financial advisory services and services related to consumer report information, 12 U.S.C. § 5481(15)(A)(viii), (ix), offered or provided to consumers "primarily for personal, family, or household uses," *id.* § 5481(5)(A). SUMF ¶¶ 11-12 (Lexington Law); SUMF ¶¶ 13-14 (CreditRepair.com).

## III.   Defendants Are Liable for Charging Illegal Fees for Telemarketed Credit Repair Services

The material facts relevant to Count I are indisputable. The question here is a legal one: do Defendants' credit repair billing practices violate Section 310.4(a)(2)? The plain language of the regulation establishes that answer is "yes": all Defendants are liable for violating Section 310.4(a)(2) as a matter of law.

### A. Defendants are telemarketers and sellers under the TSR.

The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." *Id.* § 310.2(ff). Heath and Progrexion vigorously telemarket their credit repair services under the Lexington Law and CreditRepair.com brand names. SUMF ¶¶ 9-10. They are sellers and telemarketers under the Rule.

19

**B. Defendants are covered by Section 310.4(a)(2).**

Section 310.4(a)(2) covers companies that sell or telemarket "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." Heath and Progrexion promote Lexington Law, and Progrexion promotes CreditRepair.com, as "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." SUMF ¶¶ 15-19 (Lexington Law); SUMF ¶¶ 26-29 (CreditRepair.com). Consequently, the undisputed material facts establish that Defendants are all covered by Section 310.4(a)(2).

**C. Defendants violated Section 310.4(a)(2).**

As discussed above, the Provision establishes two preconditions—both of which must be met—before a telemarketer or seller may charge a consumer for credit repair services. The two preconditions—delivery of all the services and proof of the results over six months later—work in tandem. Both are critical to protecting consumers because "there are no disclosures that could effectively remedy the problems" from telemarketed credit repair services; "*the harm to consumers could be averted only by specifying that the seller's performance of [these services] must precede payment by the consumer.*" 67 Fed. Reg. 4492, 4504 n.106 (Jan. 30, 2002) (emphasis added). Credit repair companies must comply with

the two preconditions, which are stated in subsections (i) and (ii) of the Provision, and which the FTC's published TSR guidance further describes:

- One, the time frame during which the seller has promised services will be provided must have expired. Sellers can represent the time frame for the delivery of the services either orally or in writing, including in the contract for the services. If there's a discrepancy between the various representations by the credit repair seller, the longest time frame represented determines when payment may be requested or received.

- Two, the seller must provide the consumer with evidence that the improvement promised in the consumer's credit record has been achieved. The evidence must be a consumer report from a consumer reporting agency, issued more than six months after the results were achieved.[4]

The guidance is consistent with the FTC's rulemaking statements. *See* 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002) (the Provision prohibits "requesting or receiving payment for credit repair services prior to delivery and proof that such services have been rendered"); *id.* at 4493 ("the Rule bans telemarketers who offer to … provide credit repair services … from seeking payment before rendering the promised services ….").

---

[4] FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Jan. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair.

As discussed below, the undisputed record establishes that Defendants here have violated (and continue to violate) both preconditions.[5] Thus, the Bureau is entitled to judgment on Count I against all Defendants as a matter of law.

### 1. Defendants failed to set a time frame for all of their services.

The plain language of subsection (a)(2)(i) requires a seller to specify the time frame in which *all* of the goods or services will be provided and refrain from requesting or receiving payment until expiration of that time frame. Heath and Progrexion admit that neither Lexington Law nor CreditRepair.com met this requirement. SUMF ¶¶ 23, 33. On this basis alone, Defendants are liable for violating the Provision.

The time frame requirement ensures that sellers cannot string along consumers for months and months—all the while charging them—without providing all of the goods or completing the agreed services. But Defendants fail to

---

[5] In *Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*, No. 16-cv-07111, 2016 WL 10516097, *4 (C.D. Cal. Nov. 15, 2016), the district court described Section 310.4(a)(2) as "mak[ing] it unlawful for a telemarketer advertising that it can improve a person's credit history to receive payment until it has provided documentation of the effect of its services at least six months after the results have been achieved." Applying this plain language reading, the court held the Bureau's Section 310.4(a)(2) claim sufficient based on conduct virtually identical to Defendants' here: charging the consumer initial report fees, a set-up fee, and monthly fees before providing the consumer with a consumer report showing the results of the credit repair services. *Id.* *6-7.

22

provide this necessary protection to consumers. They avoid telling consumers how long it will take for their credit repair "solutions" to work, even when consumers ask expressly. Defendants' failure to give consumers a definitive time frame means that the "time frame in which all of the goods or services will be provided" never expires, and Defendants are therefore prohibited from requesting or receiving payment. The undisputed record therefore establishes that Defendants violated subsection (a)(2)(i) as a matter of law.

### 2. Defendants failed to wait six months before requesting or receiving payment.

Subsection (a)(2)(ii) requires a company to wait six months after achieving documented credit repair results for the consumer before requesting or receiving payment. Defendants admit that they have a routine practice of charging consumers for credit repair services within the month after a consumer first enrolls, and on a monthly basis thereafter. SUMF ¶¶ 21-22, 31-32. Manifestly, then, Defendants do not wait six months before requesting or receiving payment for their services. This undisputed fact compels the conclusion that Defendants violated the Provision.

Because, in this case, there is no dispute that Defendants do not wait six months before charging any consumer, regardless of when or if they achieve *any*

results, the Court need not reach the question of what results were promised.[6]

Defendants claim exemption from subsection (a)(2)(ii) on the specious grounds that they do not guarantee results (e.g., ECF 171, 249). For the reasons explained in the Bureau's Opposition to Heath P.C.'s Partial Motion for Summary Judgment on Count I (which the Bureau incorporates here) (ECF 230), this contention contradicts the plain language, context, and regulatory history of the Provision, and the Court should reject it. Subsection (a)(2)(ii) is a precondition to payment; a company that fails to comply with it is not *exempt* from the Provision, as Defendants claim, but rather in violation of it.

Therefore, the undisputed record establishes that Defendants violated subsection (a)(2)(ii) as a matter of law.

---

[6] The phrase "promised result" in subsection (a)(2)(ii) is not superfluous. The question of what result was promised may be relevant to a claim under the Provision if a credit repair telemarketer or seller waits to request payment until it has both complied with the time frame requirement in subsection (a)(2)(i) and demonstrated a result through a consumer report issued more than six months after that result was achieved. Those facts are not present here.

## IV.    Defendants' Affirmative Defenses Are Unsupported and Meritless

### A. Defendants' Second Defense should be dismissed because the TSR remains valid.

Defendants contend that the Credit Repair Organizations Act, 15 U.S.C. §§ 1679 *et seq.* ("CROA"), "preempted and overrode" Section 310.4(a)(2). That defense is meritless because there is no evidence that Congress intended to repeal the TSR, and because CROA and the TSR do not conflict. Three courts have addressed this issue, and all agreed: CROA does not supersede Section 310.4(a)(2). *Consumer Fin. Prot. Bureau v. Commonwealth Equity Grp., LLC*, No. 20-cv-10991, 2021 WL 3516690, at *2 (D. Mass. Aug. 10, 2021); *Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*, No. CV 16-07111-BRO (JEMx), 2016 WL 10516097, at *9 (C.D. Cal. Nov. 15, 2016); *Tennessee v. Lexington Law Firms*, No. 96-0344, 1997 WL 367409, at * 6 (M.D. Tenn. May 14, 1997).

"It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co*., 426 U.S. 148, 153 (1976). To find a law repealed, "the intention of the legislature to repeal must be clear and manifest." *Id*. at 154. Otherwise, "[w]hen there are two acts upon the same subject, the rule is to give effect to both if possible." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

25

There is not a scintilla of evidence that Congress intended to repeal the Telemarketing Act or TSR when it enacted CROA, much less "clear and manifest" evidence of such intent. CROA was enacted shortly after Section 310.4(a)(2) was promulgated, and nothing in its text or legislative history indicates that it preempts the TSR, exempts credit repair companies from rules related to telemarketing, or limits the FTC's rulemaking authority. A statute, like CROA, that contains no statement of exclusivity does not impede the coverage of another law. *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.*, 534 U.S. 124, 140-41 (2001). As one district court stated, "although the Credit Repair Organizations Act undoubtedly governs Defendant's business, there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the Telemarketing Act." *Tennessee v. Lexington Law Firms*, 1997 WL 367409, at *6.

Absent clear and manifest evidence that Congress intended to repeal the Telemarketing Act or TSR, Defendants must show that there was an irreconcilable conflict between the two laws. *Morton*, 417 U.S. at 550. They cannot make that showing, because "the CROA and the TSR do not conflict." *Prime Mktg. Holdings*, 2016 WL 10516097, at *9. "The CROA prohibits all credit repair agencies from charging advance fees, *see* 15 U.S.C. § 1679b(b), while the TSR

prohibits all telemarketers who participate in credit repair services from charging advance fees until six months after the promised results have been achieved, *see* 16 C.F.R. § 310.4(a)(2)." *Id*. As a result, "when a business is both a credit repair agency and a telemarketer, it is required to comply with both the CROA and the TSR." *Id*. To so comply, a credit repair agency that is also a telemarketer "may not collect services until its services are completed *and* it has provided documentation to the consumer at least six months after the services are completed evidencing the agency's efficacy." *Id.* In short, "the two provisions may be complied with concurrently; they do not conflict," *id*., and the Bureau is entitled to summary judgment on Defendants' second defense.

### B. Defendants' Third Defense should be dismissed because Defendants had no reasonable basis in fact or law to violate the TSR.

Defendants claim that they "reasonably interpreted applicable law" and acted "in good faith," insinuating that a mistake of law excuses their conduct. But the Supreme Court has "long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (internal quotations omitted); *see also United States v. Molina*, 484 F. App'x 276, 285 (10th Cir. 2012). Neither the Telemarketing Act, the TSR, nor the CFPA contains a general mistake-of-law defense. 15 U.S.C. §§ 6101–6108; 16

27

C.F.R. pt. 310; 12 U.S.C. §§ 5481–5603. This Court should therefore decline
Defendants' "invitation to re-write" the law to include such a defense. *Consumer
Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522-JFW (RAOx), 2016 WL
4820635, at *11 (C.D. Cal. Aug. 31, 2016).

Nor can Defendants use a mistake-of-law defense to escape certain penalties
under the CFPA. Defendants were keenly aware of both the TSR and the fact that
their billing practices systematically contravened it. Lexington Law's predecessor[7]
was sued by the State of Tennessee *for violations of the Provision* in 1996, and the
Middle District of Tennessee expressly rejected numerous legal defenses raised by
Lexington Law—including some very similar to those Defendants assert in this
litigation—and held that the TSR applied. *Tennessee v. Lexington Law Firms*,
1997 WL 367409, at *4-8. Defendants cannot demonstrate that by March 8, 2016,
when liability for Count I in this case begins, they were unaware of the Provision
or its application to their conduct. The Bureau is entitled to summary judgment on
Defendants' third defense.

---

[7] Ex. 17, Heath Factual Stipulation (Apr. 8, 2021) (LEX0008532); Ex. 1, Dep.
Heath 36:7-13, 199:12-200:6.

**C. Defendants' Fifth and Sixth Defenses should be dismissed because Defendants' equitable defenses are legally invalid and lack evidentiary support.**

The Bureau previously moved to strike Defendants' Fifth ("equitable doctrines, including laches") and Sixth ("equitable doctrines, including but not limited to laches, unclean hands, estoppel, availability of legal remedies, and inequitable windfall") Defenses. Pl.'s Mot. to Strike (ECF 74). The Court struck the laches defense, but allowed the others to remain. Order (ECF 91). Defendants failed to develop any evidence during discovery to support these legally questionable defenses, and the Court should now grant judgment in the Bureau's favor on each of them.

As detailed in the Bureau's Motion to Strike (which is incorporated here) (ECF 74), the Tenth Circuit expressed grave doubt "that the Supreme Court would ever allow an estoppel defense against the government under any set of circumstances"; if available, such a defense would require a showing of "affirmative misconduct," which "is a high hurdle for the asserting party to overcome." *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489-90 (10th Cir. 1994). It requires "an affirmative act of misrepresentation or concealment of a material fact. Mere negligence, delay, inaction, or failure to follow agency guidelines does not

29

constitute affirmative misconduct." *Bd. of Cnty. Comm'rs v. Isaac*, 18 F.3d 1492,

1499 (10th Cir. 1994) (citations omitted).

The bar for an unclean hands defense is even higher and generally "may not

be invoked against a government agency which is attempting to enforce a

congressional mandate in the public interest." *SEC. v. KPMG LLP*, No. 03-Civ-

671(DLC), 2003 WL 21976733, *3  (S.D.N.Y. Aug. 20, 2003); *Estate of Golz*, No.

17-cv-01152-RBJ-MEH, 2018 WL 4090866, *9 (D. Colo. Aug. 28, 2018)

("Simply put, unclean hands is not a valid defense" to an agency lawsuit promoting

"an important public purpose"). Those courts that have not entirely foreclosed the

defense require the defendant to show egregious and prejudicial misconduct that

occurred before the initiation of the suit, bears a nexus to the defendant's ability to

defend against the suit, and constitutes constitutional injury.  *E.g.*, *SEC v. Cuban*,

798 F. Supp. 2d 783, 792-95 (N.D. Tex. 2011) (collecting and analyzing cases);

*SEC v Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd*, 891

F.2d 457 (2d Cir. 1989). Defendants have adduced no evidence of "affirmative

misconduct," much less "egregious and prejudicial misconduct" before the suit's

initiation, and they could not meet their burden of proof on these legally questionable theories in any event.[8]

The "availability of legal remedies" and "inequitable windfall" defenses also are legally invalid. The CFPA authorizes the Court to grant multiple, non-exclusive forms of relief, including the legal and equitable remedies and civil penalties that the Bureau seeks. 12 U.S.C. § 5565(a)(2); Compl. ¶ 169 (ECF 2).  Thus, the availability of legal remedies (such as legal restitution and damages) does not negate the availability of equitable relief (such as rescission of contracts and injunctions).  Rather, Congress has expressly permitted the Bureau to obtain any combination of legal and equitable remedies that the Court deems appropriate. Defendants' assertion that the Bureau may only obtain legal remedies contradicts the statute's plain language. 12 U.S.C. § 5565(a)(2); *see also* 15 U.S.C. §§ 6102(c)(2), 6105(d) (authorizing the Bureau to enforce the TSR under its CFPA enforcement authority and to treat violations of the TSR as violations of the CFPA).

---

[8] When asked to identify the principal facts that support Defendants' Sixth Defense, Defendants identified no misconduct whatsoever. Ex. 38, PGX Holdings Resp. to Pl.'s Second Set of Interrogatories, No. 15; Ex. 39, Heath's Resp. to Pl.'s Second Set of Interrogatories, No. 13. These responses merely repeat Defendants' conclusory claims and fall far short of Defendants' high evidentiary burden, even assuming their defenses are not foreclosed as a matter of law.

The "inequitable windfall" defense likewise ignores the CFPA, which expressly authorizes these remedies. It remains unclear who would receive an "inequitable windfall" if the Bureau's action succeeds. The CFPA permits the Court to grant appropriate monetary redress to harmed consumers, allows the Bureau to recover its litigation costs, and sets the amount of civil money penalties Defendants would owe, based upon their knowledge and any applicable mitigating factors. 12 U.S.C. § 5565.  Since Congress expressly authorized these remedies, Defendants have no legal basis to claim that an "inequitable windfall" will result to anyone if the Bureau prevails.

The Bureau is entitled to judgment as a matter of law on Heath's and Progrexion's legally invalid, factually unsupported Fifth and Sixth Defenses.[9]

### D. Heath's Ninth Defense and Progrexion's Tenth Defense should be dismissed because Defendants had fair notice of the TSR.

Defendants contend that they never received fair notice that their billing practices violate the TSR, and it would therefore violate the federal Due Process Clause to find them liable. This contention is meritless. The TSR was duly enacted through notice and comment rulemaking in 1995. This case concerns Defendants'

---

[9] The Fifth and Sixths Defenses invoke, but do not identify, other "equitable doctrines." The complete absence of any legal or factual support for these "other" unnamed defenses requires their elimination from the case. *See Matsushita*, 475 U.S. at 586-87.

violations since March 2016, two decades after the TSR was enacted. There is no due process violation.

As discussed above, the TSR—including the Provision—was promulgated after a notice-and-comment rulemaking process in 1995. *See supra* Regulatory Background, pp. 2-7; 60 Fed. Reg. 8313 (Feb. 14, 1995); 60 Fed. Reg. 43,842 (Aug. 23, 1995). In addition, as required by statute, the TSR was subjected to a mandatory rule review in 2000 that involved a second opportunity for public comment, as well as public forums. *Supra* p. 7; 65 Fed. Reg. 10,428 (Feb. 28, 2000). And in 2014, it was subjected to still another rule review involving another notice and comment process. 79 Fed. Reg. 46,732 (Aug. 11, 2014). Since the final rule was promulgated in 1995, the FTC has—through notice-and-comment rulemakings—amended the TSR several times, but it has never altered the Provision in any respect. Heath concedes that "[o]ver the last two decades, the FTC's views regarding the purpose of the TSR Advance Fee Provision have not changed." Heath's Mot. Summ. J. (ECF 168) p. 23.

Lexington Law has offered credit repair services since before the TSR's promulgation in 1995, and it had actual notice of the Provision since at least 1996, when it was sued by the State of Tennessee for violating it, and when the FTC filed a brief as intervenor in that lawsuit explaining the meaning of the Provision. Ex.

33

19. Nonetheless, no Defendant submitted any comment in response to either of the notices of proposed rulemaking in 1995, or the 2000 or 2014 rule reviews. The Bureau's claims under the Provision concern conduct since March 2016—two decades after the TSR was published and promulgated.

Due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1144 (10th Cir. 2010). The TSR easily meets that standard. Indeed, every Court that has considered a due process or fair notice challenge to the TSR has rejected it. *See United States v. Dish Network LLC*, 954 F.3d 970, 979 (7th Cir. 2020) (rejecting due process challenge to the TSR and noting: "[the defendant's] argument supposes that government must provide some notice on top of the statutes and rules themselves, but why? There's nothing ambiguous about them. If there is a problem, it isn't lack of notice."), *cert. denied*, 141 S. Ct. 729 (2021); *Commonwealth Equity Grp.*, 2021 WL 3516690, at *2-3 (rejecting due process challenge by a credit repair company sued under the Provision); *Consumer Fin. Prot. Bureau v. IrvineWebWorks, Inc.*, No. 14-1967 JVS (ANx), 2016 WL 1056662, at *12 (C.D. Cal. Feb. 5, 2016) (rejecting fair notice challenge to another TSR provision, noting "[t]he regulation was properly published and promulgated prior to the conduct that the Bureau contends violated

34

the Telemarketing Sales Rule"); *see also Nat'l Fed'n of the Blind v. FTC*, 420 F.3d

331, 337 (4th Cir. 2005) (discussing the TSR's regulatory history and upholding

the TSR).

Defendants argue that there has been some unwritten, interpretive change to

the Provision (*e.g.*, Heath's Mot. Summ. J. (ECF 168) pp. 1-4), but that argument

is both irrelevant, because the Provision's plain language governs this case, and

also false. *See* Pl.'s Opp'n to Partial Mot. Summ. J. (ECF 230) 41-51.

There is neither a factual nor legal basis for Defendants' contention that they

lacked fair notice of the TSR or the Provision. The Court should grant summary

judgment to the Bureau as to Heath's Ninth and Progrexion's Tenth affirmative

defense.

### E.  Heath's Eleventh Defense and Progrexion's Twelfth Defense should be dismissed because the TSR is enforceable.

Defendants contend that the Provision fails facial and as applied challenges

under Administrative Procedure Act standards. Defendants' contentions, which

were not raised during the rulemaking process, misconstrue and misread the law in

multiple ways.

Defendants first assert that the FTC "entirely failed to consider important

aspects of the credit repair industry and consumer needs for credit repair, including

how the rule might impact law firms or other providers that are not 'bogus credit

repair' entities, which were the sole stated target of the rule." But neither Defendants nor others raised Defendants' current complaints during the rulemaking process. The FTC repeatedly invited the public to comment on the costs and effects of the Provision, and no "comments recommended that changes be made to the" Provision. 67 Fed. Reg. 4492, 4512 (Jan. 30, 2002); *see also* 60 Fed. Reg. 30,406, 30,415 (June 8, 1995) ("commenters strongly supported" the Provision). Defendants have no basis to assert that the FTC should have considered contentions that were not made during the public rulemaking process. *See N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1165 n.25 (10th Cir. 2019) ("an issue must have been raised before an agency for a party to seek judicial review of agency action on that issue").

Defendants next assert that promulgation of the Provision "imposed a requirement that results be substantiated through a credit report when legitimate and needed credit repair services, and successful results (such as credit score changes), are often not reflected in a credit report." Defendants misread and misquote the text of the Provision, which refers to a "consumer report," not a "credit report." 16 C.F.R. § 310.4(a)(2)(ii). The term "consumer report" includes

both credit scores and credit reports,[10] which are fully capable of reflecting what Defendants describe as "successful results," including credit score changes.

Defendants asserted in their Answers that the FTC "exceeded its Congressional authority under which [Section 310.4(a)(2)] was purportedly adopted." Both courts that have considered this argument have rejected it and upheld the Provision's validity. *Commonwealth Equity Grp.*, 2021 WL 3516690, at *3; *Tennessee v. Lexington Law Firms*, 1997 WL 367409, at *5. And other courts have rejected this argument as to other TSR provisions. *E.g.*, *Nat'l Fed'n of the Blind*, 420 F.3d at 337 (TSR did not exceed scope of FTC's authority under Telemarketing Act). Finally, Heath dropped the argument that FTC lacked authority to promulgate the Provision. ECF 249 p.23 ("Heath is not arguing that FTC lacked authority to promulgate the AFP," Section 310.4(a)(2)).

The TSR and the Provision are routinely and appropriately applied and enforced. *See, e.g.*, *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 634 (6th Cir. 2014) (affirming summary judgment for the FTC under Sections 310.3(a)(2) and 310.4(a)(5)); *FTC v. Lalonde*, 545 F. App'x 825, 840 (11th Cir. 2013) (affirming liability for defendants who "induc[ed] the purchase of credit repair services" in

---

[10] 15 U.S.C. § 1681a(d)(1); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 55 n.6 (2007).

violation of Section 310.4(a)(4)); *Prime Mktg. Holdings*, 2016 WL 10516097, at

*6-7; *In re Nat'l Credit Mgmt. Grp., LLC*, 21 F. Supp. 2d 424, 454-57 (D.N.J.

1998). Summary judgment should be granted as to Heath's Eleventh and

Progrexion's Twelfth affirmative defense.

### F. Heath's Fifteenth Defense and Progrexion's Thirteenth Defense should be dismissed because the First Amendment does not shield Defendants from liability for charging illegal fees.

Defendants claim that the Provision violates their rights to free speech under

the First Amendment. This argument is unavailing because the Provision regulates

a course of conduct—the timing of payment for credit repair services—not speech.

Even if the court were to find that the Provision regulates speech, it would

nonetheless survive First Amendment scrutiny.

### 1. The Provision regulates conduct, not speech.

The Provision does not dictate what Defendants may or may not say. Rather,

it requires that Defendants wait at least six months and demonstrate results before

requesting or receiving payment for credit repair services. 16 C.F.R. § 310.4(a)(2).

"[I]t has never been deemed an abridgment of freedom of speech or press to make

a course of conduct illegal merely because the conduct was in part initiated,

evidenced, or carried out by means of language, either spoken, written, or printed."

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006);

*see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.").

A district court recently held that Section 310.4(a)(2) does not implicate the First Amendment because "the restriction is on conduct—the timing of payment—not on speech." *Commonwealth Equity Grp.*, 2021 WL 3516690, at *3. Similarly, another district court concluded that CROA "merely regulates when payment may be collected," and thus does not implicate the First Amendment, when it prohibits credit repair companies from charging or receiving a fee for a service before "such service is fully performed." *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 460.

## 2. Even if the Provision regulates speech, it survives First Amendment scrutiny.

Even if the Court finds that the Provision regulates speech, it survives First Amendment scrutiny. The Provision—which addresses "the telemarketing of deceptive credit repair services"—regulates deceptive and misleading commercial speech. 60 Fed. Reg. at 43,853; *see Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) (the "test for identifying commercial speech" is whether it proposes a commercial transaction).

Commercial speech subject to lesser protection than non-commercial speech, and misleading commercial speech receives even lesser protection still. *See*

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010)

(citing *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626,

651 (1985)). Regulations targeted at misleading commercial speech, like the

Provision, must be upheld so long as they are "reasonably related to the

[government's] interest in preventing deception of consumers." *Id.* at 250.

The Provision relates to preventing consumer deception. Requiring credit

repair companies to wait six months and demonstrate results before requesting or

receiving payment protects consumers from having to pay up front for services that

may ultimately prove illusory. Indeed, the FTC found that "there are no disclosures

that could effectively remedy the problems" inherent in credit repair services, and

instead, "the harm to consumers could be averted only by specifying that the

seller's performance of [these services] must precede payment by the consumer."

67 Fed. Reg. 4492-01, 4504 n.106 (Jan. 30, 2002).

Even if the Court were to apply the standard for non-misleading commercial

speech, the Provision survives. A regulation on non-misleading commercial speech

must be upheld so long as the restriction is narrowly drawn and directly and

materially advances a substantial government interest. *Fla. Bar v. Went for It, Inc.*,

515 U.S. 618, 624 (1995). The Provision's purpose—preventing economic harm to

consumers who pay in advance for credit repair services that fail to repair their

credit—is substantial, and the Provision directly and materially advances that

purpose by postponing consumers' payment for such services until they have been

assured that their credit was, in fact, repaired. And the Provision is narrowly

tailored because prohibiting credit repair services from requesting or receiving

payment prior to demonstrating results fits the problem of credit repair companies

taking payment in advance but failing to deliver results.

### G. Heath's Seventeenth Defense should be dismissed because Heath's credit repair services are not exempt from Section 310.4(a)(2)'s requirements.

Heath's Seventeenth Defense[11] asserts that the Bureau's claims "are barred

or limited," because they would "disrupt, substantially change, and undo existing

lawyer-client relationships" and "existing contracts," thereby purportedly injuring

consumers. But, as Heath itself admitted in open court, its provision "of credit

counseling services does not constitute the practice of law." *Lexington Law Firm v.

S.C. Dep't of Consumer Affairs*, 677 S.E.2d 591, 595 (S.C. 2009). And conduct

that violates the TSR is, by definition, unlawful—whether or not it is carried out

pursuant to a contract.  The Seventeenth Defense asserts no cognizable defense: it

merely posits that the relief Congress authorized for a proven TSR violation injures

---

[11] Progrexion has not expressly asserted this defense, but their Seventeenth Defense purports to incorporate all of Heath's defenses.

consumers. Even if this were true, which it is not, it would be insufficient to defeat the Bureau's claims. *See Estate of Golz*, 2018 WL 4090866, at *3 ("An 'affirmative defense' is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim'") (quoting Black's Law Dictionary (10th ed. 2014)) (alteration in original).

Thus, the Bureau is entitled to judgment as a matter of law on this legally invalid, factually unsupported defense.

## CONCLUSION

The undisputed record evidence, taken as a whole, precludes any rational trier of fact from finding in Defendants' favor on Count I. Rather, the evidentiary record and governing law entitle the Bureau to summary judgment on that Count.

Likewise, no genuinely triable issue exists regarding Heath's Second, Third, Fifth, Sixth, Ninth, Eleventh, Fifteenth, and Seventeenth, and Progrexion's Second, Third, Fifth, Sixth, Tenth, Twelfth, and Thirteenth Affirmative Defenses. The Bureau is entitled to summary judgment on those defenses as a matter of law.

The Court should grant summary judgment on Count I against all Defendants for violating Section 310.4(a)(2) during the period March 8, 2016 to the present.

Dated: December 10, 2021               Respectfully submitted,

/s/ Maureen McOwen
MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov

*Attorneys for Plaintiff Bureau of*
*Consumer Financial Protection*

43

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above motion and memorandum in support complies with the word-count limit of 12,400 words set by DUCivR 7-1(a)(4)(B), according to the word count function of Microsoft Word, excluding the face sheet, table of contents, table of authorities, signature block, and exhibits.

Dated: December 10, 2021

/s/ Maureen McOwen
MAUREEN MCOWEN
*Enforcement Attorney*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov