Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELE-SERVICES, INC.; EFOLKS, LLC; CREDIT-REPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I AND CERTAIN AFFIRMATIVE DEFENSES** |

# TABLE OF CONTENTS


INTRODUCTION .......... 1

REGULATORY BACKGROUND .......... 2

RESPONSE TO THE BUREAU'S REGULATORY BACKGROUND .......... 5

RESPONSE TO THE BUREAU'S STATEMENT OF UNDISPUTED MATERIAL FACTS .... 7

STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS .......... 13

LAW AND ARGUMENT .......... 22

I. Legal Standard .......... 22

II. The AFP does not cover all credit repair services; it covers those that promise to achieve results with respect to credit history. .......... 22

A. Defendants did not "promise results," so the six-month waiting period does not apply. .......... 22

B. The Bureau's "time frame" argument is baseless and unsupported by record evidence. .......... 23

III. The Bureau has offered no valid basis for extinguishing Defendants' affirmative defenses. .......... 26

A. The Third Defense should be allowed because, at a minimum, it limits the Bureau's recovery .......... 26

B. Defendants did not have fair notice of the Bureau's reading of the TSR, making Heath's Ninth Defense and Progrexion's Tenth Defense appropriate. .......... 29

C. Heath's Eleventh Defense and Progrexion's Twelfth Defense is valid because, had FTC attempted to advance the Bureau's atextual reading of the AFP, it would not have been sustained under the "arbitrary or capricious" standard. .......... 31

D. Because the Bureau's interpretation of the AFP would violate the First Amendment, Heath's Fifteenth Defense and Progrexion's Thirteenth Defense should be allowed. .......... 36

E. The Second Defense is valid because CROA would be unnecessary if the Bureau's interpretation of the AFP were correct. .......... 38

F. The Fifth and Sixth Defenses are proper to the extent that the Bureau seeks excessive recovery. .......... 40

CONCLUSION .......... 42

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Am. Wrecking Corp. v. Sec'y of Lab.*,
351 F.3d 1254 (D.C. Cir. 2003) ....................27

*Aptive Env't, LLC v. Town of Castle Rock*,
959 F.3d 961 (10th Cir. 2020) ....................36, 37

*Barnhart v. Walton*,
535 U.S. 212 (2002)....................33

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) ....................37

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................37

*CFPB v. CashCall, Inc.*,
No. 15-cv-07522, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018)....................41

*CFPB v. Commonwealth Equity Group, LLC*,
--- F. Supp. 3d ----, 2021 WL 3516690 (D. Mass. Aug. 10, 2021)....................31, 39

*CFPB v. IrvineWebWorks, Inc.*,
No. 14-cv-1967, 2016 WL 1056662 (C.D. Cal. Feb. 5, 2016) ....................31

*CFPB v. Prime Marketing Holdings, LLC*,
No. 16-cv-07111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ....................25, 39

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012)....................29, 30

*Consumer Union of U.S., Inc. v. FTC*,
801 F.2d 417 (D.C. Cir. 1986) ....................35

*DuCharme v. Heath*,
No. 10-02763, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010)....................5, 6, 24, 39

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017)....................41

*Liu v. SEC*,
140 S. Ct. 1936 (2020) ....................................................................................................41

*Mayo Found. for Med. Educ. & Rsch. v. United States*,
562 U.S. 44 (2011) ..........................................................................................................32

*Morton v. Mancari*,
417 U.S. 535 (1974) ..................................................................................................38, 40

*Nat'l Fed. of the Blind v. FTC*,
420 F.3d 331 (4th Cir. 2005) ..........................................................................................36

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016) ............................................................................................30

*Strong as Tr. of Consol. Legacy Debtors Liquidating Tr. v. Cochran*,
No. 14-cv-788, 2019 WL 7290835 (D. Utah. Dec. 30, 2019) ......................................22, 40

*Taylor v. Quality Hyundai, Inc.*,
150 F.3d 689 (7th Cir. 1998) ..........................................................................................38

*Tennessee v. Lexington Law Firms*,
No. 96-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997) .......................................27, 28

*Thomas v. Oreck Vacuums*,
No. 09-cv-737, 2010 WL 2868844 (D. Utah July 20, 2010) .............................................22

*United States v. Dish Network LLC*,
954 F.3d 970 (7th Cir. 2020) ......................................................................................30, 31

*United States v. Larionoff*,
431 U.S. 864 (1977) ........................................................................................................39

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) ........................................................................................37

*Usery v. Kennecott Copper Corp.*,
577 F.2d 1113 (10th Cir. 1977) ......................................................................................34

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*,
471 U.S. 626 (1985) ........................................................................................................37

**STATUTES, REGULATIONS, AND RULES**

12 U.S.C. § 5565(c)(2)(B) ....................27

12 U.S.C. § 5565(c)(2)(C) ....................27

15 U.S.C. § 1679 ....................38, 39

15 U.S.C. § 1679b ....................5

15 U.S.C. § 6102(a)(1) ....................2

16 C.F.R. § 310 ....................8, 11

16 C.F.R. § 310.4(a)(2) ....................2, 3, 25, 26

16 C.F.R. § 310.4(a)(3) ....................6

**LEGISLATIVE AND REGULATORY HISTORY**

*Oversight of Telemarketing Practices and the Credit Repair Organizations Act: Hrg. Before the S. Comm. Com., Sci. & Transp.*, 110th Cong. 110-1170 (July 31, 2007) ....................5

60 Fed. Reg. 8,313 (Feb. 14, 1995) ....................34

60 Fed. Reg. 43,842 (Aug. 23, 1995) .................... *passim*

67 Fed. Reg. 4,492 (Jan. 30, 2002) .................... *passim*

74 Fed. Reg. 41,988 (Aug. 19, 2009) ....................5

**OTHER AUTHORITIES**

CFPB, *How Do I Dispute an Error on My Credit Report?*, (last reviewed Oct. 19, 2021), https://www.consumerfinance.gov/ask-cfpb/how-do-i-dispute-an-error-on-my-credit-report-en-314/ ....................35

FTC, *Complying With the Telemarketing Sales Rule* (June 2016, last updated Aug. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair ....................3

## INTRODUCTION

Plaintiff Consumer Financial Protection Bureau ("Bureau") moves for judgment against all Defendants on Count I ("Bureau Mot."). Despite styling this as a new motion for summary judgment, the Bureau offers little more on Count I than what it has already said in response (ECF No. 232) to Heath's motion (ECF No. 171). The Bureau provides no new material evidence, or any new meaningful arguments to support its interpretation of the Telemarketing Sales Rule's (TSR) Advance Fee Provision ("AFP" or "Provision"). The only new matter on Count I that the Bureau offers is an argument that Defendants failed to wait until the "time frame" for providing services expired before collecting payment from their clients and members. That argument lacks legal support, and is easily disposed of because it only applies when a credit repair organization "promised results," and Defendants made no such promises. Even if the AFP applied, both Heath and CreditRepair.com do specify a "time frame" of one month for enumerated services and wait to collect payment until that time period has passed and services have been rendered.

In addition to repeating its Count I arguments, the Bureau also prematurely seeks to challenge eight of Defendants' affirmative defenses—in particular, Heath's Second, Third, Fifth, Sixth, Ninth, Eleventh, Fifteenth, and Seventeenth Defenses.[1] To be clear, extinguishing these defenses would not entitle the Bureau to summary judgment on Count I or any other claim for relief. Moreover, as Defendants demonstrate below, each of these defenses is well-founded in both fact and law—though many are necessary only if this Court were to accept the Bureau's atextual and ahistorical reading of the AFP.

---

[1] The Bureau also seeks to extinguish the Progrexion Defendants' corresponding defenses—the Second, Third, Fifth, Sixth, Tenth, Twelfth, and Thirteenth Affirmative Defenses.

Accordingly, this Court should deny the Bureau's motion for summary judgment.

## REGULATORY BACKGROUND

Count I of the Bureau's Complaint alleges a violation of the TSR's AFP, 16 C.F.R. § 310.4(a)(2). The Federal Trade Commission (FTC) promulgated the TSR to carry out the Telemarketing and Consumer Fraud and Abuse Prevention Act's mandate to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1) ("Telemarketing Act").

The AFP restricts asking for, or receiving, payment for certain credit repair services for "promised results." Specifically, the Rule says, in pertinent part:

> (a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> . . .
>
>> (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
>>
>>> (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and
>>>
>>> (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681 [FCRA], that a consumer report may only be obtained for a specified permissible purpose.

16 C.F.R. § 310.4(a)(2)(i)-(ii).

The requirement to show that "promised results" had been achieved six months later arose because of fraudulent schemes perpetrated by "fundamentally bogus" entities holding themselves out as credit repair companies. FTC's commentary on this requirement noted that the Provision was intended to target "deceptive credit repair services," *i.e.*, which "promise consumers that, for a fee paid in advance, they will improve the consumer's credit record by removing negative information from that record." 60 Fed. Reg. 43,842, 43,853 (Aug. 23, 1995). FTC viewed such offerings as deceptive because "[o]nce the fee is paid," "the seller fails to deliver the promised services or achieve the promised results, and the consumer's credit record does not improve." *Id.* FTC's current guidance further explains the "bogus credit repair services" the Provision targets: a fraudster may claim to provide credit repair services and will give the appearance of providing effective services by "flooding a credit bureau with letters disputing the accuracy of [legitimate] negative entries," with the credit bureau temporarily removing the negative entries pending an investigation. FTC, *Complying With the Telemarketing Sales Rule*, (June 2016, last updated Aug. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair. Faced with so many challenges, the credit bureaus cannot complete the investigations within the statutorily required 30-day period, so they provisionally remove negative items. *Id.* Such temporary removal makes it seem as if the consumer's credit record has improved. *Id.* After the fraudster takes the consumer's money, the investigation is completed and the negative entries resurface (as there is no basis for their removal), and the fraudster will have achieved nothing for the consumer. *See id.* Heath and CreditRepair.com do not offer this "fundamentally bogus" "service," and the Bureau does not contend otherwise.

One entity commenting on the AFP, the United States Postal Inspection Service, shed additional light on the sort of credit repair services that FTC intended to target. The Service made clear that there was a need to distinguish "[s]o-called credit repair services" and "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer." Exhibit 71, USPIS, Comment Letter on Proposed Telemarketing Sales Rule (received Mar. 31, 1995), FTC File No. R411001. The "[s]o-called credit repair services" would usually provide mere "written advice to customers on how to obtain copies of their credit reports," and encourage customers to "falsely document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with other borrowed funds)," but do nothing else. *Id.*

In 2002, FTC revisited the AFP to further explain the Provision's rationale. FTC believed that the Provision served the aims of the Telemarketing Act and "consumer privacy" "less distinctly" than other prohibitions in the TSR. 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002). Thus, FTC determined that it was "appropriate and prudent" to place the AFP within "the purview of its traditional unfairness analysis," as provided by the Federal Trade Commission Act. *Id*. The restricted credit repair services, FTC reasoned, were "unfair" because the services targeted by the Provision had zero benefits to offer. *Id.* "An important characteristic common to credit repair" schemes prohibited by the TSR, "is that in each case the offered service is fundamentally bogus." *Id.* "[T]he essence of these schemes," the Commission reasoned, was "to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* In other words, the Provision was meant to prohibit unfair conduct by placing conditions on services that the Commission viewed as "outright theft." *Id.*

Shortly after FTC promulgated the TSR, Congress enacted the Credit Repair Organizations Act (CROA) in 1996, which set forth a statutory construct for legitimate credit repair services. CROA contains its own billing rule, stating that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). At least one court has held that, under CROA, credit repair organizations may bill customers for services already performed on a periodic basis. *DuCharme v. Heath*, No. 10-02763, 2010 WL 5211502, at *6 (N.D. Cal. Dec. 16, 2010). Congress subsequently considered whether to amend CROA to prohibit the practice of billing monthly in arrears (which Heath and CreditRepair.com do), but Congress did not enact any legislation on that issue. *Oversight of Telemarketing Practices and the Credit Repair Organizations Act: Hrg. Before the S. Comm. on Com., Sci. & Transp.,* 110th Cong. 110-1170, at 34 (July 31, 2007) (prepared statement of Joanne Faulkner, Attorney, Nat'l Ass'n of Consumer Advoc., Nat'l Consumer L. Ctr., U.S. PIRG, and Consumer Fed'n of Am.).

**RESPONSE TO THE BUREAU'S REGULATORY BACKGROUND**

The Bureau's recollection of the regulatory history is inaccurate and misleading in at least two key respects.

First, and perhaps most egregiously, the Bureau suggests that FTC called *all* credit repair services "a type of 'purported services that the Commission determined to be fundamentally bogus.'" Bureau Mot. 5 (quoting 67 Fed. Reg. at 4,512 n.181; 74 Fed. Reg. 41,988, 41,990 (Aug. 19, 2009)). But FTC made clear that it was targeting a specific type of business holding itself out to be a credit repair service, one where "the seller has no intention of providing [the promised

services]" and "in fact does not provide" them. 67 Fed. Reg. at 4,512. As the original rulemaking record demonstrates, the sort of credit repair services that FTC called "illusory," "fundamentally bogus," and tantamount to "outright theft," *id.*, are instances where "[o]nce the fee is paid," "the seller fails to deliver the promised services or achieve the promised results, and the consumer's credit record does not improve." 60 Fed. Reg. at 43,853. FTC never intended to paint *all* credit repair services, including those that make no promises, together with the same brush. Rather, it was targeting only a specific species of providers who held themselves out as credit repair services with false promises. *See* Exhibit 71, USPIS Comment, at 12. Indeed, it would make no sense if FTC concluded that *all* credit repair was abusive, only for Congress to pass legislation recognizing the industry as legitimate the very next year.

Second, there is absolutely no indication in the rulemaking record that FTC intended for the AFP to operate "like a contingency fee arrangement." Bureau Mot. 4. In support of this observation, the Bureau cites rulemaking materials from years after the initial promulgation of the AFP, which discussed multiple TSR provisions at once—including a TSR provision that expressly requires "delivery and proof" of recovery services rendered, and the AFP, which does not. *See* 16 C.F.R. § 310.4(a)(3) (forbidding request of payment for recovery services "until seven (7) business days after such money or other item is *delivered to that person*" (emphasis added)). The Bureau seeks to do too much with the FTC's isolated, post-hoc paraphrasing of five different rules. The Bureau does not explain why there is no discussion of the Provision as a "contingency fee" if that is what FTC intended when it implemented the rule. *See DuCharme*, 2010 WL 5211502, at *5 ("If this was indeed Congress's intent in drafting CROA, nothing prevented Congress from declaring that credit repair organizations could only be paid on a contingent basis.")

**RESPONSE TO THE BUREAU'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Defendants' Identities and Roles**

8. In connection with the sale of Lexington Law and CreditRepair.com credit repair services, eFolks provides telemarketing services to Progrexion.

**Response:** Disputed. eFolks provides lead generation services to Progrexion Teleservices and CreditRepair.com. CFPB Ex. 36, eFolks Dep. 23:1-13.

**Defendants Are Telemarketers and Sellers**

9. Progrexion and Heath market and sell Lexington Law credit repair services over the telephone, through inbound and outbound interstate telephone calls.

**Response:** Disputed. eFolks contracts to generate leads for Progrexion Teleservices, which markets Heath's services through inbound and outbound interstate telephone calls. CFPB Ex. 1, 19:9-12, 129:20-24; CFPB Ex. 3, Teleservices Dep. 41:24-42:22, 52:5-13; CFPB Ex. 20, PGX0048433; CFPB Ex. 36, eFolks Dep. 23:1-13, 128:9-15, 183:7-18. In limited instances, Heath will enroll or re-enroll current or returning clients by telephone.

**Facts 10, 12, and 14** are undisputed, except to the extent they vaguely refer to "Progrexion" rather than specific entities.

**Lexington Law Credit Repair Services**

16. Heath's credit repair services are marketed as services to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating.

**Response:** Disputed. Heath markets its services as ones that "*assist* consumers in removing derogatory information from, or improving, [their] credit history, credit record, or credit rating." ECF No. 2, Compl. ¶ 111; ECF No. 65, Heath Answer ¶ 111. Heath has a policy and practice of

informing all clients that it cannot guarantee the removal of negative items. Exhibit 1, Heath Decl. ¶¶ 22-26;[2] Exhibit 3, PGX Compliance Training, PGX0002677, 89, 92.

18. Progrexion markets Lexington Law as "the industry leaders in credit repair."

**Response**: Disputed as the statement vaguely refers to "Progrexion" rather than a specific entity.

19. On its website, Lexington Law claims that "[s]tatistically, 89% of Past Lexington Law clients who saw a credit score increase had an average increase of 40 points in six months." Ex. 24, DelPonti0000357. Another page of Lexington Law's website states "Our results speak for themselves. Past clients have seen an average credit score increase of 40 points in just four months of service."

**Response:** Disputed. The quotation to Exhibit 24 inaccurately and misleadingly omits the linked disclaimer explaining the average score improvement calculation. CFPB Ex. 24, Del-Ponti0000357. Fact 19 is also immaterial because accurate statements about past results do not constitute a promise under the AFP. 16 C.F.R. § 310; *see also* Exhibit 1, Heath Decl. ¶¶ 30-31; Exhibit 4, Compliance Program Framework and Overview, LEX0008778, 83.

20. Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in Heath's credit repair services.

**Response:** Disputed. Clients are not required to purchase their TransUnion credit report for all products or in all circumstances. CFPB Ex. 1, 120:4-9.

21. After signup, Heath charges customers an initial work fee, also dubbed a Service Interval Fee. The initial work fee is typically between $79.95 and $119.95. It is typically charged 5 to 15 days after the customer signs up.

**Response:** Disputed. The initial work fee is not charged for certain returning clients. Exhibit 1-2, Engagement Agreement LEX0000540, 53.

22. Heath charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level and is typically $79.95 to $119.95 for the company's "Tier 1" credit

[2] Exhibit 2, the December 6, 2021 Declaration of John C. Heath, affirms the substance of his prior declaration, Exhibit 1, and that all of its contents were based on his personal knowledge.

repair services and $19.95 to $59.95 for the company's lower-tier credit repair services. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires.

**Response:** Disputed. The cost for one month of services depends on the amount of work Heath agrees to perform in that one month period. CFPB Ex. 2, Service Matrix; CFPB Ex. 11, LEX0000423-25. Heath does not charge a full monthly fee after a client suspends or cancels. Exhibit 1-2, Engagement Agreement, LEX0000540, 53.

23. Heath does not set a time frame in which all of the services will be provided to a customer.

**Response**: Fact 23 is vague and ambiguous. Undisputed to the extent that "time frame in which all of the services will be provided to a customer" refers to the relationship between Heath and the client—clients determine whether they want additional services from Heath. Otherwise disputed. Heath sets a one-month time frame for its services, defines the scope of work to be performed over that month based on the client's chosen service level, and only bills after services are performed. CFPB Ex. 1, 122:18-124:10; CFPB Ex. 11, LEX0000426; CFPB Ex. 2, Service Matrix. For example, for one month, Heath sends up to: (1) twenty-four credit bureau challenges (eight per bureau) and six creditor interventions at the Premier Plus level; and (2) eighteen credit bureau challenges (six per bureau) and three creditor interventions at the Concord Premier and Concord Standard service levels. CFPB Ex. 2. If the client does not cancel, or if the client cancels and later renews the relationship, Heath again undertakes another month of services and bills only after completing services. CFPB Ex. 25, Response to RFA 4. Clients may cancel services at any time. CFPB Ex. 11, LEX0000426. Heath and its clients do not agree at the outset to provide a greater scope of services or services over a greater time period than one month. CFPB Ex. 25, Response

to RFA 4; CFPB Ex. 11, LEX0000427-28. Heath does not (and cannot) provide a time frame in which results will be achieved. Exhibit 5, Compliance Policy, PGX0005842, 44.

24. Heath charges consumers without waiting at least six months.

**Response:** Disputed as vague. Heath charges fees in arrears after performing services. In certain cases: (1) it charges fees more than six months after clients have seen results; or (2) more than six months after Heath provided a report demonstrating results. CFPB Ex. 1, 122:18-124:10; Exhibit 6, DelPonti Rebuttal Report at 25 (showing 465,945 clients with seven or more months of tenure); CFPB Ex. 2, Service Matrix; Exhibit 4, Compliance Program Framework and Overview, LEX0008778, 89; CFPB Ex. 25, Response to RFA 4.

25. Heath charges consumers before Heath has provided a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved.

**Response:** Disputed for the reasons stated in Response 24.

**CreditRepair.com Credit Repair Services**

27. CreditRepair.com's credit repair services are marketed as services to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating.

**Response:** Disputed. CreditRepair.com markets its services as ones that "*assist* consumers in removing derogatory information from, or improving, [their] credit history, credit record, or credit rating." ECF No. 2, Compl. ¶ 111; ECF No. 65, Progrexion Answer ¶ 111.

28. According to CreditRepair.com's website, "Credit repair is used by those who want to improve their credit score by removing and correcting negative or inaccurate items on their credit reports… [A] credit repair professional, like CreditRepair.com, is trained to use all the tools allowable by law to get the bureaus to remove and correct negative or inaccurate items on your credit report quickly (for a monthly fee)." Ex. 28, PGX0027706.

**Response:** Disputed. The quotation in Fact 28 misleadingly omits the full text of the website, including a statement that consumers can do credit repair themselves.

29. CreditRepair.com's credit repair services are marketed as having increased past members' credit scores "40 points in 4 months." Ex. 29, PGX0040984 at PGX0041063. CreditRepair.com advertises that "Our Members Average 11.6 Removals in Just 4 Months. Call and Learn More!"

**Response:** Disputed. Plaintiff's quotation from Exhibit 29 inaccurately and misleadingly omits the linked disclaimer explaining the average score improvement calculation. CFPB Ex. 29, PGX0040984._Fact 29 is also immaterial because accurate statements about past results do not constitute a promise under the AFP. 16 C.F.R. § 310; *see also* Exhibit 7, Hamilton Dep. 70:22-71:22; Exhibit 8, Compliance Program, PGX0049202, 07.

30. Consumers must agree to pay a fee of about $13 to $15 to Progrexion to obtain their TransUnion credit report as a prerequisite to enrolling in CreditRepair.com's credit repair services.

**Response:** Disputed. Members are not required to purchase their TransUnion credit report for all products or in all circumstances. CFPB Ex. 26, Service Feature Matrix; Exhibit 9, Hamilton Decl. ¶ 9.

31. After signup, CreditRepair.com charges customers an initial work fee, also dubbed a Service Interval fee. The initial work fee is typically between $59.95 and $119.95. It is typically charged 5 to 15 days after the customer signs up.

**Response:** Disputed. The initial work fee is typically between $99.95 and $119.95. CFPB Ex. 26, Service Matrix. The initial work fee is not charged for certain returning clients. Exhibit 10, Louisiana Agreement, PGX0047487, 99.

32. CreditRepair.com charges customers a monthly service fee. The amount of the monthly fee varies depending on the service level. It is typically $99.95 to $119.95 for the company's "Tier 1" credit repair services and $24.95 to $59.95 for the company's lower-tier credit repair services. The monthly fee is typically charged every month until after the customer cancels or, in some states that impose a time limitation, after the term of the customer's contract expires.

**Response:** Disputed. The cost for one month of services depends on the amount of work CreditRepair.com agrees to perform in that one month period. Exhibit 10, Louisiana Agreement, PGX0047487, 99-500.

33. CreditRepair.com does not set a time frame in which all of the services will be provided to a customer.

**Response:** Fact 33 is vague and ambiguous. Undisputed to the extent that "time frame in which all of the services will be provided to a customer" refers to the relationship between CreditRepair.com and its members—members determine whether they want additional services from CreditRepair.com. Otherwise disputed. CreditRepair.com sets a one-month time frame for its services, defines the scope of work to be performed over that month based on the member's chosen service level, and only bills after services are performed. CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Exhibit 10, Louisiana Agreement, PGX0047487, 99; CFPB Ex. 26, Service Matrix. For example, for one month, CreditRepair.com sends up to: (1) twenty-four credit bureau challenges (eight per bureau) and six creditor interventions at the Advanced level; (2) eighteen credit bureau challenges (six per bureau) and three creditor interventions at the Standard level; and (3) twelve credit bureau challenges (four per bureau) and two creditor interventions at the Value level. CFPB Ex. 26, Service Matrix. If the member does not cancel, or if the member cancels and later renews the relationship, CreditRepair.com again undertakes another month of services and will bill only after its commitment to perform services are completed. CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Exhibit 10, Louisisana Agreement, PGX0047487, 99. Members may cancel services at any time. Exhibit 10, Louisiana Agreement, PGX0047487, 501. CreditRepair.com and its members do not agree at the outset to provide a greater scope of services or services over a greater time period than one month. CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Exhibit 10, Louisiana Agreement, PGX0047487, 499-502; CFPB Ex. 32, PGX0047444, 458-59. CreditRepair.com does not (and cannot) provide a time frame in which results will be achieved. Exhibit 5, Compliance Policy, PGX0005842, 44.

34. CreditRepair.com charges consumers without waiting at least six months.

**Response:** Disputed. CreditRepair.com charges fees in arrears after performing services, and in certain cases more than six months after clients have seen results. CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Exhibit 6, DelPonti Rebuttal Report at 26 (showing 72,462 members with seven or more months of tenure).

35. CreditRepair.com charges consumers before Heath has provided a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved.

**Response:** Disputed. The cited evidence does not support that Heath provides consumer reports to CreditRepair.com members.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### Heath's Policies and Practices Prohibit Promises or Guarantees of Results

1. Heath's policies expressly prohibit making promises of results. Exhibit 5, Compliance Policy, PGX0005842, 42, 44; Exhibit 11, Lexington Legal Style Guide, PGX.CFPB.00001762, 77-78, 80-83; Exhibit 12, Compliance Training, CTRL_LEX00000144, 45-47; Exhibit 13, Hankins Dep. 80:16-81:2; Exhibit 14, Nickl Dep. 174:4-11; Exhibit 15, Beal Dep. 141:21-142:14; Exhibit 4, Compliance Program Framework, LEX0008778, 88; Exhibit 16, Telemarketing Scripting Policy, PGX0049305, 08.

2. Call center representatives selling Heath's services are trained not to promise results. Exhibit 17, eFolks Compliance Training, PGX.CFPB.00002635, 54; Exhibit 12, Compliance Training, CTRL_LEX00000144, 48, 52-55; Exhibit 18, Progrexion Compliance Training, PGX.CFPB.00001948, 74-80; Exhibit 14, Nickl Dep. 24:14-25:8; Exhibit 19, Regulatory Compliance, LEX0001561; Exhibit 20, Compliance Class, LEX0001652; Exhibit 21, Guarantees,

LEX0001756; Exhibit 22, Compliance: Guarantees and Implied Guarantees, PGX0000347; Exhibit 23, Compliant Conversation, LEX0001919.

3. Such training is given to all new call center hires. Exhibit 24, Etherington Dep. 88:25-89:4; Exhibit 25, Kealamakia Dep. 58:4-22.

4. Call center representatives also undergo continuing training, including on Heath's prohibition on making promises of results. Exhibit 14, Nickl Dep. 167:10-15; Exhibit 24, Etherington Dep. 89:5-90:7; Exhibit 25, Kealamakia Dep. 58:23-59:25, 96:3-97:3; Exhibit 26, Q-Tips LLF – Guarantees – Positive Outcome, PGX0005831; Exhibit 27, Q-Tips LLF – Guarantees – Time Frame, PGX0005833; Exhibit 28, Q-Tips LLF – Guarantees – Item Removals, PGX0005826.

5. Heath and the Progrexion Company Defendants actively enforce the prohibition on making promises of results by, among other things, monitoring calls. Exhibit 24, Etherington Dep. 71:22-72:18; 126:21-127:12; Exhibit 8, Compliance Program, PGX0049202, 11; Exhibit 29, Quality Assurance & Call Evaluation Process, PGX0005840.

6. Progrexion Marketing employees are also trained on compliance with Heath's policies and applicable laws. Exhibit 13, Hankins Dep. 60:23-61:23; 209:13-210:19; Exhibit 15, Beal Dep. 242:3-244:24; Exhibit 24, Etherington Dep. 46:4-48:12.

7. Heath trains its paralegals to comply with its policies prohibiting guarantees and applicable laws. Exhibit 19, Regulatory Compliance, LEX0001561; Exhibit 30, Regulatory Compliance v2, LEX0001548; Exhibit 31, Service Guarantees, LEX0001546; Exhibit 32, Service Guarantees Job Aid, LEX0001549.

8. The scripts used by telemarketing agents state that Heath does not guarantee or promise results. Exhibit 33, Master Script, PGX0060515, 41; CFPB Ex. 39, Heath Interrogatory

Responses, No. 16; Exhibit 1, Heath Decl. ¶¶ 22-23; Exhibit 1-1, Script, PGX0028796, 818; Exhibit 34, Script, PGX0028460, 91; Exhibit 35, Script, PGX0060542, 67; CFPB Ex. 9, PGX0028741, 54. Agents are required to read these disclosures verbatim. Exhibit 1, Heath Decl. ¶ 24; Exhibit 35, Script, PGX0060542, 67; CFPB Ex. 9, PGX0028741, 54; Exhibit 25, Kealamakia Dep. 123:24-124:12; Exhibit 3, PGX Compliance Training, PGX0002677, 89, 92.

9. Every client signs an engagement agreement with Heath. Exhibit 4, Compliance Program Framework and Overview, LEX0008778, 89; Exhibit 1, Heath Decl. ¶ 25; *see also* Exhibit 1-2, Engagement Agreement, LEX0000540. That agreement states: "[Heath] cannot guarantee and you are not paying for a particular credit report outcome or result." Exhibit 1, Heath Decl. ¶ 25; Exhibit 1-2, Engagement Agreement, LEX0000540. Each client represents that they "understand and acknowledge that [they] are not paying for, and that [Heath] does not make, any representation, warranty, promise or guarantee as to any particular outcome or result." Exhibit 1, Heath Decl. ¶ 25; Exhibit 1-2, Engagement Agreement, LEX0000540.

**CreditRepair.com's Policies and Practices Prohibit Promises or Guarantees of Results**

10. CreditRepair.com's policies prohibit making promises of results. Exhibit 36, CreditRepair.com Substantiated Claims, PGX0005747, 49, 53; Exhibit 16, Telemarketing Scripting Policy, PGX0049305, 08.

11. Call center representatives selling CreditRepair.com's services are trained not to promise results. Exhibit 16, Telemarketing Scripting Policy, PGX0049305, 30; Exhibit 37, CR Compliance 101, PGX0000475; Exhibit 38, CR Compliance 102, PGX0002924; Exhibit 39, CR Compliance 104, PGX0000452.

12. Such training is given to all new call center hires. Exhibit 9, Hamilton Decl. ¶ 15.

13. Call center representatives also undergo continuing training, including on CreditRepair.com's prohibition on making promises of results. Exhibit 24, Etherington Dep. 89:5-90:7; Exhibit 40, Q-Tips CR.com – Guarantees – Positive Outcome, PGX0005830; Exhibit 41, Q-Tips CR.com – Guarantees – Score Increase, PGX0005832; Exhibit 42, Q-Tips CR.com – Guarantees – Time Frame, PGX0005834; Exhibit 43, Q-Tips CR.com – Guarantees – Item Removals, PGX0005829.

14. The Progrexion Company Defendants actively enforce CreditRepair.com's policies prohibiting promises or guarantees of results, by, among other things, call monitoring. Exhibit 8, Compliance Program, PGX0049202, 11; Exhibit 29, Quality Assurance & Call Evaluation Process, PGX0005840.

15. Progrexion Marketing employees are also trained on compliance with CreditRepair.com's policies and applicable laws. Exhibit 13, Hankins Dep. 60:23-61:23, 209:13-210:19; Exhibit 15, Beal Dep. 242:3-244:24; Exhibit 24, Etherington Dep. 46:4-48:12.

16. The scripts used by telemarketing agents state that CreditRepair.com does not promise results. Exhibit 9, Hamilton Decl. ¶ 18; Exhibit 9-1, Script, PGX0028674, 704; Exhibit 44, Script, PGX0028708, 30; CFPB Ex. 31, PGX0028638, 70. Agents are required to read these disclosures verbatim. Exhibit 9-1, Script PGX0028674, 704; Exhibit 44, Script, PGX0028708, 30; CFPB Ex. 31, PGX0028638, 70; Exhibit 45, CR Compliance 103, PGX0004079.

17. Every member signs an engagement agreement with CreditRepair.com. Exhibit 9, Hamilton Decl. ¶ 19; *see also* CFPB Ex. 31, PGX0028638, 53. That agreement states that: "CreditRepair.com cannot guarantee and you are not paying for a particular credit report outcome or result." Exhibit 9-2, Arkansas Agreement, PGX0047444, 46; Exhibit 46, California Agreement,

PGX0047465, 67; Exhibit 10, Louisiana Agreement, PGX0047487, 89. Each member represents that they "understand and acknowledge that [they] are not paying for, and that CreditRepair.com does not make, any representation, warranty, promise or guarantee as to any particular outcome or result." Exhibit 9-2, Arkansas Agreement, PGX0047444, 60; Exhibit 46, California Agreement, PGX0047465, 81; Exhibit 10, Louisiana Agreement, PGX0047487, 503.

**Heath and The Progrexion Company Defendants Acted in Good Faith, with a Reasonable Basis in Fact and Law**

18. Heath's predecessor was sued by the State of Tennessee for alleged violations of the AFP in 1996, and FTC intervened. Exhibit 47, *Tennessee* Complaint; Exhibit 48, Mem. of Points and Authorities in Support of Intervenor FTC's Motion for Partial (Summary Judgment at 6-7, *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn. Dec. 16, 1996) (the "*Tennessee* Action"). The *Tennessee* Action was resolved with a consent order ("*Tennessee* Consent Order") that allowed Heath's predecessor to "invoice and receive payments for specific work already performed, provided that [it] disclosed to the client the work that [it] will perform and the fee to be charged for such work in advance of performing such work, ***without providing any kind of promised results***." Exhibit 50-1, *Tennessee* Consent Order, 5 (emphasis added).

19. Based on their understanding of the law and the *Tennessee* Consent Order, Heath and the Progrexion Company Defendants understood that it is permissible to invoice customers in arrears on a monthly basis for work that the provider has completed, provided that, when offering their credit repair services to potential customers over the phone, they do not promise that the customer's credit will improve, or that negative information will be removed from the customer's credit report. Exhibit 50, Dec. 28, 2021 Heath Decl. ¶ 5.

20. Since the *Tennessee* Consent Order was entered, the State of Tennessee has not initiated an action or otherwise indicated that it believed Heath's billing practices were non-compliant with the Consent Order. *Id.* ¶ 8. Nor has FTC indicated that Heath's billing practices violated the Consent Order. *Id.* ¶ 9.

21. Heath and the Progrexion Company Defendants consistently sought to comply with applicable law and understood that Heath's billing practices were in compliance with governing laws. Exhibit 4, Compliance Program Framework and Overview, LEX0008778; Exhibit 8, Compliance Program, PGX0049202, 05; Exhibit 24, Etherington Dep. 45:4-8, 73:14-75:16, 127:2-12. Heath and the Progrexion Company Defendants understood that they were not subject to the Provision and were in compliance with CROA if they did not promise results and did not collect payment before services were rendered. Exhibit 50, Dec. 28, 2021 Heath Decl. ¶ 6. Exhibit 24, Etherington Dep. 127:2-12; Exhibit 25, Kealamakia Dep. 99:9-14; Exhibit 51, Payments and Fees, LEX0001821. Based on this understanding, Heath and the Progrexion Company Defendants trained call center representatives marketing or selling Heath's services and Heath's paralegals on compliance with the TSR, CROA, and other applicable laws. *See* Attachment A.

22. The Progrexion Company Defendants consistently sought to comply with applicable law and understood that CreditRepair.com's billing practices complied with governing laws. Exhibit 9, Hamilton Decl. ¶¶ 24-26; Exhibit 8, Compliance Program, PGX0049202, 05; Exhibit 24, Etherington Dep. 45:4-8, 73:14-75:16, 127:2-12. The Progrexion Company Defendants understood that they were not subject to the Provision and complied with CROA if they did not make promise or guarantee results and did not collect payment before rendering services. Exhibit 9, Hamilton Decl. ¶ 25; Exhibit 24, Etherington Dep. 127:2-12. Based on this understanding, the Progrexion

Defendants trained call center representatives marketing or selling CreditRepair.com's services on compliance with the TSR, CROA, and other applicable laws. *See* Attachment A.

23. In its discovery responses, the Bureau admits having offered no guidance that would have advised credit repair companies of its position that simply using the phone to offer "credit repair" triggers the Provision. Exhibit 49, CFPB Admission No. 2.

24. In deposition testimony, the Bureau identified "the *Tennessee* action" as the only fact supporting its allegation that Heath *knew* it violated the AFP. Exhibit 64, Kim Dep. 266:24-268:21.

**Delayed Billing Models & Benefits Conferred by Heath and CreditRepair.com**

25. Not all clients who sign up for Heath's credit repair end up paying for services. Exhibit 65-1, DelPonti Report ¶ 106. Heath's billing model allows it to determine (within 30 days of an invoice) whether a client will pay for its previously performed services. *Id.* ¶ 69. If the client does not pay the invoice, Heath attempts to collect payment for services rendered over a predetermined period of time. *Id.* ¶ 106. After 30 days of nonpayment, Heath generally discontinues providing services. *Id.*

26. A delayed billing model (including a contingency fee model) would require Heath to continue providing months' worth of services to many clients without knowing whether a client will pay. *Id.* ¶ 69. Heath would not be able to evaluate the collection risk amongst clients able and unable to pay for over six months. *Id.*

27. If Heath delayed accepting payments by so many months, it would render the use of the telephone financially unsustainable. *Id.* ¶ 83.

28. Clients benefit from and express satisfaction with Heath's services. Exhibit 66, DelPonti Supplemental Report at 9, tbl. 5; Exhibit 67, Ulzheimer Supplemental Report at 1-2;[3] Exhibit 68, Frederick Report at 80-82.[4] Over 87% of Heath's clients have at least 1 negative item removed. Exhibit 67, Ulzheimer Supplemental Report at 1-2, 4. On average, clients with no new negatives added to their credit reports during a tenure of at least seven months with Heath experienced a credit score increase of 45.5 points. Exhibit 66, DelPonti Supplemental Report ¶ 12, tbl. 5. Such benefits stick. Exhibit 73, Forte Report, LEX0004303, 23 (showing reinsertion rate of 0.0059% for data set of "nearly two million Removals" during two-month span in 2015); *see also* Exhibit 75-1, Ulzheimer Report at 21 ("Lexington Law clients rarely see removed items reinserted onto their credit reports.").

29. Not all members who sign up for CreditRepair.com's credit repair end up paying for services. Exhibit 7, Hamilton Dep. 129:17-130:16. CreditRepair.com's billing model allows it to determine (within 30 days of an invoice) whether a member will pay for its previously provided services. Exhibit 9, Hamilton Decl. ¶ 10. If the member does not pay the invoice, CreditRepair.com attempts to collect payment for services rendered over a predetermined period of time. *Id.* ¶ 11. After 30 days of nonpayment, CreditRepair.com generally discontinues providing services. *Id.* ¶ 12.

[3] DelPonti and Ulzheimer's analyses are supported by Defendants' underlying data, which is not included due to size, but is available at the Court's request. There is no dispute the calculations are correct. ECF No. 222, 10-12; ECF No. 224, 10-12.

[4] Defendants do not concede that Frederick's Report is admissible for purposes of trial. Rather, Defendants cite Frederick's report to highlight that the Bureau solicited evidence confirming that clients and members benefitted from Heath and CreditRepair.com's services.

30. A delayed billing model (including a contingency fee model) would require CreditRepair.com to continue providing months' worth of services to members without knowing whether a member will pay. *See generally* Exhibit 65-1, DelPonti Report ¶ 69. CreditRepair.com would not be able to evaluate the collection risk amongst members able and unable to pay for over six months. *Id.* ¶ 69.

31. If CreditRepair.com delayed accepting payments by a total of seven months, it would render the use of the telephone financially unsustainable. *See id.* ¶ 83.

32. Members benefit from and express satisfaction with CreditRepair.com's services. Exhibit 66, DelPonti Supplemental Report at 9-10, tbl. 6; Exhibit 67, Ulzheimer Supplemental Report at 1-2, 4; Exhibit 69, California Creative Report 2019, PGX0040805, 855. Over 91% of CreditRepair.com's members have at least 1 negative item removed. Exhibit 67, Ulzheimer Supplemental Report at 1-2, 4. On average, members with no new negatives added to their credit reports during a tenure of at least seven months with CreditRepair.com experienced a credit score increase of 46.9 points. Exhibit 66, DelPonti Supplemental Report ¶ 13, tbl. 6.

33. No credit repair company has established a viable telephone business model in which it waited six months before charging fees for its services. Exhibit 1, Heath Decl. ¶ 34; *see generally* Exhibit 65-1, DelPonti Report ¶ 57. Plaintiff are unable to identify—and refused discovery on—any credit repair company capable of operating under its interpretation of Section 310.4(a)(2). *See* ECF No. 119.

## LAW AND ARGUMENT

### I. Legal Standard

The relevant standard for granting summary judgment is well established. *See* Heath Mot. 17-18. As to affirmative defenses, first, the Bureau must show that "it is entitled to judgment as a matter of law on its claim" before any affirmative defenses may be extinguished. *Strong as Tr. of Consol. Legacy Debtors Liquidating Tr. v. Cochran*, No. 14-cv-788, 2019 WL 7290835, at *4-5 (D. Utah. Dec. 30, 2019). Second, an affirmative defense should not be extinguished at summary judgment so long as there is "some support in fact" to justify the defense. *Thomas v. Oreck Vacuums*, No. 09-cv-737, 2010 WL 2868844, at *3 (D. Utah July 20, 2010).

### II. The AFP does not cover all credit repair services; it covers those that promise to achieve results with respect to credit history.

#### A. Defendants did not "promise results," so the six-month waiting period does not apply.

The Bureau's interpretation of the AFP, one that would apply a six-month prohibition on any credit repair company that offers services over the telephone, is meritless. (*See* ECF No. 168). The interpretation is atextual: it requires this Court to read out the phrase "promised results" from the AFP. The interpretation is ahistorical: as explained above and in Heath's motion, the regulatory history shows that FTC intended to target a certain kind of service touting itself to be credit repair, one in which the seller promises illusory results, only to scamper with the buyer's payment once made. The interpretation is *ultra vires*: the analysis that FTC undertook to justify the AFP may be enough to sustain a narrower interpretation of the AFP—one that goes after "bogus" credit repair providers—but not the Bureau's interpretation, which goes after legitimate and illegitimate

credit repair providers alike. And, as discussed below, the Bureau's interpretation would render the AFP unconstitutional under the First Amendment, and thus should be avoided.

There is no dispute of material fact that Defendants had a policy and practice of not offering promised results. Additional Undisputed Material Facts ("AUMF") 1-24; Reply in Support of Heath, P.C.'s Motion for Summary Judgment on Count I ("Heath Reply") ECF No. 249, at 27-30. After seven years of investigation, the Bureau rests its claim on six isolated instances where a client *may* have believed that Defendants would achieve a certain result for that client. (And even in those six instances, there is, at minimum, a genuine dispute of material fact.)

**B. The Bureau's "time frame" argument is baseless and unsupported by record evidence.**

Without a shred of authority, the Bureau claims (at 22-23) that Defendants must determine the total months of services that a client might want over their lifetime in order to give the "time frame in which all of the goods or services will be provided." They advance the entirely novel claim that the AFP prohibits credit repair services from offering services and billing on a monthly basis. No court has ever adopted this novel, implausible reading of the AFP in its 25-year history.

Fundamentally, this contention is wrong because the AFP only applies to entities that offer "promised results." Therefore, this Court need not decide the Bureau's implausible reading of the requirement that a company must estimate all credit services that will be provided over a consumer's lifetime before charging any fees.

But even assuming the AFP applies to Defendants, the Bureau is not entitled to summary judgment. As FTC explains, to the extent there is any ambiguity as to the relevant "time frame," the trier of fact should look to "the longest time frame represented." 60 Fed. Reg. at 43,853 n.117. The "longest time frame represented" is one month—Heath and CreditRepair.com define the scope

of work to be performed over that month and only bill after those services have been performed. Response to Facts 23, 33. The scope of work is defined in terms of the specific credit repair actions that may be taken in each month—for example, at the highest service levels, Heath and CreditRepair.com will send up to twenty-four credit bureau challenges and six creditor interventions. *Id*. The represented services (*i.e*., the specified number of challenges and interventions) that Heath and CreditRepair.com render to their clients and members occur within a month; once "all of the goods or services" in the month-long span have been provided, and the month has passed, Heath and CreditRepair.com may collect for the services rendered in that month. *DuCharme*, 2010 WL 5211502, at *5 (finding it "hard pressed to see what is wrong with defining those 'specific services' as a month's worth of work").

There are three troubling aspects of the Bureau's baseless "time frame" argument. First, Heath and CreditRepair.com agree to provide their clients and members one month of services. Customers may continue that relationship for an additional month by not canceling the service, or, if they have cancelled, by renewing the service. They are free to terminate services at any time. Response to Facts 23, 33. The Bureau's position seems to be that a credit repair company may not offer one month's worth of services unless it commits to never provide any additional services. There is no support in the regulatory history for such an unusual requirement, which would prohibit providing services monthly.

Second, and perhaps more troublingly, the Bureau seeks to impose liability for conduct explicitly blessed by another court: collecting payment in arrears for a month's services already rendered. The Bureau repeatedly says Defendants should have been on notice of their alleged wrongful conduct because it was the sort of conduct complained-of in *Tennessee v. Lexington Law*

*Firms*, No. 3:96-0344 (M.D. Tenn.). Bureau Mot. 5, 26, 28, 33, 37. As noted below, that is wholly inaccurate. *See* pp. 27-28, *infra*. Indeed, the *resolution* of that case permitted Heath's predecessor to "invoice and receive payments for specific work already performed, provided that the Defendant has disclosed to the client the work that the Defendant will perform and the fee to be charged for such work in advance of performing such work, without providing any kind of promised results." AUMF 18. That is precisely what Defendants are doing now. If the AFP's time frame provision, 16 C.F.R. § 310.4(a)(2)(i), prohibited providing and billing for services in arrears one month at a time—the agreed-upon arrangement would have been impermissible. Yet FTC, as an intervenor, never objected to settlement.

The Bureau says (at 22 n.5) the court in *CFPB v. Prime Marketing Holdings, LLC*, No. 16-cv-07111, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016), suggested that "conduct virtually identical to Defendants' here" could constitute a violation of the AFP. But in *Prime Marketing*, "Defendant raise[d] ***no arguments*** specifically attacking the adequacy of" the Bureau's AFP claim in that case. 2016 WL 10516097, at *7. Rather, the defendant merely argued that the Bureau's complaint was too vague to proceed, and the court responded by noting that there were specific allegations on how fees were charged. *Id.*

Finally, the Bureau's suggestion (at 22-23) that the "time frame requirement" exists to prevent credit-repair operators from "string[ing] along consumers for months and months" is entirely baseless, as evidenced by the Bureau's lack of cited authority. Rather, the regulatory history makes clear that FTC intended to target "one and done" credit-repair scams where individuals would pay up-front for the illusory promise of credit repair, only for the seller to disappear with the proceeds once payment is made. 60 Fed. Reg. at 43,853 ("Once the fee is paid, however, the seller fails to

deliver . . ."). Indeed, the enforcement actions that FTC pursued under section 5 of the FTC Act prior to promulgating the AFP confirm this: FTC targeted prepaid credit repair offerings where the provider offered a "money back guarantee" that was never actually honored. *See* Exhibit 48, at 23-26 (consent-decree digests for three pre-AFP cases).

For these reasons, the Bureau is not entitled to summary judgment on the supposed basis that Defendants collected fees before the relevant time frame expired under 16 C.F.R. § 310.4(a)(2)(i).

## III. The Bureau has offered no valid basis for extinguishing Defendants' affirmative defenses.

The Bureau's request to extinguish eight of Defendants' affirmative defenses should be rejected for four reasons. First, as explained above and in Heath's motion, the Bureau is wrong about its interpretation of the AFP, and therefore cannot prevail on Count I. Second, to the extent that any affirmative defenses have been asserted regarding the Bureau's recovery, determining the necessity of, and facts supporting, those defenses is premature. Third, to the extent that the Bureau seeks to extinguish defenses that apply to multiple counts (*e.g.*, Fifth, Sixth, and Heath's Seventeenth defenses), the Bureau has not established that it is entitled to judgment on those other counts, and thus, any discussion of those defenses is premature. Finally, as discussed below, the Bureau's legal arguments on Defendants' affirmative defenses are wrong.

### A. The Third Defense should be allowed because, at a minimum, it limits the Bureau's recovery.

The Third Defense of Defendants' respective Answers states that the Bureau's "claims and recovery under Count I are barred, or limited" because Defendants undertook "acts or omissions… in good faith, with a reasonable basis in fact and/or law." ECF No. 8. The Bureau seeks to

extinguish that defense because "[n]either the Telemarketing Act, the TSR, nor the CFPA contains a general mistake-of-law defense." Bureau Mot. 27.

But whether Defendants had a "reasonable basis in fact and/or law" is indisputably germane to determining the *scope* of the Bureau's "recovery," so the Bureau's motion must be denied. For example, the Bureau seeks "civil money penalties." Compl. ¶ 168. If the Bureau seeks enhanced penalties based on the theory that Defendants "recklessly engage[d]" in violations of the AFP or "knowingly violate[d]" the AFP, 12 U.S.C. § 5565(c)(2)(B)-(C), Defendants' good-faith attempts to comply with the law will be relevant. *Cf. Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1263 (D.C. Cir. 2003) ("A company cannot be found to have willfully violated a standard if it exhibited a good faith, reasonable belief that its conduct conformed to law, or if it made a good faith effort to comply with a standard or eliminate a hazard." (internal citations omitted)).

Indeed, the Bureau argues (at 28) that it is entitled to summary judgment because it has proven a knowing violation because the 1996 *Tennessee* Action, made Defendants "keenly aware" that their "billing practices systematically contravened" the AFP. For this proposition, the Bureau cites the Tennessee court's decision denying Lexington Law's motion to dismiss in that case. *Tennessee v. Lexington Law Firms*, No. 96-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997). But the Bureau hardly comes close to meeting its burden to extinguish an affirmative defense.

At the outset, the Tennessee court never opined on the Bureau's baseless interpretation of the AFP in its dismissal decision, so Defendants could not have knowledge of something the court never addressed. Rather, that decision addressed the contention that "FTC has no statutory or constitutional authority to regulate the telemarketing practices of attorneys, and thus that Defendant cannot be punished under the FTC rules for the allegedly abusive practices in which it has

engaged." *Id.* at *4. Nowhere did the court speak to the need for "promised results" for the AFP to apply. Moreover, Lexington Law had different marketing and billing practices at the time of the *Tennessee Action* than Heath does today.

For that reason, the Tennessee court did not "expressly reject[] numerous legal defenses… some very similar to those Defendants assert in this litigation." Bureau Mot. 28. Unlike Defendants here, Heath's predecessor actually made promises to consumers. *E.g.*, Exhibit 47, First Amended Complaint, *Tennessee v. Lexington Law*, No. 3-96-0344 (M.D. Tenn. May 14, 1997)) ¶ 8(B) (alleged representation that Lexington Law could "'absolutely'… get negative credit information off of [a prospective consumer's] credit report"); *id.* ¶ 8(C) (alleging "[s]imilar representations regarding Defendant's ability to remove even current and accurate negative credit information from a consumer's file"). Because the allegations in the *Tennessee* Action were materially different to the ones presented here, the defenses could not have been "very similar."

Finally, the Bureau's argument that Defendants *knew* that they were violating the AFP because of the *Tennessee* Action is contrary to the undisputed fact record and baffling, given that the business model set forth in the approved settlement agreement in that case is Heath's business model now. AUMF 1-24. The agreement states: "the Defendant may invoice and receive payments for specific work already performed, provided that the Defendant has disclosed to the client the work that the Defendant will perform and the fee to be charged for such work in advance of performing such work, without providing any kind of promised results." AUMF 18. Defendants could hardly be accused of *knowingly* violating the law by following a business model that was approved as part of a court-approved settlement with the state authorities entitled to enforce the AFP.

**B. Defendants did not have fair notice of the Bureau's reading of the TSR, making Heath's Ninth Defense and Progrexion's Tenth Defense appropriate.**

Defendants never had fair notice that merely offering credit repair services over the telephone—without promising results such as a credit improvement or the removal of derogatory credit information—would trigger the six-month period prescribed in the AFP. AUMF 1-24. FTC certainly never said it, as evidenced by the fact that the Bureau cannot point to a single place in the regulatory history where FTC said it intended for the AFP to apply to all credit repair services, and not only when results are promised. To the contrary, the regulatory history says "services" and "results" are two distinct concepts, 60 Fed. Reg. at 43,853, and a six-month delay is expected when results are *promised*.

The Bureau makes a threadbare argument (at 32-34) that Defendants indeed had fair notice due to the AFP's "plain language," and from the rulemaking history of the AFP. As explained in Heath's Motion (at 19-22), the plain language indicates that the AFP does *not* apply to Defendants because no *results* were promised, and the offering of "services" is distinct from the offering of "results." So, too, does the regulatory history: the six-month waiting period of the AFP was intended to apply only when the arrangement proposed amounted to "outright theft," with "illusory" promises of credit repair that could never be delivered. *See* pp. 5-6, *supra*; Heath Mot. 22-25. That is not what Defendants offered to their clients and members, and the Bureau makes no allegation to the contrary.

"[A]gencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). Where "[t]he . . . regulation[]" fails to "provide clear notice" of prohibited conduct, and the regulation "could reasonably be construed" to permit a practice that an agency claims is prohibited,

there is no fair notice. *Id.* at 157. Regulated entities can be expected "to conform their conduct to an agency's interpretations once the agency announces them"; regulated parties cannot be expected "to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding," as the Bureau tries here. *Id.* at 159.

Even if the Bureau's reading of the AFP were right, FTC never announced it. It may have been possible for Defendants and other legitimate credit repair providers to "be in violation of the [AFP] for a long time without [FTC] noticing," but the "'more plausible hypothesis is that the [FTC] did not think the. . . practice was unlawful." *Id.* at 158 (citation omitted).

Indeed, the Bureau highlights the *Tennessee* Action as proof of "fair notice," except again, it fails to account for the *result* of that case that allowed Lexington Law to "invoice and receive payments for specific work already performed," provided that the work to be performed and the fee to be charged is disclosed "in advance. . . without providing any kind of promised results." AUMF 18. FTC was an intervenor in that case, and it did not object to the settlement or the payment-in-arrears model approved-of in the *Tennessee* Action for nearly 30 years, and Defendants' business practices are based upon that court-approved settlement. AUMF 1-24. As the Bureau is well aware, they cannot ask to change "a longstanding interpretation of [a] statute" and then ask to "apply[] that changed interpretation retroactively." *PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in relevant part* 881 F.3d 75, 83 (D.C. Cir. 2017). Doing so would constitute unfair surprise.

Nothing in the Bureau's cited cases requires this Court to reach a contrary result, as none of those cases addressed the AFP's requirement of "promised results." *United States v. Dish*

*Network LLC*, 954 F.3d 970 (7th Cir. 2020), is a TSR case about the Do-Not-Call rules (not the AFP) where the defendant argued that it lacked fair notice of "potentially whopping penalties," which could clearly be gleaned from the statute and the TSR itself. *Id.* at 979. In *CFPB v. Commonwealth Equity Group, LLC*, --- F. Supp. 3d ----, 2021 WL 3516690 (D. Mass. Aug. 10, 2021), the defendant attempted to argue that the definition of "telemarketing" as identified in the regulation was not sufficiently clear, despite the regulation's statement that it covered "a plan, program or campaign" "conducted to induce the purchase of. . . services by use of one or more telephones." *Id.* at *2. And in *CFPB v. IrvineWebWorks, Inc.*, No. 14-cv-1967, 2016 WL 1056662 (C.D. Cal. Feb. 5, 2016), the defendant claimed that it lacked fair notice as to when it could ask for banking or credit card information, even though the rule made clear that consumers had to "understand what services they are paying before" providing such information, as the transmission of banking or credit card information constituted consent to payment under the rule. *Id.* at *11-12. None of these cases involved the invention of a new, previously unannounced interpretation of the AFP in a retroactive enforcement action, as the Bureau seeks to do here.

Because the Bureau fails to identify any instance where Defendants had notice of its interpretation of the AFP, there is, at a minimum, a genuine dispute of material fact as to whether Defendants had fair notice. Accordingly, the Bureau is not entitled to summary judgment.

### C. Heath's Eleventh Defense and Progrexion's Twelfth Defense is valid because, had FTC attempted to advance the Bureau's atextual reading of the AFP, it would not have been sustained under the "arbitrary or capricious" standard.

If the AFP's six-month waiting period applies whenever credit repair services are marketed over the telephone, rather than only to those credit repair services that "promised results," then the restriction would be arbitrary or capricious because FTC limited its rulemaking to "scams,"

"outright theft," and "illusory" services, not legitimate credit repair providers. The fact that the Bureau's reading would have rendered the AFP arbitrary and capricious is yet another illustration of why that reading is unreasonable and should be rejected. *Cf. Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 53 (2011) (whether agency's interpretation of statute is reasonable under *Chevron* step two looks to whether the interpretation is "arbitrary or capricious in substance").

The regulatory history of the AFP makes clear that FTC intended to target instances where "the offered service is fundamentally bogus." 67 Fed. Reg. at 4,511. Specifically, FTC thought the six-month waiting period would be an effective roadblock for schemes in which a purported provider would "take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* These schemes were ones that collected "fees *before* services are rendered," Exhibit 72, Nat'l Consumer League, Comment Letter on Proposed TSR (received Mar. 28, 1995), FTC File No. 411001, and provided "services" in the form of "written advice to customers on how to obtain copies of their credit reports," and encouraged fraudulent means to "document a good credit history by leveraging one bank deposit (by using it for security on a number of loans and repaying those loans with other borrowed funds)," Exhibit 71, USPIS Comment at 12. There is no sign that FTC intended for the rule to apply to "actual services in which a company will interact with creditors and credit reporting services as an advocate for the consumer," such as Heath and CreditRepair.com. *Id.*

The Bureau seeks to extinguish this defense in its entirety, even though it fails to address every material aspect of the defense. The Bureau's motion as to Heath's Eleventh Defense (and

Progrexion's Twelfth) should be denied on that ground alone. The Bureau's arguments with respect to the challenged aspects are also meritless, as explained below.

1. The Bureau (at 35-36) faults Defendants for not raising these arguments as part of "the rulemaking process." No legitimate credit repair company had reason to raise these arguments when FTC promulgated the TSR in 1995; FTC intended for the AFP to apply only where a seller "promise[s] consumers that, for a fee paid in advance, they will improve the consumer's credit record by removing negative information," only to "fail[] to deliver the promised services *or achieve the promised results*" "[o]nce the fee is paid." 60 Fed. Reg. at 43,853 (emphasis added). Indeed, FTC specifically inquired as to whether there were "any legitimate services" that would be adversely affected by the proposed "promised results" requirement, and the Postal Inspection Service's comment letter confirmed that there would be no adverse impact on "actual services in which a company will interact with creditors and credit reporting services as an advocate for a consumer." Exhibit 71, at 12. If the AFP was understood to affect "actual services" like Heath and CreditRepair.com's, in addition to the scams and illusory promises expressly targeted by FTC, the regulation would have been written much differently. Heath Mot. 21.

2. The Bureau also says there is no basis for concluding that FTC "exceeded its Congressional authority under which [section 310.4(a)(2)] was purportedly adopted." Bureau Mot. 37. Specifically, the Bureau argues that courts have rejected arguments that the TSR is *ultra vires*, and thus this Court should reject Defendants' affirmative defense that the Bureau's reading lacks statutory authority.

But, if this Court were to adopt the Bureau's reading of the AFP, that reading would not be supported by FTC's statutory authority. An agency rule may not "exceed[] the bounds of the

permissible." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). "Administrative regulations are not absolute rules of law and should not be followed when they conflict with the design of the statute or exceed the administrative authority granted." *Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1118 (10th Cir. 1977).

Here, FTC initially promulgated the AFP as a means of implementing Congress's directive in the Telemarketing Act to implement rules to prevent abusive practices in telemarketing that intruded on consumer privacy. Telemarketing Sales Rule, 60 Fed. Reg. 8,313 (Feb. 14, 1995). Later, however, FTC realized that the AFP could not be justified under that source of legislation because the AFP did little to move the needle on consumer privacy. 67 Fed. Reg. at 4,511. So FTC reexamined the regulation and determined that it was "appropriate and prudent" to justify the AFP as a regulation on *per se* unfair activity. *Id.*

FTC determined that the scams prohibited by the AFP were unfair because they offered no benefits: "It is the essence of these schemes to take consumers' money for services that the seller has no intention of providing and in fact does not provide." *Id.* Fraudsters would use the FCRA's dispute-resolution mechanism to deliver the illusion of rehabilitated credit; the fraudster would challenge a tradeline, get it temporarily removed from a credit report (and improve a score accordingly), and take the consumer's money, only to have the tradeline returned once it was confirmed to be accurate. *See* p. 3 *supra*. Because the conduct targeted by the AFP amounted to "outright theft," and because consumers had "no way to know these offered services were illusory" when communicating with service providers solely over the phone, FTC concluded that the practices targeted by the AFP met the statutory criteria for unfairness. 67 Fed. Reg. at 4,511.

FTC never undertook the analysis needed to justify the interpretation of the AFP that the Bureau is now proposing, one that goes after legitimate credit repair providers as well as illegitimate ones. To make that justification, FTC would have had to conclude legitimate credit repair service providers were *per se* abusive, or consider the legitimate countervailing benefits provided by legitimate credit repair providers—it did neither. *E.g.*, *Consumer Union of U.S., Inc. v. FTC*, 801 F.2d 417, 426 (D.C. Cir. 1986) (upholding FTC unfairness determination because FTC's "assessment of the costs and benefits" was "reasonable" and "supported by the requisite substantial evidence"). Of particular relevance here, Heath and CreditRepair.com have a track record of removing inaccurate, negative tradelines from client credit reports. AUMF 28, 32. It does so by following the very steps that the Bureau instructs consumers to take to challenge inaccuracies in their credit reports—in other words, to obtain a benefit for themselves. CFPB, *How Do I Dispute an Error on My Credit Report?*, (last reviewed Oct. 19, 2021), https://www.consumerfinance.gov/ask-cfpb/how-do-i-dispute-an-error-on-my-credit-report-en-314/; Exhibit 74, Credit Repair Process, PGX0028273; Exhibit 75, How to Dispute, PGX0028071. At a minimum, Defendants offer the benefit of convenience and expertise to their clients and members. Moreover, unlike the fraudulent conduct targeted by FTC as part of the AFP, which resulted in the vast majority of challenged tradelines being restored once the credit bureau's investigation was complete, Heath's track record shows historically that the removals it obtains on behalf of its clients stick, with an immaterial amount that ever reappear. AUMF 28. The services go beyond the identification and challenging of inaccurate tradelines; Heath educates clients on how to maintain an excellent record if credit repair efforts are successful. Exhibit 75-1, Ulzheimer Report, at 21. The Bureau can hardly decry Defendants' work for consumers as "abusive" and "unfair" when that

work consists of the very actions that the Bureau *encourages* the very same consumers to take on their own.

Despite the Bureau's arguments to the contrary (at 37), the courts in *Commonwealth Equity*, the *Tennessee* Action, and *National Federation of the Blind v. FTC*, 420 F.3d 331 (4th Cir. 2005), never had occasion to consider this issue, let alone decide it in the Bureau's favor. *Commonwealth Equity* does not address countervailing benefits at all. The motion-to-dismiss decision in the *Tennessee* Action was issued before FTC made the switch to an unfairness rationale. And as the Bureau notes, *National Federation of the Blind* addressed an entirely different provision of the TSR, not the AFP.

**D. Because the Bureau's interpretation of the AFP would violate the First Amendment, Heath's Fifteenth Defense and Progrexion's Thirteenth Defense should be allowed.**

Heath has briefed the constitutional issues that stem from the Bureau's troubling interpretation of the AFP. Defendants incorporate the arguments articulated in Heath's motion, Heath Mot. 32-34, but repeat those arguments here only to the extent necessary to address the Bureau's constitutional arguments.

*First*, the Bureau says the AFP regulates conduct, not speech. That is obviously wrong: the Bureau's reading of the AFP would prohibit an entire method of communication (telephone) based solely on the content of speech (credit repair), which places a significant burden on speech. *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 982 (10th Cir. 2020) (noting that even "time, place, and manner restrictions remain subject to First Amendment scrutiny"). Separately, the AFP prohibits speakers from even *requesting* payment until six months after the credit repair provider is able to obtain a report showing that the "promised results" have been "achieved." That

is a direct restriction on speech by any means. Even taking the Bureau's argument at face value—that the AFP is really just a restriction on payment—payment is so closely connected to how Defendants communicate with current and potential clients and members that the restriction on payment would alter the way in which Defendants engage their clients and members. *E.g.*, *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (restrictions on campaign contributions "necessarily reduces the quantity of expression").

*Second*, the Bureau argues that the AFP was intended to prohibit "misleading commercial speech," and thus the more deferential standard of constitutional scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel of the Superior Court of Ohio*, 471 U.S. 626 (1985), should apply. But *Zauderer* applies only when the government requires "disclosure…of factual and uncontroversial information." *United States v. Wenger*, 427 F.3d 840, 849 (10th Cir. 2005). *Zauderer* has no force where governmental action burdens commercial speech even if that speech is entirely truthful—e.g., "we will do our best to help you correct inaccuracies on your credit report, but we cannot guarantee a particular outcome." The more exacting framework for burdens on commercial speech therefore applies. *Aptive*, 959 F.3d at 986-87.

*Third*, the Bureau claims (at 41) that it nevertheless satisfies the *Aptive* framework for restrictions on commercial speech because "prohibiting credit repair services from requesting or receiving payment prior to demonstrating results fits the problem of credit repair companies taking payment in advance but failing to deliver results." The Bureau's argument is nonsensical and nonresponsive. Its burden is to demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Aptive*, 959 F.3d at 989. More importantly, it must make such a showing based on "evidence of non-speculative harms or interests," not just the

Bureau's conjecture. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1227 (10th Cir. 2021). Because FTC targeted only "bogus" providers, rather than legitimate credit repair providers, there is no evidence to show that the Bureau's interpretation of the AFP will advance FTC's stated aims in promulgating the AFP.

**E. The Second Defense is valid because CROA would be unnecessary if the Bureau's interpretation of the AFP were correct.**

Defendants' Second Defense is that the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.*, "preempted and overrode the AFP, preserved for Defendant[s] the right and permission to provide [their] services and collect payment in the manner [they] did, and provided for consumers the right and permission to access credit repair services and pay for them as they agreed to do so." The Bureau argues that, because Defendants cannot point to Congress's clear intent to displace the AFP, the two provisions must be presumed to exist in harmony (and therefore, the Second Defense is not valid). Bureau Mot. 25-27.

At the outset, the Bureau gets the legal standard wrong. True, Congress must be clear when it seeks to repeal a statute; in the absence of such clarity, a court should attempt to read statutes in harmony. *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974). But the TSR is not a statute; it is a regulation that predates a congressional statute that governs the same field. "There is no reason for Congress expressly to address regulatory language that will become (in part) superseded by subsequent legislation; it is the responsibility of the agency instead to conform its rules to any pertinent new laws." *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 693-94 (7th Cir. 1998).

Even accepting the Bureau's test as the relevant one—that there must be a conflict between a statute and a regulation in order for the former to displace the latter—there is such conflict here. If the Bureau's interpretation of the AFP is correct, CROA allows for Defendants' business model,

but the AFP categorically does not.[5] *DuCharme*, 2010 WL 5211502, at *6 ("By billing clients on a monthly basis for legal tasks that were indisputably performed during the previous month, Lexington does not run afoul of section 1679b(b)'s prohibition on advanced payments."). FTC (according to the Bureau) purportedly concluded that every credit repair service is fundamentally bogus; that clashes with Congress's determination in CROA that consumers have a "vital interest" in creditworthiness and "consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers." 15 U.S.C. § 1679(a)(1). Under CROA, a credit repair provider can bill in arrears for any service rendered, but according to the Bureau, the AFP requires that the same provider wait until six months after *all services* are rendered before collecting. The Bureau's reading of the AFP, which it justifies by asserting FTC's supposed conclusion that no legitimate credit repair services exist at all, would subvert CROA by directly prohibiting credit repair companies from marketing through a primary method of communication: the telephone.[6] Federal regulations do not have the power to render congressional acts a dead letter. *United States v. Larionoff*, 431 U.S. 864, 873 n.12

---

[5] The cases that the Bureau cites for the proposition that there is no conflict did not present the same tension; in those cases, the seller actually did make bogus promises of illusory results, and so the narrower interpretation of the AFP could conceivably apply. *See, e.g.*, *Commonwealth Equity*, 2021 WL 3516690, at *1 ("The company also includes promises to 'fix unlimited negative items' from a credit report, to achieve an 'average 90 point increase in 90 days,' and to 'dramatically increase credit scores.'"); *Prime Marketing*, 2016 WL 10516097, at *2 (defendant represented that it could remove "virtually any negative information" from a credit report); *see* pp. 27-28, *supra* (describing the "promised results" of *Tennessee v. Lexington Law*).

[6] The Bureau's reading of the AFP as applying to all credit repair companies further subverts CROA by eliminating the ability to provide services on a monthly basis in another manner. In order to request payment, the AFP requires the credit repair provider to pull a credit report only to the extent allowed by FCRA, but it is at best unclear that it would be permissible for a credit repair provider to request a report after a consumer terminates services (let alone up to six months after). Whatever consumer permission existed to obtain a report under FCRA (15 U.S.C. 1681b) would also be extinguished upon termination.

(1977) (a regulation that "operates to create a rule out of harmony with the statute[] is a mere nullity"). The only way to "give effect to both" CROA and the AFP, *Morton*, 417 U.S. at 551, is to read the AFP as applying only in instances where a seller gives a consumer false guarantee of credit improvement. Under such an arrangement, CROA and the AFP both serve a specific function: CROA governs advance fees for credit repair more generally, while the AFP targets instances where illusory promises are made, warranting a heightened degree of protection for the consumer. Because the Bureau's reading of the AFP does not achieve this harmony, Defendants are entitled to pursue the preemption/displacement defense.

**F. The Fifth and Sixth Defenses are proper to the extent that the Bureau seeks excessive recovery.**

The Fifth Defense asserts that the Bureau's "claims and recovery are barred or limited, in whole or in part, by equitable doctrines." The Sixth Defense similarly asserts that the Bureau's "claims and recovery for injunctions, restitution, rescission, reformation, disgorgement or other forms of equitable relief are barred or limited, in whole or in part, by equitable doctrines."

These defenses have been asserted against all of the Bureau's claims, not just Count I, so it is unclear why the Bureau asks for summary judgment on these defenses when it is seeking summary judgment on Count I only. To extinguish these defenses, the Bureau would have to show that it is entitled to summary judgment on all counts, which it has not done. *Strong*, 2019 WL 7290835, at *5 (noting that a court should not extinguish a defense until the plaintiff has shown it is "entitled to judgment as a matter of law on its claim").

Setting aside that procedural flaw, there are several equitable principles that constrain the Bureau's recovery in this case. First, despite the Bureau's blanket assertion (at 31) that it may "obtain any combination of legal and equitable remedies that the Court deems appropriate," the

Bureau's ability to obtain equitable relief is not limitless. *E.g.*, *CFPB v. CashCall, Inc.*, No. 15-cv-07522, 2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) ( "a Court is not required to award restitution merely because a defendant violates the CFPA," and "the CFPB bears the burden of proving that restitution is an appropriate remedy and that the amount of restitution it seeks represents a defendant's unjust gains"). The Bureau must demonstrate that it is entitled to a particular equitable remedy; for example, if it seeks restitution, it must show that Defendants intended to defraud, "or that consumers did not receive the benefit of their bargain." *Id.* at *12. As even the Bureau will confess, *see* Opp. to Heath MSJ at 8, there is a valid basis for Defendants to assert that they provided a benefit to consumers. *See also* AUMF 28, 32.

Another equitable principle limiting the Bureau's recovery is the notion that "the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020). Relatedly, equitable relief cannot be tantamount to a penalty. *Kokesh v. SEC*, 137 S. Ct. 1635, 1642-44 (2017). Depending on how much the Bureau seeks as a remedy, and the theories by which it seeks that amount, these principles may be relevant to limit what the Bureau may recover, particularly given the record of consumer benefit and Defendants' efforts to comply with the law. AUMF 1-24.

Of course, it is much too early to determine whether these defenses will be needed at all; the Bureau has not even demonstrated that Defendants are "wrongdoers," never mind that it is entitled to any sort of equitable relief on *all* counts. This Court should deny the Bureau's request to hold that Defendants may not pursue the Fifth and Sixth Defenses.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Bureau's motion for summary judgment on Count I and the relevant affirmative defenses.

Dated: December 30, 2021

Respectfully submitted,

/s/ William J. Harrington
William J. Harrington*
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7140
wharrington@goodwinlaw.com

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon*
W. Kyle Tayman*
Christina Hennecken*
Virginia McCorkle*
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
thefferon@goodwinlaw.com
ktayman@goodwinlaw.com

Courtney Hayden*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
chayden@goodwinlaw.com

*Attorneys for Defendants*
(*admitted *pro hac vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2021, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ William J. Harrington
William J. Harrington

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above memorandum contains 12,392 words and complies with DUCivR 7-1(a)(4)(B)(i), according to the word count function of Microsoft Word, excluding the cover page, table of contents, table of authorities, signature block, and exhibits.

Dated: December 30, 2021

/s/ William J. Harrington
William J. Harrington