MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>*Plaintiff*,<br>v.<br><br>PROGREXION MARKETING, INC., *et al*.,<br><br>*Defendants*. | Case No. 2:19-cv-00298-BSJ |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I AGAINST ALL DEFENDANTS**

# TABLE OF CONTENTS

Background ....................................................................................................1

Reply to Defendants' Reponse to the Bureau's Statement of Undisputed Material Facts ....................................................................................................4

Reply to Defendants' Statement of Additional Undisputed Material Facts ............12

Argument....................................................................................................14

I. The Provision Covers Defendants and Requires Them to Wait Six Months and Provide a Time Frame for All Services; Defendants Indisputably Do Neither. ....................................................................................................14

A. Defendants are not exempt from the six-month waiting period.................14

B. Defendants are not exempt from providing a time frame for all services ..16

II. Defendants' Affirmative Defenses Are Legally Invalid and Factually Unsupported, and Should Be Dismissed ....................................................19

A. The Third Defense fails because it is an argument about the scope of recovery, not an affirmative defense. ....................................................20

B. Heath's Ninth Defense and Progrexion's Tenth Defense fail because Defendants had notice of the Provision. ....................................................22

C. Heath's Eleventh Defense and Progrexion's Twelfth Defense fail because Defendants are covered by the Provision. ....................................23

D. Heath's Fifteenth Defense and Progrexion's Thirteenth Defense fail because the Provision does not violate the First Amendment. ...................25

E. The Second Defense fails because CROA and the TSR do not conflict. ...27

F. The Fifth and Sixth Defenses fail because they are utterly unsupported....29

G. Heath abandoned its Seventeenth Defense. ................................................29

Conclusion ....................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Am. Wrecking Corp. v. Sec'y of Lab.*,
351 F.3d 1254 (D.C. Cir. 2003)……………………………..………… 21

*Buckley v. Valeo*,
424 U.S. 1 (1976)……….………………………………………………26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)………………..……………………………… 20, 29

*Consumer Fin. Prot. Bureau v. Commonwealth Equity Grp., LLC*,
No. 20-cv-10991, 2021 WL 3516690 (D. Mass. Aug. 10, 2021)…....…25, 28

*Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*,
No. CV1607111BROJEMX, 2016 WL 10516097
(C.D. Cal. Nov. 15, 2016)…………………………………….15, 16, 17

*Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*,
No. CV1607111BROJEMX, 2017 WL 2772313,
(C.D. Cal. Jan. 19, 2017) ……….…………………………………………17

*DuCharme v. Heath*,
No. 10-02763, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010)……………..17

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)…………………………………………………… 25

*Morton v. Mancari*,
417 U.S. 535 (1974)…………………………………………………… 28

*Petrobras Am., Inc. v. Vicinay Cardenas, S.A.*,
No. H-12-888, 2019 WL 13060210 (S.D. Tex. Dec. 18, 2019)…………... 20

*Radzanower v. Touche Ross Co.*,
426 U.S. 148 (1976)…………………………………………………… 28

*Strong as Tr. of Consol. Legacy Debtors Liquidating Tr. v. Cochran*,
No. 14-cv-788, 2019 WL 7290835 (D. Utah. Dec. 30, 2019)…………….. 20

*Taylor v. Quality Hyundai Inc.*,
150 F.3d 690 (7th Cir. 1998)……………………………………………28

*Tennessee v. Lexington Law Firms*,
No. 3:96-0344, 1997 WL 367409 (M.D. Tenn. May 14, 1997)……………22

*United States v. Dish Network LLC*,
954 F.3d 970 (7th Cir. 2020)……………………………………………22

*United States v. Gonzales*,
520 U.S. 1 (1997)……………………………………………………… 14

*United States v. Larinoff*,
431 U.S. 864 (1977)…………………………………………………… 28

*United States v. Portillo-Madrid*,
292 Fed. App'x 746 (10th Cir. 2008)………………………………... 20

*United States v. Turkette*,
452 U.S. 576 (1981)…………………………………………………... 14, 25

**Statutes**

12 U.S.C. § 5331……………………………………………………… 25

12 U.S.C. § 5565(c)(2)…………………………………………………21

15 U.S.C. §§ 1679-1679j……………………………………………… 27

15 U.S.C. § 1679(a) ………………………………………………….…. 27

15 U.S.C. § 1679(b)(2) ………………………………………………....27

15 U.S.C. § 1679b(a)(3) ……………………………………………….. 25, 28

15 U.S.C. § 6101………………………………………………………….. 25, 28

**Rules**

DUCivR 56-1(d)……………………………………………………………..12

Fed. R. Civ. P. 56(e)(3) ……………………………………………………..…29

**Regulations**

16 C.F.R. § 310.4(a)(2) ……………………………………………………...*passim*

16 C.F.R. § 310.6(b)……………………………………………………………2, 24

**Regulatory Material**

FTC, Complying With the Telemarketing Sales Rule (June 2016, last updated Jan. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair…………………………………………………8

60 Fed. Reg. 8,313 (Feb. 14, 1995) ………..…………………………………...2, 3, 24

60 Fed. Reg. 30,406 (June 8, 1995)……….……………………………………………2

60 Fed. Reg. 43,842 (Aug. 23, 1995)………..…………………………………...2

65 Fed. Reg. 10,428 (Feb. 28, 2000) ……….…………………………………...2, 3

67 Fed. Reg. 4,492 (Jan. 30, 2002)……………………………..…2, 3, 18, 24, 25

68 Fed. Reg. 4,580 (Jan. 29, 2003)………………………………………………... 2

74 Fed. Reg. 41,988 (Aug. 19, 2009)……………………………………………... 2

75 Fed. Reg. 48,458 (Aug. 10, 2010)………………………………………… 4, 24

79 Fed. Reg. 46,732 (Aug. 11, 2014)……………………………………………... 2

**Litigation Documents**

Mem. of Amicus Curiae FTC, *Illinois v. Nat'l Credit Mgmt. Grp*., No. 96C-2073, 1997 WL 35410876 (N.D. Ill. Jan. 8, 1997)……3, 17, 24, 26

**Other Authorities**

Black's Law Dictionary (8th ed. 2004)……………………………..…………… 20

## BACKGROUND

Defendants contort the text of 16 C.F.R. § 310.4(a)(2) (the "Provision") in a futile attempt to escape liability. The Provision begins by specifying who it *covers*: "*any* seller or telemarketer" that requests or receives payment for goods or services designed to remove derogatory information from, or improve, a person's credit history, record, or rating. *Id.* (emphasis added).

The Provision then explains that, to *comply*, a covered company must wait until the time frame for providing all of its services has expired (subsection (a)(2)(i)) and must demonstrate through a consumer report that the promised results have been achieved and maintained for six months (subsection (a)(2)(ii)).

In effect, Defendants contend that they are not *covered* by the Provision because they do not *comply* with the Provision's second precondition. According to Defendants, the Provision buries a massive exemption from its coverage clause in its second payment precondition. On Defendants' reading, the Provision's final requirement that a covered company must "demonstrat[e] that the promised results have been achieved…more than six months after the results were achieved" is, somehow, an exemption for all companies that do not guarantee results.[1]

[1] Although the Court need not reach the issue, Defendants do promise results. *See* Pl.'s Resp. in Opp'n to Heath's Mot. for Partial Summ. J. on Count I (ECF 230) ("Pl.'s Opp'n"), 15-21, 24-34, 63-65, & App'x C.

Defendants' reading of the Provision violates the rule's plain language and makes no textual sense. It morphs a requirement in the Provision's final paragraph into a massive escape hatch from the Provision's coverage, and rewrites the word "promised" to say "guaranteed" without basis.

Indeed, Defendants' reading presumes that the FTC created this massive exemption without ever acknowledging it. In its Federal Register notices, the FTC specifies what the Provision does not cover, such as secured credit cards and legitimate credit monitoring services.[2] Similarly, the TSR expressly exempts, or does not cover, numerous subjects.[3] Yet the FTC's numerous public notices *never mention* "legitimate credit repair" or the exemption that Defendants claim shields them.[4] Defendants essentially contend that the FTC exempts self-professedly

[2] *See* 60 Fed. Reg. 30,406, 30,416 (June 8, 1995) (expressly acknowledging coverage limits); 60 Fed. Reg. 43,842, 43,854 (Aug. 23, 1995) (reacknowledging these limits).

[3] *See* 16 C.F.R. § 310.6(b) (detailing seven express TSR exemptions); *see also, e.g.*, 60 Fed. Reg. 30,406, 30,416 (TSR does not cover bank offers of pre-approved loans); *id.* at 30,411 (other telephonic mediums); *id.* at 30,418 (*bona fide* nonprofit organizations).

[4] The FTC's silence is resounding. *See* 60 Fed. Reg. 8313 (Feb. 14, 1995); 60 Fed. Reg. 30,406; 60 Fed. Reg. 43,842; 65 Fed. Reg. 10,428 (Feb. 28, 2000); 67 Fed. Reg. 4492 (Jan. 30, 2002); 68 Fed. Reg. 4580 (Jan. 29, 2003); 74 Fed. Reg. 41,988 (Aug. 19, 2009); 79 Fed. Reg. 46,732 (Aug. 11, 2014). 1679

"legitimate credit repair" companies from the Provision *implicitly*. This is not how agency rulemaking works.

Instead, the Provision's long regulatory history underscores the FTC's intent to regulate *all* credit repair companies that telemarket. The FTC consistently describes the Provision as covering credit repair companies broadly, without exclusions. Thus, the Provision "prohibits *any* seller or telemarketer from requesting or receiving payment … until the contract for the services has expired and the promised results have been achieved." 60 Fed. Reg. 8313, 8318 (emphasis added). It "bans telemarketers who … provide credit repair services…from seeking payment before rendering the promised services," without exclusions, carveouts, or qualifiers. 65 Fed. Reg. 10,428, 10,429; 67 Fed. Reg. 4492, 4493.

Extensive public comment and the FTC's own experience did not "reveal[] the existence of *any* legitimate provider of credit repair service." Mem. of Amicus Curiae FTC, *Illinois v. Nat'l Credit Mgmt. Grp.*, No.96C-2073, 1997 WL 35410876 (N.D. Ill. Jan. 8, 1997) ("FTC Mem.") (emphasis added). Indeed, those sources confirmed the FTC's view that "credit repair services are inherently deceptive"; involve "a promise that, by its nature, cannot be kept for most consumers"; and require "more comprehensive, prophylactic" regulation that is not "'limited to deceptive acts or practices,'" leading the FTC to expressly reject

arguments for exemptions from the Provision. *Id.*

The Provision is designed to protect the "financially distressed consumers" whom "credit repair services … target." *See* 75 Fed. Reg. 48,458, 48,485 (Aug. 10, 2010). The FTC "has long recognized that [credit repair] sellers may exercise undue influence over [their] highly susceptible … purchasers." *Id.* "*For this reason*, the TSR prohibits advance fees for credit repair services…." *Id.* (emphasis added). And this reason pertains whether or not a credit repair company guarantees results.

**REPLY TO DEFENDANTS' RESPONSE TO THE BUREAU'S STATEMENT OF UNDISPUTED MATERIAL FACTS (SUMF)**

SUMF ¶¶ 1-7, 11, 13, 15, 17, and 26 are wholly undisputed.

SUMF ¶¶ 10, 12, 14, and 18 are undisputed. [redacted]

SUMF ¶ 8: Defendants' dispute is unsupported and immaterial. [redacted] Defendants characterize eFolks's services as "lead generation services," but those services are provided over the telephone and are also properly described as "telemarketing services." Defendants cite no evidence refuting SUMF ¶ 8.

SUMF ¶ 9: Defendants' dispute is unsupported and frivolous. Defendants admit that Progrexion Teleservices—part of Progrexion—markets Lexington Law credit repair services through inbound and outbound interstate telephone calls. Defendants further admit that Heath enrolls and re-enrolls clients by telephone. Defendants cite no evidence refuting SUMF ¶ 9.

SUMF ¶¶ 16 and 27: Defendants' disputes are unsupported and immaterial. Inserting the word "assist" into the sentence does not change its meaning; all credit repair services endeavor to "assist" with removing derogatory items or improving credit records. Defendants are indisputably credit repair companies; the principal purpose of their services is to remove negative items from and improve consumers' credit records. Defendants' citation to disclaimers against specific guarantees is a non sequitur; their citations do not refute SUMF ¶¶ 16 or 27, which do not reference guarantees of any kind.

SUMF ¶ 19: Defendants' dispute is unsupported. Lexington Law's website indisputably contains the quoted text. SUMF ¶ 19 is material because it illustrates that Defendants market Lexington Law as a service to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating.

SUMF ¶ 20: Defendants' dispute is unsupported and immaterial. Lexington Law indisputably requires new customers to agree to pay for their TransUnion credit report before enrolling in credit repair services. Other than vague references to someone who re-enrolls after being previously enrolled, Defendants identify no category of Lexington Law credit repair customers exempt from the payment described in SUMF ¶ 20.

SUMF ¶ 21: Defendants' dispute is immaterial. Other than for "certain [unspecified] returning clients," Heath indisputably charges customers the fee described in SUMF ¶ 21.

SUMF ¶ 22: Defendants' dispute is immaterial. Other than for "a client [who] suspends or cancels," Heath indisputably charges customers the fees described in SUMF ¶ 22.

SUMF ¶ 23: Defendants' dispute is unsupported and directly contradicts Heath's recent statement to this Court. On December 6, in response to this exact statement—"Heath does not set a time frame in which all of the services will be provided to a customer"—Heath responded: "Undisputed, because clients decide the time frame for when services are completed." Reply Mem. of Law in Supp. of Heath P.C.'s Mot. for Partial Summ. J. on Count I (ECF 249), 5. Defendants should be held to that admission. Their new response is nonresponsive to SUMF

¶ 23. None of the cited evidence supports their new, patently false assertions that "Heath sets a one-month time frame for its services" or that "Heath and its clients do not agree at the outset to provide . . . services over a greater time period than one month." Defendants' new assertions are irreconcilable with, among other things:

(1) their own consumer contracts, which state "[t]his contract continues from month to month" (*e.g.*, Ex. 11 at LEX0000428);

(2) the fact that their first "service interval"—when they charge their first work fee—is 5-15 days, not one month, from the date of the contract (*e.g.*, Ex. 11 at LEX0000426);

(3) their practice of billing consumers for the first work fee and then monthly thereafter without obtaining new consumer authorization prior to each recurring transaction (*e.g.*, Ex. 8 at PGX0028802-03; Ex. 11 at LEX0000426); and

(4) their frequent statements to consumers about services they purportedly provide beyond a one-month timeframe, such as how they [redacted].

Defendants' training materials [redacted] they do *not* inform customers that the time frame in which all of the services will be provided is one month.[5] The Court should reject Defendants' attempt to manufacture a dispute regarding a previously undisputed fact.

SUMF ¶ 24: Defendants' dispute is frivolous. The statement that Heath charges consumers without waiting at least six months is not vague. Defendants employ a monthly billing model, *not* one in which they sign up customers and then wait at least six months before billing. This is indisputable and unrefuted.

SUMF ¶ 25: Defendants rely exclusively on their frivolous dispute of SUMF ¶ 24, which the Bureau rebuts above. Defendants provide no evidence that they wait at least six months after signup before billing customers, let alone that they accomplish the tasks described in SUMF ¶ 25 before such billing. There is no such evidence, because that is not how Defendants' business works. Defendants routinely charge their customers at signup, then again after an interval of 5-15 days, and then on a monthly basis thereafter (*see* SUMF ¶¶ 20-22), which means

[5] Per FTC guidance, "If there's a discrepancy between the various representations by the credit repair seller, the longest time frame represented determines when payment may be requested or received." FTC, Complying With the Telemarketing Sales Rule (June 2016, last updated Jan. 2021), https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#creditrepair.

they charge consumers before providing a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved.

SUMF ¶ 28: Defendants' dispute is unsupported and frivolous. CreditRepair.com's website indisputably contains the quoted text, and Defendants' complaint that the Bureau should have included "the full text of the website" in its statement of facts does not create a factual dispute about the content of Defendants' own website. Defendants cite no evidence refuting SUMF ¶ 28.

SUMF ¶ 29: Defendants' dispute is unsupported. CreditRepair.com's website indisputably contains the quoted text. SUMF ¶ 29 is material because it illustrates that Defendants market CreditRepair.com as a service to remove negative items from consumer reports or to improve a person's credit history, credit record, or credit rating.

SUMF ¶ 30: Defendants' dispute is unsupported and immaterial. New customers indisputably must agree to pay to obtain their TransUnion credit report before enrolling in CreditRepair.com credit repair services, [redacted]. Other than vague references to someone who re-enrolls after being previously enrolled, Defendants

identify no category of CreditRepair.com credit repair customers that is exempt from the payment described in SUMF ¶ 30.

SUMF ¶ 31: Defendants' dispute is immaterial. Other than for "certain [unspecified] returning clients," CreditRepair.com indisputably charges customers the initial work fee described in SUMF ¶ 31. The Bureau accepts Defendants' assertion that the amount is typically between $99.95 and $119.95.

SUMF ¶ 32: Defendants' dispute is immaterial. CreditRepair.com indisputably charges customers the monthly service fees described in SUMF ¶ 32 and confirmed in Defendants' own citation, Defs.' Ex. 10, PGX0047487, 99-500.

SUMF ¶ 33: Defendants' dispute is unsupported and nonresponsive. None of the cited evidence supports Defendants' patently false assertion that "CreditRepair.com sets a one-month time frame for its services" or that "CreditRepair.com and its members do not agree at the outset to provide . . . services over a greater time period than one month." Defendants' assertions are irreconcilable with, among other things:

(1) their own consumer contracts, which state "[t]his Contract continues from month to month" (*e.g.*, Ex. 32 at PGX0047459);

(2) the fact that their first "service interval"—when they charge their first work fee—is 5-15 days, not one month, from the date of the contract (*e.g.*, Ex. 32 at PGX0047456);

(3) their practice of billing consumers for the first work fee and then monthly thereafter without obtaining new consumer authorization prior to each recurring transaction (*e.g.*, Ex. 32 at PGX0047457; [redacted]; and

(4) their frequent statements to consumers about services they purportedly provide beyond a one-month timeframe, [redacted]

Defendants do *not* inform customers that the time frame in which all services will be provided is one month.

SUMF ¶ 34: Defendants' dispute is unsupported and immaterial. It is undisputed that Defendants request payment prior to six months after signup.

Assertions that Defendants charge "in arrears" and in some cases charge consumers over a period *longer than* six months do not refute the fact that Defendants do not wait six months *before* charging their customers.

SUMF ¶ 35: Plaintiff's asserted fact contains a typographical error referencing Heath instead of CreditRepair.com. It should say: "CreditRepair.com charges consumers before *it* has provided a consumer report demonstrating that any results have been achieved, such report having been issued more than six months after the results were achieved." Defendants do not respond to the substance of SUMF ¶ 35; they cite no evidence refuting SUMF ¶ 35; and for the reasons stated in reply to SUMF ¶ 34, there is no factual dispute.

## REPLY TO DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS[6]

Defendants' Factual Assertions 1-17 concern Defendants' claimed policies and practices prohibiting promises or guarantees of results. These assertions are immaterial; there is no dispute that Defendants do not wait six months before charging any consumer, regardless of when or if they achieve *any* results for that consumer, and so the Court need not reach the question of what results were

[6] Under DUCivR 56-1(d), the Bureau may not attach additional evidence to this Reply.

promised.[7] Plaintiff also objects to Defs.' Ex. 1 as inadmissible for the reasons stated in Pl.'s Evidentiary Objections to Def. John C. Heath, P.C.'s (d/b/a Lexington Law) Mot. for Partial Summary Judgment on Count I (ECF 227) ("Pl.'s Evidentiary Objections"), which is incorporated by reference here.

Defendants' Factual Assertions 18-24 assert that Defendants acted reasonably and in good faith. These assertions are immaterial; there is no mistake-of-law defense to liability under the Provision. *See* Pl.'s Mot. for Partial Summ. J. on Count I (ECF 257) ("Pl.'s Mot."), 27-28. If the Court deems these assertions material, they are disputed. *See id*.

Defendants' Factual Assertions 25-27, 29-31, and 33 concern whether Defendants could earn a profit if they began complying with the Provision. These assertions are immaterial; Defendants' profitability is irrelevant to any claim or defense in this litigation. *See* Pl.'s Opp'n, 58-59. Also, no facts support Defendants' conclusory statements in Assertions 26 and 30 that complying with the Provision will require them to provide months of service without knowing whether a consumer will pay. [redacted] Pl.'s Mot. to Exclude

[7] If the Court deems these facts material, there is a genuine dispute regarding what results were promised. *See* Pl.'s Opp'n, 15-21, 24-34, 63-65, & App'x C.

Aug. 20, 2021 Expert Report of John DelPonti, Jr. (ECF 224), 9, 11. If the Court deems these assertions material, they are disputed.

Defendants' Factual Assertions 28 and 32 claim that some customers benefit from and express satisfaction with Defendants' services. These assertions are immaterial and disputed. *E.g.*, Pl.'s Opp'n Ex. 13, 23-28, 60. Plaintiff also objects to Defs.' Ex. 73 as inadmissible for the reasons stated in Pl.'s Evidentiary Objections, which are incorporated by reference here.

## ARGUMENT

### I. The Provision Covers Defendants and Requires Them to Wait Six Months and Provide a Time Frame for All Services; Defendants Indisputably Do Neither

#### A. Defendants are not exempt from the six-month waiting period.

The six-month billing delay applies to "*any* seller or telemarketer" that offers goods or services represented to remove negative items from or improve consumers' credit records. 16 C.F.R. § 310.4(a)(2) (emphasis added). The Provision's coverage is not limited, and the word "any" here "means what it says" and "has an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5 (1997). There is no exemption for "legitimate" companies in the TSR, Telemarketing Act, or Consumer Financial Protection Act (CFPA). A law that fails to distinguish between legitimate and illegitimate enterprises applies to both. *United States v.*

*Turkette*, 452 U.S. 576, 581 (1981). Indeed, the one court that considered this argument in the context of Section 310.4(a)(2) rejected it out of hand. *Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*, No. CV1607111BROJEMX, 2016 WL 10516097, at *10 (C.D. Cal. Nov. 15, 2016). Defendants muster *no* authority supporting their position and ignore the on-point authority refuting it.

If there were an exemption for non-bogus credit services (and there is not), it would not apply to Defendants. In Counts II-V, the Bureau alleges that Progrexion engaged in deceptive advertising and telemarketing, relying upon bogus offers made by certain long-term marketing partners. Thus, "[w]hether Defendant acts deceptively, and thus, may be considered a 'bogus' credit service, is one of the disputes in this litigation." *Prime Mktg. Holdings*, 2016 WL 10516097, at *10.

The core facts related to Count I are not in dispute. Defs.' Br. 7-13. Defendants disingenuously assert that "the Bureau rests its claim on six isolated instances" (Defs.' Br. 23), but that is obviously false. The Bureau rests its claim on the fact that Defendants are sellers and telemarketers; they offer goods or services represented to remove negative items from or improve consumers' credit records; and they flagrantly violate Section 310.4(a)(2)(ii) by requesting and receiving payment from their customers numerous times before the expiration of six months. The question of what result was promised is immaterial to this case, and need not

be reached, as there is no dispute that Defendants do not wait six months before charging any consumer, regardless of when or if they achieve *any* result. *Prime Mktg. Holdings*, 2016 WL 10516097, at *11 (C.D. Cal. Nov. 15, 2016).

**B. Defendants are not exempt from providing a time frame for all services.**

The Provision unambiguously prohibits covered companies from requesting or receiving payment from consumers until "the time frame in which the seller has represented *all* of the goods or services will be provided to that person has expired…." § 310.4(a)(2)(i) (emphasis added).[8] Heath conceded that it does not set a time frame in which *all* of its services will be provided to the consumer, and the undisputed record demonstrates that CreditRepair.com likewise fails to set any such time frame. Reply to Defs.' Resp. to SUMF ¶¶ 23, 33. On this basis alone, the Bureau is entitled to summary judgment in its favor on Count I.

Defendants rail against subsection (a)(2)(i)'s plain language, which, unchanged for 25 years, is hardly "novel." But they offer no valid argument or

[8] Structurally, subsection(a)(2)(i) operates independently from subsection (a)(2)(ii): noncompliance with either subsection violates the Provision. This structure underscores the illogic of Defendants' claimed exemption, which is based on subsection (a)(2)(ii)'s "promised results" prong. "Promised results" have no bearing on Defendants' compliance obligation under subsection (a)(2)(i).

authority for disregarding it.[9] Nor do they identify any material factual dispute to refute their blatant — and, in Heath's case, admitted — violation of it.

Instead, Defendants contend that the Provision applies only to one-time payment requests for credit repair services, not monthly charges like theirs. Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. on Count I (ECF 277) ("Defs.' Opp'n"), 25-26. Neither the Provision, its commentary, nor any other authority supports this position. Indeed, as the FTC explained in a 1997 *amicus* filing, the Provision "prevents consumers (typically of limited means) from having to pay (often, hundreds of dollars) for repair services until they know that repairs have actually been accomplished. If no real 'repair' has been made, the Rule gives consumers an opportunity to withhold payment."[10] Subscription models like Defendants' are no

---

[9] Defendants' reliance on *DuCharme v. Heath*, is misplaced, since the Provision was not at issue in that case and thus that court did not address Defendants' billing model under the Provision. No. 10-02763, 2010 WL 5211502 (N.D. Cal. Dec. 16, 2010). The *Prime Marketing* court, however, discussed the Provision in detail; dismissed many of the same arguments Defendants raise here; and concluded that conduct alleged to be very similar to Defendants' would, if proven, violate the Provision. *Prime Mktg. Holdings*, 2016 WL 10516097; *Consumer Fin. Prot. Bureau v. Prime Mktg. Holdings, LLC*, No. CV1607111BROJEMX, 2017 WL 2772313, at *8 (C.D. Cal. Jan. 19, 2017).

[10] FTC Mem., 1997 WL 35410876.

less pernicious than one-time charges, and subsection (a)(2)(i) prohibits charges until *all* services are completed.[11]

Defendants assert that their "longest time frame represented" is one month because they commit to provide *some* services each month. But the undisputed record shows, and Heath admits, that Defendants do not give customers any end date by which *all* services will be completed, and they continue to bill customers every month automatically, without re-authorization, unless they cancel. Indeed, Defendants avoid telling customers how long the "repair" will take and explain [redacted]. Reply to Defs.' Resp. to SUMF ¶¶ 23, 33. Manifestly, Defendants do not complete *all* services in a month or tell customers they will do so.

Lacking any support for their untenable position, Defendants seek refuge in the Agreed Final Order resolving Tennessee's 1996 lawsuit against Lexington Law. But that Order does not help them, because the Federal government was not a

---

[11] 67 Fed. Reg. 4492, 4511 ("[T]he remedy imposed by the Rule to correct [the abusive practices relating to credit repair services] is to prohibit requesting or receiving payment for these services until after performance of the services is completed.").

party to it and it articulates a compromise, *not* regulatory guidance. It explicitly admonishes:

> Entry into this Agreed Final Order…shall not be deemed approval of any of Defendant's business practices. Neither Defendant nor anyone with authority acting on its behalf shall state or imply and/or cause to be stated or implied that the Plaintiff Attorney General has approved, sanctioned, or authorized any practice, act, or conduct of Defendant. Nothing in this Agreed Final Order shall be construed as relieving Defendant of any obligations to comply with applicable state or federal laws."

Defs.' Opp'n Ex. 50-1, 2.[12]

The material facts are undisputed, and the Bureau is entitled to summary judgment on Count I for Defendants' violation of subsection (a)(2)(i).

## II. Defendants' Affirmative Defenses Are Legally Invalid and Factually Unsupported, and Should Be Dismissed

Defendants misstate the legal standard for summary judgment on affirmative defenses. Federal Rule of Civil Procedure 56(a) applies, without distinction, to claims and defenses. Observing that a principal purpose of Rule 56 is "to isolate and dispose of factually unsupported claims or defenses," the Supreme Court held that summary judgment should be entered "against a party who fails to make a

[12] The Order binds Defendants. *Id.* ¶ 6 ("This Agreed Final Order shall apply to the Defendant whether acting through any … successor, assign, or any other person acting in concert or participating with it.").

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The Bureau's election to seek summary judgment only on Count I of its Complaint does not alter Defendants' burden under Rule 56(c) to demonstrate each challenged defense's legal validity and identify probative evidence sufficient to permit a reasonable factfinder to find in Defendants' favor on the defense. *E.g.*, *Petrobras Am., Inc. v. Vicinay Cardenas, S.A.*, No. H-12-888, 2019 WL 13060210 (S.D. Tex. Dec. 18, 2019) (granting summary judgment on multiple legally invalid or factually unsupported affirmative defenses).[13] Defendants fail to carry their burden.

### A. The Third Defense fails because it is an argument about the scope of recovery, not an affirmative defense.

Affirmative defenses are "'assertion[s] of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim.'" *United States v. Portillo-Madrid*, 292 Fed. App'x 746, *747 n.1 (10th Cir. 2008) (quoting Black's Law

---

[13] Defendants' reliance on *Strong as Tr. of Consol. Legacy Debtors Liquidating Tr. v. Cochran*, No. 14-cv-788, 2019 WL 7290835 (D. Utah. Dec. 30, 2019), is misplaced; that decision discussed whether a defendant waives an affirmative defense by failing to raise it in opposition to a plaintiff's successful motion for summary judgment. By contrast, the Bureau seeks summary judgment here on affirmative defenses that present no triable issue, independent of the Court's determination of the Bureau's motion for summary judgment on Count I.

Dictionary (8th ed. 2004)). Defendants essentially concede that their Third Defense will not defeat any of the Bureau's claims. Rather, Defendants now assert that whether they acted with "reasonable basis in fact and/or law" is germane to the scope of the Bureau's recovery. But arguments that go to the scope of recovery, which presume that the Bureau's claims are *successful*, are by their nature not affirmative defenses. *Id.* Lacking a basis to defeat, or in any way address, the Bureau's claims, summary judgment is appropriate for the Defendants' Third Defense.

Even assuming that Defendants' "reasonable basis" argument is relevant to potential civil money penalties,[14] this affirmative defense is unnecessary as good faith is already a factor in the determination of any penalty under the CFPA, as is the Defendants' state of mind in committing the wrongful acts. 12 U.S.C. § 5565(c)(2), (3). These statutory provisions eliminate any need for Defendants' Third Defense.[15]

---

[14] *See* Defs.' Opp'n, 27.

[15] Defendants' reliance on *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254 (D.C. Cir. 2003) is misplaced as that case dealt solely with the penalties authorized by the Occupational Safety and Health Act of 1970 and in particular whether defendants' actions were "willful." The CFPA's civil money penalties provision does not require "willfulness"; the penalty tiers encompass federal consumer financial law violations committed (a) with no particular *scienter*; (b) recklessly; and (c) knowingly. 12 U.S.C. § 5565(c)(2).

**B. Heath's Ninth Defense and Progrexion's Tenth Defense fail because Defendants had notice of the Provision.**

The Bureau identified facts demonstrating that Defendants had notice of the Provision—which is all that is required[16]—and the Provision's coverage of all telemarketed credit repair services.[17] Rather than address the relevant Federal Register history, FTC guidance, and the prior enforcement history of the Provision, Defendants attempt to argue that Tennessee's lawsuit against Lexington Law somehow defeats the Bureau's claims, despite a ruling in that case that the TSR clearly applies to Lexington Law, *Tennessee v. Lexington Law Firms*, No. 3:96-0344, 1997 WL 367409, at *6 (M.D. Tenn. May 14, 1997).

Defendants mischaracterize the FTC's role and position in that suit. The FTC was *not* a party to the settlement agreement. Defs.' Ex. 50-1, 2. Its role was as a limited intervenor, "for the limited purpose of addressing challenges…to the validity and applicability of the [Provision]." *Id*. And its position, with which the court agreed, was that Lexington Law's affirmative defenses to liability under the Provision were meritless. *Lexington Law Firms*, 1997 WL 367409, at *8. The FTC explained that the Provision "prohibit[s] the collection of a fee for credit repair services until actual credit improvement has been shown," Ex. 19, 7—a position

[16] *E.g.*, *United States v. Dish Network LLC*, 954 F.3d 970, 979 (7th Cir. 2020).
[17] *See* Pl.'s Mot., 32-35.

entirely consistent with the Bureau's position here, which Defendants fail to address.

Moreover, contrary to Defendants' characterization, the settlement in that case did not approve their business model or alter their obligations under the law. Rather, as quoted above, it stated that the settlement "shall not be deemed approval [by the Attorney General] of any of [Lexington Law's] business practices" and commanded Lexington Law to not even *imply* that the Attorney General approved any of its practices or conduct. Defs.' Ex. 50-1, 2. It did not sanction the collection of fees where "no promised results have been represented to the client" generally, but only for the limited purposes of "interpreting and enforcing" the settlement. Defs.' Ex. 50-1, 5. A bilateral settlement agreement between a company and a state is not legal guidance on a federal regulation and cannot undo and supersede duly noticed and promulgated notice-and-comment rulemaking.

**C. Heath's Eleventh Defense and Progrexion's Twelfth Defense fail because Defendants are covered by the Provision.**

Defendants contend that the Provision is unenforceable against them because "the FTC limited its rulemaking to 'scams.'" Defs.' Opp'n, 32. Defendants' argument fails for the same numerous independent and sufficient reasons that their merits argument fails. Among other fatal issues, Defendants' purported exemption for non-scam credit repair would:

- contort the Provision's clear language and structure beyond plausibility;
- invent a credit repair exemption, when the FTC created none and expressly excluded credit repair from actual TSR exemptions, *see* 16 C.F.R. § 310.6(b);
- disregard the abundant regulatory history demonstrating the FTC's intent to regulate telemarketed credit repair services *broadly*, not narrowly, *e.g.*, 60 Fed. Reg. 8313, 8330; 67 Fed. Reg. 4492, 4504 n.106;
- conflict irreconcilably with the FTC's near-contemporaneous statements that it had no evidence of "the existence of any legitimate provider of credit repair" and did not limit the Provision to "'deceptive acts or practices,'" FTC Mem., 1997 WL 35410876;
- undermine the Provision's purpose of protecting "highly susceptible … financially distressed consumers," whom the FTC determined credit repair companies may particularly "exercise undue influence over," 75 Fed. Reg. 48,458, 48,485;
- spawn an unworkably vague coverage standard because neither the TSR nor its regulatory history defines, or even mentions, non-bogus credit repair;
- gut the Provision and thwart enforcement by enabling any company that professes not to be a scam to exempt itself from compliance;

- contradict the canon of construction that laws that do not limit their coverage to legitimate or illegitimate entities govern both, *see Turkette*, 452 U.S. at 580-81; and
- render the Provision absurd, because by only covering scams, it would impose a highly-detailed billing structure on services that are unlawful under multiple other laws, *e.g.*, CFPA, 12 U.S.C. § 5331; Credit Repair Organizations Act (CROA), 15 U.SC. § 1679b(a)(3).

Defendants fail to address these defects, and their affirmative arguments alter nothing. They misread both the Telemarketing Act, which is not limited to protecting consumer privacy, *see* 15 U.S.C. § 6101, and the FTC's 2002 unfairness analysis, which does not adopt a major, new limitation to the Provision's coverage *sub silentio*, *see* 67 Fed. Reg. 4492, 4511. Nor could it. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). The Provision always covered "*any*" telemarketed credit repair, and the 2002 unfairness analysis did not change that.

**D. Heath's Fifteenth Defense and Progrexion's Thirteenth Defense fail because the Provision does not violate the First Amendment.**

Defendants cite no authority supporting their position that the Provision unconstitutionally restricts their speech and ignore the contrary authority cited by the Bureau. *E.g.*, *Consumer Fin. Prot. Bureau v. Commonwealth Equity Grp., LLC*,

No. 20-cv-10991, 2021 WL 3516690, at *3 (D. Mass. Aug. 10, 2021), *reconsideration denied*, ECF No. 57 (D. Mass. Oct. 13, 2021). Because the Provision regulates only non-expressive conduct, Defendants' references to time, place, or manner restrictions—which pertain only to speech or expressive conduct—are inapposite. Their alternative argument—that the Provision, which does not restrict speech, is so "closely connected" to how they communicate with their customers that compliance would "alter" how they "engage" with those customers—is nonsensical. Defendants do not explain how compliance would "alter" how they "engage" with customers, nor do they provide any relevant authority for this position, relying solely on *Buckley v. Valeo*, 424 U.S. 1 (1976), which deals with the relationship between campaign contributions and political expression, not the timing of demands for payment for services.

Defendants wrongly assert that the *Zauderer* standard governing misleading commercial speech applies only to disclosure requirements. But even if that were true, which it is not, the *Central Hudson* standard Defendants propose is inappropriate, because, in the words of the FTC, credit repair is "inherently deceptive," FTC Mem., 1997 WL 35410876, and thus it is not entitled to First Amendment protection, *see id.* (citing *Ibanez v. Fla. Dep't of Bus. and Pro. Reg.*, 512 U.S. 136, 142 (1994) ("deceptive…. commercial speech may be banned")).

Ultimately, though, the Court need not decide which First Amendment standard applies because the Provision does not restrict speech and, even if it did, it would satisfy either standard.

**E. The Second Defense fails because CROA and the TSR do not conflict.**

Defendants contend that CROA, 15 U.S.C. §§ 1679-1679j, completely preempts the Provision, without citing *any* factual or legal support. It does not, as all three courts to address this issue have agreed.

CROA does *not* "recogniz[e] the [credit repair] industry as legitimate." *Contra* Defs.' Opp'n, 6. Congress enacted CROA "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2). CROA requires credit repair organizations to comply with hyper-detailed operational and contracting requirements, and it authorizes actual and punitive damages plus attorneys' fees to both private and governmental plaintiffs who prosecute violations.[18]

Even if CROA did not prohibit Defendants' business model,[19] as Defendants baldly assert, this would not produce a conflict between CROA and the Provision.

---

[18] CROA finds that credit repair organizations may "*offer* to improve" consumers' credit worthiness, 15 U.S.C. § 1679(a) (emphasis added), but it never finds that they *actually* do so.

[19] The Bureau makes no concession that Defendants' business complies with CROA.

*See Radzanower v. Touche Ross Co.*, 426 U.S. 148, 155 (1976). Indeed, the TSR, unsurprisingly, imposes stringent requirements on credit repair *telemarketers* on top of those CROA imposes on all credit repair *organizations*, given the "magnitude" of Congress's concerns with telemarketing fraud. *See* 15 U.S.C. § 6101. The applicable test for statutory repeal of a regulation is whether it is impossible to comply with both. *Commonwealth Equity Grp.*, 2021 WL 3516690, at *2.[20] That test is unmet.

Defendants' attempt to harmonize their interpretation of the Provision with CROA demonstrates its unworkability. Defendants contend that "CROA governs advance fees for credit repair more generally," while the Provision applies "only in instances where a seller gives consumers a false guarantee of credit improvement." Defs.' Opp'n, 40. But this fails to "give effect to both" CROA and the Provision, *Morton v. Mancari*, 417 U.S. 535, 551 (1974), because giving consumers a false guarantee of credit improvement directly violates CROA, 15 U.S.C. §1679b(a)(3).

[20] Defendants' argument for an alternate legal standard is unsupported by Defendants' citations, which address the inapplicable situation where a regulation conflicts with the statute under which it was promulgated. *See United States v. Larinoff*, 431 U.S. 864, 873 & n.12 (1977) ("regulations, in order to be valid must be consistent with the statute under which they are promulgated"); *Taylor v. Quality Hyundai, Inc.*,150 F.3d 690, 693-94 (7th Cir. 1998) (addressing conflict between Truth in Lending Act and FTC regulation promulgated thereunder).

No evidence exists, and no court has found, that Congress ceased to be concerned with abusive telemarketing practices when it passed CROA.

**F. The Fifth and Sixth Defenses fail because they are utterly unsupported.**

Defendants provide no factual or legal support whatsoever for their unclean hands, estoppel, availability of legal remedies, and inequitable windfall defenses, and still have not identified any other equitable defenses. Defendants, thus, have "fail[ed] to make a showing sufficient to establish the existence of an element essential to" these defenses, on which they bear the burden of proof. *Celotex*, 477 U.S. at 322. Defendants' failure to provide any evidentiary support or meet the high legal hurdles for these defenses warrants summary judgment in the Bureau's favor.

**G. Heath abandoned its Seventeenth Defense.**

Defendants offer no factual or legal support for Heath's non-viable Seventeenth Defense. Per Rule 56(e)(3) and *Celotex*, and the reasons stated in the Bureau's motion, the Court should enter judgment in the Bureau's favor on this defense.

## CONCLUSION

The Court should grant the Bureau's motion in full.

Dated: January 18, 2022

Respectfully submitted,

/s/ Maureen McOwen
MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above motion and memorandum in support complies with the word-count limit set by DUCivR 7-1(a)(4)(B), according to the word count function of Microsoft Word, excluding the face sheet, table of contents, table of authorities, signature block, and exhibits.

Dated: January 18, 2022

/s/ Maureen McOwen
MAUREEN MCOWEN
*Enforcement Attorney*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov