Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>    Plaintiff,<br><br>    v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELE-SERVICES, INC.; EFOLKS, LLC; CREDIT-REPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>    Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS PROGREXION MAR-KETING, INC., PGX HOLDINGS, INC., PROGREXION TELESERVICES, INC., EFOLKS, LLC, AND CREDITRE-PAIR.COM, INC.**<br><br><br>**REDACTED VERSION** |

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF SOUGHT ................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 3

**I.** Defendants did not have an agency relationship with the Relevant Hotswaps.................. 3

**II.** Progrexion's policies and procedures prohibited statements about Hotswap products and services............................................................................................................................ 6

**III.** One Loan Place helps consumers obtain loans. .............................................................. 7

**IV.** Progrexion had no knowledge that Ascent/Lead Virtue did not provide rent-to-own listings. .......................................................................................................................... 8

**V.** Easy Home Ownership, OwnerWiz, and Rent2Own.house. ............................................ 11

**VI.** CreditRepair.com ........................................................................................................... 11

    A.   CreditRepair.com's Services........................................................................................ 11

    B.   CreditRepair.com's Billing Practices.......................................................................... 13

    C.   CreditRepair.com's policies and practices are to make no promises or guarantees of specific results.......................................................................................................... 14

**VII.** The Bureau had notice of the facts for its claims before March 8, 2016. ......................... 16

LAW AND ARGUMENT ............................................................................................ 21

**I.** Legal Standard ................................................................................................................ 21

**II.** The CFPA's three-year statute of limitations prohibits the Bureau's recovery before at least March 8, 2016........................................................................................................ 21

    A.   The Bureau has not alleged a continuing violation, and, in any event, cannot seek recovery for a continuing violation here. ................................................................... 22

    B.   The Bureau should be barred from recovering any payment made prior to July 7, 2017, three years before the Bureau ratified its Complaint. ..................................... 23

    C.   At a minimum, the Bureau is barred by the three-year statute of limitations from recovery for any violation that occurred prior to March 8, 2016............................... 25

**III.** Defendants are not liable under Counts II and III because they had policies in place against making direct representations to consumers concerning loans or rent-to-own housing contracts. .......................................................................................................... 28

    A.   There is no evidence to support that Defendants had policies and practices of making representations to consumers directly regarding loans or rent-to-own housing contracts. ....................................................................................................... 29

    B.   The CFPA does not allow for the sort of agency liability that the Bureau seeks to impose here. ............................................................................................................... 29

C.    Even if an agency theory were permissible, the Bureau has not proven that an agency relationship existed between Defendants and the Relevant Hotswaps. ........ 31

IV.  CFPB's substantial assistance claims under Counts IV and V fail because the Rent-to-Own Hotswaps are not "covered persons" or "service providers" under the CFPA. ........ 32

    A.    The Rent-to-Own Hotswaps are not "covered persons." ......................................... 33

    B.    The Rent-to-Own Hotswaps are not "service providers." ....................................... 35

V.    The Bureau's substantial assistance claim regarding OLP's alleged misconduct fails because OLP actually provided its advertised services. .................................................. 37

VI.  The Bureau's substantial assistance claim premised on Ascent's alleged misconduct fails. ................................................................................................................................. 38

    A.    Consumers received rent-to-own listings from Ascent. ........................................... 38

    B.    Progrexion had no knowledge of facts supporting the allegation that Ascent did not provide consumers with rent-to-own listings. ........................................................... 39

VII. The Bureau has no authority to regulate the rent-to-own industry and cannot seek to impose liability on Defendants by proxy. ........................................................................ 40

VIII. CreditRepair.com is entitled to summary judgment on Count I because it had a policy and practice of not offering "promised results." .................................................. 42

CONCLUSION ....................................................................................................................... 43

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Agnew v. Granite Seed Co.*,
No. 2:16-cv-00887-BSJ, 2017 WL 8776902 (D. Utah Dec. 11, 2017)
(Jenkins, J.) ......................................................................................................21

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021)......................................................................................42

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................................................................................29, 30

*CFPB v. Access Funding, LLC*,
No. E:H-16-3759, 2021 WL 2915118 (D. Md. July 12, 2021)...........................36

*CFPB v. Consumer Advoc. Ctr. Inc.*,
No. SACV 19-1998-MWF, 2020 WL 7774930 (C.D. Cal. Dec. 1, 2020) ............36

*CFPB v. D & D Mktg.*,
No. CV 15-9692 PSG (EX), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016).........35

*CFPB v. Future Income Payments, LLC*,
No. 8:19-2950-BHH-KFM, 2020 WL 6162947 (D.S.C. May 21, 2020) ..............33

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) ...............................................................34

*CFPB v. Nationwide Biweekly Admin., Inc.*,
No. 15-cv-02106-RS, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017)...................25

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ...................21

*CFPB v. Think Fin., LLC*,
No. CV-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) .............36

*CFPB v. Universal Debt & Payment Sols., LLC*,
No. 1:15-CV-0859-RWS, 2019 WL 1295004 (N.D. Ga. Mar. 21, 2019) .............37

*CIG Expl., Inc. v. Hill*,
824 F. Supp. 1532 (D. Utah 1993)....................................................................32

iii

*Converse, Inc. v. Norwood Venture Corp.*,
No. 96 CIV. 3745 (HB), 1997 WL 742534 (S.D.N.Y. Dec. 1, 1997) ...................................30

*Davidson v. Am. Online, Inc.*,
337 F.3d 1179 (10th Cir. 2003) .............................................................................23, 25

*FEC v. NRA Pol. Victory Fund*,
513 U.S. 88 (1994).................................................................................................24

*FEC v. Swallow*,
304 F. Supp. 3d 1113 (D. Utah 2018)....................................................................30

*FTC v. Chapman*,
714 F.3d 1211 (10th Cir. 2013) .............................................................................36

*FTC v. LifeWatch Inc.*,
176 F. Supp. 3d 757 (N.D. Ill. 2016) ......................................................................32

*FTC v. Nudge, LLC*,
No. 2:19-cv-00867-DBB-DAO, 2021 WL 3145700 (D. Utah July 26, 2021) .......................36

*G.L. v. Ligonier Valley Sch. Dist. Auth.*,
802 F.3d 601 (3d Cir. 2015).................................................................................27

*Goodman v. FTC*,
244 F.2d 584 (9th Cir. 1957) ...............................................................................30

*J. White, L.C. v. Wiseman*,
No. 2:16-cv-01179-DBB-JCB, 2020 WL 3922977 (D. Utah July 10, 2020) .......................31

*Martin v. Nannie & Newborns, Inc.*,
3 F.3d 1410 (10th Cir. 1993) ...............................................................................27

*Murphy v. Setzer's World of Camping, Inc.*,
No. 3:20-cv-00406, 2020 WL 8484878 (S.D.W. Va. Sept. 15, 2020)....................................34

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
--- S. Ct. ----, 2022 WL 120952 (U.S. Jan. 13, 2022)............................................................41

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)........................................................................................23, 27

*Pennsylvania v. Think Fin., Inc.*,
No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016)..................................................30

iv

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016) ................................................................................22, 23

*Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*,
    No. 2:20-cv-352-JNP-DAD, 2021 WL 5772269 (D. Utah Dec. 6, 2021) ..............................29

*Proctor & Gamble Co. v. Haugen*,
    222 F.3d 1262 (10th Cir. 2000) ...............................................................................31

*Roberts v. Gadsden Mem'l Hosp.*,
    850 F.2d 1549 (11th Cir. 1988) ...............................................................................27

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ...........................................................................................23

*Standard Distribs. v. FTC*,
    211 F.2d 7 (2d Cir. 1954) ........................................................................................30

*Sterlin v. Biomune Sys., Inc.*,
    114 F. Supp. 2d 1163 (D. Utah 2000) .........................................................................27

*SW Gen., Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015) ...................................................................................24

*United States v. Corps. for Character, L.C.*,
    116 F. Supp. 3d 1258 (D. Utah 2015) .........................................................................38

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ...............................................................................................40

*In re World Access, Inc.*,
    310 F. Supp. 2d 1281 (N.D. Ga. 2004) ...................................................................38, 39

**STATUTES, REGULATIONS, AND RULES**

16 C.F.R. § 310.2(a) ....................................................................................................31

16 C.F.R. § 310.2(dd) ..................................................................................................31

16 C.F.R. § 310.2(ff) ...................................................................................................31

16 C.F.R. § 310.3 ..........................................................................................................1

16 C.F.R. § 310.3(a)(4) ................................................................................................37

16 C.F.R. § 310.3(c)(2) ................................................................................................31

16 C.F.R. § 310.4(a)(2)(ii) ........................................................................................42

12 U.S.C. § 5481(6) ..........................................................................................30, 33

12 U.S.C. § 5481(7) ...................................................................................................33

12 U.S.C. § 5481(15)(A)(i) ..................................................................................33, 34

12 U.S.C. § 5481(15)(A)(ii) ......................................................................................34

12 U.S.C. § 5481(15)(A)(viii) ...................................................................................34

12 U.S.C. § 5481(15)(A)(ix) ......................................................................................35

12 U.S.C. § 5481(26) .................................................................................................35

12 U.S.C. § 5481(26)(A) ............................................................................................30

12 U.S.C. § 5531 ........................................................................................1, 32, 37

12 U.S.C. § 5531(a) ...................................................................................................30

12 U.S.C. § 5536(a)(1)(B) .........................................................................................37

12 U.S.C. § 5536(a)(3) .........................................................................................32, 38

12 U.S.C. § 5564(g)(1) ..............................................................................................21

15 U.S.C. § 6105(d) ..................................................................................................33

Fed. R. Civ. P. 56(a) .................................................................................................21

Tex. Prop. Code § 5.061 *et seq.* ..............................................................................42

Va. Stat. § 55.1-3000 *et seq.* ....................................................................................42

## REGULATORY HISTORY

60 Fed. Reg. 43,841 (Aug. 25, 1995) ........................................................................43

67 Fed. Reg. 4,492 (Jan. 30, 2002) ...........................................................................43

## INTRODUCTION AND RELIEF SOUGHT

The Bureau's case against Defendants has proven to be one of massive agency overreach, where the Bureau has alleged what it cannot deliver.[1]  In Counts II through V of the Complaint, the Bureau alleges that Defendants violated the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5531, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3, because independent hotswap companies that Defendants retained to market Defendants' credit-repair offerings made deceptive statements to consumers about (1) the availability of allegedly non-existent loans and (2) allegedly fake rent-to-own offerings.  The first half of the Bureau's theory has proven to be indisputably false:  One Loan Place, the hotswap company that offered loans, actually delivered on those loans, so there was no deception involved.

There is no legal and factual basis for the second half.  At the outset, the Bureau has no authority to extend the CFPA, which provides the jurisdictional hook for both the CFPA and TSR claims, to cover the rent-to-own industry.  Tellingly, no rent-to-own companies are defendants in this case, despite the Bureau's specious theory that Defendants broke the law by "substantially assisting" the rent-to-own companies (or that the companies acted as Defendants' agents).  Moreover, the Bureau has not explained how—and the facts do not show—the rent-to-own companies are "covered persons" or "service providers" under the CFPA.  Nor has the Bureau pointed to any textual basis in the CFPA or the TSR that allows for agency liability.  Even if there were such a

---

[1] This brief is filed collectively on behalf of the Progrexion entities named as parties in the lawsuit: Progrexion Marketing, Inc. ("Marketing"); PGX Holdings Inc. ("Holdings"); Progrexion Teleservices, Inc. ("Teleservices"); eFolks, LLC ("eFolks"); and CreditRepair.com, Inc. ("CreditRepair.com") (collectively "Progrexion" or "Defendants").

basis, the undisputed material facts do not support that Defendants controlled the hotswap companies, such that they could control the hotswap companies' messaging.

The Bureau's overreach is not only substantive, but temporal as well. Despite the CFPA's three-year statute of limitations, the Bureau says it can reach back to conduct dating back to 2012, nearly seven years prior to the limitations tolling date and more than twice the limitations period. The Bureau claims a "continuing violation," even though the Supreme Court has rejected its legal theory.

Moreover, the undisputed record shows that the Bureau failed to act diligently in bringing its claims, instead sitting on them for at least four to five years before bringing suit. That also forecloses a continuing violation. Counts II to V advance the Bureau's incorrect theory that Defendants are legally responsible for third party advertisements that the Bureau contends systematically deceived consumers. As set forth below, and as would be proven by Defendants at trial, the Bureau's theory is legally and factually unsound. But much of the Bureau's claim, which goes back to 2012, is also time barred, because the Bureau had notice of the facts of the alleged violations before March 8, 2016 and yet failed to conduct a reasonably diligent investigation or timely file suit.

Accordingly, Defendants are entitled to summary judgment on Counts II through V. Defendants also seek summary judgment on Count I, which incorrectly asserts that Defendants violated a billing rule that only applies where a credit repair company promises results, which Defendants do not.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

**I.     Defendants did not have an agency relationship with the Relevant Hotswaps.**

1.      Ascent Mortgage Resource Group and Lead Virtue, LLC (collectively referred to as "Ascent"); Easyhomeownership.net ("EHO"); OLP.com, Inc., a/k/a Rocket Daddy, Inc. and One Loan Place ("OLP"); The Hope Program, LLC, a/k/a Help Renters, Hope to Own, and Ecain, LLC ("Hope"), YHTBA Corp., d/b/a rent-2-own.house, Rent Then Own Homes, and renttoown.house Realty, Inc. ("Rent2own.house"); and OwnerWiz Realty, Inc. ("OwnerWiz") (collectively, the "Relevant Hotswaps"),  are third party entities that have sold leads to Marketing in its marketing efforts for John C. Heath, Attorney at Law P.C. ("Heath") and/or CreditRepair.com.  <u>Exhibit 2</u>, CFPB-PGX-249827, Ascent Contract; <u>Exhibit 3</u>, CFPB-PGX-194925, Hope Contract;  <u>Exhibit 4</u>, PGX.CFPB.II.00026419, Lead Virtue Contract at 30;  <u>Exhibit 5</u>, PGX.CFPB.II.00729339, OLP Contract;  <u>Exhibit 6</u>, PGX.CFPB.II.00869992, EHO Insertion Order; <u>Exhibit 7</u>, PGX.CFPB.00003343, OwnerWiz Registration Insertion Order; <u>Exhibit 8</u>, Kemp Dep. 316:24-318:15, 323:4-9; <u>Exhibit 9</u>, Curtis Decl. ¶ 6.

2.      The Relevant Hotswaps were formed or incorporated without assistance or funding from Defendants.  <u>Exhibit 8</u>, Kemp Dep. 79:19-80:14, 81:2-9, 316:19-23; <u>Exhibit 10</u>, Rook Dep. 201:2-15; <u>Exhibit 11</u>, Delfgauw Dep. 303:16-304:20; 335:13-337:10; <u>Exhibit 12</u>, Robinson Dep. 43:8-11; 22:20-22; <u>Exhibit 9</u>, Curtis Decl. ¶ 7.

3.      Marketing had an arms-length contractual relationship with the Relevant Hotswaps. <u>Exhibit 2</u>, CFPB-PGX-249827, Ascent Contract at § E; <u>Exhibit 3</u>, CFPB-PGX-194925, Hope Contract at 19436 § N; <u>Exhibit 4</u>, PGX.CFPB.II.00026419, Lead Virtue Contract at 00026430; <u>Exhibit 5</u>, PGX.CFPB.II.00729339, OLP Contract, at 00729344 § 12.9; <u>Exhibit 8</u>, Kemp Dep. 316:24-

318:15, 323:4-9; <u>Exhibit 6</u>, PGX.CFPB.II.00869992, EHO Insertion Order; <u>Exhibit 7</u>, PGX.CFPB.00003343, OwnerWiz Registration Insertion Order; <u>Exhibit 9</u>, Curtis Decl. ¶ 8.

4.      The Relevant Hotswaps could terminate their relationship with Marketing at will. <u>Exhibit 8</u>, Kemp Dep. 328:15-25; <u>Exhibit 10</u>, Rook Dep. 203:12-14; <u>Exhibit 13</u>, PGX.CFPB.II.00840247, 10/25/16 email by Ascent employee signaling potential termination for financial reasons; <u>Exhibit 12</u>, Robinson Dep. 258:6-12; <u>Exhibit 2</u>, CFPB-PGX-249827, Ascent Contract at § C; <u>Exhibit 3</u>, CFPB-PGX-194925, Hope Contract at 19428 § II.B; <u>Exhibit 4</u>, PGX.CFPB.II.00026419, Lead Virtue Contract at 00026421 § II.B; <u>Exhibit 5</u>, PGX.CFPB.II.00729339 at 729342 § 6.2; <u>Exhibit 9</u>, Curtis Decl. ¶ 9.

5.      Marketing had a policy of instructing the Relevant Hotswaps to inform consumers that they were different from, and provided services different than, Progrexion, Heath and the offer of credit repair. <u>Exhibit 14</u>, PGX.CFPB.00001822, Heath Hotswap Guide at 24-25; <u>Exhibit 15</u>, PGX.CFPB.II.00297911, email between Hankins and Delfgauw; <u>Exhibit 16</u>, PGX0031290, email between Hankins and Robinson; <u>Exhibit 8</u>, Kemp Dep. 323:11-18, 334:13-17; <u>Exhibit 9</u>, Curtis Decl. ¶ 12.

6.      The Relevant Hotswaps were instructed to make clear they were a separate company when speaking with consumers, and did so. <u>Exhibit 9</u>, Curtis Decl. ¶¶ 12-13; <u>Exhibit 8</u>, Kemp Dep. 323:19-23; <u>Exhibit 18</u>, PGX.CFPB.II.00029279, EHO script; <u>Exhibit 19</u>, CFPB-PGX-245743, OLP script; <u>Exhibit 20</u>, PGX.CFPB.00004851, Hope script; <u>Exhibit 21</u>, PGX0031292, Ascent/Lead Virtue Script.

7.      The Relevant Hotswaps never took payment from consumers on behalf of Defendants or Heath. Exhibit 8, Kemp Dep. 324:8-11; Exhibit 11, Delfgauw Dep. 177:8-17; Exhibit 9, Curtis Decl. ¶ 14.

8.      Marketing never advertised the Relevant Hotswaps' services.  Exhibit 8, Kemp Dep. 324:12-15; Exhibit 9, Curtis Decl. ¶ 15.

9.      The Relevant Hotswaps controlled their own marketing efforts for their services, designed their own websites, ads, and creative material, and determined where to advertise.  Exhibit 8, Kemp Dep. 325:10-16, 319:20-24, Exhibit 12, Robinson Dep. 256:19-258:5; Exhibit 10, Rook Dep. 202:7-12; Exhibit 11, Delfgauw Dep. 341:8-342:15; Exhibit 9, Curtis Decl. ¶¶ 16-17.

10.     The Relevant Hotswaps wrote and controlled their own scripts; Progrexion's review of scripts was focused on how the hotswaps represented credit repair.  Exhibit 8, Kemp Dep. 344:20-25, 344:7-19, 345:1-3, 345:24-347:1; Exhibit 17, PGX.CFPB.II.00029278, email between Hankins and Kemp; Exhibit 12, Robinson Dep. 180:19-181:15; Exhibit 10, Rook Dep. 200:2-201:1; Exhibit 23, Hankins Dep. 39:2-41:12, 218:23-219:2; Exhibit 24, Nickl Dep. 97:12-99:19; Exhibit 11, Delfgauw Dep. 339:24-341:7; Exhibit 25, PGX.CFPB.00001826, Heath Style Guide at 27-58; Exhibit 9, Curtis Decl. ¶ 18.

11.     The Relevant Hotswaps made their own business decisions, including determining business strategy, hiring and firing employees, compensating employees, and providing back-end business functions.  Exhibit 8,  Kemp Dep. 318:17-19, 318:20-23, 318:24-320:18; Exhibit 11, Delfgauw Dep. 345:2-6, 335:13-337:10, 337:23-339:23; Exhibit 12, Robinson Dep. 254:20-256:18, 256:19-258:5; Exhibit 10, Rook Dep. 201:19-202:6, 202:22-203:14; Exhibit 9, Curtis Decl. ¶ 19.

12.     Defendants had no input in the Relevant Hotswaps' services or business decisions. Exhibit 8, Kemp Dep. 320:21-321:11; Exhibit 11, Delfgauw Dep. 342:16-343:2, 350:10-351:1; Exhibit 10, Rook Dep. 202:13-21; Exhibit 9, Curtis Decl. ¶ 19.

## II.     Progrexion's policies and procedures prohibited statements about Hotswap products and services.

13.     The allegedly deceptive statements cited by the Bureau in Counts II and III of the Complaint were made by Hope, not by Defendants. Compl. ¶ 79(a); Exhibit 26, CFPB-PGX-153538, Hope Website; Exhibit 11, Delfgauw Dep. 180:4-5 (admitting ownership of Hope-ToOwn.com); Compl. ¶ 79(b); Exhibit 27, CFPB-PGX-153721, Hope Website; Exhibit 11, Delf-gauw Dep. 197:19-198:2; Compl. ¶ 79(c); Exhibit 28, CFPB-PGX-002510, email to Delfgauw discussing referenced ads ran by Hope; Compl. ¶ 79(d); Exhibit 29, CFPB-PGX-153513, Hope Facebook Page,  Exhibit 11, Delfgauw Dep. 343:24-344:8; Compl. ¶ 79(e); Exhibit 30, CFPB-PGX-153745, Hope Website; Exhibit 11, Delfgauw Dep. 195:13-20; Compl. ¶  80 ("HSPI made [ ] misrepresentations"); Compl. ¶  81; Exhibit 20, PGX.CFPB.00004851, Hope script; Compl. ¶ 85; Exhibit 31, PGX.CFPB.II.00044593, email containing Hope Script; Compl. ¶ 97 (describing "a telemarketing script for HSP1").

14.     Teleservices' and CreditRepair.com's employees are prohibited from making statements concerning the availability of products advertised by a Relevant Hotswap. Opp. Ex. 40,[2] PGX0005830 – Q-Tips CR.com – Guarantees – Positive Outcome; Opp. Ex. 26, PGX0005831, Q-Tips LLF – Guarantees – Positive Outcome; Exhibit 32, PGX0005846, Q-Tips LLF – Discussing Hotswap Product.

---

[2] "Opp. Ex." refers to exhibits to the Appendix of Evidence Submitted in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF 280.

15.     Teleservices's and CreditRepair.com's employees are prohibited from suggesting enrollment in credit repair will allow the consumer to move forward with any lead generation partner's advertised product. Exhibit 33, PGX0061943, Q-Tips LLF – Case ID; Exhibit 34, PGX0062101, CR.com Violations Email.

**III.     One Loan Place helps consumers obtain loans.**

16.     OLP began providing live transfers of leads to Marketing on July 30, 2012. Exhibit 35, PGX.CFPB.II.00387661, Insertion Order.

17.     Between October 11, 2017 and October 10, 2018, OLP also provided lead genera-tion services, but not live transfers, to eFolks. Exhibit 10, Rook Dep. 245:7-16; Exhibit 36, eFolks Supp. Resp. Rog. 1.

18.     The Bureau asserted that OLP "offered, and may still be offering, consumers illu-sory, guaranteed loans as a means of enticing them to sign up for Progrexion's credit repair ser-vices" when "[i]n reality, consumers did not receive loans through OLP or were unable to meet lending criteria set by third-party lenders on whose behalf OLP serves only as a lead generator." Exhibit 37, 3/25/20 Ltr. at 3.

19.     The Bureau asserted that OLP "represented to consumers that it provided refinance loans, often characterized as loans with more conventional lenders and better terms [when] One Loan Place did not provide such refinance loans." Exhibit 38, CFPB Corr. Resp. Rog. 6.

20.     OLP operates a legitimate business, in which it helps consumers obtain a loan by matching them with potential lenders. Exhibit 10, Rook Dep. 24:6-15, 41:23-43:1. OLP does not charge consumers, but receives fees from the lenders and other third parties. *Id.* During the time in which OLP has done business with Marketing, OLP received or placed calls to consumers

interested in loan products it advertised. *Id.* 53:4-55:8. Based on information from the consumer about credit and income, OLP would attempt to match the consumer with one of its lending partners' criteria, and give consumers potential lending options via email. *Id.* 34:19-39:21, 55:19-60:10, 82:11-24, 126:2-25; Exhibit 39, CFPB-PGX-245741, Historical Lenders.

21.     Between September 18, 2013, and November 11, 2020, at least 181,194 consumers whom OLP referred to lenders obtained a loan. Exhibit 10, Rook Dep. 23:12-24:15; Exhibit 1, Tayman Decl. ¶ 3.

22.     Over one million other consumers obtained a loan through an OLP referral. Exhibit 10, Rook Dep. 217:19-218:17, 247:6-248:13.

23.     When consumers seeking loans also indicated an interest in credit repair, OLP transferred them to Progrexion or other credit repair providers. *Id.* 44:13-45:5, 55:9-56:7, 204:4-205:1.

24.     OLP had a policy and practice of requiring employees to use approved scripting designed to accurately represent its offerings when speaking with consumers. *Id.* 190:17-23, 193:1-20, 199:1-200:1. OLP trained its employees not to mislead customers. *Id.* 250:1-23.

25.     OLP's scripts did not make guarantees or promises to consumers about what OLP could accomplish for them. *Id.* 195:20-24, 196:4-6. OLP's scripts did not make guarantees to consumers about the results that could be achieved through credit repair. *Id.* 195:20-196:6.

## IV.     Progrexion had no knowledge that Ascent/Lead Virtue did not provide rent-to-own listings.

26.     Ascent provided live transfer leads to Marketing approximately between early 2013 and early 2020, when Ascent ceased operations. Exhibit 40, CFPB-PGX-249954, Terms &

Conditions; Exhibit 12, Robinson Dep. 18:10-12.  Ascent briefly provided leads to CreditRepair.com in December 2017.  *Id.* 114:19-115:5.

27.     The Bureau alleged "after contacting Ascent through one of its lead generation platforms, consumers were told that they needed to sign up for [Heath's services] in order to gain access to the advertised rent-to-own listings.  But after signing up for credit repair, consumers were confronted with listings for properties that were not in fact available as rent-to-own."  Exhibit 37, 3/25/20 Ltr. at 8 (citing Exhibit 41, CFPB-PGX-194032, a complaint noting that the provided listings were not *free*).

28.     The Bureau has contended that "Ascent represented to consumers that it provided mortgages, rent-to-own housing, and grants" when "Ascent did not provide mortgages, rent-to-own housing, and grants."  Exhibit 38, CFPB Corr. Resp. Rog. 6.

29.     Ascent operated a lead generation business focused on consumers seeking rent-to-own housing and mortgages. Exhibit 12, Robinson Dep. 18:13-16.  Ascent sent emails to every consumer who asked for information about rent-to-own properties.  *Id.* 63:21-64:11, 64:18-21, 70:14-21, 170:17-23.  Those emails included listings of properties available on a rent-to-own basis. *Id*.

30.     The listings Ascent provided to consumers were operated by Ascent's multiple listing service (MLS) partners, which changed over time, including Home Partners of America and Nations Info.  *Id.* 70:14-21, 239:1-20.  Ascent's practice was to only partner with preferred MLS listings operated by licensed relators.  *Id.* 71:21-22.  Ascent's advertising was also based on the offerings of its listing partners—Ascent's websites would pull specific properties for advertisements that were included in the MLS listings of its partners.  *Id.* 72:16-73:10, 75:4-10.

31.     There are documented Heath clients, referred by Ascent, who successfully obtained rent-to-own homes after they contacted Ascent. Opp. Ex. 68, Frederick Report at 11, 51.

32.     Ascent did not guarantee that consumers would obtain a rent-to-own property or loan.  Exhibit 12, Robinson Dep. 240:5-10.

33.     Ascent's call center employees were prohibited from making promises or guarantees to consumers. *Id.* 242:17-243:14.

34.     The Bureau has contended Progrexion had "knowledge of deceptive practices" based on a Progrexion document stating:  "[Ascent] offer[s] loan resources and RTO listings.  Clients in RTO are required to sign up for [Heath's services] to work on their credit.  That way the seller will know they were serious about working toward home ownership."  Exhibit 42, PGX.CFPB.II.00211764; Exhibit 37, 3/25/20 Ltr. at 9.

35.     Throughout Progrexion's relationship with Ascent, Progrexion understood that Ascent gave consumers listings that included rent-to-own properties.  Exhibit 43, PGX0033997, 6/8/17 email from Ascent to Marketing (noting that rent-to-own clients would "receive an email with listings to view and begin their home search"); Exhibit 44, PGX0049607, 5/6/19 email from Robinson to Marketing (explaining Ascent "actively will take these leads and pursue rent to own companies that will provide a home for these folks through the rent to own channel"); Exhibit 22, Curtis Dep. 78:17-79:4.

36.     In fact, when a customer complained to Marketing about not being contacted by Ascent, Marketing raised the issue with Ascent and Ascent responded within minutes indicating that it would "handle this immediately."   Exhibit 45, PGX0034652, 7/21/2017 email between Robinson and Marketing.

37.     Ascent's services did not include the extension of credit and servicing loans or other extensions of credit to consumers. Exhibit 12, Robinson Dep. 79:8-10.

## V.     Easy Home Ownership, OwnerWiz, and Rent2Own.house.

38.     Throughout its relationship with Marketing, EHO regularly provided consumers with rent-to-own housing listings.  Exhibit 8, Kemp Dep. 313:2-6.  Consumers were able to use those listings to obtain rent-to-own housing.  *Id.* 223:9-25, 313:14-314:5.  EHO's owner testified that the company was not an agent of Progrexion.  *Id.* 317:22-318:2.

39.     Throughout its relationship with Marketing, OwnerWiz's services consisted of providing consumers with rent-to-own housing listings.  Exhibit 9, Curtis Decl. ¶ 21.

40.     Throughout its relationship with Marketing, Rent2Own.house's services consisted of providing consumers with rent-to-own housing listings.  *Id.* ¶ 22.

## VI.    CreditRepair.com

### A.     CreditRepair.com's Services

41.     CreditRepair.com provides a wide range of credit repair services "offering to help" its members (Compl. ¶¶ 2-3) enforce their legal rights to ensure that items on the members' credit reports are fair, accurate, and substantiated.  Opp. Ex. 9, Hamilton Decl. ¶ 2.

42.     On behalf of its members, CreditRepair.com submits communications to the three major consumer reporting agencies, asking them to verify that the information reported by the furnisher is accurate, or explaining that the tradeline (a) is not the client's, (b) was "never late," or (c) was not appropriately reported.  *Id.* ¶ 3.

43.     CreditRepair.com also submits "intervention" letters on behalf of clients, which include:  (a) account information requests, which ask furnishers to verify that the information in

the tradeline provided to the bureaus can be substantiated; and (b) goodwill interventions, which ask that creditors forgive a client's mistake in being late by less than 30 days. *See* Opp. Ex. 75, PGX00028071; CFPB Ex. 26,[3] Service Matrix.

44.    CreditRepair.com sets a one-month time frame for its services and defines the scope of work to be performed over that month based on the member's chosen service level.  CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Opp. Ex. 10, PGX0047487, Louisiana Agreement at 99; CFPB Ex. 26, Service Matrix.  For example, for one month, CreditRepair.com sends up to: (1) twenty-four credit bureau challenges (eight per bureau) and six creditor interventions at the Advanced level; (2) eighteen credit bureau challenges (six per bureau) and three creditor interventions at the Standard level; and (3) twelve credit bureau challenges (four per bureau) and two creditor interventions at the Value level.  CFPB Ex. 26, Service Matrix.

45.    Members may cancel services at any time.  Opp. Ex. 10, PGX0047487, Louisiana Agreement at 501.  If the member does not cancel, or if the member cancels and later renews the relationship, CreditRepair.com again undertakes another month of services. CFPB Ex. 35, Credit-Repair.com Supp. Resp. to RFA 1; Opp. Ex. 10, PGX0047487, Louisiana Agreement at 99.

46.    Each member signs an engagement agreement with CreditRepair.com.  Opp. Ex. 9, Hamilton Decl. ¶ 19. The agreement states members are paying for CreditRepair.com's efforts on their behalf through communication with the credit reporting agencies and furnishers.  Opp. Ex. 9-2, PGX0047444, Arkansas Agreement at 46.

---

[3] "CFPB Ex." refers to exhibits to the Appendix of Evidence Submitted in Support of Plaintiff's Motion for Partial Summary Judgment, ECF 257.

47.     Members benefit from and express satisfaction with CreditRepair.com's services. Opp. Ex. 66, DelPonti Supplemental Report at 9-10, tbl. 6; Opp. Ex. 67, Ulzheimer Supplemental Report at 1-2, 4; Opp. Ex. 69, PGX0040805, California Creative Report at 55.  Over 91% of CreditRepair.com's members have at least one negative item removed.  Opp. Ex. 67, Ulzheimer Supplemental Report at 1-2, 4.  On average, members with no new negatives added to their credit reports during a tenure of at least seven months with CreditRepair.com experienced a credit score increase of 46.9 points.  Opp. Ex. 66, DelPonti Supplemental Report ¶ 13, tbl. 6.

### B.    CreditRepair.com's Billing Practices

48.     CreditRepair.com employs a monthly subscription model: it charges in arrears for services it has already provided, generally in monthly increments, and in certain cases more than six months after clients have seen results.  CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Opp. Ex. 6, DelPonti Rebuttal Report at 26 (showing 72,462 members with seven or more months of tenure); Opp. Ex. 9, Hamilton Decl. ¶ 4.

49.     The monthly service fee is not charged until after CreditRepair.com completes work on the member's behalf. Opp. Ex. 9, Hamilton Decl. ¶ 5; CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Opp. Ex. 9-1, PGX0028674, Script.

50.     In addition to the monthly subscription fee, CreditRepair.com charges its members a "first work" fee, which is a one-time charge.  Opp. Ex. 9, Hamilton Decl. ¶ 7.  This covers: (1) an initial interview to set up the member's case and record; (2) analysis of a credit report and identification of potentially inaccurate tradelines; and (3) preparing the initial round of letters challenging the potentially inaccurate tradelines (if any are found).  Opp. Ex. 9, Hamilton Decl. ¶ 7.

The fee is not incurred until the services are provided.  Opp. Ex. 9, Hamilton Decl. ¶ 8; CFPB Ex. 35, CreditRepair.com Supp. Resp. to RFA 1; Opp. Ex. 9-1, PGX0028674, Script.

### C.   CreditRepair.com's policies and practices are to make no promises or guarantees of specific results

51.     CreditRepair.com's policies prohibit making promises of results.  Opp. Ex. 36, PGX0005747, CreditRepair.com Substantiated Claims at 49, 53; Opp. Ex. 16, PGX0049305, Telemarketing Scripting Policy at 08.

52.     Call center representatives selling CreditRepair.com's services are trained not to promise results.  Opp. Ex. 16, PGX0049305, Telemarketing Scripting Policy at 30; Opp. Ex. 37, PGX0000475, CR Compliance 101; Opp. Ex. 38, PGX0002924, CR Compliance 102; Opp. Ex. 39, PGX0000452, CR Compliance 104.  They are reminded of that training on an ongoing basis. Opp. Ex. 24, Etherington Dep. 89:5-90:7; Opp. Ex. 40, PGX0005830, Q-Tips CR.com – Guarantees – Positive Outcome; Opp. Ex. 41, PGX0005832, Q-Tips CR.com – Guarantees – Score Increase; Opp. Ex. 42, PGX0005834, Q-Tips CR.com – Guarantees – Time Frame; Opp. Ex. 43, PGX0005829, Q-Tips CR.com – Guarantees – Item Removals.

53.     Defendants actively enforce CreditRepair.com's policies prohibiting promises or guarantees of results, by, among other things, call monitoring.  Opp. Ex. 8, PGX0049202, Compliance Program at 11; Opp. Ex. 29, PGX0005840, Quality Assurance & Call Evaluation Process.

54.     Marketing employees are also trained on compliance with CreditRepair.com's policies and applicable laws.  Exhibit 23, Hankins Dep. 60:23-61:23, 209:13-210:19; Opp. Ex. 15, Beal Dep. 242:3-244:24; Opp. Ex. 24, Etherington Dep. 46:4-48:12.

55.     The scripts used by telemarketing employees state that CreditRepair.com does not promise results.  Opp. Ex. 9, Hamilton Decl. ¶ 18;  Opp. Ex. 9-1, PGX0028674, Script at 704;

Opp. Ex. 44, PGX0028708, Script at 30; CFPB Ex. 31, PGX0028638, Script at 70.  Employees are required to read these disclosures verbatim.  Opp. Ex. 9-1, PGX0028674, Script at 704; Opp. Ex. 44, Script, PGX0028708, 30; CFPB Ex. 31, PGX0028638, Script at 70; Opp. Ex. 45, PGX0004079, CR Compliance 103.

56.     Every member signs an engagement agreement with CreditRepair.com.  Opp. Ex. 9, Hamilton Decl. ¶ 19; *see also* CFPB Ex. 31, PGX0028638, Script at 53.  That agreement states that: "CreditRepair.com cannot guarantee and you are not paying for a particular credit report outcome or result."  Opp. Ex. 9-2, PGX0047444, Arkansas Agreement at 46; Opp. Ex. 46, PGX0047465, California Agreement at 67; Opp. Ex. 10, PGX0047487 Louisiana Agreement at 89.  Each member "acknowledge[s] that [they] are not paying for, and that CreditRepair.com does not make, any representation, warranty, promise or guarantee as to any particular outcome or result."  Opp. Ex. 9-2, PGX0047444, Arkansas Agreement at 60; Opp. Ex. 46, PGX0047465, California Agreement at 81; Opp. Ex. 10, PGX0047487, Louisiana Agreement at 503.

57.     Defendants consistently sought to comply with applicable law and understood that CreditRepair.com's billing practices complied with governing laws.  Opp. Ex. 9, Hamilton Decl. ¶¶ 24-26; Opp. Ex. 8, PGX0049202, Compliance Program at 05; Opp. Ex. 24, Etherington Dep. 45:4-8, 73:14-75:16, 127:2-12.  Defendants understood that they were not subject to the Provision and complied with CROA if they did not make promise or guarantee results and did not collect payment before rendering services.  Opp. Ex. 9, Hamilton Decl. ¶ 25; Opp. Ex. 24, Etherington Dep. 127:2-12.

**VII.    The Bureau had notice of the facts for its claims before March 8, 2016.**

58.    From 2011 to 2013, the Bureau received consumer complaints about companies offering rent-to-own properties and then transferring consumers to Heath for credit repair. Exhibit 46, CFPB-PGX-194068; Exhibit 47, CFPB-PGX-194070; Exhibit 48, CFPB-PGX-194072; Exhibit 49, CFPB-PGX-194074; Exhibit 50, CFPB-PGX-194077; Exhibit 51, CFPB-PGX-194079; Exhibit 52, CFPB-PGX-194082; Exhibit 53, CFPB-PGX-194085; Exhibit 54, CFPB-PGX-194088; Exhibit 55, CFPB-PGX-194107; Exhibit 56, CFPB-PGX-194110; Exhibit 57, CFPB-PGX-194112; Exhibit 58, CFPB-PGX-194114; Exhibit 59, CFPB-PGX-194066; *see also* Exhibit 60, CFPB-PGX-222359, Lexington Related Leads Search.

59.    On February 2, 2013, the Bureau received a complaint from two former Progrexion employees that "███████████████████████." Exhibit 38, CFPB Corr. Resp. Rog. 3; Exhibit 60, CFPB-PGX-222359 at 62. Specifically, the former employees asserted that Progrexion purportedly "███████████████████████," in turn, "███████████████████████." Exhibit 60, CFPB-PGX-222359 at 62.  The Bureau claimed privilege over this complaint, acknowledging that its privilege assertion was "based on a suspicion of specific wrongdoing." Exhibit 61, 12/23/20 Ltr. at 8; *see also* Exhibit 62, CFPB Categorical Privilege Log; Exhibit 38, CFPB Corr. Resp. Rog. 3.

60.    On April 17, 2013, a consumer complained that OwnerWiz transferred ███████ ███████████████████████████████████████ ███████. Exhibit 59, CFPB-PGX-194066.

61.    About a year later (March 2014), the Bureau created "[p]redecisional and deliberative internal Enforcement drafts and communications" that discussed "potentially opening an

investigation into a Progrexion/Heath lead generator," which supposedly was "unrelated to the Bureau's investigation and litigation against Defendants." Exhibit 62, CFPB Categorical Privilege Log.

62.     The Bureau waited another seven months before it served its first Civil Investigative Demand ("CID") on Heath.  Exhibit 63, Heath CID.  Dated October 3, 2014, the CID sought materials and information related to Heath's marketing and advertising.  This included a "copy of each different advertisement or piece of promotional material used or issued by, or on behalf of, the Company," and "copy of each different version of each website used by the Company to market a product or service" identified in response to the former request.  *Id.* at 17.

63.     On a November 11, 2014 call, the Bureau asked Heath to identify its third-party marketing vendors.  Exhibit 64, Heath Supp. CID Resp.  Heath responded on December 15, 2014, stating that "███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████"  *Id.* at 2 (internal citation omitted).

64.     In 2015, the Bureau again received what the Bureau claims to be "[m]aterials concerning deceitful marketing practices for leads sent to Defendants by [Relevant Hotswaps]," including their "consumer-facing activities," "lead generation practices," and "provision of services or products to consumers," as well as Defendants' purported "oversight" thereof.  Exhibit 65, 3/25/21 Ltr. at 6-7; Exhibit 62, CFPB Categorical Privilege Log.

65.     During 2013, 2014, and much of 2015, the Bureau never interviewed the former Progrexion employees who complained in February 2013.  The Bureau waited more than two years

– until June 18, 2015 – to send an investigator to interview the employees who provided the February 2013 information.  Exhibit 66, Albanese Dep. 61:22-62:7; Exhibit 38, CFPB Corr. Resp. Rog. 3; Exhibit 67, CFPB-PGX-252572, Interview Report; Exhibit 68, Kim Dep. 150:25-152:8.

66.     The former Progrexion employees informed the Bureau about Progrexion's use of rent-to-own leads for Heath.  Exhibit 60, CFPB-PGX-222359, Lexington Related Leads Search at 62.

67.     The Bureau admits that by the time of the June 2015 interviews, litigation was already "reasonably foreseeable at that time."  Exhibit 61, 12/23/20 Ltr. at 8; Exhibit 62, CFPB Categorical Privilege Log; *see also* Exhibit 67, CFPB-PGX-252752, Interview Report.

68.     In 2015, the Bureau interviewed others relating to the allegations in this Litigation. Exhibit 68, Kim Dep. 142:8-150:24; 228:5-229:13; 230:19-233:6; 234:23-235:9.  For example, in June 2015, the Bureau interviewed a former Heath paralegal.  Exhibit 38, CFPB Corr. Resp. Rog. 3. The paralegal worked at Heath from approximately December 2014 to February 2015, spoke with consumers after enrollment, and remarked that "the consumers' goals were often to obtain rent to own housing." *Id.*

69.     On March 31, 2015, a consumer, ██████████, submitted a complaint through the Consumer Sentinel Network, the Federal Trade Commission's consumer complaint tool. Exhibit 69, CFPB-PGX-215066. ███████████████████████████████████████████
██████████████████████████. *Id.*

70.     In August 2015, the Bureau spoke with a consumer, ██████████. Exhibit 38, CFPB Corr. Resp. Rog. 3. █████████████████████████ had filed a complaint through the Consumer

Sentinel Network ████████████████████████████████.   Exhibit 41, CFPB-PGX-194032.

71.     In August 2015, the Bureau received "consumer payment chargeback, refund, and return information for 2012-2015 from Progrexion's payment processor, Vantiv."   Exhibit 38, CFPB Corr. Resp. Rog. 3.  Vantiv, which processed credit card payments for Heath and Defendants, provided the Bureau with ███████████████████ ████████████████████████████████████████.   Exhibit 70, CFPB-PGX-221551, Vantiv CID Response.

72.     On August 10, 2015, the Bureau asked the Better Business Bureau of Utah (BBB) for "complaints filed against a Utah company called [Heath] (and their affiliate businesses, Progrexion and eFolks)."   Exhibit 83 CFPB-PGX-154803, Utah BBB CID; Exhibit 84, CFPB-PGX-219504, email correspondence between CFPB and Utah BBB.  The Utah BBB responded the next day by ████████████████   Exhibit 38, CFPB Corr. Resp. Rog. 3; Exhibit 85, CFPB-PGX-219534, Complaints.

73.     Between November 2015 and January 2016, a Bureau investigator recorded undercover telephone calls to Hope, Ascent, and other companies.  Exhibit 38, CFPB Corr. Resp. Rog. 3. The Bureau also received three emails from Hope. *Id.*

74.     In November 2015, the CFPB downloaded images from Hope's website and Facebook page that it asserts were "false, misleading, or deceptive."  Exhibit 38, CFPB Corr. Resp. Rog. 1; Exhibit 71, CFPB-PGX-153701; Exhibit 72, CFPB-PGX-193783; Exhibit 73, CFPB-PGX-193784; Exhibit 74, CFPB-PGX-193785.

75.     The Bureau waited until February 2, 2016 to issue CIDs to Holdings, Marketing, Teleservices, and eFolks.  Exhibit 75, Progrexion Holdings CID; Exhibit 76, Marketing CID; Exhibit 77, Teleservices CID; Exhibit 78, eFolks CID, three years after it received the February 2013 complaints from Progrexion employees.

76.     Claiming privilege, the Bureau has refused to indicate the precise date on which it had sufficient factual information to bring this litigation.  Exhibit 68, Kim Dep. 159:7-173:21.

77.     The Bureau entered into a tolling agreement with Defendants on March 8, 2019, which tolled the limitations period for any unexpired claims "from March 8, 2019 to June 7, 2019." Exhibit 79, Tolling Agreement.

78.     The Bureau did not file its Complaint in this case until May 2, 2019.  ECF No. 2.

79.     On July 9, 2020, Bureau Director Kathleen L. Kraninger "ratif[ied] the decision to file the above-captioned lawsuit against Defendants."  Exhibit 80, Kraninger Decl., ¶ 5.

80.     On September 15, 2020, the Bureau issued a document subpoena to OwnerWiz. Exhibit 81, OwnerWiz Subpoena.  OwnerWiz failed to respond.  Exhibit 1, Tayman Decl. ¶ 83 The Bureau and Defendants were also unable to locate a witness to testify on OwnerWiz's behalf; accordingly, no deposition of an OwnerWiz representative occurred.  *Id.*  Other deponents could not recall any specifics concerning OwnerWiz.  *See* Exhibit 24, Nickl Dep. 40:24-41:1.

81.     On September 15, 2020, the Bureau issued a document subpoena to Rent2own.house.  Exhibit 82, Rent2own.house Subpoena. Rent2own.house failed to respond.  Exhibit 1, Tayman Decl. ¶ 84.  The Bureau and Defendants were also unable to locate a witness to testify on Rent2own.house's behalf; accordingly, no deposition of a Rent2own.house

representative occurred.  *Id.*  Other deponents could not recall any specifics concerning Rent2own.house. *See* <u>Exhibit 24</u>, Nickl Dep. 39:21-40:14, 45:15-25, 47:5-11, 60:22-61:3.

## <u>LAW AND ARGUMENT</u>

### I.    **Legal Standard**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," and "all facts and reasonable inferences" are construed "in the light most favorable to the nonmoving party."  *Agnew v. Granite Seed Co.*, No. 2:16-cv-00887-BSJ, 2017 WL 8776902, at *3 (D. Utah Dec. 11, 2017) (Jenkins, J.) (citations and internal quotation marks omitted).  Once that initial burden has been met, "the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial," *i.e.*, "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* (citation and internal quotation marks omitted).

### II.    **The CFPA's three-year statute of limitations prohibits the Bureau's recovery before at least March 8, 2016.**

The CFPA states that "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates."  12 U.S.C. § 5564(g)(1).  "The date of discovery is the date when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."  *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211 (CM), 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (citation and internal quotation marks omitted).

The Bureau entered into a tolling agreement on March 8, 2019, and filed its Complaint just two months later—both were well after it had a sufficient basis for bringing its claims here.

Statement of Material Fact ("SUMF") 77.  The three-year limitations period began running on March 8, 2016—and all claims before that point are barred by the statute of limitations.

Nonetheless, the Bureau seeks to recover for allegations dating back to 2012, on the basis that the case involves a continuing violation.  *E.g.*, Compl. ¶¶ 74-75, 79, 112, 113, 117, 120.  But there is no continuing violation, as the discrete acts alleged in this case are not the kind that are capable of forming a continuing violation.  Moreover, despite hearing claims from witnesses between 2011 and 2013 regarding Heath's relationship with Defendants, the Bureau delayed for years in investigating those allegations, taking more than two years to even interview the Progrexion former employees who logged complaints and three years to demand documents from Progrexion.  These are not the actions of a "reasonably diligent" plaintiff, which the continuing violation doctrine requires.

Statutes of limitations exist to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has lost, memories have faded, and witnesses have disappeared."  *PHH Corp. v. CFPB*, 839 F.3d 1, 50 (D.C. Cir. 2016) (Kavanaugh, J.) (citation omitted), *reinstated in relevant part by* 881 F.3d 75 (D.C. Cir. 2018) (en banc).  Here, Defendants suffer prejudice because of the Bureau's slumber—the events took place so long ago that there are no witnesses available for at least two of the third-party Relevant Hotswaps (OwnerWiz and Rent2Own.House), and other evidence has proven elusive because of the staleness of the Bureau's claims.  SUMF 80-81.

A. **The Bureau has not alleged a continuing violation, and, in any event, cannot seek recovery for a continuing violation here.**

In its opposition to Defendants' motion to dismiss, the Bureau stated that it was relying on a continuing violation theory:  "a continuing series of discrete violations."  ECF No. 36, at 25 n.14.

But as the Bureau admits, the alleged violations here were "discrete" ones, *id.*, meaning that each alleged instance should be independently assessed, not viewed as a "series."

A continuing violation is not available "for claims against discrete acts." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). As the Supreme Court explained in *Morgan*, each discrete act "constitutes a separate actionable" violation, and "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." 536 U.S. at 112-14; *accord Davidson*, 337 F.3d at 1185. Continuing violations, the Court held, are for those acts that "may not be actionable on [their] own." *Morgan*, 536 U.S. at 115.

The Bureau says the violations are "discrete," so under *Morgan*, the Bureau cannot string together a "continuing series" of alleged violations to reach beyond the three-year limitations period. Anything from 2012 to the beginning of the limitations period should be barred. To hold otherwise would be to reward the Bureau for merely sitting by and accruing alleged violation after alleged violation, leaving the Bureau with a virtually limitless period to seek recovery. That is repugnant to the notion "that a federal civil cause of action … must not allow suits to be brought forever and ever after the acts in question." *PHH Corp.*, 839 F.3d at 50. Accordingly, the Bureau is limited to three years of recovery—the length permitted by the CFPA.

**B.     The Bureau should be barred from recovering any payment made prior to July 7, 2017, three years before the Bureau ratified its Complaint.**

As the Court may recall, Defendants moved to dismiss the Complaint on constitutional grounds because, when the Bureau entered into tolling agreements with Defendants on March 8, 2019, and later filed its Complaint on May 2, 2019, it lacked the authority and power to engage in any sort of litigation activity (and was not properly constituted). ECF No. 30, at 29-31. In *Seila*

*Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the U.S. Supreme Court agreed and held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Id.* at 2197.   It determined that the Director's removal provisions were severable from the rest of the Bureau's enabling act, but the Court left open the question of whether the actions that the Bureau took without a properly appointed Director could be cured by ratification.  *Id.* at 2211.

The harm in this case from the Director's unconstitutional appointment is a structural defect that "results from, at a minimum, the combination of the removal provision … and the provision allowing the CFPB to seek enforcement," *id.* at 2222-23 & n.7 (Thomas, J., concurring in part, dissenting in part), which in turn led to the filing of the Complaint on May 2, 2019 (with a tolling date of March 8, 2019).

To purportedly cure that structural constitutional violation, a properly appointed Director eventually ratified the Complaint, but that ratification is *in*-effective for at least two reasons.  First, the constitutional infirmity is incurable by its very nature:  structural constitutional violations like the Director's unconstitutional appointment are not subject to "harmless error" review, nor do they require a showing of prejudice; rather, they require "automatic reversal."  *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 79 (D.C. Cir. 2015).  Second, the ratification came too late, as the properly appointed Director had the power to approve a Complaint only "at the time the ratification was made," not at "the time the act was done."  *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994).  The Supreme Court has required both.  *Id.*

Because the Director's belated ratification cannot retroactively sanction the May 2, 2019 Complaint, the Bureau is bound by a limitations period that runs from the date of ratification:  July

7, 2020.  Thus, under the CFPA's three-year statute of limitations, the Bureau may seek relief only for conduct reaching back to July 7, 2017.

### C.   At a minimum, the Bureau is barred by the three-year statute of limitations from recovery for any violation that occurred prior to March 8, 2016.

Even if the filing date of the Complaint, rather than the ratification date, were used to set the relevant limitations period here, the Bureau should be barred from recovering for violations, if any, that occurred prior to March 8, 2016, three years prior to the date of the Bureau's tolling agreements with Defendants.  Further, setting aside that the Bureau is categorically barred from relying on the continuing violation doctrine, the doctrine would not apply here because the Bureau was not diligent in investigating and bringing its claim.  The Bureau had a basis for investigating this claim more than seven years before the tolling date, and had a sufficient basis for bringing its claim at least four to five years before the tolling date.  Its failure to timely vindicate its rights bars it from extending the limitations period beyond the CFPA's three years.  *Davidson*, 337 F.3d at 1184 ("[A] continuing violation claim fails 'if the plaintiff knew, or through the exercise of reasonable diligence would have known'" a violation occurred) (citation omitted).

The Bureau could have brought this suit shortly after 2013.  Between 2011 and 2013, the Bureau received at least fourteen consumer complaints about the practice of Relevant Hotswaps offering rent-to-own properties and then referring them to Heath for credit repair.  SUMF 58-60. A reasonably diligent plaintiff would have investigated the complaints; the Bureau did not.  *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106-RS, 2017 WL 3948396, at *10 (N.D. Cal. Sept. 8, 2017) (suggesting that "a credible and specific consumer complaint might in some circumstances serve as a 'storm warning' and put the CFPB on 'inquiry notice' that it should begin investigating").

The Bureau failed to act despite the fact that one of the complaints it received was by former Progrexion employees, who claimed that Defendants "███████████████████████ ███████████████████████████████████████████████████." SUMF 59. The Bureau admits that this document gave it "the suspicion of specific wrongdoing" by Defendants. *Id.* Yet the Bureau failed to diligently investigate further and did not bring a lawsuit until nearly *six years* later. Indeed, the Bureau inexplicably failed to even issue CIDs to Defendants until exactly ***three years*** after employees approached the Bureau, claiming to have information that the Bureau should investigate. SUMF 59, 75. That is hardly "reasonable diligence," especially compared to the diligence of Heath and third-parties, who responded straightaway to the Bureau's demands for information. *E.g.*, SUMF 63 (Heath response one month after CID); SUMF 72 (Utah BBB response one day after Bureau request).

Any reasonably diligent plaintiff in the Bureau's shoes would have brought a lawsuit by or before 2015, when the Bureau had conducted a comprehensive investigation of Heath. First, such a reasonably diligent plaintiff would have begun its investigation of Heath before October 2014, when the Bureau first served Heath a civil investigative demand about its marketing practices, and later served other non-parties, which provided relevant information to the Bureau by the summer of 2015. SUMF 63, 71-72. According to the Bureau, the investigation yielded "[m]aterials concerning deceitful marketing practices for leads sent to Defendants by [Relevant Hotswaps]," yet the Bureau stood by and did nothing to bring a claim, or investigate further. SUMF 64. A reasonably diligent plaintiff would have responded to complaints made by former Progrexion employees in early 2013 by interviewing them promptly. SUMF 59. Yet the Bureau's interviews were far from prompt, finally taking place in June 2015 (two years later), in the same summer that the

Bureau conducted interviews of consumer complainants.  SUMF 65-66, 68-70.  Thus, by mid-2015, the Bureau had such considerable discovery at its disposal, and admits to preparing litigation papers and that litigation was "reasonably foreseeable" by this juncture.  SUMF 67.  Yet still the Bureau waited four more years to bring its lawsuit against Heath and Defendants.

When a plaintiff is bound by a discovery-based statute of limitations, the plaintiff cannot simply just "wait and see" whether a violation will arise; if the facts and circumstances would give a reasonable person exercising diligence suspicion that a violation has occurred, that plaintiff must bring suit.  *Sterlin v. Biomune Sys., Inc.*, 114 F. Supp. 2d 1163, 1172-73 (D. Utah 2000).  Here, a reasonably diligent plaintiff with a self-admitted "suspicion" of wrongdoing in 2013 that morphed into a "reasonably foreseeable" basis for litigation by 2015 would surely have "assert[ed its] rights" in 2015, if not soon thereafter.  *See Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1415 n.6 (10th Cir. 1993), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  But the Bureau, armed with ample discovery collected over several years, failed to act on what it gathered, choosing instead to sit on its rights until 2019.  Thus, the Bureau cannot be said to have acted diligently in pursuing its rights in litigation, and cannot extend the limitations period beyond the three years preceding the filing of this suit.  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625 (3d Cir. 2015) (continuing violation doctrine does not allow plaintiffs to "knowingly sit on their rights or attempt to sweep both timely and expired claims into a single 'continuing violation' claim brought years later"); *Roberts v. Gadsden Mem'l Hosp.*, 850 F.2d 1549, 1550 (11th Cir. 1988) (a claim does not "continue[]" simply because "a putative plaintiff knowingly fails to seek relief").

### III.   Defendants are not liable under Counts II and III because they had policies in place against making direct representations to consumers concerning loans or rent-to-own housing contracts.

In Counts II and III, the Bureau seeks to hold Defendants directly liable[4] by alleging that "the Progrexion Defendants, directly or through at least one affiliate, acting on Progrexion's behalf and for its benefit" made representations that: "(1) [t]he advertised product or service, such as a loan or rent-to-own housing contract, was available through the affiliate, or that it would be available after signing up for credit repair services"; or that "(2) [c]onsumers were either guaranteed or had a high likelihood of obtaining the advertised product or service, such as a loan or rent-to-own housing contract." Compl. ¶¶ 138, 147.

Defendants are entitled to summary judgment on both counts. The undisputed evidence demonstrates that Defendants maintained a policy and practice of ensuring that its employees made no such representations, and there is no evidence that, as a programmatic matter, Defendants "directly" made such representations to consumers. The Bureau's evidence, at best, cites to statements by the Relevant Hotswaps. Nor can agency liability be asserted against Progrexion on the basis of these third-party statements. Neither the CFPA nor the TSR provides for such secondary liability by which Defendants can be held liable for a third party's actions "on Progrexion's behalf and for its own benefit." Even if they did, there would be no basis for concluding that the Relevant Hotswaps acted as agents of Defendants, as they were not under Defendants' control.

---

[4] By contrast to these direct liability allegations, Counts IV and V allege indirect liability as an alternative bases of recovery. Specifically, Counts IV and V seek to hold Progrexion liable for assisting or aiding the alleged wrongdoing of the Relevant Hotswaps.

A. **There is no evidence to support that Defendants had policies and practices of making representations to consumers directly regarding loans or rent-to-own housing contracts.**

There is no evidence that Defendants had policies or practices in place that would lead their employees to make representations regarding loans or rent-to-home opportunities.  To the contrary, the undisputed evidence shows that Teleservices and CreditRepair.com, the only Defendants that made marketing statements directly to consumers during calls initiated through the Relevant Hotswaps, had policies and practices in place that prohibited their employees from making statements: (1) concerning the availability of products advertised by a Hotswap Company; and (2) suggesting that enrolling in credit repair will allow consumers to move forward with a Hotswap Company.  SUMF 14-15.  These policies demonstrate that the Bureau cannot prevail on its alleged theory that Defendants made representations directly to consumers.

B. **The CFPA does not allow for the sort of agency liability that the Bureau seeks to impose here.**

The Bureau's alternative theory is that "as the principal of its marketing affiliates," Marketing is "liable for the actions of its agents," Compl. ¶ 25, regardless of whether such actions were taken "on Progrexion's behalf" or "for [an agent's own] benefit," Compl. ¶¶ 138, 147.  But neither the CFPA (as to Count II) nor the TSR (as to Count III) allows for liability under an agency theory.

When a statute identifies which individuals may be held liable, a "court 'cannot amend the statute to create liability for acts that are not themselves . . . within the meaning of the statute.'" *Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*, No. 2:20-cv-352-JNP-DAD, 2021 WL 5772269, at *8 (D. Utah Dec. 6, 2021) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 177-78 (1994)).  That is, when a statute is silent on the question of secondary liability, the Court cannot infer the availability of such liability.  *E.g.*, *FEC v.*

*Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018) ("[T]he United States Supreme Court held that the government cannot infer secondary liability when the statute in question is silent on that subject.").[5]

With respect to Count II, the CFPA, as relevant here, authorizes liability against only certain principal actors:  a "covered person" or a "service provider."  12 U.S.C. § 5531(a).  Congress defined "covered person[s]" narrowly:  "any person that engages in offering or providing a consumer financial product or service," or any "affiliate" of such a person, "if such affiliate acts as a service provider to such person."  *Id.* § 5481(6).  A "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service."  *Id.* § 5481(26)(A).  In Count IV, the Bureau seeks to impose liability for Defendants as "covered persons," for "substantially assisting" the actions taken by the Relevant Hotswaps as "covered persons" or "service provider[s]."  *E.g.*, Compl. ¶ 156.  But the CFPA does not provide direct liability for covered persons as *principals* for actions taken by service providers.  Nor does it allow for any other means of imputing the actions of (and liability for) the Relevant Hotswaps to Defendants.  *Pennsylvania v. Think Fin.*,

---

[5] The Bureau has previously suggested that "courts have repeatedly held that federal consumer-protection statutes . . . incorporate common-law principles of agency liability."  ECF No. 38-1, at 11-12.  But as the Bureau's citation to a Second Circuit decision from 1954 suggests, holdings about whether the FTC Act incorporates agency principles pre-date *Central Bank of Denver*.  *E.g.*, *Standard Distribs. v. FTC*, 211 F.2d 7, 13 (2d Cir. 1954); *Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957).  As far as Defendants are aware, no court has ever held that the CFPA allows for unstated secondary liability in the form of agency liability, despite *Central Bank of Denver*.  And it is doubtful that, if properly challenged, that secondary liability under the FTC Act would be allowed.  *Cent. Bank of Denver*, 511 U.S. at 200 n.12 (Stevens, J., dissenting) (explaining that the majority's holding in *Central Bank of Denver* means it is unlikely that "respondeat superior and other common-law agency principles" would "survive the Court's decision"); *e.g.*, *Converse, Inc. v. Norwood Venture Corp.*, No. 96 CIV. 3745 (HB), 1997 WL 742534, at *3 (S.D.N.Y. Dec. 1, 1997) ("claims based on agency liability are no longer viable after *Central Bank*").

*Inc.*, No. 14-cv-7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) (rejecting "common en-terprise" argument of joint-and-several liability under the CFPA).

The TSR likewise does not provide for agency liability.  The TSR applies to "sellers" and "telemarketers."  Both terms refer to persons that directly engage in acts.  A seller, for example, is "any person who … provides, offers to provide, or arranges for others to provide goods or ser-vices."  16 C.F.R. § 310.2(dd).  A telemarketer is "any person who … initiates or receives tele-phone calls to or from a customer or donor."  *Id.* § 310.2(ff).  As shown, Defendants are neither sellers or telemarketers of the Relevant Hotswaps' products or services, and neither definition em-braces covering acts taken by agents acting on behalf of the "seller" or "telemarketer."  FTC could have easily added acts taken by agents, as it did for other terms.  *E.g.*, *id.* § 310.2(a) (defining "[a]cquirer" as "a business organization, financial institution, or ***an agent*** of a business organiza-tion or financial institution" (emphasis added)); *id.* § 310.3(c)(2) (defining as an abusive act certain credit-card-related activity involving "a merchant, or an employee, representative, or *agent* of the merchant" (emphasis added)).  It did not do so for the definition of "seller" or "telemarketer," and this Court cannot assume such secondary liability.

C.   **Even if an agency theory were permissible, the Bureau has not proven that an agency relationship existed between Defendants and the Relevant Hotswaps.**

"An agent is a person authorized by another to act on his behalf and under his control." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1278 (10th Cir. 2000) (citation and internal quotation marks omitted).  The touchstone of agency is control: both the principal and agent must understand that "the agent is subject to the principal's control."  *J. White, L.C. v. Wiseman*, No. 2:16-cv-01179-DBB-JCB, 2020 WL 3922977, at *3 (D. Utah July 10, 2020) (citing *Stamper v.*

*Johnson*, 232 P.3d 514 (Utah 2010); *Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998)); *CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532, 1540 (D. Utah 1993), *aff'd sub nom.*, *CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996) ("[A] necessary precondition to the establishment of an agency relationship is that the principal have control over the conduct and activities of the agent.").

There is no genuine dispute of material fact that Defendants did not "control" the Relevant Hotswaps. The Relevant Hotswaps are independent companies with which Marketing had only arms-length agreements for services. SUMF 1-4. The Relevant Hotswaps' representatives would not have been in a position to think "their companies were the same as [Defendants]." *FTC v. LifeWatch Inc.*, 176 F. Supp. 3d 757, 774 (N.D. Ill. 2016); SUMF 5-8. The Relevant Hotswaps were autonomous and retained control over how they marketed their services, including where to advertise, and what to put in their advertisements. SUMF 9. They wrote their own scripts, with Marketing providing limited "suggestions" to ensure the accuracy of representations about credit repair. SUMF 10. The Relevant Hotswaps controlled every aspect of how they ran their businesses, with no input from Defendants. SUMF 11-12. These undisputed facts demonstrate that Defendants did not exercise control over the Relevant Hotswaps, and thus, the Hotswaps were not Defendants' agents.

**IV.   CFPB's substantial assistance claims under Counts IV and V fail because the Rent-to-Own Hotswaps are not "covered persons" or "service providers" under the CFPA.**

To violate the CFPA's substantial assistance provision, Defendants must have knowingly or recklessly provided substantial assistance to a "covered person or service provider in violation of the provisions of section 5531 of this title." 12 U.S.C. § 5536(a)(3) (emphasis added). The

Bureau contends that the Relevant Hotswaps are "covered person[s]." Compl. ¶ 155. The Bureau may also contend that the Relevant Hotswaps are "service provider[s]." Compl. ¶ 156. Because Ascent, OwnerWiz, EHO, and Rent2Own.house (the "Rent-to-Own Hotswaps") fit neither definition, Count IV fails as to those entities. Similarly, the Bureau cannot enforce the TSR except "with respect to the offering or provision of a consumer financial product or service subject to [the CFPA]." 15 U.S.C. § 6105(d). Because the Rent-to-Own Hotswaps do not offer a consumer financial product or service under the CFPA, Count V also fails as to those hotswaps.

### A.   The Rent-to-Own Hotswaps are not "covered persons."

A "covered person" under the CFPA means "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The Bureau contends the Relevant Hotswaps engaged in providing a "consumer financial product or service" under one of three provisions of its statutory definition, none of which apply here—12 U.S.C. § 5481(15)(A)(i), (viii), and (ix). Compl. ¶ 155. It is undisputed that the Rent-to-Own Hotswaps offered to provide consumers with rent-to-own housing listings. SUMF 29-30, 38-40. Because this service is not a "consumer financial product or service," they are not covered persons under the CFPA.

First, the Rent-to-Own Hotswaps do not "extend[] credit and service[e] loans, including acquiring, purchasing, selling, brokering, or other extensions of credit." 12 U.S.C. § 5481(15)(A)(i). "[C]redit" is defined as "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7). Unlike other cases where entities were found to be covered persons for extending credit, the Rent-to-Own Hotswaps did not do so. *See CFPB v. Future Income Payments, LLC*, No. 8:19-2950-BHH-KFM, 2020 WL 6162947, at *3 (D.S.C.

May 21, 2020) (defendant was a "covered person" because they "extended consumer credit and serviced consumer loans").  Nor are any of the Rent-to-Own Hotswaps "brokers" of credit under this provision.  *CFPB v. ITT Educ. Servs., Inc*., 219 F. Supp. 3d 878, 907–09 (S.D. Ind. 2015) ("Because the Bureau has not alleged that ITT was engaged in the 'business' of effecting loan transactions on behalf of its students, its conduct as an educational institution does not qualify it as a broker under 12 U.S.C. § 5481(15)(A)(i)").  And the Rent-to-Own Hotswaps certainly do not fall within the Bureau's jurisdiction by "extending or brokering leases of … real property that are the functional equivalent of purchase finance arrangements," 12 U.S.C. § 5481(15)(A)(ii), be-cause, again, no financing is provided as part of these transactions.

Second, the Rent-to-Own Hotswaps do not "provid[e] financial advisory services", includ-ing "credit counseling" or "providing services to assist a consumer with debt management or debt settlement…" under 12 U.S.C. § 5481(15)(A)(viii).  SUMF 37-40; *Murphy v. Setzer's World of Camping, Inc.*, No. 3:20-cv-00406, 2020 WL 8484878, at *6 (S.D.W. Va. Sept. 15, 2020), *report and recommendation adopted in part, rejected in part,* No. 3:20-0406, 2021 WL 302744 (S.D.W. Va. Jan. 29, 2021) (declining to extend "financial advisory services" definition to include a seller of expensive consumers goods who merely facilitated financing through third-party banks).  For example, the Rent-to-Own Hotswaps neither "advised [consumers] on how to manage their debt" nor filled out loan forms for consumers.  *ITT*, 219 F. Supp. 3d at 909–10 (defendant provided "financial advisory services" when it "completed nearly every step in the process of acquiring [] loans on the students' behalf").

Third, the Rent-to-Own Hotswaps do not "collect[], analyz[e], maintain[], or provid[e] consumer report information or other account information, including information relating to the

credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service" under 12 U.S.C. § 5481(15)(A)(ix). There is no evidence these hotswaps collected this information, and residential leases are not a "consumer financial product or service." SUMF 29, 38-40.

**B.      The Rent-to-Own Hotswaps are not "service providers."**

A "service provider" under the CFPA means "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that-- (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service…." 12 U.S.C. § 5481(26). The Bureau has not explicitly asserted that the Rent-to-Own Hotswaps are "service providers" under the CFPA, although it vaguely alleged that a different hotswap was a "service provider" "because it provided material services to one or more covered persons, including Progrexion." Compl. ¶ 156. No matter, the term does not apply to the Rent-to-Own Hotswaps. Assuming arguendo Defendants are somehow "covered persons" and provide the "consumer financial product or service" of credit repair, it is undisputed that none of the Rent-to-Own Hotswaps participated in "designing, operating, or maintaining" Heath or CreditRepair.com's credit repair businesses. And none of the Rent-to-Own Hotswaps "process[ed] transactions" for any of the Defendants "relating to the consumer financial product or service" of any of the Defendants. 12 U.S.C. § 5481(26); *cf. CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (EX), 2016 WL 8849698, at *8 (C.D. Cal. Nov. 17, 2016) (finding entity was sufficiently pled to be a "service provider" where it allegedly played "integral role" in "processing and selling consumer loan applications to small-dollar lenders").

It is telling that the Bureau has not brought an enforcement action against any of the Rent-to-Own Hotswaps (or any Relevant Hotswaps for that matter), when in all other cases where the Bureau has brought "substantial assistance" allegations, the alleged primary violator was either a party to the action or a related enforcement action.  *E.g. CFPB v. Access Funding, LLC,* No. E:H-16-3759, 2021 WL 2915118, at *1 (D. Md. July 12, 2021); *CFPB v. Consumer Advoc. Ctr. Inc.*, No. SACV 19-1998-MWF (KSx), 2020 WL 7774930, at *1 (C.D. Cal. Dec. 1, 2020).[6]  The same is true in FTC Act cases, where cases alleging "substantial assistance" also either join the primary violator, or the primary violator had already been found liable.  *E.g. FTC v. Chapman*, 714 F.3d 1211, 1213 (10th Cir. 2013); *FTC v. Nudge, LLC*, No. 2:19-cv-00867-DBB-DAO, 2021 WL 3145700, at *1 (D. Utah July 26, 2021).  Moreover, in *Access Funding*, the court stated that in order to bring CFPA claims for substantial assistance, the primary violator "must not be excluded from an enforcement action." *Access Funding, LLC*, 2021 WL 2915118, at *23 (determining that triable issue of material fact existed as to whether primary violator was subject to a CFPB enforcement action).

Because the Rent-to-Own Hotswaps are not "covered persons" or "service providers" under the CFPA, there is no basis for substantial assistance liability premised on their conduct and Counts IV and V fail as to those Hotswaps.

---

[6] The only exception to this rule was where the alleged primary violator had tribal sovereignty. *See CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *9 (D. Mont. Aug. 3, 2018).

**V.      The Bureau's substantial assistance claim regarding OLP's alleged misconduct fails because OLP actually provided its advertised services.**

The Bureau has no evidence to support its allegation that Defendants violated the CFPA's substantial assistance provision based on OLP's alleged misconduct.   "[T]o establish liability for a deceptive act or practice under the CFPA, the CFPB must prove: '(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material.'"   *CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *6 (N.D. Ga. Mar. 21, 2019) (citation omitted).   The Bureau's claim fails at the second step:   there was no misleading representation.

The Bureau has contended that OLP "offered, and may still be offering, consumers illusory, guaranteed loans as a means of enticing them to sign up for Progrexion's credit repair services" when "[i]n reality, consumers did not receive loans through OLP or were unable to meet lending criteria set by third-party lenders on whose behalf OLP serves only as a lead generator."   SUMF 18; *see also* Compl. ¶¶ 157, 164 (asserting statements violated the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B) and the TSR, 16 C.F.R. § 310.3(a)(4) "by misrepresenting, expressly or by implication, the availability of an advertised product or service, such as a loan, or that consumers were either guaranteed or had a high likelihood of obtaining the advertised product or service.").

With discovery closed, however, it is now undisputed that OLP's offer of loans was *not* illusory and that more than one million people received loans through OLP referrals.   SUMF 22.

As to the Bureau's assertion that OLP "guaranteed loans" when consumers "were unable to meet lending criteria," it is undisputed that OLP's practice was for employees to use approved scripting designed to accurately represent its offerings when speaking with particular consumers. SUMF 18, 24.   It is also undisputed that OLP's scripts did not make guarantees or promises to

consumers about what OLP could accomplish for them.  SUMF 25.  There is also no dispute that OLP trained its employees not to mislead customers.  SUMF 24.

Without evidence of the primary violation by OLP (*i.e.*, evidence that OLP misrepresented the availability of illusory loans to consumers), the Bureau has no basis for its substantial assistance claim; Defendants are entitled to summary judgment as to OLP.  *United States v. Corps. for Character, L.C.*, 116 F. Supp. 3d 1258, 1271 (D. Utah 2015) (granting summary judgment in favor of defendants on FTCA § 5 claim where challenged representations were true, and thus not misrepresentations); *In re World Access, Inc.*, 310 F. Supp. 2d 1281, 1300 (N.D. Ga. 2004) (rejecting plaintiff's substantial assistance claim under SEC Act § 20(a) when no primary violation occurred).[7]

## VI.   The Bureau's substantial assistance claim premised on Ascent's alleged misconduct fails.

### A.      Consumers received rent-to-own listings from Ascent.

The Bureau also accuses Defendants of violating the CFPA and TSR's substantial assistance provisions based on the alleged misconduct of Ascent.  Specifically, the Bureau contends that "after contacting Ascent through one of its lead generation platforms, consumers were told that they needed to sign up for [Heath] in order to gain access to the advertised rent-to-own listings" and that "after signing up for credit repair, consumers were confronted with listings for properties that were not in fact available as rent-to-own."  SUMF 27.

---

[7] Because there are few cases discussing substantial assistance liability under the CFPA, courts have looked to the "similar substantial-assistance provision in § 20(e) of the [SEC Act] to analyze the requirements for liability under 12 U.S.C. § 5536(a)(3)."  *Universal Debt*, 2019 WL 1295004, at *6 (CFPA case relying on cases analyzing § 20(e) of the SEC Act).

The undisputed evidence, however, establishes that Ascent sent all consumers a listing of properties and those listings included rent-to-own properties. SUMF 29. It is also undisputed that the property listings Ascent provided to consumers were operated by Ascent's multiple listing service (MLS) realtor partners, and that it was Ascent's practice to partner with only preferred MLS listings operated by licensed realtors. SUMF 30. Moreover, the undisputed evidence, confirmed by the Bureau's own expert, shows that referrals from Ascent to Heath included people who actually obtained rent-to-own housing. SUMF 31. Finally, Ascent did not guarantee that consumers would obtain a rent-to-own property or loan, and its call center employees were prohibited from making promises or guarantees. SUMF 32-33.

Without evidence of the primary violation by Ascent (*i.e.*, evidence that Ascent misrepresented its service of providing rent-to-own housing listings), the Bureau has no basis for its substantial assistance claim and summary judgment should be granted for Defendants. *In re World Access, Inc.*, 310 F. Supp. 2d at 1300.

### B.   Progrexion had no knowledge of facts supporting the allegation that Ascent did not provide consumers with rent-to-own listings.

To establish substantial assistance liability, Defendants must have had at least a "'general awareness' of the roles they were playing in the primary [violation] and that they knowingly contributed to it." *Universal Debt*, 2019 WL 1295004, at *15 (citation omitted). This requires proof of "severe recklessness" that entails "conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care." *Id.* (citation omitted). With respect to Ascent, the Bureau has contended Progrexion had "knowledge of deceptive practices" based on a Progrexion document stating: "[Ascent] offer[s] loan resources and RTO listings. Clients in RTO are required to sign up for [Heath's services] to work on their credit. That way the seller will know

they are serious about working toward home ownership."  SUMF 34.  Contrary to the characteri-zation in the Bureau's letter, this document shows that Progrexion understood Ascent *was* helping its clients get rent-to-own housing.  The undisputed evidence is that Defendants did not have an awareness of Ascent's alleged misrepresentation of its services.  Instead, communications between Marketing and Ascent demonstrate that Progrexion understood Ascent provided consumers list-ings, including listings for rent-to-own properties.  SUMF 35.  In fact, when a customer com-plained to Marketing about not being contacted by Ascent, Marketing raised the issue with Ascent and Ascent responded within minutes indicating that it would "handle this immediately."  SUMF 36.

Because there is no evidence that Defendants knew Ascent made misrepresentations, let alone that they were "severe[ly] reckless[]" of the purported role they were playing, Defendants could not have substantially assisted Ascent in the alleged deceit.  *Universal Debt*, 2019 WL 1295004, at *15.  Accordingly, summary judgment should be granted to Progrexion with respect to Counts IV and V premised on Ascent's alleged conduct.

## VII.   The Bureau has no authority to regulate the rent-to-own industry and cannot seek to impose liability on Defendants by proxy.

While the Bureau's suit purports to target providers of legitimate credit repair (and those who market those services), Counts II through V are not about their statements regarding credit repair.  Rather, those counts are mostly about statements made by companies offering rent-to-own services regarding the availability of rent-to-own homes—specifically, that the Relevant Hotswaps allegedly "used advertisements that included fake real estate ads, fake rent-to-own housing oppor-tunities, fake relationships with lenders, false credit guarantees, and false and unsubstantiated statements about past consumer outcomes."  Compl. ¶ 72; Exhibit 38, CFPB Corr. Resp. Rog 3.

In discovery, the Bureau has explored questions such as whether an entity may advertise rent-to-own housing when it does not offer such housing itself, but provides third-party listings; whether an entity that provides listings must verify that the listings only contain rent-to-own properties; and whether rent-to-own advertisements may use stock photography.  Exhibit 8, Kemp Dep. 65:17-66:5, 107:4-14, 221:4-14, 276:16-25; Exhibit 12, Robinson Dep. 71:10-18, 85:12-13, 86:6-8.

The Bureau cannot seek the answers to these questions because, as set forth below, the Bureau has no authority to regulate the rent-to-own industry.  Indeed, Counts II through V reflect an aggressive effort to push the Bureau's authority far beyond its lawful limits by shoehorning a claim against those within the Bureau's reach ***because*** they do business with those outside of the Bureau's reach, based on acts taken by those that lay outside the Bureau's jurisdiction.  The Bureau has no authority to regulate rent-to-own services, and accordingly, this Court should enter judgment in Defendants' favor on Counts II through V to the extent that the Bureau's claims turn on representations related to rent-to-own.

The CFPA does not allow for regulation of the rent-to-own industry because rent-to-own transactions do not fall within the CFPA's statutory authority.  As explained above, rent-to-own transactions are not "consumer financial product[s] or service[s]."  *See* pp. 34, *supra*.

All told, the Bureau lacks authority to regulate rent-to-own transactions, and Congress did not intend for the Bureau to be able to regulate such transactions by extending covered persons who happen to do business with un-covered persons, based on un-covered transactions.  "Administrative agencies are creatures of statute.  They accordingly possess only the authority that Congress has provided."  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, --- S. Ct. ----, 2022 WL 120952, at *3 (U.S. Jan. 13, 2022).  Congress "speak[s] clearly

when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citation and internal quotation marks omitted).  It "does not … hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); Congress would not have given the Bureau the authority to regulate rent-to-own transactions in such a contorted and tangential way—by authorizing actions against those that do business with rent-to-own companies, rather than the rent-to-own companies themselves.

The Bureau's attempt to regulate the rent-to-own industry by proxy is particularly repulsive given that it seeks to "intrude[] into an area that is the particular domain of state law:  the landlord-tenant relationship." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.  Rent-to-own transactions are extensively regulated by *state* law.  *E.g.*, Tex. Prop. Code § 5.061 *et seq.*; Va. Stat. § 55.1-3000 *et seq.*  If Congress wanted to alter this "balance between federal and state power" by giving the Bureau the authority to regulate the rent-to-own industry, it would have "enact[ed] exceedingly clear language." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (citation omitted).  Because Congress did not imbue the Bureau with the power to prosecute claims over the rent-to-own industry, and Counts II through V are essentially about statements made relating to that industry, this Court should enter judgment in Defendants' favor on Counts II through V.

## VIII.   CreditRepair.com is entitled to summary judgment on Count I because it had a policy and practice of not offering "promised results."

The TSR's Advance Fee Provision ("AFP") applies only in circumstances where a credit repair provider "promised results" by removing negative credit information or improving a credit history, credit record, or credit rating.  16 C.F.R. § 310.4(a)(2)(ii).  That threshold requirement is clearly apparent in the plain text of the regulation and is reinforced by the regulatory history, which

shows that the Federal Trade Commission intended to target only "bogus" and "deceptive" credit repair services—services that *guaranteed* a credit improvement, only to scamper with a consumer's money when it came time to deliver. 60 Fed. Reg. 43,841, 43,853 (Aug. 25, 1995); 67 Fed. Reg. 4,492, 4,511 (Jan. 30, 2002). The undisputed record shows that CreditRepair.com is not that kind of business, and it made no guarantees. SUMF 44, 46-47, 51-56. The Court is well familiar with these arguments, and CreditRepair.com adopts the arguments set forth in Heath's motion for summary judgment on Count I, and reaffirms the arguments it set forth as part of its opposition to the Bureau's motion for summary judgment on Count I.

CreditRepair.com's motion for summary judgment on Count I is ripe. Unlike Heath, it is not a law firm, and thus questions identified by this Court in response to Heath's motion do not prevent this Court from rendering a ruling on summary judgment. This Court should grant summary judgment in CreditRepair.com's favor on Count I.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in Defendants Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, and CreditRepair.com, Inc.'s favor on Counts II-V and on Count I as to CreditRepair.com's billing.

Dated:  January 21, 2022                Respectfully submitted,

                                                     /s/ William J. Harrington
                                                     William J. Harrington*
                                                     Goodwin Procter LLP
                                                     620 Eighth Avenue
                                                     New York, NY 10018
                                                     (212) 459-7140
                                                     wharrington@goodwinlaw.com

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon*
W. Kyle Tayman*
Christina Hennecken*
Virginia McCorkle*
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
thefferon@goodwinlaw.com
ktayman@goodwinlaw.com

Courtney Hayden*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
chayden@goodwinlaw.com

*Attorneys for Defendants*
(*admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2022, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ William J. Harrington
William J. Harrington

## <u>CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT</u>

I certify that the above memorandum contains 12,208 words and complies with DUCivR 7-1(a)(4)(B)(i), according to the word count function of Microsoft Word, excluding the cover page, table of contents, table of authorities, signature block, and exhibits.


Dated:  January 21, 2022                            <u>/s/ William J. Harrington     </u>
                                                    William J. Harrington