MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
LORRAINE VAN KIRK
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
lorraine.vankirk@cfpb.gov
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, <br><br> *Plaintiff*, <br><br> v. <br><br> PROGREXION MARKETING, INC., *et al*., <br><br> *Defendants*. | Case No.  2:19-cv-00298-BSJ <br> **REDACTED PUBLIC VERSION** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
PROGREXION'S
MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................1

II.  BACKGROUND ................................................................................1

III. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL
     FACTS ........................................................................................10

IV.  STATEMENT OF ADDITIONAL MATERIAL FACTS (SAMF) ...............37

     A.  The Sample Hotswaps' offerings. .............................................37

     B.  The Sample Hotswaps' activities for Defendants. ........................41

     C.  Defendants' assistance to the Sample Hotswaps...........................42

     D.  Defendants' knowledge of the deception. ...................................45

     E.  Defendants' services. ............................................................47

V.   ARGUMENT...................................................................................48

     A.  The Bureau's claims are not time-barred. ....................................49

         1.  The Bureau brought this action when it filed the Complaint. .................49

         2.  Defendants misconstrue Section 5564(g)(1) ...........................................51

         3.  The Complaint was timely filed. .................................................54

     B.  Progrexion is liable for deception under Counts II and III..........................56

         1.  Progrexion, with knowledge of the deception, participated in it
             or had the right to control it. ........................................................57

         2.  The Sample Hotswaps were Progrexion's agents. ...................................60

     C.  Progrexion is liable for substantial assistance under
         Counts IV and V. .......................................................................65

         1.  The Sample Hotswaps are "covered persons" or "service
             providers" under the CFPA. ...........................................................65

             a.  The Rent-to-Own Hotswaps are covered persons...............................66

             b.  The Rent-to-Own Hotswaps are service providers. ............................71

2. OLP misled consumers in connection with advertising credit repair, and Progrexion knew it..............................................................74

3. Ascent misrepresented its products and services to consumers, and Progrexion knew it. ...................................................................75

a. Ascent misled consumers. ...................................................75

b. Progrexion knowingly or recklessly provided substantial assistance to Ascent. ........................................................................77

D. Progrexion is liable for Count I. ..................................................79

VI. CONCLUSION..................................................................................79

# Table of Authorities

## Cases

*Advanced Disposal Servs. E., Inc. v. NLRB*,

   820 F.3d 592 (3d Cir. 2016) ........................................................................ 51

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,

   456 U.S. 556 (1982) ............................................................................. 60, 61

*Anderson v. Liberty Lobby, Inc.*,

   477 U.S. 242 (1986) ...................................................................................... 48

*Bavardo Palace, S.A. v. Vacation Tours, Inc.*,

   203 Fed. App'x 252 (11th Cir. 2006) ........................................................... 71

*BP Am. Production Co v. Burton*,

   549 U.S. 84 (2006) ................................................................................. 53, 55

*CBE v. Lexington Law Firm*,

   No. 17-cv-02594 (N.D. Tex.) ......................................................................... 9

*Cent. Bank of Denver v. First Interstate Bank of Denver*,

   511 U.S. 164 (1994) ...................................................................................... 61

*CFPB v. Access Funding, LLC*,

   No. 1:16-cv-03759, 2021 WL 2915118 (D. Md. July 12, 2021) ................. 73

*CFPB v. D & D Mktg.*,

   No. CV15-9692-PSG(EX), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)  72

*CFPB v. ITT Educ. Servs., Inc.*,

   219 F. Supp. 3d 878 (S.D. Ind. 2015) ..................................................... 70, 71

*CFPB v. Nationwide Biweekly Admin., Inc.*,

   No. 15-CV-02106-RS, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) ... 52, 56

*CFPB v. NDG Fin. Corp.*,

    No. 15-cv-5221(CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ........... 72

*CFPB v. Universal Debt & Payment Solutions*,

    No. 15-cv-00859, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015) ................ 77

*Collins v. Yellen*,

    141 S. Ct. 1761 (2021)........................................................................ 49, 50, 51

*FTC v. Credit Bureau Ctr.*,

    235 F. Supp. 3d 105 (N.D. Ill. 2017), *vacated in part on other grounds*

    937 F.3d 764 (7th Cir. 2019) ................................................................ 63, 79

*FTC v. Freecom Commc'ns., Inc.*,

    401 F.3d 1192 (10th Cir. 2005) ............................................................ 57, 76

*FTC v. LeadClick Media, LLC*,

    838 F.3d 158 (2d Cir. 2016) ....................................................................... 57

*FTC v. LifeWatch, Inc.*,

    176 F. Supp. 3d 757 (N.D. Ill. 2016)......................................................... 63

*FTC v. MacGregor*,

    360 Fed. App'x 891 (9th Cir. 2009) .......................................................... 62

*FTC v. Partners in Health Care Assoc.*,

    189 F. Supp. 3d 1356 (S.D. Fla. 2016)................................................. 63, 79

*FTC v. Stefanchik*,

    559 F.3d 924 (9th Cir. 2009) ................................................................ 60, 62

*FTC v. Wash. Data Res.*,

    856 F. Supp. 2d 1247 (M.D. Fla. 2012) .................................................... 76

*G.L. v. Ligonier Valley Sch. Dist. Auth.*,

    802 F.3d 601 (3d Cir. 2015) ...................................................................... 52

*Gabelli v. SEC*,

    568 U.S. 442 (2013)........................................................................ 55

*Holland v. Florida*,

    560 U.S. 631 (2010)........................................................................ 51

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,

    137 S. Ct. 1523 (2017).................................................................... 62

*In Re Adler, Coleman Clearing Corp.*,

    263 B.R. 406 (S.D.N.Y. 2001) ...................................................... 62

*In Re Heiser*,

    No. 4-18-bk-01410-RNO, 2019 WL 919732 (M.D. Pa. Feb. 24, 2019)...... 69

*In Re Integrity Advance, LLC*,

    CFPB No. 2015-CFPB-0029 (Jan. 11, 2021) ....................................... 52, 56

*Interamericas Invs., Ltd. v. Bd. of Governors of the Fed. Rsrv. Sys.*,

    111 F.3d 376 (5th Cir. 1997) .......................................................... 53

*Johnson v. United States*,

    544 U.S. 295 (2005)........................................................................ 51

*Life Alert Emergency Response, Inc., v. LifeWatch Inc.*,

    601 Fed. App'x 469 (9th Cir. 2015) .............................................. 63

*Merck & Co. v. Reynolds*,

    559 U.S. 633 (2010)........................................................................ 56

*Nat'l R.R. Passenger Corp. v. Morgan*,

    536 U.S. 101 (2002)........................................................................ 53

*Safeco Ins. Co. of Amer. v. Burr*,

    551 U.S. 47 (2007).......................................................................... 77

*SEC v. Lauer*,

    52 F.3d 667 (7th Cir. 1995) ............................................................ 67

*Seila Law LLC v. CFPB*,

    140 S. Ct. 2183 (2020) ................................................................... 49

*Seolas v. Bilzerian*,

    951 F. Supp. 978 (D. Utah 1997) ................................................... 60

*United States v. Ackerman*,

    831 F.3d 1292 (10th Cir. 2016) ..................................................... 63

## Statutes

12 U.S.C. § 5481(5) ........................................................................... 66

12 U.S.C. § 5481(6) ........................................................................... 65

12 U.S.C. § 5481(7) ........................................................................... 67

12 U.S.C. § 5481(15) ............................................................. 66, 67, 70

12 U.S.C. § 5481(19) ......................................................................... 61

12 U.S.C. § 5481(26) ...................................................................... 65,71

12 U.S.C. § 5511 ................................................................................ 61

12 U.S.C. § 5536(a)(1) ........................................................... 71, 73, 77

12 U.S.C. § 5564(g) ................................................................ 49, 51-55

15 U.S.C. § 1681i(a)(3) ....................................................................... 9

15 U.S.C. § 6101(5) ........................................................................... 61

15 U.S.C. § 6105(d) ................................................................... 71, 73

15 U.S.C. § 77m ................................................................................ 54

21 U.S.C. § 335b ................................................................................ 54

28 U.S.C. § 1658(b) ........................................................................... 52

31 U.S.C. § 3731(b)(2)............................................................... 52

42 U.S.C. § 2000e–5(e)(1) ......................................................... 53

Securities Exchange Act of 1934, §10(b) ................................. 62

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ................................... 69

## Regulations

12 C.F.R. § 1022.43(a)............................................................ 9, 25

12 C.F.R. § 1022.43(b)(2)........................................................... 9

16 C.F.R. § 310.2(y) ................................................................. 61

16 C.F.R. § 310.3(a)(4) ............................................................. 71

16 C.F.R. § 310.3(b) ................................................................. 73

16 C.F.R. § 310.4(a)(2) ........................................................ 28, 33

17 C.F.R. § 240.10b–5 ............................................................. 62

## Regulatory Material

80 Fed. Reg. 37,496 (June 30, 2015) ....................................... 70

## I.     INTRODUCTION

Progrexion violated the Consumer Financial Protection Act (CFPA) and Telemarketing Sales Rule (TSR) by using deceptive, bait advertising to telemarket its credit repair services, and by charging consumers illegal upfront and monthly fees. Progrexion's motion fails to meet long-established summary judgment standards and should be denied.[1]

## II.    BACKGROUND

Private equity firm H.I.G. Capital purchased a majority share of Progrexion in 2010 and used telemarketing to expand the business to over 500,000 active customers. ██████████████████████████████████████████████ ████████████████████████████████████ Ex. 12 (DelPonti0000371). By 2013, Lexington Law and CreditRepair.com held an estimated ████ market share. Ex. 52 at CFPB-PGX-123838. By 2016, Progrexion had ██████ telephone sales agents in ████████████████████████ and ████ phone numbers. Ex. 14 (Marketing's Resp. to Request for Report 2 (Mar. 28, 2016)); Ex. 15

---

[1] Defendants Progrexion Marketing ("Marketing"), PGX Holdings ("Holdings"), Progrexion Teleservices ("Teleservices"), eFolks, and CreditRepair.com (collectively, "Progrexion") ██████████████████████████████████ ████████████████████████████████████████████████████

(Teleservices's Resp. to Interrog. 5 (Apr. 7, 2021)); Ex. 16 (Teleservices's Resp. to RFA 10); Ex. 17 (CreditRepair.com's Resp. to RFA 12).



████████████████████████████ the Hotswap Program, through which affiliate telemarketers—"Hotswap Partners"—advertise Defendants' credit repair services and refer potential customers via telephone. ████████████████████

████████████████████████████████████████████

████. The Hotswap Partner makes the first credit repair pitch, then live-transfers the consumer to a Progrexion telemarketer, who attempts to close the credit repair sale. ██████████████████████████

██████████████████████████████████████

███████████████████████████

████████████████████████

Besides telemarketing credit repair, most Hotswap Partners advertise other credit-related products or services online. SAMF ¶¶84-86. Their strategy is to identify consumers having difficulty obtaining credit (*e.g.*, ███████

█████████████████ Ex. 89 (CFPB-PGX-153901)) and pitch credit repair as the solution. SAMF ¶82.

For example, a consumer searching online for housing might encounter a

H.O.P.E. Program ("HOPE")[2] advertisement stating:

- "BUY A HOME IN THE NEXT 30-90 DAYS NO MATTER WHERE YOUR CREDIT IS NOW…We have helped 10,000 people buy a home who started out with under a 500 credit score!" (Defs.' Ex. 29 (CFPB-PGX-153513)); or

- "The H.O.P.E. Program guarantees ANYONE a 0-3.5% Down Home Loan no matter how bad their Credit is when we start!" (Defs.' Ex. 26 (CFPB-PGX-153538)).

The consumer could call or complete an online form indicating interest and receive

a call back. *Id.*; Ex. 29 (CFPB-PGX-002714). Once on the phone, a HOPE agent,

using a 

. HOPE agents said their "blitz" program would

get the consumer "credit-ready" (*i.e.*, to a 640 score) to qualify for a home within

---

[2] The Complaint refers to HOPE as HSP1.

three months, as long as the customer worked on credit repair with Lexington Law

because "you can't get around credit repair." Ex. 2 (CFPB-PGX-154644 – audio

recording).

      If the consumer agreed, HOPE would live-transfer them to Progrexion (Ex.

16 (Teleservices's Resp. to RFAs 9-15)) who would pitch Lexington Law credit

repair as a solution to achieving their credit dreams. *E.g.*, ████████████████

████████████████████████████████████████

████████ Ex. 3 (CFPB-PGX-154641 – audio recording); ███████████████

████████

      If the consumer became a paying Lexington Law customer, Progrexion paid

HOPE a $110 referral fee. ██████████████████████████ Ex. 33 (CFPB-

PGX-004473). At least until March 2016, all of HOPE's income came from

Lexington Law sales. Ex. 34 (HOPE Program Investigative Hr'g Tr.) 203:14-23;

████████████████████████ By October 2017, about ██████ people

transferred from HOPE became Lexington Law customers. PGX0042355.[3]

      Despite advertising that they "guarantee" mortgages and "have helped

countless families…with purchasing a home," HOPE offered neither mortgages,

---

[3] Defendants' customer datasets are not attached because they are large and contain extensive Personal Identifying Information (PII). Plaintiff stands ready to produce them at the Court's request.

nor a home ownership program; it worked "merely as an affiliate call center" for

Lexington Law. Ex. 36 (CFPB-PGX-007640). ██████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

        Defendants knew about HOPE's deceptive advertising, but allowed it to

continue for years. *E.g.*, Ex. 214 (CFPB-PGX-004547); Ex. 87 (CFPB-PGX-

007517); ████████████████████████ After the Bureau began

investigating Defendants' advertising through HOPE in early 2016, ████████

████████████████████████████████████████

████████████████████████████████████ But

Defendants—████████████████████████████)—continued

their partnership with HOPE until ███████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████ But Defendants did not

actually implement these measures. *See* Response to No. 57. And the deceptive

statements remained in HOPE's marketing materials. *E.g.*, Ex. 39 (CFPB-PGX-

153568) (9-2017 capture from HopeToOwn.com); Defs.' Ex. 27 (CFPB-PGX-

153721) (8.19.2016 capture from HOPE website Registertobuyahome.com).

Lexington Law and CreditRepair.com credit repair services are substantively

indistinguishable. *E.g.*, ECF 98 (Pl.'s Mot. to Compel Defs. to Produce Clawed-

Back Documents and Unredacted Call Recordings and Exhibits 7-14 thereto).

████████████████████████████████

████████████████████████ But Progrexion

markets Lexington Law services as *legal* services ███████████████████

████████████████████████ Lexington Law does

not ████████████████████████████

███████████████████████████████████

███████████████████████████████████

6



[4] The two brands are marketed as competitors, and some consumers unwittingly enroll in the second brand after being dissatisfied with the first. Ex. 28 (McQuiller Decl.); Ex. 27 (Williams Decl.).

Progrexion, not the law firm, controls the business.[5]

---

[4] With 500,000 active clients and 29 attorneys, each client could get 7.3 minutes with a lawyer each year, assuming the lawyers dedicated 8 hours per day to client service and took no days off. *See also* Ex. 45 (Heath Dep.) 47:17-24.
[5] Prior to Heath PC, another firm was "Lexington Law."

*Id.* ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Consumers typically sign the engagement agreement with Heath by texting the word "Agree" to a Progrexion telemarketer. *E.g.*, ████████████████ ████████████████████████ Nobody countersigns the agreements. ████████████████████████ The agreements only vaguely describe the service, repeatedly referencing the consumer's "case" and promising to assist "in requesting that Bureaus and Furnishers demonstrate their compliance with various laws governing fair, accurate and substantiated consumer credit reporting." Ex. 11 (LEX0000421). Next, the Progrexion agent typically performs the "case setup" by marking the consumer's negative credit report items with an "action type" such as "collection" or "item verify." ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



Defendants focus on retention because

*see also, e.g.*, Ex. 28 (McQuiller Decl.) ¶¶7, 10-12; Ex. 27 (Williams Decl.) ¶¶17-18; Ex. 23 (D. Jacobs Decl.) ¶12.

Lexington Law and CreditRepair.com advertise "leveraging" laws in consumers' favor. Ex. 64 (PGX0028273); Ex. 65 (PGX0040774). But federal law does not require that a credit reporting agency (CRA) or furnisher conduct a reasonable investigation of a credit dispute if the CRA reasonably believes the dispute is frivolous or irrelevant or the furnisher reasonably believes it was prepared or submitted by a credit repair organization, not directly by the consumer. 15 U.S.C. §1681i(a)(3)(A); 12 C.F.R. §1022.43(a), (b)(2). The legal advantage Defendants advertise is actually a material disadvantage.[6] Defendants thus attempt to disguise their involvement by sending template dispute letters under the

---

[6]

consumer's name, not on company letterhead. *E.g.*, Ex. 28 (McQuiller Decl. and

Exhibits F, G, I thereto).

### III.   RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Ascent Mortgage Resource Group and Lead Virtue, LLC (collectively referred to as "Ascent"); Easyhomeownership.net ("EHO"); OLP.com, Inc., a/k/a Rocket Daddy, Inc. and One Loan Place ("OLP"); The Hope Program, LLC, a/k/a Help Renters, Hope to Own, and Ecain, LLC ("Hope"), YHTBA Corp., d/b/a rent-2-own.house, Rent Then Own Homes, and renttoown.house Realty, Inc. ("Rent2own.house"); and OwnerWiz Realty, Inc. ("OwnerWiz") (collectively, the "Relevant Hotswaps"),[7]

---

[7] The Bureau disagrees that these six entities (referred to herein as the Sample Hotswaps) are the only relevant Hotswap Partners.

**Pages 11-47
REDACTED**

117. 

## V.    ARGUMENT

The record supports a reasonable jury's verdict in favor of the Bureau on each of its claims. Defendants' motion therefore must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

## A.     The Bureau's claims are not time-barred.

### 1.     The Bureau brought this action when it filed the Complaint.

The CFPA provides that "[e]xcept as otherwise permitted by law or equity,

no action may be brought…more than 3 years after the date of discovery of the

violation to which an action relates." 12 U.S.C. §5564(g)(1). The Bureau brought

this action on May 2, 2019, when it filed the Complaint. Defendants nevertheless

ask this Court to treat this case as having been brought in July 2020 when the

Bureau's Director Kathy Kraninger ratified the Complaint. Mot. 23-25. Citing

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), Defendants claim the Bureau

lacked authority to file the Complaint in May 2019 (or to enter the March 2019

tolling agreement). Defendants' theory is foreclosed by the Supreme Court's

decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which Defendants fail to cite.

In *Seila Law*, the Supreme Court held that a provision in the Bureau's

organic statute purporting to restrict the President's authority to remove the

Bureau's Director was unconstitutional but "severable from the other statutory

provisions bearing on the CFPB's authority." 140 S. Ct. at 2192. In *Collins*, the

Supreme Court held that a similar statutory restriction on the President's authority

to remove the Director of the Federal Housing Finance Agency also violated the

Constitution. 141 S. Ct. at 1783-87. But in so holding, the Court made clear that

49

"the unlawfulness of [a] removal provision does not strip the Director of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23 (citing *Seila Law*).

*Collins* also makes clear, contrary to Defendants' unsupported assertion, Mot. at 24, that the existence of an unconstitutional restriction on *removing* the Bureau's Director does not mean that the Director was improperly *appointed*. *Collins*, 141 S. Ct. at 1787. A properly appointed official (like Director Kraninger) possesses the "authority to carry out the functions of the office" even where the agency's organic statute contains an unconstitutional removal restriction, and "there is no reason to regard" such an official's actions "as void." *Id.* at 1787-88. As to Defendants' assertion, Mot. at 24, that *Seila Law* "meant that the Director's action would be void unless lawfully ratified," the Supreme Court was emphatic: "we said no such thing." *Collins*, 141 S. Ct. at 1788.[10]

---

[10] *Collins* suggests that a party could obtain relief based on an unconstitutional removal provision if it could establish that the removal restriction—despite having "never really been part of the body of the governing law"—actually caused them "harm." *Id.* at 1788-89. But Defendants do not attempt to satisfy *Collins*' standard. Nor could they, because the removal provision had no real-world impact here. There is no evidence, for instance, that President Trump wanted to remove Director Kraninger (whom he had selected for the job and who approved the filing of this action and later ratified it), let alone that the removal restriction had any "effect" on the Bureau's pursuit of this action. *Id.* at 1789.

With or without ratification, the Bureau's properly appointed Director had the authority to carry out the functions of her office, including with respect to the filing of the Complaint and the Bureau's entry into the tolling agreement.[11] This Court should therefore hold that the Bureau brought this action when it filed the Complaint and reject Defendants' effort to undo the tolling agreement they signed.

### 2. Defendants misconstrue Section 5564(g)(1).

Defendants also erroneously suggest that the Bureau's recovery cannot encompass conduct that occurred more than three years (excluding the agreed tolling period) before the Bureau filed suit. Mot. 23-27. Section 5564(g)(1) limits when the Bureau can *file suit*—within "3 years [of] the date of discovery"—but it does not limit or proscribe when the underlying violation must have *occurred*. Thus, the Bureau must sue within three years of discovering a violation (excluding tolling periods), but the underlying violation need not have occurred within three

---

[11] Even putting *Collins* aside, Defendants' theory defies common sense. *See Johnson v. United States*, 544 U.S. 295, 305 (2005) (calling it "highly doubtful" Congress intended a time limit on pursuing a claim to expire before the claim arose). Defendants' approach likewise ignores that "as an equitable remedy, ratification has been applied flexibly and has often been adapted to deal with unique and unusual circumstance," *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 603 (3d Cir. 2016), and that a statute of limitations is equitably tolled where the plaintiff diligently pursued its rights (here, by signing a tolling agreement and filing a Complaint) and some extraordinary circumstance stood in its way (here, the statutory removal provision), *see Holland v. Florida*, 560 U.S. 631, 649 (2010).

years of the start of litigation. *E.g.*, *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-CV-02106-RS, 2017 WL 3948396, at *10 (N.D. Cal. Sept. 8, 2017) (complaint covering violations from 2011 was timely filed May 11, 2015); *In re Integrity Advance, LLC*, CFPB No. 2015-CFPB-0029, at 17-18, 35 (Jan. 11, 2021)[12] (notice of charges covering violations from 2011 was timely filed November 18, 2015).

Much like in the *G.L.* case on which Defendants rely, Section 5564(g)(1) limits when a plaintiff can sue after discovering a violation or injury, but it does not limit when the violation or injury must have occurred. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 605 (3d Cir. 2015) (requiring filing within 2 years of "reasonable discovery of an injury," but authorizing "a complete remedy," irrespective of when the injury occurred). Congress knows how to impose a limit on when a violation must occur, but it chose not to do so in the CFPA. *Compare, e.g.*, 31 U.S.C. §3731(b)(2) (False Claims Act action may be filed within 3 years of discovery, "but in no event more than 10 years after the date on which the violation is committed") *and* 28 U.S.C. §1658(b) (private securities action may be filed by

---

[12] Available at https://files.consumerfinance.gov/f/documents/cfpb_2015-cfpb-0029_document-308_2021-01.pdf.

the earlier of 2 years after discovery or 5 years after the violation), *with* 12 U.S.C. §5564(g) (imposing no limitation regarding when the violation was committed).[13]

Defendants' muddled reading of Section 5564(g)(1) would bar the Bureau from suing within three years of discovering a violation if the violation occurred before the Bureau discovered it, as almost always happens. This is not the law.[14]

Defendants' argument cannot be reconciled with the text of Section 5564(g)(1), which is unambiguous. Even if some ambiguity existed, the Court should apply "the rule that statutes of limitations are construed narrowly against the government." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006). The Bureau is also entitled to deference regarding its interpretation of Section 5564(g)(1), which it administers, and which is part of its enabling act. *Interamericas Invs., Ltd. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 111 F.3d 376, 382 (5th Cir. 1997).

---

[13] Defendants devote much verbiage to rebutting an irrelevant continuing violation theory that the Bureau does not advance. The Complaint alleges ongoing, discrete violations.

[14] Defendants cite mostly to inapplicable Title VII cases, which are subject to a dissimilar limitations period requiring charges to be filed within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. §2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).

### 3. The Complaint was timely filed.

Defendants blame the Bureau for not satisfying a reasonably diligent plaintiff standard. Mot. 25-27. But Section 5564(g)(1) contains no such standard, and even if it did, Defendants cannot show that the Bureau failed to satisfy it.

Section 5564(g)(1) requires the Bureau to sue within "3 years of the date of discovery of a violation." It does not require the Bureau to sue within 3 years of when a hypothetical reasonably diligent government agency should have discovered a violation. If Congress had intended to incorporate Defendants' reasonably diligent plaintiff standard, it could have required the Bureau to sue within 3 years of the "date of discovery of a violation, *or the date when such discovery should have been made by the exercise of reasonable diligence*." *See* 15 U.S.C. §77m (barring actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence") (emphasis added); *see also* 21 U.S.C. §335b(b)(3)(B) (barring actions initiated "more than 6 years after the date when facts material to the act are known or reasonably should have been known by the Secretary"). But that is not the statute that Congress enacted. And for good reason. Applying the reasonably diligent discovery standard to Bureau enforcement actions would pose substantial difficulties. For example, "[i]t is

unclear whether and how courts should consider agency priorities and resource

constraints in applying that test to Government enforcement actions." *Gabelli v.*

*SEC*, 568 U.S. 442, 452-53 (2013). Moreover, undertaking this analysis would

mire courts in inquiry into an agency's funding, staffing and training, enforcement

programs, statutory constraints, and other factors—all of which would be "further

complicat[ed]" by the inevitable assertion of "various privileges, such as law

enforcement, attorney-client, work product, or deliberative process." *Id.* Section

5564(g)(1) does not include this standard or require this analysis, and

Defendants—who merely assume, without argument, that it does—do not show

otherwise. And, to the extent that there is any ambiguity on this score, the Court

must construe the limitation narrowly against the government. *Burton*, 549 U.S. at

95.

Even if a reasonably diligent government plaintiff standard applied, the

Complaint is timely. The Bureau tolled the limitations period and filed suit only

two years after May 1, 2017—the earliest date the Bureau could have discovered

Defendants' Count II-V violations. Response to SUMF ¶76. The Bureau's claims

depend on Defendants' scienter—specifically, Defendants' knowledge of the

Sample Hotswaps' misrepresentations, reckless indifference to the

misrepresentations, or awareness of a high probability of the misrepresentations,

along with an intentional avoidance of the truth. *See* Compl. ¶¶141, 150, 154, 157.

Defendants' scienter is a factual element of the Bureau's claims, *see Merck & Co.*
*v. Reynolds*, 559 U.S. 633, 648 (2010), and one which the Bureau could not have

alleged until it received and reviewed Progrexion's March 10, 2017 response to the

Bureau's CID, which contained 17,821 documents. Ex. 144 (Bureau Supp.

Interrog. Resp. July 28, 2021). Without this evidence, the complaints from

consumers and former employees that Defendants cite did not establish all of the

"important and necessary elements of the 'violation[s]'" that must be discovered

before the statute of limitations clock begins to run. *In re Integrity Advance*, slip

op. at 18; *see also Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, at *10

n.22 ("Had CFPB rushed into court" with just a consumer complaint, "it would

have been a clear violation of Rule 11.").

## B. Progrexion is liable for deception under Counts II and III.

Counts II and III seek to hold Progrexion liable for years of deceptive

marketing practices that it knew about, actively participated in, and had the right to

control. Compl. ¶¶138-39, 147-48. Under well-established law, Progrexion is liable

for the deceptive statements of its marketing affiliates under two different

doctrines.

### 1. Progrexion, with knowledge of the deception, participated in it or had the right to control it.

First, Progrexion is liable because, with knowledge of the deceptive nature of the scheme, it either directly participated in the deception or had the authority to control the deceptive practice of another, but allowed the deception to proceed, *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 169-70 (2d Cir. 2016); *FTC v. Freecom Commc'ns., Inc.*, 401 F.3d 1192, 1202-03 (10th Cir. 2005).[15] Progrexion's motion does not address this doctrine and presents no legal arguments or undisputed facts that prevent the Bureau from proceeding under it. This omission alone defeats Defendants' motion.

Progrexion argues that it made no representations regarding loans or rent-to-own housing opportunities. That assertion is insufficient and contradicted by the record. Defendants' policies *endorsed* Teleservices and CreditRepair.com employees' statements about loans and rent-to-own housing. ███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

---

[15] Additional legal authority for the first doctrine (knowing participation or authority to control) is contained in the Bureau's Response in Opposition to Defendants' Motion to Dismiss the Complaint, ECF 38-1, at 14-18, and is incorporated here by reference.

███████████████████████████████████████████

████████████ Likewise, Defendants' policies *endorsed* statements suggesting that enrolling in credit repair would enable consumers to secure their desired credit product. ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

Additionally, "one who puts into the hands of others the means by which such others may deceive the public is equally as responsible for the resulting deception." *In re Litton Indus., Inc.*, 97 F.T.C. 1, 31 (1981), *aff'd*, 676 F.2d 364 (9th Cir. 1982). Defendants did this. Defendants provided telemarketing scripts to Hotswap Partners that contained misleading statements regarding the availability of rent-to-own homes, loans, and other products. *See, e.g.*, ████████████████



Defendants also provided telemarketing scripts to Hotswap Partners that represented, expressly or implicitly, that enrolling in credit repair would enable consumers to obtain the Hotswap Partner's offered product or service.

SAMF ¶¶97-98.

Progrexion—which provided and endorsed the Hotswap Partners' deceptive telemarketing scripts—knowingly participated in the deception.

## 2. The Sample Hotswaps were Progrexion's agents.

Second, Progrexion is liable because the marketing affiliates acted as Progrexion's agents. *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009). Federal courts "impose[] liability upon principals for the misdeeds of agents." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982). In particular, "a principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party." *Id.* at 566. Defendants—seeking to profit from their marketing partners' misrepresentations—assert that the CFPA and TSR, uniquely among consumer protection statutes, allow parties to outsource unlawful activity without repercussion.[16] Not so.

Relying solely on aiding and abetting cases, Defendants argue that the principal/agent doctrine is a form of secondary liability that impermissibly expands the scope of the law. But civil aiding and abetting liability is incomparable to principal/agent liability because agency law is a source of *primary*, not secondary, liability. *Seolas v. Bilzerian*, 951 F. Supp. 978, 983-84 (D. Utah 1997). Civil "aiding and abetting liability reaches persons who do not engage in the proscribed

---

[16] The Bureau's allegations do not concern action taken solely "for [an agent's own] benefit." Mot. 28. Rather, the Bureau alleges that Progrexion, directly, or through affiliates "acting on Progrexion's behalf and for *its* benefit," violated the CFPA and TSR. Compl. ¶¶138, 147 (emphasis added).

activities at all," but who are secondarily liable because they provide assistance. *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 176 (1994). By contrast, principals bear primary liability for the proscribed activities committed by their agents, irrespective of acts of support or assistance. *Hydrolevel*, 456 U.S. at 565-69. "*Central Bank*'s discussion of aiding and abetting law should not be transplanted into the more settled realm of agency law," *Bilzerian*, 951 F. Supp. at 984, or relied upon here.

Both the CFPA and TSR authorize agency liability as both include corporations within their definitions of "person." 12 U.S.C. §5481(19); 16 C.F.R. §310.2(y). "[B]y explicitly including corporations in its definition of 'person,'" Congress "foresaw that corporations would be held liable under agency principles," as a "corporation can only act through its agents, and therefore only can be bound through application of agency principles." *Bilzerian*, 951 F. Supp. at 984. Inclusion of agency principles under the CFPA and TSR is also consistent with these laws' purpose: to protect consumers from unfair, deceptive, and abusive acts and other harms. 12 U.S.C. §5511; 15 U.S.C. §6101(5).[17] Defendants do not show otherwise.

---

[17] Defendants' references to two other provisions of the TSR that explicitly use the term "agent" are inapposite, as both provisions concern technical aspects of

"[C]ourts may take it as given that Congress has legislated with an expectation" that well-established common law principles apply. *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1536 (2017). Indeed, courts have repeatedly held that federal consumer protection statutes, including the FTC Act and TSR, incorporate common-law principles of agency liability. *E.g., Stefanchik*, 559 F.3d at 930 (corporation liable for the telemarketing misrepresentations of its agent, a third-party marketing company); *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009) (corporations liable where "third party call centers had the apparent authority to engage in the acts that were improper under the FTC Act and the TSR").[18]

"An agency relationship is usually said to 'result[ ] from the manifestation of consent by one person to another that the other shall act on his behalf and subject

---

merchant payment systems and credit card laundering and particular actors involved therein.

[18] The Bureau does not rely on cases that pre-date *Central Bank*. Furthermore, Defendants' assertion that *Central Bank* forecloses agency liability generally is directly contradicted by *Adams v. Kinder-Morgan, Inc.*, wherein the Tenth Circuit held in a securities fraud action under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. §240.10b–5, that the actions of agents are attributable to a corporation for purposes of showing a primary violation. 340 F.3d 1083, 1106-07 (10th Cir. 2003); *see also, In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 495 (S.D.N.Y. 2001) ("[T]he better argument is made by the courts which have held that *Central Bank* does not bar application of agency principles to support liability in securities fraud cases.").

to his control, and consent by the other so to act.'" *U.S. v. Ackerman*, 831 F.3d 1292, 1301 (10th Cir. 2016) (quoting Restatement (Second) of Agency §1). But this "manifestation and consent doesn't have to be formalized in any particular way," and the "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* A principal need not exercise "constant supervision or awareness of every discrete act"; "the question is usually simply whether the agent acts with the principal's consent and (in some way) to further the principal's purpose." *Id.*

The agency relationship standard is satisfied here. To determine whether a company controls a telemarketer, courts focus on whether the company reviews, edits, or otherwise controls the telemarketing script used to solicit consumers. *See FTC v. LifeWatch, Inc.*, 176 F. Supp. 3d 757, 776 (N.D. Ill. 2016); *FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356, 1360 (S.D. Fla. 2016); *Life Alert Emergency Response, Inc. v. LifeWatch Inc.*, 601 F. App'x 469, 473 (9th Cir. 2015) (company controlled telemarketer where it "had the power and practice of approving scripts" and suggested changes to the marketing message when it heard something it did not like). Another indicator of control is the ability to terminate the advertising agreement with the marketer at any time. *FTC v. Credit Bureau*

*Ctr.*, 235 F. Supp. 3d 1054, 1062 (N.D. Ill. 2017), *vacated in part on other grounds*, 937 F.3d 764 (7th Cir. 2019).

Here, Progrexion was contractually required to ███████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████. On calls, Sample Hotswaps'

call center agents were contractually required to ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

In practice, Progrexion ███████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

provided technology that facilitated the referral, including exchanging data through

Progrexion's proprietary software and tracking systems (*id.*; Ex. 170); and paid the

Sample Hotswaps weekly or monthly, usually via direct deposit, based on the

number of people who signed up and paid their first work fee ████████

████████████████████████████████████████████ For purposes of this

case, the Sample Hotswaps were Progrexion's agents, and Progrexion is liable for

their conduct.

## C.   Progrexion is liable for substantial assistance under Counts IV and V.

### 1.   The Sample Hotswaps are "covered persons" or "service providers" under the CFPA.

Only Count IV requires proof that a Sample Hotswap is a "covered person"

or a "service provider" under the CFPA, and proof of either is sufficient to sustain

Count IV. Compl. ¶¶155-56.

A covered person includes "any person that engages in offering or providing

a consumer financial product or service," and a service provider is "any person that

provides a material service to a covered person in connection with the offering or

provision by such covered person of a consumer financial product or service." 12

U.S.C. §5481(6), (26). Consumer financial products or services include, *inter alia*,

any of the following, offered or provided for use by consumers primarily for

personal, family, or household purposes:

- Extending credit;

- Extending or brokering certain leases of real property that are the functional equivalent of purchase finance agreements;

- Providing financial advisory services; and

- Collecting information or providing services related to financial accounts or consumer reports.

*Id.* §§5481(5), (15)(A)(i)-(ii), (viii)-(ix).

Progrexion does not contest—and thus concedes—that HOPE and OLP are

covered persons or service providers, but it baselessly argues that Ascent,

OwnerWiz, EHO, and Rent2Own.house (the "Rent-to-Own Hotswaps") are not.

Mem. 33-35. In fact, the Rent-to-Own Hotswaps meet both definitions.

### a.  The Rent-to-Own Hotswaps are covered persons.

The Rent-to-Own Hotswaps are covered persons because they were engaged

in offering Defendants' credit repair services, which are undisputedly consumer

financial services. 12 U.S.C. §§5481(15)(A)(viii), (ix). They also purported to

offer or provide credit or financial advisory services. And they purported to offer

or provide rent-to-own housing opportunities, which often, depending on the

contract details, meet the CFPA's definitions of credit or non-operating leases

intended to result in ownership. *Id.* §5481(7), (15)(A)(i)-(ii). The latter services'

illusory nature does not render the statute inapplicable. *SEC v. Lauer*, 52 F.3d 667,

670 (7th Cir. 1995).

      Progrexion protests the Rent-to-Own Hotswaps' status as "covered persons,"

but conveniently ignores that those entities are engaged in offering Defendants'

credit repair services. Mot. 33-35. The Rent-to-Own Hotswaps advertised credit

repair services, identified and screened potential credit repair customers, collected

information about consumers' credit histories and bank account information for

Defendants' use, transferred consumers to Defendants for the closing sales pitch,

and were paid based on the number of new credit repair customers who made a

payment within 45 days. SAMF ¶¶82-83. Because Defendants' credit repair

services are consumer financial products or services under the CFPA, the Rent-to-

Own Hotswaps are "covered persons."

      The Rent-to-Own Hotswaps also offered credit and financial advisory

services, in addition to credit repair. Ascent purported to offer both. SAMF ¶¶84,

86. ███████████████████████████████

███████████████████████████

██████████████████████████████

██████████████████████████████



EHO marketed itself as "provid[ing] home buying services to individuals with bad credit who are planning to buy a house," and purported to offer consumers multiple financial services and products. Ex. 194; SAMF ¶¶82, 85, 86.

It purported to refer consumers to lenders who could get them "approved for home ownership or mortgage" and provide consumers with "assistance in other financial tools." Ex. 196 (CFPB-PGX-252594). It claimed to provide "the opportunity to own your dream home through the help of an expert from [EHO]." Ex. 194.

OwnerWiz purported to SAMF ¶¶85-86. OwnerWiz's program purported to



Rent2Own.House marketed itself as ████████████████████
████████████████████████████████████████ . It offered consumers ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

Finally, Progrexion asserts that rent-to-own home contracts are not a

consumer financial product or service. Mot. 33-34, 41. But in many cases, they

are.[19] The CFPA defines "financial product or service" to include "extending or

---

[19] Rent-to-own housing contracts, also known as "installment land contracts," can carry certain legal protections similar to residential mortgages. *In Re Heiser*, No. 4-18-bk-01410-RNO, 2019 WL 919732, at *1-2 (M.D. Pa. Feb. 24, 2019); *see also* Black's Law Dictionary (11th ed. 2019) (installment land contract: "A contract for the sale of land providing that the buyer will receive immediate possession of the land and pay the purchase price in installments over time….").

brokering leases of …real property that are the functional equivalent of purchase

finance arrangements" where the lease is: (a) non-operating; (b) for an initial term

of at least 90 days; and (c) in the case of real property, intended at the inception of

the initial lease to result in ownership of the leased property being transferred to

the lessee. 12 U.S.C. §5481(15)(A)(ii). Defendants proclaim that Congress "does

not…hide elephants in mouseholes," Mot. 42; in its detailed description of covered

leases in §5481(15)(A)(ii), Congress hid nothing.[20]

The Hotswap Partners' offerings, though illusory, appear to meet this

definition. The offers were presented as an alternative to mortgages that would

purportedly result in homeownership. They are reasonably perceived as functional

equivalents to purchase finance agreements.[21] Moreover, by claiming to effectuate

rent-to-own contracts, the Hotswap Partners claimed to be "brokers." *See CFPB v.*

*ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 909 (S.D. Ind. 2015).

Overall, Defendants' arguments that rent-to-own contracts are not covered

by the CFPA are a red herring. As noted above, only Count IV requires a showing

that the marketing affiliate is a covered person or service provider, and they meet

---

[20] The Bureau's claims do not "intrude" upon state law. Defendants' citations to eviction moratorium caselaw (Mot. 41-42) are factually and legally inapposite.
[21] "[I]n light of the Bureau's purpose and mandate, the phrase 'functional equivalent of purchase finance agreements' is best interpreted from the perspective of the consumer." 80 Fed. Reg. 37,496, 37,498 (June 30, 2015).

those definitions for other reasons explained above. For Count II, it suffices that

Progrexion is a covered person, and for Counts III and V it suffices that this

lawsuit is brought "with respect to the offering or provision of a consumer

financial product or service subject to [the CFPA]." 15 U.S.C. §6105(d). The

relevant prohibitions apply to covered persons and covered sellers and

telemarketers that engage in *any* deceptive practice, or that make false or

misleading statements. 12 U.S.C. §5536(a)(1)(B); 16 C.F.R. §310.3(a)(4). There is

no requirement that the deceptive "bait advertising"[22] only involve consumer

financial products or services.

### b. The Rent-to-Own Hotswaps are service providers.

The Rent-to-Own Hotswaps are service providers under the CFPA because

they "provide[] a material service" to Defendants, who are covered persons

(SAMF ¶15), in connection with Defendants' "offering" of a "consumer financial

product or service." 12 U.S.C. §5481(26); *ITT Educ. Servs.,* 219 F. Supp. 3d at

912. Their material services include identifying and screening potential credit

repair customers, telemarketing Defendants' credit repair services, and transferring

---

[22] "Bait advertising" is "an alluring but insincere offer…. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else…." *Bavardo Palace, S.A. v. Vacation Tours, Inc*., 203 Fed. App'x 252, 257 (11th Cir. 2006).

consumer data to Defendants. *See CFPB v. NDG Fin. Corp.*, No. 15-cv-5221(CM), 2016 WL 7188792, at *12 (S.D.N.Y. Dec. 2, 2016) (entities "provide material services to covered persons by…identifying potential customers"); *ITT Educ. Servs.*, 219 F. Supp. at 912; *CFPB v. D & D Mktg.*, No. CV15-9692-PSG(EX), 2016 WL 8849698, at *8 (C.D. Cal. Nov. 17, 2016). Progrexion's website proclaimed:

> One of the primary ways Progrexion generates massive quantities of leads for [Lexington Law and CreditRepair.com] is through our strong working relationships with numerous affiliates. Our affiliates help reach potential customers when [Lexington Law's and CreditRepair.com's] services are top of mind, and quickly route the lead through to us for conversion. We're proud of our affiliate network and consider them one of our greatest strengths.

Ex. 201 (CFPB-PGX-154645). The Rent-to-Own Hotswaps were vital to Defendants' marketing operations and credit repair business. ████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████████████████

The CFPA unambiguously prohibits any person—whether they are covered persons or not—from providing substantial assistance to any covered person or service provider that engages in a deceptive act or practice, and deems the assisters violators "to the same extent as the person to whom such assistance is provided."

12 U.S.C. §5536(a)(3). The CFPA does not make a defendant's liability for providing unlawful substantial assistance dependent on whether the Bureau has already sued the person the defendant aided. *Access Funding* does not hold otherwise or require a particular entity to be sued: the court there only considered whether one defendant's conduct was subject to a statutory exclusion to the Bureau's authority. *CFPB v. Access Funding, LLC*, No. 1:16-cv-03759, 2021 WL 2915118, at *26 (D. Md. July 12, 2021). Defendants' claim that the Bureau has always sued the "primary violator" when it brings substantial assistance claims is both inaccurate, *see* Complaint, *CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-cv-07492 (C.D. Cal. Sept. 20, 2021),[23] and irrelevant.

Finally, the Bureau indisputably can enforce 16 C.F.R. §310.3(b) against Defendants (Count IV). The Bureau enforces the TSR "with respect to the offering or provision of a consumer financial product or service subject to [the CFPA]." 15 U.S.C. §6105(d). Credit repair is subject to the CFPA, and the Rent-to-Own Hotswaps were integral to marketing Defendants' credit repair services. Ex. 201. They initiated the very phone calls in which consumers were offered and enrolled in credit repair services.

---

[23] Available at https://files.consumerfinance.gov/f/documents/cfpb_credit-repair-cloud_complaint_2021-09.pdf.

2.  **OLP misled consumers in connection with advertising credit repair, and Progrexion knew it.**

Counts IV and V allege that OLP, among Defendants' other marketing partners, "misrepresent[ed], expressly or by implication, the availability of an advertised product or service, such as a loan, or that consumers were either guaranteed or had a high likelihood of obtaining the advertised product or service." Compl. ¶¶157, 164. OLP's misrepresentations concerned refinance loans, personal loans, and credit repair's effects on consumers' short-term eligibility for more favorable credit.

First, when advertising Defendants' services (usually just before transferring a customer to Progrexion), OLP represented to consumers that it provided refinance loans, which it called ███████████████████████████ ████████████████████████████████████. In fact, OLP did not provide such loans. SAMF ¶90.

The opportunity to refinance was key to OLP's telemarketing pitch. ████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████

OLP baited consumers by promising a high likelihood of receiving a loan in

their desired amount within 24-72 hours. ████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

OLP's misrepresentations were written into the scripts Progrexion routinely

reviewed and edited. Progrexion knew of the vast gulf between OLP's business

practices and its representations to consumers.

3. **Ascent misrepresented its products and services to consumers, and Progrexion knew it.**

a. **Ascent misled consumers.**

Ascent's telemarketing pitch was unequivocal: ██████████████████

██████████████████████████████████

████████████████████████████████████████

██████████ Credit repair was central to Ascent's pitch. It was ████████

██████████████████████████████████████████████

████████████ Ascent presented a clear offer to consumers: ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████

Ascent vastly overstated its services. An ordinary consumer would take Ascent at its word and expect a process that would get them into a rent-to-own home. *See Freecom*, 401 F.3d at 1202 (the "cardinal factor" in whether conduct is deceptive "is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer"). But all Ascent did was transfer consumers to credit repair companies and provide consumers with a link to a third-party website selling lists of homes. Those actions do not realize Ascent's representations. *See FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1274 (M.D. Fla. 2012) (telemarketer engaged in deceptive practices where representations regarding mortgage loan modification "program" were materially different from limited services actually provided).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████ These elements were repeated throughout its telemarketing scripts.

*See* Response to SUMF ¶35. Yet Ascent, which only provided links to websites

selling listings subscriptions, had no basis to describe the terms and conditions of

rent-to-own contracts, ████████████████████████████████

████████████████████████████████ Ascent's marketing

fundamentally misrepresented its purported "Rent-to-Own process."

### b. Progrexion knowingly or recklessly provided substantial assistance to Ascent.

Progrexion knew of, or was recklessly indifferent to, Ascent's deception.[24]

As Progrexion acknowledged, ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████ But

---

[24] Citing *CFPB v. Universal Debt & Payment Solutions*, No. 15-cv-00859, 2015
WL 11439178 (N.D. Ga. Sept. 1, 2015), Defendants assert that the Bureau must
prove "severe" recklessness for its substantial assistance claim. But "severe
recklessness" is an Eleventh Circuit term of art that "is identical to that used by
other courts to describe what conduct they consider[]reckless." *Id*. The statute uses
the term "recklessly." 12 U.S.C. §5536(a)(3). Recklessness is "generally
understood…as conduct violating an objective standard: action entailing an
unjustifiably high risk of harm that is either known or so obvious that it should be
known." *Safeco Ins. Co. of Amer. v. Burr*, 551 U.S. 47, 68 (2007) (citations and
internal punctuation omitted).

rather than exercising its contractual right to require Ascent and other partners to

cease this deception, Progrexion endeavored to enable its employees to █████

████████████████████████████████████ Likewise, Progrexion told

its managers to ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ Progrexion's compliance training

similarly instructed ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

Progrexion admits it always "understood that Ascent gave consumers

listings that included rent-to-own properties" (SUMF ¶35), despite regularly

supplying, reviewing, editing, and approving Ascent's telemarketing scripts that

promised far more. SAMF ¶97-98. For example, a Progrexion employee reviewed

and edited a telemarketing script that stated that ██████████████████

████████████████████████████████████████

████ This representation goes well beyond sending consumer listings—the only task

Progrexion claims Ascent actually did. *See* SUMF ¶35. It was clear *why* Ascent

made such misrepresentations; Ascent told Progrexion 

SAMF ¶93. Approving this script and others demonstrates Progrexion's recklessness regarding Ascent's deceptive practices. *Partners in Health Care*, 189 F. Supp. 3d at 1366-68; *Credit Bureau Center*, 235 F. Supp. 3d at 1062-63.

**D.        Progrexion is liable for Count I.**

The reasons Progrexion is liable on Count I are set forth in Plaintiff's Motion for Partial Summary Judgment on Count I Against All Defendants (ECF 257), which the Bureau incorporates here. Count I is ripe for decision, but not in CreditRepair.com's favor. CreditRepair.com's status as a non-law-firm is not relevant to the Court's analysis of Count I.

**VI.   CONCLUSION**

Progrexion's motion should be denied.

Dated: March 4, 2022                     Respectfully submitted,


                                         /s/ Maureen McOwen
                                         MAUREEN MCOWEN
                                         JONATHAN REISCHL
                                         TRACY L. HILMER
                                         ALICIA FERRARA
                                         LORRAINE VAN KIRK
                                         *Enforcement Attorneys*
                                         Bureau of Consumer Financial Protection
                                         1700 G Street, NW
                                         Washington, DC 20552
                                         Telephone: (202) 435-9553
                                         maureen.mcowen@cfpb.gov
                                         jonathan.reischl@cfpb.gov
                                         tracy.hilmer@cfpb.gov
                                         alicia.ferrara@cfpb.gov
                                         lorraine.vankirk@cfpb.gov

                                         *Attorneys for Plaintiff Bureau of*
                                         *Consumer Financial Protection*

## CERTIFICATE OF COMPLIANCE
## WITH THE WORD COUNT LIMIT

I certify that the above memorandum complies with the word-count limit of 17,400 words set by Order of this Court, ECF 300. According to the word count function of Microsoft Word, the memorandum contains 17,387 words, excluding the face sheet, table of contents, table of authorities, signature block, and exhibits.

Dated: March 4, 2022

/s/ Maureen McOwen
MAUREEN MCOWEN
Enforcement Attorney
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov