Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
thefferon@goodwinlaw.com
(additional counsel listed on signature page)

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC.; PGX HOLDINGS, INC.; PROGREXION TELESERVICES, INC.; EFOLKS, LLC; CREDITREPAIR.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW, PC, D/B/A/ HEATH P.C.,<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**DEFENDANTS PROGREXION MARKETING, INC., PGX HOLDINGS, INC., PROGREXION TELESERVICES, INC., EFOLKS, LLC, AND CREDITREPAIR.COM, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED** |

# TABLE OF CONTENTS


Page

INTRODUCTION ........ 1

REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS ........ 3

RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ........ 9

LAW AND ARGUMENT ........ 17

I. The Bureau does not have a limitless statute of limitations—at a minimum, its claims cut off three years prior to the Complaint. ........ 17

A. The undisputed facts demonstrate that the Bureau "discovered" its case before the statute of limitations period. ........ 17

B. The Bureau had the evidence it needed to bring its claim before the start of the three-year limitations period. ........ 17

C. There is no authority for the Bureau's view that the Bureau can unilaterally decide whether the limitations period has started. ........ 18

D. The Bureau's unconstitutional structure harmed Defendants and means the Bureau can proceed, at most, from the July 2020 Ratified Complaint. ........ 20

II. Neither the CFPA nor the TSR allows the Bureau to seek recovery under a broad agency theory. ........ 22

A. "Knowledge and control" is not a viable theory of imputation. ........ 22

B. Neither the CFPA nor TSR embrace the Bureau's agency theory. ........ 24

C. The undisputed evidence shows that Defendants did not control the Relevant Hotswaps, foreclosing an agency or "knowledge and control" relationship. ........ 26

III. The Rent-to-Own Hotswaps are neither "Covered Persons" nor "Service Providers" under the CFPA. ........ 28

A. There is no genuine dispute of material fact regarding whether the Rent-to-Own Hotswaps are "Covered Persons"—they are not. ........ 28

B. The Rent-to-Own Hotswaps are undisputedly not "Service Providers." ........ 30

IV. There is no dispute of material fact regarding whether OLP provided its advertised services. ........ 30

V. There is no dispute of material fact regarding whether Ascent provided its advertised services or whether Defendants knew of Ascent's purported misconduct. ........ 34

A. The Bureau's unsubstantiated assertions do not show Ascent deceived consumers. ........ 34

B. It is undisputed that Defendants lacked knowledge of Ascent's purported misconduct. ........ 35

CONCLUSION ........ 36

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
722 F.3d 1229 (10th Cir. 2013) ....................24

*Advanced Disposal Servs. E., Inc. v. NLRB*,
820 F.3d 592 (3d Cir. 2016)....................22

*BP Am. Prod. Co. v. Burton*,
549 U.S. 84 (2006)....................19

*Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*,
643 F. Supp. 2d 883 (S.D. Tex. 2008) ....................27

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................24, 26

*CFPB v. D&D Marketing*,
2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)....................30

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)....................29

*CFPB v. NDG Financial Corp.*,
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ....................30

*City Select Auto Sales Inc. v. David Randall Assocs., Inc.*,
885 F.3d 154 (3d Cir. 2018)....................26

*Collins v. Yellen*,
141 S. Ct. 1761 (2021)....................20, 21

*Converse, Inc. v. Norwood Venture Corp.*,
1997 WL 742534 (S.D.N.Y. Dec. 1, 1997) ....................24

*FEC v. NRA Pol. Victory Fund*,
513 U.S. 88 (1994)....................21

*FEC v. Swallow*,
304 F. Supp. 3d 1113 (D. Utah 2018)....................24

*Fernandez v. Clean House LLC*,
883 F.3d 1296 (10th Cir. 2018) ....................17

*In re Fidelity/Micron Sec. Litig.*,
964 F. Supp. 539 (D. Mass. 1997) ....................25

*FTC v. Credit Bureau Center, LLC*¸
235 F. Supp. 3d 1054 (N.D. Ill. 2017) ....................27

*FTC v. Freecom Commc'ns, Inc.*,
401 F.3d 1192 (10th Cir. 2005) ....................23

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016)....................23

*FTC v. Lifewatch Inc.*,
176 F. Supp. 3d 757 (N.D. Ill. 2016) ....................26, 27

*FTC v. Partners in Health Care Ass'n*,
189 F. Supp. 3d 1356 (S.D. Fla. 2016) ....................27

*Fuqua v. Lindsey Mgmt. Co.*,
321 F. App'x 732 (10th Cir. 2009) ....................32

*Kisor v. Wilke*,
139 S. Ct. 2400 (2019)....................19

*In re Litton Indus., Inc.*,
97 F.T.C. 1 (1981)....................23

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)....................18

*Murphy v. Setzer's World of Camping, Inc.*,
2020 WL 8484878 (S.D. W. Va. Sept. 15, 2020) ....................29

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016)....................19

*Romag Fasteners, Inc. v. Fossil, Inc.*,
140 S. Ct. 1492 (2020)....................25

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020)....................20

*Self v. Crum*,
439 F.3d 1227 (10th Cir. 2006) ....................31

*Seolas v. Bilzerian*,
951 F. Supp. 978 (D. Utah 1997)....................25

*Smith v. Berryhill*,
139 S. Ct. 1765 (2019)....................19

*United States v. Mead Corp.*,
533 U.S. 218 (2001)....................19

*Warden v. Crown Am. Realty Tr.*,
1999 WL 476996 ....................24

**STATUTES, REGULATIONS, AND RULES**

12 C.F.R. § 1080.6....................21

16 C.F.R. § 310.2(a)....................26

16 C.F.R. § 310.2(dd) ....................25

16 C.F.R. § 310.2(ff)....................25

16 C.F.R. § 310.3(a)(4)....................25, 26

16 C.F.R. § 310.3(c)(2)....................26

12 U.S.C. § 5481(15) ....................28, 29

12 U.S.C. § 5481(15)(A)(ii)....................29, 30

12 U.S.C. § 5481(25)(C)(i)....................25

DUCivR 56-1(c)(3)....................3, 11

Fed. R. Civ. P. 9(b) ....................17

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 1.01(c) ....................27

Restatement (Third) of Agency § 1.01(f) ....................27

Allan Smith, *Dueling Appointments Set up a Battle Between Trump and Elizabeth Warren's Favorite Government Agency*, Business Insider (Nov. 25, 2017 12:39 PM), https://www.businessinsider.com/consumer-financial-protection-bureau-trump-cordray-cfpb-elizabeth-warren-2017-11 ....................20

## INTRODUCTION

The Bureau's opposition is a master class in agency overreach. The Bureau proclaims unreviewable power to judge its compliance with the statute of limitations, which it further misreads to permit suit against alleged violations years past the CFPA's three-year limit. The Bureau minimizes the grave harms its unconstitutional structure has inflicted on Defendants, whose investigation flowed from the decisions of an unaccountable director the President openly opposed. And it seeks to circumvent its lack of authority over the rent-to-own industry by instead suing Defendants—whose business is limited to credit repair—under a theory of common-law-agency liability absent from the statute and unsupported by the facts.

Independently, each of these defects entitles Defendants to relief; together, they illustrate the dangers of an agency run amok. This Court should grant summary judgment in Defendants' favor on Counts II-V, and in CreditRepair.com, Inc.'s favor on Count I.[1]

At a minimum, the Court should excise portions of the Bureau's claims to avoid a needlessly extended and complicated trial. The Court should exclude allegations dating back further than the three-year limitations period. The facts relevant to this issue are undisputed: *Insiders* who worked for Defendants informed the Bureau of its claims between 2011 and 2015. At worst, the Bureau had sufficient knowledge to bring its claims nearly six years before it filed its Complaint; at best, it failed to act diligently, as required, to pursue potential violations on which it would later rely. Either way, swaths of the Bureau's allegations are untimely and should be excluded from the case.

[1] The Bureau did not provide any new substantive responses to CreditRepair.com's arguments on Count I. Accordingly, CreditRepair.com will rest on the arguments in Defendants' Motion.

The Court also should preclude claims arising from two Relevant Hotswaps—One Loan Place ("OLP") and Ascent—given the Bureau's failure to set out facts supporting the relevant allegations. The Bureau's theory that OLP falsely advertised the availability of personal loans fails in the face of undisputed evidence of hundreds of thousands of loans. Nor can the Bureau properly pivot to its new, hyper-technical "refinancing" theory to target OLP's conduct; this theory is not in the Complaint and is factually baseless. The Bureau's claims against Ascent likewise lack merit because Ascent did what it said it would: provide consumers with rent-to-own listings. In response, the Bureau again switches theories—now it says Ascent overpromised and undelivered. Except the Bureau's only evidence of that is a "test" script, a single instance where an Ascent agent went off script, and mischaracterized emails. The Bureau's argument that Ascent made guarantees about rent-to-own housing with Progrexion's knowledge is equally baseless.

Those are far from the only unsupported and irrelevant allegations the Bureau advances at risk of an orderly trial. The first 48 pages of the 79-page Opposition floods the Court with facts unrelated to Defendants' present request for summary judgment. For example, despite conceding (at 66) that Defendants do not seek summary judgment with respect to the representations of one Relevant Hotswap, HOPE, the Opposition includes more than 60 references to HOPE. The Bureau's repeated reliance on irrelevant facts does not bear on the material issues here. The relevant facts remain undisputed, and the legal questions are ripe for disposition at summary judgment. This Court should resolve the motion in Defendants' favor.

**REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

**2, 4, 7, 16, 18, 19, 21, 26, 28, 37, 58, 60, 63, 65-68, 73, 74, and 77-79**, which Plaintiff did not respond to, are undisputed. *See* DUCivR 56-1(c)(3).

The following facts are not genuinely disputed for the reasons discussed herein.

**1**. As to the second sentence, it is undisputed that the Relevant Hotswaps live-transferred consumers pursuant to contract. The third sentence is non-responsive and mischaracterizes the evidence, which establishes that Marketing compensated Relevant Hotswaps according to contracts. *See* Response 83. As to the fourth sentence, that OwnerWiz, Hope, and OLP sold leads to eFolks pursuant to separate contracts is not germane to this litigation or the Motion.

**3**. The second sentence is unsupported. DUCivR 56-1(c)(3). The third sentence is non-responsive, argumentative, and unsupported; Marketing's relationship with the Relevant Hotswaps focused on contractual services only, and there is no evidence that the businesses were "deeply intertwined." *E.g.*, CFPB-Ex. 69 (Marketing employee offering to assist in increasing transfer volume); CFPB-Ex. 70 (same). The fourth, sixth, and seventh sentences are non-responsive. The fifth sentence is non-responsive, and it is undisputed that Marketing required hotswaps to distinguish their business from Progrexion, Heath, and the offer of credit repair when speaking to consumers. *See* Response 5.

**5-6**. Plaintiff admits that the relevant policy existed, and that it was communicated to the Relevant Hotswaps. Plaintiff's disputes are non-responsive, argumentative, and unsupported. [redacted] Exhibit 87,

Robinson Dep. 287:13-16, 293:11-13, 294:23-295:7 (explaining grant program referenced in CFPB-Ex. 92 was tested, but not used).

**8**. Plaintiff's dispute is argumentative and unsupported by admissible evidence; Teleservices and/or CreditRepair.com sales agents referenced, but did not advertise, hotswap products. *See* [redacted]

**9-12**. Plaintiff's disputes mischaracterize the evidence, which shows that Relevant Hotswaps controlled their own businesses and decisions concerning their services. Marketing only had the right to control *credit repair* marketing and scripting, and made only *suggestions* to Relevant Hotswaps about their business with Progrexion. *See* [redacted] Exhibit 9, Curtis Decl. ¶¶ 9, 18-19; [redacted] Plaintiff's assertion in the second sentence of Response 12 that Progrexion "assisted" the Relevant Hotswaps is non-responsive, argumentative, and mischaracterizes the evidence. *E.g.,* SAMF ¶ 104 (Relevant Hotswaps did not have merchant processing accounts); Response SAMF ¶¶ 97-103, 106-109.

**13**. The cited evidence shows Hope made the statements cited in the Complaint, not the Defendants or another Relevant Hotswap. The third and fourth clauses of the second sentence are non-responsive, argumentative, and unsupported, and the cited evidence does not support the existence of "an integrated sales pitch." *E.g.*, Exhibit 26 (Hope website created by Hope employee "not approve[d]" by Progrexion); Exhibit 11, 178:5-22 (employee drafted website).

**14-15**. Plaintiff's response mischaracterizes the cited evidence, which does not create a genuine dispute of fact concerning the prohibition on sales employees discussing the availability of products advertised by Relevant Hotswaps. Exhibit 32 (instructing agents to avoid discussing hotswap products); CFPB-Ex. 110 (discussing script for OLP agents); [redacted] The second sentence of Response 15 alleging what agents "routinely" said is non-responsive and unsupported. CFPB-Ex. 9, Attachment A (recording of *one* call unrelated to policy discussion).

**17**. Plaintiff admits the facts and the assertion as to OLP's compensation is non-responsive and inaccurate. *See* Reply 1.

**20**. Plaintiff admits OLP's business matched consumers to loans, and its asserted facts and disputes are non-responsive and argumentative.

**22**. Plaintiff's argument that OLP.com's corporate testimony is "unsubstantiated" is argumentative and does not create a genuine dispute of fact.

**23**. Plaintiff's dispute concerning the pitch is non-responsive.

**24**. Plaintiff admits the facts asserted. Plaintiff's disputes are non-responsive, argumentative, and unsupported. *E.g.*, CFPB-Ex. 119 (OLP hired additional employees to ensure adherence to approved scripting).

**25 and 33**. Undisputed that OLP and Ascent had policies not to make promises and that their scripts do not make promises or guarantees; Plaintiff's disputes are argumentative, unsupported, and rest on its mischaracterization of documents. *See* [redacted] CFPB-Ex. 90 (notes from a call review).

**27 and 34**. Plaintiff disputes only the quantum of evidence offered, and so admits the facts.

**29, 30, 38, 39, and 40**. The cited evidence establishes that Ascent, EHO, OwnerWiz, and Rent2Own.house provided consumers rent-to-own housing listings. Plaintiff's disputes are non-responsive, argumentative, rest on *its interpretation* of what constitutes a service or the provision of listings, and do not establish a genuine dispute of fact. As to the first sentence of Response 29, CFPB-Exhibit 120 concerns two consumers, and is insufficient to create a dispute that Ascent sent listings to every consumer who asked. As to Response 39, Plaintiff's partial quotation omits that "[redacted]" CFPB-Ex. 130. As to Response 40, Plaintiff's response is non-responsive to the asserted fact that Rent2Own.house provided listings. [redacted]

**31**. The fact is supported by Plaintiff's purported expert. [redacted]

**32, 46, 49, and 75**. Plaintiff's response that each fact is "immaterial" is an admission that the fact is undisputed and is non-responsive.

**35 and 41-43**. Plaintiff's disputes are non-responsive and argumentative. As to Response 35, Plaintiff's interpretation of "promis[es]" in the cited scripts does not show Progrexion's knowledge. *E.g.*, [redacted]

[2] "Def. Opp. Ex." refers to exhibits filed with the Appendix to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 278.

[redacted]

**36**. Plaintiff's dispute is non-responsive to the asserted fact that Ascent *told* Progrexion it would respond to a *specific* consumer.

**44-46**. The cited evidence establishes that CreditRepair.com members agree to a month-to-month contract which describes the services provided, the time period, and that services may be cancelled at any time. Plaintiff's disputes are non-responsive and its assertion of "immaterial" is an admission.

**47**. Plaintiff's dispute regarding substantiation is non-responsive. Plaintiff's theory that removals seen by CreditRepair.com's members are not the result of services is unsupported. Evid. Obj. at 7. The fourth and fifth sentences are non-responsive, and the fifth sentence mischaracterizes the cited advertisements, which includes advertisements without incentives. *Compare* Def. Opp. Ex. 69, PGX0040805, California Creative Report at 55 *with* CFPB-Ex. 125; *see also* Reply 32.

**48**. Plaintiff admits the facts asserted, and its dispute is non-responsive and a legal conclusion.

**50**. Plaintiff admits the facts asserted, and its dispute is non-responsive, argumentative, and unsupported. Members are not always required to purchase their TransUnion credit report. CFPB-Ex. 26; Def. Opp. Ex. 9, Hamilton Decl. ¶ 9.

**51-53, and 55-56**. As to Facts 51-53, Plaintiff's "immaterial" assertion is an admission. The evidence cited establishes shows CreditRepair.com's policies prohibit making promises of results, employees are trained accordingly, and consumers are informed that CreditRepair.com

does not promise results. [redacted] Plaintiff's disputes are non-responsive, a legal conclusion, and mischaracterize offered services as "promises."

**54**. Plaintiff's dispute is non-responsive, argumentative, unsupported, and mischaracterizes the evidence. *E.g.*, CFPB-Ex. 139 (emails concerning review of Hope's website unrelated to training received by Marketing); CFPB-Ex. 50, 249:18-250:5 (testimony that employee did not recall training on Bureau's interpretation of TSR).

**57**. Plaintiff's "immaterial" response is an admission. Plaintiff's dispute and cited evidence is non-responsive to the fact alleged regarding Defendants' understanding of applicable law.

**59**. Plaintiff admits the fact asserted, and its dispute as to the third sentence is non-responsive, argumentative, and contrary to the record. Plaintiff admitted the former employee complaint raised a "suspicion of specific wrongdoing," Exhibit 61, at 8. Plaintiff did not withdraw all of its privilege claims, and it asserted work product over its identified "potential law violations."

**61**. Plaintiff's response that certain facts are "immaterial" is an admission.

**62 and 64**. Plaintiff admits the facts asserted and its dispute as to the characterizations are non-responsive.

**69, 70-72, and 75**. Plaintiff admits the facts asserted, and its disputes are non-responsive and, as to Fact 75, argumentative.

**76**. Plaintiff's cited evidence does not identify any "precise date" when it had sufficient factual information.

**80 and 81**. Plaintiff admits the facts, and its dispute as to the fourth sentences are non-responsive, argumentative, and unsupported—the cited evidence does not challenge the fact that most deponents could not recall specifics concerning OwnerWiz and Rent2Own.house. *E.g.*, CFPB-Ex. 111, 226:17, 227:3 ("I don't recall specifics….").

**RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

83. The Sample Hotswaps[3] identified potential credit repair customers, collected financial information from consumers prior to transfer, transferred consumers to Defendants for a further credit repair sales pitch and potential signup, and [redacted]

[redacted] Disputed. The Relevant Hotswaps pre-qualified consumers for credit repair but did not "collect" financial information for Progrexion. CFPB-Ex. 108. [redacted]

84. Ascent, HOPE, and OLP advertised consumer loans.

[redacted] Disputed as to Ascent. For Exhibit 121, Plaintiff proffered no evidence that the statements in the script were made to consumers. [redacted] For Exhibit 148, Plaintiff proffered no evidence that the cited advertisement concerned loans.

87. None of the Sample Hotswaps brokered loans, extended credit, had rent-to- own contracts or housing to provide, or provided services other than transferring or referring consumers to affiliate offers such as Defendants' credit repair services.

---

[3] Progrexion disagrees that the Relevant Hotswaps are a "sample," and the Bureau has admitted only the Relevant Hotswaps are "at issue" in this litigation. Exhibit 88, 3/11/22 Hearing Tr. 30:8-9.

Response: Disputed that the Relevant Hotswaps "provided [no] services other than transferring or referring consumers to affiliate offers." *See* SUMF ¶¶ 20, 29, 38-40. Ascent provided consumers a free eBook, CFPB-Ex. 66, 62:15-63:11, EHO spoke with landlords on behalf of consumers, CFPB-Ex. 67, 23:16-24:13, and OLP provided consumers a free eBook, and at times, referrals to charitable organizations. Exhibit 10, 42:4-43:6. For OwnerWiz and Rent2Own.house, Plaintiff's assertions are based on mischaracterizations and not supported by admissible evidence. *See* Evid. Obj. at 8-9; [redacted]

88. When EHO, Ascent, Rent2Own.house, OwnerWiz, and HOPE advertised a rent-to-own home, that property was not available through them and in many cases was not available at all on the advertised terms.

Response: Disputed. There is no evidentiary support that the Relevant Hotswaps advertised property as "available through them," and homes advertised by EHO, Ascent, Rent2Own.house, Hope, and OwnerWiz were available through the listings they provided to consumers. *E.g.*, SUMF ¶¶ 35, 38-40; Exhibit 12, 71:19-24; CFPB-Ex. 67, 23:18-24. The assertion that homes were "not available at all on the advertised terms" is inaccurate and unsupported. *See* Evid. Obj. at 8-9; CFPB-Ex. 67, 114:16-118:4 (advertisements based on home availability research); CFPB-Ex. 66, 71:10-75:19, 129:18-133:3 (Ascent advertised homes from certified MLS listings); CFPB-Ex. 159 (no indication of complaints that homes were not available on the advertised terms).

89. When HOPE advertised guaranteed mortgages, it actually had *no* mortgages to offer and no basis to claim that it had helped prior customers obtain a mortgage.

Response: Disputed. Hope had relationships with mortgage providers and helped consumers obtain mortgages. CFPB-Ex. 106 199:24-200:6.

90. When OLP advertised refinances and lower-interest loans after credit repair removed negative items from a consumer credit report, those products were not available through OLP and the credit repair representations were unsubstantiated.

Response: Disputed. The fact asserted is irrelevant to the Motion and the Complaint's allegations. OLP had relationships with lenders to which it referred clients seeking a second loan with more favorable terms; over one million consumers came through OLP's system more than once. CFPB-Ex. 110, 79:18-80:4. OLP's credit repair representations were based on the company's experience through "millions of transactions." *Id.* 117:3-22.

91. When a Sample Hotswap advertised a program for obtaining a mortgage or becoming a homeowner through a rent-to-own home program, that program did not exist. Transferring a consumer to a credit repair company, or sending the consumer a link to a website offering real estate listings, is not a program to obtain credit or a contract to purchase a home.

Response: Disputed. The first sentence is unsupported. DUCivR 56-1(c)(3). The second sentence is argumentative regarding what constitutes "a program" and does not create a genuine dispute of fact.

[redacted]

Response: [redacted]

[redacted]

[redacted]-

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

97. Progrexion provided telemarketing scripts.

Response: Disputed. Marketing provided suggestions for scripts concerning credit repair and the transfer to a Progrexion company, and the Relevant Hotswaps wrote their own scripts concerning their own services. *E.g.*, CFPB-Ex. 165 (transfer language); [redacted] CFPB-Ex. 98, 219:11-220:11 (language concerning rent-to-own program from Ascent's script); Exhibit 92, PGX.CFPB.II.00957556 (language concerning credit repair feature); SUMF ¶ 10. Progrexion's "provid[ing]" eFolks scripts (CFPB-Ex. 157) is irrelevant to the Motion and the Complaint's allegations regarding live transfers.

98. Progrexion reviewed, edited, and approved telemarketing scripts.

Response: Disputed. Marketing reviewed and suggested edits to scripts, which were ultimately controlled by the Relevant Hotswaps, and approved script language concerning credit repair. *See* SUMF Reply 9-12; [redacted]

[redacted] [redacted]

[redacted]

[redacted]

100. Progrexion provided detailed information on consumers who cancelled (ZPC) transferred by the Sample Hotswaps for use in optimizing telemarketing sales.

Response: Disputed. The cited evidence does not support that Progrexion "provided detailed information on consumers," or that information provided was for the purpose of "optimizing telemarketing sales." *E.g.*, CFPB-Ex. 172.

[redacted]

102. Progrexion's eFolks division made outbound telemarketing calls for OLP, HOPE, and OwnerWiz.

Response: Disputed. *See* Reply 1.

103. Progrexion processed card and ACH payments and remitted funds to each Sample Hotswap by check or direct deposit.

Response: Disputed. Progrexion ASG processed card and ACH payments for credit repair services. CFPB-Ex. 53; CFPB-Ex. 208. Progrexion did not "remit" funds to Relevant Hotswaps, it paid them based on contractually agreed-to terms for their lead generation services. *See* SUMF ¶ 1; Reply 1; Response 83.

[redacted] [redacted]

[redacted] [redacted]

[redacted].

107. Progrexion reviewed Hotswap Partners' telemarketing calls to optimize scripting.

Response: Disputed. Marketing reviewed telemarketing calls in order to ensure compliance, improve scripting, and to ensure customer satisfaction. CFPB-Ex. 98, 42:1-7, 46:3-25, 52:23-53:4; CFPB-Ex. 11, 192:1-15.

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

111. Progrexion knew of the Sample Hotswaps' deceptive representations through reviewing, editing, and approving scripts, websites, and advertisements, and reviewing call recordings.

112. Progrexion knew of the Sample Hotswaps' deceptive representations through consumer complaints.

[redacted] [redacted]

Response: **111-113** are disputed. The asserted fact that representations were "deceptive" is a legal conclusion, so Facts 111-113 are inadmissible. As to 111, Progrexion had a policy prohibiting deceptive behavior, and requested changes to Hotswaps' scripts when there was a possibility for consumer confusion. Def. Opp. Ex. 11 at PGX.CFPB.00001769-70; Exhibit 35; CFPB-Ex. 67, 309:4-7 (EHO understood that Marketing wanted EHO to tell the truth and not mislead consumers); Exhibit 12, 260:8-11 (Progrexion "definitely did not want" Ascent to mislead consumers); CFPB-Ex. 214 (requesting changes to avoid possible consumer confusion); CFPB-Ex. 138, 188:6-15 (addressing allegations of OLP guaranteeing loans). The cited evidence does not support that Progrexion knew any representations were "deceptive." *E.g.*, CFPB-Ex. 98, 46:19-47:8 (generally describing review and auditing responsibilities). As to 112, Progrexion did not know of any allegedly "deceptive" representations and addressed complaints about Hotswaps when received. *E.g.*, CFPB-Ex. 211 (requesting investigation of isolated instances of confusion). [redacted]

[redacted]. [redacted]. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

Response: **117-120** are disputed because Plaintiff's expert report is inadmissible, and Credit-Repair.com members with at least 7 months tenure experienced average score increases of 46.9 points (ECF 277 at 20-21). Evid. Obj. at 7; CFPB-Ex. 55; CFPB-Ex. 37.

## LAW AND ARGUMENT

### I. The Bureau does not have a limitless statute of limitations—at a minimum, its claims cut off three years prior to the Complaint.

#### A. The undisputed facts demonstrate that the Bureau "discovered" its case before the statute of limitations period.

Defendants seek to enforce the three-year statute of limitations, thus avoiding an unwieldy jury trial that involves events as far back as 2011. The Bureau denies that this three-year limitations period applies, first contending it had no proof of Defendants' "scienter" until March 10, 2017 when it received documents from Defendants. Second, the Bureau argues that it had no duty to diligently investigate the evidence it did have, even though that evidence was undisputedly sufficient to trigger a reasonable plaintiff to investigate. To win, the Bureau must prevail on both of these points. Neither is correct.

#### B. The Bureau had the evidence it needed to bring its claim before the start of the three-year limitations period.

To start, the Bureau's claim that it could not have filed a complaint absent direct evidence of scienter is legally incorrect. A plaintiff need not plead intent with specificity, only generally. Fed. R. Civ. P. 9(b); *e.g.*, *Fernandez v. Clean House LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (general allegations that violations were willful were sufficient to survive a motion to dismiss).

Further, the Bureau *did* have access well before 2017 to the same type of evidence that it now claims supports scienter. Defendants' Motion catalogued the materials the Bureau already had available to it in 2013—nearly six years (and two limitations periods) before it filed its Complaint. The Bureau responds that proof of Defendants' scienter could not be provided by consumer complaints alone. Opp. 55-56. But the Bureau omits that by 2013, Mot. 25, it had received reports from former Progrexion employees, who complained about Defendants' purported practices in

gathering leads through rent-to-own advertisements, Mot. 26, not just consumer complaints. The Bureau certainly had the facts it claimed to need to file a complaint by 2015, by which point it had conducted a comprehensive investigation of Heath. *Id.* Instead, the Bureau sat on its rights until 2019. No reasonable jury would think the Bureau acted with reasonable diligence in bringing its claims against Defendants.

### C. There is no authority for the Bureau's view that the Bureau can unilaterally decide whether the limitations period has started.

As to the Bureau's decision to delay initiating proceedings, the Bureau concedes the statute required it file within three years of "discovery" of the violation, but remarkably contends that it alone can decide when it has "discovered" a violation. Opp. 51. The Bureau says the statute of limitations has no diligence requirement. Opp. 54. The law says otherwise: a discovery-based limitations period begins to run when a reasonably diligent plaintiff has sufficient facts to bring a claim. Mot. 27.

The Bureau counters that, if Congress wanted to incorporate a reasonable diligence requirement, it would have said so explicitly. Opp. 54. But the Supreme Court has already rejected the Bureau's argument. In *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), the Court explained that "the word 'discovery' is often used as a term of art in connection with the 'discovery rule.'" *Id.* at 644. And under that rule, a claim accrues "when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." *Id.* at 646 (citation omitted). "[B]ecause the term 'discovery' in respect to statutes of limitations for fraud has long been understood to include discoveries a reasonably diligent plaintiff would make, the omission of an explicit provision to that effect did not matter." *Id.* at 647. This unambiguous directive forecloses the Bureau's claim (at 53) that it is entitled to deference in interpreting the statute-of-limitations provision, *cf.*

*Kisor v. Wilke*, 139 S. Ct. 2400, 2415 (2019), as does the absence of any "specialized exper[tise]" the Bureau has to offer on the purely legal issue, *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001). Courts' power to entertain agency suits for past violations, moreover, is "hardly the kind of question that the Court presumes that Congress implicitly delegated to an agency," *Smith v. Berryhill*, 139 S. Ct. 1765, 1778 (2019)—further cutting against the Bureau's appeal to deference.

The Bureau also argues that, as a policy matter, allowing the Bureau to decide when the discovery standard has been met is necessary because it needs discretion to balance "agency priorities and resource constraints," (Opp. 55), and "time does not run against the King." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006).

But to credit the Bureau's interpretation of the statute of limitations would be to render Congress's carefully considered time constraints a nullity. The Bureau alone would get to decide whether it has "discovered" a violation,[4] and has the discretion to let a claim accrue for years. "[T]rust us" is not a "good enough" standard for applying a statute of limitations—even for the Government. *PHH Corp. v. CFPB*, 839 F.3d 1, 55 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated in relevant part*, 881 F.3d 75 (D.C. Cir. 2018) (en banc) (citation omitted). The Bureau's proposed approach to the statute of limitations would defy the fundamental principle that "allowing parties to sue 'at any distance of time' would be 'utterly repugnant to the genius of our laws.'" *Id.* at 50 (citation omitted).

[4] Even if that were the standard, by 2013 the Bureau had already identified "violations" based on employee complaints regarding the very conduct at issue. *See* Exhibit 60.

**D. The Bureau's unconstitutional structure harmed Defendants and means the Bureau can proceed, at most, from the July 2020 Ratified Complaint.**

The Bureau does not dispute that a Director insulated from presidential supervision spearheaded the investigation and initial Complaint in this case. This constitutional defect persisted until the Supreme Court's decision in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). As Defendants explained (Mot. 23-24), the Bureau's unconstitutional structure vitiates all actions taken prior to Director Kraninger's July 2020 ratification.

The Bureau responds by invoking *Collins v. Yellen*, 141 S. Ct. 1761 (2021), which it reads as rendering any and all removal restrictions harmless. *Collins*, however, did not address the showing required of parties, like Defendants, subject to unconstitutionally headed enforcement proceedings. Nor did *Collins* involve requests for prospective relief to cure ongoing constitutional violations. 141 S. Ct. at 1787. By contrast here, Defendants are suffering continued constitutional harm in the form of ongoing enforcement proceedings by an agency outside the bounds of Article I's Appropriations process. The Bureau ignores these fundamental differences in an effort to shoehorn this case into *Collins*' remedial ruling.

In all events, *Collins* makes clear that "it is still possible for an unconstitutional provision to inflict compensable harm." *Id.* at 1789. And indeed, the Director's removal provision prejudiced the proceedings in the manner *Collins* contemplates: President Trump publicly "express[ed] displeasure with actions taken" by Director Cordray, making clear that he would have sought Director Cordray's removal "if the statute did not stand in the way." *Id.*[5] It was under Director

[5] Allan Smith, *Dueling Appointments Set up a Battle Between Trump and Elizabeth Warren's Favorite Government Agency*, Business Insider (Nov. 25, 2017 12:39 PM), https://www.businessinsider.com/consumer-financial-protection-bureau-trump-cordray-cfpb-elizabeth-warren-2017-11 (quoting a presidential tweet that "CFPB[] has been a total disaster as run by the previous

Cordray's unaccountable leadership that the Bureau eventually initiated the investigation that preceded this lawsuit. *See* 12 C.F.R. § 1080.6. A more clear-cut case of *Collins* prejudice is difficult to imagine.

The Bureau's unconstitutional history means it must rest on ratification to salvage its enforcement action. But it is dubious that ratification has any role to play, let alone the one the Bureau envisions. As Defendants explained (at 24), ratification serves to address unconstitutionally appointed agents, not unconstitutionally structured agencies. Because the Bureau did not have the power "to do the act ratified"—*i.e.*, filing the original action—"at the time," ratification of that Complaint is inapplicable. *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994). What is more, ratification of prior defective actions cannot cure prospective constitutional violations. That rule likewise neuters the alleged ratification here, which did not and could not remedy a present-day Bureau funding structure that transgresses Appropriations-Clause limits. ECF No. 30, at 28-29, 31-32.

Even if the ratified Complaint is valid in its own right, it is the July 2020 date of the ratification—not the date of the original Complaint—that serves as the statute-of-limitations cutoff for the agency's claims. Because ratification cannot resurrect rights that have expired, *NRA*, 513 U.S. at 98, the Bureau is limited to targeting only that conduct it "discovered" after July 7, 2017. *See supra* pp. 19-20. The Bureau counters that equity compels the Court to somehow extend the ratification to reach the original filing date of the Complaint, as the Bureau had "diligently pursued its rights … and some extraordinary circumstance stood in its way (here, the statutory removal

---

Administrations pick," and that "Financial Institutions have been devastated and unable to properly serve the public").

provision)." Opp. 51 n.11. But equitable "adaptability" applies only where there is no "timing problem" and "no statute of limitations" that would work a prejudice. *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 603-04 (3d Cir. 2016) (citation omitted). And the Bureau can hardly be said to have acted diligently. Mot. 25-27.

## II. Neither the CFPA nor the TSR allows the Bureau to seek recovery under a broad agency theory.

The Bureau advances a theory that Defendants are directly liable for the Relevant Hotswaps' bad acts (Counts II and III). In the Bureau's view, the Relevant Hotswaps acted as Defendants' agents because the third parties' scripts were subject to Defendants' approval and edits. Defendants dispute this: the evidence shows their edits (suggestions) were limited.

Regardless, even if the Bureau were correct about the degree of editorial control Defendants exercised (it is not), that would not establish an agency relationship: Agency requires a control relationship between principal and agent, *and* the agent's understanding that it is acting on the principal's behalf. Merely alleging that Defendants specified how the Relevant Hotswaps were to describe *Defendants'* services does not mean the Hotswaps turned into Defendants' agents with respect to the *Hotswaps'* services and products. The Relevant Hotswaps still acted autonomously and independently of Defendants as separate, arms-length-apart entities. Against that backdrop, the Bureau's claims of an agency relationship between Defendants and the Relevant Hotswaps fail as a matter of law, and there is no basis for direct liability-by-agency.

### A. "Knowledge and control" is not a viable theory of imputation.

The Bureau incredibly argues that the CFPA and/or the TSR allow for liability when one corporation "directly participate[s] in the deception or ha[s] the authority to control the deceptive practice of another, but allowed the deception to proceed." Opp. 57. But the cited cases are

inapposite. All involve *individual* liability—particularly for a corporation's officers—not liability for one corporation that engaged in an arms-length relationship with another. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 169-70 (2d Cir. 2016) ("an individual's liability for corporate deception"); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202-03 (10th Cir. 2005) (FTC must "show the *individual* participated directly in the business entity's deceptive acts") (emphasis added).[6] Regardless, even if "authority to control" were a basis for imputing one corporation's liability to another, the undisputed evidence shows that Defendants could not have exercised such control over the Hotswaps.

The Bureau also cites a nonbinding 1981 FTC ALJ decision which observed that "one who puts into the hands of others the means by which such others may deceive the public is equally as responsible for the resulting deception." Opp. 58 (quoting *In re Litton Indus., Inc.*, 97 F.T.C. 1, 31 (1981)). *Litton* just stands for the unremarkable proposition that a person who gives deceptive copy to an advertisement publisher cannot evade responsibility for the advertisement merely by funneling the copy through some third party. 97 F.T.C. at 31. This is not a case where the eventual publisher (here, the Relevant Hotswaps) had no editorial discretion for communications with the public, like the outlets in *Litton*. *Id.* at 4-5. Rather, the undisputed evidence shows the Relevant Hotswaps exercised complete autonomy and control over all aspects of their businesses and their offerings, and that Defendants had no authoritative input into what the Relevant Hotswaps said about those products and services. SUMF ¶¶ 5-12.

[6] The Bureau also suggests "Defendants' policies *endorsed* Teleservices and CreditRepair.com employees' statements about loans and rent-to-own housing." Opp. 57 (emphasis in original). The Bureau's argument is inaccurate and irrelevant—the Bureau does not cite any authority that mere "endorsement" is sufficient to impose primary liability on Defendants.

**B. Neither the CFPA nor TSR embrace the Bureau's agency theory.**

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, holds that a court "cannot amend [a] statute to create liability for acts that are not themselves … within the meaning of the statute." 511 U.S. 164, 173, 177-78 (1994). The CFPA and TSR are silent on the question of agency liability, and thus the Court cannot presume that it can hold Defendants secondarily liable for the actions of their purported agents. Mot. 29-31; *see also FEC v. Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018).

The Bureau deems *Central Bank* inapplicable because it concerns only secondary liability, and agency is "a source of primary, not secondary, liability." Opp. 60 (citing *Seolas v. Bilzerian*, 951 F. Supp. 978, 983-84 (D. Utah 1997)). But under circuit law, agency liability can be a theory of secondary liability. *E.g.*, *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1240 (10th Cir. 2013). Thus, courts have applied *Central Bank* to hold that an agency theory of direct liability is unavailable. *Warden v. Crown Am. Realty Tr.*, 1999 WL 476996, at *4 (W.D. Pa. July 6, 1999), *aff'd*, 229 F.3d 1140 (3d Cir. 2000) ("little reason" why *Central Bank* should not apply to an agency theory); *Converse, Inc. v. Norwood Venture Corp.*, 1997 WL 742534, at *3 (S.D.N.Y. Dec. 1, 1997) ("claims based on agency liability are no longer viable after *Central Bank*"). This Court should do the same.

The Bureau's attempt to find an explicit reference to secondary liability in the statute—their argument that Congress and the FTC included corporations in the definition of "person" in the CFPA and the TSR—is weak tea. That reference proves only that corporations face primary liability. As even the Bureau's primary case acknowledges, Congress imposes corporate liability "under agency principles" in "some instances" where agency principles serve "as a source of

primary liability." *Seolas*, 951 F. Supp. at 984 (citation omitted). Those instances are limited to when the agent speaks on the corporation's behalf, because the corporation has no other means of doing so. *In re Fidelity/Micron Sec. Litig.*, 964 F. Supp. 539, 544 n.10 (D. Mass. 1997). Thus, primary liability may attach when "the corporate delegate has spoken *as the corporation*." *Id.* But the agency liability the Bureau seeks here sweeps more broadly than the delegate-as-corporate-mouthpiece; as a result, "[s]imply because a corporation satisfies the requirements of vicarious liability for the acts of its delegate does not mean that the delegate has acted 'as' the corporation and does not mean the corporation is 'primarily' liable." *Id.* Whatever the Bureau's theory of agency liability may be, it is certainly not that the Hotswaps served as mere mouthpieces for Defendants—they were too independent and autonomous for that. *See* pp. 26-28, *infra*; Mot. 31-32.

The Bureau's argument also fails as a matter of statutory construction. The CFPA expressly identifies a certain class of persons who are "agents": "related persons." 12 U.S.C. § 5481(25)(C)(i). The Bureau did not allege that the Hotswaps are Defendants' "related persons." As for the TSR, it is not "inapposite," as the Bureau says (at 61 n.17), that the TSR refers to "agents" in certain other provisions, but not in the provision relevant for Count III, 16 C.F.R. § 310.3(a)(4), which applies to "sellers" and "telemarketers" (terms that don't include "agent" in their definition). *See* Compl. ¶¶ 145-146 (Count III); 16 C.F.R. § 310.2(dd), (ff) (defining "[s]eller" and "[t]elemarketer," respectively). In statutory interpretation, courts typically do not "read into statutes words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020). They are "doubly careful to avoid when Congress has … included the term in question elsewhere in the very same statutory provision." *Id.* The same is true in the regulatory context here: the FTC expressly stated when it wanted the TSR's terms to apply to agents. *E.g.*, 16 C.F.R.

§§ 310.2(a), 310.3(c)(2). The FTC did not do so in § 310.3(a)(4); by its plain terms, the provision applies only to actions taken by "sellers" or "telemarketers," not for actions taken by those with whom sellers and telemarketers have contracted.

Finally, the Bureau makes the specious argument that agency liability must survive post-*Central Bank* because there are post-*Central Bank* cases blessing the FTC's attempts to impose agency liability. Opp. 62 & n.18. The Bureau denies that it is relying on "cases that pre-date *Central Bank*." *Id.* at 62 n.18. Except it is. *Id.* (quoting *FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009), which cites *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438 (9th Cir. 1986), and *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009), which also cites *Southwest Sunsites*). The FTC's imposition of agency liability does not survive *Central Bank* by longevity alone. *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 161 (3d Cir. 2018).

### C. The undisputed evidence shows that Defendants did not control the Relevant Hotswaps, foreclosing an agency or "knowledge and control" relationship.

Even under the Bureau's caselaw, whether an agency relationship exists depends on *all* of the facts regarding the principal-agency relationship, focusing on two factors: "(1) whether the telemarketers act on [the principal's] behalf and (2) whether they are subject to its control." *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 773 (N.D. Ill. 2016) (citation omitted). Neither factor is satisfied here.

No reasonable jury would think the Relevant Hotswaps were acting on Defendants' behalf *and* subject to Defendants' control. The Relevant Hotswaps were fully independent in how they (1) marketed their services, (2) wrote their scripts, and (3) maintained their operations. Mot. 32. Defendants' influence amounted to little more than suggestions to improve the accuracy of representations relating to credit repair. SUMF ¶ 10. While Defendants provided limited feedback and

suggestions on call scripts to ensure accuracy, that fact does not make the Relevant Hotswaps "agents" of Defendants. "[S]etting standards in an agreement for acceptable service quality does not of itself create a right of control." Restatement (Third) of Agency § 1.01(f); *accord Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 889 (S.D. Tex. 2008) (agency must "go beyond" inspecting progress, making suggestions or recommendations, prescribing alterations, and setting quality standards).

The Bureau mistakenly suggests that the test for agency turns on whether the principal company "reviews, edits, or otherwise controls the telemarketing script used to solicit customers," and whether the principal can terminate agreements. Opp. 63. But, critically, in the Bureau's cited cases, the telemarketing representatives "thought their companies were the same as" the companies for whom they were marketing. *Lifewatch Inc.*, 176 F. Supp. 3d at 774; *e.g.*, *FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356, 1360 (S.D. Fla. 2016) (telemarketer provided seller's "man-power and support," and seller itself "ha[d] no employees"); *FTC v. Credit Bureau Center, LLC*, 235 F. Supp. 3d 1054, 1061 (N.D. Ill. 2017) (individual agents spoke "on behalf of [the principal]," including issuing directions "on behalf of [the principal]" to field "complaints of phishing against [the principal]"). That element is missing here: no employee of a Relevant Hotswap would think he was working or speaking for Defendants. There is no evidence that the Relevant Hotswaps could make decisions on Defendants' behalf or had any other "power to affect the legal rights and duties of" Defendants. Restatement (Third) of Agency § 1.01(c). The Bureau cites no case to support the notion that Defendants' limited review of the Relevant Hotswaps' scripts somehow changes that analysis.

## III. The Rent-to-Own Hotswaps are neither "Covered Persons" nor "Service Providers" under the CFPA.

The Bureau cannot seek to hold Defendants liable under a substantial assistance theory (Counts IV and V) because the Bureau cannot establish that the persons whom Defendants were "assisting" are "covered persons" or "service providers" under the CFPA. Accordingly, Defendants are entitled to summary judgment on Counts IV and V.

### A. There is no genuine dispute of material fact regarding whether the Rent-to-Own Hotswaps are "Covered Persons"—they are not.

To start, the Bureau contends the Rent-to-Own Hotswaps are covered persons because they "are engaged in offering Defendants' credit repair services." Opp. 67. The Bureau provides no evidence that the Rent-to-Own Hotswaps provide credit repair themselves, and Defendants are aware of no authority (and the Bureau cites none) to support that a person becomes a "covered person" just by advertising a third party's products or services. Congress listed eleven categories of consumer financial products or services in the definition of "covered person"—advertising a third party's consumer financial services is *not* one of them. *See* 12 U.S.C. § 5481(15). The Bureau's argument risks extending the CFPA's reach to television stations, radio stations, newspapers, and internet search engines. Such an expansive reading of the CFPA is unsupported and untenable.

The Bureau's assertion that the Rent-to-Own Hotswaps "offered credit and financial advisory services" is equally unsupported and meritless. Opp. 67. None of the Rent-to-Own Hotswaps purported to be lenders, and the Bureau's cited evidence does not show otherwise. SUMF ¶¶ 29, 38-40. The Bureau's conclusory assertion that the Rent-to-Own Hotswaps offered "financial advisory services" also has no factual support. For example, the Bureau asserts EHO "purported to

offer consumers multiple financial services and products" (Opp. 68), but then cites assertions that EHO "advertised Defendants' credit repair services," "rent-to-own home opportunities" and "programs to advise consumers on how to become homeowners" (*Id.* (citing SAMF ¶¶ 82, 85, 86))—none of these services are within the statute's definition for financial services. 12 U.S.C. § 5481(15).[7] Moreover, *connecting* consumers to lenders (Opp. 67-68) does not constitute "provid[ing] financial advisory services." *Murphy v. Setzer's World of Camping, Inc.*, 2020 WL 8484878, at *6 (S.D. W. Va. Sept. 15, 2020); Mot. 33-35.[8]

Lastly, the Bureau asserts that offering to provide consumers with rent-to-home listings makes the Rent-to-Own Hotswaps "brokers" under 12 U.S.C. § 5481(15)(A)(ii). Opp. 70. That assertion is disproven by the Bureau's lone citation: "[t]he Dodd-Frank Act expressly incorporates the definition of 'broker' contained in the Securities Exchange Act of 1934," which includes only "broker[s] or dealer[s] that are required to be registered under the Securities Exchange Act." *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 909 (S.D. Ind. 2015) (citation omitted). "Broker" has a specialized meaning that does not apply here. Moreover, the Bureau identifies no evidence that the rent-to-own listings offered by the Rent-to-Own Hotswaps included contracts satisfying the many conditions required to constitute a "purchase finance arrangement" in 12 U.S.C. § 5481(15)(A)(ii) (*e.g.*, "the initial term of the lease is at least 90 days"). Mot. 34.

---

[7] The Bureau also relies on a document purporting to show EHO offered a "Rent-to-Own guide handbook" (CFPB-Ex. 194), but fails to explain how this constitutes a financial service under the statute. Opp. 68. [redacted]

[8] The Bureau's reliance on Defendants' internal nomenclature for its marketing channels (Opp. 68) does not transform the Rent-to-Own hotswaps into "covered persons."

**B. The Rent-to-Own Hotswaps are undisputedly not "Service Providers."**

There is no dispute that the Rent-to-Own Hotswaps were not "service providers" because they did not "design[], operat[e], or maintain[]" Heath or CreditRepair.com's credit repair businesses, nor "process transactions" for Defendants. Mot. 35 (quoting 12 U.S.C. § 5481(26)). The Bureau says screening credit repair customers and transferring customer data is a "service," except there's no authority for that—and neither screening nor transferring is necessary to "operate" or "maintain" Defendants' businesses. Opp. 71-72. Take the Bureau's cited cases. In *CFPB v. NDG Financial Corp.*, the defendants who disputed being "service providers" allegedly "established and managed banking and payment processing relationships" for covered persons, and therefore were "important for 'operating' and 'maintaining'" the covered persons' payday lending business. 2016 WL 7188792, at *12 (S.D.N.Y. Dec. 2, 2016) (citations omitted).[9] In *CFPB v. D&D Marketing*, a defendant was deemed a "service provider" when it "process[ed] and s[old] consumer-loan applications to small-dollar lenders." 2016 WL 8849698, at *8 (C.D. Cal. Nov. 17, 2016). The Rent-to-Own Hotswaps' services fall dramatically short of anything described in these cases.

This Court should not let the Bureau expand its authority beyond what Congress granted.

**IV. There is no dispute of material fact regarding whether OLP provided its advertised services.**

The Bureau does not dispute, because it cannot, that tens of thousands of consumers whom OLP referred to lenders obtained a loan. Mot. 8, 37-38; Opp. 17-18 (SUMF ¶ 21 undisputed). Instead, realizing its alleged theory of misconduct was untrue, the Bureau (1) makes

[9] The Bureau's parenthetical for this case is misleading—it omits key language, and neglects to mention that the dicta describes entities who had not challenged their status as service providers. *Id.*

unsubstantiated assertions that OLP misrepresented to consumers that "it provided refinance loans" (Opp. 74) and (2) abandons the Complaint by asserting entirely new theories of liability. This Court should not reward either strategy.

First, the Bureau's "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (citation omitted). The Bureau asserts that OLP misrepresented to consumers that "it provided refinance loans," when "OLP did not provide such loans." Opp. 74. OLP is not a lender and, as shown in the scripts the Bureau relies upon, did not represent to consumers that it was. *See*, *e.g.*, [redacted] CFPB-Ex. 168 (same). And the Bureau's cited deposition testimony supports the opposite conclusion. While OLP testified that it did not deal with "mortgage refinance" (which the Bureau does not accuse it of offering or failing to provide), it otherwise explained that "refinance" is merely short-hand for customers who came back to OLP for another loan after improving their credit:

> we do offer refinance in the fact that, when somebody works with us, that they can work with us again, and that the offers change based on their situation … we don't do any traditional refinance options. … [s]o we say refinance, the second loan, that they are allowed to use to pay off whatever they want … So the refinancing is only for repeat customers.

CFPB-Ex. 110, 25:3-26:6. [redacted]

The Bureau also points to testimony where OLP *tracked* consumers who successfully received loans, but that does not show OLP failed to deliver as advertised. Opp. 75. [redacted]

[redacted]

Seeing its original theory has no basis in fact, the Bureau next asserts *new* theories of misconduct not pled in the complaint, which are waived. *Fuqua v. Lindsey Mgmt. Co.*, 321 F. App'x 732, 734 (10th Cir. 2009).

To start, the Bureau asserts that OLP did not "have any basis to tell consumers that after signing up with Defendants, they would be eligible for credit on better terms." Opp. 75. This supposed misrepresentation is both untimely and untrue. The Bureau has not alleged it or sought leave to amend so that it can. Moreover, this new theory is unsupported by the record. OLP nowhere made this purported representation. [redacted] The Bureau does not dispute this common sense, but nevertheless attempts to paint the conditional "if" as a guarantee. The Court can reject that using its common sense.

Next, the Bureau asserts *another* new and unpled theory of misconduct: it accuses OLP of mispresenting the *timing* in which loans were funded, claiming OLP "baited consumers by

promising a high likelihood of receiving a loan in their desired amount within 24-72 hours." Opp. 75. In support, the Bureau quotes an OLP script that says: [redacted] Again, this supposed misrepresentation was not alleged in the Complaint, does not relate back to the Bureau's original theory, and is unsupported by the record. The quoted script, on its face, makes no guarantee with respect to timing. CFPB-Ex. 113. And the Bureau presents no evidence that any consumer that OLP referred to Defendants who had heard this script and was approved for a loan failed to receive their funds within any represented time frame. [redacted] The Bureau ignores this testimony and instead rests its entire theory of supposed misconduct on testimony that OLP did not *track* the precise time in which each loan was funded. Opp. 75. A failure to track is not misrepresentation, and certainly does not call into dispute the fact that OLP actually provides its advertised services. Moreover, there's no evidence that this script language somehow "baited" consumers—as the Bureau concedes, tens of thousands of consumers referred to lenders by OLP actually received loans. Mot. 8.

The Bureau also cavalierly asserts (with no citation) that "Progrexion knew of the vast gulf between OLP's business practices and its representations to consumers." Opp. 75. As demonstrated above, no such "gulf" existed, and Progrexion had no knowledge of any (non-existent) gulf.

## V. There is no dispute of material fact regarding whether Ascent provided its advertised services or whether Defendants knew of Ascent's purported misconduct.

### A. The Bureau's unsubstantiated assertions do not show Ascent deceived consumers.

The Bureau admits Ascent provided consumers with rent-to-own listings. Mot. 38; Opp. 77. Because that theory failed to pan out, the Bureau now claims that Ascent's actual misconduct was *overstating* its services. It cites an email between Progrexion attaching a "test" script (CFPB-Ex. 63)—but the Bureau points to no evidence indicating that this script was ever used or that Ascent adopted its language. Opp. 75-76. [redacted] This evidence is plainly insufficient to create a genuine dispute of fact regarding whether Ascent regularly provided (or overstated) its advertised services to consumers.

Otherwise, the Bureau criticizes scripts where Ascent generally described how rent-to-own contracts work, asserting Ascent "had no basis to describe the terms and conditions of rent-to-own contracts, because it had no contact with owners or agents offering rent-to-own homes." Opp. 76-77. But the Bureau's cited testimony shows that Ascent *did* communicate with the rent-to-own listings companies (MLS brokers) and that Ascent based its overview statements regarding rent-to-own contracts on twenty years' experience in the rent-to-own industry. Opp. 77; CFPB-Ex. 66, 130:12-131:17.

**B. It is undisputed that Defendants lacked knowledge of Ascent's purported misconduct.**

The Bureau does not dispute that Defendants understood Ascent provided consumers with rent-to-own listings. Mot. 40. Instead, the Bureau asserts that "Progrexion acknowledged" that Ascent's marketing contained implicit guarantees that consumers *would* obtain rent-to-own housing if they signed up for credit repair. Opp. 77. But the Bureau does not point to evidence that Ascent ever guaranteed rent-to-own housing, let alone evidence that Progrexion knew that Ascent did. [redacted] First, this email does not suggest Ascent was guaranteeing housing or that Progrexion thought it was. [redacted] Exhibit 9, Curtis Decl. ¶ 12. Neither document speaks to knowledge regarding any misconduct.

Next, the Bureau's assertion that Progrexion's telephone agents were not to alert a consumer "if they knew they were being misled by a Hotswap Partner" is a gross falsity unmoored from any evidence. Opp. 78. As shown in the deposition testimony cited by the Bureau, [redacted]

[redacted]

All told, there is no factual basis to keep Ascent in the Bureau's case.

**CONCLUSION**

This Court should grant Defendants summary judgment on Counts II-V and Count I as to CreditRepair.com.

Dated: March 25, 2022

Respectfully submitted,

/s/ William J. Harrington
William J. Harrington*
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7140
wharrington@goodwinlaw.com

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Thomas M. Hefferon*
W. Kyle Tayman*
Christina Hennecken*
Virginia McCorkle*
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
thefferon@goodwinlaw.com
ktayman@goodwinlaw.com

Courtney Hayden*
Goodwin Procter LLP

100 Northern Avenue
Boston, MA 02210
(617) 570-1000
chayden@goodwinlaw.com

Edward J. Bennett*
Edward C. Barnidge*
Suzanne Salgado*
Shauna M. Kramer*
Emma J. Nino*
Daniel Whiteley*
Atticus DeProspo*
Williams & Connolly LLP
725 Twelfth Street NW
Washington, DC 20005
ebennett@wc.com
ebarnidge@wc.com

*Attorneys for Defendants*
(*admitted *pro hac vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2022, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ William J. Harrington
William J. Harrington

**CERTIFICATE OF COMPLIANCE WITH THE WORD-COUNT LIMIT**

I certify that the above memorandum contains 10,178 words and complies with the word limit established in ECF No. 300 according to the word count function of Microsoft Word, excluding the cover page, table of contents, table of authorities, signature block, and exhibits.

Dated: March 25, 2022

/s/ William J. Harrington
William J. Harrington