Ex. 2

Transcript of the Deposition
of Victor Stango
(Dec. 14, 2021)
Public Version Redacted

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

- - - - -

BUREAU OF CONSUMER          )
FINANCIAL PROTECTION,       )
                            )
        Plaintiff,          )   Case No.
                            )   2:19-cv-00298-BSJ
        vs.                 )
                            )
PROGREXION MARKETING, INC., )
et al.,                     )
                            )
        Defendants.         )

REMOTE VIDEOCONFERENCE

VIDEO-RECORDED DEPOSITION OF VICTOR STANGO

Tuesday, December 14, 2021, 8:13 a.m. Pacific Time

All Parties Appearing Remotely

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

Page 2

1                    REMOTE VIDEOCONFERENCE

2        VIDEO-RECORDED DEPOSITION OF VICTOR STANGO,

3    a witness herein, called by the Plaintiff for

4    examination, taken pursuant to the Federal Rules of

5    Civil Procedure 5, by and before Marjorie Peters, a

6    Registered Merit Reporter, Certified Realtime

7    Reporter and Notary Public in and for the District

8    of Columbia, at All Parties Appearing Remotely, on

9    Tuesday, December 14, 2021, at 8:13 a.m. Pacific

10   Time.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2   For the Plaintiff:

 3       Tracy Hilmer, Esquire
         Lorraine Van Kirk, Esquire
 4       Bureau of Consumer Financial Protection
         1700 G Street, NW
 5       Washington, DC 20552
         tracy.hilmer@cfpb.gov
 6       lorraine.vankirk@cfpb.gov
         202-435-7459

 7

 8   For the Defendants:

 9       Christina L. Hennecken, Esquire
         James An, Esquire
10       Goodwin
         1900 N Street NW
11       Washington, District of Columbia 20036
         chennecken@goodwinlaw.com
12       jan@goodwinlaw.com
         202 346 4291

13

14   ALSO PRESENT:

15   Bill Thomas, Legal Videographer

16

17

18

19

20

21

22       * Index appears at the back of the transcript.*

23

24

25
```

Page 4

```
 1                    I N D E X

 2    EXAMINATION                              PAGE

 3    VICTOR ORESTE STANGO, PhD

 4      By Ms. Hilmer                          8

 5

 6

 7            I N D E X   O F   E X H I B I T S

 8    EXHIBIT                                  PAGE

 9      Exhibit 475     Subpoena               11

10      Exhibit 476     Goodwin letter 10.1.2021   14

11      Exhibit 477     Stango expert report,  24

12                      10.25.2021

13      Exhibit 478     Stango expert report,  25

14                      12.9.2021

15      Exhibit 479     Stango/Zinman study,   32

16                      Exponential Growth Bias

17                      and Household Finance

18      Exhibit 480     Lam Declaration        69

19      Exhibit 481     FN105 Turner PERC paper    116

20      Exhibit 482     article, "Can I raise my   120

21                      credit fast?"

22      Exhibit 483     CreditRepair.com, Inc.'s   144

23                      Supplemental Response to

24                      Interrogatory

25
```

Page 5

```
1              I N D E X   O F   E X H I B I T S

2    EXHIBIT                                          PAGE

3    Exhibit 484      Heath Supplemental             156

4                     Interrogatory Response

5    Exhibit 485      2/2017 study, Stango,          191

6                     Yoong, Zinman

7    Exhibit 486      Barron and Staten study,       200

8                     DMP Participation and

9                     Credit Counseling Outcomes

10   Exhibit 487      2002/01/30 FTC TSR NPRM        226

11                    Excerpt

12   Exhibit 488      Intervenor Brief               232

13

14   PREVIOUS EXHIBITS                               PAGE

15   Beal 349         Lexington Law service          74

16                    feature matrix

17   Beal 351         CreditRepair service           77

18                    feature matrix

19   DelPonti         article, Credit Repair         107

20   Exhibit 430      Companies: How do they

21                    help

22   Frederick        Frederick Expert Report        239

23   Exhibit 445

24   Frederick        Frederick Rebuttal Report      249

25   Exhibit 446
```

Page 6

```
 1                P R O C E E D I N G S

 2               THE VIDEOGRAPHER:  Good morning.  My

 3    name is William Thomas.  I am a certified legal

 4    videographer.  I'm sorry.  Let me start that again.

 5    My apologies.

 6               Good morning.  My name is William

 7    Thomas.  I'm a certified legal videographer in

 8    association with TSG Reporting, Inc.

 9               Due to the severity of the COVID-19

10    outbreak and following the practice of social

11    distancing, I will not be in the same room with the

12    witness; instead, I will record this videotaped

13    deposition remotely.

14               The reporter, Marjorie Peters, will

15    also not be in the same room and will swear the

16    witness remotely.

17               Do all parties stipulate to the

18    validity of this video recording and remote

19    swearing, and that it will be admissible in the

20    courtroom as if it had been taken following Rule 30

21    of the Federal Rules of Civil Procedure and the

22    State's Rule where this case is pending?

23               MS. HILMER:  Bureau so stipulates.

24               MR. HARRINGTON:  On behalf of all

25    Defendants, I stipulate.
```

```
 1                     THE VIDEOGRAPHER:  All right.  Thank
 2    you.
 3                     So this is the start of media
 4    labeled number one, taken in the -- of the
 5    video-recorded deposition of Victor Stango --
 6    Dr. Victor Stango, taken in the matter of Bureau of
 7    Consumer Financial Protection v. Progrexion
 8    Marketing, Inc., et al.
 9                     This is in the U.S. District Court,
10    District of Utah, Case Number 2:19-cv-00298-BSJ.
11                     The time is 8:15 Pacific Time on
12    December 14, 2021.  My name is William Thomas.  I am
13    the videographer.
14                     The court reporter is Marjorie
15    Peters, who is here in association with Heritage
16    Reporting.
17                     Counsel, would you now identify
18    yourselves for this proceeding.
19                     MS. HILMER:  Tracy Hilmer on behalf
20    of the Bureau of Consumer Financial Protection.
21                     MR. HARRINGTON:  William Harrington
22    on behalf of all Defendants.
23                     THE VIDEOGRAPHER:  And will the
24    court reporter now please swear in the witness.
25                     COURT REPORTER:  Prior to going on
```

Page 8

1    the record, I confirm the witness's drivers license

2    for today's hearing.

3                         VICTOR STANGO,

4    a witness, having been first duly sworn, was

5    examined and testified as follows:

6                         DIRECT EXAMINATION

7    BY MS. HILMER:

8         Q.    Good morning, Dr. Stango.

9         A.    Good morning.

10        Q.    Would you please state your full name

11   for the record.

12        A.    Victor Oreste Stango III.

13        Q.    Just for the record, you are currently

14   based in California?

15        A.    Yes.

16        Q.    All right.

17              Have you given a deposition before?

18        A.    Yes.

19        Q.    How many times?

20        A.    I believe this is roughly my tenth.

21        Q.    Okay.

22              So you're probably familiar with the

23   process, but I'd like to go over that process with

24   you just so we're all on the same page.

25              Is that all right?

1      A.      Yes.

2      Q.      So I'll be asking you questions and

3    expecting you to answer those questions.

4              If any question I ask you requires

5    clarification, you haven't heard it, you haven't

6    fully understood it, will you please let me know?

7      A.      Okay.

8      Q.      If you answer the question, I will

9    assume that you understood it; is that fair?

10     A.      Yes.

11     Q.      Okay.

12             Now, when you answer the question,

13   it's important that you give a verbal answer because

14   we have a court reporter here who's taking

15   everything down, and she can't record easily a shake

16   or nod of the head.

17             So please give a verbal answer.

18     A.      Okay.

19     Q.      If you don't, I may remind you to do

20   that, but -- or the court reporter may, but let's

21   try our best.

22             Also, especially in this remote

23   setting where there can be delays in the feed, it's

24   important for us to try our very best not to talk

25   over each other; again, because the court reporter

Page 10

1    needs to make a record, and she won't be able to

2    hear what we're saying if we're talking at the same

3    time.

4              So I will do my very best to let you

5    complete an answer, and I'll ask you to help by

6    letting me finish a question.

7              Okay?

8    A.    Yes.

9    Q.    Also, with regard to breaks, it's my

10   usual practice to take a break about every hour or

11   so, plus a lunch break.

12             You're on the West Coast, but I

13   recognize that you probably started quite early for

14   your time, and so we may be looking at a lunch break

15   somewhere around the 1:30 to 2:00 p.m. Eastern Time.

16             Does that work for you?

17   A.    Sure.  Yes.

18   Q.    Okay.  You know, if you need a break

19   before then, or if I've kind of overrun my usual

20   hour practice, please feel free to take a break --

21   or to ask me for a break, and I'll go off the record

22   as soon as I finish my line of questioning.

23             Okay?

24   A.    Okay.

25   Q.    All right.  Very good.

Page 11

```
 1                    Do you have any questions before we
 2    begin?
 3         A.    No.
 4         Q.    All right.
 5                    Why don't we just start right in,
 6    then.
 7                    All right.  Let's mark our first
 8    exhibit, which will be the subpoena that you
 9    received, and that will be Exhibit 475.
10    (Exhibit 475, Subpoena, was marked for
11    identification.)
12         Q.    Will my assistant please mark that
13    exhibit, and show it.  This is a good test of our
14    AgileLaw program.
15                    Do you see what's been marked as
16    Exhibit 475, which was the subpoena for your
17    deposition?
18         A.    Yes, I can view something on my screen
19    that appears to be a subpoena.
20         Q.    Did you receive this document?
21         A.    Yes.
22         Q.    Okay.
23                    If I can have you scroll towards the
24    back.  See if we can get this to work for us.  It's
25    a little bit slow this morning.
```

Page 12

1              Let me have you go to page 16 of the

2   document.  So that's PDF page 16.

3       A.    I'm on PDF page 16, I believe.

4       Q.    Okay.  Great.

5              Do you see it says there:  "Requests

6   for Production"?

7       A.    Yes.

8       Q.    Okay.

9              Then on the next page, and the

10  following pages, do you see additional enumerated

11  requests for production?

12      A.    Yes, I do.

13      Q.    Did you provide documents in response to

14  this subpoena?

15      A.    I don't recall precisely which documents

16  were produced by counsel.  I had a communication

17  with Cornerstone Research about the request for

18  production and was told that beyond the materials I

19  produced with my expert report, we would not be

20  expecting that we would produce anything further.

21      Q.    I see.  Okay.

22              So you have produced no other

23  documents -- well, I'm going to withdraw that

24  question because I know you produced a couple of

25  invoices recently; right?

Page 13

1        A.       If I produced them, then that's correct,

2    yes.

3        Q.       Did all of -- let me just step back.

4                 Process-wise, did all of the

5    production come from Cornerstone, or did it come

6    from you?

7        A.       I worked with Cornerstone in the

8    production of the documents associated with my

9    expert report.

10       Q.       Okay.

11                So did they have some of the

12   documents, and you had others?

13       A.       That may have been true, yes.

14       Q.       Okay.

15                All of -- whatever you had, you

16   delivered to Mr. Harrington and his team; is that

17   fair?

18       A.       I may have delivered them via

19   Cornerstone.

20       Q.       I see.  Okay.

21                It's your understanding that

22   Cornerstone then delivered all of the documents to

23   Mr. Harrington and his team?

24       A.       That may have been the case, yes.

25       Q.       All right.

Page 14

```
 1              Let me ask my assistant to mark our

 2   second exhibit, and this is the document called

 3   Stango, many zeros, 1.

 4              We'll mark that as our next Exhibit,

 5   476.

 6   (Exhibit 476, Goodwin letter 10.1.2021, was marked

 7   for identification.)

 8       Q.    Please let me know when you can see it,

 9   Dr. Stango.

10       A.    I see a document with a heading

11   "Goodwin."

12       Q.    Yep.

13              And a date of October 1st, 2021?

14       A.    Yes.

15       Q.    Do you recognize this document?

16       A.    Yes.

17       Q.    What is this document?

18       A.    This appears to be the engagement

19   agreement that I signed.

20       Q.    Okay.

21              I'm not seeing -- I see.  Okay.

22   Your signature is on the very last page; is that

23   right?  Under "Agreed and Accepted."

24       A.    Yes.

25       Q.    Okay.
```

Page 15

1                        Now, this document indicates that

2    you're to be paid an amount of $1,100 per hour for

3    your work; is that correct?

4         A.    Yes.  I read where it says that my

5    compensation is $1,100 per hour.

6         Q.    Is that the amount that you are being

7    paid for your work in this case?

8         A.    It's my billing rate, yes.

9         Q.    I guess I'm asking if that's what you're

10   being paid, not just whether it's your billing rate.

11        A.    Let me clarify.

12   (Clarification requested by the Court Reporter.)

13                   MR. HARRINGTON:  I said objection.

14   Ambiguous.

15        Q.    You can answer.

16        A.    I'll try to clarify.

17                   It's the amount that appears on my

18   invoices as an hourly rate, but I have not actually

19   received payment for some of the -- or, actually,

20   the invoices that I've submitted.

21        Q.    You submitted have approximately $55,000

22   worth of -- or invoices seeking about $55,000 worth

23   of payment?

24                   Is that about right?

25        A.    I recall the number being somewhere in

Page 16

1    that range, yes.

2        Q.    Okay.

3              And you haven't been paid?

4        A.    Not yet, no.

5        Q.    Now, can you explain to me what your

6    relationship is with Cornerstone in the context of

7    this case?

8              MR. HARRINGTON:  Objection.

9    Ambiguous.

10       A.    Cornerstone assisted me and worked under

11   my direction in preparation of my expert report.

12       Q.    Are they also handling your billing?

13       A.    Not sure what you mean by "handling

14   billing," but I do send my invoices to Cornerstone

15   Research on a monthly basis.

16       Q.    Okay.

17              So are you expecting payment through

18   Cornerstone?

19       A.    I can't be 100 percent sure since this

20   invoicing practice is a relatively new one for me.

21              But I believe that the way it would

22   work is that I invoice Cornerstone, and they

23   transmit the invoices to the client, after which I

24   receive a payment from Cornerstone Research.

25       Q.    Okay.

Page 17

```
 1                    Now, you indicated that in this

 2    matter, Cornerstone is -- has assisted you; correct?

 3         A.      Yes.

 4         Q.      What have they done for you?

 5         A.      They worked under my direction to

 6    conduct data analyses.

 7         Q.      Did they conduct all of the data

 8    analyses that are reflected in the tables in your

 9    report?

10         A.      I and Cornerstone conducted those

11    analyses, yes.

12         Q.      Okay.

13                    I guess in terms of maybe I can be a

14    little more colloquial and ask about the data

15    crunching.

16                    Did Cornerstone do the data

17    crunching or did you undertake some of that

18    yourself?

19                    MR. HARRINGTON:  Objection.

20    Compound.

21         A.      I'm not sure what would constitute data

22    crunching, but Cornerstone, under my direction

23    worked and assisted me in conducting a fair amount

24    of the data analysis.  I guess that's the best way I

25    would characterize it.
```

Page 18

```
 1      Q.      Okay.

 2              What specific analyses did you do on

 3   your own?

 4              MR. HARRINGTON:  Objection.  Assumes

 5   facts not in evidence.  Ambiguous.

 6      Q.      You can answer.

 7              MR. HARRINGTON:  Mischaracterizes

 8   the prior testimony.

 9      A.      I didn't undertake a detailed

10   enumeration of which analyses I have conducted on my

11   own, nor really am I sure what that would mean in

12   this context since we were working together.

13              I reviewed data.  I worked with the

14   team to discuss analyses, and they worked under my

15   direction in conducting those analyses.

16      Q.      Okay.  All right.

17              Dr. Stango, you have a PhD; is that

18   right?

19      A.      Yes.

20      Q.      In what discipline is your PhD?

21      A.      Economics.

22      Q.      Are you an attorney?

23      A.      No.

24      Q.      Have you attended law school at all?

25      A.      No, I have not.
```

Page 19

1      Q.     All right.

2             Your CV indicates that you currently

3      serve at the Federal Reserve Bank of Philadelphia as

4      a visiting scholar; is that right?

5      A.     Yes.

6      Q.     What do you -- are you paid for that --

7      withdraw the question.

8             Are you paid for that service as a

9      visiting scholar?

10     A.     I believe, and it's been a while since

11     I've visited the bank, due to COVID, but I believe

12     that I receive a per diem for each day that I spend

13     in the bank as a visiting scholar.  I also am

14     reimbursed for my expenses associated with visiting

15     the bank.

16     Q.     Okay.

17            Do you do actual work for the bank?

18            MR. HARRINGTON:  Objection.  Vague.

19     Argumentative.

20     A.     I'm not sure what you mean by "actual

21     work."  If you could be more specific --

22     Q.     Yeah.  Let --

23     A.     -- I'll give you an answer.

24     Q.     Why don't I just back up.

25            When was the last time you were in

Page 20

1    the Federal Reserve Bank in Philadelphia?

2         A.    I can't recall the exact date.  It would

3    have been before the pandemic.  And I recall -- I

4    recall visiting the bank in the fall when I was

5    there last, but as I sit here, I can't recall

6    whether it was the fall immediately preceding the

7    pandemic or the one prior to that.

8         Q.    Okay.

9               What does your status as a visiting

10   scholar at the bank involve?

11        A.    I can't recall the specifics of the

12   visiting scholar contract that -- under which I

13   work, and which would define all of the specifics of

14   my relationship.

15              But generally speaking, I visit the

16   bank to discuss research ideas, occasionally to

17   present research, and there's an opportunity for me

18   to publish papers in the bank's working paper

19   series, which contains academic research by people

20   like myself.

21        Q.    Is it the case that you held a similar

22   visiting scholar position at the Federal Reserve

23   Bank in New York at one point?

24        A.    Yes, that's correct.

25        Q.    Did that service involve the same kinds

Page 21

1    of activities that you just described with respect

2    to the Philadelphia Federal Reserve Bank?

3         A.    At a high level, yes.  Some of the

4    specifics may have differed.  I was visiting that

5    bank for a period of several months consecutively,

6    rather than occasionally over the course of a year,

7    for example.  That would be one difference.

8         Q.    Did any of your activities at either of

9    the Federal Reserve Banks involve participation in

10   rule-making activity?

11        A.    No.  Not at the banks where I was a

12   visiting scholar, and -- I'm not quite sure what you

13   mean by "participation in rule-making," but I

14   believe the answer would be no.

15        Q.    Okay.

16              Are you familiar with Agency

17   rule-making processes and how they happen?

18        A.    I'm not sure I understand what you mean

19   by "agency rule-making processes" in this particular

20   situation.

21        Q.    All right.

22              Are there any particular regulations

23   or proposed regulations that you have either worked

24   on -- that you have worked on while you were as a

25   visiting scholar at either of the banks?

Page 22

1          A.      No.  I don't recall being part of any

2     rule-making discussions or processes, at least as I

3     would conceive of them.

4          Q.      Okay.

5                  Have you commented on any rules

6     proposed by the Federal Reserve Board?

7                  MR. HARRINGTON:  Objection.  Vague.

8          A.      Yeah.  I'm not sure what "comment" would

9     mean in that context, as I understand it may have

10    more or less formal definitions in some contexts.

11         Q.      Okay.

12                 Are you familiar that -- with the

13    Notice and Comment process that's involved with

14    Federal rule-making?

15         A.      I've heard discussions of such a

16    process, but I wouldn't claim to know every detail

17    of how it works.

18         Q.      That's fine.

19                 I'm asking whether you have ever

20    participated, submitted comments, in connection with

21    a Notice and Comment process for any Federal agency?

22         A.      I don't recall having done so,

23    particularly recently.

24         Q.      Okay.

25                 Have you worked for any other

Page 23

1    Federal Government agency besides the Federal

2    Reserve Banks?

3          A.     In terms of full-time employment or

4    sustained involvement, no.  I can't recall whether I

5    may have done any contract work in the past for a

6    Federal agency or even what would constitute a

7    Federal agency in every instance, but no would be my

8    answer, as I sit here today.

9          Q.     Okay.

10                Have you ever worked for the Federal

11   Trade Commission in any capacity?

12         A.     No, not that I recall.

13         Q.     Have you ever worked for the Consumer

14   Financial Protection Bureau in any capacity?

15         A.     No, I have not.  I have visited the

16   CFPB, but I have not been employed by the CFPB.

17         Q.     I guess what I would ask is whether you

18   have been engaged as a contractor in any capacity by

19   the CFPB?

20         A.     Not that I recall, no.  I interviewed

21   for a job there, but I never worked there.

22         Q.     Okay.

23                How about the FTC; have you ever

24   been involved as a contractor for the Federal Trade

25   Commission?

Page 24

1      A.      Not that I recall, no.

2      Q.      All right.  Right.

3              So let's mark our next exhibit,

4  which will be Exhibit 477, and this will be your

5  expert report dated October 25, 2021.

6              And I'll ask my colleague to bring

7  this up.

8  (Exhibit 477, Stango expert report, 10.25.2021, was

9  marked for identification.)

10     Q.      Would you let me know when you can see

11  it, Dr. Stango.

12     A.      I can see the first page of the

13  document.

14     Q.      Okay.

15              Do you want to take a look through

16  it and verify that this is, in fact, your expert

17  report submitted in this matter dated October 25,

18  2021?

19     A.      Yes, please.

20              It appears to be my expert report.

21     Q.      Great.

22              Could you please take a look at page

23  38 of the document.  And again, in AgileLaw, you can

24  type in the page number at the bottom, it might go

25  quicker.

Page 25

1      A.      Thanks.  I'll -- I'll look for that.

2              I'm on page 38 of the PDF.

3      Q.      Yes.

4              Do you see your signature there?

5      A.      Yes.

6      Q.      Right.

7              This is page 36 of the report, but

8      38 of the PDF; correct?

9      A.      Yes.

10     Q.      Right.  All right.

11             Let's mark the next exhibit, which

12     will be 478, and this will be the 12/09/2021

13     corrections to the expert report of Dr. Stango.

14     (Exhibit 478, Stango expert report, 12.9.2021, was

15     marked for identification.)

16     Q.      Please let me know when you can see that

17     document.

18     A.      I can see it.

19     Q.      Okay.

20             Feel free to take a look at it, and

21     let me know if this is, in fact, certain corrections

22     that you provided on December 9th in connection with

23     your October 25th expert report in this case.

24     A.      Yes.  This is the set of corrections.

25     Q.      Okay.

Page 26

1                        Just to be clear, do you regard any

2    of these corrections as substantive corrections to

3    your report?

4          A.      I'm not sure what you mean by

5    "substantive," but none of them alter my opinions or

6    conclusions in the report.

7          Q.      Okay.

8                        I guess my question is, are they

9    citation -- correcting potential citation errors as

10   opposed to offering some type of alternative or

11   additional opinion?

12                      MR. HARRINGTON:  Objection.

13   Compound.

14         A.      So the ones on page 2 of the PDF are, as

15   you say, corrections to footnotes.

16                      On page 3, there is a corrected

17   version of one of the tables that appears in my

18   expert report.

19                      And I don't believe it changes the

20   percentage figures in the second column to the first

21   decimal, if that gives a sense of the magnitude of

22   the change in that table.

23         Q.      Are the changes that you made only with

24   respect to the second part of the table that deals

25   with Counts 2 through 5?

1      A.      I can quickly confirm that if I look at

2  the original table in my report.  It would only take

3  me a moment.  That may be the case, but I prefer to

4  confirm it before answering your question.

5      Q.      Please.

6              And that -- by the way, Table 2 in

7  your original report is found on page 28 of the

8  report, which might be 30 of the PDF.

9              And that's Exhibit 477.

10     A.      Yes.  So it appears -- I'm trying to

11  hold the numbers in my head because I haven't

12  figured out how to look at them next to each other.

13              It appears that the change applies

14  only to the figures in rows -- what I'll call rows 3

15  and 4 pertaining to Counts II through IV.

16     Q.      Can you just explain what the reason for

17  the correction was.

18     A.      Sure.

19              In the original table, the product

20  that I'll call "Hold," which is listed in footnote

21  2, was classified as a credit repair product rather

22  than in the Other category.

23              The total dollar amount of payments

24  associated with the Hold product is, as I said,

25  fairly small because it doesn't affect the

Page 28

1    percentages in the second column.

2                    So the original table, as I said,

3    included Hold in row 3, and it should have included

4    Hold in row 4, the Other category, as indicated by

5    footnote 2.

6                    So that's the correction.

7        Q.    Is that the only change that you made to

8    the figures that were shown in the original Table 2

9    in your report?

10       A.    Yes.

11       Q.    Very good.

12                   MS. HILMER:  All right.  I'm going

13   to pause at this moment to go off the record, and

14   let our videographer just test his audio quality.

15                   THE VIDEOGRAPHER:  We're going off

16   record.  The time is 8:46.

17   (Off the record.)

18   (RECESS, 8:46 a.m. - 8:52 a.m.)

19                   THE VIDEOGRAPHER:  We're back on

20   record.  The time is 8:52.

21   BY MS. HILMER:

22       Q.    Okay.

23                   Dr. Stango, do you have a hard copy

24   of your October 25th report available to you?

25       A.    Yes.

1    Q.    Okay.

2          I -- unless your counsel objects, I

3    would invite you to use it because it will make it

4    easier for you to look at exhibits on the screen and

5    answer questions from the report without too much

6    toggling back and forth.

7    A.    Okay.

8          Thank you.

9    Q.    Would you let me know when you have that

10   available.

11   A.    I have it in front of me now.

12   Q.    Great.  Okay.

13         So turning to Exhibit 477, your

14   expert report, Paragraph 2, you identify yourself as

15   an expert on consumer behavior in financial service

16   markets; is that correct?

17   A.    Yes.

18   Q.    Is that a field of study within the

19   larger discipline of economics?

20   A.    It's the subject of much of my academic

21   research, and I would list it as the primary area of

22   my research is financial service markets.

23   Q.    Specifically, consumer behavior;

24   correct?

25   A.    My research focuses on both consumer

Page 30

1    behavior and firm behavior, but I've examined both.

2         Q.    Okay.

3                   Is consumer behavior in financial

4    service markets part of the larger field of research

5    known as behavioral economics?

6         A.    I would say that I would also

7    characterize myself as a behavioral economist.

8                   The field of research in banking

9    would include work done by behavioral economists and

10   work done by people who might not call themselves

11   behavioral economists.

12                  But I'm a behavioral economist.

13        Q.    Now, can you please describe what

14   behavioral economists study?

15        A.    I'm not sure I could tell you what every

16   behavioral economist studies.

17                  But, in my case, I would call my

18   work as taking the tools of economics and

19   incorporating insights from psychology to the

20   understanding of individual behavior and

21   decision-making.

22        Q.    Okay.

23                  Particularly, financial

24   decision-making; is that fair?

25        A.    Other behavioral economists might study

1  other types of decisions, but those are the ones on

2  which I focus.

3      Q.    So just to be clear, your focus is -- to

4  be colloquial, perhaps, your focus studies the

5  impact of consumer behavior on consumer financial

6  decision-making; is that fair?

7      A.    Sure.  I study the relationship between

8  them, is the way I would characterize it is that

9  there's a link between the two and there's a

10  context --

11              MR. HARRINGTON:  Objection to the

12  question as mischaracterizes the testimony.

13  (Clarification requested by the Court Reporter.)

14              MS. HILMER:  Can you read the last

15  question.

16  (The record was read back by the Court Reporter.)

17      Q.    Is it fair to say that what you study is

18  the effect of consumer behavioral factors on

19  consumer financial decision-making?

20              MR. HARRINGTON:  Objection.

21  Mischaracterizes the witness's prior testimony.

22      A.    I would say that I study links between

23  consumer behavior and financial decisions and

24  financial outcomes, at least in some of my research,

25  if that's what you mean.

1    Q.    Yeah.  In your work, have you identified

2    errors that consumers make when they're approaching

3    financial decisions?

4                MR. HARRINGTON:  Objection.  Vague.

5    A.    I would call one thing that I've

6    studied, the classification of behavioral biases,

7    which could be connected to the concept of errors,

8    yes.

9    Q.    Okay.

10                Let's bring up our next exhibit,

11   which is called Stango Zinman 2009 JOF EXP Growth,

12   and that will be Exhibit 479.

13   (Exhibit 479, Stango/Zinman study, Exponential

14   Growth Bias and Household Finance, was marked for

15   identification.)

16   Q.    Let me know when you see it.

17   A.    I see it.

18   Q.    Is this a paper that you authored?

19   A.    It appears to be a copy of a paper that

20   I wrote with Jon Zinman, yes.

21   Q.    Do you want to look at the next page and

22   see if it's the paper that you wrote?

23   A.    The next page appears to be the next

24   page of that paper, yes.  I haven't paged through

25   the whole thing.

Page 33

1      Q.      Okay.

2              Let me invite you to -- well, I'll

3      just draw your attention to the second paragraph on

4      the second page of the document.

5              And the title of this document is:

6      "Exponential Growth Bias and Household Finance."

7              Correct?

8      A.      Yes.

9      Q.      All right.

10             So that second paragraph says, "We

11     begin by tying together existing and new evidence on

12     these cost perceptions to show that most consumers

13     err systematically when given information commonly

14     available in the market."

15             Have I read that correctly?

16     A.      Yes.

17     Q.      Is it fair to say that in this paper,

18     you and your co-author determined that people

19     underestimate the value of compounding on savings

20     over time?

21     A.      I think that's generally true.  What we

22     would say is that we show that consumers can

23     underestimate the future value associated with

24     savings due to compounding over time.

25     Q.      Right.

Page 34

1                        So, in other words, a dollar saved

2      today is worth quite a bit more in the future;

3      correct?

4                        MR. HARRINGTON:  Objection.

5      Ambiguous.

6           A.     That would depend, but it could be if

7      the consumer were saving money and earning interest

8      on it.

9           Q.     Or investing it; correct?

10          A.     Yes.  Yes, I would view those as

11     equivalent.

12          Q.     Okay.

13                       MR. HARRINGTON:  Objection.

14     Ambiguous.

15          Q.     Did you also conclude with your

16     co-author that people -- consumers underestimate the

17     cost of -- let me withdraw that question.

18                       That they -- withdraw the question.

19                       Did you also conclude in this paper

20     with your co-author that consumers frequently

21     underestimate the true interest rate for borrowings?

22          A.     The statement was a little bit different

23     than that.  We presented consumers -- or the survey

24     that we used, which wasn't designed by us, presented

25     consumers with a hypothetical loan scenario and

Page 35

1    asked them to estimate the interest rate on a loan

2    associated with the principal monthly payment and

3    maturity, and what we show is that many consumers

4    underestimate that interest rate.

5         Q.    Okay.

6              In other words, is it fair to say

7    that particularly with regard to short-term

8    borrowings, like short-term loans, many people did

9    not realize how high the actual interest rate was

10   that they were paying?

11             MR. HARRINGTON:  Objection.  Calls

12   for speculation.  Mischaracterizes the witness's

13   testimony.

14        A.    I'd like to hear the question again,

15   please.

16             MS. HILMER:  Can you read it back.

17             THE COURT REPORTER:  Yes.

18   (The record was read back by the Court Reporter.)

19        A.    In this context, when presented with

20   these survey questions, many people underestimated

21   the loan interest rate --

22        Q.    Is it fair to say that you found that to

23   be particularly true with shorter term loans?

24             MR. HARRINGTON:  Objection.

25   Ambiguous.

Page 36

1      A.      So to clarify, the data that we used

2   pertained to loans that all had the same maturity,

3   and we undertook some theoretical analysis that

4   provided an example of how that payment/interest

5   bias, as we call it, could be more severe on those

6   loans and less severe on loans with longer maturity.

7               There was a data-based part of it

8   that used loans that all had the same maturity in

9   the question.

10      Q.      Okay.

11              And was that maturity one year?

12      A.      Yes, it was 12 months, as I recall.

13      Q.      Okay.

14              And for those loans, the ones with

15   the one-year maturity, that was where you and your

16   co-author identified significant underestimation of

17   true interest rate by the consumers; is that right?

18      A.      Yes.  Underestimation of the APR or

19   annual percentage rate.

20      Q.      Okay.

21              Now, is it fair to say that -- well,

22   let me have you -- I'm going to withdraw the

23   question, and just ask you to turn to page 7 of

24   the -- of the document.

25              This will be page 2812 of the paper.

1        A.      Okay.

2        Q.      All right.

3                 Now, under B, do you see where it

4    says, "B.  New Evidence: Payment/Interest Bias on

5    Hypothetical Loans"?

6        A.      Yes.

7        Q.      It says there, "We build on the prior

8    work above in several ways.  We start by presenting

9    nationally representative empirical evidence on

10   payment/interest bias from two previously untapped

11   sources, the 1983 and 1977 Surveys of Consumer

12   Finances."

13                Have I read that correctly?

14       A.      Yes.

15       Q.      Those were data sets that were developed

16   completely independently of anything you were doing;

17   is that right?

18       A.      I didn't write those surveys or the

19   questions.  That's correct.

20       Q.      Okay.

21                I mean, you wrote this paper in

22   2009; right?

23       A.      We published it in 2009.  It was written

24   before then, but it post-dated the surveys.

25       Q.      By quite a number of years; correct?

Page 38

1      A.     Yes, if -- in the case of 1983, if we

2  started the paper in 2004, that would have been 21

3  years.

4      Q.    Okay.

5              The surveys were published by the

6  Federal Reserve Board; is that correct?

7      A.     Yes.  The Survey of Consumer Finances is

8  administered by the Fed.

9      Q.    Okay.

10             Is there -- and it's -- that survey

11  is administered without regard to any litigation

12  interest; is that fair to say?

13     A.     I'm not sure I could tell you why it's

14  administered or how it relates to any litigation.

15     Q.    Okay.

16             Is it your understanding that the

17  survey is administered annually or on some periodic

18  basis?

19             MR. HARRINGTON:  Objection.  Lack of

20  foundation.

21     A.     I haven't kept up with the

22  administration frequency, but I can tell you that in

23  the past, it was administered at various points

24  every six years.

25     Q.    Okay.

Page 39

1                    In your --

2                    MS. VAN KIRK:  Would it be okay if

3    we take a -- just interrupt to take a quick break

4    for a moment?

5    (Clarification requested by the Court Reporter.)

6                    MS. HILMER:  Okay.  Well, let's go

7    off the record for a moment.

8                    MS. VAN KIRK:  May we take a

9    five-minute break?  Yeah.  Thank you.

10                   THE VIDEOGRAPHER:  We're going off

11   record.  The time is 9:09.

12   (RECESS, 9:09 a.m. - 9:14 a.m.)

13                   THE VIDEOGRAPHER:  We're back on

14   record.  The time is 9:14.

15   BY MS. HILMER:

16       Q.    All right, Dr. Stango, before we went

17   off record, we were talking about Exhibit 479, which

18   is your 2009 paper on exponential growth bias, and

19   so let's go back to that.

20                   We were on page 7 of the document,

21   and talking about the particular survey.

22                   Is it fair to say that you, in

23   utilizing these two surveys, 1977 and 1983 Surveys

24   of Consumer Finance, you found significant -- well,

25   significant data on household financial information?

Page 40

1              MR. HARRINGTON:  Objection.

2    Leading.

3        A.    I'm not sure what you mean by

4    significant information in that particular

5    situation.

6        Q.    Why don't I withdraw the question and

7    ask this:  Why did you use these two surveys?

8        A.    We describe why we use the surveys in

9    the paragraph under heading B there.

10              "We used the 1983 SCF because it has

11   the most recent (and, as far as we know, the only)

12   nationally representative data on both

13   payment/interest bias and household financial

14   outcomes."

15              So stopping there, as I recall, and

16   it was a while ago when we wrote this paper, later

17   SCFs did not ask the survey questions that allowed

18   us to calculate payment/interest bias.

19              And the next sentence says, "We used

20   the 1977 SCF because it contains richer data on

21   payment/interest bias than the 1983 survey."

22              And as I sit here today, not having

23   re-read the paper in a while, I can't be familiar

24   with all the details of what that would be, but

25   that's what we say there.

Page 41

1    Q.    Did those surveys also contain

2  demographic information.

3    A.    The -- as I recall, the SCF from 1983,

4  which was what we used in most of the statistical

5  analysis that comes later in the paper, did contain

6  demographic information such as income, education,

7  and so on.

8    Q.    Did it contain information about

9  household size?

10    A.    Again, it's been a while since I've

11  reviewed this paper, and I could take a quick look

12  and refresh myself on the details, but as I sit here

13  right now, I can't recall whether it contained

14  household size or whether we employed that in any of

15  the statistical analysis that we did.

16    Q.    Okay.

17          You were interested in having a data

18  set that was more representative of the national

19  population, though; is that fair?

20    A.    I'm not sure that I would say we were

21  interested in it for any particular reason going

22  into the research.

23          As I said, we used it primarily

24  because it had the survey question we were most

25  interested in.

Page 42

1          Q.      Okay.

2                  Did you impose any controls in

3    conducting your research with this data?

4          A.      I'm not sure what you mean by "controls"

5    in that specific context.

6          Q.      Okay.

7                  The -- let me draw your attention to

8    page 5 of the paper -- of the PDF.  This is page

9    2810 of the paper.  Just let me know when you're

10   there and then I'll direct your attention further.

11         A.      I'm on page 2810.

12         Q.      Great.

13                 If you look at the bottom paragraph

14   that begins, "Fourth and finally," do you see there,

15   it says, "It is possible that our measure of bias is

16   correlated with unobserved elements of preferences

17   or expectations.  Our controls do include measures

18   of time preference, risk aversion, and income

19   expectations, making it unlikely that they are

20   omitted variables driving the results.  However, we

21   lack measures of 'behavioral' biases such as time

22   inconsistency, loss aversion, or optimism."

23                 Have I read that correctly?

24         A.      Yes.

25         Q.      So there were certain controls that you

Page 43

1    were able to employ, but others that you were not;

2    is that fair to say?

3                     MR. HARRINGTON:   Objection.

4    Mischaracterizes the document.

5         A.     So the sentence describes the

6    statistical analysis that we did, and the controls,

7    as we called them, would be a set of variables

8    included in that statistical analysis, and this

9    sentence or sentences simply describe the sets of

10   variables in the data that we used as control

11   variables, and notes that there were some other

12   variables, such as time inconsistency, that we did

13   not employ in the analysis here.

14        Q.     Those variables that were not employed,

15   are they behavioral factors that you study as part

16   of your work as a behavioral economist?

17        A.     They are behavioral biases, yes.

18        Q.     What is the biases of optimism --

19   withdraw the question.

20                     What is the bias of optimism?

21        A.     People can be optimistic about a variety

22   of things, and in fairness to other work, I would

23   say other people might define "optimism bias"

24   differently than I would.

25                     But a specific example of something

Page 44

1    one might call optimism would be a belief that one's

2    income is going to be higher than -- in the future

3    than it actually would be.

4         Q.    Okay.

5                   Is that a bias that you have

6    observed with some frequency in your work?

7         A.    I --

8                   MR. HARRINGTON:  Objection.

9         A.    I'm not sure what you mean by

10   "frequency."

11                  I would say that it's a -- some -- a

12   behavioral bias that has been studied by other

13   people, and one that some of my own survey research

14   has tried to identify in certain groups of survey

15   respondents.

16        Q.    Okay.

17                  Have you, in fact, identified it as

18   a behavioral factor in consumer financial

19   decision-making?

20                  MR. HARRINGTON:  Objection.

21   Ambiguous.

22        A.    It's a little bit of a general question.

23                  What I would say is that some of my

24   other survey research has attempted to estimate the

25   extent to which different people have different

Page 45

1  levels of optimism, and without having that research

2  in front of me, I couldn't give you a detailed

3  description of every way in which we've employed

4  that variable, but part of the purpose of that

5  research project was to correlate a wide range of

6  behavioral biases with certain household financial

7  outcomes.

8       Q.    Okay.

9            Let me ask you to turn to the next

10  page; this is page 6 of the document, page 2811 of

11  the paper.

12       A.    I see it.

13       Q.    Okay.

14            And at the very top, it says, "It

15  may therefore be the case that individuals with

16  exponential growth bias have biases in other

17  dimensions as well, and that those biases drive our

18  observed relationship -- relationships between

19  payment/interest bias and financial decisions."  (As

20  read.)

21            Have I read that correctly?

22       A.    Yes.

23       Q.    So, in this sentence, is it fair to say

24  that you were open to the idea of alternative

25  possibilities for the phenomenon that you observed

Page 46

1    in your study?

2        A.    This sentence is a statistical caveat

3    that allows for the possibility that some of the

4    correlations we observe could be driven by things

5    within our data in this case, and some could be

6    driven by things that we don't measure.

7        Q.    Okay.

8              In your academic work, is it typical

9    for you to include such a statistical caveat when

10   you are describing observations in a data set?

11             MR. HARRINGTON:  Objection.  Vague.

12       A.    I wouldn't refer to it as typical.  I

13   would say that in any statistical analysis, it would

14   be our goal in our research to make the appropriate

15   statistical caveats where they would apply.

16       Q.    Okay.

17             Now, turning to the next paragraph

18   on that same page, the second sentence says, "But

19   most work in household finance continues to assume

20   that consumers correctly perceive the decline, or

21   increase, in future consumption that results from

22   borrowing, or saving, today.  Our findings suggest

23   that exponential growth bias leads consumers to get

24   these assessments wrong, and to err systematically

25   in particular directions that tilt portfolios

Page 47

1    towards short-term debt, and away from long-term

2    saving, increase borrowing and reduce saving, and

3    depress overall wealth accumulation."  (As read.)

4                    Have I read that correctly?

5    A.      Yes.

6    Q.      Okay.

7                    Has any of the work that you've done

8    since 2009 caused you to change that conclusion?

9    A.      I would say no.  I don't think I've done

10   any research that would directly contradict the

11   findings -- the statement here that our findings

12   suggest that exponential growth bias leads consumers

13   to get these assessments wrong, and in particular,

14   that some consumers get them more wrong than others.

15   Q.      Okay.

16                   Let me direct your attention to page

17   19 of the PDF, and this is page 2824 of the paper.

18   A.      I can see it.

19   Q.      Okay.  Great.

20                   So maybe in the bottom third of the

21   page, there's a paragraph that begins, "A second set

22   of alternative explanations."

23                   Are you with me?

24   A.      Yes.

25   Q.      Okay.

Page 48

1             That paragraph says, "A second set

2    of alternative explanations concerns the bias

3    maturity relationship.

4             In this case, there are plausible

5    complementary explanations for one fact; that

6    consumers correctly assess the interest rates on

7    their long-term loans.

8             One such explanation is that

9    consumers learn and remember their mortgage rates

10   because the stakes are high.

11            Another explanation is that

12   enforcement of the APR disclosure mandated by the

13   Truth in Lending Act, or TILA, is effective for

14   mortgages.

15            Indeed, our related work provides

16   evidence consistent with this hypothesis.  TILA has

17   more bite for banks than non-banks, and banks

18   dominated the mortgage market during our sample

19   period.

20            So both of these factors could

21   explain why consumers have accurate and precise

22   knowledge of interest rates on long-term loans.

23   Neither explains payment/interest bias on short-term

24   loans, however."

25            Have I read that correctly?

Page 49

1      A.      Yes.

2      Q.      So is it fair to say that your

3    alternative explanation that you explain here

4    includes the impact of a Federal regulation

5    mandating disclosures of annual percentage rates for

6    home mortgages?

7                      MR. HARRINGTON:  Objection.

8    Unintelligible.

9      A.      I'd like to hear the question again.

10     Q.      Okay.  I'll just restate it.

11                     Is it fair to say that in

12   considering why exponential growth bias affects

13   consumers less for long-term loans like mortgages,

14   you took into account the impact of Federal

15   regulation, the Truth in Lending Act, in mandating

16   disclosures to consumers on long-term loans like

17   mortgages?

18                     MR. HARRINGTON:  Objection.

19   Unintelligible.

20     A.      I'm not sure that we estimated whether

21   bias affected consumers less.  The set of data

22   points that we discuss here has to do with what we

23   call the bias maturity relationship, which is simply

24   the link between what we could call payment/interest

25   bias and the length of the loan.

Page 50

1              Again, it's been a while since I

2     wrote this paper, so I would have to go back and dig

3     into it again to recall exactly every detail here.

4              But the -- I think it's fair to say

5     that we found different bias maturity relationships

6     for mortgage loans, and that we, again, are making a

7     caveat about potential alternative explanations for

8     a pattern in our data, one of which is the Truth In

9     Lending Act, as we say here, and its potential

10    effectiveness on mortgage disclosure.

11         Q.    Let me ask you, if you will, to turn to

12    page 25 of this document.

13              And the page number is 2830.

14         A.    I see it.

15         Q.    In the text underneath the table, do you

16    see references to a variety of controls that you

17    utilized within your study?

18         A.    Yes.

19         Q.    Is it typical in your practice when

20    you're studying data to determine what controls are

21    appropriate and to apply them?

22              MR. HARRINGTON:  Objection.

23    Ambiguous.

24         A.    Again, I wouldn't make a

25    characterization about what's typical.

Page 51

1                    But, in this particular case, we

2    were estimating a statistical relationship between

3    payment/interest bias and household financial

4    outcomes and the statistical approach that we chose

5    to use in this instance involved identification of a

6    set of control variables that we thought would be

7    appropriate in this situation to include as what I

8    would call right-hand side regression variables.

9         Q.    What's the point of using controls in a

10   study?

11        A.    There could be many different points.  I

12   would say that in this particular instance, we were

13   interested in identifying correlations between

14   payment/interest bias and outcomes.

15                    And the correlations between those

16   two things could, as I said earlier, be reflective

17   of links between payment/interest bias and outcomes

18   or other things if those things are not included as

19   controls.

20                    So the control function approach is

21   an attempt to -- to identify correlations that

22   account for other things, essentially.

23        Q.    Okay.

24                    Is a purpose of controls to isolate

25   the specific topic that you're studying and trying

Page 52

1    to test?

2                    MR. HARRINGTON:  Objection.

3    Ambiguous.

4        A.    I'm not sure exactly what you mean by

5    "isolate a particular topic."

6                    Again, I think it's a statistical

7    technique that allows one to estimate correlations

8    between certain variables, allowing for variation in

9    the others.

10       Q.    Okay.

11                    Does the use of controls lead to

12   more reliable outcomes?

13                    MR. HARRINGTON:  Objection.

14   Ambiguous.

15       A.    I don't know exactly what you mean by

16   "reliable" there.

17                    I think that the control function

18   approach changes the interpretation of the

19   correlation, and, again, it changes it from one that

20   would simply reflect what I would call a raw

21   correlation between two variables to one that

22   reflects a correlation between two variables

23   allowing for -- or controlling for, as we would say,

24   the variation in the other control variables.

25                    It's two different ways of

Page 53

1  estimating the correlation, and they -- it changes

2  the interpretation of the correlation.

3       Q.      Do you use controls to test the validity

4  of your hypothesis?

5       A.      Again, the use of the control function

6  approach would change depending on the statistical

7  environment and the research question.

8               Here, we were -- again, we were

9  linking payment/interest bias to outcomes, and the

10 question is -- that we wanted to ask was:  What is

11 the link between those two things, accounting for as

12 many other household characteristics as we could

13 usefully measure and include in the model?

14              And the list of control functions

15 there -- or control variables, excuse me, is the set

16 of those household characteristics that we wanted to

17 account for.

18              That does change the statistical

19 model and how somebody might interpret it.

20      Q.      Just looking in this first paragraph, do

21 you see some of the data that you actually had

22 available here in these surveys included the number

23 of members in the household, gender, education,

24 race, age, marital status, health status, years with

25 current employer, industry, and occupation?

Page 54

1      A.      Yes.

2      Q.      Does it also include data about whether

3   a household had been denied credit or discouraged

4   from applying in the past few years and whether the

5   household has a credit card?

6      A.      Yes.

7      Q.      Okay.

8              Did you use those data?

9      A.      Again, I'd have to look at the paper in

10  detail to see exactly when and where and how we

11  might have used those data.

12              They may appear in some tables, but

13  not others, or in some of the empirical models, but

14  not others.

15              It's been a while, as I said, since

16  I've looked at this, and this may simply be a list

17  of all the controls we had at our disposal, and

18  there may be certain models that included some of

19  them, but not others.

20              It's -- it could depend, depending

21  on which of the analyses we're talking about here.

22     Q.      Let me help you out here.

23              Why don't you take a look at page

24  28, which is a table.  This is page 28 of the

25  document, and 2833 of the paper.

Page 55

1              The table continues onto the next

2   page, 2834.

3              Do you see it?

4        A.    Yes.

5        Q.    Do you see some of the demographic

6   information listed there on the left side as an LHS

7   variable?

8        A.    Just to be clear, I believe that the LHS

9   variable would be the column headers there --

10       Q.    Okay.

11       A.    -- as would the mean of the LHS.

12             And the variables listed below,

13  which may be the ones to which you refer, would be

14  the RHS in that nomenclature, or right-hand side

15  variables.

16       Q.    Okay.

17             But just to be clear, there is

18  consideration in this table, or I should even say

19  analysis -- withdraw the question.

20             In this table on page 2833, there's

21  analysis of various demographic features of the

22  respondents; is that fair?

23       A.    They're included as controls in these

24  models.

25       Q.    Okay.

Page 56

 1                     When you use controls in this case,

 2     in this particular paper, were you trying to reach a

 3     kind of "all other things being equal result or

 4     analysis"?

 5                     Is that how you use the control?

 6                     MR. HARRINGTON:  Objection.

 7     Ambiguous.

 8         A.     There were many purposes for using the

 9     controls in this situation.

10                     Again, I think the best way I can

11     put it is that we were tempting to estimate links

12     between bias, which would be the variables listed at

13     the top of the table there:  Bias quintile 2 through

14     5, or bias unknown, and the LHS variables, the

15     left-hand side variables, in those columns.

16                     The control variables are ones, in

17     this context, that are things that also could be

18     correlated with the left-hand side variables, and so

19     I suppose, loosely speaking, one could view this as

20     getting to -- closer to all things equal in the

21     statistical model than leaving out those controls

22     would be.  It's not perfect by any means.

23         Q.     Okay.

24                     Was the point of this table to

25     demonstrate that exponential bias affects consumers

Page 57

1  across a wide variety of demographic features?

2      A.    I wouldn't put it quite that way.  I

3  think I would say the point was to estimate links

4  between bias and a variety of outcomes controlling

5  for those demographic characteristics.

6      Q.    Did you conclude that exponential both

7  bias affects consumers across these various

8  demographic features?

9      A.    So again, I think the point really

10  wasn't to assess whether it affected things across

11  demographic characteristic categories, it was really

12  to allow for or control for differences in

13  demographics.

14              We in -- we did include the -- and

15  it's been -- again, it's been a while, as I look at

16  this, we did include consumers from many different

17  characteristics in the analysis and estimated links

18  between bias and outcomes for all of those

19  consumers, controlling for their demographics.

20              I think that's the best way I could

21  describe it.

22      Q.    Did you conclude that low-income

23  households are more likely to show exponential

24  growth bias with respect to short-term loan

25  products?

Page 58

1        A.      I'd have to go back and look to see

2    whether we estimated that.  I'm paging back to

3    Table 4.

4        Q.      Could you give us the page?

5        A.      And -- I'm sorry.  That's on page 24 of

6    the PDF, and page 2829 of the document.

7        Q.      Right.

8        A.      And if I recall your question correctly,

9    it was about links between demographics and

10   payment/interest bias, and this table documents some

11   of those correlations.

12       Q.      So my question specifically was whether

13   you concluded that low-income households are more

14   likely to demonstrate exponential growth bias by

15   taking on short-term debt and not realizing the

16   actual cost of interest.

17       A.      So, in this table, we didn't ask whether

18   households were actually taking on debt because of

19   bias.  What we did was we correlated bias as we

20   measured it by the hypothetical question, the loan

21   question that I described, with income.

22                    And so what we would find -- if you

23   look at the top four rows of the table there, is

24   that -- and again, I'm -- I'm interpreting something

25   I haven't looked at in a while here, but relative to

Page 59

1    bias income quintile 1, the table would document

2    differences in the degree of bias as you proceed

3    down through quintiles 2, 3, 4, and 5.  And in that

4    instance, it doesn't look to me like there are

5    statistically significant differences between the

6    income quintile 1 and 2, or 1 and 4.

7                    I mean, we could go into the

8    details, but that's what that table says.

9         Q.    Okay.

10                    Are you familiar with the sunk cost

11   fallacy?

12        A.    I've heard the term, yes.

13        Q.    What does it mean?

14        A.    Again, I don't know if there's one

15   agreed-upon definition, but the fallacy could refer

16   to a situation in which a consumer does not ignore

17   what economists would call sunk costs.

18        Q.    Okay.

19                    Is it fair to say that sunk cost

20   fallacy -- an example of sunk cost fallacy is, for

21   example, if a person has paid for some subscription

22   service for some number of years, they continue to

23   pay it because they don't want to lose the money

24   they have already invested?

25                    MR. HARRINGTON:  Objection.

Page 60

1    Unintelligible.

2        A.      I haven't seen any evidence studying

3    that particular question.

4        Q.      Okay.

5                Is -- okay.

6                What is an example of sunk cost

7    fallacy that you can give?

8        A.      As I sit here today, off the top of my

9    head, again, I can give you a general definition,

10   not sure I could come up with a universally

11   applicable example right now.

12       Q.      Is it a behavioral factor that you've

13   studied?

14       A.      I'm trying to remember the sets of

15   behavioral biases that we've surveyed consumers

16   about in my research papers, and I actually don't

17   recall specifically having written on the topic.

18       Q.      Okay.

19                Is it something that others in your

20   field have written on?

21       A.      It's possible.  Again, I've heard the

22   term, and have a general understanding of what it

23   could mean, but I wouldn't claim to know every

24   detail of what's been written about it in the past.

25       Q.      Are you familiar with Richard Thaler?

1      A.      I've heard his name, yes.

2      Q.      He is a Nobel Prize winner in economics;

3  is that right?

4      A.      I believe so, yes.

5      Q.      And a developer of the behavioral

6  economics field; is that fair to say?

7      A.      I think that's fair.  I think he

8  received his Nobel for work that would fall into the

9  category of behavioral economics.

10      Q.      Are you familiar with his explanation of

11  sunk cost fallacy?

12              MR. HARRINGTON:  Objection.

13  Ambiguous.

14      A.      I can't recall it off the top of my

15  head, if that's the question.

16      Q.      Okay.

17              Do you have a definition of "fair

18  market value"?

19      A.      I don't know that I would be able to

20  give you a universal definition that would apply to

21  that particular term.  I've heard it before, of

22  course.

23      Q.      Is it the price at which a willing buyer

24  will pay and a willing seller will sell something,

25  where the parties are at arm's length?

Page 62

1            MR. HARRINGTON:  Objection.  Asked
2    and answered.
3        A.    That could be one definition.  I
4    haven't -- don't have any source for that in front
5    of me, but it could be one definition.
6        Q.    Do you -- is there anything I've omitted
7    from that definition that you think should be
8    included in a definition of "fair market value"?
9            MR. HARRINGTON:  Objection.  Asked
10   and answered.
11       A.    Again, I'm not sure.  I've heard the
12   word used in different contexts, and it could have
13   different meaning in those different contexts, and
14   so I'm not sure there's a universal, single
15   definition.
16            Just to give an example, I recall
17   having encountered the term in preparing my income
18   taxes, and I don't recall having read that
19   definition of "fair market value" in doing my income
20   taxes.
21       Q.    Okay.
22            MS. HILMER:  Why don't we stop at
23   this point, and take a break.  I think 10 minutes is
24   enough.  Is -- does that work for you, Dr. Stango,
25   and you, Bill?

Page 63

1                    MR. HARRINGTON:  Yeah.  I'm good,

2    whatever, sure.

3                    MS. HILMER:  Okay.

4                    MR. HARRINGTON:  Or we can -- why

5    don't we go off.

6                    THE WITNESS:  Yeah.

7                    THE VIDEOGRAPHER:  So we're going

8    off record.  The time is 9:55.

9    (RECESS, 9:55 a.m. - 10:06 a.m.)

10                    THE VIDEOGRAPHER:  Back on record.

11   The time is 10:06.

12   BY MS. HILMER:

13        Q.    Okay.

14                    Dr. Stango, have you ever worked for

15   one of the credit reporting agencies?

16        A.    I've done some expert work for two of

17   them, I believe.

18        Q.    Which ones?

19        A.    TransUnion and Equifax.

20        Q.    Okay.

21                    The third one is Experian; right?

22        A.    Yes.

23        Q.    Have you ever had any involvement in

24   developing any of those companies' credit scoring

25   algorithms?

Page 64

1      A.      I haven't been employed in that

2  capacity, no.

3      Q.      What about FICO; have you ever been

4  involved in developing scoring algorithms for FICO?

5      A.      No, I haven't worked for FICO.

6      Q.      All right.

7              Do you know how many scoring

8  algorithms exist?

9      A.      No.  I understand that there are many,

10  but I don't know the specific number.

11      Q.      Do you understand that some scoring

12  models are proprietary?

13      A.      Yes.  I believe that that's the case.

14      Q.      Have you ever studied whether a consumer

15  score under one company's model may be materially

16  different from a score under another model?

17      A.      I'm taking some time to answer the

18  question here because I'm trying to recall the

19  credit file and credit score data that I've used in

20  my own research.

21              Some of my research has employed

22  credit score data.  I don't know that any of it

23  explicitly examines differences in scores or

24  different algorithms that would apply to the same

25  consumer, specifically.

1      Q.     Would you need to have consumer-level

2   data in order to conduct such a study?

3      A.     I suppose it would depend on what the

4   purpose of the study is, and what the question was.

5   If the question is whether scores could differ, that

6   might involve using higher level data.

7             But if one wanted to conduct

8   consumer-level analysis of differences in scores,

9   and, for example, links between them and other

10  things, then it's possible consumer-level data might

11  be more useful.

12     Q.     Okay.

13            Have you ever had access to

14  consumer-level data possessed by the credit

15  reporting agencies?

16     A.     I may have had access to some of that

17  data as part of some of my expert work, although I

18  can't recall the details as I sit here.  And in some

19  of my own research, I and my co-author employed --

20  pardon me.  We employed anonymized, but

21  individual-level credit file data that included

22  credit scores.

23     Q.     Okay.

24            Did the consumers consent to that?

25     A.     Yes.

Page 66

1       Q.      Okay.

2               Would you need to have consumer

3    consent in order to access consumer-level data that

4    the credit reporting agencies have?

5       A.      I'm not sure for what purpose you're

6    talking about, but as a researcher, yes, one might

7    need to obtain consent before obtaining

8    consumer-level credit file data, and in some of my

9    own work, I've written questions asking for --

10   consumers for such consent.

11      Q.      Okay.

12              Just to close the loop on this --

13   this area, is it correct to say that you have not

14   studied specifically whether different scoring

15   models could yield substantially different scoring

16   outcomes for the same consumer?

17      A.      So if you're talking about my individual

18   research, the answer would be no.

19      Q.      Okay.

20              Have you reviewed studies that did

21   that?

22      A.      As part of the work I did in preparing

23   for this case and some others, I've reviewed studies

24   of the credit scoring industry.

25              And although it wasn't the focus of

1  my report in this case, I believe that some of them

2  discuss possible differences in credit scores across

3  the three main CRAs that could arise for the same

4  consumer.

5       Q.    Okay.

6             Did you do any inquiry to determine

7  why those differences might happen?

8       A.    In the context of writing my report for

9  this case?  No.

10      Q.    Otherwise?

11      A.    I can't recall having done that.

12      Q.    Have you utilized any -- I'll withdraw

13  the question.

14            In connection with your report in

15  this case, have you utilized any of the work or

16  conclusions done by John DelPonti Jr.?

17      A.    No.

18      Q.    In your work on this case, have you used

19  any of the work done or the report submitted by John

20  Ulzheimer?

21      A.    I don't believe I've seen that report,

22  no.

23      Q.    Other than Cornerstone and the resources

24  cited in your report, have you obtained any

25  information from anyone else that you utilized in

Page 68

1    rendering your opinions in this case?

2        A.      I'd like to hear the question again,

3    please.

4                    MS. HILMER:  Please read it back.

5    (The record was read back by the Court Reporter.)

6        A.      I had a Zoom call with -- and -- excuse

7    me, someone involved with the production of data in

8    the case.  His name was Tony Lam, I believe.

9        Q.      Okay.

10                   What was the nature of that

11   conversation?

12       A.      It was a call to familiarize me with the

13   data that formed the basis for my analyses in the

14   report.

15       Q.      Okay.

16                   Have you seen Mr. Lam's declaration

17   concerning the data?

18       A.      I'd have to double-check my records to

19   see whether it was something that I reviewed and/or

20   relied on.

21       Q.      Okay.

22                   We may get to that later.

23                   Actually, why don't we just bring it

24   up.

25                   I'll ask my colleague to bring up

Transcript pp. 69-261

REDACTED

Page 262

1                              ERRATA SHEET

2

3

4       PAGE/LINE              CHANGE           REASON FOR CHANGE

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22

23

24      _____           _____

25      SIGNATURE OF WITNESS                 DATE

Page 263

1                     CERTIFICATE OF REPORTER

2

3          I, Marjorie Peters, RMR, CRR, Notary Public,

4     the Court Reporter before whom the foregoing

5     examination was taken, do hereby certify that the

6     foregoing transcript is a true and correct record of

7     the proceedings; that said proceedings were taken by

8     me stenographically and thereafter reduced to

9     typewriting under my supervision; and that I am

10    neither counsel for, related to, nor employed by any

11    of the parties to this case and have no interest,

12    financial or otherwise, in its outcome.

13

14    IN WITNESS WHEREOF, I have hereunto set my hand and

15    affixed my notarial seal this 16 day of December,

16    2021.

17

18    My commission expires October 31, 2024.

19

20

21

22    _____

23    NOTARY PUBLIC IN AND FOR

24    THE DISTRICT OF COLUMBIA

25