1        IN THE UNITED STATES DISTRICT COURT

2        DISTRICT OF UTAH, CENTRAL DIVISION

3

   BUREAU OF CONSUMER FINANCIAL        )
4  PROTECTION,                         )
                                       )
5            Plaintiff,                )
                                       )
6  vs.                                 )        Case No.
                                       )     2:19-CV-298-BSJ
7  PROGREXION MARKETING, INC.; PGX     )
   HOLDINGS, INC.; PROGREXION TELE-    )
8  SERVICES, INC.; EFOLKS, LLC; CREDIT-)
   REPAIR.COM,INC.; and JOHN C. HEATH, )
9  ATTORNEY AT LAW, PC, D/B/A HEATH     )
   P.C.,                               )
10                                      )
             Defendants.               )
11 _____)

12

13        BEFORE THE HONORABLE BRUCE S. JENKINS
          ------------------------------------

14             June 29, 2022

15        Final Pretrial Conference

16        Transcript of Proceedings

17

18

19

20

21

22

23

24 REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25 351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                         A P P E A R A N C E S

 2

 3   For Plaintiff:         Maureen E. McOwen
                            Jonathan H. Reischl
 4                          Alicia Ferrara
                            John McConkie
 5                          Tracy L. Hilmer
                            BUREAU OF CONSUMER FINANCIAL PROTECTION
 6                          1700 G Street NW
                            Washington, DC  20552
 7

 8   For Defendant:         Edward John Bennett
                            Edward C. Barnidge
 9                          Paul A. Hoversten
                            Shauna M. Kramer
10                          Loryn Helfmann
                            Atticus DeProspo
11                          WILLIAMS & CONNOLLY LLP
                            680 Maine Avenue SW
12                          Washington, DC  20024

13                          Karra J. Porter
                            CHRISTENSEN & JENSEN
14                          257 East 200 South, #1100
                            Salt Lake City, Utah  84111
15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SALT LAKE CITY, UTAH; WEDNESDAY, JUNE 29, 2022; 10:00 A.M.
 2                             PROCEEDINGS
 3               THE COURT:  Good morning.  Welcome.  Glad you're
 4    here.  This is in the matter of the Bureau of Consumer
 5    Financial Protection vs. Progrexion and others, 19-CV-298,
 6    here today for pretrial and related motions.
 7               I will indicate to begin with, we'll deal with
 8    motions after we've gotten an agreed pretrial order, just to
 9    alert you as to process.
10               You have submitted to me a suggested form of
11    pretrial order, but before we get to that, let me have you
12    identify, for the record, those of you who are making
13    appearances, tell us who you are and whom you represent.
14    And then I'd like each side to designate the person who is
15    going to handle pretrial.
16               MS. McOWEN:  Good morning, Your Honor.  Maureen
17    McOwen appearing for the Bureau of Consumer Financial
18    Protection.  I will be handling the pretrial order.  I have
19    colleagues who also will make an appearance.
20               THE COURT:  Okay.
21               MR. REISCHL:  Good morning, Your Honor.  Jonathan
22    Reischl on behalf of the Bureau of Consumer Financial
23    Protection.
24               MS. HILMER:  Good morning, Your Honor.  I'm Tracy
25    Hilmer on behalf of the Bureau.
```

```
 1              MR. McCONKIE:  Good morning.  Taylor McConkie,
 2    also on behalf of the Bureau.
 3              MS. FERRARA:  Good morning, Your Honor.  Alicia
 4    Ferrara, also on behalf of the Bureau.
 5              THE COURT:  Is that everybody?
 6              Who is going to be the spokesman?
 7              MS. McOWEN:  I will, Your Honor.  Thank you.
 8              MR. BENNETT:  Your Honor, good morning.  Ted
 9    Bennett, from Williams & Connolly, on behalf of the
10    defendants.  With me are my colleagues, Shauna Kramer, who
11    will be handling the pretrial order.  And because the
12    government has more than 700 exhibits on their list and has
13    listed nearly 50 witnesses, we divided it up, if that's okay
14    with Your Honor, to have some of our colleagues handle
15    specific parts of the government's witness list and the
16    government's exhibit list.
17              THE COURT:  Well, we'll get to that eventually.
18              MR. BENNETT:  I'll introduce those folks.
19              Paul Hoversten, Ed Barnidge, Loryn Helfmann,
20    Atticus DeProspo, all of Williams & Connolly.  We have with
21    us a summer clerk -- she will not be appearing today --
22    Sarah Chanski, from Northwestern.  And also our co-counsel,
23    Karra Porter.
24              THE COURT:  Tell me your name again.
25              MR. BENNETT:  Ted Bennett.  It appears as Edward
```

1   Bennett on the docket, but only my mother calls me that.

2            THE COURT:  Okay.

3            MR. BENNETT:  Thank you, Your Honor.

4            THE COURT:  And you're the principal spokesman?

5            MR. BENNETT:  I will not be the principal

6   spokesman today, Your Honor.  Ms. Kramer will be doing most

7   of the talking this morning.

8            THE COURT:  Over all of it.  Is that Shauna

9   Kramer?

10           MR. BENNETT:  Yes, Your Honor.

11           THE COURT:  Okay.  Some of these are new names

12   from the prior activity that we've had in this particular

13   case.  I hope you're all well acquainted with what's gone

14   before.

15           MR. BENNETT:  Yes, Your Honor.

16           THE COURT:  Okay.

17           I'm well acquainted of the fact that I have under

18   advisement what is essentially the argument in reference on

19   Count 1, but I'm interested in proceeding on Count 1 in

20   reference to the complaint filed by the United States.

21   Hopefully we can simplify, identify those issues that are

22   genuinely concerning parties that require decision, let's

23   put it that way.  Hopefully we can take your fairly extended

24   argument that involves pretrial issues down to a more simple

25   identification of the issues actually that are involved.

1                I think it would be helpful if the United States

2        spent a few minutes this morning talking about Count 1 in

3        your complaint, which is primarily the regulation problem

4        that we've had for a time, and all the asking, on occasion,

5        factual matters.  I'm interested as part of that examination

6        as to the propriety of Count 1 and the reg, that you give to

7        me the issues that you see exist in reference to that, from

8        your point of view.

9                And the impression I got from the defendants is

10       that they suggest that the regulation is simply inapplicable

11       to them.  So educate me as to your view as to what these

12       folks do and why we ought to be concerned with it.

13               MS. McOWEN:  Thank you, Your Honor.

14               I'm happy to start with Count 1.  The Bureau's

15       view is that there is no issue to be tried on Count 1, that

16       the dispute between the parties is essentially a dispute

17       about the meaning and application of the regulation and the

18       text of the regulation.  We have briefed this, and I'm happy

19       to walk through it.

20               The government's position is that 16 C.F.R.

21       Section 310.4(a)(2), we've talked about quite a lot, is a

22       billing restriction that applies to telemarketed credit

23       repair services.  We believe there is no dispute of fact as

24       to whether the defendants telemarket.  There is no dispute

25       of fact as to whether defendants' line of business is

1    offering credit repair services to the public.

2              THE COURT:  Now you're talking here about all of

3    the defendants?

4              MS. McOWEN:  That's correct, Your Honor.  So there

5    are six named defendants.  One is the law firm of John C.

6    Heath, attorney at law, PC, which also does business as

7    Lexington Law, which licenses the trade name Lexington Law

8    from Progrexion.  And then the other five defendants are

9    Progrexion companies that are essentially within the

10   Progrexion family -- corporate family.  And we have a

11   stipulation in this case that those five companies will be

12   treated essentially as one for purposes of evidence, for

13   purposes of the claims, defenses, and any judgment.  They

14   operate essentially as departments of one company as opposed

15   to as fully separate entities.  And that's a stipulation

16   just for purposes of this matter, Your Honor.

17             So our position is that both the law firm and

18   Progrexion are in the business of offering telemarketed

19   credit repair services.  The credit repair is offered under

20   two brand names, CreditRepair.com and Lexington Law.  They

21   are often marketed as competitors in the credit repair

22   market, but they are essentially sister companies.  They are

23   brands owned by the same company.

24             And the telemarketing is done by one of the

25   Progrexion defendants named Progrexion Teleservices, which

1    is primarily involved in making and receiving telemarketing

2    and telesales calls, and that is an agent of the law firm,

3    Heath PC.  And there's no dispute about that, Your Honor,

4    that the law firm, Lexington Law, has represented to this

5    Court that when Progrexion Teleservices is making phone

6    calls to either potential or actual Lexington Law clients or

7    receiving phone calls from potential or actual Lexington Law

8    customers, that Progrexion Teleservices is acting as Heath's

9    agent.

10            The other entity that is primarily involved in the

11   telemarketing aspect is CreditRepair.com, which has, again,

12   call centers with sales staff staffing the phones, making

13   both outbound and inbound calls to market and sell

14   CreditRepair.com services.

15            There is another entity within the five Progrexion

16   defendants called eFolks, which is another sort of marketing

17   department, if you will, that did something a little

18   different, which is that they would take leads, which is

19   lists of consumer names and telephone numbers, contact

20   information, and eFolks, as we understand it, would make

21   outbound calls to those people to advertise primarily the

22   credit repair services of Lexington Law and

23   CreditRepair.com.  So they play a role in that telemarketing

24   as well.

25            In terms of the overarching structure, the

1   services are primarily performed, if you will, by

2   Progrexion.  Progrexion owns and operates the software

3   systems that are these sort of automated core of the credit

4   repair service that they are offering.  Progrexion also

5   handles all of the marketing for both CreditRepair.com and

6   Lexington Law.  Progrexion also handles the payment

7   processing, for example, for both CreditRepair.com and

8   Lexington Law.

9           But we do assert that both Progrexion and Heath PC

10  are in violation of the telemarketing sales rule, billing

11  provision, the provision I mentioned earlier,

12  Section 310.4(a)(2).  Both companies are, as I said,

13  indisputably involved in offering telemarketing credit

14  repair services as to both companies and both brands.

15  There's no dispute as to how they bill their customers.

16  They do not wait the prescribed period under the rule.  And

17  that is the crux of the government's argument.

18          The defendants, as you said in your introduction,

19  Your Honor, the defendants take the view that this rule does

20  not apply to them.  But it really is not based on a question

21  of fact that would be appropriate to send to a jury to

22  decide that.  Their defenses are legal in nature.  We

23  dispute them strongly.  We see no exceptions in the

24  regulation where the defendants have read them in.  And as I

25  said, I think we have thoroughly briefed this sort of legal

1    issue that is at the crux of the parties' dispute as to

2    Count 1, and we genuinely believe that there is no material

3    dispute of fact as to Count 1.

4              I will say with one caveat, and that is if the

5    Court rejects the government's interpretation of the

6    regulation, which, as I said, from our perspective, it's

7    very straightforward.  It is a billing restriction that is

8    applicable to telemarketed credit repair services that

9    requires that the company comply with the two subparts of

10   the regulation before receiving payment from their

11   customers.

12             If that's the interpretation, if the Court adopts

13   the government's interpretation of the regulation, then

14   there really is -- there's nothing to be tried.

15             If the Court -- so defendants press a different

16   reading of the regulation to be generous.  The defendants'

17   position, as I understand it, is that the part of the

18   payment, the restriction on when payments can be requested

19   or received, which is found in both Romanettes (i)and (ii)

20   to the regulation, their position is that if the defendants

21   were not guaranteeing specific credit repair results, then

22   they are not covered by the regulation.

23             We strenuously disagree with that view.  But we

24   concede that if the Court were to read that rule that way,

25   and we think it would require a departure from the plain

1    text of the regulation and the entire regulatory history and

2    enforcement history of the regulation, but were the Court to

3    adopt defendants' view, then there would be a dispute as to

4    what credit repair results were promised to consumers by

5    these defendants.

6           Now as I said, we don't believe you need to reach

7    that issue, we don't believe it's presented, and we don't

8    believe it would be properly presented to a jury.  But if it

9    is deemed to be an element that the government must prove in

10   order to bring this claim, Count 1, then we will need to put

11   forward evidence as to the credit repair promises that were

12   being made by the defendants.  And of course the defendants

13   will need, in that situation, to put forward their own

14   evidence, they say, establishing that they made no such

15   guarantees.

16          THE COURT:  Why don't you give me a brief

17   exposition of how you understand the whole process works and

18   who the players are at each intermediate step.

19          MS. McOWEN:  Are you interested, Your Honor, in

20   the Hotswap facts or in the more generic credit repair facts

21   applicable to Count 1?

22          THE COURT:  I understand the affiliate argument,

23   but I'm interested in the specifics, who gets on the

24   telephone, who are we talking to?  When we purportedly talk

25   to the lawyer office, what person are we talking to?  What

1   category of person are we talking to?

2              MS. McOWEN:  I'm happy to walk through that.

3         So I will take, for example, to walk through the

4   customer experience of someone who is coming through one of

5   the relevant Hotswap partners.

6         So this person might see an advertisement online

7   for an apartment or a house for that's being offered as a

8   rent-to-own house.  It might have a specific price, number

9   of bedrooms, other features advertised.

10             THE COURT:  Are we only talking about the Hotswap

11  people?

12             MS. McOWEN:  Well, this would just be -- I will

13  explain sort of how the consumer comes in through that

14  channel since it is relevant --

15             THE COURT:  That particular methodology, okay.

16             MS. McOWEN:  I'm happy to talk about a different

17  scenario as well.  But for this person, they pick up the

18  phone.  They make a call to the phone number advertised in

19  the post.  They then reach someone employed by the Hotswap

20  partner, which is a separate company.  Let's take, for

21  example, Easy Home Ownership.

22             They're on the phone with a telemarketing agent of

23  Easy Home Ownership, who proceeds to -- the way they

24  describe it is warms them up, warm up the consumer by

25  talking to them about a rent-to-own house, a rent-to-own

1   program, about a program for becoming a home owner, getting

2   mortgage credit, et cetera.  And they tell the consumer, in

3   the typical case, that the only thing holding them back from

4   obtaining that desired credit product or home is that their

5   credit score is too low.

6          And so as a first step and as a necessary step,

7   they had to be transferred, on the telephone, to another

8   agent.  At that moment -- and I would be happy to play a

9   call recording for Your Honor to show this -- at that

10  moment, the consumer, who is still on the phone, is live

11  transferred to a telemarketer, who is typically employed by

12  either CreditRepair.com or Progrexion Teleservices.

13         So if it's a Lexington Law Hotswap, then the phone

14  will be transferred to a Progrexion Teleservices agent who

15  will introduce themselves as an agent of Lexington Law.

16         THE COURT:  Now who's talking here?  Progrexion?

17         MS. McOWEN:  This is a person employed by

18  Progrexion Teleservices, yes.  And the person's title, at

19  least as of the last several years, that person's title

20  would typically be the credit consultant, or that's how they

21  would represent themselves to the consumer.  They would not

22  say paralegal.  At a certain point that was phased out.

23         THE COURT:  Now you suggest they are employees of

24  Progrexion?

25         MS. McOWEN:  Yes, Your Honor.

1          THE COURT:  And are paid by Progrexion?

2          MS. McOWEN:  That's correct.

3          THE COURT:  And are not employees of the law firm?

4          MS. McOWEN:  That is correct, Your Honor.  But

5    they are agents of the law firm because they are --

6          THE COURT:  That's a different question.  But

7    they're hired by Progrexion?

8          MS. McOWEN:  That is our understanding, yes,

9    Your Honor.  That individual would be getting a paycheck

10   from Progrexion Teleservices.  Their boss will be someone

11   from Progrexion Teleservices.  They will introduce

12   themselves on the telephone to the consumer as this is

13   Maureen from Lexington Law or, you know, whatever their name

14   is.

15         THE COURT:  They have a conversation with the

16   prospective client?

17         MS. McOWEN:  Correct.  And the goal of that

18   conversation is to enroll the prospective customer into the

19   subscription credit repair services that are offered by

20   Lexington Law.

21         THE COURT:  Okay.  Now the nature of that

22   conversation as such, does it result in a written document,

23   a contract with that person?

24         MS. McOWEN:  Yes.  In the typical case that we've

25   heard on -- it's both scripted, Your Honor, and so it's

1    visible in the scripts that we have reviewed and presented,

2    and it's also audible in the call recordings that we have.

3           What will happen is that once the consumer -- if

4    the consumer agrees to sign up for credit repair services

5    with Lexington Law, then the agent on the telephone will

6    send the consumer a text message, typically.  The agent on

7    the telephone will read through a certain -- I guess the

8    primary points of the engagement agreement, certain

9    disclaimers.  There's text that they will read through in

10   the script, and then ask the consumer to text the word agree

11   in response to the text message they have received.  That

12   seems to be the most common way that this is done.

13          It can also be done verbally where the

14   teleservices agent will read a more extensive portion of the

15   agreement and get verbal agreement rather than text message

16   agreement from the consumer.

17          THE COURT:  Is there a conversation about payment?

18          MS. McOWEN:  There's a conversation about payment

19   at that time, Your Honor.  The payment that is requested

20   immediately is ostensibly a payment for obtaining the

21   consumer's TransUnion credit report.  And there's a very

22   substantial markup on that credit report, but typically the

23   consumer is charged either 12.99 or 14.99 at that time.

24          THE COURT:  At that time, and they get a credit

25   report at that time?

1          MS. McOWEN:  They do not, Your Honor.  The credit

2     report gets received into the Lexington Law or

3     CreditRepair.com system and the consumer does not get a copy

4     of it.  They get access because they're signing up.  This is

5     inextricably linked to the sign-up for credit repair

6     services.  So that credit report becomes part of their

7     credit repair file, if you will.

8          THE COURT:  Is that done during that conversation?

9          MS. McOWEN:  Yes, Your Honor.  That is done during

10    that conversation.  And then the Progrexion teleservices

11    agent will typically then walk through the consumer's credit

12    report focusing on what we would call negative trade lines

13    or derogatory marks on the consumer's credit report.

14         THE COURT:  How is that paid for?

15         MS. McOWEN:  I'm sorry, Your Honor?

16         THE COURT:  There's a charge for the credit

17    report.  Is that a charge of Progrexion or is that a charge

18    of the one of the three credit reporting agencies?

19         MS. McOWEN:  That is a charge that Progrexion

20    charges.  They charge that -- they charge that charge

21    separately.  It is not billed through the law firm.  It is

22    billed directly through one of the Progrexion entities -- a

23    Progrexion subsidiary.  The exact subsidiary I think has

24    changed over time, but I don't believe it's material.

25         THE COURT:  Do they acquire the report?

1          MS. McOWEN:  That's correct.

2          THE COURT:  Is there a markup on the report?

3          MS. McOWEN:  There is a price markup, yes.

4          THE COURT:  About how much is that?

5          MS. McOWEN:  We've calculated it to be, I think,

6    over five times, and I can get you the --

7          THE COURT:  I don't understand that.

8          MS. McOWEN:  Sure.

9          THE COURT:  You charge the client?

10         MS. McOWEN:  Well, from the information we have,

11   which is to say the contracts between the defendants and

12   TransUnion, which is providing the credit report, it depends

13   on the volume.  And there are some other sort of small

14   add-ons, but essentially the credit report costs a couple of

15   dollars.

16         THE COURT:  To Progrexion?

17         MS. McOWEN:  Correct.

18         THE COURT:  Now is it paid for by a credit card?

19         MS. McOWEN:  Usually -- in the vast majority of

20   cases it is made by either a credit card or a debit card.

21   Then it can sometimes be paid by what's called an ACH

22   transfer directly from someone's bank account.  So the

23   consumer could provide their bank account number and routing

24   number and have it charged without going through a card, but

25   it is an electronic transaction.  And Progrexion --

1          THE COURT:  Ordinarily it's a card?

2          MS. McOWEN:  I would say ordinarily -- more often

3     than not it is a card.

4          THE COURT:  Okay.  And then there's a conversation

5     about the credit report and people go through the credit

6     report?

7          MS. McOWEN:  That's correct.  Again, we're talking

8     about the typical call.  Once the consumer has signed up,

9     agreed, paid for the TransUnion report, then the Progrexion

10    Teleservices agent would walk through the negative items on

11    that person's credit report.  And the Progrexion

12    Teleservices agent is expressly not allowed to provide

13    advice, including they are expressly not allowed to provide

14    legal advice to the consumer.  They merely set out the

15    options for how to challenge the items on the consumer's

16    credit report.

17         THE COURT:  But you have items that are

18    identified --

19         MS. McOWEN:  That's correct.

20         THE COURT:  -- in that conversation?

21         MS. McOWEN:  Correct.

22         THE COURT:  Okay.  And then what is suggested, if

23    anything?

24         MS. McOWEN:  Well, our understanding is that the

25    Progrexion Teleservices agent is not supposed to suggest

1    anything to the consumer.  They merely --

2              THE COURT:  Well, they are helping identify

3    something that people contest.

4              MS. McOWEN:  They are marking down the reasons the

5    consumer gives them to contest or sometimes suggesting

6    reasons or ways the consumer should contest.

7              THE COURT:  Then what happens?

8              MS. McOWEN:  Our understanding is then that gets

9    marked in the consumer's electronic record.  And the

10   consumer -- essentially that is the end of the call.  So

11   once all the negative items have been talked through, which

12   usually takes a couple of minutes, then --

13             THE COURT:  Who does what?

14             MS. McOWEN:  You mean what happens next with the

15   service?

16             Well, I will say the actual nuts and bolts of the

17   service are somewhat beyond the scope of this case.  And so

18   I can tell you generally what we understand to happen, which

19   is that there is a computer run algorithm that will, based

20   on the coding that's been done during that initial call --

21   so, for example, if I have a derogatory item on my credit

22   report saying that I had a late payment on a credit card a

23   couple of years ago, then I might be given the option to

24   challenge that saying it was not mine, as in it was not my

25   card, it should not be on my credit report, that it was

1    never late, that I never paid that late, that's a mistake.

2          The vast majority of these challenges that

3    Lexington Law and CreditRepair.com do are what they call

4    item verify, which is a much more general request that the

5    credit reporting company or the furnisher verify the item.

6          So let's say I choose item verify for my credit

7    card late payment.  Then that goes into the system.  It's

8    checked, as you know, item verify on that item.

9          What we understand, to the best of our

10   understanding, the algorithm then would determine whether

11   and when -- if so when, to send a challenge to either the

12   credit reporting agency or the credit card company that has

13   reported that trade line, or to both, and that that would

14   then be electronically sent out.  It's automated.

15         So what's been described to us is that once it is

16   tagged or coded by that telemarketer, that the system sort

17   of runs itself.

18         THE COURT:  Okay.  After identifying the disputed

19   items, and we've agreed that I'm going to pay something in

20   the future, does my contract require my payment of a

21   particular level of service?

22         MS. McOWEN:  Your contract will set out the

23   various levels of service.  I don't believe the contract

24   specifies which one the customer has.  The contract will

25   have their name affixed to it as a sort of an electronic

1    signature based on them having texted back or verbally

2    agreed.  It's not countersigned by anyone from the law firm.

3    And I don't believe it specifies the service level, as they

4    say.

5              But what will happen in terms of the billing,

6    which is highly relevant to Count 1, is what they call the

7    first work fee, which is typically about $100, is charged

8    five to 15 days after that initial call, that sign-up call,

9    and then the monthly charge will be withdrawn from the

10   consumer's account on a monthly basis thereafter until the

11   consumer --

12             THE COURT:  Are these physically billed or are

13   they in some fashion determined by the contract?

14             MS. McOWEN:  They are determined by the contract

15   and they are automatically withdrawn from the consumer's

16   account or card.

17             THE COURT:  In the contract do they state what

18   they're going to do?

19             MS. McOWEN:  In vague terms the contract explains

20   that it is a credit repair service, the purpose of which is

21   to seek the removal of negative items from the consumer's

22   credit report and to improve the consumer's credit history.

23             It states what they will not do, which is that

24   they will not represent the consumer in any sort of legal

25   action.  It's very clear about what legal services are not

1     provided.

2              I will say the Lexington Law contract and the

3     CreditRepair.com consumer contract are, in terms of their

4     description of the services, substantively the same despite

5     the fact that the Lexington Law services are advertised as

6     legal services.

7              THE COURT:  Tell me who signs the letter that goes

8     to the agency.

9              MS. McOWEN:  I believe the best answer is that the

10    computer will put a typed signature onto the letter.  And

11    then that is printed, stuffed into an envelope somewhere,

12    and sent off.  I will clarify that with respect to Equifax,

13    TransUnion, and Experian, the three national credit

14    reporting companies.

15             The defendants have stopped sending actual

16    letters.  What they send instead is an electronic

17    transmission through a sort of designated electronic system.

18    They pay the credit reporting companies for use of that

19    system, and there is no actual paper letter anymore.

20             THE COURT:  Okay.  To whom is the -- if there's a

21    reply, to whom is the reply sent?

22             MS. McOWEN:  With respect to the credit furnishers

23    where a letter is actually posted, the response, if there is

24    one, would go directly to the consumer and not to any of the

25    defendants.

1          With respect to the electronic transmission, our

2    understanding is that there really -- our understanding is

3    that there isn't really a response from the system to any

4    individual query.

5          THE COURT:  Okay.  Now if I have identified my

6    contested items in the credit report, who creates the

7    letter?

8          MS. McOWEN:  Our understanding, Your Honor, is

9    that Progrexion has a computer system that contains a

10   database of form letters, blank letters, and that when the

11   Progrexion Teleservices agent on the telephone with the

12   consumer marks down that the consumer wants to challenge

13   this delinquent -- this derogatory item, the credit card

14   payment we talked about, and they want to challenge this

15   item verify, then that goes into the computer system.  The

16   computer algorithm selects a form letter, puts the address

17   of the credit card company on the form letter, puts the name

18   and address of the consumer on the form letter, puts, you

19   know, a kind of italicized signature, typed signature

20   usually onto the form letter, and then that gets generated

21   out.  So there isn't a human being in the company that is

22   involved in that process with respect to the consumer's

23   challenge of that trade line.

24          Now the defendants want to point out that someone

25   wrote the letters, and I guess that's true.  At some point

 1  there may be some human involvement in producing the normal

 2  letters that go into this computer system.

 3          THE COURT:  Is there an extended -- I recognize

 4  that there are termination powers on the part of parties

 5  that exist.  Is there something said about what else would

 6  be done other than generating the letters?

 7          MS. McOWEN:  Well, Your Honor, the generation of

 8  the letters is spaced out over time.  So when the consumer

 9  signs up, it's not the case that all of their challenges or

10  intervention letters are generated right away.

11          The way the defendants have structured their

12  services is that depending on your service level, you're

13  entitled to a certain number of challenges per month.  And

14  so also depending on the number of negative marks on your

15  credit report, that's going to affect that as well.

16          Those letters will, they say, continue to be

17  generated, whether it's, you know, three per month or five

18  per month, while the consumer is an enrolled customer.  That

19  really is the primary service being offered as a credit

20  repair service.

21          THE COURT:  When do I get to talk to a lawyer?

22          MS. McOWEN:  Typically you will get to talk to a

23  lawyer if you have a complaint about the services that have

24  been provided to you and you escalate that complaint to the

25  point where you have requested to speak to the lawyer, or

1    the lower level staff deems it something that needs to be

2    escalated to an attorney.  So it is the rare case where a

3    customer of Lexington Law actually speaks to a lawyer

4    substantively about their cases is our understanding.

5            We have not -- again, I think that's somewhat --

6    it's really not material to our case.  It came up in the

7    context of our request for call recordings.

8            You might recall that the Court's resolution of

9    that was to say that the call recordings involving a

10   Progrexion Teleservices agent and a consumer were not

11   privileged attorney-client communications.  And the Court

12   said that if there were any call recordings involving an

13   attorney, or even involving a paralegal, conveying a

14   response to a question put to an attorney, that those

15   recordings could be withheld on grounds of privilege.

16           No call recordings were withheld from the samples

17   we requested.  So our only conclusion is that that is a very

18   rare instance indeed.  And in interviewing consumers and

19   speaking to consumers who have used these services, that's

20   confirmed as well.  Very few of them have ever spoken to an

21   attorney.

22           The system is set up -- and this is something that

23   the defendants tout, is the system is set up to run on a

24   computer algorithm without the need for or participation of

25   attorneys in the provision of the service in the ordinary

1    course.  It is, they say, set up to run on this

2    superefficient algorithm rather than involving any attorneys

3    or even, you know, paralegals working with attorneys to sort

4    of review and provide legal advice on the consumer's credit

5    situation.

6          THE COURT:  Well, the issue that you suggest

7    exists is whether or not the reg applies to what they're

8    doing, and you have briefly described, at least in part,

9    what they're doing.  And do you see any other issues at all

10   in Count 1?

11         The reason I ask is that Count 1 took up the major

12   portion of the suggested form of pretrial order.  And while

13   it is argued a lot, I'm really interested in nailing down

14   the issue for decision.

15         MS. McOWEN:  Your Honor, the only issue we see for

16   decision is whether this regulation applies to the

17   defendants.  And I would say beyond that, if it does, then

18   we would seek an opportunity to brief the question of

19   relief.  The Bureau would be seeking injunctive relief for

20   the defendants to actually comply with the regulation as

21   well as monetary relief.  And that's been discussed in some

22   of the papers that you've seen, but it hasn't been --

23   obviously we haven't gotten to that stage.

24         THE COURT:  Why don't you tell me why you think it

25   applies?

1          MS. McOWEN:  We believe the regulation applies

2     because the FTC set out to put guardrails on an extremely

3     high risk industry.  This is a doubly high risk industry

4     because it is in the telemarketing industry, which Congress

5     has found to be, unfortunately, more affected by issues of

6     deception and abusive conduct than many other ways of

7     selling products and services.  And credit repair, which the

8     Federal Trade Commission, through extensive study,

9     determined was rife with consumer abuse.  Misrepresentations

10    about what can be accomplished for a consumer who has a bad

11    credit score and derogatory marks on their credit report the

12    FTC has studied quite extensively.

13          In one study, for example, they found that one in

14    250 people could see a credit score increase of 100 points

15    if they got an error removed from their credit report.  So

16    that person stands to benefit quite a lot from correcting

17    that error.

18          But, unfortunately, the majority of defendants'

19    customers, and the majority of people, period, consumers

20    generally, cannot, in a short period of time, materially

21    improve their credit standing.  And what credit repair

22    companies do, and particularly telemarketed credit repair

23    services that are operating on a very, very, very large

24    commercial scale, is that they are representing that anyone

25    can benefit from these services, and that your average

1   person who has derogatory marks on their credit report could

2   see a material and significant improvement in their credit

3   standing by hiring this company to, quote, unquote, clean up

4   their report.

5        Now we are not here to argue about the efficacy of

6   defendants' services.  We actually think that issue is

7   wholly irrelevant and shouldn't come into the trial.  We

8   aren't conceding that the defendants' services are

9   effective, but really this case is not about whether they

10  are or they aren't, because what the FTC did when it enacted

11  this regulation is it set up guardrails to protect consumers

12  from these kinds of sales representations, this hope -- this

13  often false hope that is being sold to consumers with poor

14  credit, that those consumers don't need to pay for the

15  service unless it actually improves their credit record.

16       The genius of this rule is that it enters a risk

17  laden industry where consumers are really being taken

18  advantage of and harmed, and it sets these guardrails that

19  allow the consumer essentially the protections of almost

20  like a contingency fee agreement where they only have to pay

21  if it works.

22       Now there's no guarantee that it will work, and

23  for many people it will not, but the rule says that the

24  company cannot charge unless it does.

25       Now the defendants here say that they're different

```
 1    from most credit repair services because they say they
 2    actually, unlike some, provide services.  They actually send
 3    the letter.  They say it's not illusory, and they say it
 4    works.
 5             Now, again, we don't concede their general
 6    efficacy claims, but if it does work as well as they say,
 7    then this regulation -- they should be able to operate in
 8    full compliance with this regulation by simply charging
 9    their consumers after they have demonstrated that their
10    highly effective service has accomplished those results.
11             Now the regulation uses the phrase promised
12    results, and that is what has become sort of a hang-up in
13    this case and it's the hook that the defendants grab onto to
14    try to make their argument about this regulation not
15    applying unless there is an express guarantee.  We read it
16    very differently, Your Honor.
17             The reference in Romanette (ii) to promised
18    results, again, we need to think of it more like a
19    contingency fee agreement where there's an understanding
20    between the company providing the service and the consumer,
21    or there should be, about what result is being sought and
22    what payment will be made for that if that's accomplished.
23             So, for example, there could be an arrangement
24    where the consumer has an understanding that if a derogatory
25    item is removed from their credit report, and if, in
```

1  compliance with the regulation, it can be shown that that

2  item was removed and stayed off the credit report and didn't

3  come right back on within six months, then the company can

4  charge for that removal.  The company can charge the

5  consumer -- there's no restriction on how much the company

6  can charge for these services, these results.

7          The restriction in the regulation is that they

8  cannot charge until they've demonstrated that it happened

9  and that it has been -- is that it's durable, that the

10  removal didn't just get reinserted right away, which is a

11  function of the credit reporting system, and something that

12  the FTC took into consideration when they drafted the

13  regulation.  They said you have to demonstrate that this has

14  been accomplished and that it has stayed that way for six

15  months.

16          It's an incredibly practical regulation.  It does

17  not say that you can't telemarket credit repair services.

18  It simply says if you do, then you must comply with this

19  billing restriction.

20          And that's why we're here, Your Honor, because

21  these are credit repair companies.  There's no question

22  about that.  They are engaged in a large scale telemarketing

23  operation.  There's no question about that.  And they charge

24  consumers on a monthly basis without waiting, as prescribed

25  by the regulation, without waiting until the full time

1    period for all services has expired and the promised results

2    have been achieved, demonstrated in the form of a consumer

3    report that was issued more than six months after the

4    result.  In that situation, then, they are free to go forth

5    and charge their customer, and they would be in compliance

6    with the regulation.

7         So that's why we believe this regulation applies.

8    We believe it's very important as a consumer protection.  It

9    is not a technical matter.  It's actually incredibly

10   thoughtful and a well supported regulation that the FTC

11   promulgated after doing extensive research, notice and

12   comment processes, which they then repeated.  This rule

13   actually went through, I believe, three separate rounds of

14   notice and comment rule making.  It's been very thoroughly

15   looked at and analyzed under the FTC's unfairness authority

16   as well.  And the FTC has found that this regulation --

17   compliance with this regulation is necessary to protect

18   consumers in this marketplace from unfair and abusive

19   conduct.

20        And we believe that, again, there's no question of

21   fact.  We read the regulation as it's written.  We've never

22   read it any other way.  We point to the enforcement history

23   of this regulation.  We point to statements by the Federal

24   Trade Commission in prior enforcement actions in amicus

25   briefs and intervenor briefs.  We point to the regulatory

1   history.  But really it's a plain language reading of the

2   rule.  That is why it applies and why we think there's

3   really just no dispute of fact that should weary a jury on

4   this.

5            We do believe that if we can resolve this issue

6   and this question of law, that it would very much narrow the

7   matters for trial.  It would reduce the Bureau's witness

8   list quite a bit.  It would reduce the Bureau's's exhibit

9   list quite a bit.  We believe it would render several of the

10  defendants' experts superfluous, irrelevant.  So sort of as

11  a threshold question, we're happy to spend time trying to

12  resolve this.

13            THE COURT:  Thank you.

14            MS. McOWEN:  Thank you, Your Honor.

15            THE COURT:  Let's take a ten-minute break, give

16  the court reporter a break.  We'll resume in ten minutes and

17  we'll hear from counsel.

18            MS. McOWEN:  Thank you, Your Honor.

19            MS. KRAMER:  Thank you, Your Honor.

20            (Recess)

21            THE COURT:  Counselor, why shouldn't the reg

22  apply?

23            MS. KRAMER:  Good morning, Your Honor.  I'm happy

24  to discuss the application of the regulation.

25            Our position is that this particular regulation,

```
 1   and specifically Romanette (ii) of section (a)(2), does not
 2   apply to the defendants in this case, because the defendants
 3   do not promise results to their clients or to consumers.
 4            THE COURT:  What good are they?
 5            MS. KRAMER:  The defendants do promise a number of
 6   things to consumers, Your Honor, that are laid out very
 7   clearly --
 8            THE COURT:  What do they promise?
 9            MS. KRAMER:  We, in our contract -- which I'm
10   happy to bring up, Your Honor, and show you directly in
11   black and white what we do promise our consumers.
12            If you don't mind, Mr. Schliesske, please bring up
13   JX-13.
14            This, Your Honor, is a set of documents that
15   contain the disclaimers and contract for consumers who sign
16   up with Lexington Law.  If we go to page ten of this
17   particular document, you'll see there's an engagement
18   agreement and limited designation of agency between the
19   client and John Heath, attorney at law, doing business as
20   the Lexington Law firm.
21            Now if we go down through this document, you'll
22   see initially in the definitions, there's information about
23   the service interval, for example, section (E), which is the
24   time frames in which we do offer services, the services of
25   which are laid out below.
```

```
 1                If we scroll down in this document, you'll see a
 2      section titled Services and Representations that begins at
 3      the bottom of this page.  This lays out very clearly the
 4      promises, which are services and efforts that Lexington Law
 5      is going to give to the client, or to the consumer who signs
 6      up.  Both on this page and the services and representations
 7      section and laid out on the next several pages in detail for
 8      the client is exactly what Lexington Law is promising to do.
 9                For example, Lexington Law is promising to provide
10      services in the form of sending out letters or challenges to
11      creditors and credit bureaus.
12                THE COURT:  Their suggestion was that nobody talks
13      to a lawyer before the letters go out.
14                MS. KRAMER:  That was suggested.  That is not
15      always the case, Your Honor.
16                THE COURT:  Well, let's talk about what is the
17      case.  You tell me what's done.
18                MS. KRAMER:  Yes, Your Honor.
19                Your Honor asked when does the client get to speak
20      with the lawyer.  The client gets to speak with a lawyer at
21      their request whenever they request it.  There may be
22      clients who say before signing up for a contract even, I
23      would like to speak with a lawyer.  They may say before
24      sending out a letter --
25                THE COURT:  At what point in time does the letter
```

1    go out?

2            MS. KRAMER:  Letters will only go out after a

3    consumer or a client has signed the contract, after they

4    have completed their initial intake interview in

5    conversation with, nowadays, a Progrexion employee.  And

6    then that client's entire file and profile is set up and put

7    into the system.

8            In terms of when that client can speak with a

9    lawyer --

10            THE COURT:  No.  I asked when does the letter go

11    out.

12            MS. KRAMER:  The letters go out during our first

13    service interval after a client has signed up on the

14    contract.

15            THE COURT:  Before he talks with a lawyer?

16            MS. KRAMER:  Potentially, Your Honor.

17            THE COURT:  Before he ever talks to a lawyer the

18    letters go out?

19            MS. KRAMER:  Potentially, Your Honor, but that's

20    not always the case necessarily.

21            THE COURT:  Well, you tell me what's always the

22    case.

23            MS. KRAMER:  What's always the case, Your Honor,

24    is that a client has an opportunity to request to speak to a

25    lawyer at any time during their engagement with Lexington

 1   Law.

 2            THE COURT:  Prior to such a request, do the

 3   letters go out?

 4            MS. KRAMER:  For some clients, yes, but some

 5   clients may request to speak with a lawyer either before

 6   they sign the contract or shortly after signing the contract

 7   before any action is taken.

 8            THE COURT:  Are there percentages?

 9            MS. KRAMER:  I don't have those available right

10   now, Your Honor, but I can look into that information and

11   get back to you.

12            THE COURT:  You go ahead.

13            MS. KRAMER:  So I'm happy to elaborate more on the

14   services that are offered, Your Honor, and the time lines,

15   but specific to Count 1 -- I know Your Honor is asking what

16   is the issue for Count 1.

17            THE COURT:  That's it.

18            MS. KRAMER:  The issue that's squarely on the

19   table is whether Count 1, in particular, as I mentioned,

20   Romanette (ii), in this particular statutory provision, is

21   whether that applies to defendants.  Defendants' position is

22   based on the plain text of the statute and the unambiguous

23   factual record --

24            THE COURT:  Are we talking the reg or are we

25   talking the statute?

```
 1              MS. KRAMER:  The statute.  My apologies,

 2    Your Honor.

 3              THE COURT:  Read me the section that you're

 4    talking about.

 5              MS. KRAMER:  We're talking about 16 C.F.R. Section

 6    310 -- sorry, the regulation -- 4(a)(2).

 7              THE COURT:  We're talking the reg?

 8              MS. KRAMER:  That is correct, Your Honor.  My

 9    apologies for my misstatement.

10              And in Romanette (ii) under (a)(2) we find the

11    requirement about providing the person with documentation in

12    the form of a consumer report from a consumer reporting

13    agency demonstrating that the promised results have been

14    achieved.

15              Defendants' position, and I know we've briefed

16    this and argued this before, is that this particular

17    provision does not apply to defendants because the

18    unambiguous factual record shows that we do not promise

19    results, looking just at that document alone that we brought

20    up a moment ago.

21              THE COURT:  How do you define results?  How do you

22    define results?

23              MS. KRAMER:  In terms of results, Your Honor, it

24    can be, for example, in other cases where this regulation

25    has been applied promising that a particular consumer will
```

1    get 90 points increased on their credit score, or promising

2    that certain derogatory information will definitely be

3    removed within 30 days.  Those are the types of results that

4    other defendants in other cases have promised and that are

5    subject to this regulation.

6         But in terms of what results mean for defendants

7    in respect to our services, we state in our contracts very

8    clearly that we are not promising a particular result.  We

9    use the exact same word that's in the statute, and that's

10   not unintentional.  We lay out in black and white -- and I'm

11   happy to bring it up and show Your Honor.

12        JX-13, please, Mr. Schliesske.

13        If we go to page 11 of this document, please,

14   there's a paragraph that starts -- the third full paragraph

15   down, Lexington cannot guarantee and you are not paying for

16   a particular credit report outcome or result.  The exact

17   language.

18        So when we're talking about what's the issue for

19   Count 1 --

20        THE COURT:  Well, what do I pay you for?

21        MS. KRAMER:  You pay -- and the sentence

22   continues, you can see on this document, you are paying only

23   for Lexington's efforts on your behalf.

24        THE COURT:  Well, tell me what the efforts are.

25        MS. KRAMER:  Yes, Your Honor.

```
 1              THE COURT:  Lexington's efforts are.

 2              MS. KRAMER:  Yes.  There are a couple of different

 3    efforts, Your Honor.  And, again, this contract that we're

 4    looking at is with Lexington Law.

 5              Lexington Law's efforts include sending out the

 6    challenges and sending out letters to --

 7              THE COURT:  No, no.  No one has talked to them.

 8    The letters go out automatically, purportedly.

 9              MS. KRAMER:  They do go out according to an

10    automated system, but that system, all of the inputs and the

11    letters themselves have been either written or reviewed and

12    approved by attorneys at Lexington Law.

13              THE COURT:  Well, now in the suggested form of

14    pretrial order, they talk about -- on page 13, subsection

15    (b), it says Progrexion markets Lexington Law and

16    CreditRepair.com as services that will assist consumers in

17    removing derogatory information from, or improving, the

18    consumer's credit history, credit record, or credit rating.

19    That's a stipulated, uncontested fact, as I understand it.

20              MS. KRAMER:  It is, Your Honor, and that's drawn

21    directly from the complaint and the answer filed in this

22    case.

23              THE COURT:  That's what it says.

24              MS. KRAMER:  It does, Your Honor, and --

25              THE COURT:  And do you indeed market Lexington Law
```

1    and CreditRepair as services that will assist consumers in

2    removing derogatory information from or improving the

3    consumer's credit history, credit record, or credit rating?

4    Is that what you're marketing?

5              MS. KRAMER:  I'm sorry, Your Honor?

6              THE COURT:  Do you, in fact, market according to

7    your stipulation?

8              MS. KRAMER:  Yes, Your Honor.  That is a portion

9    of the marketing that's done by Progrexion for Lexington Law

10   and CreditRepair.com.  But what Progrexion does not say in

11   that marketing and advertising and what's very clear in all

12   of the company's policies with respect to marketing and

13   advertising is that we cannot guarantee or promise that

14   particular derogatory information will be removed from a

15   credit report or that a consumer will see a particular

16   improvement in their credit score.

17             THE COURT:  Tell me what your services are.

18             MS. KRAMER:  We assist consumers --

19             THE COURT:  Now who's to assist them?  Who's to

20   assist them?

21             MS. KRAMER:  Yes.  In the case of a consumer who

22   signs up with Lexington Law, it's Lexington Law.

23             THE COURT:  Okay.  Now how does Lexington Law

24   assist them if the conversation stops with the so-called

25   representative of Progrexion?

```
 1              MS. KRAMER:  Yes, Your Honor.  Although there may
 2    only be a conversation with a representative from
 3    Progrexion, the services that are provided in terms of the
 4    software and the algorithms that run, generate and send out
 5    letters are all services that were either generated or
 6    approved by and are overseen by Lexington Law.
 7              THE COURT:  Who are they owned by?
 8              MS. KRAMER:  So the systems, in terms of the
 9    patents, in terms of the software itself, is owned by
10    Progrexion.  But the --
11              THE COURT:  Do they have pattern letters?  Does
12    Progrexion own the pattern letters?
13              MS. KRAMER:  There's a particular individual,
14    Randy Padawer, who's on defendants' witness list, who does
15    own three patents related to the credit repair services that
16    are offered.
17              THE COURT:  No, no.  The letters, who owns the
18    letters?
19              MS. KRAMER:  The letters are housed in a software
20    system that is owned by Progrexion.  But in terms of who
21    wrote or who reviewed and approved the letters --
22              THE COURT:  That's a different question.
23              MS. KRAMER:  It is, Your Honor, but I think it's a
24    crucial one when we're talking about what does Lexington Law
25    do for its clients.
```

1          THE COURT:  What does Progrexion do?  Progrexion

2     sends the letters.

3          MS. KRAMER:  The system does, Your Honor, that's

4     correct.

5          THE COURT:  And Progrexion owns the system?

6          MS. KRAMER:  It does own the software system.  But

7     Progrexion offers, as agents of Lexington Law, acting at

8     Lexington Law's direction --

9          THE COURT:  Is Progrexion practicing law?

10         MS. KRAMER:  No, it is not, Your Honor.

11         THE COURT:  Okay.  How is it offering services on

12    behalf of the law firm?

13         MS. KRAMER:  So the letters that are in the

14    systems, and it's the software that's owned by Progrexion,

15    the substance, the letters are controlled by Lexington Law.

16         THE COURT:  Well, who tells me that in all of the

17    depositions that you folks have taken?  Who ever tells me

18    that?

19         MS. KRAMER:  Not every witness was deposed that we

20    intend to put on at trial, Your Honor.  But I can tell you

21    at trial you will hear from witnesses like --

22         THE COURT:  No.  We're going to pretry the matter.

23    I want to know who tells me that the letters are owned by

24    Lexington Law.

25         MS. KRAMER:  Yes.  So you can hear that from

1   witnesses like John Heath, who is on defendants' witness

2   list.  John Heath, who's the principal at Lexington Law.

3              THE COURT:  I know who John Heath is.  But I'm

4   curious because the matter in which the whole process

5   starts, and you can say somebody looked at the letters, but

6   nobody looks at the letters when they're sent automatically,

7   in quotation marks.  We have a judgment call from a machine.

8              MS. KRAMER:  Yes, Your Honor, a machine that has

9   been programmed by --

10             THE COURT:  I understand that.  I understand that.

11  We're talking about marketing legal services.

12             MR. BENNETT:  Your Honor --

13             THE COURT:  I thought she was the spokesman.

14             MR. BENNETT:  She is, Your Honor.

15             THE COURT:  All right.  Let her speak.  You can

16  sit down and speak after she's spoken.

17             MR. BENNETT:  Thank you, Your Honor.

18             MS. KRAMER:  May I have the Court's indulgence to

19  confer with my colleague for one moment, Your Honor?

20             THE COURT:  Well, sure.  I thought you were

21  prepared.  Go ahead and consult.

22             MS. KRAMER:  I am, Your Honor.  Thank you.

23             In terms of what happens at the direction of the

24  lawyers, Your Honor, what is Lexington Law doing for its

25  clients with respect to these letters and the letters that

1   are sent out, all of the letters that are housed within the

2   system, form letters that are then sent out on behalf of

3   clients are all either written or approved by Lexington Law

4   in terms of which letters --

5          THE COURT:  Who owns them?

6          MS. KRAMER:  Again, they are controlled by

7   Lexington Law.

8          THE COURT:  No.  Who owns them?

9          MS. KRAMER:  I'm having a little bit of trouble

10  with that question, Your Honor, because I think in terms of

11  where they're housed, they're housed in the software system

12  that's owned by Progrexion.  I think of it this way,

13  Your Honor, in a more maybe traditional legal context.

14         Often you may have a paralegal or a secretary who

15  has certain form filings that a lawyer might use in a

16  variety of different cases.  They could be fairly standard

17  filings, for example, a certificate of service.

18         Now I may not have on my computer a form

19  certificate of service, but I know that my secretary or my

20  paralegal, who work, in part, at my direction, have a copy

21  there.  And I will often direct that paralegal or that

22  secretary to please create and generate a certificate of

23  service for this filing or this case.

24         In terms of how the Lexington Law business is

25  built and scaled and is able to offer services to consumers

1    in this manner, there are letters that have been either

2    written or reviewed.  And also it's not just the content of

3    the letters that's controlled by the lawyers of Lexington

4    Law.  In terms of the cadence, how often those letters are

5    sent out, in terms of which letters will be most effective

6    potentially for a particular client, that is all based on

7    lawyer direction and lawyer input.  It's based on over

8    20,000 data points that Lexington Law has, having done this

9    for decades.

10            So in terms of what Lexington Law and what the

11   lawyers do to serve their clients and serve consumers, it's

12   in the substance of those services in terms of letters or

13   challenges that are sent out to creditors and credit

14   bureaus.

15            So, Your Honor --

16            THE COURT:  Who bills the client?

17            MS. KRAMER:  The client is billed automatically as

18   counsel for the government indicated.  In terms of where the

19   payment --

20            THE COURT:  Who bills the client?  Does Progrexion

21   bill the client?

22            MS. KRAMER:  It depends on whether we're talking

23   about CreditRepair.com services or Lexington Law services.

24            THE COURT:  Lexington Law.

25            MS. KRAMER:  For Lexington Law, the billing and

```
 1   the payments are -- actually the payment is made to
 2   Lexington Law.  Progrexion has contracted with Lexington Law
 3   to provide billing services.
 4            THE COURT:  I understand that.
 5            MS. KRAMER:  So Progrexion does conduct the actual
 6   billing and uses --
 7            THE COURT:  How do they send the bill?
 8            MS. KRAMER:  So for many consumers, the billing is
 9   automatic.  Once a consumer signs --
10            THE COURT:  I don't know what automatic is.  How
11   do you bill automatically?
12            MS. KRAMER:  No problem, Your Honor.
13            For example, a consumer signs up with Lexington
14   Law and says I'd like to sign up for your credit repair
15   services and specifically I want to sign up for your Concord
16   Standard plan.  I sign the contract, and then the contract
17   outlines when I will be billed and often for how much I'll
18   be billed.
19            THE COURT:  I understand that in the contract.  Do
20   you actually send a bill?
21            MS. KRAMER:  In terms of a hard copy bill, no,
22   Your Honor.
23            THE COURT:  You do not send a bill?
24            MS. KRAMER:  No, we do not necessarily -- we don't
25   send hard copy bills to the consumers.
```

1              I think of it as your cable company, there may be

2     subscription services, like others that are offered, where

3     you sign an initial contract and you're billed on a monthly

4     basis.  It's not necessarily that you get a paper bill, but

5     you have a form of payment, either a credit card or perhaps

6     a banking or checking account --

7              THE COURT:  Credit cards are here mostly used?

8              MS. KRAMER:  Yes, Your Honor.  And when I say

9     they're automatic, what I mean is that at the end of a

10    particular service interval, when the client is then billed

11    for the services rendered during that interval --

12             THE COURT:  How do I know what services you've

13    performed during that interval?

14             MS. KRAMER:  Sure.  There are a couple of ways you

15    can find out, Your Honor.  One is in terms of anticipating

16    what services will be provided, it's laid out in the

17    contract.  In terms of seeing what services were actually

18    provided and what was done, each client has access to a

19    client portal where it has information about the client's

20    contract, their personal information, their signature

21    information, for example, and also what letters --

22             THE COURT:  Your services for the first month, and

23    the second month, and the third month, and the fourth month.

24             MS. KRAMER:  That is correct, Your Honor.

25             THE COURT:  And I'm interested in knowing what

1    services you perform during the second month, for example.

2            MS. KRAMER:  So as a client of Lexington Law you

3    can sign on to your client portal, it's an electronic portal

4    online, and you're able to view there what exactly Lexington

5    Law has been doing on your behalf, what services have been

6    performed.

7            THE COURT:  What if I don't have a computer?

8            MS. KRAMER:  If you don't personally have a

9    computer, Your Honor, there are other ways to publicly get

10   online, for example, at a public library.

11           THE COURT:  You don't send a bill, but you charge

12   an account?

13           MS. KRAMER:  We do, based on the contract with the

14   client, Your Honor.  We don't send a paper bill, but the

15   client is billed only after services have been performed.

16           THE COURT:  Yes.  And have you defined what

17   service you're performing the second month?

18           MS. KRAMER:  Yes, Your Honor.

19           THE COURT:  The third month?

20           MS. KRAMER:  Yes, Your Honor.  In the contract

21   with the client, there's very clear expectations laid out in

22   black and white about what will happen on a monthly basis.

23   The average number of communications sent to bureaus and

24   furnishers, for example, and for particular service

25   intervals, how many communications are to be expected.  So

1   it lays out not just the first service interval, but if you

2   have two service intervals, for example, after that second

3   month.  If you have four, six, ten, et cetera.

4          THE COURT:  Who receives the money?

5          MS. KRAMER:  In terms of the consumer's payments,

6   those go to Lexington Law.

7          THE COURT:  Now that's a Lexington Law account

8   maintained by Progrexion?

9          MS. KRAMER:  No.  That's an account maintained by

10  Lexington Law, Your Honor.

11         THE COURT:  Oh, doesn't Progrexion maintain that

12  account?

13         MS. KRAMER:  Progrexion maintains accounts for not

14  Lexington Law's customers but CreditRepair.com.  But for

15  Lexington Law clients, the payments are made to Lexington

16  Law, and they're deposited into, via a payment processor, a

17  Lexington Law bank account.

18         THE COURT:  Okay.  Who are the signators on that

19  account?

20         MS. KRAMER:  Your Honor, I don't have that

21  information available, but I would be happy to track it down

22  and get it to you.  I'll make a note right now.

23         THE COURT:  Are they officers of defendant?

24         MS. KRAMER:  I will get you that information,

25  Your Honor, and let you know the specific signatories.

```
 1              THE COURT:  Now Progrexion licenses to Heath the
 2   use of proprietary items?
 3              MS. KRAMER:  I'm sorry, Your Honor.  Can you
 4   repeat that, please?  I couldn't hear the beginning of your
 5   statement.
 6              THE COURT:  Yes.  They license Heath with the name
 7   and the domain name.  But they also, do they not, license
 8   proprietary matters owned by Progrexion?
 9              MS. KRAMER:  Just to make sure I completely
10   understand, Your Honor, are you asking whether Lexington
11   Law, Heath PC licenses products from Progrexion?
12              THE COURT:  Yes.
13              MS. KRAMER:  Okay.  If I may --
14              THE COURT:  They talk about proprietary
15   products --
16              MS. KRAMER:  Yes.
17              THE COURT:  -- if I remember correctly in their
18   complaint.
19              MS. KRAMER:  With the Court's indulgence,
20   Your Honor.
21              So Lexington Law, Your Honor, does license the
22   software that's owned by Progrexion, the software that's
23   been used.
24              THE COURT:  And the software contains the letters.
25              MS. KRAMER:  In part, Your Honor, yes.  It also
```

1    contains the algorithms that determine which letters should
2    go out and the cadence with which certain letters should be
3    sent out.
4            THE COURT:  And these are licensed to Heath?
5            MS. KRAMER:  Yes, Your Honor.
6            THE COURT:  Okay.  And what does Heath pay for
7    that license?
8            MS. KRAMER:  With the Court's indulgence, I can
9    take a look at the contracts to see if I have that
10   information available right now.
11           Mr. Schliesske, bring up JX-74.
12           Your Honor, what I'm going to put on the screen is
13   the advertising, marketing, and software licensing
14   agreement.  This one is an example for CreditRepair.com I
15   can show you.  I don't have the one for Lexington Law right
16   at hand, but it's a similar structure.
17           And if we look on this agreement, on page ten it
18   lays out, via contract, in black and white, the compensation
19   and taxes for licensing.  Lexington Law has a similar
20   agreement.  And this is all pursuant to contract.  And it
21   lays out what a licensee shall pay to Progrexion in terms of
22   a budget that's agreed on on a quarterly basis.  But that
23   licensing, the terms that govern it and the payment amounts
24   are all contained within contracts, Your Honor.
25           THE COURT:  Well, they refer to something that

```
 1   isn't there --

 2           MS. KRAMER:  If Your Honor is interested --

 3           THE COURT:  -- equal to 125 percent of the budget

 4   agreed upon.

 5           MS. KRAMER:  That budget changes on a quarterly

 6   basis, Your Honor.  So if Your Honor would like, we can look

 7   into --

 8           THE COURT:  I'm just curious as much as anything.

 9           When Progrexion collects the money and the

10   individual puts it in the Heath account --

11           MS. KRAMER:  Yes, Your Honor.

12           THE COURT:  -- is that the gross amount that goes

13   into the Heath account?

14           MS. KRAMER:  Yes, Your Honor.  It's the entirety

15   of the payment.

16           THE COURT:  Okay.  Heath, in turn, has agreed for

17   them to provide advertising services?

18           MS. KRAMER:  Them being Progrexion, Your Honor?

19           THE COURT:  Yes.

20           MS. KRAMER:  Yes.  There is a separate contract

21   between Progrexion Marketing, for example, and Lexington

22   Law.

23           THE COURT:  Okay.  And other services that

24   Progrexion performs like bookkeeping services?

25           MS. KRAMER:  That is correct, Your Honor.  Other
```

1   Progrexion entities provide a lot of the backup house, we

2   may say, services for Lexington Law.

3          THE COURT:  And the advertising services?

4          MS. KRAMER:  Yes.  That's done through Progrexion

5   Marketing specifically.

6          THE COURT:  Okay.  Now does Progrexion have

7   contracts with the affiliates that counsel referred to,

8   those who have other businesses going but refer matters?

9          MS. KRAMER:  Yes, Your Honor.  Progrexion has a

10  number of contracts with not just those affiliates, but many

11  other affiliates who do advertising, and other firms as

12  well, for example, Lending Tree, and others who may do

13  advertisements, or posting online, and print, via radio, et

14  cetera.

15         THE COURT:  Once Progrexion gets a referral, it

16  pays the referrer a fee, does it not?

17         MS. KRAMER:  If that particular consumer ends up

18  signing up for Lexington Law and then stays on and pays for

19  Lexington Law services, yes.  However, just --

20         THE COURT:  Who pays that?

21         MS. KRAMER:  I'm sorry, Your Honor?

22         THE COURT:  I say who pays that?

23         MS. KRAMER:  That's pursuant to the contract

24  between Progrexion and a third-party affiliate.

25         THE COURT:  Does Progrexion pay it?

1          MS. KRAMER:  Yes, it does.

2          THE COURT:  Okay.  Does it pay it on behalf of

3  Lexington Law?

4          MS. KRAMER:  I don't believe so, Your Honor.  That

5  is a contract directly between Progrexion Marketing and

6  whatever the third-party affiliate is.  Lexington Law is not

7  a party to those contracts.

8          THE COURT:  Okay.

9          MS. KRAMER:  Your Honor, I'm happy to --

10          THE COURT:  What I'm curious about, does anybody

11  from Lexington Law pay any of the fee that Progrexion pays

12  or reimburses Progrexion for the fee that Progrexion pays to

13  the affiliate?

14          MS. KRAMER:  There is no direct connection there

15  in terms of payments made by Lexington Law, specifically for

16  a consumer who came in through a particular third-party

17  affiliate.

18          THE COURT:  Is there an arrangement between

19  Progrexion and Heath?

20          MS. KRAMER:  Yes, there is, Your Honor, for all of

21  Progrexion's marketing services that are provided to

22  Lexington Law.

23          THE COURT:  Does that include the $100 somebody

24  mentioned a while ago to an affiliate?

25          MS. KRAMER:  That amount depends on the affiliate

1   and depends on the payment structure.  But in terms of the

2   amount of money that is paid by Lexington Law --

3            THE COURT:  And I've had fun, as I'm sure you have

4   had, in reference to figuring out who's on first and trying

5   to identify the actual functions of the actual entity and

6   the actual person, and I've been curious as to, okay, we

7   talked to somebody and we'll help you write a letter, but

8   we'll write it in your name and we'll send it to a creditor

9   or a vendor that you dispute.  We sign your name to it.  And

10  when the creditor responds, they don't send it to us.  They

11  send it to you.  And under your contract you're supposed to

12  let us know what you hear.

13           MS. KRAMER:  That is correct, Your Honor.

14           THE COURT:  Okay.

15           MS. KRAMER:  One thing I'll note -- you mentioned

16  signing on behalf of the client, right?  I'll note two

17  things.  Number one is that those signatures are generated

18  only with the client's permission and consent.  And second,

19  the client actually --

20           THE COURT:  That's part of the contract, isn't it?

21           MS. KRAMER:  Correct.  But also the client has

22  even a little bit more control over what that signature

23  looks like.  In the client portal that they can access

24  online, the client can go in, for example, and change the

25  text or the font of their signature that they would like to

1    appear on those letters.  So, again, this is just one

2    example of how the client does have control and can get

3    direction in terms of the efforts that are made on their

4    behalf.

5              THE COURT:  But the efforts at that point in time

6    are the Progrexion efforts?

7              MS. KRAMER:  No, Your Honor.  Those are Lexington

8    Law's efforts.  There may be Progrexion agents -- Progrexion

9    employees who are working as agents at the direction of

10   Lexington Law, just as there are paralegals and other

11   employees of Lexington Law who work at the direction of

12   attorneys, but those are efforts by Lexington Law.

13             THE COURT:  Okay.  Who pays their salary?

14             MS. KRAMER:  When you say their, Your Honor, which

15   specific employees are you referring to?

16             THE COURT:  The employees who are on the

17   telephone, that have been referred to a person, are chatting

18   with a person and getting the setup fee, and getting the

19   card identification, arranging to pick up the credit report

20   for 12 or $15, that person.  Who's that person paid by?

21             MS. KRAMER:  Yeah.  So right now, Your Honor,

22   those folks are Progrexion Teleservices representatives.

23   They're employed by and paid by Progrexion.

24             If it's all right, Your Honor, I would like to

25   address briefly that credit report that you mentioned

because there were some statements made about that credit
report from TransUnion.

One thing I want to be clear on is in terms of the
sale of that credit report to a consumer, Progrexion is a
certified reseller of TransUnion credit reports, meaning
that Progrexion can sell and can offer any consumer a copy
of their full TransUnion credit report.

Now when a consumer calls, for example, or comes
in through an affiliate channel and is speaking with a
Progrexion Teleservices representative, initially the credit
consultation that that consumer receives is based on a
general TransUnion score and summary that's free.

Then the Teleservices representative will offer to
the consumer, if you'd like, for a fee, I can pull your full
TransUnion credit report and we can go into a more in-depth
consultation.  Some consumers choose to do that.  Some do
not.  There are some consumers who choose to have Progrexion
pull that full TransUnion report, and then they never sign
up for Lexington Law services, and that's fine.  In fact,
two-thirds of the consumers who end up speaking with
Progrexion Teleservices representatives get a free credit
consultation.  Some may purchase a full TransUnion credit
report, but then they never sign up for Lexington Law
services.

So I just want to be very clear that in terms of

1    those TransUnion full credit reports and how they're sold,

2    that is a reselling agreement that Progrexion has and is

3    offering to consumers, but it's not necessary that the

4    consumer has to sign up for Lexington Law and then pay that

5    fee to get the TransUnion report.  I just want to be very

6    clear about that.

7            THE COURT:  In order to gather information, you

8    need a report?

9            MS. KRAMER:  That is correct, Your Honor.

10           THE COURT:  Whether it's free or whether it's paid

11   for.

12           MS. KRAMER:  So as part of the contracted for

13   services between the client and Lexington Law, Lexington Law

14   periodically pulls credit reports from not just TransUnion

15   but the other credit bureaus as well, and that's covered as

16   part of the services that are offered to the client.

17           THE COURT:  Well, counsel just suggested that

18   there was a markup.

19           MS. KRAMER:  There is, Your Honor.

20           THE COURT:  And I don't know what that is, but she

21   suggested it may have cost you $2 rather than 12 or 15.

22           MS. KRAMER:  I believe that's correct, Your Honor.

23   I don't have at my disposal at this moment but can get you

24   the exact numbers on that.  Again, that's a reseller

25   agreement in terms of Progrexion reselling a credit report

1    to any consumer, not necessarily just customers of Lexington

2    Law.  And that's something that many private companies and

3    entities have with the credit bureaus where they will have a

4    contract to be a certified reseller of credit reports.

5              THE COURT:  But it happens.

6              MS. KRAMER:  It does, Your Honor.

7              THE COURT:  It happens without payment.

8              MS. KRAMER:  There are some companies or services

9    that may offer consumers a free credit report as part of,

10   for example, consumers providing their data or providing

11   information to that company, and then they're provided a

12   free credit report, often from one bureau.  That is

13   definitely a service that is out there, Your Honor.

14             THE COURT:  Yes.  The information gathering

15   process is with the employee of Progrexion.

16             MS. KRAMER:  In terms of the information gathered

17   from the client during that initial intake call, yes,

18   Your Honor.  There is a script and a fillable form that the

19   Progrexion Teleservices agent walks through, and those

20   questions and data points are, for example, data points that

21   Lexington Law has learned over the years can help inform

22   which letters or which efforts would be most effective for

23   that consumer.

24             MS. KRAMER:  I know Your Honor asked about the

25   employees who are on the calls, who employs them and who

1    pays them.  Just to make sure our record is clear in terms

2    of subsequent calls that a client may have after their

3    initial sign-up and their initial intake, those calls go to

4    Lexington Law paralegals, and often they speak with

5    Lexington Law attorneys.  Those employees are employees of

6    Lexington Law.  They are hired and paid by Lexington Law.

7              So I just want to be clear when we're talking

8    generally about a phone call a consumer may have, depending

9    on the phone call, they may be speaking to a Lexington Law

10   employee.

11             THE COURT:  I understand.

12             Now in the pleadings, and I could be

13   misremembering, but I thought in the pleadings it was a

14   suggestion that Progrexion employed as many as 1200

15   telephone operators.

16             MS. KRAMER:  At a particular point in time, yes,

17   Your Honor, and more than that over the years.

18             THE COURT:  Okay.  And roughly speaking, if you

19   know, what do they employ now?

20             MS. KRAMER:  If you'd give me a moment,

21   Your Honor, I can see if I have that information readily

22   available.

23             We're investigating to try to get you an exact

24   number, Your Honor, but I believe it's approximately 1,000.

25   I will confirm that, though, and can report back.

```
 1              THE COURT:  So that you're busy.

 2              MS. KRAMER:  In terms --

 3              THE COURT:  There's enough interest to employ a

 4   thousand people, roughly, on the telephone?

 5              MS. KRAMER:  Oh, yes, Your Honor.  Progrexion

 6   Teleservices handles millions of calls, many of which are

 7   direct inbound calls from consumers who are calling because

 8   they're interested in learning about or signing up for

 9   credit repair.  There's definitely a need and an interest

10   level that sustains that many employees.

11              THE COURT:  And you advertise.  Are the services

12   advertised in all 50 states?

13              MS. KRAMER:  I'm not sure if the services are

14   advertised, for example, in print or on radio in all 50

15   states, but the services are advertised in a variety of ways

16   online, including direct brand advertising where Lexington

17   Law, for example, does, via Progrexion Marketing, direct

18   advertising online in various ways for its services.

19              So to your question, to the extent we're

20   considering Internet advertisements as well, yes, it is.

21              Your Honor, I'm happy to answer additional

22   questions or explain further our services or various facts

23   about our business.  With respect to Count 1, though, I do

24   have a few additional points that I'd like to offer.

25              THE COURT:  Yes, please do.
```

```
 1              MS. KRAMER:  Thank you very much.

 2              So in terms of Count 1, that particular regulation

 3      and the promised results in Romanette (ii), defendants'

 4      position, and we've briefed this and argued this

 5      extensively, is that based on the unambiguous, clear reading

 6      of the statute, that portion does not apply to defendants.

 7      We think it's in black and white.  As you saw in our

 8      engagement agreements with clients, we do not promise

 9      results, and that that record is very clear.

10              I will say, though, that at a minimum -- at a

11      minimum -- and, again, we do believe the record is clear,

12      the government mentioned in their presentation that there's

13      no factual dispute potentially relevant to Count 1.  In the

14      event that the Court believes that promised results are, in

15      fact, as laid out in black and white, a crucial component of

16      this particular regulation, while we maintain that it's very

17      clear we do not promise results, at a minimum there could be

18      a factual dispute as to whether, in fact, the defendants did

19      promise results to consumers.

20              So I just want to address the idea that there's no

21      factual dispute in principle.  And, in the first instance,

22      we do agree with that and believe that the regulation does

23      not apply to the defendants.  But if Your Honor is inclined

24      to think that promised results could, maybe depending on the

25      facts, go one of two ways, then that would be a live,
```

 1    factual issue for the jury.  And that's why in the proposed

 2    pretrial order there are a couple of questions that are fact

 3    in law about whether, in fact, the defendants do promise

 4    results.

 5              I also recall that the government mentioned that

 6    much of the pretrial order -- or much of the case is all

 7    about Count 1, and that if the Court were to dispose of

 8    Count 1, for example, it would significantly narrow the

 9    case.

10              I do want to point out, Your Honor, that in fact

11    the majority of the contested issues of fact and law in this

12    case, as Your Honor may have seen in the pretrial order, are

13    not concerning Count 1.  They're concerning Counts 2 through

14    5.  And so there is still a very significant case on the

15    table for the Court's consideration and the jury's

16    consideration potentially as to Counts 2 through 5.

17              THE COURT:  We're going to take up each of those

18    in sequence.

19              MS. KRAMER:  No problem, Your Honor.

20              I just wanted to say, though, that as to which

21    portions of the proposed pretrial order specifically address

22    Count 1, if you'd like, I'm happy to walk through the

23    specific disputed issues of fact and law, if it would be

24    helpful to the Court.

25              THE COURT:  As to Count 1.

```
1              MS. KRAMER:  Yes, Your Honor.

2              THE COURT:  Go ahead.

3              MS. KRAMER:  All right.

4          If we look, beginning on page 23 -- it's page 25

5    of the entire filing, but internal page 23 of the proposed

6    pretrial order -- thank you, Mr. Schliesske.

7              It's also up on the screen, Your Honor, for

8    convenience.

9              We're looking at Section 4(a), contested issues of

10   fact.  The first two issues that are listed there

11   specifically apply to Count 1, do defendants represent that

12   all services would be provided to a consumer in a given time

13   frame, and if so, what was that time frame.  That references

14   specifically Romanette (i) of the regulation.

15             Then second, do defendants promise results to

16   clients or customers, and if so, what results do they

17   promise.  Those are the two contested issues of fact that

18   apply specifically to Count 1.

19             The remaining contested issues of fact, at least

20   as contended by both parties, apply to Counts 2 through 5.

21             THE COURT:  How do you define results?

22             MS. KRAMER:  In terms of the results that may be

23   promised to a particular client, other companies, for

24   example, Your Honor, will say we will raise your credit

25   score a certain number of points.  We guarantee it within 30
```

days.  We will definitely remove at least ten negative items

from your credit report.  Those are the types of results

that other companies do promise.  Thus they are subject to

this regulation.

THE COURT:  You say we'll help you write a letter.

What if you get a response to the letter, is that a result?

MS. KRAMER:  It depends on what their response may

be and what the effect may be for the consumer.  But in our

contract we say we don't promise that you'll get a

particular result because that is not in Lexington Law's

control.

THE COURT:  You say we're going to help you write

a letter.  We're going to contest items one, three, and five

on the report.

MS. KRAMER:  That's correct, Your Honor.

THE COURT:  Then we're going to ask either for a

verification or we're going to ask in some fashion for a

demonstration.  We're going to send this to the bureau and

they're going to, we hope, respond.  You send them the

letter.  You ask for a response.  You get a response.  The

response says you're all wet.  They're valid obligations.

Is that a result?

MS. KRAMER:  It is, Your Honor, for many

consumers, because part of the services we offer is not just

providing letters that result in removal of negative trade

 1   lines.  It also provides for a consumer, in some instances,

 2   what's called an item verification, and that may be the

 3   response that comes back from a creditor or credit bureau.

 4   That is a valuable service for many consumers.

 5          THE COURT:  It is.  But that's a result, isn't it?

 6          MS. KRAMER:  It can be a result, Your Honor, and

 7   many of our clients do get those types of results.  But

 8   there's a difference between promising or guaranteeing a

 9   result as a matter of contract, as a matter of what's

10   represented to consumers.

11          THE COURT:  What's the anticipation when you write

12   a letter?

13          MS. KRAMER:  The anticipation is that the bureau

14   or the furnisher may respond, may provide a verification,

15   may ultimately remove a trade line.

16          THE COURT:  Do they respond within a time frame?

17          MS. KRAMER:  Well, ideally, yes, Your Honor.  Our

18   contract tells our consumers, our clients in black and

19   white -- and we don't need to bring it up.  I will read it

20   very briefly, Your Honor.  In that same paragraph we were

21   looking at earlier explains the bureaus or furnishers may

22   not respond to initial or subsequent communications, and

23   ultimately --

24          THE COURT:  My question is do they have a duty to

25   respond?

```
 1              MS. KRAMER:  Do they ever --

 2              THE COURT:  Do they have a duty?

 3              MS. KRAMER:  Do they have a duty to --

 4              THE COURT:  An obligation to respond to a dispute,

 5    or a verification request.

 6              MS. KRAMER:  With the Court's indulgence,

 7    Your Honor.

 8              In terms of an obligation to respond, Your Honor,

 9    at times the bureaus or furnishers do have an obligation to

10    respond, but they do not have an obligation to respond to

11    letters in many instances.

12              THE COURT:  How about queries from nice people who

13    are assisting others in making a request that is often sent

14    by email?

15              MS. KRAMER:  Emails that may be sent to the credit

16    bureaus or creditors, again, Your Honor, are governed by a

17    particular set of requirements.  Certain communications,

18    depending on the substance and the time frame, there is a

19    requirement that the bureau or furnisher respond.  But for

20    many others, there is not.  And Lexington Law can't control

21    what the bureau or furnisher does at the end of the day,

22    which is why we make that very clear to our clients.

23              THE COURT:  But you're going to help me write a

24    letter and I'm disputing three items, or I've requested

25    verification on at least one item directly to a creditor,
```

 1   for example, but no answer as a result, I assume.

 2           MS. KRAMER:  In this instance, Your Honor, if

 3   there are three communications sent out and the client does

 4   not get a response to any of those communications, that is

 5   definitely a possibility.  Sometimes they may get a response

 6   to a subsequent communication, and that's why our services

 7   do, based on our analysis and data points for years,

 8   determine a good cadence for sending out repeated letters or

 9   challenges.  But it's entirely possible that a bureau or

10   furnisher does not respond.

11           THE COURT:  Why don't you use your own name when

12   you send a letter assisting a client?  Why don't you say

13   Heath, or Lexington, or indeed CreditRepair?

14           MS. KRAMER:  One of the primary reasons,

15   Your Honor, we have learned throughout the years based on

16   experience, a client is most likely to get a response and

17   get action on a letter if it does, in fact, come from that

18   client and come in their own name.

19           THE COURT:  Okay.

20           MS. KRAMER:  And part of our zealous advocacy --

21           THE COURT:  How do I know if you're an attorney

22   asking for a response?

23           MS. KRAMER:  If you're the credit bureau or the

24   creditor?

25           So I think there are two different possibilities

1   here.  One in terms of a letter that's sent just on the

2   client's behalf with the client's name and signature, the

3   bureaus or the creditors don't necessarily know -- I should

4   say the creditors, that it's coming from Lexington Law in

5   terms of the logistics of how that's generated and sent out.

6   Lexington Law does have special relationships specifically

7   with the credit bureaus, the big three, where there are

8   contracts, and they've set up an electronic platform so that

9   there are specific letters that come directly from this

10  platform from Lexington Law to the credit bureaus.  Those

11  are still, again, in the client's name.  Those are still

12  signed by the client, again.  The one primary reason is that

13  we know that to be the most effective way.  But any

14  communications that are coming through that specific

15  proprietary platform do come through Lexington Law.

16          THE COURT:  Yes.  Do you respond to them?  Do they

17  get a carbon copy, using old-fashioned terms, of the letter

18  that you sent to the client?

19          MS. KRAMER:  When you say they, does the client

20  get a carbon copy?

21          THE COURT:  No, no.  Does Lexington Law get a copy

22  from the bureau?

23          MS. KRAMER:  So Lexington Law and Progrexion,

24  depending on CreditRepair.com or Lexington Law, they do

25  generate and have in their system copies of the letters that

1   they send out to the bureaus or to creditors.

2          THE COURT:  No, no.  It's the bureau responding --

3          MS. KRAMER:  The response, Your Honor.  My

4   apologies.

5          THE COURT:  -- responding to the client,

6   supposedly.  The client called Lexington Law.  At that point

7   in time, and you have a special platform, does Lexington Law

8   at least get a copy of what you respond to?

9          MS. KRAMER:  With the Court's indulgence.

10          So in terms of a response or an action taken by

11   the credit bureaus, Your Honor, Lexington Law would see the

12   result in terms of, for example, a negative item being

13   removed from a credit report.  That is available in terms of

14   what's provided by the credit bureaus.  If there is, for

15   example, though, just a letter that is sent to a client in

16   response from a credit bureau, that's not sent in carbon

17   copy as well to Lexington Law.

18          THE COURT:  Okay.  Well, good.

19          Well, I'll let you take an early break.  Give you

20   two minutes extra lunch.  Let's reassemble at 1:30, if

21   that's convenient for everybody, and we'll see you back here

22   at 1:30.

23          MS. KRAMER:  Thank you, Your Honor.

24          (Recess)

25          THE COURT:  You go ahead.

1              MS. KRAMER:  Your Honor, I would like to address

2    two specific points that we discussed before our lunch

3    break.  The first is with respect to a question that

4    Your Honor asked a couple of times.  We have talked a lot

5    about results, what is a result and what does a result mean.

6              What's really important for the pretrial order and

7    for the jury instructions and trial in this case --

8              THE COURT:  That's assuming a jury.

9              MS. KRAMER:  Assuming so, as to Count 1

10   specifically, which Your Honor is highlighting right now, is

11   what does the term result mean in the regulation at issue in

12   Count 1.  And in order to understand what the term results

13   means in that regulation, we need look no further than that

14   portion of the regulation itself.

15             Mr. Schliesske, if you could please bring up

16   Romanette (ii) from the relevant C.F.R. portion.

17             You will see here, Your Honor, it says the seller

18   has provided -- this is of course payment can't be requested

19   or received -- until the seller has provided the person, the

20   consumer, with documentation in the form of a consumer

21   report from a consumer reporting agency demonstrating that

22   the promised results have been achieved.

23             What that language of the regulation tells us is

24   that the results at issue, what that term means is results

25   that can be demonstrated on a consumer report -- or a credit

report from a consumer reporting agency, such as a credit

bureau.  So this would cover, for example, a change in a

consumer's credit score.  That is a result that appears on

that consumer report on that credit report, or a negative

trade line or item being removed.  That is a result that

appears on a consumer report.

Now what result doesn't mean in the context of

this regulation is something that would not appear on a

consumer report and thus can't be verified via this

documentation.

To give an example that Your Honor brought up

earlier, you asked, well, let's say a client sends a letter

to a credit bureau, and a credit bureau sends a letter

response.  Is that letter response a result?  In the context

of this regulation as it applies in Count 1 of this case,

no.  A mere letter coming back from a credit bureau is not

something that appears on a consumer report.  So that is not

the type of result as that term in defined in this statute.

Now our contracts, when we're talking about

Lexington Law's contracts with its clients, contains the

word result.  We looked at that earlier today.  Now the term

result in our contracts, or the term result as it might be

used colloquially or understood by a consumer, could mean

more than just something that would appear on a consumer

report.

1              So when you're talking about what does the term

2     result mean, for example, in a different context, in the

3     context of our contracts with clients, that term result is

4     defined more broadly than just what's at issue in Count 1

5     and in this regulation.

6              So as to the Court's specific question and to put

7     a fine point on it for the purpose of Count 1 in this case

8     and in the pretrial order and what's the issue, the issue is

9     have the defendants promised results.  Has promised results

10    or result is defined, in this particular portion of the

11    regulation, meaning something that is verifiable via

12    documentation on a credit report.

13             THE COURT:  Okay.  What's the purpose of the

14    letter?

15             MS. KRAMER:  The letter that is sent on behalf of

16    the client to the credit bureau or to the creditor?  It

17    depends on the type of letter that's sent, Your Honor.  A

18    few different types.

19             There could be an item verification letter that's

20    sent, that's sent out to a creditor or credit bureau that

21    says this particular trade line or, you know, line on this

22    consumer's credit report, we'd like to see -- the consumer

23    would like to see the documentation from the creditor

24    verifying this debt or verifying this particular item.

25             There could be letters also that go out,

 1   especially after receiving certain information about the

 2   veracity of a trade line, that's a specific challenge to a

 3   trade line that says we believe this is incorrect.

 4           So depending on the context, the letters

 5   themselves can serve different purposes.

 6           THE COURT:  But you are expecting a change in the

 7   credit report as the result of one type of letter?

 8           MS. KRAMER:  If there is an unverifiable or a

 9   false trade line, for example, on a consumer's credit

10   report, then our hope would be -- although we can't make a

11   promise or a guarantee to a consumer, our hope would be that

12   the credit bureaus remove that trade line.

13           Now there are instances where a client might say I

14   don't know if that's true, I don't believe it.  We get the

15   verification, and you know what, it's true.  Lexington Law

16   makes very clear that we are not going to try to remove

17   accurate trade lines and accurate information.  That

18   wouldn't be ethical and it wouldn't be correct.

19           There is -- I'm sorry, Your Honor.  I didn't mean

20   to preempt you.

21           THE COURT:  I'm thinking for the purpose of the

22   letter.

23           MS. KRAMER:  Yes.

24           The one other issue, before we go too far,

25   Your Honor, that I wanted to just clarify that we discussed

1   earlier --

2          THE COURT:  I appreciate that very much.

3          MS. KRAMER:  Thank you, Your Honor.

4          The other issue that I'd like to just clarify,

5   Your Honor asked about whether Lexington Law advertises in

6   all 50 states, and I talked a bit about Web based

7   advertising.  So one thing I want to make clear is that the

8   type of Web advertising that Lexington Law engages in is the

9   type of advertising that law firms all across the country,

10  including law firms in the State of Utah, engage in, posting

11  a law firm website, putting advertisements or posts on

12  Facebook, for example, or Linkedin, and it's perfectly

13  acceptable for law firms to use the Internet to post these

14  types of advertisements or to try to target particular

15  potential clients.

16         THE COURT:  When it first started out a long time

17  ago, that would be justification for losing your license.

18         MS. KRAMER:  It may have been years ago.

19         THE COURT:  I'm just commenting.

20         MS. KRAMER:  I will say, Your Honor, that one

21  thing that Lexington Law does for all of its advertising,

22  all of the advertisements that are sent out, whether it's on

23  the Internet, via print advertisements, they're all reviewed

24  by outside counsel -- by an independent outside counsel who

25  is a Utah Bar attorney and Utah licensed attorney to ensure

1    that those advertisements are reviewed for ethics and for

2    compliance with whatever relevant statutes or regulations

3    apply.

4              So in terms of ensuring that the advertising

5    practices of Lexington Law, even when they're carried out by

6    Progrexion, are in line with ethical requirements, that is

7    something that the company has hired outside counsel to

8    ensure and we're very concerned about.

9              THE COURT:  If you send a letter, you're expecting

10   something.

11             MS. KRAMER:  I think that everyone has a hope of a

12   response when they send a letter in any respect, Your Honor.

13             THE COURT:  You're engaging in hope.

14             MS. KRAMER:  We are.  We're engaging in our best

15   efforts to zealously advocate on behalf of clients, which is

16   what all lawyers do.

17             As I'm sure Your Honor is more than familiar,

18   lawyers all around the country, including lawyers in Utah,

19   often have a sentence in their engagement letter that says

20   we cannot promise a particular outcome or result in a case.

21             Similarly here, for clients of Lexington Law,

22   since we are sending letters and making requests often on

23   behalf of clients to third parties, we can't control what

24   those third parties are going to do.  Just as attorneys

25   here, we can't control the outcome of a case.

 1              THE COURT:  You're hoping.

 2              MS. KRAMER:  Of course, Your Honor.

 3              THE COURT:  There's a consequence as a result of

 4    the letter plus the hope.  There's a consequence.  It may be

 5    affirmative, it may be negative, it may be something else,

 6    but there's a consequence for sending it otherwise you

 7    wouldn't send it.

 8              MS. KRAMER:  Well, the hope, I think, in part,

 9    Your Honor, is that there is a consequence, be that a

10    response from the credit bureau, be that a result in terms

11    of a change in the credit report.  But sometimes,

12    Your Honor, the consequence could just be the client knowing

13    that they have an attorney out there, or just a company out

14    there working as best as they can to advocate for that

15    client, and the client is doing everything that they can to

16    learn about and potentially clean up their credit report.

17    That in and of itself is a consequence of our services.

18              THE COURT:  Well, that's interesting.

19              I'm always curious as to how an attorney can talk

20    to 100,000 clients.

21              MS. KRAMER:  I think that's a great curiosity,

22    Your Honor, and part of it, I think -- part of what might

23    help is taking a step back and making sure we're examining

24    this legal practice in the right lens.

25              Traditionally there's this view of a law firm as a

1    certain collection of however many attorneys, you work with

2    a discrete amount of clients, and you offer your legal

3    services.  In today's age there's a huge demand -- we talked

4    about the number of consumers who call into our

5    telemarketing services, there's a huge demand for assistance

6    in terms of credit repair, and there's a market and a need

7    for legal services and legal advice here.

8            But, frankly, Your Honor, it wouldn't be

9    economical or possible for lawyers to provide this quality

10   and this level of legal assistance and legal services to

11   every average consumer out there in the United States who

12   might need it.

13           So in terms of how Lexington Law and how this

14   legal practice and this company was set up, it's with the

15   idea of how can we design a company, a law firm, a practice

16   that can give legal services to as many consumers as

17   possible for a price point that actually makes sense.

18           THE COURT:  And after you collect the money on

19   behalf of Heath --

20           MS. KRAMER:  Yes, Your Honor.

21           THE COURT:  -- and it goes into a separate

22   account, you tell me that Heath -- the Heath account.

23           MS. KRAMER:  Correct, Your Honor.

24           THE COURT:  You were going to tell me who writes

25   the checks on that account.

```
 1                    MS. KRAMER:  The signatory, Your Honor, I believe
 2      you asked.  I was able to confirm with our clients that the
 3      signatory to that account is John Heath himself or an agent
 4      acting at John Heath's direction.
 5                    THE COURT:  Name the agent.
 6                    MS. KRAMER:  So currently, Your Honor, I can tell
 7      you one agent who is acting at his direction is named Jared
 8      Hartley.
 9                    THE COURT:  Who does he work for?
10                    MS. KRAMER:  He's the agent of John Heath for the
11      purpose of --
12                    THE COURT:  Who does he work for?
13                    MS. KRAMER:  If Your Honor will give me one
14      moment.
15                    THE COURT:  Okay.
16                    MS. KRAMER:  I'll get that information for you,
17      Your Honor.
18                    THE COURT:  Once it's placed in the separate
19      account, how's that shared with Progrexion?
20                    MS. KRAMER:  So Progrexion has contractual
21      relationships with Heath --
22                    THE COURT:  What's the share?  What's the share?
23      How is that shared?
24                    MS. KRAMER:  In terms of the payment structure,
25      there's not a set share percentage in terms of Progrexion
```

1   gets 50 percent of that account.  That's not how it works.

2           THE COURT:  Tell me how it works.

3           MS. KRAMER:  Happy to, Your Honor.

4           So what happens is all those payments go into a

5   bank account for John Heath and for Lexington Law.  That

6   money is then utilized by Heath and by Lexington Law to, as

7   any business would do, pay off various expenses, be it

8   employee salaries, overhead, paying on contracts with

9   certain vendors, licensing fees.  So just one of those

10  expenses that Lexington Law has is its contract with

11  Progrexion Marketing, for example.

12          There are also contracts with other Progrexion

13  entities, but just Progrexion Marketing as an example,

14  there's a set contract.  And so each year there's a payment

15  plus structure where there's a set based fee payment that

16  Lexington Law will make to Progrexion.  And then there's

17  kind of a plus percentage based on a number of factors that

18  varies by quarter.  So in terms of what proportion of

19  that --

20          THE COURT:  How was it shared last year?  How was

21  it shared?  How was it agreed to be shared this coming year?

22          MS. KRAMER:  Yes.  So the agreement per the

23  contract is there's a particular flat fee, which I'll

24  confirm but I believe is $100 million for marketing services

25  of all sorts, in all respects, for example, plus a

1   particular percentage.  And I don't have at hand,

2   Your Honor, what that is.

3            THE COURT:  Who would have that?

4            MS. KRAMER:  Who would have that?  My clients

5   would, Your Honor, the company.

6            THE COURT:  Well, ask them.

7            MS. KRAMER:  Happy to.  Thank you.

8            Your Honor, we're contacting the representative of

9   the company who would have those numbers.  His name is

10  Mr. Chad Wallace.  He's the CFO, and he is one of the

11  individuals on our witness list who will testify to these

12  issues at trial.  We're looking into that right now,

13  Your Honor.

14           THE COURT:  Okay.  I'm curious as to how that's

15  shared.  And I would be interested in who writes that check,

16  if it's a check, whether Mr. Heath signs it or whether his

17  agent, in quotation marks, signs it.

18           MS. KRAMER:  So his agent, Your Honor,

19  Mr. Hartley, we've confirmed Mr. Hartley is employed

20  actually by Progrexion ASG, one of the defendants in this

21  case.  That's one of the entities at Progrexion, as I

22  mentioned earlier, that does some kind of like the back

23  office, the finance and accounting, and such.

24           THE COURT:  So Progrexion can sign the checks for

25  the law firm?

1              MS. KRAMER:  For Progrexion ASG, purely with

2    respect to that particular account, yes.

3              THE COURT:  That particular account, Progrexion

4    signs that?

5              MS. KRAMER:  That individual, Mr. Hartley, is a

6    signatory on that account, yes.

7              In terms of the share, I know Your Honor is very

8    curious about how it's shared, maybe one thing that might

9    help clarify is Lexington Law's account isn't shared

10   necessarily or split in terms of a pot with the Progrexion

11   entities.  Any payments or monies that flow from Lexington

12   Law to the Progrexion entities are set based on contractual

13   relationships.

14             THE COURT:  I understand that.  They've got a

15   contract.  One of the interesting sections in the suggested

16   form of pretrial order, on pages ten and 11, it says Heath

17   PC contracts with PGX Holdings' subsidiaries, including

18   defendants Progrexion Marketing and Progrexion Teleservices,

19   to, one, have Progrexion market, telemarket, and sell over

20   the telephone the credit repair services that Lexington Law

21   provides.  Now you've given me a view of the contract that

22   purports to define what the services are.

23             Then it goes on to say, two, on page 11, use,

24   Progrexion's proprietary credit repair products, and the

25   trade name and the domain name, and then obtain other

1  business services, such as payment processing and payroll

2  services.

3          And I am eager to have you tell me what credit

4  repair products are Progrexion's proprietary credit repair

5  products.

6          MS. KRAMER:  Sure, Your Honor.

7          The primary ones are ones that we were talking

8  about earlier today, the software that's used and the

9  algorithm that's used in terms of generating and identifying

10 the correct letters to send out to bureaus on behalf of

11 consumers.  Those are the key I'll say credit repair

12 products that are proprietary to Progrexion.

13         THE COURT:  That's something that you provide to

14 the law firm?

15         MS. KRAMER:  That Progrexion licenses, yes, and

16 provides to the law firm.

17         THE COURT:  To the law firm.

18         MS. KRAMER:  It's just as, for example -- to use

19 another example from the legal industry, there are a number

20 of products like West Law, or Lexus Nexus, they're case data

21 repositories, and law firms or lawyers can license those

22 products so that they can use them.

23         To put maybe a finer point on an analogy, in the

24 bankruptcy context, for example, there's a product that's

25 used by bankruptcy attorneys where you get a license for the

1    software, you plug in a client's financial information and

2    personal information, and that software will generate the

3    proper bankruptcy filing forms that you would file in court

4    to file for bankruptcy for that client.

5              Similarly, Lexington Law licenses and has the

6    authority to use the proprietary software products that are

7    owned and offered by Progrexion, and they do so in their

8    provision of legal services.

9              THE COURT:  Okay.  What's the license fee for the

10   use of those proprietary products?

11             MS. KRAMER:  I believe we took a look at that

12   earlier, Your Honor.  The 125 percent figure you may

13   remember, we're investigating to see if we can find what

14   that exact number was for this past quarter, because per the

15   contract, it does change on a quarterly basis.

16             MS. McOWEN:  Your Honor, I believe we have that

17   figure, if it would be helpful.

18             THE COURT:  I can't hear you.

19             MS. McOWEN:  I believe we have that figure.  If it

20   would be helpful, we could pull up -- I believe it's JX-12,

21   page two.

22             I believe it says, Your Honor, that the payment is

23   $20.83 per month, per user -- per active customer user, with

24   a floor of $1.1 million per month.

25             THE COURT:  Per month?

1            MS. KRAMER:  And just to be clear, Your Honor, the

2    $20.83 per month is for active users on our core products,

3    which can be known as our credit repair products.  The

4    company also offers what are called care products or

5    monitoring products that similarly are licensed from

6    Progrexion.  And that's credit monitoring services, which

7    many of our clients choose to use.

8            THE COURT:  Whose actually rendering the service?

9    I get mixed up, quite frankly, as we deal with the parties

10   and the operation as to who does what, when, and for what.

11   And it's fascinating that the credit repair products include

12   the letters that you license to the law firm, who

13   purportedly has examined and approved the letters in some

14   fashion over the years.  But the law firm doesn't press the

15   button to send the letter out to the credit bureau, does it?

16           MS. KRAMER:  The law firm itself?

17           THE COURT:  The law firm itself.

18           MS. KRAMER:  Agents of the law firm do,

19   Your Honor.

20           THE COURT:  Which agents?

21           MS. KRAMER:  It can be --

22           THE COURT:  The telephone agent?

23           MS. KRAMER:  It can be, for example, Progrexion

24   Teleservices agents acting under a contract as agents of

25   Lexington Law.  There can be --

1           THE COURT:  I'm interested in that contract.  I

2    don't think I've seen that contract.

3           MS. KRAMER:  I believe we have that contract.

4           THE COURT:  It's probably one of the 700 that

5    people have talked about.

6           MS. KRAMER:  Yes, Your Honor.

7           The other thing, Your Honor, is that you mentioned

8    the letters are licensed by Progrexion.  To be clear, the

9    letters that are included in the Progrexion software

10   platform, those letters are routinely updated by attorneys.

11   There may be new letters that are drafted or put in there by

12   attorneys in response to new evolutions in either the credit

13   industry or concerns that consumers are having based on the

14   financial status of the country.

15          For example, in the last several years --

16          THE COURT:  These are patterns.  These are pro

17   forma letters.

18          MS. KRAMER:  They are based on --

19          THE COURT:  They are patterns.

20          MS. KRAMER:  They are form letters, that is

21   correct, based on the lawyer's experience with what works in

22   terms of trying to get this information.  And also they can

23   reflect kind of ongoing changes to the laws in the various

24   states and federal regulations.

25          There are, of course, updates that are made as the

1    credit regulations throughout the country or in particular

2    states are adjusted.  There is review to ensure that the

3    letters that are sent out are reflective of those changes in

4    the law.

5              THE COURT:  But they are proforma letters.

6    They're patterns.

7              MS. KRAMER:  They are, Your Honor.

8              THE COURT:  They say, oh, this client deserves

9    letter A.  Who actually punches the computer that sends the

10   letter?

11             MS. KRAMER:  So in terms of who presses, for

12   example, you know, a button that populates the consumer's

13   file and then starts the machine running to send the

14   letters, in the first instance, Your Honor, it is, nowadays,

15   Teleservices agents working on behalf of Lexington Law after

16   they have collected the information from the client.

17             It's the same way that, for example, at a legal

18   pro bono services organization, there may be non-attorney

19   intake people who will take the client's initial

20   information, fill out the forms, and fill out the particular

21   fields that the lawyers have indicated they need.  And then

22   whether that's done in hard copy or electronically, it's

23   then put into a database or put into whatever needs to

24   happen next.

25             THE COURT:  Something activates the sending of the

```
 1   letter?

 2               MS. KRAMER:  That is correct, Your Honor.

 3               THE COURT:  That traditionally is your

 4   telemarketing person?

 5               MS. KRAMER:  Nowadays it is in terms of just

 6   having the client's profile fully set up such that the

 7   algorithm that's been constructed by attorneys can run, and

 8   it's actually --

 9               THE COURT:  But somebody starts that process.

10               MS. KRAMER:  You're right, someone starts the

11   process, Your Honor.

12               THE COURT:  Who presses the button?

13               MS. KRAMER:  So when we say the button --

14               THE COURT:  Well, who starts the process?

15               MS. KRAMER:  That's a great question, Your Honor.

16          In terms of who starts the process, when

17   Teleservices agents input that customer's information and

18   submit it into the system, that starts the process.

19          But if Your Honor is really interested in what

20   sends out -- what happens to send out a letter, what's the

21   triggering event that sends out that letter, it's not an

22   action by the Teleservices agent.  It's an action by the

23   algorithm, by the computer based on directions from the

24   attorneys.  And that's how Lexington Law has been able to

25   provide legal services on a broad scale.
```

```
 1            THE COURT:  At that point in time the attorney has

 2   not participated in reference to that particular client.

 3            MS. KRAMER:  The attorney has not necessarily

 4   looked -- a live attorney has not necessarily looked at that

 5   specific consumer file, you're correct, Your Honor, but an

 6   attorney has built out and provided the instructions of what

 7   to do.

 8            THE COURT:  I understand that.  But if you're

 9   talking about a law firm -- a law firm, the judgment call is

10   a computer call, then, at that point, isn't it?

11            MS. KRAMER:  The judgment call is a call made by

12   attorneys and then programmed into a computer to execute.

13            THE COURT:  But the call itself is by the machine?

14            MS. KRAMER:  Yes, Your Honor.  Once that algorithm

15   is running and following the instructions of the attorneys,

16   what's actually happening in terms of the technical carrying

17   out, it's done by the algorithm in the computer, but again,

18   only operating under the instructions and doing exactly

19   what's been directed by attorneys.

20            THE COURT:  Without looking at the specific

21   client?

22            MS. KRAMER:  Without a live attorney looking at

23   every individual file, yes, Your Honor.  That's how the law

24   firm has chosen to utilize available technology in order to

25   make it feasible to service this many clients at a given
```

1  time.

2         It's similar to other -- I mentioned earlier,

3  Your Honor, there are other legal services products, for

4  example, where a paralegal or an intake person could fill in

5  a software program particular client information, and that

6  program will generate legal forms, but those legal forms

7  weren't created by the computer.  Those are only being

8  generated based on the direction and inputs from attorneys.

9         THE COURT:  To meet patterns?

10        MS. KRAMER:  Well, when Your Honor speaks of

11  patterns, to be clear, there's over 20,000 unique individual

12  letters that are currently in the software platform that can

13  be sent out on behalf of a client.  We're not talking about

14  five or six form letters.  This is a very sophisticated,

15  highly specialized algorithm that really looks at the

16  individual client's needs, many different data points, and

17  figures out of all the options that an attorney could do in

18  this instance, which one is the best one based on that

19  attorney guidance.

20        THE COURT:  Out of some 20,000?

21        MS. KRAMER:  Over 20,000 currently, yes.

22        THE COURT:  They're updated every year.

23        MS. KRAMER:  Not every single letter is updated

24  every year, Your Honor, but there are updates made based on,

25  for example, changes in state regulations.  So there are

 1  consumers that come from different states and there may be

 2  particular requirements for letters coming from a consumer

 3  in that state or going to a particular creditor in a given

 4  state.

 5          THE COURT:  Does somebody rap on Heath's door for

 6  help when they have a complaint or is the matter referred

 7  routinely to the live people?

 8          MS. KRAMER:  So if a consumer calls in with a

 9  complaint and they would like to speak to an attorney, they

10  speak with an attorney.  It could be John Heath.

11          THE COURT:  I understand that.

12          MS. KRAMER:  It could be another attorney.  So if

13  there's a complaint -- when Your Honor says a complaint, you

14  mean like from a client?

15          So if a client comes in with a complaint, there

16  are instances where there's outreach by the attorneys or by

17  paralegals to that client.  Often when there's not a

18  complaint, Your Honor, there are often opportunities for an

19  attorney to get involved and interact with a client.  There

20  may be a particularly complex trade line or issue that a

21  client has, and those can be escalated.  We have an

22  escalation process where all the documentation has been sent

23  to one of the attorneys, and the attorneys will review that

24  and may reach out to the client to discuss.

25          THE COURT:  If you're talking percentages, and you

1    may not have this information, what percentage of clients,

2    initially signed on, ever actually talk to a live attorney?

3              MS. KRAMER:  You're exactly right, Your Honor, I

4    don't have that number at hand, but it's something that we

5    can look into, certainly.

6              I'm guessing -- and I don't want to speculate too

7    much, but we can also provide how that number may change

8    over time depending on the year, because a lot of it is

9    driven by client demand.

10             THE COURT:  Well, I'm curious about that because

11   we're talking about marketing, and in the suggested form of

12   order, we sell over the telephone the credit repair services

13   that Lexington Law provides.

14             MS. KRAMER:  Correct.

15             THE COURT:  Now how do we describe those services

16   other than in your contract with the person?

17             MS. KRAMER:  Of course.  There's a very specific

18   script, a long script, Your Honor, that every Progrexion

19   Teleservices employee is trained on, reviews regularly, and

20   receives coaching on if there's ever any other questions or

21   issues that pop up.  And in that particular script, it has

22   many explicit descriptions of what services will be

23   provided, for example, sending item verifications and

24   sending letters.  So that there's a full opportunity for the

25   client not just by seeing it in a contract or hearing a

 1   written contract read out loud, but that there is an

 2   opportunity for conversation with the Teleservices

 3   representative about the services.

 4            THE COURT:  Are there any services other than

 5   those set forth in the contract?

 6            MS. KRAMER:  As to the contract between Lexington

 7   Law and the consumer?

 8            THE COURT:  The contract that the telemarketer

 9   talks to the client about.

10            MS. KRAMER:  Yes.  So in the case of Lexington

11   Law, because there's also CreditRepair.com and telemarketers

12   who speak about the CreditRepair.com products, but for

13   Lexington Law and CreditRepair.com, all of the services that

14   will be provided are laid out in that contract.  There are

15   different levels of services laid out, but a consumer

16   doesn't necessarily sign up for all of them.

17            THE COURT:  Why don't we take a moment and read to

18   me, if you will, please, the services that the telemarketer

19   sells and that the client contracts for, signs.

20            MS. KRAMER:  Are you asking, Your Honor, in part

21   for what the Teleservices representative reads from the

22   contract?

23            THE COURT:  Yes.  I'm interested in the contract,

24   what the client signs.

25            MS. KRAMER:  Yes.

 1              THE COURT:  And why don't you read to me, if you

 2     will, please, specifically what it is that you say you're

 3     going to furnish.

 4              MS. KRAMER:  One moment, Your Honor.

 5              Mr. Schliesske, if you could please bring up

 6     JX-13.

 7              This is the contract document we were looking at

 8     before, Your Honor.  And if we go to -- let me get the page

 9     number correct -- page ten of this document, you'll see the

10     section that begins services and representation.

11              THE COURT:  Yeah.  I'm interested in the services.

12              MS. KRAMER:  Yes.  And this section, Your Honor,

13     goes for approximately three and a half pages.  So I'll try

14     to pull out the most relevant.

15              THE COURT:  Read it slowly.

16              MS. KRAMER:  Okay.  If Your Honor prefers, I'm

17     happy to start at the beginning.

18              THE COURT:  I'm interested in the services that

19     you say you provide.

20              MS. KRAMER:  Sounds great, Your Honor.

21              So to begin, you, the client, are engaging, for

22     example, the premier plus service level described below as

23     of the date of this contract.  There's information for the

24     client about how they can change the service level.

25              Then the next paragraph begins, you agree that by

1    signing this contract, you are providing Lexington with,

2    quote, written instructions in accordance with the Fair

3    Credit Reporting Act to periodically obtain your credit

4    reports from any consumer reporting agency, affiliate, or

5    third party, and to use your credit reports to provide you

6    with the services agreed to as part of this contract.

7              So in that paragraph, one portion of the services

8    that is described, Your Honor, is obtaining the credit

9    reports from the credit agencies periodically.

10             THE COURT:  That's for the benefit of the vendor?

11             MS. KRAMER:  Well, that's for the benefit of the

12   consumer, Your Honor.

13             THE COURT:  As well.  I understand that.

14             MS. KRAMER:  All right.

15             THE COURT:  Go ahead and get a written report.

16             MS. KRAMER:  The more information that Lexington

17   Law has from those credit bureaus about the credit report,

18   the better Lexington Law can serve their clients.

19             The next paragraph talks about additional specific

20   services.

21             Mr. Schliesske, if you can please bring back up

22   JX-13, and we'll be on that next page.

23             I have a hard copy, Your Honor, and I'm happy just

24   to continue reading, or I can wait for the monitor.

25             THE COURT:  I don't see anything.

1          Why don't you just read it.

2          MS. KRAMER:  No problem, Your Honor.

3          Lexington performs one or more of the following

4   services before you pay:  Enters your personal data and one

5   or more credit reports into its secured database; provides

6   you with a login to access your case online and to access

7   certain informative content Lexington offers its clients;

8   collects your information and instructions from you

9   regarding your particular circumstances and how you wish to

10  proceed; analyzes your case, and --

11         THE COURT:  Stop there for a moment.

12         MS. KRAMER:  Okay.

13         THE COURT:  I'm interested in the analysis.  Who

14  does the analysis?  The telephone operator?

15         MS. KRAMER:  There is some analysis done by the

16  Teleservices agent acting as an agent of Lexington Law, yes.

17         THE COURT:  But it's the Teleservices person?

18         MS. KRAMER:  On that initial call, yes,

19  Your Honor.

20         THE COURT:  Yes.  Employed by Progrexion?

21         MS. KRAMER:  Employed by Progrexion Teleservices

22  and working as an agent pursuant to contract with Lexington

23  Law, yes.

24         THE COURT:  Okay.

25         MS. KRAMER:  To conclude this paragraph, if I may,

1   Your Honor, and prepares and sends one or more

2   communications on your behalf.  Those letters begin to go

3   out even before the first payment comes in from a consumer.

4           THE COURT:  Prepares and sends a letter on your

5   behalf?

6           MS. KRAMER:  Yes, Your Honor.  The term is

7   communications, one or more communications on your behalf,

8   which can include a hard copy letter, it can include an

9   electronic communication, and that term is defined in the

10  contract.

11          THE COURT:  Is the alternative -- the alternative

12  available to the client or is that a choice made by the

13  telemarketer?

14          MS. KRAMER:  When you say the alternative,

15  Your Honor, do you mean our other products that don't

16  involve sending communications?

17          THE COURT:  Communication products.  I'm going to

18  send your letter.  I'm going to email your letter.

19          MS. KRAMER:  So there are other products that

20  Lexington Law offers.  I mentioned earlier those core

21  products.  They don't involve sending letters.

22          So the contract lays out, for example, a service

23  level called Maintenance Pro and one called Report Watch.

24  For example, Report Watch is designed for clients who

25  achieved their primary credit repair goals, but would

1   continue to benefit from longer term report and score

2   monitoring and analysis.

3           So every consumer who calls up, every potential

4   client has the option of whether they want to engage

5   Lexington Law for the core services, meaning the ones --

6           THE COURT:  What are the core services?

7           MS. KRAMER:  The core services are the services

8   that involve those communications to the credit bureaus and

9   the creditors.  It involves the item verifications and the

10  challenges, for example.

11          The care services don't involve those

12  communications, Your Honor, because there are many consumers

13  out there, especially today with --

14          THE COURT:  Tell me what your contract says that

15  you're selling basically.

16          MS. KRAMER:  Sure.  Your Honor, the services

17  section that I was just reading from has -- if you would

18  like, Your Honor, I can go on and read the next paragraph

19  that continues to describe the services provided.

20          THE COURT:  I'm interested in the services.

21  That's what's being marketed.  That's what's being

22  contracted for.

23          MS. KRAMER:  Correct, Your Honor.

24          Subsequently, Lexington typically performs one or

25  more of the following ongoing and periodic services as

1    appropriate in its judgment and discretion.

2              THE COURT:  These are elections on the part of the

3    service provider?

4              MS. KRAMER:  Working at the direction of the

5    client, yes, Your Honor.

6              THE COURT:  Okay.

7              MS. KRAMER:  Receives and reviews bureau and

8    furnisher correspondence.

9              THE COURT:  That's part of the communications that

10   the client gets and makes available to you?

11             MS. KRAMER:  Yes.  Collects and reviews updated

12   information and instructions from you regarding your

13   circumstances, goals, and case.

14             And why that's important, for example, Your Honor,

15   is a credit report, just as a person's credit situation,

16   isn't static.  It changes based on events in our lives.

17             THE COURT:  It's a dynamic world.

18             MS. KRAMER:  Exactly.

19             So when a client has a change going on, for

20   example, they may be trying to make a major purchase --

21             THE COURT:  What else do you do besides respond to

22   the client?  Okay.

23             MS. KRAMER:  Next it says monitors and analyzes

24   your case.  Provides you with status updates regarding your

25   case.

```
 1              THE COURT:  What does monitor case mean?

 2              MS. KRAMER:  So there are a couple of things in

 3   terms of monitoring, Your Honor.

 4              THE COURT:  I don't get the communication back

 5   from the bureau, you see.  I have to rely on you to bring

 6   something in to me.  What are you monitoring?  What are you

 7   actually doing?

 8              MS. KRAMER:  There's one thing primarily that

 9   we're monitoring, which is the client's credit reports, and

10   those credit reports that we pull periodically from the

11   three major credit bureaus change, and they can change

12   sometimes on a daily, weekly, and monthly basis.  So part of

13   the service that we provide is the client doesn't have to.

14   We monitor those credit reports to see --

15              THE COURT:  Do you actually ask for a credit

16   report as part of that service?

17              MS. KRAMER:  Yes, Your Honor.  We saw a moment ago

18   in the contract that the client is giving Lexington Law

19   permission to request --

20              THE COURT:  But what do you do?  What do you do?

21   I'm a client, you say you're going to monitor me.  That's

22   fine.  What do you do?

23              MS. KRAMER:  So we monitor, Your Honor, changes to

24   the client's credit report, or the credit reports coming out

25   of the three different agencies.
```

1          THE COURT:  But the credit bureau doesn't respond

2     to you.  He responds to the client.

3          MS. KRAMER:  So if there is a particular trade

4     line, for example, where there's a challenge or an item

5     verification letter that is sent, Lexington Law will monitor

6     that trade line.  There's one of potentially many trade

7     lines on a credit report.  We will potentially periodically

8     check in with a client to see if there's been any

9     correspondence, or if there hasn't been a response that

10     we're aware of, based on the legal analysis and the

11     algorithm that has been created, there's a particular

12     cadence for follow-up letters that will be sent that we

13     found, based on our years of experience, to be the most

14     effective to get a response.

15          THE COURT:  Your next item after you monitor

16     whatever you monitor.

17          MS. KRAMER:  And the last one -- well, after the

18     monitoring provision, Your Honor, it says provides you with

19     status updates regarding your case.

20          THE COURT:  Okay.  Now do you do that?  How do you

21     do that unless I ask?

22          MS. KRAMER:  Primarily, Your Honor, through that

23     client's portal that we talked about earlier.  Anytime

24     there's an additional communication that's sent out, anytime

25     there's a communication back from a credit bureau that we're

1    made aware of, or any time there's a change to that

2    particular client's credit report from one of the bureaus.

3         THE COURT:  Do you ask for a new credit report

4    periodically?

5         MS. KRAMER:  We do have updates to the credit

6    reports that come periodically from the bureaus, yes,

7    Your Honor.  That's part of the monitoring and the updating

8    that we provide to our clients.

9         THE COURT:  How often do they send you a new one?

10         MS. KRAMER:  I would have to confer, Your Honor,

11    to get that exact time frame.

12         I understand also that part of that is built into

13    the software platform that we use with the credit bureaus

14    via that special contract and relationship we have with the

15    credit bureaus so that we can get some of that information

16    through that platform.

17         THE COURT:  Does anybody ever look at it?

18         MS. KRAMER:  When you say does anybody, you mean,

19    Your Honor, does Lexington Law --

20         THE COURT:  With live eyes look at the credit

21    report.

22         MS. KRAMER:  Yes, Your Honor.  In fact, there are

23    Lexington Law paralegals that are often involved, for

24    example, at that stage of review and monitoring the cases,

25    and seeing what are the best next steps for a particular

1    client.

2            THE COURT:  Are they employees of Heath or are

3    they employees of Progrexion?

4            MS. KRAMER:  The paralegals are employees of

5    Heath, Your Honor, of Lexington Law.

6            THE COURT:  Okay.  How many do we have of those?

7            MS. KRAMER:  Your Honor, I would have to

8    double-check the number at this moment.  I believe the last

9    time we checked it was around 39.

10           600, Your Honor.  I apologize.  I was wildly off.

11           THE COURT:  Where are they housed?

12           MS. KRAMER:  In terms of where they work from?

13           THE COURT:  Yeah.

14           MS. KRAMER:  I know a number of them work here in

15   the State of Utah, Your Honor, and then there are others who

16   work remotely from other locations.

17           THE COURT:  I know there are a lot in Phoenix,

18   supposedly.

19           MS. KRAMER:  Yes.

20           I will say also, Your Honor, in the last two years

21   or so, in today's post-pandemic world, I know that remote

22   options are more accessible for more people nowadays.

23           If Your Honor would like, there's additional

24   services that are laid out in the contract.

25           THE COURT:  Yeah.  I'm interested in services.  So

1  this is what you're promoting.  This is what you're selling.

2         MS. KRAMER:  Exactly, and what we're providing to

3  clients.

4         So that last line of that paragraph I was just

5  reading about what Lexington Law does subsequent to that

6  initial work, the last line says and prepares and sends one

7  or more additional communications on your behalf.  So that's

8  to Your Honor's question about what happens in month two, or

9  month three, or month four, for example.

10        The next couple of paragraphs in these services

11  section, one of them is one that we highlighted earlier

12  about what we cannot guarantee and what the client is not

13  paying for.

14        So as we said, we cannot guarantee and you are not

15  paying for a particular credit report outcome or result.

16  You are paying only for Lexington's efforts on your behalf.

17        And, your Honor, I think that line really sums up

18  well all the services that are being offered.  It's

19  Lexington's efforts -- their best and zealous efforts on

20  behalf of the client.

21        THE COURT:  That's such an ambiguous term to begin

22  with, whatever the efforts are, and you try to narrow it

23  down with your contract.  Okay.

24        MS. KRAMER:  That is fair, Your Honor.

25        So if we go on to the contract, there's another

1  paragraph about Lexington's representation, its goals, and

2  such.  But there's another section that begins at the bottom

3  of this page -- Mr. Schliesske -- it's section A, credit

4  repair service levels.  And this is where, to Your Honor's

5  point, there's more detailed information for the client

6  about what efforts that client can expect to receive and

7  will receive.

8           THE COURT:  What are the efforts?

9           MS. KRAMER:  Sure.  So just to start, there's a

10 Concord Standard service level.  There's a Concord Premier

11 service level and a Premier Plus.  And there are a few other

12 products.

13          But just to give you an example, Your Honor, that

14 I think really highlights this, let's take a look at the

15 Concord Premier and Concord Standard service level.

16          So here -- on that same page, Mr. Schliesske,

17 yes -- credit repair service levels, the Concord Standard.

18 The Concord Standard service level will assist you in

19 requesting that bureaus and furnishers demonstrate their

20 compliance with various laws governing fair, accurate, and

21 substantiated consumer credit reporting.  Based upon its

22 analysis of your credit reports and the information and

23 instructions you provide, Lexington will prepare and send

24 communications to bureaus and up to three communications to

25 furnishers during a service interval on your behalf and in

1   your name to verify and/or challenge the accuracy of your

2   credit reports.

3           THE COURT:  You don't ask for that on the standard

4   level, the early level?

5           MS. KRAMER:  That is the Concord Standard level,

6   Your Honor.  I'm reading directly from Concord Standard.

7           THE COURT:  Does that include what we've been

8   talking about as to services?

9           MS. KRAMER:  Yes.  So all of --

10          THE COURT:  Is this the $79 level?

11          MS. KRAMER:  It is the standard level.  I'll have

12  to double-check if it's currently $79, Your Honor, because I

13  want to be perfectly clear.  But, yes, this is the standard

14  level.  And the paragraphs we read earlier that were

15  broader, generalized descriptions of the services that

16  Lexington offers, that's offered to all consumers.  So here

17  we're down more into the details, as Your Honor pointed out,

18  to really lay out for clients in black and white --

19          THE COURT:  You said three requests, is it?

20          MS. KRAMER:  So that's up to three requests --

21  three communications to furnishers.  There's a difference

22  between the furnishers and the bureaus.

23          And if we go to the next page of the document,

24  Your Honor -- if you don't mind, Mr. Schliesske, the first

25  full paragraph that begins clients who engage -- clients who

```
 1   engage the Concord Standard service level -- which we were
 2   just talking about -- or Concord Premier service level --
 3   because both -- for the following example numbers of
 4   specific service intervals -- so example number of months --
 5   have the following average number of communications sent to
 6   bureaus and furnishers.  In one service interval -- that
 7   first month -- four to six communications.  Two service
 8   intervals, eight to 12 communications.  Four service
 9   intervals, 16 to 24 communications.  And it continues.
10           So that lays out for the client in terms of the
11   service we provide what, in concrete terms, for the Concord
12   Standard service level am I getting and how much am I
13   getting every service interval for every month.
14           THE COURT:  That's a standard form that's
15   generated in that segment of time by the communication.
16           MS. KRAMER:  It's a communication that's sent out.
17   So it could be, for example, in that first service interval,
18   Your Honor, a client may have, in the Concord Standard
19   program, four to six different communications that go out.
20   Those could all be different, Your Honor.  Some could be to
21   the credit bureaus, some could be to furnishers.
22           THE COURT:  As instructed by the client?
23           MS. KRAMER:  With input from the client,
24   Your Honor, but as instructed by the lawyers' directions to
25   the algorithm.
```

```
 1              THE COURT:  No, no.  In the contract itself it
 2    says pursuant to your instructions, doesn't it?
 3              MS. KRAMER:  It does, Your Honor, because the
 4    client doesn't necessarily say I want you to challenge A, B,
 5    C, D, and E.
 6              I apologize.  That was too fast.  I will slow
 7    down.
 8              I don't necessarily want you to challenge, you
 9    know, this or that specific trade line.  Some clients do,
10    but other clients just may say I have been having an issue
11    with student loan debt or medical debts, and I'm not sure
12    what these particular things mean.  What can you do,
13    Lexington Law, to help me?  And we provide counseling --
14              THE COURT:  You send a letter.
15              MS. KRAMER:  So it says earlier in the contract,
16    Your Honor, in one of those paragraphs I mentioned briefly
17    about Lexington's representations, I didn't go through word
18    for word but it says, in part, regardless of the service
19    level, Lexington uses its judgment and discretion to
20    determine the content, number, and frequency of the
21    communications.  The way that any lawyer would, of course,
22    you know, take their client's instructions and goals, but at
23    the same time you have to use your professional and ethical
24    judgment.
25              THE COURT:  I think that's probably true.  How do
```

 1    they use it here if the pattern is used in contrast to a

 2    conversation with a live person?

 3           MS. KRAMER:  Sure.  So in terms of which

 4    particular form letter, which particular pattern letter is

 5    used -- as I mentioned, there are over 20,000 possibilities,

 6    right, Your Honor?  So the part of the goal of the algorithm

 7    and of this machine, the system, is to basically do the

 8    process that a lawyer would do through a live conversation

 9    with a client by saying --

10           THE COURT:  Who sends that?

11           MS. KRAMER:  Well, by saying, Your Honor, like

12    here are these data points that we get from the client, the

13    same way I would ask questions of a client in my office, and

14    just as we analyze live, maybe in a conversation, all right,

15    based on these factors about your case, these particular

16    aspects, these goals, these laws and regulations, here's, I

17    think, the best next step.

18           That's similarly what the algorithm does,

19    programmed at the direction of lawyers, to go, based on this

20    consumer's or client's data, their profile, their credit

21    report, their financial and personal information, what,

22    based on all of the collective legal knowledge that's been

23    put into this system, is the best option for this client in

24    this scenario.

25           THE COURT:  Why do you need a live lawyer at all?

 1              MS. KRAMER:  Well, Your Honor, there has to be in

 2    order for us to operate as a law firm lawyers.  But to your

 3    point, Your Honor, this is how, in the Lexington Law

 4    context, we've leveraged technology so consumers can benefit

 5    from legal services in this way.

 6              THE COURT:  Machine services, if nothing else.

 7              MS. KRAMER:  Your Honor, absolutely correct.

 8    There's a machine here that is utilized in the provision of

 9    legal services.

10              It's the same way that often there are -- I know

11    in a number of law firms, in a number of legal offices

12    throughout the country, paralegals who perform many legal

13    services.  And it's not necessary or even desirable for some

14    clients to have to talk to their attorney very often.  They

15    may say I just want to deal with the paralegal.

16              At this point, Your Honor, if you have -- I have

17    confirmation on the current prices of the different levels

18    that are offered to clients, if that would be helpful.

19              So the Concord Standard policy, that program level

20    that we were just speaking of, is currently 95.95 per month,

21    or per service interval.

22              THE COURT:  They've raised the price.

23              MS. KRAMER:  There have been increases over the

24    years, Your Honor.  I think, unfortunately, we're seeing

25    that in many products all across the country.

1          The Concord Premier service level, which is the

2     next step up, we didn't go into all the details, but was

3     referenced, that's $119.95 per month, or service interval.

4          And then the third product is the premier plus

5     level, that's offered to clients at $139.95 per month, or

6     service interval.

7          THE COURT:  What's the service that's the plus?

8          MS. KRAMER:  If we take a look at the contract,

9     Your Honor -- thank you, Mr. Schliesske -- on that same page

10    we were looking at, there's a description of Concord Premier

11    plus.

12         THE COURT:  What's the plus?

13         MS. KRAMER:  The Concord Premier plus service

14    level will, in addition to all services provided under the

15    Concord Premier service level, provide -- so the plus --

16    additional communications, periodic credit score tracking,

17    management tools for identity protection and personal

18    finance, and other communications as requested and as

19    applicable that leverage additional consumer protections.

20         There's then a paragraph that gives the same type

21    of examples that we saw for the standard plan of if you

22    engage for X number of service intervals, here is an average

23    range of communications that would be sent out.

24         THE COURT:  Now other communications or

25    communications in and of itself, you construct the letter

1    with the client?  Do the telemarketers construct the letter

2    with the client to which they affix the client's name?

3         MS. KRAMER:  No, Your Honor.  The Progrexion

4    telemarketing representatives do not themselves construct or

5    create the letter.  That is done by the algorithm and by the

6    system at the direction of attorneys.

7         THE COURT:  By the machine?

8         MS. KRAMER:  That's correct, Your Honor.

9         THE COURT:  Okay.  And as the result of the input

10   of the information concerning the client, by the client?

11        MS. KRAMER:  Yes, that is correct, Your Honor.

12   All of the information, at least at the initial phase, for

13   example, that the Progrexion Teleservices agent takes down

14   from the client, the intake, if you will, all of those data

15   points get fed into the algorithm, which then considers that

16   individual client's unique case, their unique data and

17   information.  And then using the algorithm in the machine

18   that's been programmed by and working at the direction of

19   lawyers, uses that legal judgment to figure out what is the

20   appropriate of all of the options in terms of these letters

21   that could be sent out.

22        THE COURT:  Okay.  That's the machine deciding

23   which is appropriate?

24        MS. KRAMER:  I would phrase it, Your Honor, as the

25   algorithm in the machine deciding based on the instructions

1    from attorneys.  So at the end the day, in terms of what's

2    the judgment behind the decision, the judgment behind the

3    decision is coming from the lawyers.  It's coming from

4    Lexington Law.

5            THE COURT:  Well, the lawyers that they haven't

6    talked to anybody about.

7            MS. KRAMER:  That is correct, Your Honor, in many

8    instances, but that's how Lexington Law is able to offer

9    these types of legal services to consumers at the price

10   points we just talked about.

11           If a consumer were to go and try to hire their own

12   individual lawyer at many law firms, as I'm sure Your Honor

13   is aware, they could be paying hundreds and hundreds of

14   dollars per hour for these types of services.  But by

15   leveraging technology, Lexington Law is able to offer

16   consumers who have a real need for these services but can't

17   necessarily afford or don't necessarily want to pay those

18   high lawyer hourly bills, can still have access to these

19   types of legal services.

20           If Your Honor has additional questions --

21           THE COURT:  Are these legal services?

22           MS. KRAMER:  Your question is purely are these

23   legal services?  Yes, Your Honor, these are legal services

24   being offered by lawyers and by paralegals, and others,

25   working at the direction of lawyers.

```
 1              To give you another example of how legal services
 2    nowadays may be using not necessarily the exact same
 3    structure as Lexington Law but similar technology, there's a
 4    company called Legal Zoom, Your Honor may have heard of.
 5    There's a number of court cases about Legal Zoom, and Legal
 6    Zoom is another type.  It's another company that offers
 7    legal services of different types to consumers, or the
 8    clients, but it leverages technology in order to make legal
 9    services more accessible because there is such a need and
10    there's such a demand, but there's not necessarily, you
11    know, your average American out there ready to jump up and
12    pay hundreds of dollars an hour.
13              THE COURT:  Almost like going to the automat and
14    putting your quarter in.
15              MS. KRAMER:  Perhaps in a different context,
16    Your Honor, yes.  But the great thing in this case is that
17    the types of services offered by Lexington Law, there are
18    cases like, for example, the LegalZoom v. VNC Bar case that
19    talk about how, in fact, this is professional legal
20    services.
21              THE COURT:  I'm genuinely interested in what
22    portion of the income that's billed by the law firm is
23    retained by the law firm and how much is paid out to the
24    advertiser, among others, and how much is retained --
25    actually retained by the law firm.
```

1          MS. KRAMER:  So with the Court's indulgence,

2     Your Honor, if I may, just to confirm.

3          In terms of the breakdown of where the money goes,

4     the consumer's payments that come to Lexington Law, I'll

5     say, Your Honor, I don't have an exact breakdown right now

6     of where all of that money goes.  We do have on our witness

7     list Mr. Chad Wallace, the CFO, who is prepared to discuss

8     in detail kind of the expenses breakdown and the net profits

9     breakdown, for example, of what's retained by the law firm.

10         THE COURT:  You're in a position to talk with him

11    so that perhaps tomorrow we can have that information?

12         MS. KRAMER:  We can track that down, Your Honor.

13         One thing I can tell you, though, that we did

14    track down today is the amount paid under the contracts

15    between Lexington Law and the various Progrexion entities,

16    in total, from the year 2021 and from 2022 to date.  So it's

17    not a consumer by consumer breakdown, but it would give you

18    a sense of how much money Lexington Law has paid pursuant to

19    those contracts to Progrexion.

20         So for Progrexion Marketing, there's a contract

21    with Progrexion Marketing, Lexington Law paid in 2021

22    $135,242,433.

23         Today, year to date for 2022 -- I should say May,

24    I'm sorry, May year to date, so not quite June, but the

25    first five months of this year, Lexington has paid to

1    Progrexion Marketing for those services $39,763,011.

2            I also have the numbers for Progrexion

3    Teleservices, Progrexion IP, which is the licensing, and the

4    Progrexion ASG, which is the billing and back office.  If

5    Your Honor prefers, I can provide those.

6            THE COURT:  I'm interested.

7            MS. KRAMER:  For Progrexion Teleservices for 2021,

8    the net contract value paid out was $85,166,822.  For 2022

9    through May, so the first five months, Lexington Law paid to

10   Progrexion Teleservices $25,802,184.

11           For Progrexion IP, which is the Progrexion entity

12   that licenses the software products, Lexington Law paid, in

13   2021, $128,076,546.  And in 2022, through May, the first

14   five months, Lexington Law paid Progrexion IP $49,087,558.

15           Finally, for Progrexion ASG, which provides the

16   billing, back office, et cetera, in 2021, Lexington Law paid

17   ASG $41,051,665.  And in 2022, through May, the first five

18   months of this year, Lexington Law has paid Progrexion ASG

19   $18,627,450.

20           So those are the net contract payments or values

21   that have been paid by Lexington to the Progrexion entities.

22           THE COURT:  Is there a figure as to what was

23   retained by Lexington?

24           MS. KRAMER:  That I will have to confer with our

25   clients, Your Honor.  We can try to track that down and get

1    back to you tomorrow.

2              THE COURT:  That would be great.  That would be

3    great.

4              Counsel suggests that you're covered by the reg.

5    Why aren't you?

6              MS. KRAMER:  Why aren't the defendants covered by

7    the regulation in Count 1?  As we discussed I know earlier

8    and in some briefing, Your Honor, specifically with respect

9    to Romanette (ii) of the regulation, it speaks, as we saw,

10   to sellers who have to then provide documentation of

11   promised results that have been achieved.

12             Now one thing that I know the government mentioned

13   earlier about the purpose behind this regulation and why the

14   FTC put it into practice in the first place, it's important

15   to remember that this particular regulation -- excuse me,

16   Your Honor.  Thank you.

17             This particular regulation in the section is about

18   abusive telemarketing practices.  Not all telemarketing

19   practices or all credit repair services, but it's about

20   targeting specifically abusive practices that were taking

21   advantage of consumers.  One of those practices is that

22   there were companies out there marketing themselves as

23   credit repair, or under some other moniker, and making

24   promises to consumers about particular results that would be

25   seen on a credit report.

1            I gave some examples earlier, such as in 90 days

2    we guarantee we'll improve your score by 90 points.  We

3    guarantee we'll remove all negative trade lines from your

4    credit report.  And it's exactly those types of

5    representations that became an issue, because some of those

6    companies would send out floods of letters or challenges,

7    make consumers pay in advance, and then maybe something

8    would temporarily drop off of a credit report while a

9    creditor or bureau was investigating, but then they would

10   reappear.  This is a process called reinsertion.

11           So the purpose really of this particular

12   regulation is to target those companies that are engaged in

13   abusive practices by making promises to consumers about a

14   particular lowered credit score in terms of points or

15   removing particular or all trade lines, maybe having that

16   happen temporarily, but then, after having absconded with

17   the consumer's money, one, two, three months later, those

18   items are back on the credit report and the credit score

19   drops.  So that's what was -- that's the type of behavior

20   that was intended to be targeted by this regulation.

21           When we're talking about Lexington Law and the

22   Progrexion defendants and why it does not apply to us, if

23   you look at our credit repair services and the services that

24   we offer consumers, how they're laid out in our contracts,

25   how they're marketed, how we tell third-party affiliates to

1   describe them, it's very clear in multiple fora, we do not

2   make those types of promises or guarantees.  We are not that

3   type of company who is going out there and promising a point

4   jump of X number on your credit score.  Rather, we want to

5   be helpful and transparent with our clients about what we do

6   provide.

7           We provide credit repair services, as that term is

8   defined in other statutes, but we do not engage in abusive

9   practices by promising particular results that are visible

10  on a credit report but then forcing consumers to pay in

11  violation of this particular regulation.

12          So that is why, Your Honor, our position is, as

13  we've briefed extensively and argued before, at least in

14  particular Romanette (ii), does not apply to the defendants

15  in this case.

16          THE COURT:  You do market credit repair?

17          MS. KRAMER:  We do, Your Honor, and that's that

18  term.  Credit repair is not a term that we necessarily --

19  it's used for some of our products.  But just to be clear,

20  Your Honor, credit repair as it applies in the statutory

21  context and in the FTC statutes and regulations is a defined

22  term.

23          THE COURT:  How is it defined in the regs?

24          MS. KRAMER:  If Your Honor would give me just a

25  moment's indulgence.

1          We're going to pull up the relevant regulations,

2    Your Honor, so that I can make sure I'm completely accurate

3    in terms of the wording.

4          But in terms of the credit repair services, yes,

5    we do offer credit repair services.  That is what we offer

6    and make very clear to our clients what that means.  So we

7    don't want there to be any mistaken impressions on behalf of

8    our clients about what they're signing up for and what

9    services they're getting when they're signing up for credit

10   repair with Lexington Law.

11         THE COURT:  What are you repairing?

12         MS. KRAMER:  We are working with consumers to

13   repair, often, their credit reports, maybe their credit

14   scores, but sometimes it's just their credit profile and

15   understanding.  Part of what we offer to consumers, as

16   Your Honor heard as we walked through the services provided,

17   is information and tools about how to build credit, about

18   the credit industry, and credit repair.  Part of what we

19   offer is verification of what actually appears on a

20   consumer's credit report.

21         So those are the types of services where when we

22   talk about credit repair, it's not just about jumps in

23   numbers or negative items coming off.  We do find

24   empirically that that does happen for the vast majority of

25   our clients, but that's not the only component to our credit

1    repair services.  We do have those others as well.

2            So when we say credit repair and what that means,

3    that's why we have a contract that specifically lays out all

4    the different services that are encompassed.

5            THE COURT:  We've talked about this before, but on

6    page 13 in the suggested form of order, additional facts,

7    Count 1, Progrexion markets Lexington Law and

8    CreditRepair.com as services that will assist consumers in

9    removing derogatory information from, or improving, the

10   consumer's credit history, credit record, or credit rating.

11           So you say you're going to help them try to

12   remove, and I understand that.  But you do have a goal as

13   suggested here?

14           MS. KRAMER:  That's correct, Your Honor.  That is

15   one of the goals.

16           I'll say about this particular uncontroverted

17   fact, as it appears in the PTO, in creating the section of

18   the proposed pretrial order, or PTO, the parties took the

19   instructions in this model pretrial order from the District

20   of Utah.

21           THE COURT:  That's too bad.

22           MS. KRAMER:  Well, without hearing otherwise,

23   Your Honor, we wanted to follow the instructions, and, in

24   particular, the government wanted to ensure -- and I believe

25   I'm saying this correctly -- that the certain admissions

1   from the answer filed by defendants in this case -- or the

2   answers of both Heath and the Progrexion defendants were

3   reflected in this uncontroverted fact section.  So this

4   particular paragraph 14 is verbatim, one admission that was

5   made in the answer to the complaint in this case.

6           THE COURT:  Well, it's your stipulation.

7           MS. KRAMER:  It is.  You're exactly right,

8   Your Honor.  We did not --

9           THE COURT:  Set out there this is what we're

10  marketing.

11          MS. KRAMER:  It is, Your Honor.  We are -- I

12  should say Progrexion is marketing Lexington Law and

13  CreditRepair.com as services that will assist consumers.

14  That is true and that is part of what they're marketing.

15  That's not to say that there aren't other services also that

16  Lexington Law and CreditRepair.com offer that --

17          THE COURT:  I'm talking about this.

18          MS. KRAMER:  Of course, Your Honor.  All I mean to

19  clarify is that to the extent we're trying to define all of

20  the services that Progrexion markets for Lexington Law and

21  CreditRepair.com, and everything that Progrexion says about

22  those services, that's not necessarily what's captured in

23  this paragraph because we were following what we believed

24  were the instructions for the pretrial order in terms of

25  specific phrasing from the answer.

1          THE COURT:  Some people use that, but it deals

2     with surplus matters often, redundant matters that aren't

3     needed.  There are all kinds of things that where it's far

4     more simple to identify what it is we're talking about, and

5     skip all of the redundant stuff because it just wastes time

6     for everybody.

7          MS. KRAMER:  That's exactly right, Your Honor.  So

8     there are certain uncontroverted facts proposed by either

9     one or both parties that may be candidates for that.

10          THE COURT:  Well, the effort -- the effort in

11     assistance is to assist consumers to do what?  Removing

12     derogatory information.  Okay.  We've got letters from for

13     improving the consumer's credit history.  Well, history is

14     inaccurate so you modify it.

15          MS. KRAMER:  Well, and at times, as has been

16     recognized by the government itself in many publications,

17     there are many inaccuracies in the credit reporting

18     industry.  So part of what we offer is assisting consumers

19     to resolve those inaccuracies.

20          THE COURT:  Well, you're correcting the history.

21     You're correcting the record.  You're correcting the

22     ranking.  Those are sort of a little beyond hope.  They're

23     an indication of goals that are marketed to attract people

24     one way or another to use your services as defined in your

25     contract.

1          MS. KRAMER:  That is correct, Your Honor.  Those

2     are several of the goals and some of the primary goals that

3     our clients may have when they engage us.  And part of what

4     we do and what Teleservices representatives do when they're

5     talking to potential clients is determining whether, in

6     fact, a particular consumer is a good candidate for our

7     services.

8          So there are some consumers who come in, who might

9     call to want to talk to Lexington Law, and they say I want

10    to sign up for credit repair services.  But sometimes, after

11    looking at that consumer's profile or their credit reports,

12    we may realize this person isn't a good candidate for our

13    services.  They don't have negative trade lines to be

14    removed or they may have items that they have already

15    verified and we will not challenge true, accurate, verified

16    items.

17         And so what happens on those calls is our agents

18    will say you know what, we don't think you're a good

19    candidate for credit repair services.  We may offer a credit

20    monitoring service, but Lexington Law's goal is not to just

21    sign up as many consumers as possible regardless of their

22    needs.  That wouldn't be ethical.

23         That's also what guides our practice with current

24    clients.  There's a process where periodically Lexington Law

25    runs data and evaluates whether clients are getting a good

1   enough return on their payment in terms of negative items

2   that are left, or trade lines that we think can be removed.

3   And if Lexington determines that this client is still

4   willing to keep paying for our premier level service, that

5   they're not getting their bang for their buck, they no

6   longer need this level of service, we will affirmatively

7   reach out and tell that client we think that maybe this

8   level of service is no longer necessary.  Maybe we can

9   transition you to a different monitoring product.

10          So part of the intention here, Your Honor, is yes,

11   these are the goals for a lot of our clients and consumers,

12   and they're some of the things that we and Progrexion market

13   for Lexington Law to assist consumers in trying to achieve.

14   Others as well, but this is certainly a part of it.

15          But then there is a process by which Lexington Law

16   and Progrexion ensure that we are signing up consumers for

17   the appropriate products as long as they're a good fit.

18          THE COURT:  Okay.  Why don't you describe for me

19   how you charge and how you get paid.

20          MS. KRAMER:  Yes, Your Honor.

21          In terms of Lexington Law charging, for example, I

22   know it's laid out in the contract, but to kind of talk

23   practically, what happens is once a consumer signs their

24   contract, there's the first service interval that happens

25   five to 15 days after signing the contract, and that's the

1    first time that a consumer or client is charged.

2          The consumer, or client, when they sign up and

3    sign up with a contract with Lexington Law, provides most

4    often credit card information, and gives authorization for

5    Lexington Law to charge their credit card on a service

6    interval basis, which generally is a monthly basis, for the

7    work that was performed during that past service interval,

8    past month.

9          So after that initial service interval, which

10   involves all of the setup, thereafter, on a monthly basis,

11   that's one service interval is one month, after the work has

12   been performed, Lexington Law, through its contract with

13   Progrexion ASG, who actually performs this charging, will

14   then charge the client -- for example, right now it's

15   June 29th.  So if a service interval for a client ran from

16   June 1st through June 30th, Lexington Law would perform all

17   that work.  And then after the service interval has ended in

18   the month of July, they would then bill the client or charge

19   the client for the work performed in the month of June.

20   That's how we charged in compliance with FTC regulations,

21   including CROA.

22          Then in July when that charge is made pursuant to

23   the credit card authorization and the contract that the

24   client signed, Progrexion ASG will charge, and on behalf of

25   Lexington Law will charge that client's credit card for the

1    monthly fee, or service interval fee for the services

2    performed, in our example, in the month of June.

3                THE COURT:  Are services actually performed?

4                MS. KRAMER:  Yes, Your Honor.  They are.

5                THE COURT:  By a machine or by some live person?

6                MS. KRAMER:  Depending on the service interval,

7    depending on the month and the client, it could be one, the

8    other, or both.

9                THE COURT:  Depending on the level of service.

10               MS. KRAMER:  Well, any Lexington Law client can

11   talk to an attorney or talk to a paralegal, but in terms of

12   the number of communications sent out or other services that

13   we talked about beyond communications, that does vary

14   depending on the service level.

15               THE COURT:  If you don't perform any services, you

16   don't charge?

17               MS. KRAMER:  I don't believe -- especially with

18   respect to some of the other products that are offered as

19   part of credit repair, Your Honor, and our services, I don't

20   believe there would be a month that goes by without us

21   providing some type of service to the client.

22               THE COURT:  That's always interesting because if

23   the service performed would ordinarily be a very minor type

24   of activity, you charge the full price for the level that

25   you're at?

1          MS. KRAMER:  We would, Your Honor, but that's

2     exactly why, after we have a client who's signed up,

3     Lexington Law does a regular evaluation of that client's

4     profile.

5          So, for example, if you signed up for the premier

6     service level, and there's an average of -- I'd have to pull

7     up the contract, Your Honor, but a certain number of

8     communications, letters that you would expect to go out per

9     month, per service interval, if that client reaches a point

10    with us where we don't have any more letters to send out,

11    we've verified all of the items, we've challenged what we

12    can challenge, we will not just continue to bill that client

13    for an indefinite period of time without saying one word

14    about it.

15         What happens is we do an evaluation and we'll try

16    to identify those clients who no longer need that level of

17    service, and then we will reach out and encourage that

18    client to downgrade.

19         The clients also, I will point out, Your Honor,

20    sign in our contract and make a representation that they

21    themselves will also monitor their credit report and

22    evaluate whether they still need this level of service.

23         THE COURT:  They can terminate with 30 days'

24    notice, I understand that.  But I'm curious as to a matter

25    of practice, if you don't do anything that's worth charging,

```
 1   do you still draw down at the end of the month?

 2           MS. KRAMER:  So there are instances, Your Honor,

 3   where there is no charge for a month for a client because we

 4   don't have the opportunity to provide a service.

 5           The primary example of this is when a customer

 6   came in and provided us certain account information, but

 7   there's additional account information that we need that's

 8   missing to complete our services, we won't charge the client

 9   as long as we're missing that information and we can't take

10   action.  That would be unethical.  So in those instances we

11   don't charge the client because we're unable to provide that

12   particular service.

13           THE COURT:  I was curious as to whether you charge

14   while everybody is awaiting a response from the credit

15   bureau, who is slow and late in responding, and you go

16   through month one, no response, and you go through month

17   two, no response, do you charge for month two if the credit

18   bureau hasn't responded?

19           MS. KRAMER:  Well, for a particular consumer, if

20   there's only one negative item and there's only one letter

21   that's going to be sent out on behalf of Lexington Law, in

22   those instances, Your Honor, under our contract, we actually

23   don't recommend those higher level service plans.  We

24   recommend more of a monitoring and lower level plan where we

25   can do a one-off communication.
```

1          THE COURT:  I was wondering what happens when the

2     letters are sent, people anticipate a response, and you

3     don't get one, and month two goes by waiting eagerly for a

4     response, and I'm just wondering if you charge.

5          MS. KRAMER:  Well, during those subsequent months,

6     Your Honor, for many of our clients, they will have a number

7     of trade lines on their credit report that they'd like to

8     verify or challenge, and we don't send out all of the

9     letters all at once.

10         THE COURT:  I understand you spread them out.

11         MS. KRAMER:  Exactly, and that's in part to spread

12    out the other service intervals.

13         THE COURT:  Just say that they're all like that,

14    but I'm interested, frankly, in knowing if you charge when

15    nobody has responded to the letters that you send.

16         MS. KRAMER:  So if all of the communications that

17    can be sent out have been sent out --

18         THE COURT:  Oh, yes.

19         MS. KRAMER:  -- the consumer is still receiving

20    the benefit of additional services that we offer beyond just

21    communications.

22         THE COURT:  Well, we've got available services,

23    but I don't take care of them.  All I'm doing is waiting

24    eagerly for that response.

25         MS. KRAMER:  Even if you, Your Honor, as a client,

1    for example, your primary goal and what you care the most

2    about is that response to that letter, there are still a

3    number of other services that you've contracted for that

4    Lexington Law is continuing to provide.

5              THE COURT:  Such as?

6              MS. KRAMER:  In terms of continued monitoring of

7    your credit report --

8              THE COURT:  We monitor.  You know, we monitor and

9    we haven't had a response.  You haven't called me.  I

10   haven't called you.  I'm really interested in that question

11   because ordinarily if you send a nice letter, even by email,

12   to a credit bureau, they don't respond the next day.  There

13   is often a time lag.  If there is a time lag after

14   communications have been sent, client hasn't received

15   anything, you haven't received anything, do you charge?

16             MS. KRAMER:  In terms of that client still being

17   active with the additional services that are part of

18   their --

19             THE COURT:  The answer is you do charge, then, for

20   additional services.

21             MS. KRAMER:  The services that are laid out in the

22   contract, they can be.

23             But, Your Honor, to your question about do we keep

24   charging if nothing is happening, if we have a client where

25   we have done all that we can do for them in terms of sending

1    out communications, again, while we contract and the client

2    represents that they will continually reevaluate whether

3    they need our services, we also take the affirmative step to

4    evaluate and affirmatively reach out to clients and say,

5    hey, you know what, it's been a certain number of months.

6    We've sent out all the communications we can.  You might

7    still have some items on your credit report that you would

8    like to come off, but either they've been verified or we

9    don't think there's a high likelihood of that, we don't want

10   you, our client, to just keep paying for us to not

11   necessarily send out additional communications.

12          THE COURT:  I appreciate that.  I understand that,

13   and people are nice to do that.  But my question still

14   remains.  Other than the potential of monitoring, the

15   potential of analyzing, if you haven't had a response, do

16   you charge them the second month?

17          MS. KRAMER:  We will, Your Honor.  When there's --

18   I understand Your Honor has hit on monitoring, for example,

19   but there are other services that are still being provided

20   to that client.

21          Now our concern with -- I appreciate --

22          THE COURT:  I'm not talking about potential

23   services --

24          MS. KRAMER:  I agree, Your Honor.

25          THE COURT:  -- or available services.  I'm talking

1    about services rendered.

2            MS. KRAMER:  Yes, Your Honor, we agree completely.

3    But the act of monitoring, what's happening on a consumer's

4    credit report, that's a service that not just Lexington Law

5    but many companies offer nowadays for consumers.

6            THE COURT:  I don't care what others are offering.

7    I'm really interested in what you're doing.

8            MS. KRAMER:  Very fair, Your Honor.  So that is

9    one of the services that we offer.

10           We also offer continued analysis.  We also

11   continue to offer to all of our clients access to that

12   internal portal and profile that we talked about that also

13   has additional resources for clients provided by and offered

14   by Lexington Law.

15           So in terms of what are the services that are

16   being offered and the services that are being performed by

17   Lexington Law, in practicality and pursuant to our contract,

18   it's not just sending out communications and waiting for the

19   response.

20           But as Your Honor -- I appreciate saying that it's

21   nice to do, to be proactive with our clients, but it's also

22   in the client's best interests.  And as Lexington Law is a

23   law firm, we have ethical obligations in terms of being

24   zealous advocates for our clients and working in their best

25   interest.  So part of this is fulfilling that legal

 1   responsibility to inform our clients when we don't think

 2   they're getting the proper value in terms of the value of

 3   our services based on what they're paying.

 4          If there's someone paying the 119 plus dollar a

 5   month plan when in reality they don't need it, they could be

 6   doing fine on the 99.95 plan, or even something less.

 7          THE COURT:  I think that's wonderful.  I think

 8   that's just great.  But it doesn't answer my question, and

 9   my question still exists, and I think it's a very pertinent

10   question, particularly, through experience, often the credit

11   bureaus don't respond.

12          MS. KRAMER:  You're right, Your Honor.  They

13   don't.

14          I will say two things on that point.  Number one,

15   in terms of the communication with the credit bureaus, while

16   an average consumer may send a nice email, even a really

17   nice email to a credit bureau or creditor, that email

18   doesn't necessarily get looked at with as much priority or

19   as much expediency as, for example, some of the

20   communications that come from Lexington Law.

21          Part of the reason we have these special

22   relationships and contracts with the credit bureaus and we

23   have this electronic platform is because we have learned

24   that it is more efficient in terms of timing and in terms of

25   getting the attention of the credit bureaus to work with

1    them through this platform.

2          So part of when Your Honor is thinking, all right,

3    I sent an email off into the ether and I'm waiting for a

4    response, there's a different structure that's happening

5    with Lexington Law and the credit bureaus in terms of their

6    modes of communication.

7          THE COURT:  I understand that, and I appreciate

8    that.  But, you see, the credit helper who assisted me

9    didn't sign the communication.  He signed my name to the

10   communication.  And I've been waiting expectedly for a

11   response -- for a response that doesn't come, and one month

12   goes by, and two months go by.  Do I see a withdrawal on my

13   credit card at the end of the second month while I'm waiting

14   to find out if the letters did any good?

15         MS. KRAMER:  So one thing that is important to

16   note, Your Honor, in terms of what happens in response to a

17   letter sent to the credit bureau, you may, the client, be

18   waiting for a letter in response, but as --

19         THE COURT:  It's sent by the client, though signed

20   by the firm.

21         MS. KRAMER:  Correct, Your Honor.  But sometimes

22   what happens in reality is the credit bureau never sends a

23   letter back to the client.  What the credit bureau does is

24   they may remove that negative trade line anyways as a result

25   of the letter, because the credit bureau, as Your Honor

 1  asked earlier, doesn't necessarily, in all circumstances,

 2  have an affirmative obligation to send a letter to the

 3  client.  So part of what we're doing as Lexington Law --

 4          THE COURT:  I'm just saying the passage of time,

 5  the end of the second month, do you draw down using the

 6  credit card?

 7          MS. KRAMER:  I will say, Your Honor, we are not

 8  aware of --

 9          THE COURT:  Check that out for me and maybe

10  tomorrow we can chat about it as well.

11          MS. KRAMER:  I'm happy to continue to dig,

12  Your Honor, but I can tell you, from conferring with my

13  colleagues, we are not currently aware of any instance where

14  there are charges made to clients when there is zero

15  communications being sent out.

16          THE COURT:  Even though I'm available, if you call

17  me and talk to me?

18          MS. KRAMER:  That's what I'm aware of right now,

19  Your Honor.  We can look into this tonight and confer.

20          But, again, the goal of Lexington Law is to try to

21  make sure that we're providing a service and only charging

22  clients when we provide that service.  It would be unethical

23  and it's not something that we're trying to do or doing

24  pursuant to our contract to charge a client for a particular

25  service interval when we didn't do anything for that client.

 1   That is not what we would do.

 2             THE COURT:  You say you don't charge them?

 3             MS. KRAMER:  We're not aware of a client being

 4   charged with no services being provided or no communications

 5   being sent out.  I will confer with my client and we'll

 6   continue to look into that tonight.  But I understand

 7   Your Honor's question and what you're trying to get at, and

 8   we'll dig into that and confirm.

 9             THE COURT:  Thank you.

10             Anything else you want to tell me?

11             MS. KRAMER:  At this point, Your Honor, not

12   specifically as to Count 1, which I understand was what the

13   government initially addressed.

14             THE COURT:  Well, we'll let counsel respond.

15             MS. McOWEN:  Thank you, Your Honor.

16             A lot has just been said and much of it the Bureau

17   disagrees with, in particular, the characterization of these

18   services as legal services, and some of what Ms. Kramer has

19   described as far as the detailed analysis and attention of

20   legal minds to the customers of Lexington Law firm, but I do

21   not have time to respond point by point to all of the

22   material, which I believe is mostly extraneous to the

23   question before the Court.

24             And I'd like to just bring us back to the

25   complaint, I'd like to bring us back to the stipulated

1    uncontroverted facts, and I'd like to show the Court how the

2    elements pled in Count 1 of the complaint are satisfied by

3    the uncontroverted facts stated in the pretrial order.

4    There are no further facts to decide and the matter can be

5    resolved, I think, rather cleanly on the law.

6        So I would point the Court to Count 1 of the

7    Bureau's complaint.  It's not very long.  It first states

8    the text of the regulation.

9        Ms. Kramer has emphasized and stated repeatedly

10   that defendants' position is that they are exempt from this

11   regulation because of Romanette (ii), and that they have not

12   violated Romanette (ii), which uses the word promised

13   results.  But the regulation says that it is an abusive

14   telemarketing act or practice and a violation of the TSR for

15   any seller or telemarketer to request or receive payment of

16   any fee or consideration for goods or services represented

17   to remove derogatory information from, or improve, a

18   person's credit history, credit rating, or credit record

19   until, number one, the time frame in which the seller has

20   represented all of the goods or services will be provided to

21   that person has expired, and the seller has provided the

22   person with documentation in the form of a consumer report

23   from a consumer reporting agency demonstrating that the

24   promised results have been achieved.

25       So they have completely ignored Romanette (i),

1   which they are also in violation of and which is a separate

2   basis for this Court to rule on Count 1.

3           I would also like to focus -- so let me move to

4   the next paragraph of the complaint, paragraph 131.  It says

5   the Progrexion defendants and Heath are sellers, and the

6   Progrexion defendants are telemarketers under the TSR.  And,

7   Your Honor, I believe that is clearly established by

8   uncontroverted facts, particularly facts four as to Heath

9   and five as to CreditRepair.com.

10          The next paragraph of the complaint, paragraph

11  132, says the Progrexion defendants' and Heath PC's credit

12  repair services are represented to consumers as services to

13  remove derogatory information from, or improve, the

14  consumers' credit histories, credit reports, or credit

15  ratings.

16          Your Honor, that paragraph is established by the

17  paragraph you've been focused on, which is paragraph

18  uncontroverted fact 14 in the pretrial order.

19          THE COURT:  I would appreciate it if you would

20  move the mike a little bit so that we can articulate.

21          That's great.

22          MS. McOWEN:  Thank you.

23          The only remaining paragraph of this count

24  concerns when the defendants requested and received payment,

25  and that isn't controverted either.  And for that you need

1    only rely on the contract that we've just reviewed in detail

2    or Ms. Kramer's presentation today about the fees.  They're

3    not in dispute.  The basic structure of the billing and fees

4    charged by these companies is not up for debate.

5              So with those few paragraphs of this pretrial

6    order, which line up precisely with these few paragraphs of

7    our complaint, we believe Count 1 is satisfied.

8              I'm happy to go into more detail about why the

9    government disagrees so strongly with their assertion about

10   legal services, but I don't want to spend an undue amount of

11   time on it.  I will simply say that I believe it is a bit of

12   a red herring.

13             You asked, Your Honor, why have a lawyer at all,

14   and Ms. Kramer responded in order for us to operate as a law

15   firm.  And that's precisely it.  Progrexion is a marketing

16   company.  What they specialize in is marketing, and they

17   have chosen to market two credit repair brands differently.

18   It's essentially the same service.  It's described the same

19   way in the consumer contracts.  But it is marketed for

20   CreditRepair.com as simply credit repair services, and it is

21   marketed as legal services when it's called Lexington Law.

22   And that's very attractive to some members of the consuming

23   public.

24             But the services, Your Honor, are the same.  The

25   letters they send out are the same.  And I mean the same.

1          We have, for example, a potential witness on our

2   trial witness list, Mr. McQuiller, who is a customer of both

3   brands, which is not that unusual, at different times, and

4   he has in his records the same form letter sent once on

5   behalf of -- once while he was a customer of Lexington Law

6   and once when he was a customer of CreditRepair.com.

7          The sales scripts are essentially the same.  The

8   training for sales agents is essentially the same.  The

9   bones of the service and the provision of the service, even

10  the pricing and billing structure is all essentially the

11  same.

12         I also want to respond to the comment Ms. Kramer

13  made about how in their view Lexington Law makes legal

14  services available to people who wouldn't otherwise be able

15  to afford that.  And, again, I'll be brief, but just to hit

16  on one point, I want to point out that she says that

17  attorney time can cost hundreds of dollars an hour.  But

18  consider a customer of Lexington Law who has signed up for,

19  let's say, six months, and that person pays the company 600

20  or $700, and they get zero minutes of attorney time.  So

21  this assertion that this is a way to provide legal services

22  in an affordable way to people is, I think, just not

23  substantiated on the record.

24         I would only add, Your Honor, that you can see

25  this sort of tortured gymnastics that counsel has to go

through in order to try to describe the services as anything

other than services to remove negative items from a

consumer's credit report or improve that credit report.  And

as we have said before, what they are marketing to consumers

is that improvement, is at least the hope of negative items

being removed and their credit score going up.  And that is

the reasonable expectation that customers have when they

agree to pay this company $100 a month.  That is, in fact,

the definition of a promise, is that reasonable expectation

of obtaining that result.

It isn't a specific guarantee, but the law, prior

to the enactment of this regulation, was already full of

prohibitions against deceptive guarantees.  The FTC didn't

need to add one more.  There's already a prohibition against

deceptive acts and practices.

There is elsewhere in the telemarketing sales

rules a prohibition against deceptive representations about

exactly that, about the results.  But what Section

310.4(a)(2) adds is different.  It is not just a simple

prohibition against making deceptive specific guarantees.

What it does is it tries to, again, put guardrails

up against the inherent of the likely abusive and unfairness

of an industry that can peddle hope and then represent on

paper that they've provided some service.  Some service,

they say, has been provided each month, and they'll make

1    sure that they have something they can point to, some bit of

2    consumer education, or some bit of monitoring, or something

3    that they sent to some credit reporting company.  They'll

4    make sure they have something each month.

5            But the reason the Federal Trade Commission

6    enacted this rule was to say that's not what people are

7    paying for.  What's being marketed and what people are

8    reasonably expecting from these engagements are results, and

9    those results are, unfortunately, often not forthcoming.  If

10   they are forthcoming, then the company can document that

11   it's been achieved and the company can charge the consumer.

12           But I just want to emphasize that this is a very

13   different kind of regulation and it is designed to address

14   exactly what you've just heard about from Ms. Kramer for the

15   last hour and a half.

16           I'm happy to answer any of your questions you have

17   about Count 1, Your Honor.  I'd also be happy to move to

18   Count 2.

19           THE COURT:  Thank you.

20           MS. McOWEN:  Thank you.

21           THE COURT:  You're welcome to take a minute to

22   respond.

23           MS. KRAMER:  Your Honor, I'm happy to respond now.

24   I also know we've been going for quite a bit of time.  So if

25   either Your Honor or the court reporter needs a break, I

1    would also be happy to come back after a brief break.

2            THE COURT:  I'm going to break for the day in a

3    few minutes.  So respond now and we'll break for the day and

4    be good to you this afternoon --

5            MS. KRAMER:  Understandable.

6            THE COURT:  -- and start in tomorrow at ten.

7            MS. KRAMER:  So to address two points that the

8    government just brought up, first with respect to Romanette

9    (i) of the regulation, which we didn't discuss beforehand,

10   the government asserts that the defendants have also

11   violated Romanette (i) in terms of our payment structure.

12   We disagree, and we've briefed this, as Your Honor may be

13   aware, extensively.

14           I want to point out that our billing practices, we

15   do not bill until all services for a particular service

16   interval have been provided.

17           And, in fact, Your Honor, there was a lawsuit that

18   was litigated in California, decided back in 2010, involving

19   Heath PC, as the defendant, specifically about our billing

20   practices, and it was in the context of another FTC

21   regulation, CROA.  But similarly, it was about charging

22   advanced fees for services.  And in that case the court

23   found that our service interval billing process was lawful

24   and was in compliance with those FTC regulations.

25           I have that citation available if it would be

1    convenient, but I know that's also been cited in the

2    briefing by the parties.  But I didn't want to leave that

3    unaddressed, Your Honor, since Romanette (i) didn't come up

4    much in our discussion earlier.

5            Another just very brief point.  I know that the

6    government mentioned about -- was talking about promised

7    results and what that means.  We heard the term reasonable

8    expectation, or hope.  But promised results, as that term

9    appears in the regulation, and in context, in reading the

10   regulation, we can understand and define the term results.

11   It doesn't mean reasonable expectation, and it doesn't mean

12   hope or goal of a consumer.  It's very specific to a result

13   that a seller has promised to a particular consumer, and

14   it's a result that can be verified on a written credit

15   report.

16           Finally, Your Honor, I do have some of that data

17   that Your Honor was interested in knowing before about the

18   percentages of the consumer fees paid to Lexington Law,

19   about how much it retains and where those other fees go.

20   Right now what I can tell you, Your Honor, is in terms of

21   those payments I described earlier from Lexington Law to the

22   Progrexion entities, those millions of dollars payments we

23   discussed for 2021 and 2022 through May, I have the

24   percentage of Lexington Law's total revenue and what those

25   payments amount to, in total, in terms of that revenue.

1              So in 2021, in terms of those numbers we discussed
2    earlier and the contract payments made from Lexington Law to
3    the Progrexion entities, those payments were 82.7 percent of
4    Lexington Law's total revenue.  And in terms of the payments
5    made in 2022 through the month of May, so the first five
6    months, the payments we discussed earlier amounted to 84.5
7    percent of Lexington Law's total revenue, in terms of paying
8    for all of the licensing fees, the services, the account
9    billing, the back office, the marketing and the teleservices
10   agents.  So I wanted to provide Your Honor that information
11   as soon as it was available.
12           THE COURT:  Roughly 15 percent was retained by
13   Lexington then?
14           MS. KRAMER:  In terms of -- yes, Your Honor.  I
15   don't have right now information about whether Lexington
16   Law's other expenses, for example, expenses related to its
17   own employees, how that would factor in.  But at least in
18   terms of these particular contracts, as you can see, it
19   makes up a very large proportion of the revenue and the
20   amount that comes in from consumers.
21           THE COURT:  I appreciate that.
22           MS. KRAMER:  Thank you, Your Honor.
23           THE COURT:  As I indicated, I'm going to give you
24   a break this afternoon.  We'll reassemble tomorrow at ten,
25   and we'll continue with our conversation.

1          It may be that those who have exhibits that people

2     are going to worry about, you're welcome to use the

3     courtroom until five o'clock, or thereabouts, if you desire

4     to.  Let's put it that way.

5          MS. KRAMER:  Thank you, Your Honor.

6          THE COURT:  I take it that you've abandoned any

7     claim of constitutionality?

8          MR. BENNETT:  No, Your Honor.  We're standing on

9     our objections and our defense -- the defenses related to

10    the Constitution, both under Article I and Article II, as

11    well as --

12         THE COURT:  Well, you've talked about -- and

13    you've given me a citation, but the citation from the

14    Supreme Court talks about separating the single director

15    provision from the rest of the enactment and the rest of the

16    powers.  I was curious as to why that was even given to me.

17         MR. BENNETT:  So there's a couple of issues,

18    Your Honor, with respect to constitutionality.  I think

19    you're focusing on the Seila Law issue, which is that the

20    director -- when the CFPB was initially constituted, it was

21    unconstitutional because of the appointment.

22         THE COURT:  I'm going to let you talk about that

23    tomorrow when we get to it.  Give you an opportunity to do

24    that.  But as I read the case that you've cited, there was a

25    differentiation between the powers of the director and the

1   limitation on the president to fire him, but they separated

2   that --

3           MR. BENNETT:  Yes, they did.

4           THE COURT:  -- from the organization as an

5   organization, and the powers of the organization.  And I'll

6   be interested tomorrow to listen to you on that subject

7   because I didn't think it helped you, but maybe I'm wrong.

8   I've been wrong before.

9           MR. BENNETT:  To give you a sneak preview, the

10  word intersects is the statute of limitations and other

11  delay defenses, because the director who ratified this suit

12  initially was a nullity, not appointed correctly.  By the

13  time a new director came around --

14          THE COURT:  I don't think we're communicating.  So

15  take a look at it.  We can chat about it tomorrow.

16          MR. BENNETT:  Thank you, Your Honor.

17          THE COURT:  We'll be in recess today and give the

18  court reporter a big break because she's going to be busy

19  tomorrow.

20          MS. McOWEN:  Thank you, Your Honor.

21          MS. KRAMER:  Thank you, Your Honor.

22          THE COURT:  Thanks a lot.

23          And you're excused.  Don't worry about me.

24          (Whereupon, the proceeding was continued to

25  Thursday, June 30, 2022 at 10:00 a.m.)

1                   C E R T I F I C A T E

2

3

4           I hereby certify that the foregoing matter is

5     transcribed from the stenographic notes taken by me and is a

6     true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP      DATED: 7-11-2022
      Official Court Reporter
17    351 South West Temple, #8.431
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25