1        IN THE UNITED STATES DISTRICT COURT

2        DISTRICT OF UTAH, CENTRAL DIVISION

3

BUREAU OF CONSUMER FINANCIAL      )
4  PROTECTION,                     )
                            )
5         Plaintiff,       )
                            )
6  vs.                     )      Case No.
                            )  2:19-CV-298-BSJ
7  PROGREXION MARKETING, INC.; PGX  )
   HOLDINGS, INC.; PROGREXION TELE-  )
8  SERVICES, INC.; EFOLKS, LLC; CREDIT- )
   REPAIR.COM,INC.; and JOHN C. HEATH, )
9  ATTORNEY AT LAW, PC, D/B/A HEATH  )
   P.C.,                       )
10                          )
          Defendants.      )
11  _____)

12

13     BEFORE THE HONORABLE BRUCE S. JENKINS
        -------------------------------------

14              August 9, 2022

15             Motions Hearing

16        Transcript of Proceedings

17

18

19

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP   801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

1                      A P P E A R A N C E S

2

3    For Plaintiff:          Maureen E. McOwen
                             Jonathan H. Reischl
4                            Alicia Ferrara
                             John McConkie
5                            Tracy L. Hilmer
                             BUREAU OF CONSUMER FINANCIAL PROTECTION
6                            1700 G Street NW
                             Washington, DC  20552
7

8    For Defendant:          Edward John Bennett
                             Edward C. Barnidge
9                            Paul A. Hoversten
                             Shauna M. Kramer
10                           Loryn Helfmann
                             Atticus DeProspo
11                           Daniel Whiteley
                             Emma J. Nino
12                           Suzanne Salgado
                             WILLIAMS & CONNOLLY LLP
13                           680 Maine Avenue SW
                             Washington, DC  20024
14
                             Karra J. Porter
15                           CHRISTENSEN & JENSEN PC
                             257 East 200 South, #1100
16                           Salt Lake City, Utah  84111

17

18

19

20

21

22

23

24

25

```
 1        SALT LAKE CITY, UTAH; TUESDAY, AUGUST 9, 2022; 10:00 A.M.
 2                              PROCEEDINGS
 3             THE COURT:  Good morning.  It looks like we're all
 4   here.  Let's go ahead in the Bureau of Consumer Financial
 5   Protection vs. Progrexion and others.  It's 19-C-298,
 6   calendared for a series of motions.
 7             And for the benefit of the record, if you will be
 8   kind enough to make a record.  Again, counsel, make your
 9   appearances for the record, tell us who you are and whom you
10   represent.
11             MS. McOWEN:  Good morning, Your Honor.  This is
12   Maureen McOwen representing the Bureau of Consumer Financial
13   Protection, and I will let my colleagues introduce
14   themselves as well.
15             MS. HILMER:  Good morning, Your Honor.  Tracy
16   Hilmer for the Bureau.
17             MS. FERRARA:  Good morning, Your Honor.  Alicia
18   Ferrara for the Bureau.
19             MR. McCONKIE:  Good morning.  Taylor McConkie,
20   also for the Bureau.
21             MR. REISCHL:  Good morning.  Jonathan Reischl, for
22   the Bureau.
23             THE COURT:  Is that everybody on that side?
24             MS. McOWEN:  Yes, Your Honor.  Thank you.
25             MR. BENNETT:  Good morning, Your Honor.  Ted
```

1    Bennett, from Williams & Connolly, on behalf of the

2    defendants.  I've got a number of my colleagues here who I

3    will introduce because some of them don't have access to

4    microphones where they are sitting.

5           My colleague Shauna Kramer, also of Williams &

6    Connolly.

7           Suzanne Salgado, also of our firm.

8           THE COURT:  I'm sorry.  I didn't pick up the first

9    name.

10          MR. BENNETT:  Suzanne.

11          Edward Barnidge.  Paul Hoversten.  Emma Nino.

12   Daniel Whiteley.  Loryn Helfmann.  Atticus DeProspo.  And

13   our co-counsel, Karra Porter.

14          And because of the array of motions that are on

15   the docket, you may be hearing from many of those attorneys

16   today, Your Honor.  And they will reintroduce themselves

17   when they take the podium.

18          THE COURT:  Okay.  We could have a bar convention

19   at the same time.

20          To begin with, in reference to the motion to

21   amend, I'm going to grant the motion to amend the complaint.

22   It's obvious when you look at the history of this case that

23   nobody has been astonished or surprised that the subject

24   matter has been examined on both sides, including the scope.

25          So I'll ask the United States to prepare and

 1   submit a suggested form of order in reference to the motion

 2   to amend, and we'll grant the same.

 3           Let's start with the motion to exclude the expert

 4   report and testimony of John Ulzheimer, and we'll be happy

 5   to move ahead on that.

 6           MR. BENNETT:  Thank you, Your Honor.  Ted Bennett

 7   on behalf of the defendants.

 8           We emailed the government last night.  We're

 9   actually withdrawing Mr. Ulzheimer.  So he won't be called

10   at trial by us.  That probably obviates that motion.

11           THE COURT:  Gee, thanks.

12           MR. BENNETT:  Sorry, Your Honor.  It was a late

13   made decision in light of the examining the other evidence

14   that the government has put on its exhibit list and the list

15   of witnesses.  It makes sense not to add yet another

16   witness.

17           THE COURT:  Well, I enjoyed reading his report,

18   though it took a long time.

19           MR. BENNETT:  I apologize for that, Your Honor.

20           On the motion to amend, we'll file a responsive

21   pleading.  Is 14 days sufficient for the Court?

22           THE COURT:  I'm sorry?

23           MR. BENNETT:  We'll file a responsive pleading to

24   the new amended complaint, and I just was asking if we could

25   have 14 days for that.

1              THE COURT:  That's fine with me.

2              MR. BENNETT:  Thank you, Your Honor.

3              THE COURT:  The response should be fairly simple,

4    noting the history of this case and the 16 lawyers that have

5    been appearing for the defendant, six for the United States.

6    You'll have adequate help.

7              MR. BENNETT:  Yes, we do, Your Honor.  Thank you.

8              THE COURT:  Okay.  Let's take a look at the motion

9    to exclude the expert report of John DelPonti, Jr. and

10   related testimony.

11             Again, if you'll be good enough, for the record,

12   tell us again who you are so that we can keep track of you.

13             MS. HILMER:  Yes.  Good morning, Your Honor.  I'm

14   Tracy Hilmer for the Bureau.

15             Your Honor, we also understand, from an email we

16   received from defendants last evening, that defendants have

17   withdrawn all but one category of opinions by Mr. DelPonti.

18   I'll let them confirm that, but our understanding is that

19   they have withdrawn Mr. DelPonti's cash flow analysis, which

20   was his first opinion, the testimony about the credit

21   reporting environment, and about credit repair generally.

22             THE COURT:  Is that correct?  Are they withdrawn

23   as well?

24             MR. BENNETT:  Yes, Your Honor.  We have withdrawn

25   his opinions regarding the overview of the credit reporting

1    industry.  That will come in through fact witnesses.  We

2    don't need to call an expert for that.  And then the

3    testimony about the effect of this case would have on the

4    business for the government to prevail.

5                THE COURT:  What remains of his proffer?

6                MR. BENNETT:  So what remains of Mr. DelPonti,

7    Your Honor, is his consumer data analysis -- consumer data

8    analysis which responds to the expert report of the

9    government's expert, Dr. Frederick.  Mr. DelPonti is one of

10   the four experts that respond to Dr. Frederick, given the

11   breadth of Dr. Frederick's anticipated testimony.  I think

12   that's the principal opinion that remains.  Yes, Your Honor.

13               So he exists merely to respond to that part of

14   Dr. Frederick's testimony.  If Dr. Frederick is allowed, we

15   would call Mr. DelPonti to respond, similar with Dr. Wind

16   and Dr. Maronick.

17               THE COURT:  Well, you're talking about rebuttal?

18               MR. BENNETT:  Yes, Your Honor.  All of those,

19   Dr. Wind, Dr. Barnett, Dr. Maronick, and Mr. DelPonti, all

20   respond to Dr. Frederick, the government's expert.  So they

21   are kind of pendant to his report.  So depending on how

22   much, if any, of Dr. Frederick comes into the case, we will

23   adjust accordingly with those four experts.

24               THE COURT:  Do you contemplate those as rebuttal?

25               MR. BENNETT:  They would be responsive in our case

1    to him.  So yes, to rebut Dr. Frederick, which is --

2                THE COURT:  They're not part of your case in

3    chief?

4                MR. BENNETT:  As defendant, I always have a

5    struggle with that, Your Honor.  We intend to make their

6    points in our principal case.  We've got one case as the

7    defendant.  We don't anticipate being able to --

8                THE COURT:  Are they part of your case in chief?

9                MR. BENNETT:  They will not be part of our case in

10   chief.

11               THE COURT:  Talking rebuttal?

12               MR. BENNETT:  They will rebut Dr. Frederick.  So

13   if Dr. Frederick is stricken or limited in some way, all of

14   or some of those experts won't appear.  In that way, it may

15   make sense to talk about Dr. Frederick first because the

16   result of the discussion of Dr. Frederick will affect Dr.

17   Maronick, Dr. Wind, Dr. Barnett, and Mr. DelPonti.

18               THE COURT:  Well, let's talk about Dr. Frederick.

19               MS. HILMER:  Your Honor, if I might, I'm not

20   completely clear on what defendants are still offering -- or

21   potentially offering Mr. DelPonti for.

22               THE COURT:  They want to see what Frederick has to

23   say, as I understand it.

24               MS. HILMER:  Okay.  Would you like to handle that

25   by a proffer first, Your Honor, about Dr. Frederick or --

1          THE COURT:  No.  No.  I think we ought to move to

2    Dr. Frederick, and he apparently seems to be a pivotal

3    person here and they want to respond to Dr. Frederick.

4          MS. HILMER:  Then I will take my seat until it's

5    time for me to discuss with the Court what Dr. Frederick

6    will testify about.

7          THE COURT:  Okay.  What we've got is a motion in

8    reference to Dr. Frederick.  So let's move to that and we'll

9    strike the other two on the representation that they are

10   rebuttal.

11         MR. BENNETT:  Thank you, Your Honor.

12         THE COURT:  I want to just demonstrate, if I may,

13   while it's refreshing to have people withdraw things, this

14   is just one example of the motions that have been filed,

15   lots of motions, and it takes a great deal of time and

16   effort to become acquainted with motions if they're not

17   seriously filed.  And I will simply offer that as a comment,

18   because not only the attorneys are involved in the case,

19   unfortunately or fortunately, the Judge is involved in the

20   case as well.  If he's conscientious at all, there's a great

21   deal of time that's been expanded in dealing with matters

22   that are currently withdrawn.  I'm grateful that they are.

23         MR. BENNETT:  Thank you, Your Honor.  We apologize

24   for that.

25         As Your Honor has apprehended in this case, we

1     have struggled mightily to understand what the government

2     alleges are the misleading statements in this case.  We have

3     struggled mightily to understand which of the 50 or so

4     witnesses the government intends to call they actually will

5     call.  And we have struggled mightily to understand which of

6     the 700 plus exhibits they intend to use.  In that analysis,

7     Your Honor, we have done our best to try to pare things down

8     to streamline this case.

9              THE COURT:  That's one reason why I continued the

10    pretrial order for discussion until mid September.

11             MR. BENNETT:  Thank you, Your Honor.

12             So with respect to Dr. Frederick, the government

13    states in its opposition to our motion that Dr. Frederick,

14    quote, will assist the jury to conclude whether these sample

15    hotswaps, advertising, and scripts used to pitch the

16    defendants' credit repair services were deceptive.  So they

17    say they are going to bring in Dr. Frederick, who is an

18    expert in consumer decision making, to testify about whether

19    the scripts the hotswaps used were deceptive or whether

20    their ads were deceptive.

21             The challenge for us is that Dr. Frederick

22    doesn't, in fact, do that.  He doesn't help understand

23    whether the scripts or ads were deceptive.

24             What Dr. Frederick does is in the first part of

25    his testimony he presents a consumer survey that is

1    unfortunately flawed and not helpful to the trier of fact.

2    The consumer survey that he drafted was designed to be a

3    three-minute survey, a three-minute survey that he sent out

4    by email to 270 plus consumers who had come to one of the

5    defendants through a hotswap.

6           THE COURT:  I thought it was 250,000.

7           MR. BENNETT:  I think the initial group was 270,

8    and then there was some discussion about the emails and

9    whether the email addresses were accurate.  I think the

10   precise number that he sent it out to, 270,773 email

11   addresses.  And then he ultimately culled that down to

12   234,740 email addresses.  So some number of those people,

13   after some additional steps in there.  It's a little unclear

14   how he rationalizes the representativeness of the ultimate

15   target audience with the ultimate list.

16          THE COURT:  He got a very few back.

17          MR. BENNETT:  He got an infinitesimally small

18   number back.  He got -- he initially said 479, but then it

19   turns out that some people answered more than once.  We

20   think it's 475 unique responses.

21          THE COURT:  That number was really fascinating.

22   If you sent out 250 inquiries, 250,000, or 270, whatever he

23   sent, that he gets less than 500 back.

24          MR. BENNETT:  It is fascinating, Your Honor.  I

25   think it's -- and it's a problem that plagues his research

1  because what he does in this survey is try to assess, you

2  know, at a high level who was happy with the services they

3  provided.  And as I'll discuss, many people had erroneous

4  memories about what they had actually undertaken.  Many of

5  them forgot, apparently, who they had dealt with.  Many of

6  them misunderstood his questions, which he admitted were

7  ambiguous as to what it means to try to get a mortgage.

8          But at the base, if you go back, ignoring those

9  issues just for a moment, and talk about the

10 representativeness issue, it has a couple of problems.  One

11 is if you think about in our society who shows up for a

12 school board meeting, for example, people are

13 self-selecting.  People self-selected to this survey.

14 People self-select to go to a city council meeting or a

15 school board meeting.  But people who select to show up for

16 those things, who select to go through a survey like this,

17 they're the people who have a gripe.  Very few people show

18 up at the town council and say you all are doing a great

19 job.

20         And that's what you have here.  You have people

21 who get an email that invites them to take a survey about

22 something, and the ones who select to do it are inevitably

23 the ones who have complaints.  And we see that -- if you

24 compare this population with the track record of other

25 people who engaged Lexington and CreditRepair.com, Credit

1    Repair and Lexington send out consumer satisfaction surveys

2    internally, and these people were more likely to have

3    responded negatively than the overall population.  So you

4    have this selection bias in his report.

5            Now there's a quarrel about that.  The government

6    has, they think, responses to that, and he looked at some

7    data and tried to say that the 475 really do represent the

8    250,000.  But one of the things he admits in his

9    testimony -- and this is a really key point that the

10   government kind of glosses over -- he admits -- and we have

11   some of his testimony on slides.

12           If we can put up slide one, Andrew, please.

13           Dr. Frederick admits, while he quarrels with us

14   about whether the 475 represent the 250,000, he admits that

15   his sample of these 475 are not representative on a hotswap

16   to hotswap basis.  And that's really critical, Your Honor,

17   because the allegations in this case is that people came

18   through individual hotswaps.  They saw a script or they saw

19   an ad maybe.  They spoke to someone on the phone.  They came

20   to Lexington Law or CreditRepair.com, and the government

21   says in that process they were misled.  And he wants to --

22   according to the government, Dr. Frederick wants to help us

23   understand was this person who came in through, for example,

24   Hope, were they misled.  So he sends out these surveys.

25           But he admits -- he's asked, 34 consumers

1    responded for Easy Home Ownership, and you did not assess

2    whether the 34 were representative of the overall Easy Home

3    Ownership consumer profile; is that correct?  And

4    Dr. Frederick testified that's true for any of these looked

5    at individually.

6            So he admits that his survey, lumping everyone

7    together, people who came through different channels at

8    different times, saw different ads, heard different scripts,

9    he admits that lumping them all together, he doesn't have a

10   representative sample from any individual hotswap.

11           So he can't, based on his survey, and the

12   government can't, extrapolating from his survey, say that

13   OneLoanPlace, or Easy Home Ownership, or Help Renters, that

14   any of these hotswaps about whom discovery was taken, that

15   any of them, based on his survey, did anything deceptive or

16   misleading.  That's a fatal flaw to his survey.  He wants to

17   lump together in a case where you need to have

18   individualized proof of each channel standing on its own,

19   and he admits he can't do that.

20           Now it's interesting in the way he asked his

21   questions in his survey.

22           You can take that down.  Thank you, Andrew.

23           Dr. Frederick has been an expert in one case

24   previously.  It was a Federal Trade Commission case tried to

25   an administrative law judge, ultimately appealed to the

1    Sixth Circuit, which is how it comes into the federal

2    system.

3        But in this ALJ trial, he was put forward as an

4    expert on consumer decision making, which is his field.  And

5    in that -- and this is the ECM BioFilms case.  And in his

6    work there, he did a survey, and he got 29,000 responses

7    from consumers.  And it's interesting what his survey asked.

8    His survey in that case put to those consumers the allegedly

9    deceptive language.  In that case it was what does the

10   phrase biodegradable mean, and he gave them choices about

11   what they thought it meant.  And the consumer selected and

12   the Court considered that testimony.

13       He didn't do that here.  He didn't put to any

14   consumer, you know, I see that you came in through Easy Home

15   Ownership.  Here is an ad they used.  Or even putting aside

16   knowing which channel they came through, he didn't put to

17   them any language that was ever presented to any consumers

18   to assess what they thought it meant.  Did they think it was

19   a promise of something?  Did they think they were guaranteed

20   some result?  He didn't do that at all.  Instead he asked a

21   bunch of questions that simply confused consumers and didn't

22   yield what the government promised with him, which is that

23   he was going to help us understand whether people were

24   deceived.

25       And you don't have to take my word for it,

1    Your Honor.  Dr. Frederick admits that the questions he put

2    to consumers were subject to multiple interpretations.  For

3    example -- if you could put up slide three, Andrew.

4             So Dr. Frederick sends out this survey, and he

5    wants to impugn the business of Lexington Law and

6    CreditRepair.com based on the responses of the various

7    people who received it, putting aside representativeness for

8    a minute.  And the survey questions -- and we'll look at

9    them in a moment -- they use the word try over and over,

10   were you trying to get a mortgage.  Were you trying to get

11   into a hotswap.  I'm sorry, into a rent-to-own home.  But he

12   testified in his deposition, I agree with you that different

13   people who have different standards for what constitutes

14   trying -- different people have different standards for what

15   constitutes trying.

16            And the questioning goes on.  If you responded to

17   an ad that said you were interested in a rent-to-own home,

18   does that constitute trying to get into a rent-to-own home,

19   and Dr. Frederick testified, I would say that language is

20   ambiguous and different people will make different

21   interpretations of the word.  So why is this so important?

22            If you look at slide four, for example, he asks

23   about trying and gets completely nonsensical responses

24   because people have a different standard for what that

25   means.  So, for example, in his three-minute survey, he

1  asked people have you ever tried to improve your credit

2  score by using a credit repair service.

3          Your Honor, we're here today and we're looking at

4  this data because each of these 250,000 people who were sent

5  the survey, each of them used CreditRepair.com or Lexington

6  Law.  They used a credit repair company on their journey.

7  And yet 140 of those people, out of the 275, 140 of them

8  answered no to the question about whether they had ever used

9  a credit repair service while trying to improve their credit

10  score.

11          If you look at slide five, another question he

12  asked, did you have contact with any companies or

13  services -- any companies or services -- when you were

14  trying to get a mortgage?  This question was asked only of

15  people who said they had tried to get a mortgage.

16  Sixty-five of those people said no, that they never had

17  contact with a company or service while trying to get a

18  mortgage.  Clearly people didn't understand what he meant.

19          Slide six.  Have you ever tried to get into a

20  rent-to-own home?  320 people out of 475, no, never tried.

21  Did you have any contact with companies while you were

22  trying to get into a rent-to-own contract?  Of the people

23  who said they had tried to get into a rent-to-own home, 68

24  said they had never contacted a company when trying to do

25  so.  They just didn't understand what the words meant that

1    he was using with them because he didn't ask specific enough

2    questions.

3              Let's look at slide seven just briefly.

4              He admitted he didn't do any analysis to assess

5    what people meant when they said they tried to get into a

6    hotswap.  He didn't know whether they meant they did

7    anything at all other than make that one initial call.

8              Finally, slide eight, just quickly.

9              He was asked specific questions about that.  He

10   doesn't know whether they did anything other than call in

11   one of the hotswaps.  He doesn't know whether they made an

12   application and withdrew it.  And he doesn't know whether

13   these people who he wants to blame -- now the government

14   wants to say people were unable to get a mortgage, unable to

15   get into a hotswap even though they used Lexington Law.

16   Isn't Lexington terrible.  But their expert admits he

17   doesn't even know if these people even applied for a

18   mortgage, even applied for a rent-to-own home because he

19   didn't ask the right questions.

20             So we're going to be blamed, based on his

21   statistical reduction of these people's journey, with not

22   providing a valuable service when he can't testify that they

23   carried their end of the bargain of actually taking the

24   steps, filling out the application, pursuing the application

25   to achieve what he said they wanted to achieve.

1           In fact, one of his opinions, again, impugning the

2   business of Lexington and CreditRepair.com, is that only

3   eight percent of respondents who tried to get into a

4   rent-to-own home were able.  That's meaningless unless you

5   know what he meant by try.  It's meaningless unless you know

6   those people actually filled out the application and took

7   the other steps.

8           And, of course, and this is also endemic to all of

9   his work, it's also meaningless statistics unless you have a

10  control group, because saying that eight percent is somehow

11  a low number for people trying to get into rent-to-own,

12  well, against what?  What happens if you don't engage

13  Lexington or Credit Repair?  Is the number then two percent?

14  Is it ten percent?  We have nothing to compare it to because

15  he simply didn't do what a scientist should do who wants to

16  stand on his opinions, like Dr. Frederick, which is give us

17  something to compare it to.

18          I'm going to talk in a minute about his data

19  reduction regarding FICO scores.  It suffers the same

20  problem.  He draws all sorts of conclusions about whether

21  CreditRepair.com or whether Lexington Law actually helped

22  consumers in what he calls a material way.  But he has no

23  control group to say that the performance was materially

24  different based on their work with Lexington Law, their work

25  with Progrexion as opposed to any kind of a control group.

1          We talked about representativeness earlier.  I

2     want to just focus back, going back to the question that the

3     government says he's going to answer, which is whether

4     people were deceived.  And then he goes on in his discussion

5     of data to talk about whether people were assisted by

6     Lexington and CreditRepair.com in terms of getting actual

7     credit repair services and whether they were successful in

8     acquiring a mortgage.

9          But Dr. Frederick admits -- and he buries this in

10    a footnote in his November 22nd, 2021 -- I think it's his

11    third report of the reports he did -- he buries in a

12    footnote that he cannot testify that his 475 folks were

13    representative of other consumers' journey in terms of those

14    two key facts, whether they successfully got a mortgage and

15    whether they were satisfied with their process.

16         The government comes back on this

17    representativeness point -- they don't really respond,

18    because they can't -- to his admission that he doesn't do

19    anything that is representative of each individual hotswap

20    channel.  But they say no, it's all representative of the --

21    475 represents the 250,000 because he compared four or five

22    aspects of their characteristics with the overall

23    characteristics of the 250,000 who didn't respond.

24         But he completely avoids discussing issues that

25    are really critical and we know, and the government admits,

1    affect someone's creditworthiness.  He doesn't compare the

2    two groups on the basis of, for example, the employment

3    status.  So we don't know whether the 475 who responded had

4    poor employment history, were unemployed at all, had no, you

5    know, prospect of employment at greater numbers as compared

6    to the 250,000.  That obviously would affect their credit

7    performance, their creditworthiness.  And

8    Dr. Frederick doesn't control for that.

9          He doesn't control for age, which he admits is a

10   factor that is reflected in credit scores and

11   creditworthiness.  He doesn't control for the time frames in

12   which they signed up.  He's got people in different time

13   periods, but he doesn't do anything to show that the time

14   periods -- so people who signed up in 2016 are

15   representative of people who signed up -- of the 250,000,

16   the portion of those who signed up in 2016.

17         He doesn't control for education.  He doesn't

18   control for geography.  These are all factors that can

19   affect someone's creditworthiness.  He ignores them

20   completely.  And without that analysis, there's no way to

21   testify in a scientific way that the 475 represent the

22   250,000 who didn't respond.

23         And it's not surprising that it's not

24   representative, because of the infinitesimal number -- and

25   Your Honor focused on this -- the infinitesimal number of

1    people who responded.  We're unaware, and the government

2    hasn't pointed one out, of any case where a court accepted

3    survey evidence with such a minuscule response rate.  One

4    out of 500 people took three minutes to answer these

5    questions.  That is something that is just -- a court has

6    never accepted that level of response.

7            And putting on top of it, it's not a randomized

8    sample of people.  It's not as if he took 250,000 and then

9    used a random number generated, for example, to select a

10   subpopulation.  He put it to the respondents -- and, again,

11   this goes back to the city council meeting.  He put it to

12   the respondents to decide whether or not they would respond.

13   And when you do that, you inevitably build bias into the

14   responses and get the people who may have a gripe.

15           So the bottom line on his survey -- and we'll talk

16   about his data work in a moment -- it doesn't answer the

17   question that the government poses, which is whether or not

18   the ads or the scripts were deceptive.  He could have asked

19   those questions.  I don't know why he didn't.  But he chose

20   not to ask those questions.

21           The questions he did ask were ambiguous.  It's

22   really a question of garbage in, garbage out.  If you don't

23   ask questions that are easily understood and actually get to

24   the point, the results are inevitably worthless and

25   misleading.

1             And, finally, he doesn't -- he admits that his

2     method here doesn't yield a representative sample of the

3     Hope or the other hotswap customers.  He just doesn't yield

4     a representative sample that would be useful for the finder

5     of fact to be able to determine were Hope, or Ascent, or any

6     of these other hotswaps ads or scripts deceptive.

7             His testimony should not go into this case.  It

8     shouldn't pollute the record in this case, and we would say

9     that testimony regarding his sample should be stricken.

10    And, of course, this would obviate the need for us to call,

11    for example, Dr. Maronick, who is a former FTC employee and

12    an expert on survey taking.  We would withdraw him if

13    Dr. Frederick's survey opinions were stricken.

14            Data analysis.  So the second part of his report

15    is to take a larger group of 588,000 customers -- and these

16    are people who came to Lexington and CreditRepair.com

17    between March of 2016 and July of 2020.  A bit of a

18    concession there, Your Honor, about the statute of

19    limitations, by the way.  They only did Dr. Frederick's

20    analysis for a period that postdates the statute of

21    limitations that we argued about previously.  And he does

22    this analysis to determine whether it was deceptive for the

23    HSPs to, quote, claim that Progrexion services would help

24    them attain either a loan or a mortgage.  And to do this, he

25    does two steps.

1          He first takes this data regarding almost 600,000

2     consumers and he analyzes FICO scores, other criteria to

3     determine whether their FICO scores changed during their

4     tenure with Lexington Law.

5          And then he does a second step where he tries to

6     leap from the number crunching to some conclusions.  We'll

7     talk about that separately because that is completely far

8     afield from his expertise, and we'll get to that in a

9     moment.  Let's focus for just a moment on the number

10    crunching.

11         Now the data that Lexington Law and Progrexion

12    keep, and they keep very voluminous, detailed data about

13    clients, it's actually very helpful in understanding how

14    effective the programs that Lexington and CreditRepair

15    undertake, how effective those programs are, because they

16    are able to track how many people have removals, how many

17    trade lines are removed, what the timing of that is.  And we

18    can, in many cases, compare FICO scores along the way to

19    determine whether somebody's FICO score is going up or going

20    down, or not changing at all.

21         So this is fact testimony.  It's taking business

22    records and discussing -- doing the math and discussing the

23    facts that those records convey.  We have, in fact, on our

24    witness list a guy named Tony Lam, who's the keeper of this

25    data.  The government deposed him at length, and he crunches

1    the numbers, and he can describe for the Court and the

2    finder of fact what the numbers reveal about consumers.  And

3    he can slice it however the Court or the parties want him to

4    in terms of this hotswap, and people who came in through

5    that hotswap, or what the timing was, and determine how that

6    affected people.  It's fact testimony, it's not expert

7    testimony, and it's relevant to showing whether or not these

8    companies were ripping people off.

9            We don't need an expert to do it.  And you can see

10   from Dr. Frederick, when you bring in an expert who wants to

11   get to a result, they can do it pretty effectively in the

12   way that, unfortunately, some experts do.  So what are the

13   problems with the way he crunches the numbers?

14           So, first of all, I mentioned that Dr. Frederick

15   starts with nearly 600,000 consumers.  Right off the bat he

16   starts slicing that number down.  He excludes 221,000

17   consumers who didn't have FICO score data.  You know,

18   because Lexington and CreditRepair don't make any promises

19   to people about what's going to happen with their FICO

20   score, there are many, many clients who don't have FICO

21   score data in their client file.  Some of the programs

22   collect it -- some of the service levels collect it, some of

23   them don't.  He just slices those 221, more than a third of

24   the people, onto the cutting room floor.

25           He then excludes another 172,000, because those

1  people had credit scores that -- they had credit score data,

2  but they had more than one score, but it was on the same

3  day.  So they might have gotten a score from their

4  TransUnion report and a score from their Experian report,

5  and it's on the same day.  So you can't tell the difference

6  between those people, if that makes sense.  So he cuts those

7  people.

8          He didn't go out through the government's

9  investigatory power, or any other way, to get from the

10  credit reporting agencies what these people's FICO scores

11  would have been along their journey.  He just discarded more

12  than two-thirds of the people in the population.  He does

13  zero analysis about how representative the remaining 190,000

14  people are.  He just moves ahead and does his analysis.

15          But even in doing that analysis, he makes three

16  choices, at least, that skew the results in the government's

17  favor.  First, he relies only on the first credit score and

18  the last credit score in a person's credit file.

19          So say someone signed up in January of this year,

20  and they stayed with Lexington Law through June of this

21  year.  And if they got a credit score in January when they

22  signed up and they got another credit score in May, he uses

23  those two scores.  If they got another credit score in the

24  middle in April, or February, or March, he ignores that

25  completely.  So we don't know what happened in the middle

1    for people.  He ignores that.

2          And, really, most importantly, Your Honor, by

3    taking the last score but not getting a score from one of

4    the credit reporting agencies postdating termination, he

5    ignores the period of time after someone leaves the service

6    when the effects of the work are still playing out.

7          As Your Honor knows, the work that we do -- it's

8    described in the engagement agreement -- a huge part of that

9    work is sending out challenges to the bureaus and

10   correspondence, we call it interventions, to the furnishers.

11   And there's a process that plays out where we send that out,

12   and then maybe a few weeks later, but sometimes longer, they

13   either remove an item or they don't.  Or they come back to

14   us with a letter that says I need more information, in which

15   case we have this escalation process that we've talked about

16   with Your Honor.

17         It takes some time for that to play through.  And,

18   again, once the item is removed, it doesn't immediately

19   generate, oh, you have a new score.  Here's your new score

20   right now.  They may not get that new score for a couple of

21   weeks.

22         So if somebody signs up in January and we're

23   sending out interventions and challenges on their behalf,

24   maybe an escalation on their behalf, and they quit in June,

25   it might not be until August that they see the improvement

1    in their score.  He just ignores that completely.

2          And not only does he ignore the post-engagement

3    score movement, he ignores score movement that might have

4    occurred while they were engaged.  One-third of the

5    responses he got from Lexington Law clients, he used the

6    final FICO score for them.  For one-third of Lexington Law

7    clients, it was more than a month before they terminated the

8    service.  So these people had one, two, three -- who knows

9    how many months of additional service after the FICO score

10   that he uses as their end point.

11          For CreditRepair.com, that number is two-thirds --

12   two-thirds of the CreditRepair.com people who he wants to

13   say their score only moved X, Y, or Z amount.  Two-thirds of

14   them continued with the service and he doesn't have any data

15   on what happened after that.

16          Second, he includes literally tens of thousands of

17   consumers who never paid for the service.  They signed up.

18   They decided they didn't want to do it -- or maybe they

19   wanted to do it and they wanted to do it for free, because

20   as Your Honor knows, when somebody signs up, we start

21   sending out the correspondence to their furnishers.  We may

22   reach out to the bureaus on their behalf.  We do that for a

23   month, and then we send out a bill.  A number of clients

24   never pay that bill.

25          Actually the bill goes out in the first service

1    period, which is not a month.  It's five to 15 days.

2            We do the work.  We send out a bill, and a lot of

3    clients don't pay it.  So these are clearly people who

4    either aren't committed to the journey, they're not

5    committed to doing the stuff that they need to do to improve

6    credit score, and we coach them on that.  They aren't people

7    who stay with the service, and he includes them in his

8    amount -- in the denominator of his assessment of FICO

9    scores.  That skews the scores in the government's favor.

10           Lastly, this one is really kind of inexcusable,

11   the other two are as well, but this one is just glaring.

12   About one-fifth of Lexington and CreditRepair.com clients

13   are on what we call monitoring programs where they're not

14   getting the same sort of credit repair correspondence that

15   the other clients are getting.  Much like, you know, other

16   services that exist.  Your bank probably has a service,

17   Your Honor, like this where they'll monitor your credit.

18   You pay them ten bucks a month, or some amount, and they

19   monitor your credit.

20           Lexington and CreditRepair.com offer that, with

21   some additional services, but it's not the kind of service

22   where we're going out and sending letters and challenges on

23   these people's behalf.  He includes those people.

24           So these are people for whom we are not actively

25   trying to get removals from their credit report.  We're not

1     actively trying to improve their FICO score.  But he

2     includes them in his denominator.  Again, skewing the

3     numbers in the government's favor.

4             And as I mentioned, he doesn't use a control group

5     at all.  So we have no idea -- when he wants to criticize

6     Lexington or CreditRepair.com because people's FICO scores

7     moved X amount, there's no basis to know whether that

8     criticism is valid, because if he'd used a control group, we

9     would know is that movement a lot, is that movement a

10    little.  We just don't know.

11            And that lack of a control group really ties to

12    the other fatal flaw in his data analysis, and this is the

13    leap that he makes, what the Tenth Circuit in the Atherton

14    case called a too great and analytical gap that he tries to

15    fill with really just guesses and suppositions.

16            And this is the -- if Your Honor recalls from his

17    report, he has a final conclusion.  And Dr. Frederick, who's

18    an expert in consumer behavior but not an expert in credit

19    repair, credit reporting, banking, lending, anything like

20    that, one of his concluding opinions is -- it's on page 46

21    of his initial report -- for Lexington Law and

22    CreditRepair.com customers obtained through the six sample

23    hotswap affiliates, credit score increases were sufficiently

24    modest to be immaterial to most customers.  Credit repair --

25    sorry, credit score increases were sufficiently modest as to

be immaterial to most customers.

How does he know what's material and what's not material?  He doesn't.  He's making a leap.  He's saying I can crunch the numbers -- which, again, Tony Lam can crunch the numbers.  I crunch the numbers.  I put my thumb on the scale a little bit.  I come up with these numbers.  And what I see -- and he'll admit this -- credit scores generally went up for most consumers.  But he wants to say no, no, no. It doesn't matter that they went up a little bit.  They didn't go up enough to improve their prospect of getting a mortgage, getting a loan, getting into a rent-to-own home.

He has no basis -- no basis to make that leap, because he's not an expert in lending.  He's not an expert in consumer finance.  He's not an expert in credit repair certainly, and the government just stretches him way too far to make that assessment.

So the bottom line on his data analysis is that he doesn't analyze what caused the scores for people to move. He tries to denigrate the work that CreditRepair.com does and that Lexington Law does by saying other factors might have played into credit score movement.  Because he does admit the scores go up, but he wants to blame it on other things.  But he doesn't do any analysis of that.  And he can't make this leap to say that the movement in the credit scores wasn't enough, it wasn't material, because he has no

1  basis to assess materiality.

2          Finally, he doesn't help us understand whether any

3  consumer was deceived by the amount that their credit score

4  went up, because he doesn't tie any of this analysis, and

5  the government doesn't tie this analysis, to a promise that

6  was made about people's FICO scores, or their removals, or

7  anything else, because those promises, as Your Honor has

8  seen, are disclaimed repeatedly in Lexington Law's

9  engagement material.

10          So those are two of the areas where Dr. Frederick

11  focuses.  He has a third area that he focuses on.  So if

12  Your Honor recalls, there's about 250,000 people in the

13  initial survey.  Those were people who came in through the

14  rent-to-own side of the business.  What he excluded from

15  that are the 300,000 plus consumers who came in through

16  OneLoanPlace, which is, as Your Honor may recall, a lending

17  facilitator.  It helps people find lenders in the way there

18  are other services available online to do this, where people

19  can come on and say I want to get a personal loan, what are

20  my best bets?  Bankrate.com, for example, is another service

21  that does this.

22          And his opinion regarding that is that he wanted

23  to assess whether the work that CreditRepair.com and

24  Lexington Law do actually helped people obtain a loan

25  through OneLoanPlace, and he opines that they did not help

1    people get a loan through OneLoanPlace, and that

2    OneLoanPlace's scripts were therefore deceptive.

3            Now the only script or ad he mentions in his

4    report at all is a OneLoanPlace script, and that's, I guess,

5    the basis for his opinion, which is on page 22 of his

6    report.  But the foundational and fatal flaw of his

7    OneLoanPlace analysis is that the data he relies on was

8    cherry-picked by the government.

9            The government is aware, and Dr. Frederick is now

10   aware, although he wasn't aware before his deposition -- the

11   government is aware that OneLoanPlace provided to it a

12   partial list of loans that it was able to obtain for its

13   clients.

14           When asked about this list at their deposition,

15   OneLoanPlace's's corporate designees were crystal clear, the

16   list was partial.  Because of the way OneLoanPlace keeps its

17   records and because of the way they interpreted the

18   government's question when it sent them discovery requests,

19   they provided a list to the government that omitted more

20   than a million loans, according to their testimony.

21           So the government has a list of about 180,000 --

22   less than 200,000 loans on it.  They give that to their

23   expert and they say do your math, does it look like people

24   got loans through OneLoanPlace?  And he does that math and

25   he says no, they did not.  The 180 loans on there, not

1    enough, not a lot.  They don't tell him that this sworn

2    testimony of OneLoanPlace is that there's a million other

3    loans.  In his deposition he said I can only deal with the

4    information I received and I didn't receive that information

5    from the government.  He just relied on the representations

6    of counsel.  So that kills his analysis of OneLoanPlace.

7         But there's more, of course, because with

8    OneLoanPlace, like every other bit of analysis he did,

9    there's no control group.  So he can't say if people came to

10   OneLoanPlace to get a loan and they engaged with Lexington

11   Law, they had a greater or lesser chance of getting a loan

12   than if they came to OneLoanPlace and they didn't engage

13   with Lexington Law.  He hasn't done that analysis.

14        So the finder of fact is going to have no way to

15   know whether the percentage that he puts on -- I think it's

16   6.5 percent, whether 6.5 percent of consumers would have

17   gotten loans absent Lexington Law, whether it would have

18   been higher than that, would it have been lower than that.

19   His data just hangs in space.  It has nothing to compare it

20   with.

21        So for that reason, in addition to the

22   cherry-picking of data, the OneLoanPlace opinions have no

23   place in this trial.

24        And the last thing I will say about Dr. Frederick,

25   Your Honor, unless you have questions, is just to go back to

1    where I started, which is he creates a sideshow.

2    Dr. Frederick, the only part of his testimony that has any

3    place in court would be about data reduction regarding the

4    data kept by the defendants.  But as we've seen, he does

5    that data analysis in such a slanted and ham-handed way that

6    it's completely unreliable.  That has no place here.  At any

7    rate, it's fact testimony.  There are plenty of fact

8    witnesses in this case who can do that.  Everything else he

9    brings has no basis in his expertise.

10          But more to the point, the sideshow is that

11   because the government has stretched him, they've used him

12   like a Swiss Army knife, he's got tools for all these

13   different areas, that it requires us to bring in a stats

14   expert, a statistics expert in Dr. Barnett.  It requires us

15   to bring in a survey expert in Dr. Maronick.  It requires us

16   to have an efficacy expert, Mr. DelPonti, and a consumer

17   decision making expert like Dr. Wind.

18          If Dr. Frederick goes, we can try this case based

19   on fact witnesses, the people who lived through the

20   experience, who can testify about the documents firsthand

21   and without the spin that Dr. Frederick puts on it.

22          So unless Your Honor has any questions, that's my

23   presentation on Dr. Frederick.

24          THE COURT:  Thank you.

25          MS. HILMER:  Good morning, Your Honor.  Tracy

 1    Hilmer, again, for the Bureau.

 2             Your Honor, Dr. Frederick is absolutely relevant

 3    to this case.  He's well qualified.  He checks all the 702

 4    boxes.  And all of his testimony concerning his surveys and

 5    his data analyses are adequately founded in facts and data.

 6    They are based on reliable methods, reliably applied to the

 7    facts of this case.  That's who he's testing, the consumers

 8    in this case.  And in his work, he's particularly focused on

 9    the consumers who were hotswapped by one of the relevant

10    hotswap companies.

11             So that's who he's testing.  He's not testing the

12    world at large.  He's not even testing, except in rebuttal

13    to Mr. DelPonti, if they offer it, he's not even testing the

14    experience of consumers who were customers of Lexington Law

15    and CreditRepair.com who were not hotswapped.  He's really

16    just focused on this group.

17             And let me just go through --

18             THE COURT:  Did the government interview the

19    identifying responders to the survey?

20             MS. HILMER:  Dr. Frederick selected verbatim

21    responses from them in response to certain of his open-ended

22    questions.

23             THE COURT:  No, no.  My question is did the

24    government interview the identified persons who responded to

25    the survey?

```
 1              MS. HILMER:  We did not.

 2              THE COURT:  Why not?

 3              MS. HILMER:  Because this was Dr. Frederick's

 4  survey and he determined his -- let me --

 5              THE COURT:  We're talking about misrepresentation.

 6  We're talking about what was said in a moment in time.

 7              MS. HILMER:  Let me focus, Your Honor, on what the

 8  survey is really directed to, because Mr. Bennett has not

 9  characterized it correctly.

10              This was not a copy test.  This was not

11  Dr. Frederick saying here's an ad.  What does this ad say to

12  you?  How do you interpret it?  That's not what this was

13  about.  Dr. Frederick did a survey to find out whether

14  people who came in through one of the rent-to-own hotswaps

15  got a rent-to-own house or they didn't, whether people who

16  came in through one of the mortgage companies got one or

17  they didn't.

18              THE COURT:  They either went back or they didn't.

19  Did they apply?

20              MS. HILMER:  Some of them may have and some of

21  them didn't.  He didn't get into -- he didn't get into a

22  20-minute, you know, multi, multi, multilevel survey because

23  he wanted to make sure that he could get the answers that he

24  needed.  So he kept the questions -- intentionally kept the

25  survey reasonably short so that he could get answers to the
```

1    questions that mattered.

2            THE COURT:  How many got a house?

3            MS. HILMER:  How many got a house?  Let me ask my

4    colleague to bring up Plaintiff's Exhibit 547.

5            Your Honor, this is a graphic depiction of the

6    survey results.  If you look at the bottom chart, that

7    addresses the question you just asked.  Of the 475

8    respondents to the survey -- a sample that Dr. Frederick

9    will testify is a perfectly adequate and indeed rather large

10   sample compared to the kinds of samples that are used in

11   published journals.  Of those 475 respondents, 50 reported

12   they currently hold a mortgage.  So 50.  159 reported that

13   they tried to get a mortgage but did never obtain one.  And

14   zero reported that they obtained a mortgage through one of

15   the sample hotswap partners.

16           So that is the question that was posed and that's

17   what was answered.

18           The top chart deals with the rent-to-own setting.

19   There, out of the 475, a total of 16 people -- 16 people out

20   of the 475, who were hotswapped by one of the rent-to-own --

21   one of the companies that were offering rent-to-own housing,

22   supposedly, only 16 of the 475 reported getting a

23   rent-to-own home contract, out of 143 who reported that they

24   tried, but didn't get one.

25           Let me rephrase that.  Actually there were 143

1  besides the 16 who tried to get a rent-to-own home but

2  didn't get one.

3          So it's a simple question.  And, you know,

4  Mr. Bennett critiques the question, well, could people

5  interpret differently what does it mean to try.  But the

6  questions are adequate for the purpose.  Maybe trying is I

7  called one of the rent-to-own hotswaps and then I got

8  transferred to Lexington Law because they told me that's

9  what I needed to do in order to get it.

10          THE COURT:  I understand the process, but I'm

11  curious on the follow-through with specific people.

12          MS. HILMER:  He did not do a focus group,

13  Your Honor.  He did not try to pull them in and do a focus

14  group.  But that's not fatal.  I mean that's another thing

15  that someone could have done.

16          THE COURT:  Yes.  Of those the good doctor looked

17  at, did they improve their scores?

18          MS. HILMER:  Of the people who he looked at in

19  general, the scores did not improve very much.  Let us bring

20  up --

21          THE COURT:  Well, how about the ones who were

22  successful in getting a house?

23          MS. HILMER:  Of those who were successful in

24  getting a house?

25          THE COURT:  Yes.  Did it improve their scores?

```
 1              MS. HILMER:  I don't know that he did that level

 2    of --

 3              THE COURT:  Well, isn't that one of the

 4    interesting questions as to I couldn't get a house at this

 5    point and I went to Lexington Law, or its alternative.  I

 6    either got an improvement in my score and I was successful

 7    or I didn't get an improvement in my score and I'm still

 8    successful.

 9              MS. HILMER:  So I think, Your Honor, that I want

10    to point the Court to the allegation that we have concerning

11    these companies.  What we're saying is that this was a bait

12    and switch scheme.

13              THE COURT:  I understand that.  I understand that.

14              MS. HILMER:  You understand that, of course,

15    Your Honor.

16              So our position is that -- and this is what

17    Dr. Frederick's work goes to.  Not just survey, but his data

18    analyses, which I'll get to.  We allege that the advertised

19    product or service either was not available through the

20    relevant hotswap partner and neither Progrexion nor the

21    relevant hotswap partner had a reasonable basis for

22    representing the consumers were either guaranteed or had a

23    high likelihood of getting that advertised product or

24    service.

25              THE COURT:  Now I'm interested in the
```

1    representation.  Is the representation made in the script?

2            MS. HILMER:  The representations are made in the

3    script, for example, Hope.  Hope says we can get anybody to

4    640 in 90 days who started out below that.

5            There are other examples in the scripts where

6    people say -- for example, Easy Home Ownership's pitch is

7    generally along the lines, and Ascent is like this too for

8    rent-to-own, it's no problem that you have a bad credit

9    score.  What we do is we partner with a credit repair

10   company.  So you go over to them and you work with them, and

11   then when you're ready, you come back to us and we'll get

12   you a rent-to-own home.  That's the deal.

13           THE COURT:  Of those that you're referred, how

14   many came back?

15           MS. HILMER:  That's unknown.  Lexington Law and

16   CreditRepair.com didn't track it.  And that's one of the

17   things I want to point out too.

18           I actually thought I heard coming out of

19   Mr. Bennett most of my arguments for the reasons why

20   Mr. DelPonti should be excluded.  But the real problem here,

21   Your Honor, is we're limited by defendants' own data.

22           So when you think about, well, what could be done

23   with this data, Mr. Bennett wants to have Mr. Lam come and

24   offer a whole bunch of unsupported opinions instead of

25   Mr. DelPonti.  That's not much of a difference.

1          But, for example, let's talk about what data the
2    defendants gave us after we asked for everything.  We said
3    give us everything you have.  Give us all your data, and
4    they said no, we're not going to do that.  What we'll give
5    you is we'll give you data for 2016 to 2020.  So there's no
6    concession about the statute of limitations.  That's all
7    they would give us.

8          Those data do not contain any detail about
9    specific trade lines.  We asked for demographic data of the
10   kind that Mr. Bennett was criticizing Dr. Frederick for not
11   using.  They didn't give it.  Apparently they have it.  They
12   didn't give it.

13         So we deposed Mr. Lam, who they proposed to have
14   come up and give these talks instead of Dr. Frederick, and
15   Mr. Lam gave many erroneous answers and didn't seem to know
16   that much about the data either.  So the problems that they
17   are criticizing Dr. Frederick for are largely due to the
18   limitations of the data that they produced in this case.

19         They talked about some other customer -- internal
20   customer satisfaction surveys and criticized Dr. Frederick
21   for not considering those.  We don't even know what those
22   are, Your Honor.  We asked for all those surveys.  We asked
23   for every survey they did about their services, about the
24   hotswaps, hotswap consumers.  They didn't produce it.

25         So what they have, Your Honor, and you'll see it,

1    because this is an area that the parties have a dispute on

2    in terms of the exhibits, they have columns for this

3    promotor or detractor survey, and they have a score in it.

4    What is that?  It's a mystery.  What are the surveys?  Who

5    are they given to?  How do they code them?  Who coded them.

6    The Court should just disregard all of that.  That's an

7    attempt by the defendants to create, you know, a narrative

8    that is just not capable of being validated.  So put that

9    aside.

10           Let's talk about what Dr. Frederick actually did,

11   why he's qualified to do it, and why, although not perfect,

12   although not perhaps the most detailed or lengthy survey,

13   it's not a census form, nevertheless, the survey is

14   sufficient for the purpose and focuses on the specific

15   people that we're concerned with here, the people who were

16   hotswapped by the relevant hotswap partners, Ascent, Easy

17   Home Ownership, Hope, Rent-To-Own.com, and OneLoanPlace, and

18   it tells you something.  It tells you enough about what

19   their experience was.  That is certainly admissible.

20           If they want to cross-examine him, that's fine.

21   They can point out that, you know, certain aspects of the

22   survey maybe they think could have been done better.  But

23   the question for Rule 702 is is it enough, is it reliable

24   enough, and will it help the jury, and we say it will.

25           Let me tell you something about --

1          THE COURT:  Tell me how it helps.

2          MS. HILMER:  Yes.  First of all, Your Honor -- if

3   I could bring up 547, again -- it answers this fundamental

4   question.  When you went to look for a rent-to-own house

5   through one of these hotswaps, did you get it or didn't you?

6   When you were seeking a mortgage, did you get it or didn't

7   you?  How many people got it?

8          It's not a copy test.  It's an effort to just

9   determine whether people got the thing that the hotswap was

10  advertising when they signed up for credit repair.

11         THE COURT:  Apparently they were turned down to

12  begin with.  They were insufficient to begin with to justify

13  a referral.

14         MS. HILMER:  Well, who knows?  I mean if

15  somebody --

16         THE COURT:  Well, if somebody doesn't need repair,

17  nobody asks to repair.

18         MS. HILMER:  And that's how it starts, Your Honor.

19         I think what we would start with, for example, is

20  Easy Home Ownership.  They didn't have any houses.  They

21  didn't have any listings.  What they would do when somebody

22  came to them looking for rent-to-own housing is they would

23  send them to Zillow, or Trulia, you know.  Anybody can do

24  that.  They weren't actually performing any kind of a

25  service.

1          What they were really doing is generating leads

2     and referrals to Lexington Law for credit repair.  That's

3     what they were doing.  But the way they did it was to hold

4     out this hope for a lot of people who were really deeply

5     subprime, really not in a good credit situation to hold out

6     this hope, you can get a house if you'll just work on your

7     credit a little bit.

8          THE COURT:  Does the script say that?

9          MS. HILMER:  The scripts say -- let me see if I

10    can pull one up for you.

11         First of all, can you please bring up Plaintiff's

12    Exhibit 124.

13         This is an ad from Hope, Your Honor.  You may have

14    seen this before and I apologize if it's very familiar, but

15    here's what it says.  Join the more than 12,000 people since

16    2003 that bought a zero down -- a home zero down that

17    started with under a 500 score.  Your Honor, that is deep

18    subprime.  And the 90 Day Blitz will get anybody to 640 plus

19    in 90 days.  That's the kind of ad that the Hope program had

20    out there.

21         THE COURT:  Okay.  Now was this ad approved by

22    Lexington Law?

23         MS. HILMER:  It was known to Lexington Law.  The

24    ad was known to Lexington Law.

25         THE COURT:  How about CreditRepair?

1          MS. HILMER:  This company did not hotswap to

2     CreditRepair.  The only ones that went to CreditRepair were

3     Ascent and OneLoanPlace.

4          THE COURT:  Okay.

5          MS. HILMER:  So that's one script -- or one ad.

6          THE COURT:  How is Lexington Law knowledgeable of

7     this particular script?

8          MS. HILMER:  How were they knowledgeable?  Well,

9     the standard is did they know, were they recklessly -- did

10    they act in reckless disregard.

11         THE COURT:  Did they know?

12         MS. HILMER:  We know they knew.  They commented to

13    Hope in at least one email from Ms. Blakely Hankins, who was

14    the contact person, about the 90 Day Blitz.  So there is

15    evidence that they knew about it for sure.

16         And they also claimed to have a practice of

17    reviewing the advertising and the Facebook, you know,

18    offerings of their hotswap partners.  So we'll get to that

19    in terms of knowledge.

20         THE COURT:  Now have you got specific people who

21    saw this ad and who were referred?

22         MS. HILMER:  Your Honor, I think we're going to a

23    different topic, but I'm happy to address it, Your Honor.

24         THE COURT:  I'm just curious if you have a

25    specific person who saw this ad and was referred.

```
 1              MS. HILMER:  Your Honor, we intend to show that
 2    this ad, which was on Facebook for years, was widely
 3    disseminated and therefore seen by many people.
 4              THE COURT:  I'm interested if you've got a person
 5    who said I saw that ad, and I believed that ad, and they
 6    told me to go to Lexington Law.
 7              MS. HILMER:  I don't at this time.  The Bureau
 8    doesn't intend to offer a specific person who is going to
 9    say they saw that specific ad.  But this is the
10    advertising -- excuse me.
11              THE COURT:  I'm sorry.
12              MS. HILMER:  I wanted to hear what you were
13    saying.  I apologize.
14              THE COURT:  I was just wondering who was deceived.
15              MS. HILMER:  Who was deceived?  This is the
16    advertising Hope was doing.
17              THE COURT:  I understand that.  I understand that.
18    But you've got to have somebody who said I was deceived.
19              MS. HILMER:  Well, Your Honor, the standards for
20    deception is we have to show that an ordinary consumer who
21    saw this ad would be misled.
22              THE COURT:  I'm searching for the ordinary
23    consumer who has legs, and arms, and heads, and brains who
24    saw the ad, and who responded to the ad, and who was
25    disappointed.
```

1          MS. HILMER:  Your Honor, we have consumers who

2    will talk about their experiences with other hotswap

3    companies.  The standard that we need to meet -- you know,

4    and I believe we do have consumer complaints along these

5    lines.  We have consumer complaints --

6          THE COURT:  Post their ad?

7          MS. HILMER:  Yes.

8          THE COURT:  You have to show that somebody

9    responds to it, don't you.

10          MS. HILMER:  Well, they did.  We know that they

11    were transferred to Lexington Law.

12          THE COURT:  They were transferred.

13          MS. HILMER:  This is the advertising they were

14    doing, and it was similar on their website.

15          So if you found a Hope ad on Facebook, if it

16    popped up while you were looking at your, you know,

17    sister-in-law's new puppy, if the ad popped up, you could

18    click on it, or somebody might be searching for rent-to-own

19    homes and we'd end up on their website, and the same kind of

20    advertising is happening there.  And this is what the Hope

21    program did.  They transferred people to Lexington Law.

22          THE COURT:  Okay.  We've identified those that

23    were transferred, haven't we?

24          MS. HILMER:  Excuse me, Your Honor?

25          THE COURT:  The records of Lexington Law indicate

1    which persons were transferred?

2              MS. HILMER:  That's correct.

3              THE COURT:  And about 90 percent go by telephone,

4    as I understand it.

5              MS. HILMER:  Yes, Your Honor, a large percentage.

6              THE COURT:  And --

7              MS. HILMER:  So the process is they would click on

8    this Facebook ad or Hope's Web page, with the same kind of

9    representations, fill out a form, and then Hope will call.

10   And we will have testimony from a witness who will talk

11   about that process.  The Bureau's investigator did a call

12   and went through that process, was pitched with the blitz,

13   and then was sent to Lexington Law.

14             So we know that this is what happened.  It

15   happened on their websites, it happened in their scripting,

16   and we know that people got transferred to Lexington Law.

17             And what else we know is that very, very few

18   people who heard these pitches from these different

19   rent-to-own companies ever got a house.

20             So I want to address the sample size, because I

21   think that's crucial.  Dr. Frederick is not new at this.

22   He's been doing these things for many, many, many years.  As

23   you'll know from reading our papers, he's a tenured

24   professor at Yale in the School of Marketing, but he teaches

25   and studies in the areas of marketing, consumer behavior, et

1    cetera.

2            THE COURT:  They're all credentialed.  They have

3    wonderful resumes.  But I'm really interested in the

4    relevancy of what they have to tell us to see if that's

5    helpful.

6            MS. HILMER:  Okay.  Your Honor, I can address the

7    sample size, which Dr. Frederick is prepared to testify is,

8    you know, a large sample size by the standards of peer

9    review journals.  So he can address that.

10           I'm prepared to talk about the steps he took to

11   validate the survey responses to make sure, within the

12   confines of defendants' data, that they would be willing to

13   produce to us, shows that the results are acceptably

14   representative and reliable.

15           For example, here's what he did.  He checked the

16   475 participants and he determined that the hotswap

17   companies were proportionally represented in that group

18   compared to the larger group of 260,000.  So, you know, it's

19   not exactly one to one, but it's proportionally

20   representative of the number of people.  So you don't have

21   like some, you know, greater number proportionally of Hope

22   versus Easy Home Ownership.  It's about equivalent.

23           Defendants criticize, as I alluded to earlier, the

24   comparisons he made to determine the representativeness of

25   the 475 compared to the nonrespondents.  But he looked at

1    the relevant factors.  Things like, you know, what was their

2    tenure?  How long were they enrolled?  How many removals did

3    they purportedly have according to the data?  What were

4    their first and last credit scores according to the data?

5    And that's what we're interested in here.

6              So that's what he looked at and he determined that

7    that pool of respondents was quite representative of the

8    overall group and actually fared a little bit better in

9    their outcomes.  So that's why --

10             THE COURT:  Do they have all credit scores that

11   were improved?

12             MS. HILMER:  Who, the 475?

13             The 475, I believe there is some data on that.  I

14   don't have the specific data.  Some people went up.  Some

15   people went down.  So that's kind of the -- if I could

16   show --

17             Could you bring up Plaintiff's Exhibit 470,

18   please, Amanda.

19             I'll bring up this exhibit later.

20             Essentially what happened, Your Honor, was that

21   people who started with a high score, the longer they stayed

22   in CreditRepair it tended to go down.  And the people who

23   started with a very low score, the longer they stayed in

24   CreditRepair, it tended to go up.  And the people in the

25   middle kind of stayed in the middle.  So Dr. Frederick, who

1    has plenty of academic credentials to say this, will testify

2    that that demonstrates that there is like a regression to

3    the mean.

4              So some people's scores went up, some people's

5    scores went down, but there's no reason to say that that's

6    because, you know, of Lexington Law or CreditRepair.com's

7    work.  It's just a process that happens in the -- that's an

8    observable process for this kind of activity.

9              So some people's scores went up.  Some people's

10   scores went down.

11             Maybe I can bring up a different one.  Maybe this

12   will be helpful.

13             Bear with me a moment, Your Honor.

14             Plaintiff's Exhibit 474.

15             This might answer your question, Your Honor.  This

16   is one of Dr. Frederick's tables that he put together that

17   shows over the time period how customers' FICO scores

18   changed by affiliates.  What you see is that the mean score

19   change overall in the very bottom on the second column is

20   only 4.4 points for this group.  And that's not surprising.

21   Many of these people are quite deep subprime or subprime.

22             So this is showing that over their tenure and over

23   the course of the data that we have, there's not much

24   improvement.  That is the basis for his statement that, you

25   know, this is a negligible difference for most people.  If

1    you were already deep subprime and you saw a four-point

2    increase in your score, that's not getting you a mortgage.

3    That's not getting you a rent-to-own house, if there is one

4    available at all.  So these are the results.

5          Let's take a look at Hope, for instance.  You

6    asked about Hope, Your Honor.  So you remember the ad said

7    that we can get anybody in 90 days across the magic number

8    of 640 who started below.  The number that's achieved that

9    were only six percent.  It's a very small number.

10         So I think this is really relevant to showing when

11   people were offered -- you know, when this promise of or

12   this very strong hope of getting a house, or getting a

13   rent-to-own home, or a loan was offered to these folks and

14   they sign up for credit repair believing if they just work

15   on their credit they will get there.  This shows that it

16   didn't happen.

17         Let me see if I can bring up Plaintiff's Exhibit

18   456.  That's the one I was trying to show you before.  I

19   think you will see this as interesting.  This is again,

20   Dr. Frederick's work.

21         So this is the data that shows for the hotswap

22   customers over time what's happening with their credit

23   scores.  The people who are super-prime at the beginning,

24   the longer they stay, on average their scores decrease.  And

25   the deep subprime people, the bottom, in red, the longer

1    they stay in, their scores increase, but they're still

2    pretty stuck in the subprime zone.  These show that when

3    these offers are made, you know, you're going to get a

4    rent-to-own house, or we can get you into a rent-to-own

5    house.  You just need to do a little work with your credit.

6    We'll send you over to our partners and they'll help you.

7    That's not substantiated, Your Honor.  This is evidence that

8    those claims are unsubstantiated.

9         And moreover, because it comes from the

10   defendants' data, and they have talked to you about how much

11   they use their data, they knew or should have known that

12   this is exactly what's happening.  This is their data.  They

13   could run these numbers.  They said they're going to have

14   Mr. Lam do it.  Maybe he already has done it.  Maybe he does

15   it routinely.  Or maybe they don't do it because they don't

16   want to see this.  All of that is relevant to Progrexion's

17   knowledge about whether these claims are substantiated or

18   not substantiated.  So that's part of the data analysis.

19        Your Honor, I really want to make sure that I

20   address the OneLoanPlace issue.  Dr. Frederick took the

21   roster of loans that OneLoanPlace produced pursuant to this

22   Court's order.  He didn't cherry-pick anything.  He took

23   that entire roster.

24        The Court will certainly remember that subpoena

25   enforcement action, and the Court ordered OneLoanPlace to

1    produce a roster of loans.  They produced it.  Dr. Frederick

2    took that roster of loans and he compared it to defendants'

3    data, the data that we've just been talking about, and he

4    identified common people from the two data sets, people

5    who -- he used customer name and ZIP code to identify

6    common -- you know, whoever in the defendants' data set got

7    a loan according to that roster.

8            What he found was that fewer than seven percent of

9    Lexington Law and CreditRepair.com customers who were

10   hotswapped by OneLoanPlace got a loan after signing up for

11   credit repair.

12           And he further found -- you'll remember, I think

13   from all of the briefing that has been done -- I know we

14   have just inundated the Court with some of this.  Our

15   contention is that OneLoanPlace misled consumers about the

16   likelihood of getting a loan or a refinance on better terms.

17   They would say, you know, along the lines of we'll get you

18   an offer.  It's going to be at a high interest rate.  You

19   can take it if you want, but, otherwise, what we'll do is

20   we'll look to send you over to our partners at Lexington

21   Law, and they'll set you up.  They will work with you on

22   your credit.  And then we can look to come back and

23   refinance you at a better rate on better terms.

24           What Dr. Frederick's study shows, using the very

25   data that OneLoanPlace produced in response to this Court,

1    what it shows is that fewer than one percent of those people

2    got a second loan, or got more than one loan.

3            So he will testify that -- Dr. Frederick can

4    testify that these data suggest that being enrolled in

5    Lexington Law or CreditRepair.com services did not really

6    help consumers obtain a loan or a refinance through

7    OneLoanPlace.  And that's super relevant, Your Honor, and he

8    can draw that conclusion from the data.

9            He's also going to show that based on the data and

10   his review of the data, yes, he used the first and last FICO

11   score.  He needed to do that.  If you want to see a score

12   change, you have to have two.  You have to have one from one

13   period of time and one from the second period of time.  And

14   defendants' data, again, they have what they have.  They

15   don't have all of the score data.  And apparently, for

16   whatever reason, we don't know why.  They were never able to

17   explain it.

18           I asked Mr. DelPonti that question.  He didn't

19   know.  I don't know if Mr. Lam knows why they don't have it,

20   but they don't.

21           What Dr. Frederick did was he looked at people who

22   were hotswapped, who had two scores from different dates.

23   So for the OneLoanPlace people, he found that the vast

24   majority of those customers who were hotswapped from

25   OneLoanPlace to either of the two brands did not approve

1    their score tranche.  Only about one in ten did.  So

2    90 percent of the people who were hotswapped didn't see a

3    score increase.

4            So he also will testify that the mean credit score

5    of that group either stayed the same or dropped.  So the

6    mean scores remained.  For both CreditRepair.com and

7    Lexington Law customers, who were hotswapped by

8    OneLoanPlace, they remained deeply subprime.  Not likely to

9    get a better loan or get a loan on better terms when you're

10   still deeply subprime.

11           Again, this is a test, did you get what the

12   hotswaps were offering you, ultimately?  And, you know, I

13   think it's this is the data we have.  And Dr. Frederick has

14   been very transparent about saying what its limitations are.

15   But that doesn't mean that his whole study should be thrown

16   out.  He can ask about it.  That can be weighed.  That goes

17   to the weight of his testimony, not whether or not it's

18   admissible.

19           So he did -- and as I showed you before with

20   Plaintiff's Exhibit 474 -- can you bring that up again,

21   please -- he did the same kind of testing with FICO scores

22   for each of the hotswap partners that we're concerned with

23   here.  The bottom one -- there's a bottom one down there,

24   OwnerWiz, Your Honor, the Bureau -- I just want to make

25   clear, the Bureau is not pursuing relief or claims based on

1  OwnerWiz, and we will have Dr. Frederick take that out

2  before trial.

3          So ignoring OwnerWiz, this is the kind of study

4  that Dr. Frederick has done.  And he also has looked -- he's

5  done a lot of tables.  He's looked at how does the score --

6  what happens with the score based on tenure?  Does it get

7  better over time by hotswap?  Different breakdowns by month

8  of how scores progress.

9          So, again, to the extent that defendants' data

10 permit these sorts of studies, Dr. Frederick has done them

11 and he should be allowed to talk about them.  He is somebody

12 who is an expert in consumer decision making.  So it's

13 certainly proper for him to bring his expertise to bear on

14 these data, you know, and that's, I think, something that

15 also has to be borne in mind.

16         I wanted to see if there are other questions that

17 the Court has before I -- I wanted to tell you just a couple

18 of the other top line conclusions.

19         Can you bring that table back up, please.

20         So what Dr. Frederick found was overall, within

21 this population of hotswap Lexington Law customers, credit

22 scores increased by an average of just 4.4 points.  But the

23 scores remained constant were declined for 45 percent of

24 customers.  And the credit score tranche remained constant

25 or declined for 87 percent of customers.

1              And it's similarly dismal for the credit repair

2      side.

3              If I could have Plaintiff's Exhibit 483.

4              Again, these are people who are hotswapped by the

5      two that sent customers to CreditRepair.com.  Overall FICO

6      scores increased by an average of 1.6 points, Your Honor.

7      Overall, the FICO score increased for 54 percent of

8      customers and remained unchanged or fell for 46 percent.  I

9      may have gotten that wrong.  Increased for 54 percent,

10     remained unchanged or fell for 46 percent.

11             Dr. Frederick also found that shifts between

12     credit tranches, moving on up and down in those credit

13     tranches, were very uncommon.  So this is really helpful

14     information for the jury to understand.

15             They asked the question, well, did people get what

16     they were looking for?  Did they have a reasonable chance of

17     getting that loan, or getting that refinance after -- or

18     mortgage, or rent-to-own house after they put in their time

19     and paid their money?  And the answer is pretty much no.

20     And this is based on the defendants' own data, what they

21     were willing to share with us.

22             If they have other -- you know, other data that

23     they didn't produce, I think at this point it's too late to

24     start talking about it, Your Honor.  They've given us what

25     they've given us, and, you know, that's what we've used.  So

1    they should be precluded from complaining that they have all

2    this other data that they didn't give us, or for blaming

3    Dr. Frederick for that, because we did ask and we just

4    didn't get it.

5             I want to talk very briefly, Your Honor, just to

6    make clear, about Dr. Frederick's work.

7             Could I have Plaintiff's Exhibit 329 brought up,

8    please.

9             One of the critiques that was made, Your Honor --

10   I don't know if we can zoom in on this.  This is hard to

11   read.  I apologize, Your Honor.

12            One of the critiques that was made was that

13   Dr. Frederick counted people who weren't in credit repair,

14   but were only in a monitoring service.  That's not true.  He

15   did not count the people who were in an exclusively

16   monitoring service.  But he did count people who were in a

17   lower level credit repair service.  So maybe it was one that

18   only did three challenges a month instead of four or eight.

19   But he counted anybody who was getting credit repair, who

20   was being told they were getting credit repair.

21            And this is one of the defendants' chart.  They

22   have a similar one for CreditRepair.com where they report

23   how many interventions you get with how many bureaus a month

24   for what price.  And Dr. Frederick absolutely did not

25   include anybody who was only in a monitoring product that

1    had no interventions.  So everybody that he considered was

2    supposedly getting some kind of an intervention.

3         THE COURT:  How does it help us?

4         MS. HILMER:  How does it help us?  I think it goes

5    back to the questions that I said at the beginning.  What

6    Dr. Frederick really goes to is this question, did people

7    get what the hotswaps were offering?  Were they likely to

8    get what the hotswaps were offering?  Those are the very

9    questions that are posed by our allegations under the

10   deception counts.

11        We say very few people.  People did not -- very

12   few people -- I mean, we're talking a small amount of people

13   got a rent-to-own house or a mortgage, even though they went

14   through the hotswaps that offered those things.  We are also

15   saying just look at the data.  Look at the overall data from

16   defendants, defendants' own data, and take a look at it.  It

17   shows that people were not very likely at all to be able to

18   qualify for those credit products that brought them to the

19   hotswap in the first place.

20        And it also, because it's defendants' data, shows

21   that they either knew or should have known.  They had the

22   means to track this.  There is some evidence at one point in

23   time they were interested in tracking it, but they abandoned

24   that project.  And maybe the reason they did is because when

25   they started doing it, they started seeing data they didn't

1   like.

2           One thing I will point out, Your Honor, is that

3   defendants themselves, back in 2012, did a study, a survey

4   of their own customers to find out whether they got

5   rent-to-own houses when they were looking for that kind of a

6   product.  The results were very similar to what

7   Dr. Frederick found.  Like ten percent of the people who

8   tried to get a rent-to-own house actually ended up in one.

9   So that document is Joint Exhibit 5.

10          Maybe I can have you bring it up, Amanda.  Thank

11  you.

12          Can you go to the next page so His Honor can see

13  it?

14          Lexington Law's rent-to-own analysis.  So they did

15  this study -- I'm sorry, Your Honor.  It's twisted.

16          Can you go to what's marked as page three.  I

17  think it will be a couple more pages down.

18          I think we need to go down one more page after

19  that and then we can orient it.

20          I can give you the bottom line, Your Honor.  The

21  bottom line is nine people -- nine percent of the people who

22  were looking for a rent-to-own house found one.  That was

23  15.  Dr. Frederick found 16.  And so, you know, it's not

24  like this is an outlier.  This is pretty consistent with

25  what defendants found before.  Now have they done another

1    rent-to-own study?  We asked.  They claim privilege.

2           So I want to be clear, Your Honor, just to make

3    sure I clear this up.  I don't want to give any -- leave any

4    misconception on the record.  We have certain data from the

5    defendants that predates 2016 about the hotswaps, and we

6    used some of that to do our restitution calculations, but

7    that data doesn't contain FICO scores.  So the data that has

8    the FICO scores is only that data that covers the period of

9    2016 to 2020.  And believe me, it's not because we made some

10   concession on the statute of limitations.  It's because the

11   defendants wouldn't give us more.  We would have been happy

12   to take it.  We would have been happy to take all of it and

13   analyze all of it, but that's all they would give us.

14          Does the Court have any more questions for me at

15   this point?

16          Okay.  Your Honor, we would urge that the

17   defendants' motion to exclude Dr. Frederick be denied, and

18   that Dr. Frederick be admitted to give his testimony about

19   these matters that we have been discussing this morning.

20          There's also -- I have to say, because we're not

21   clear now where we stand after they withdrew Mr. Ulzheimer

22   and Mr. DelPonti last night, we also would like the

23   opportunity to have Dr. Frederick offer his rebuttal

24   opinions if they attempt to put up any testimony about their

25   data studies through Mr. Lam, which we obviously haven't

1    seen.

2            Thank you, Your Honor.

3            MR. BENNETT:  Good morning, Your Honor.  I'll try

4    to be brief.  I have a number of topics to address based on

5    the government's presentation.

6            I'll start by saying I've never been in a case, I

7    don't think, where the Court's gatekeeping function, the

8    gatekeeping function that is the Court's alone has been more

9    important.  And I think the government just highlighted the

10   need for the Court's gatekeeping function in some of the

11   things they said to the Court, because if Dr. Frederick's

12   testimony will be anything like the government's

13   presentation about his testimony, it will be full of

14   misleading exhibits and misleading statements about the

15   evidence.

16           I will just start where the government left off,

17   Your Honor.  The government just a moment ago told the Court

18   that Mr. -- or, sorry, that Dr. Frederick excluded customers

19   on monitoring services from his analysis.  At his deposition

20   he was asked the question, and when you concluded that

21   12 percent of CreditRepair.com customers increased their

22   credit tranche, do you exclude consumers who were on credit

23   monitoring?  I don't believe so.  Same is true for his

24   analysis of Lexington Law, he included those people.

25           And related to that Your Honor, you noticed that

1    the government --

2              THE COURT:  He was unsure.  I don't believe so.

3              MR. BENNETT:  That's as much of a no as you'll

4    ever get from an expert, Your Honor.

5              THE COURT:  Well, there it is.  He says what he

6    says.

7              MR. BENNETT:  The related point, Your Honor, you

8    notice the government --

9              THE COURT:  Ambiguous at most.

10             MR. BENNETT:  It directly conflicts with what the

11   government said a moment ago, I believe, Your Honor.

12             THE COURT:  Well, I say he eliminated.  He says I

13   don't believe so.  Well, that gives him an opportunity to

14   say whether he did or whether he didn't.

15             MR. BENNETT:  And, thus, my reference to the

16   gatekeeping function, Your Honor.

17             The related point, though, you notice the

18   government talks a lot about credit tranches, this credit

19   tranche, that credit tranche.  There are five credit

20   tranches, and it's common for people to be considered in one

21   tranche or the other.  But that's not something that the

22   defendants or the hotswaps focus on at all.  It's something

23   the government did, because if you look at raw credit

24   scores, it's unassailable that people generally go up.  The

25   tranches, there are five of them, so they're quintiles.

```
 1            THE COURT:  Do you keep track of improvement of a

 2   given customer?

 3            MR. BENNETT:  In certain --

 4            THE COURT:  If I start with a FICO to begin with

 5   and I'm with you for three months, do I get a new FICO

 6   score?

 7            MR. BENNETT:  It depends, I believe, on your

 8   service level.  And it will also depend on the tenure, like

 9   what year you were a member.  And that, again, is important

10   to keep in mind, Your Honor, because the government -- we've

11   talked about this a little bit.  Dr. Frederick focuses on

12   four years.

13            Now you've probably noticed, and we'll look at

14   this in a second, the ad that they talked about from Hope,

15   the Facebook posting, predates his analysis.  So that

16   clearly doesn't go to his analysis whatsoever.  But the

17   rent-to-own study that Lexington Law did was even in years

18   before that.  That clearly doesn't go to his study.  I want

19   to talk about those in just a moment.

20            I want to go back, though, to something else the

21   government said.  The government said to the Court that 90

22   percent of people didn't see -- I think it was in reference

23   to the LOP consumers.  Ninety percent didn't see an increase

24   in their credit score.  That's a misstatement.  I think it

25   was probably accidental.  I think what the government meant
```

1   to say is that 90 percent didn't increase their credit

2   tranche.  But you see the shell game with the words, they're

3   important, because credit scores, 54 percent --

4           THE COURT:  Words are very, very important in this

5   case.

6           MR. BENNETT:  And this is why it's so dangerous to

7   put Dr. Frederick, from Yale, on the stand to play word

8   salad with some of these important points, and he does that

9   throughout his report.

10          And if we could pull up Exhibit 456 that the

11  government showed a second ago.

12          Here is another -- in a case about deception, this

13  is one of the most deceptive things I've ever seen.  There

14  are five credit tranches here, and if you look at this

15  chart, it looks like they come together.  And one might

16  assume, looking at this chart from Dr. Frederick, that all

17  of these deserve equal weight.

18          What's not presented here, Your Honor, is that the

19  number of people in deep subprime is orders of magnitude

20  more than the people in super-prime.  That makes sense.

21  People in super-prime are less likely to come for credit

22  repair.  They've already got a rock star credit score.

23          This chart is completely misleading and would

24  mislead the jury into thinking that it's about a tie when,

25  in fact, the deep subprime people, who are the core

 1   constituents of the cohort Dr. Frederick studied, they see

 2   an increase, but he weights it the same as super-prime,

 3   prime, and near-prime.  It's completely misleading.  Again,

 4   a great reason for the Court to exercise its gatekeeping.

 5           I was, frankly, surprised that the government

 6   showed you that.  I thought it was an awesome example to use

 7   on cross-examination with Dr. Frederick about the misleading

 8   way he presents the data.

 9           I want to talk now about Exhibit 124 that the

10   government focused on for a moment.  So this is a Facebook

11   ad.  Your Honor can see it was posted, apparently, in

12   February of 2014, so, again, before Dr. Frederick does his,

13   you know -- before the beginning of his analysis.  So,

14   again, ties not at all to Dr. Frederick.  But the government

15   likes this ad.

16           They asked Joe Delfgauw, who is the head of the

17   Hope program, they asked him about this ad, and he didn't

18   seem that familiar with it.  I don't think -- I think he

19   testified he wasn't familiar -- didn't remember seeing it.

20   Now the government wants to put this ad at Lexington.  They

21   want to say Lexington and Progrexion were aware of this ad,

22   and they cited --

23           THE COURT:  Were they?

24           MR. BENNETT:  No.  There's no evidence that they

25   were aware of this ad.

 1             The exhibit that the government mentions but

 2    didn't show is Exhibit 195 -- sorry, 095, which is an email

 3    involving Blakely Hankins, who is an employee of Progrexion,

 4    where she --

 5             THE COURT:  Progrexion furnishes scripts, do they

 6    not?

 7             MR. BENNETT:  Progrexion furnishes language

 8    dealing with Progrexion's business.

 9             THE COURT:  Do you furnish scripts to the

10    referrals?

11             MR. BENNETT:  We furnish parts of scripts

12    referring to Lexington's business.  We want to make very

13    clear that -- we want to make very sure, rather, that

14    anybody talking about our business --

15             THE COURT:  And you have them furnish that to you?

16             MR. BENNETT:  And we ask them to send us the

17    language --

18             THE COURT:  And do you look at the language?

19             MR. BENNETT:  We look at it, and we edit it.

20             And then even for things that don't concern our

21    work, if we think there is a possibility of something being

22    confusing, we ask a question about it.

23             So, here, this is just a matter of days after this

24    Facebook ad went up, and Ms. Hankins writes, I'm getting a

25    lot of reports from our agents saying they're hearing a lot

1    about your 90 Day Blitz.  I know that's part of the

2    scripting and program changes you have made.  I want to make

3    sure that we clarify a few things through -- clarify a few

4    things through with the 90 Day Blitz and do not set an

5    unreal expectation for clients.

6         So she is hearing about this through the call

7    center, and she reaches out to him to say, hey, we want to

8    make sure we're not setting expectations in the wrong place

9    because we don't want people to think that miracles can be

10   worked.

11        Now the 90 Day Blitz is an interesting thing.

12   Mr. Delfgauw, who again is the head of Hope, he testified at

13   length about the 90 Day Blitz.  It's a multifactor program.

14   One small part of it is credit repair.  There are all sorts

15   of other things that clients do to improve their credit,

16   unrelated completely to Lexington Law.  It's a program that

17   he runs, he's in charge of.  He testified about it.  It is

18   not a Lexington Law program.

19        And so we want to make sure, as Ms. Hankins did in

20   this email, that he's not setting unreal expectations about

21   credit repair.

22        Now interestingly, in doing his survey,

23   Dr. Frederick didn't know anything about the 90 Day Blitz.

24   He didn't know what it meant.  He didn't know the factors in

25   it.  And yet he wants to opine to the jury that somehow

1   these ads were misleading.

2         The other thing that -- another thing that I

3   think, a few kind of word games were being played with.  The

4   quarreling with the sample representativeness is not about

5   the size of the sample.  One could draw a sample of 475

6   consumers that would be representative of a larger set.  You

7   would have to draw it randomly and you'd have to run

8   controls for ways where it might deviate from

9   representativeness.

10        The problem with Dr. Frederick is he didn't draw

11  it randomly.  And the problem with size in this is that the

12  size of -- the number of people who didn't respond so

13  grotesquely outnumbered the people who did respond.  It's

14  not the raw number of 475.  It's the one out of 500 with no

15  control to ensure that it's representative.

16        If we could pull up Exhibit 547, please, for a

17  moment.

18        Speaking again of the gatekeeping function, the

19  reason why we have to be assiduous about information that

20  gets presented in the case, this is an exhibit that the

21  government intends to use based on Dr. Frederick.  And as

22  the government noted, the top part relates to rent-to-own

23  and the bottom part relates to mortgages.

24        Again, it goes without saying there's no control

25  here.  They don't have a counterpart that shows how many of

1    these people would have gotten a rent-to-own had they taken

2    another path, or how many people would have gotten a

3    mortgage through another path.  That alone is a reason not

4    to look at it.

5            But the impression, when you look at this, looking

6    at the top part, for example, of the 475 respondents, and it

7    has this large field with 475 dots in it, and a few of them

8    are colored different colors, it's completely misleading.

9    It gives the impression that all 475 people wanted to get

10   into rent-to-own, when we know from Dr. Frederick's survey

11   that about a third weren't interested in rent-to-own.  They

12   were interested in mortgages.

13           So they put this up -- and I guess they intend to

14   present this to the Court or to a jury -- to give the

15   impression there was a huge number of people seeking

16   rent-to-own and only a small number did.  Of course it ties

17   back to the ambiguity of what is trying?  What do these

18   people do?  Did they do anything other than make a call?  We

19   just don't know.  It's completely misleading.

20           And if you look at the bottom presentation, it's

21   even worse because many fewer people were looking for a

22   mortgage.  And yet they put up all 475 dots to make it seem

23   super small, super rare that people get a mortgage.  That

24   kind of misleading presentation of evidence is exactly why

25   the Court ought to keep Dr. Frederick out.

1          Now with the Court's indulgence for a moment, I

2     want to make sure I'm not missing something.  I was taking

3     notes as fast as I could.

4          I don't want the Court to be left with the

5     impression that we somehow surprised the government by

6     adjusting our expert lineup in an email last evening.  We've

7     been meeting and conferring with the government periodically

8     since the last time we were before Your Honor, and we have

9     been discussing with them perhaps adjusting Mr. DelPonti and

10    Mr. Ulzheimer.  So those things did not come as a surprise

11    to the government.

12         I do apologize to the Court.  Many, many months

13    ago these motions were filed and at that time we fully

14    intended to call them, and it wasn't until we got into the

15    deep process of trying to ascertain what case the government

16    actually intends to put on that we got to a point where we

17    were comfortable saying we don't need Mr. Ulzheimer and we

18    don't need those portions of Mr. DelPonti.

19         Finally, Your Honor, just to focus back where the

20    government started.  The government started by saying

21    Mr. Frederick was going to testify about whether consumers

22    who came in through one of the hotswap companies -- the

23    people who came in through one of the hotswap companies were

24    likely to get a mortgage or likely to get a rent-to-own

25    home.  That should be what he -- that is what he should have

1    done.  He should have ascertained whether you came through

2    the Hope program, or whether you came through Help Renters,

3    or Ascent, whether you had a likelihood of getting what you

4    thought you had been promised.

5         But, again, he admits -- he admits that his

6    methodology does not produce a representative sample of the

7    Hope program, of Ascent, of any of the other hotswaps, that

8    it's all conglomerated together.  And he claims, then, if

9    you push it all together and you ignore the different

10   business models, you ignore the different scripts, the

11   different ads, the different time frames, you can get 475 to

12   represent 250,000.  We think he fails even at that level.

13        But the unassailable question -- unassailable

14   truth, rather, is that he does not have a representative

15   sample of each of the hotswaps, and that's the way the case

16   is going to be litigated.  He's simply not helpful and would

17   confuse the record in this case and burn a lot of trial time

18   putting on his opinions that then require the answering

19   opinions of our experts.

20        That's all I have, Your Honor.  Thank you.

21        THE COURT:  Tell me just by way of information

22   more to curiosity than anything else at this point, are the

23   majority of the telephone calls that are transferred by the

24   affiliates the source of the business?  That is to say are

25   those that the affiliates refer all or part of the

1    90 percent of phone calls that initiates the whole process?

2              MR. BENNETT:  They are a portion and a minority

3    portion of that.

4              Most of the people who call Lexington Law do it

5    from some other source, whether it's online advertising or

6    seeing something on the website, or other media.  A minority

7    of people come from hotswaps in general and a super minority

8    come from these hotswaps.

9              And then the other important thing to remember,

10   Your Honor, is that of the people who call Lexington Law,

11   whether it's hotswap people or other channels, of those

12   people, the vast majority of them get the free credit

13   consultation.  And then they decide, having heard the

14   services described in the way that we talked about with the

15   engagement letter, and so forth, of what we're going to do

16   and the fact we don't guarantee outcomes, the majority of

17   them say no thank you.  I'm not interested.

18             THE COURT:  Tell me you've got a 1200-person bank

19   answering the telephone.

20             MR. BENNETT:  Yes, Your Honor.  I believe it's

21   smaller than that post COVID.  But yes, it's in that frame.

22             THE COURT:  Roughly, and I recognize we're talking

23   about roughly, roughly how many come from affiliates?

24             MR. BENNETT:  How many of the calls come from

25   affiliates?  You know I have that information but not with

1   me here.  If after the break I can come back, we have a

2   pretty specific -- I want to say it's in the teens of

3   percent, but I could confirm that for Your Honor.

4           THE COURT:  Okay.  And the other phone calls come

5   from other sources?

6           MR. BENNETT:  Other sources.  If you Google credit

7   repair, you will get a page for Lexington Law that will have

8   a number, and those kinds of things -- those kinds of

9   channels are the vast majority of people who --

10          THE COURT:  But the first call goes to the

11  telephone bank?

12          MR. BENNETT:  The first call goes to the

13  Teleservices operator, yes, who are the Progrexion

14  employees.

15          THE COURT:  Now those folks work for Progrexion?

16          MR. BENNETT:  They are Progrexion employees who

17  work as agents for Lexington Law, under the supervision of

18  Lexington Law.

19          THE COURT:  I understand.  But they work for

20  Progrexion?

21          MR. BENNETT:  Yes, Your Honor.  Progrexion

22  Teleservices to be specific, as a distinction from

23  Progrexion Marketing which runs the hotswap program.

24          THE COURT:  Are they paid a salary or do they work

25  on commission?

```
 1              MR. BENNETT:  They are paid a salary, and then
 2   they are bonused -- and this has changed over time.  But
 3   they are paid a salary, and then they are bonused on
 4   commission, and the formula has changed over time.
 5              THE COURT:  Okay.  And the commission relates to
 6   those that they sign up?
 7              MR. BENNETT:  I can confirm this, Your Honor.  The
 8   information I have is that the commission, for the majority
 9   of the time, has related not to people who sign up but for
10   people who decide to pursue the program and pay and stay.
11              THE COURT:  You sign a contract basically?
12              MR. BENNETT:  And are committed enough to pay.
13              So if somebody gets on the phone and they sign the
14   contract, but then they decide, you know -- there's a couple
15   things they can do.  First of all, they can cancel within
16   five days, or they can just not pay, in which case Lexington
17   doesn't send out a collection agency and they don't ding
18   their credit.  They just don't pay and they disappear into
19   the night.
20              My understanding, and I will confirm this, is that
21   the Teleservices rep does not get any sort of, you know,
22   commission based on that.
23              THE COURT:  I understand that.  Now the telephone
24   rep takes information from the caller?
25              MR. BENNETT:  Correct.
```

 1          THE COURT:  And the information received from the

 2    caller ends up having the telephone rep send them a

 3    contract?

 4          MR. BENNETT:  So they take the information from

 5    the caller.  They talk about their credit report summary.

 6    They say you have these issues that we see here.  Or they

 7    ask them, really, do you know what this one is, do you know

 8    what this is?  People might say, oh, I recognize that one.

 9    I don't recognize that.  They go through this conversation.

10    Then they say here's what we do for our services.  No

11    guarantees.  You should keep paying your bill.  All that.

12    And then ultimately --

13          THE COURT:  It's the telephone operator that gets

14    the written contract?

15          MR. BENNETT:  The telephone operator activates the

16    process that sends the contract, and then the contract comes

17    back, yes.

18          THE COURT:  Yes.  And once the contract comes

19    back, information is taken before or after, whatever.  And

20    once the information is taken, you indicated the last time

21    we talked, the machines generate the response either to the

22    credit bureau or to the supplier.

23          MR. BENNETT:  So that order of events is correct.

24    The letters have been pre-drafted over the last years --

25          THE COURT:  I understand that.

```
 1              MR. BENNETT:  What keys the letter to go or keys
 2    the challenge to go to the bureau is that algorithm that's
 3    been developed over years, that is triggered by the
 4    information collected at Lexington's direction by the --
 5              THE COURT:  And that's at the level of the
 6    telephone operator?
 7              MR. BENNETT:  That happens subsequent to the
 8    telephone operator call.
 9              THE COURT:  Acquiring the information?
10              MR. BENNETT:  After acquiring the information,
11    correct.
12              THE COURT:  And when, if any, at what time does
13    anybody talk to a lawyer?
14              MR. BENNETT:  So at any time is the answer to the
15    question.  At the initial take, if during intake --
16              THE COURT:  No.  I generate the letter.  I'm the
17    telephone operator.  I get the information.  The
18    information, in effect, triggers the letter to the credit
19    bureau, or to the merchant.  At that point in time when the
20    letters go out, they go out in the name of my name?
21              MR. BENNETT:  That's correct, Your Honor.
22              THE COURT:  Not your name?
23              MR. BENNETT:  That's correct.
24              THE COURT:  Not Lexington Law's name?
25              MR. BENNETT:  Correct.
```

 1              THE COURT:  And the response comes back to my
 2    address, not your address?  My address?
 3              MR. BENNETT:  Correct.
 4              THE COURT:  Okay.
 5              MR. BENNETT:  Often -- most often, yes.
 6              THE COURT:  Yes.  Okay.
 7              Now in this process, if there are changes made, as
 8    the result of the letter going out, in the credit report,
 9    does the credit bureau, in response to my letter, send me a
10    new credit report or do they acknowledge the change?
11              MR. BENNETT:  So they will acknowledge the change.
12    Then we at Lexington or CreditRepair.com get an
13    acknowledgment of the removal, which then is posted to the
14    portal so that the clients can see in real time, you know,
15    we sent out a letter to Acme Collection Agency.  Fifteen
16    days later, that Acme trade line comes off your report.  We
17    find that out.  We put it on the portal.  The client then
18    knows what happened.
19              THE COURT:  You put it where?
20              MR. BENNETT:  The client portal.
21              So every client has access, both on their phone
22    and at their computer, to real-time information about the
23    correspondence we're sending out.  When we send out a
24    correspondence, you'll get a report that says today we sent
25    out questions about these trade lines.  And they'll get

 1    something that says --

 2            THE COURT:  Using my name, and the response comes

 3    to my address?

 4            MR. BENNETT:  A response comes to your address,

 5    but the change to the credit report is reported to us, the

 6    removal of the trade line, and that goes on the portal.

 7            THE COURT:  And you post that?

 8            MR. BENNETT:  For the client to see.  And every

 9    client, as you can imagine, Your Honor, is different.  Some

10    go to the portal every day.  Some go much less frequently.

11    They can track what is Lexington doing for me.  And then, of

12    course, they can call a paralegal or a lawyer to check in

13    and say, listen, you sent out a letter to Acme and Acme

14    didn't remove the trade line.  Why not?  And we can explain

15    how the process works, and either send them an email with

16    that explanation or have a live person on the phone talking

17    to them.

18            THE COURT:  When I talk to the telephone operator

19    and arrange a contract, and the information that I give

20    identifies more than one dispute, one change, say I've got a

21    dozen changes, why do I deal with only two changes the first

22    letter, or three changes, or whatever?  Why not deal with

23    the dozen?

24            MR. BENNETT:  So that's a really great question.

25    It goes to the way the business has developed over the

1    years.

2         So because for 25 years we've been dealing with

3    literally millions of clients and tens of millions of

4    interactions with eight bureaus, and, you know, debt

5    collectors, and furnishers, and credit card companies, the

6    lawyers and the people at Progrexion understand which trade

7    lines are most likely to come off.  They understand which

8    trade lines are most likely to affect your credit score.

9    And they understand what's the best way in terms of cadence

10   of communication to make that happen.

11        If we send out a blast where we send 12 disputes

12   right away to TransUnion, or to one of the other bureaus, it

13   may be less effective than dealing with them seriatim, one

14   at a time, in the best order as determined by -- and this is

15   where the work product of the lawyers plays out -- what is

16   the best way for me to advocate for my client.

17        In the same way as a lawyer preparing for trial,

18   the algorithm that the lawyers coach up is designed to make

19   the most effective arguments first, and make them in the

20   order and cadence that they should be made to get the best

21   result for the client.  So that's why there's a certain

22   pace.

23        Now if clients want to pay more, they can address

24   more each month, or each service interval, and get more

25   action from the attorneys.  If they want to pay less, they

1    get fewer.  But the same analysis is done to make sure that

2    we're doing it in the most effective way.

3            THE COURT:  Well, I'm interested in your use of

4    the word more effective.  If I've got 12 possibilities, why

5    shouldn't I have 12 sent the first letter with the algorithm

6    demonstrating that I've got 12 good shots?

7            MR. BENNETT:  So you haven't paid to send 12 is

8    the most likely answer to that.  You've paid to send three

9    because you're in a service level that sends three.

10           THE COURT:  We're talking about the number of

11   letters, then, aren't we?

12           MR. BENNETT:  The number of letters and

13   communications to the bureaus.  So the math is

14   interesting -- and this is all described to the clients --

15   because if you have one -- Acme Collection Agency is dunning

16   me.  It's wrong.  It's my brother who's a deadbeat, not me.

17           I'm making this up.

18           THE COURT:  I understand that.

19           MR. BENNETT:  And so --

20           THE COURT:  How much difference in charge is it

21   going to be for me if I just don't want the two of them, but

22   I want 12 right now?

23           MR. BENNETT:  It will be in the range of $20 a

24   month.  I can get you the exact pricing, Your Honor.

25           But the math that's interesting and important to

1    keep in mind, and as is described to the client, so Acme,

2    that's one, I'm going to send a letter to Acme.  They're the

3    furnisher.  It's probably, but not always, probably reported

4    on each of the three credit bureaus.  So then I'm sending

5    three communications to them.  So one trade line can be four

6    communications.

7           So if you have 12 -- and the math is all rough

8    because it's different in every case.  If you have 12, that

9    could be 48 communications.  So to determine which of those

10   to do first, we go back in 25 years of experience, millions

11   of touches, that's all programmed into the algorithm with

12   the guidance of the attorneys, by the folks who study this,

13   in the same way that we rely on experts to help us

14   understand what's the most effective way to present

15   evidence.  They advocate on behalf of their client this way,

16   and the client gets to decide do I want to have all of it

17   done right now as quickly as possible or do I want to save a

18   little bit of money and have it done over time.

19           And happening, of course, all the while, because

20   people's lives go on, and this is one of the reasons -- and

21   we'll talk about this a lot at trial about FICO scores --

22   people are making choices.  They're maxing out their credit

23   cards, or they're paying down debt.  So there's all the

24   other factors.

25           We're focusing here on communications to the

1   bureaus and furnishers.  That's only 35 percent of your

2   credit score.  The other 65 percent is stuff that happens

3   outside of the letter dispute process.  It's how much of

4   your credit you've used?  Have you maxed your credit cards?

5   Have you taken out new loans?  Do you have a long history?

6   You know, as we get older, we have more credit history.  All

7   of those things can help your credit score.

8           We coach people about those, but we don't control

9   them, which is why it would be a fool's errand for us to

10  tell our clients you're going to get an X increase in your

11  score, because we can't promise that.

12          THE COURT:  Well, the ad suggests that as an

13  expectation, not a promise.  Otherwise you're wasting your

14  time if you don't consider modification of a particular

15  status, as of a particular credit report, as of a particular

16  moment in time.  We're not just sending letters for the joy

17  of it.

18          MR. BENNETT:  You're correct, Your Honor.

19          THE COURT:  We expect, according to your

20  experience, that is the experience of the company, that if

21  you're correct in pointing out a defect, that somebody is

22  going to change the defect within the 30-day period

23  supposedly.

24          MR. BENNETT:  We definitely have the expectation

25  that our work is going to help people improve their credit.

1    There is no question about that.  So where the rubber hits

2    the road in this case, Your Honor, is whether --

3                 THE COURT:  If your intention is right, your FICO

4    score is going to go up as well?

5                 MR. BENNETT:  If you pursue the right challenges,

6    pursue the right interventions, and do the other things we

7    counsel people to do, like pay down their debts, pay off the

8    things they owe, your credit score will go up.  We totally

9    expect that.  But where the rubber hits the road in this

10   case is the question whether we are promising that to

11   people.  And the unassailable answer to that is we are not

12   promising that to people.

13                THE COURT:  Oh, no.  I understand that.  You make

14   that expressly --

15                MR. BENNETT:  I feel strongly about it.

16                THE COURT:  -- set forth in the written contract.

17   But we expect, if you're right on this incorrect entry on

18   the credit report and call that appropriately to the

19   attention of the credit bureau, while we don't promise

20   they'll do anything, we expect they will do something.

21                MR. BENNETT:  And we hope they will, and they

22   should.  If it's inappropriately on there, they should.

23   They don't always, but they should.

24                THE COURT:  Tell me, does CreditRepair offer legal

25   services?

1          MR. BENNETT:  They do not.

2          THE COURT:  Okay.  Does Lexington Law offer legal

3    services?

4          MR. BENNETT:  Absolutely.

5          THE COURT:  Are the legal services consisting of

6    the computer generated responses?

7          MR. BENNETT:  In part, but not entirely.

8          So there are the letters in the letter bank,

9    drafted by the lawyers, curated by the lawyers in the

10   algorithm.  That is part of what we do.  That has legal

11   advice, and experience, and work product embedded in it, and

12   it has for decades -- two decades.

13         Also there's an escalation process -- we talked

14   about this briefly -- where if the creditor comes back --

15   and we've sent them a letter saying I see this trade line, I

16   don't understand it, I don't think it's mine, and they come

17   back and they say it's yours, take our word for it, and that

18   comes back.  When we talk to the client or the client gets

19   that response, the client may come to us and say, no, I can

20   prove that that's not mine, or I can prove that I paid that

21   on time and I've got the receipts, well, then it goes

22   through an escalation process where the lawyers are

23   involved, the paralegals are involved, and we send another

24   request like that.

25         And then the third way is that we have lawyers who

```
 1    are available -- Your Honor has heard this -- available for
 2    calls, and they discuss it.  So the legal services run the
 3    gamut --
 4              THE COURT:  On a percentage basis, do you have
 5    figures that show where the lawyer gets involved?
 6              MR. BENNETT:  I don't have those with me.  I can
 7    ask if we have that statistically.  We certainly have
 8    witnesses who will testify at trial about the kind of day in
 9    the life of a Lexington lawyer, what it looks like, and how
10    much time they spend dealing with client issues, and how
11    much time they spend --
12              THE COURT:  How about a day in the life of the
13    telephone operator?
14              MR. BENNETT:  We have that as well, and we can
15    provide that.  Certainly Terry Kealamakia, who runs that
16    function, can talk about that in detail.
17              THE COURT:  Let's see.  I'm trying to figure out,
18    with the withdrawals that we've had, the next motion, but
19    why don't I let you get some lunch, and let's start again at
20    1:30.
21              MR. BENNETT:  Thank you, Your Honor.
22              MS. HILMER:  Thank you, Your Honor.
23              THE COURT:  We'll be in recess.
24              (Recess)
25              THE COURT:  It looks like we're all here.  You may
```

1    want to respond for a few minutes on Frederick.

2              MS. HILMER:  Thank you, Your Honor.

3              I will be very brief.  I just wanted to clean up a

4    few things and make some clarifications.

5              First of all, it's true that Dr. Frederick did not

6    consider any purely monitoring customers in his data

7    analysis, because people who only have monitoring, that is

8    they didn't have a product that offered any credit repair

9    whatsoever, no interventions, those people weren't in the

10   data.  That wasn't provided.

11             So when there's been a suggestion that

12   Dr. Frederick didn't distinguish between credit repair

13   customers and monitoring customers, that's not true because

14   it's impossible.  The data excluded the monitoring

15   customers.  So everybody that was in that data had some

16   credit repair -- some credit repair products, some service

17   level of credit repair.  I wanted to make sure that the

18   Court understood that.

19             Second, Mr. Bennett suggested that I may have

20   misspoken about the LOP results.  So I want to be very clear

21   that what Dr. Frederick said -- or what Dr. Frederick found

22   was that for Lexington Law customers who were hotswapped

23   from OneLoanPlace and had two different FICO scores, the

24   people who got a loan after starting that -- for the people

25   who got a loan after starting, they increased their tranche

1    by -- there were about eight percent of them that increased

2    their tranche.

3         So I may have misspoken, but I want to be clear

4    that whatever misspeak I said is not what Dr. Frederick

5    said.  Dr. Frederick was clear about the difference between

6    tranches and scores.  So he should be allowed to clarify

7    that for himself.

8         I would also like to ask -- Amanda, would you

9    please bring up Plaintiff's Exhibit 473 for us.

10        These are the score tranches.

11        We're going to hope our system works, Your Honor.

12    It's been a little slow.  So I apologize.

13        These are the score tranches -- the credit score

14    tranches that Dr. Frederick used.  He used them because

15    Mr. DelPonti used them, and Mr. DelPonti was the first one

16    to issue a report on these topics.  The sequence was

17    Mr. DelPonti issued his expert report in August of 2021 in

18    support of the defendants' motion for partial summary

19    judgment on Count 1.

20        And you'll recall, Your Honor, that we asked for

21    additional time to respond so we could depose those experts

22    who the defendants had disclosed.

23        Dr. Frederick did not issue his report until

24    September 27th.  And so in doing so, he just used the same

25    score tranches that Mr. DelPonti had used, and that are,

1    frankly, pretty standardly accepted. You know, you'll find

2    them in CFPB reports. You'll find them on the FICO website.

3    So I just want to be clear that that's why we are using this

4    range. It shouldn't be a matter of controversy and I just

5    want to make sure it isn't.

6         Also, if I could have 456 brought back up.

7         Your Honor, this is why experts, and not lawyers,

8    should speak about mean regression. Dr. Frederick will do a

9    much better job of explaining this than I have. But I want

10   to be clear that there's no misrepresentation here.

11        The way this chart works is it shows that at each

12   point in time, say, if you look at the six-month point along

13   the bottom, and you look up, the dotted line is the average

14   starting FICO score. The solid line is the average ending

15   FICO score. And he's done that for each time period. So

16   for each time period, he's looking at the average of all the

17   people who were in for that period of time, if you will. So

18   there's not some excess weight being given to the subprime

19   group because it's all averages.

20        So I just want to be clear that this is a proper

21   chart, or at least Dr. Frederick should be allowed to talk

22   about it. And if they want to cross-examine him, have at

23   it. That's what cross-examination is for. But there's

24   nothing misleading about it.

25        And I think that's all we have for you on

1    Dr. Frederick.  I just wanted to make sure that the record

2    was clear on those matters.

3                THE COURT:  Thank you.

4                Are we still talking about Allen Weinberg?

5                MR. BENNETT:  Yes, Your Honor.

6                THE COURT:  Why don't we go ahead on Allen

7    Weinberg.

8                Now as I understand it, Dr. Wind is gone and

9    Dr. Mott is gone?

10               MR. BENNETT:  I'm sorry, Your Honor?

11               THE COURT:  Is Dr. Wind gone?

12               MR. BENNETT:  Dr. Wind is gone only if

13   Dr. Frederick is gone.  If Dr. Frederick is in, Dr. Wind is

14   still relevant.

15               THE COURT:  How about Mr. Mott?

16               MR. BENNETT:  He responds to --

17               THE COURT:  Frederick?

18               MR. BENNETT:  -- to Weinberg.

19               So Weinberg and Mott are a pair.  If Weinberg

20   goes, Mott goes.  And if Frederick goes, DelPonti, Barnett,

21   Maronick, and Wind go.  But if Frederick is in, if Weinberg

22   is in, then Mott is in, and the other four are in.

23               THE COURT:  And we're still having Victor Stango?

24               MR. BENNETT:  Yes, who stands a little bit by

25   himself.  He is an expert intended, really, I think,

1   Your Honor, for a remedies phase.  So he might be an expert

2   that if there's a jury trial, he only would testify to the

3   Court about remedies, not to the jury about remedies,

4   depending on what the Court prefers.  We could do it either

5   way.  It's up to the Court.

6           THE COURT:  Well, we did have a motion to exclude

7   the testimony of him.

8           MR. BENNETT:  Yes, Your Honor.  That's the

9   government's motion.

10          So on to Dr. Weinberg.

11          THE COURT:  You go ahead.

12          MR. DePROSPO:  Hi, Your Honor.  My name is Atticus

13  DeProspo of Williams & Connolly.  I represent the

14  defendants.

15          We seek to exclude the opinions of the

16  government's chargeback expert witness, Mr. Allen Weinberg.

17  So, Your Honor, a chargeback, or a payment dispute is a

18  debit or a credit card transaction that is reversed by a

19  cardholder's bank or credit card company after a customer

20  disputes a charge on their account.

21          The government uses an expert, Mr. Weinberg, to

22  opine that if a consumer seeks a chargeback, then it must be

23  evidence of deception or fraud in the defendants' marketing

24  and/or sales practices.  And therefore Mr. Weinberg's

25  opinion is that defendants knew or should have known

1   deception was going on based on consumers seeking

2   chargebacks, and that is not true.

3           Chargebacks are irrelevant because there's no

4   causal link between chargebacks and deceptive marketing

5   and/or sales practices that the government alleges.  The

6   government's use here of Mr. Weinberg is an attempt to prove

7   fraud by a proxy.  Chargebacks are not evidence of deception

8   or fraud.

9           Even if chargebacks are somewhat relevant,

10  chargeback experts are repetitive, duplicative, cumulative

11  of fact witnesses.  We believe that fact witnesses can

12  address any issues related to payment processing and

13  chargebacks, and therefore chargeback expert witnesses would

14  only confuse the jury and discuss matters that are

15  irrelevant to the matters before this Court.

16          Regardless, we argue that this Court should still

17  exclude Mr. Weinberg's opinions because they were

18  inadmissible.  Mr. Weinberg's opinions are based on

19  unreliable methodology and insufficient facts or data.

20  Mr. Weinberg's opinion should be excluded because, first

21  off, Your Honor, he failed to consider or properly rule out

22  obvious alternative explanations for defendants' chargeback

23  rates.  Mr. Weinberg's opinion is that if a client seeks a

24  chargeback, that must be evidence of deception or fraud on

25  behalf of the defendants.

1              But consider, Your Honor, for example, a customer

2      who purchases a shirt from Amazon, but after making that

3      purchase, he decides to seek a chargeback from his bank.  In

4      Mr. Weinberg's expert opinion, that is evidence of deception

5      by Amazon.  However, the consumer who seeks a chargeback

6      after purchasing a shirt from Amazon might do so because the

7      shirt doesn't fit, there's a tear or a stain in the shirt.

8      The consumer might not remember that they purchased the

9      shirt from Amazon when they received their credit card or

10     their bank statement that shows a charge from Amazon, or

11     they might not remember -- sorry, they might not understand

12     what the billing descriptor is on their credit card or

13     billing statement.  Or it could be because the consumer

14     didn't have sufficient funds in the first place to even

15     purchase that shirt.

16             Similarly, Your Honor, Mr. Weinberg does not

17     consider obvious possible alternative explanations for

18     defendants' clients' reasons for seeking a chargeback, such

19     as the nature of the defendants' business, right?  They're

20     in the telemarketing business with a subscription billing

21     model.  A consumer might not understand the billing in

22     arrears requirements that are unique to the credit repair

23     space, whereas when a consumer purchases a shirt from

24     Amazon, they're charged immediately upon purchasing the

25     shirt.  Whereas here, because of the regulations, a client

1    cannot get charged until we have provided those services.

2            So, Your Honor, Mr. Weinberg's opinions are

3    inadmissible because he jumps to the conclusion without

4    connecting the link as to how you get from chargeback rates

5    or evidence of deception or fraud.  So we would say for this

6    reason, Mr. Weinberg's expert opinions are inadmissible.

7            Another reason that Mr. Weinberg's opinions should

8    be excluded is because he cannot opine on the defendants'

9    state of mind about whether they knew or should have known

10   that their chargeback rates were because of an alleged

11   deceptive marketing and/or sales practices as this is a

12   question for the fact finder to decide.

13           The case law in this circuit is pretty clear,

14   Your Honor, that experts may not tell the jury what result

15   to reach nor testify regarding intent, motive, or state of

16   mind.  Expert evidence that simply tells the jury how to

17   rule circumvents the whole fact finder's decision making

18   function by telling it how to decide, and that is

19   inadmissible.

20           And so, again, Your Honor, Mr. Weinberg's opinion

21   should be excluded on that basis alone.

22           Another reason that Mr. Weinberg's opinions should

23   be excluded is because of unreliable methodology.  He does

24   not do an apples to apples comparison.  He incorrectly

25   compares defendants' chargeback rates to merchants across

1    all markets rather than merchants in the same industry,

2    which is the telemarketing card not present space.  So the

3    card not present space just refers to transactions that are

4    completed via mail order, over the telephone, online, or

5    through a mobile device.  This is inappropriate because it

6    fails to take into account that chargeback rates vary from

7    industry to industry.

8            So, for example, chargeback rates in the food and

9    beverage sector are lower than they are in defendants'

10   industry because consumers aren't seeking chargebacks for

11   their Starbucks coffee.  And yet Mr. Weinberg compares the

12   defendants' chargeback rates to those in the food and

13   beverage industry, as well as several other industries and

14   sectors that the defendants do not operate in.

15           Additionally, Your Honor, Mr. Weinberg's

16   methodology is flawed because he inappropriately applies

17   what are called chargeback rate thresholds as a benchmark

18   for the assessment of defendants' alleged deceptive

19   marketing and/or sales practices.  And the purpose of these

20   thresholds, Your Honor, is to protect the payment industry

21   in general.  So it's basically to ensure that merchants

22   aren't losing thousands of dollars by having to issue

23   numerous chargebacks.

24           These thresholds are also -- that's what they're

25   used for, and they are not used to test whether a company's

1    dispute rates are too high, and they are definitely not used

2    to assess a company's marketing and/or sales practices.

3         Even if this Court were to decide that thresholds

4    were an appropriate benchmark, which we still argue they're

5    not, a more appropriate comparison here would have been to

6    compare the defendants' chargeback rates against the higher,

7    excessive thresholds that are set by the credit card

8    companies, because after a certain period of time, if you

9    operate above these higher, excessive thresholds, the credit

10   card companies will no longer permit a merchant to use their

11   form of payment to process customers' forms of payment.

12        What Mr. Weinberg here did was compare defendants'

13   chargeback rates to these lower level thresholds.  And

14   that's inappropriate because even Mr. Weinberg himself

15   acknowledges that credit card networks set higher, excessive

16   thresholds, but he ignored them, we can only assume, because

17   defendants' chargeback rates never approached nor exceeded

18   these higher, excessive thresholds.  But Mr. Weinberg's

19   opinions is that our chargeback rates are above average and

20   excessively high.

21        THE COURT:  Are you talking about a specific

22   defendant?

23        MR. DePROSPO:  When you say specific defendant, so

24   there is the Progrexion defendants, and then he also has

25   opinions as to the hotswap partners' dispute rates.

 1          THE COURT:  But you're not talking about Heath?

 2          MR. DePROSPO:  I'm sorry, Your Honor?

 3          THE COURT:  You're not talking about the lawyer.

 4   You're only talking about --

 5          MR. DePROSPO:  The Progrexion defendants,

 6   Your Honor.

 7          THE COURT:  -- the Progrexion defendants?

 8          MR. DePROSPO:  Yes, because it goes back to how

 9   payments are processed, and payments are processed, right?

10   We have a third-party payment processor, and the Progrexion

11   entity is the one that works with the third-party payment

12   processors to process the payments on behalf of clients for

13   Lexington Law and CreditRepair.com.

14          So, Your Honor, the other thing I just want to

15   point out in terms of -- so Mr. Weinberg's opinion should be

16   excluded because of all these flawed methodologies, but then

17   he tries to attempt to fill the analytical gap between the

18   defendants' dispute rates and his conclusion that they

19   resulted from deceptive marketing practices by relying on

20   his own categorization of what are called reason codes.

21          And so reason codes are what financial

22   institutions use to explain why a customer might seek a

23   chargeback.  And these vary widely from financial

24   institution to financial institution.  So Visa versus

25   MasterCard versus maybe your bank here in Utah could have

1    different reasons to explain why you might seek a

2    chargeback.

3         Mr. Weinberg, what he does is he uses these reason

4    codes and he places them into buckets, and he opines that

5    certain buckets indicate the existence of deceptive

6    marketing practices.  Again, this methodology is completely

7    flawed, and as the gatekeeper, we would ask Your Honor to

8    exclude his opinions on this.

9         And Mr. Weinberg himself even concedes that not

10   all of the reason codes that he categorized as reflecting

11   deception actually reflect deception.  He admitted that

12   there are certain factors unrelated to deceptive marketing

13   and/or sales practices that could explain the codes he

14   labeled as like transaction not recognized or authorized,

15   that he inextricably grouped as codes representing

16   deception, but could have other reasons for it, right?

17        So, again, it goes back to those possible

18   alternative explanations that, again, a consumer might not

19   remember that they made a certain transaction or they might

20   not have recognized the billing descriptor of a certain

21   merchant on their credit card or their bank statement.

22        And Mr. Weinberg himself in previous literature,

23   and I quote, says that chargeback reason codes often do not

24   accurately reflect the actual reason the transaction is

25   being charged back since consumers and issuers often insert

1   arbitrary reasons to get the chargeback process going.  And,

2   again, Your Honor, these reason codes vary considerably from

3   financial institution to financial institution.

4           So for all of these reasons, Your Honor, we would

5   ask this Court to exclude Mr. Weinberg's expert opinions

6   because they are irrelevant, chargebacks are not evidence of

7   deception.  And even if chargeback rates are somehow

8   relevant, which, again, we do not think they are, chargeback

9   experts are duplicative and repetitive of fact witnesses

10  that the government has had a chance to depose and who will

11  testify at trial as to these topics.

12          THE COURT:  What level of chargebacks is he

13  talking about?

14          MR. DePROSPO:  When you say levels, Your Honor, do

15  you mean the excessive thresholds that I explained or the

16  lower ones?

17          THE COURT:  The lower and the upper ones as well.

18          MR. DePROSPO:  Sure, Your Honor.

19          In Mr. Weinberg's report, he compares our

20  chargeback rates to the major credit card companies.

21          THE COURT:  What are those specifically?

22          MR. DePROSPO:  What are those rates?

23          Just give me one moment, Your Honor, and I can

24  pull that up for you.

25          So, Your Honor, these have varied over time.  So

 1   I'm referring now to Mr. Weinberg's expert report on page

 2   24.  And if you look here, Visa has dispute monitoring

 3   programs for the early warning, which has these lower

 4   thresholds.  Before October 2019, it was .75 percent.  And

 5   then after October 2019 onwards, they lowered it to 0.65

 6   percent.  Again, these are the lower early warning

 7   thresholds that merchants can still --

 8           THE COURT:  What are the ones he's pointing to as

 9   being excessive?

10           MR. DePROSPO:  He doesn't point to those,

11   Your Honor.  He compares defendants' dispute rates to this

12   lower early warning dispute rate instead of --

13           THE COURT:  What are the relevant dispute rates

14   that he compares to the lower ones?  What does he say is the

15   rate for dispute?

16           MR. DePROSPO:  So, Your Honor, Mr. Weinberg

17   compares our chargeback rates to the early warning ones that

18   I just mentioned to you.

19           THE COURT:  What are your chargeback rates that he

20   uses?

21           MR. DePROSPO:  What does he say our chargeback

22   rates are?

23           So, Your Honor, he also refers to that here in his

24   expert report.  Just give me one moment here.  And obviously

25   this fluctuates over time.

1              If you look on page 37 of his expert report, he

2       provides -- sorry.  Those are the ACH return rates.

3              Page 34, Your Honor, the Progrexion organization

4       chargeback rates.  So he maps out on here, there's the

5       percent threshold, and then he obviously does lower ones.

6       And on four instances he points out that defendants'

7       chargeback rates exceeded the four-percent period.

8              THE COURT:  I'm interested in the figures.

9              MR. DePROSPO:  Yes.  So, Your Honor, if --

10             THE COURT:  They exceeded, but tell me the

11      figures, if you have figures.

12             MR. DePROSPO:  Yes, Your Honor.

13             So here he shows -- so over a 24-month period,

14      between May of 2018 and May of 2020, if you look here, these

15      are the figures he uses, and he shows in four months out of

16      the 24 months, our chargeback rates were above one percent.

17             THE COURT:  Well, I understand that.  Tell me the

18      figure.

19             MR. DePROSPO:  It's just above one percent,

20      Your Honor, in four months.  And then the other months it's

21      less than one percent here.  Those are the figures.  They're

22      percentages.

23             THE COURT:  But we don't have the underlying

24      figures that the percentages are based on.

25             MR. DePROSPO:  Your Honor, he calculates those.  I

1    don't have them handy right now in terms of the total, you

2    know, number of chargebacks that he analyzed.

3              THE COURT:  What's the difference?

4              MR. DePROSPO:  I'm sorry?

5              THE COURT:  What's the difference between the

6    standard that he uses and your rates?

7              MR. DePROSPO:  Well, Your Honor, the reason that

8    this is important is because if you're above the excessive

9    thresholds --

10             THE COURT:  I understand that.  What's the

11   difference?  One percent, .75?

12             MR. DePROSPO:  Sorry about that, Your Honor.

13             So, for example, if you look here, and, you know,

14   again, I can't see the specific number, but here in July of

15   2018, Mr. Weinberg says that Progrexion's, you know, Visa

16   card chargeback rate was just under one percent.  It looks

17   like it's somewhere between .08 and .09 percent.

18             Your Honor, I'm again referring back to this page

19   24 where you look at, okay, what's the difference between

20   early warning and excessive threshold, right, and why does

21   this matter?

22             So if you're looking at this, Your Honor, if

23   you're above two percent, which is the excessive threshold

24   rate, then if you're in that category for a certain period

25   of time, eventually Visa or MasterCard won't allow a

1    merchant to use a Visa or MasterCard, you know, for a

2    merchant to process that form of payment for consumers.

3            So if you look here -- and this is Mr. Weinberg's

4    data -- none of our chargeback numbers, the actual numbers

5    themselves even come close to the two-percent excessive

6    threshold.  Where mostly, if you look at this chart again,

7    Your Honor, that's in front of you, other than the four

8    instances here, most of our chargeback rates are under the

9    one-percent threshold, which is really just closer to the

10   standard program, or even early warnings, and there's not

11   any repercussions for the merchants, or defendants in this

12   case.  We can still process Visa and MasterCard payments for

13   our clients.

14           And so, again, the reason that this is important

15   is because Mr. Weinberg tries to use these lower levels to

16   say that we're above average or excessive, but if you

17   actually look at the rates set by the credit card companies

18   or the network, we're not in that excessive category.

19           THE COURT:  It really has to do with whether

20   they're going to cut you off or whether they're not.

21           MR. DePROSPO:  That's correct, Your Honor.  So

22   we're never even close nor do we exceed that excessive

23   threshold.

24           THE COURT:  Never been cut off?

25           MR. DePROSPO:  Have we ever been cut off,

1    Your Honor?

2           Based on the data that we've produced here, I'm

3    pretty sure we've never been cut off.  Yeah, we've never

4    been cut off, Your Honor.

5           Unless you have any other questions -- I guess,

6    you know, just in terms of, you know, summing this all up,

7    Your Honor, chargebacks are an ordinary course of business

8    and an issue that merchants have to deal with.  This isn't

9    an issue that just defendants' business deals with.  This is

10   true from retail, again, food and beverage, people seek

11   chargebacks.  Amazon has to deal with chargebacks.  So this

12   is not a unique issue here, but, again, is any form of

13   evidence of deception or fraud on behalf of the defendants.

14          Defendants have tried their best to practice good

15   business by being proactive and issuing refunds where

16   necessary, and our chargeback rates have never been or

17   exceeded the excessive thresholds, but we have been cut off

18   from being able to process forms of payment, Your Honor.

19          THE COURT:  Well, you use credit cards.  Do you

20   also use access to the bank account?

21          MR. DePROSPO:  Yes.  These are called ACH returns.

22          THE COURT:  Yes.  Roughly, on a percentage basis,

23   credit cards versus that function, that's a minor function,

24   I assume.  But is there a percentage that is capable of

25   being attributed to drawing down on the bank account versus

1    credit card?

2            MR. DePROSPO:  So is Your Honor's question like

3    the actual number of clients who pay via ACH versus credit

4    cards?

5            I don't have that figure on hand with me now.  I

6    would have to look into the number of our customers who pay

7    via direct transfer from their bank versus a credit card,

8    but I don't have that number offhand on me right now.

9            THE COURT:  In the initial interview and in the

10   subsequent delivery of the contract, is that laid out as

11   part of the contract?

12           MR. DePROSPO:  In terms of the forms of payment

13   that we accept?  I would have to look at the language in the

14   contract in terms of the different forms of payment.

15           But I can say that we do have -- you can have a

16   primary form of payment and a secondary form of payment,

17   right?  So a lot of people will offer up their credit card

18   or their debit card first, or their secondary option might

19   be to just do a direct, you know, wire transfer from their

20   bank.  So I think it's just a matter of how the defendant

21   wants to pay for our services.  Sometimes it might be, you

22   know, they prefer to do it via credit card versus a direct

23   transfer from their bank.

24           So it says in the contract here, Your Honor, that

25   your credit or debit card company, or bank -- so we accept

1  any of the three forms of payment there -- are laid out in

2  the contract as to how you can pay for our services.

3          THE COURT:  Are most credit cards?

4          MR. DePROSPO:  Again, Your Honor, I don't know

5  whether or not -- you know, again, I don't want to mislead

6  the Court as to if it's a majority of credit cards or it's a

7  majority of direct wire transfers.  But, again, I could look

8  into that for you when I look into, you know, what is the

9  actual statistical breakdown.

10         THE COURT:  I'm interested in the actual process.

11 But go ahead.

12         MR. DePROSPO:  So you're interested in which

13 process, Your Honor?

14         THE COURT:  The process of payment.

15         MR. DePROSPO:  Okay.  Do you want me to explain

16 the payment process?

17         THE COURT:  Oh, I'm acquainted with it.  I'm fine.

18         MR. DePROSPO:  Okay.  Well, Your Honor, if you

19 don't have any other questions, you know, again, I would

20 just like to emphasize that chargebacks are something that

21 all merchants have to deal with, right, and our position is

22 that they're not evidence of deception or fraud.

23         THE COURT:  Some people even accept cash.

24         MR. DePROSPO:  Yeah, for services.  That is not

25 laid out in the contract, cash.  I only laid out from what

 1    it says here is, you know, credit cards, a bank, or your

 2    debit card, Your Honor.

 3            So, again, we would ask this Court to exclude

 4    Mr. Weinberg's opinions because they're based on unreliable

 5    methodology and insufficient facts and data, and we also

 6    just don't think chargebacks are relevant to the matters

 7    before this Court, and there are fact witnesses that can

 8    cover these issues.

 9            So thank you, Your Honor.

10            THE COURT:  I'm happy to hear from the United

11    States.  Tell me why we should be concerned with chargeback

12    at all.

13            MS. FERRARA:  Yes, Your Honor.  Alicia Ferrara for

14    the Bureau.

15            As Your Honor is aware, the Bureau has offered

16    Mr. Weinberg to opine on defendants' high levels of

17    chargebacks and ACH returns, particularly in the hotswap

18    marketing channel.  And I think it would be helpful to

19    contextualize Mr. Weinberg's testimony.

20            I'd like to start with a brief description of the

21    evidence that the Bureau has developed relating to payment

22    disputes, so chargebacks and ACH returns, and how that fits

23    into our proof and is relevant to our claims on Counts 2

24    through 5, which are the deception claims.

25            Your Honor, the Bureau has developed evidence that

1    defendants had high dispute levels during the relevant

2    periods, and particularly for customers transferred from the

3    relevant hotswaps.  I think that's a key piece that

4    defendants haven't quite acknowledged.  But defendants were

5    keenly aware of this and they, in fact, attributed it to

6    misrepresentations made by particular ones of the relevant

7    hotswaps, that they went to great length, often

8    unsuccessfully, to rein in those chargebacks and return

9    levels.  When that failed, they attempted to mask the

10   problem from the payment networks.

11           The Bureau intends to use this evidence to support

12   its showing that defendants knew about the

13   misrepresentations that the relevant hotswaps were making to

14   consumers.

15           THE COURT:  How do they know?

16           MS. FERRARA:  Mr. Weinberg will testify that based

17   on the evidence that he has reviewed in the record, so that

18   includes, for example, defendants' close tracking of their

19   chargeback and return levels.  For example, in their key

20   performance indicator, KPI reports, defendants considered

21   chargebacks to be a key performance indicator.  They tracked

22   them very closely.

23           And in that report, Your Honor, they actually

24   included top ten lists of the top ten marketing channels

25   contributing to the overall chargeback rates.  Several of

1    the relevant hotswaps routinely appeared in that list.

2    OneLoanPlace, which we've talked about quite a bit,

3    Your Honor, was frequently number one.  And there are many

4    other indications in the records, emails as well, indicating

5    that Progrexion was aware that OneLoanPlace chargebacks were

6    out of control, that they were, in fact, skewing the

7    company's overall chargeback levels.

8         He will also testify as to the payments risk

9    forum, which was a monthly meeting that defendants held

10   where they tracked their chargeback and dispute levels.

11   They were clearly aware that they had a problem with

12   chargebacks and were working very hard to bring them down.

13        He will also testify as to the fact that the

14   chargeback rates, the levels were worse in the hotswap

15   channel than for defendants' aggregate business.

16        Your Honor, I would point -- I would direct you to

17   the case FTC vs. Credit Bureau Center.  That was a case

18   similar to this, involving affiliate marketing where

19   particular marketing affiliates were contributing to

20   chargebacks at a higher level, a market increase in one

21   particular marketing channel, and the court held that that

22   was a red flag that should have led the defendants to

23   realize there was something going on in that marketing

24   channel, that they were making misrepresentations to

25   consumers.  And we have a quite similar situation going on

1    here.

2            There's also evidence that new customers were

3    charging back at higher rates than existing customers, which

4    is an indication as to the timing, an indication that this

5    was occurring during the sign-up process.  Defendants were

6    also aware of that.

7            And then Mr. Weinberg will also testify as to

8    particular documents that he reviewed indicating that

9    defendants not only should have but, in fact, did make that

10   connection.

11           THE COURT:  What document are you referring to?

12           MS. FERRARA:  Sure, Your Honor.  I will take you

13   through a couple of them.

14           So the first document, I believe it's Exhibit 6 to

15   defendants' motion to exclude Mr. Weinberg.  There's an

16   intra email from Progrexion to OneLoanPlace saying the

17   biggest factor we see with ZPCs.

18           THE COURT:  Now who is the author of the document?

19           MS. FERRARA:  I would have to pull that up,

20   Your Honor.

21           It's Nils Evensen, who is a Progrexion employee,

22   and the email is being sent to Cam Stanton.

23           THE COURT:  What does it say?

24           MS. FERRARA:  It says the biggest factor we see

25   with ZPCs is if someone is promised they can pay for our

1    services using our loan.

2            THE COURT:  Using what?

3            MS. FERRARA:  Using our loan.  So the implication

4    being that OneLoanPlace customers, that they believe that

5    they are going to get a loan from OneLoanPlace that they can

6    then use to pay their credit repair fee, and that that is

7    contributing to the rates of ZPCs --

8            THE COURT:  Now who says that?

9            MS. FERRARA:  The Progrexion employee to the

10   OneLoanPlace.

11           THE COURT:  What is the name of the employee?

12           MS. FERRARA:  Nils Evensen.

13           THE COURT:  I'm sorry?

14           MS. FERRARA:  Evensen.

15           THE COURT:  Okay.  What was the date on the

16   document?

17           MS. FERRARA:  I don't have the document in front

18   of me, Your Honor, but I can certainly find that out.

19           THE COURT:  Well, if we're talking about knowledge

20   on the part of Progrexion, I suppose the date is of some

21   moment and helpful to us because we're dealing with other

22   issues.  Whether we're back in 2011 or whether we're in 2016

23   could be a difference.

24           MS. FERRARA:  Your Honor, the email is dated

25   August 22nd, 2017.

1          THE COURT:  What does it say?

2          MS. FERRARA:  It says the biggest factor we see

3    with ZPCs, zero paying customers, is if someone is promised

4    they can pay for our services using our loan.

5          THE COURT:  Okay.

6          MS. FERRARA:  I can walk you through several other

7    documents as well, Your Honor.

8          There's another email.  I believe this one was

9    from July of 2018.  This email arose at the conclusion of a

10   period where OneLoanPlace had particularly high chargeback

11   rates.  So, for example, during this period of time -- one

12   moment, Your Honor.

13         During the period from January 2017 to May 2018,

14   so towards the middle of our period, we have data showing

15   that OneLoanPlace in particular, its chargeback rates

16   ranged, at the lowest, 1.03 percent, which was already above

17   the Visa and MasterCard violation threshold, to 5.03

18   percent, which is five times that threshold.

19         THE COURT:  So what?  How does that equal

20   misrepresentation?

21         MS. FERRARA:  So, Your Honor, I think what I was

22   explaining is that this evidence of these elevated

23   chargeback rates, particularly chargeback rates that surpass

24   these thresholds --

25         THE COURT:  So what?  How do we get

1    misrepresentation from the rate?

2            MS. FERRARA:  Because it's an indication,

3    Your Honor, that basically what is -- as Mr. Weinberg will

4    explain -- and I think this partly goes to his usefulness as

5    an expert because he will be able to walk the fact finder

6    through this -- what happens when a payment is disputed, the

7    customer is indicating that something has happened, they are

8    challenging the payment.

9            THE COURT:  Yeah, and it's the something that we

10   need to focus on, what has happened.

11           MS. FERRARA:  So I think what the case law

12   indicates, Your Honor, is that when these chargebacks are

13   elevated in the way that they were with defendants, that is

14   an indication of deception and misrepresentation.

15           THE COURT:  What case law says that?  What case

16   are you referring to?

17           MS. FERRARA:  Sure.  I can refer you to several

18   cases that are cited --

19           THE COURT:  Give me your best case.

20           MS. FERRARA:  Sure.  I think a particularly good

21   one for us that I've mentioned before, Your Honor, is FTC

22   vs. Credit Bureau Center.

23           THE COURT:  What were the facts of that case?

24           MS. FERRARA:  So that was a similar case involving

25   affiliate marketing, also of housing.  So that was a case

1    where affiliate marketers were advertising houses on Craig's
2    List, that effectively didn't exist.
3              THE COURT:  Okay.  And they told untruths on
4    Craig's List?
5              MS. FERRARA:  Yes, Your Honor.
6              THE COURT:  Okay.
7              MS. FERRARA:  So --
8              THE COURT:  And you had specific evidence of
9    untruths on Craig's list?
10             MS. FERRARA:  Yes.  And --
11             THE COURT:  Now that's a difference between what
12   we've got here.  If you've got a specific representation on
13   the part of the affiliate speaking, purportedly, for himself
14   and for others, I'd be interested.  But I'm interested in
15   specifics.  And I wonder when I listen to or read the
16   opinions of the prospective expert witness, how he jumps
17   from the rate to the representation.  It seems to me he's
18   got it in reverse.  You would need the representation first
19   upon what people rely, and then they discover that the
20   representation is inappropriate and they want their money
21   back.  They say I'm disputing this particular payment that
22   folks have in their pocket already and they want it back.
23             But I'm curious as to what, standing alone, the
24   rate equals misrepresentation.  I have trouble making that
25   connection.

 1          MS. FERRARA:  Yes, Your Honor.  I think it may be

 2   helpful to clarify here because I don't think defendants

 3   described it entirely accurately.

 4          Mr. Weinberg is not saying that the rate alone is

 5   what indicates deception.  I think that's an

 6   oversimplification of his opinion.

 7          THE COURT:  That's what it sounds like to me when

 8   you look at what he says.  What else does he take into

 9   consideration?

10          MS. FERRARA:  So what Mr. Weinberg did here is

11   what he refers to as a root cause analysis.

12          So to back up a little bit, Mr. Weinberg, he has a

13   lot of experience in the payments industry.  Most recently

14   he has worked as a consultant for this firm called --

15          THE COURT:  Just tell me the other factors that he

16   relies on.

17          MS. FERRARA:  So as part of this root cause

18   analysis that he did, which is what he typically does for

19   his clients, he looked at the numbers.  That was certainly

20   one part of it.  He looked at the numbers in aggregate as

21   compared to the hotswaps.  And he also looked at the reason

22   codes.

23          Now to explain a little bit about the reason

24   codes, I think I have to back up a little bit and explain

25   sort of how the process works.  So when a customer goes and

1    they want to dispute a payment, they call up their bank and

2    they're going to give like a plain English description of

3    the reason they're initiating the dispute.  What the bank is

4    then going to do is assign a reason code to that dispute.

5         Mr. Weinberg conducted an analysis of the reason

6    codes for defendants' chargebacks and returns.  This is a

7    type of analysis that he routinely performs for his

8    consulting clients, one he is very familiar with.  And he

9    bucketed the various reason codes -- the relevant reason

10   codes that were assigned to defendants' chargebacks.

11        THE COURT:  What specific code says

12   misrepresentation?

13        MS. FERRARA:  So there is one particular code that

14   says misrepresentation specifically.  And then there is

15   another one called unauthorized.  And it's Mr. Weinberg's

16   opinion that that code as well is indicative of potential

17   misrepresentation because it indicates that the merchant

18   behaved in some way that was not what the consumer was

19   expecting.

20        THE COURT:  Now we're talking about

21   misrepresentation, and we get these fancy codes between

22   banks and lending institutions, and parents and children in

23   corporate structures, people punching a number in the

24   computer that says misrepresentation.  The problem we have

25   is that we need somebody saying this is what they told me

1    and it was incorrect.  I don't see that in Mr. Weinberg's

2    testimony.

3            MS. FERRARA:  So I think, Your Honor, that aspect

4    comes in in other parts of our case.  We certainly plan to

5    show --

6            THE COURT:  We're talking about Weinberg, if he's

7    worth listening to.  You know, how's he going to help.

8            MS. FERRARA:  So I think how he's going to help

9    us, Your Honor, is he is going to take this set of evidence

10   that we've developed, that we maintain is relevant -- it's

11   actually fairly routine in these types of cases.  Many

12   courts have admitted this to show deception.

13           THE COURT:  They suggest he's not worth listening

14   to and you suggest that he is.  And my question is why is he

15   worth listening to if he's just going to say excessive

16   chargebacks?  What does that mean for a fact finder who is

17   concerned with misrepresentation?  The fact that somebody

18   uses a code may or may not accurately portray what it's

19   supposed to portray.

20           MS. FERRARA:  So I think, Your Honor, part of how

21   Mr. Weinberg will be helpful is he's going to explain all of

22   this.  He's not going to just get up there and say it's

23   excessive.  He's going to explain for the jury in quite

24   great detail how the payment system works, what is a

25   chargeback, what is an ACH return, what can we learn from

1    them.

2              THE COURT:  We know a chargeback is a chargeback.

3    So what?  How does that equal misrepresentation?  That's the

4    question.

5              MS. FERRARA:  Mr. Weinberg, he'll testify based on

6    everything that he looked at, not just the fact that they

7    were high, though that is certainly an important part of it,

8    based on the fact that they were high, the reason codes that

9    he looked at, the specific documents he looked at showing

10   that defendants made that connection, the ways that they

11   tried to mask it from the payments networks.  It's really a

12   whole picture of evidence.

13             THE COURT:  And that's fine.  Why are we in a

14   position to even deal with it at this point?

15             MS. FERRARA:  I think it's our assertion,

16   Your Honor, that it's quite relevant to the knowledge piece

17   of our case.

18             THE COURT:  Well, I don't know because I don't

19   know what he's going to say.

20             MS. FERRARA:  Right.  I can proffer you more

21   specifically what he's going to say if that would be

22   helpful.

23             THE COURT:  That would be helpful.

24             MS. FERRARA:  So he's going to start --

25             THE COURT:  Something beyond high rates.  What

1    else is he going to say?  High rates and chargebacks.

2         MS. FERRARA:  So starting with the background,

3    which we've gotten into a little bit, he's going to describe

4    how the payment system works.  He's going to describe what a

5    chargeback is, what a return rate is.  I know it possibly

6    seems elementary to you, Your Honor, but the jurors may not

7    have that knowledge, and so that will certainly be helpful

8    to them.  He will describe the dispute process, how a

9    consumer goes about disputing a payment.  He'll describe the

10   consequences to merchants who have high dispute rates, why

11   that's vitally important.  I think Your Honor mentioned cash

12   before.  Merchants like the defendants can't accept cash.

13   It doesn't really work with their business model.  So this

14   whole electronic payment system is extremely vital, and

15   he'll explain all of that.

16        THE COURT:  I've been charged -- I've got a charge

17   on my credit card, it exists, and I dispute it.  I can

18   dispute it for a hundred different reasons, one of which may

19   have been a misrepresentation.  You say they code it.

20   Somebody codes it because somebody says something.  I say

21   I've been misrepresented.  I've been told something that

22   isn't true.  Well, what have I been told and how do we know

23   whether it's true or not?  I accept on face value what you

24   suggest and put in a computer code.  So what?  He looks at

25   the computer code.  He doesn't look at what's been said.

 1           MS. FERRARA:  So I'll also note, Your Honor, in

 2     terms of what was said, that is in the chargeback narrative.

 3     So there is a specific narrative that the consumer gives to

 4     the bank.  But defendants refuse to produce those, and so

 5     all we really have is the chargeback codes themselves.  So

 6     there is a specific narrative.  We did not get access to

 7     that through discovery because defendants wouldn't produce

 8     it.

 9           THE COURT:  But you don't have that.

10           MS. FERRARA:  We don't have that.

11           THE COURT:  You purport to code that and reduce it

12     to a letter, or a figure, or a number.  So what?  What is

13     said?  What is said?  What is said?

14           MS. FERRARA:  It's Mr. Weinberg's expertise.  You

15     know, he looks at these codes for his clients all the time.

16     He spends a lot of time pouring over these codes and trying

17     to understand what information can be drawn from them.  He

18     has a good sense sort of ferreting out these underlying

19     causes of chargebacks is what he does.  That's his

20     expertise, and he has bucketed those accordingly.

21           And I'll --

22           THE COURT:  Does he tell us the percentage of

23     those that he looked at where the code says deception,

24     misrepresentation?

25           MS. FERRARA:  Yes, he does, Your Honor.

 1              THE COURT:  How much?

 2              MS. FERRARA:  We can pull that up actually.  One

 3     moment.

 4              Can we please pull up Plaintiff's Exhibit 502,

 5     Amanda.

 6              So this is the chart, Your Honor, showing his

 7     breakdown.  As you can see, the actual express

 8     misrepresentation was about seven percent, but the

 9     transaction not recognized or authorized, which Mr. Weinberg

10     will also testify, indicates deception was about 53 percent.

11              THE COURT:  Say that again.  Deception is how

12     much?

13              MS. FERRARA:  The ones that went to that

14     particular category were coded as seven percent, and then

15     53 percent was a transaction not authorized.

16              THE COURT:  Well, that's different.  It's one

17     thing to say I didn't buy it, I didn't authorize it, I

18     didn't order it, and another thing to say I was told a lie.

19     I was told something that wasn't true.

20              MS. FERRARA:  Right.  Mr. Weinberg did quite a bit

21     of analysis on this transaction not authorized category to

22     sort of pinpoint that, because there are a number of

23     different things that can attribute to that.

24              THE COURT:  Not authorized is different than

25     misrepresentation.

1          MS. FERRARA:  I think -- it's Mr. Weinberg's

2    testimony, and I think how he has explained it is that

3    saying it's not authorized is an indication that the

4    merchant behaved in some way that was different from what

5    the consumer was expecting.  So it can also be indicative

6    that the consumer was led to believe something and didn't

7    get that out of the transaction.  He did a quite robust

8    elimination of alternative explanations on that category to

9    get to that.

10         THE COURT:  We've got to deal with specifics.

11   It's one thing to say misrepresentation and quite another

12   thing to say not authorized.  Here we're talking about

13   patterns within a particular industry, so-called credit

14   repair.  Okay.  Is the seven-percent figure a comparable to

15   what's present in other comparable industries?

16   Misrepresentations, seven percent?

17         MS. FERRARA:  I don't know the answer to that

18   question, Your Honor.

19         THE COURT:  Nor do I.

20         MS. FERRARA:  I don't think Mr. Weinberg looked at

21   that.  But the 60 percent, it was his opinion that the

22   unauthorized is indicative of misrepresentations as well,

23   and the 60-percent figure he did find to be pretty

24   indicative of misrepresentations among that population of

25   hotswapped consumers.

1              THE COURT:  You know, we're dealing with specific

2     transactions over a period of time.  Okay.  You go ahead.

3              MS. FERRARA:  All right.  So I was just going to

4     explain a little bit more about that unauthorized category

5     and sort of how he analyzed it.  It is a little bit less

6     straightforward, and so he did a little bit more digging

7     under those codes, and the ones that he put into that

8     category are the ones that he thought indicated

9     misrepresentation.  And so he eliminated a few alternate

10    explanations in doing that.

11             For example, certain things that can frequently

12    end up in that category, it can generally be a couple of

13    different things.  It can be fraud or deception on the part

14    of the merchant.  That is certainly one of them.  It can

15    also be third-party fraud, so, for example, if a credit card

16    is stolen.  And it could also be something called friendly

17    fraud, which is when, you know, a consumer purchases a

18    product and then initiates a chargeback denying the

19    legitimacy of that transaction.

20             So he looked at the specific codes that were in

21    that category, in the context of the facts of this case, to

22    eliminate those alternate explanations, which led him to the

23    conclusion that it was most plausible that in this case,

24    based on the facts of this case, that the codes that were in

25    that category were indicative of misrepresentation.

1          So, for example, as he wrote in his report and as

2     he would testify, it's pretty unlikely that a third party

3     would use a stolen card to purchase credit repair.  It's not

4     the kind of tangible good that can be resold or immediately

5     used.  Any potential value is sort of dependent on that

6     relationship between the customer and the company over time.

7     It would also just be trivially easy to get caught given the

8     types of information that you have to give to make the

9     purchase.  So third-party fraud he didn't think was a likely

10    contributor to this.

11         And friendly fraud he also found implausible.

12    Many of the same reasons why he ruled out third-party

13    criminal fraud, he also ruled out friendly fraud.

14         Many of the other alternative explanations that

15    defendants have put forth, as he explains in his reply to

16    Mr. Mott, simply don't make sense given the pattern that

17    he's identified where the hotswap channel was worse.

18         So, for example, I think the example came up in

19    defendants' presentation about billing in arrears, customers

20    charging back because they were confused about that, but

21    that is something that applies to defendants' business as a

22    whole.  It fails to account for the pattern that

23    Mr. Weinberg has identified where the hotswap channel, in

24    particular, was worse.

25         And so all of those considerations led him to the

1    conclusion that based on the facts of this case, his

2    knowledge of this topic from his years of expertise, looking

3    at that 53 percent, that it was most plausible that

4    defendants' high unauthorized rate was due to

5    misrepresentation.

6          I will also point out that NACHA, which is the

7    industry group that creates the rules for the ACH network,

8    it's an administrative body, has specifically made the

9    connection between telemarketed transactions over the phone,

10   the risk that those transactions could be the result of

11   deceptive telemarketing, and the fact that that would likely

12   result in higher levels of unauthorized returns, and some of

13   those statements from NACHA sort of expressly making that

14   connection between the deception and the unauthorized

15   category are quoted in Mr. Weinberg's report.

16         THE COURT:  Okay.  Anything else you want to tell

17   me?

18         MS. FERRARA:  There are a couple of points that

19   defendants made that I would just like to touch on briefly,

20   Your Honor.

21         With respect to Mr. Weinberg's opinion that the

22   knowledge piece, that it's improper legal testimony, we

23   believe that he -- I understand that that issue can be a

24   close call.  I just want to clarify as to what he will say.

25   He's going to testify based on what the evidence in the

1    record indicates to him.

2         I'll note that Rule 704(a) does not prohibit in a

3    civil case an expert from testifying on an ultimate issue.

4    And I also direct the Court to a Tenth Circuit case, United

5    States vs. Schneider, which says that an expert witness can

6    testify as to mental states where they're talking about what

7    the evidence indicates to them.  So they're not purporting

8    to know or be inside the entity's head, but that they're

9    simply looking objectively at the evidence and saying what

10   it indicates to them.  We think that defines sort of the

11   proper paremeter of what he can say, and his testimony will

12   fall within that.

13        THE COURT:  Does the corporate structure have a

14   mental state?

15        MS. FERRARA:  I'm sorry, Your Honor?

16        THE COURT:  Does a corporate structure have a

17   mental state?

18        One of the defendants here, among others -- there

19   are others -- there are a number of corporations.  I'm

20   curious as to whether the corporation has a mental state.

21        MS. FERRARA:  I think part of Mr. Weinberg's -- I

22   think part of what we're hoping to show through

23   Mr. Weinberg's testimony on that knowledge point is that

24   this knowledge that the chargeback situation was bad, this

25   knowledge that it was worse among the hotswaps, that

1   knowledge went up pretty high within the Progrexion

2   organization.  It was in the KPI reports, which were

3   distributed to executives.  It was in the payments forum

4   that this was an important issue to them at an

5   organizational level and that their knowledge of it went

6   quite high.

7            THE COURT:  Any particular executive you are

8   pointing to?

9            MS. FERRARA:  So on some of the emails we have

10  cited to you, you have Jesse Beal, who is fairly high up.

11  He had different positions at different times.  I'm not sure

12  if I can name the title on the spot, but I can certainly get

13  that to Your Honor.

14           Kelly Etherington, who was the vice president for

15  compliance was on some of the emails.  And I believe that

16  the KPI reports also were distributed up as high to the CEO.

17           THE COURT:  Okay.

18           MS. FERRARA:  Then, Your Honor, I won't keep you

19  too much longer, but there are two more points the

20  defendants made that I just want to correct for the record.

21  With respect to the thresholds, the relevance of those

22  thresholds, I want to explain a little bit more about that.

23           So throughout the majority of the relevant period,

24  Visa and MasterCard, which are the card networks, set

25  thresholds for acceptable levels of chargebacks and returns.

1  For the majority of the period, it was .75 percent to

2  receive a warning and one percent to receive a violation.

3         Now once you pass that one percent, there could be

4  a series of consequences.  You could be fined.  You could be

5  placed on a monitoring program.  You could have to submit a

6  chargeback performance plan.  And if the problem goes on and

7  isn't fixed, you could theoretically lose the ability to

8  accept cards, which obviously would be a death blow in

9  modern commerce.  So that is the importance of those

10  thresholds and that is why Mr. Weinberg chose to focus on

11  them.

12         Those thresholds implicitly account for the fact

13  that different industries have different, you know, average

14  levels of chargebacks.  There are no special thresholds for

15  telemarketers.  Those thresholds apply to everyone and

16  they're an objective measure that he has chosen to use.

17         I also just wanted to say, with respect to the

18  article that was mentioned with respect to Mr. Weinberg

19  about use of reason codes, just to give a little bit of

20  context on that, Mr. Weinberg wrote an article a number of

21  years ago where he was advocating for organizations to pay

22  closer attention to chargeback reason codes, and he urged

23  defendants to look beyond the face of the codes and do a

24  deeper analysis to understand the root cause of chargebacks.

25  So he was not saying in that article that chargeback reason

 1   codes cannot be relied upon.  Quite the opposite.  He was

 2   saying that organizations can and should rely on them, but

 3   they should do a more holistic analysis to truly understand

 4   what is contributing to those reason codes, what is the

 5   underlying cause, and that is what he did here.

 6          So that far from undercutting him, that article

 7   actually bolsters what he did in this case.

 8          THE COURT:  Anything else?

 9          MS. FERRARA:  Nothing else for now, Your Honor.

10          THE COURT:  Okay.  Fine.

11          Mr. DeProspo.  You go ahead.

12          MR. DePROSPO:  So I will just say it again for the

13   Court, Mr. DeProspo for the defendants.

14          So, Your Honor, I just want to bring it back to,

15   you know, the really critical point here, right, is that

16   chargebacks are not relevant to deceptive marketing and/or

17   sales practices.  There is no causal link between chargeback

18   rates and being able to show deceptive marketing and/or

19   sales practices on behalf of the defendants.

20          THE COURT:  Deceptive marketing is an excuse for a

21   chargeback?

22          MR. DePROSPO:  It could be one possible.  But,

23   again, Your Honor, I think that the problem here and the

24   major fatal flaw to Mr. Weinberg's opinions is he doesn't

25   take into account any of these other alternative

1    explanations that I discussed with Your Honor before.

2    Again, the only ones that the government mentioned was

3    deceptive marketing and/or fraud, and then identity theft.

4    And other than that, again, I already explained all of the

5    other possible explanations that Mr. Weinberg doesn't

6    consider.

7             And the other point that I just want to make here

8    too, Your Honor, is the government points to that FTC case,

9    right?  And in that case I think it's really important to

10   distinguish the difference there between that case and the

11   case before Your Honor.

12            So in that case, right, there was one affiliate

13   who had generated 2.7 million visitors to the defendants'

14   site.  And that accounted for 89 percent of the chargebacks,

15   which is very different here.  We have multiple affiliates

16   that we work with.  We're actually only looking at six

17   potential partners -- actually now even less because the

18   government has excluded others.  And so, again, that case is

19   very much distinguishable from this one.

20            In addition, Your Honor, in that case, in the FTC

21   case, there were also customer declarations that there was

22   confusion, right, and we don't have that here in this case.

23   So, Your Honor, I think the case that the government cites,

24   this FTC vs. Credit Bureau Center, LLC, is very

25   distinguishable from the facts before Your Honor, and so

1    that case I would say is unreliable.

2           So, again, just one last point, Your Honor, on

3    those reason codes.  We keep coming back to the reason

4    codes.  And if you looked at what the government showed you,

5    even in Mr. Weinberg's own report for that seven percent

6    that supposedly are misrepresentations of services, if you

7    actually look at page 64 of his report that explains this

8    seven-percent number -- just give me one moment, Your Honor,

9    to bring it up here.

10          If you actually look at the misrepresentation of

11   services category and you look at the code associated with

12   it, it could be services not rendered, nonreceipt of goods

13   or services.  This isn't an evidence of deception or fraud,

14   and yet the category that it's placed into is

15   misrepresentation of services.

16          The other explanations for it, you know,

17   collaborative flow, consumer not even described the reason

18   for seeking the chargeback.  So if you look even at the

19   reason codes that Mr. Weinberg says is misrepresentation of

20   services, they're not even actually chargeback reason codes

21   that are deception and/or fraud.

22          So, Your Honor, I think, again, you know, as your

23   line of questioning pointed out to the government, there is

24   a huge missing link here.  Chargebacks are irrelevant to the

25   matters before this Court.  It is not evidence of deception

1    and/or fraud on behalf of the defendants in any of the

2    services and/or marketing practices, Your Honor.

3         So unless you have any further questions, I'd just

4    ask this Court again to exclude Mr. Weinberg's expert

5    opinions because they are not relevant to the matters before

6    this Court.  Thank you.

7         THE COURT:  Why don't I give you a ten-minute

8    break.  And are we down to Victor Stango?  We may have

9    skipped somebody.  But, at any rate, let's take ten minutes.

10        (Recess)

11        THE COURT:  I think we're down to Victor Stango.

12        MS. HILMER:  Thank you, Your Honor.  Tracy Hilmer,

13   again, for the Bureau.

14        Your Honor, the Bureau seeks to exclude Dr. Victor

15   Stango, who's an expert that has been proffered by the

16   defendants to speak about economic damages.  There's no

17   claim for economic damages in this case.  The Bureau is

18   seeking legal or equitable restitution or refund of monies

19   in the context of redress for consumers.

20        THE COURT:  How do you distinguish between legal

21   and equitable restitution?

22        MS. HILMER:  I'm so glad you asked, Your Honor.

23   This was recently explained very succinctly by the Ninth

24   Circuit in the Cashcall case that came out in May -- just in

25   May.  So here's the difference.

```
 1              Restitution is a legal remedy when ordered in a
 2    case at law and an equitable remedy when ordered in an
 3    equity case, and whether it's legal or equitable depends on
 4    the basis for the plaintiff's claim and the nature of the
 5    underlying remedy sought.  That's a quote from the Supreme
 6    Court's decision in Great-West Life & Annuity Insurance
 7    Company vs. -- I'm going to hopefully get this right --
 8    Knudson, begins with a K, 534 U.S. 204, from 2002.
 9              So restitution is legal when the plaintiff cannot
10    assert title or right to possession of particular property.
11              THE COURT:  You're not claiming anything
12    except --
13              MS. HILMER:  We're claiming consumer relief.
14              THE COURT:  Well, that's a different question.
15              MS. HILMER:  That's the restitution.
16              THE COURT:  But the United States isn't asking for
17    anything back.  You're asking on behalf of others?
18              MS. HILMER:  Correct.  That's right, Your Honor.
19              So as the Cashcall court articulated, where
20    consumer relief is -- we're not seeking to trace funds here.
21    What we're seeking to do here is to obtain net revenues.
22    We're seeking to obtain back for the consumers what they
23    paid less any refunds that the defendants already gave them.
24    That's the appropriate measure of restitution that was
25    endorsed in the Ninth Circuit's decision, and it really is
```

1   consistent with the Tenth Circuit's decision in Kuykendall

2   and also in Freecom.  The starting point in a case like this

3   that involves mass deception of consumers is to try to put

4   the consumer back in the status quo ante by returning to

5   them what they paid less any refunds that have already been

6   returned to them.  So that's the relief that we're seeking.

7        We are also seeking penalties and that's clearly

8   something for the Court to -- the Court has discretion on

9   that.

10        THE COURT:  I'm curious.  You're suggesting this

11   is a form of legal restitution, and I'm interested in your

12   Tenth Circuit cases.  Tell me why they justify what you're

13   asking for here.  Why are you entitled to bring an action on

14   behalf of anybody?

15        MS. HILMER:  Well, the CFPA, the Consumer

16   Financial Protection Act, gives us not only that right but

17   that duty.

18        THE COURT:  Read that section to me.

19        MS. HILMER:  The section of the CFPA?

20        THE COURT:  That you're relying on.

21        MS. HILMER:  Let me -- I believe I have it.

22   Excuse me, Your Honor.  Let me pull it up.

23        I rarely leave home without my statutes,

24   Your Honor, so relieved.

25        Litigation authority.  So this is 12 U.S.C.

1  Section 5564(a).  In general, if a person violates a federal

2  consumer financial law, the Bureau may, subject to various

3  sections, commence a civil action against such person to

4  impose a civil penalty or to seek all appropriate legal and

5  equitable relief including a permanent or temporary

6  injunction as permitted by the law.

7          Then under 12 U.S.C. Section 5565 (2), relief is

8  defined as follows:  Relief under this section may include,

9  without limitation, rescission or reformation of contracts,

10  refund of monies or return of real property, restitution,

11  disgorgement or compensation for unjust enrichment, payment

12  of damages or other monetary relief, public notification

13  regarding the violation, including the costs of

14  notification, limits on the activities or functions of the

15  person, and civil money penalties, as set forth more fully

16  below.

17          THE COURT:  And what portion of that do you rely

18  on?

19          MS. HILMER:  We rely on two portions of it.  We

20  seek refund of monies, which is section 5565(a)(2)(B), and

21  restitution, which is (C) under the same subsection.

22          THE COURT:  Okay.  Traditionally restitution is at

23  least historically equitable, is it not?

24          MS. HILMER:  You are correct, Your Honor.  And

25  it's an interesting question.  These cases rely on treatises

1    as well was the Supreme Court's decision in Knudson.

2              And I would also refer to -- there is a Supreme

3    Court case that I can get you the full cite Granfinanciera.

4    That's a 1989 decision, the Granfinanciera case.  These are

5    cases where the Supreme Court has recognized that when a

6    plaintiff is seeking a sum of money in a federal action, and

7    not a tracing of money, just seeking a sum of money, that

8    things that traditionally may be called an equitable remedy

9    is really a legal remedy, because that's what we're seeking.

10             We're not looking for, you know, some fiduciary

11   who transferred the money, and then transferred it and

12   transferred it.  That's not what we're doing here.  We are

13   saying that consumers paid money for these services.  They

14   were improperly charged for those services under Count 1

15   because those billing restrictions had not yet been

16   satisfied.  And under Counts 2 through 5, the sale of credit

17   repair services was a product of deceptive marketing either

18   through Progrexion's agents or with Progrexion's

19   participation, knowledge, and control -- or control.

20             So in that setting, we're not seeking some

21   particular pot of money.  We're just seeking the return of

22   monies to the consumers in the amounts they paid less any

23   refunds previously paid.

24             THE COURT:  Which consumers are you representing?

25             MS. HILMER:  Well, the Bureau, as a federal

1   agency, represents -- the Bureau on behalf --

2           THE COURT:  How do you identify those folks that

3   you say have been had?

4           MS. HILMER:  Yes.  Well, Your Honor, it's the

5   people who -- we do it in two ways under the two different

6   sets of counts.  Under Count 1, it's anybody who paid for

7   credit repair services when the defendants had not satisfied

8   the requirements of 16 C.F.R. Section 310.4(a)(2).  And

9   you've heard all about that.  You've heard about that

10  probably more than you want to hear about it.

11          THE COURT:  I still have that matter under

12  advisement.

13          MS. HILMER:  You do.  You do.  And if the Court

14  were to grant judgment on that, then all of the consumers

15  who made payments during the relief period for credit repair

16  services and for whom the defendants could not show they

17  satisfied the billing requirements, all of those folks

18  should get their money back, except accounting for any

19  refunds already paid.

20          On the deception side, for the deception counts,

21  it's similar.  Anybody who was hotswapped by one of these

22  relevant hotswaps that engaged in deceptive marketing and

23  bought credit repair services should receive their money

24  back less a refund.  That's the standard.  That's the

25  standard that was accepted, has been accepted.  You know,

1    it's guiding authority as to an en banc decision by the

2    Tenth Circuit in FTC vs. Kuykendall.  And then the Tenth

3    Circuit also expanded on that a bit a year later in the

4    Freecom decision, FTC vs. Freecom.

5            So we've laid out -- because the Court was

6    interested in this last time, the parties provided the Court

7    in our recently filed pretrial order an appendix that lays

8    out, from each party's perspective, what is the plaintiff's

9    burden on Counts 2 through 5.  What is the plaintiff's

10   burden to show liability, and then what are the additional

11   showings required to obtain consumer relief.

12           THE COURT:  If you get relief under Count 1, then

13   does 2 through 5 go away?

14           MS. HILMER:  Well, it doesn't go away.  It's still

15   an alternate -- it's still an alternate.  But as a practical

16   matter, of course the Bureau is not seeking duplicative

17   relief.  So if we obtain relief under Count 1, that would

18   cover at least part of Counts 2 through 5, because Counts 2

19   through 5 cover an additional time period.  They go back

20   farther.  But if somebody has already been reimbursed fully

21   for what they paid from March 8th, 2016 to the present,

22   we're not going to ask for that twice obviously.

23           And of course I'm happy to address the Court's

24   questions on this.  It's a fascinating question really.  And

25   I think the Cashcall decision that just came out in May

1    really explains how this form of relief, which had been

2    accepted for many years in pretty much all the courts under

3    the FTC's Act, how that now plays out under the CFPA,

4    because under the CFPA we have explicit authority to seek

5    this relief.  We have explicit authority to seek legal and

6    equitable relief, whereas the FTC --

7              THE COURT:  They give you both of them?

8              MS. HILMER:  They give us everything, whatever is

9    appropriate.

10             THE COURT:  They don't distinguish them.

11             MS. HILMER:  They don't.  They don't distinguish

12   them.  That's for the Court to do, you know, after

13   consulting the case law -- the authoritative case law.

14             But I think the Supreme Court's decisions are also

15   very clear.  They explain when relief like this, which has

16   traditionally -- let's say premerger of law and equity, were

17   traditionally thought of as equitable remedies.  But if

18   you're just getting a sum of money back, then that's under a

19   legal claim, which this unquestionably is.  I mean you've

20   heard from both sides that it's a legal claim.  That's why

21   there's a jury right.  That means --

22             THE COURT:  It hasn't been decided whether there

23   is a jury yet.

24             MS. HILMER:  We leave it in the Court's hands.

25             I will say that when the relief being sought is a

1   sum of money and not a particular source --

2          THE COURT:  Aren't you trying to get an injunction

3   as well?

4          MS. HILMER:  We seek that in addition.  But that

5   doesn't -- the fact that we seek injunctive relief is in

6   addition to any legal relief we seek.

7          You know, in an appropriate case, the Bureau could

8   seek damages.  And let me give you an instance of what would

9   be kind of a damages claim in a case like this.

10         For example, suppose people were -- suppose people

11  were being charged without authorization on their bank

12  accounts by the defendants, right, and they had overdraft

13  fees.  So not only would they be entitled to get back the

14  money that was improperly drawn, but they might also be able

15  to get overdraft fees, which would be damages.

16         Here, that's different than what we're seeking.

17  And it's --

18         THE COURT:  You're not asking for damages, are

19  you?

20         MS. HILMER:  We are not asking for damages.

21         What I will say, as the Court has identified,

22  there are times when the form of remedy that we seek, which

23  is what the consumers paid less refunds already received,

24  when that has sometimes been called damages, but it can be

25  called damages or restitution, it's been called, you know,

1    unjust gains, the formula is what matters, and the formula

2    here is what the consumers paid less the refunds.  And

3    that's been consistent in these kinds of cases, these large

4    consumer cases where there has been a showing of deceptive

5    or unfair practices.

6            THE COURT:  What does that have to do with our

7    friend Victor Stango?

8            MS. HILMER:  Well, that's my question, Your Honor.

9    What does it have to do with Victor Stango?  Why is he here?

10           He was proffered as an expert to talk about

11   economic damages, and all he did along those lines was an

12   interest rate calculation for the consumers based on their

13   payment of monies before the six months expired, before the

14   requirements of Count 1.  So he did that.  And he used the

15   three-month Treasury bill rate.

16           None of this makes any sense to me, Your Honor.  I

17   mean none of it makes any sense in the context of this case

18   because it's not the relief we're seeking.  The three-month

19   Treasury bill rate is a rate that the government -- a very

20   privileged rate that the government gets to pay.  These

21   folks aren't getting a three-month Treasury bill rate when

22   they, you know, have to create a balance on their credit

23   card to pay for these services.  They're paying 20 or

24   24-percent APR, or maybe even higher, right?  So why is he

25   here?  He doesn't really contribute to anything.

1           The other thing I would point out, Your Honor, is

2     the defendants want to offer him to provide some evidence

3     that they are entitled to offsets beyond the refunds.  You

4     know, there are benefits that the consumers got.  And he

5     posits some of these benefits, but he has done absolutely

6     nothing to quantify them, study them, or really even

7     describe them.  He just sort of postulates there could be

8     these benefits and one ought to think about that.

9           But that doesn't help us at all, Your Honor.  That

10    doesn't tell us what the consumer redress calculation is

11    going to be.  It's defendants' burden to prove any offsets

12    under Kuykendall and Freecom, and Cashcall and the like.

13    The speculative and just nonwork that Dr. Stango has done

14    can't come close to carrying that burden.

15          He says things like, well, you should consider the

16    value of the consumer education that the defendants provide.

17    Well, would people have signed up for their service and paid

18    them for that consumer education or would they have gone on

19    to the Internet and gotten it for free from the CFPB or

20    Credit Karma, or Experian, or some other source?  Would they

21    have really paid the defendants for that?  There's no

22    showing they would have, and Dr. Stango didn't study it.

23          He also posits that, well, you know, the

24    defendants have -- or the defendants' services are valuable.

25    It's helped them -- it's helped at least some consumers.

1    But they haven't shown that.  They can't show that anything

2    they did, any trade line they removed was removed because of

3    something they did versus, let's say, for example, the age

4    of the item.  Seven years passes, the item falls off the

5    credit report.  They have done no tracking of that.  They

6    can't tell you a thing.  This is also, as the Court is well

7    aware, one of our main complaints about Mr. DelPonti and it

8    remains one.

9           So what does Victor Stango have to do with this

10   case?  I have been puzzling about that myself, Your Honor.

11   The defendants provided in interrogatories a -- in

12   interrogatory answers a response to the question for each

13   year, for each of their brands, how much gross receipts did

14   you receive from consumers minus refunds?  And so for Count

15   1, that's what we used.

16          And for Counts 2 through 5, we did a summary table

17   counting up the payments made by each of the consumers

18   hotswapped by the relevant hotswaps, minus refunds.  They

19   gave us that data.  So why do we need an expert for any of

20   this?

21          I think there's a couple of other things they have

22   Dr. Stango do.  But, again, why do you need it?  He gives an

23   overview of defendants' services just by reading their

24   website.  That doesn't sound proper.  That sounds like

25   trying to use an expert to get in hearsay material that

1    can't otherwise come in.

2            He himself said that he is not -- he does not hold

3    himself out as an expert in economic damages, and he did no

4    model.  He just has nothing to contribute here.  Honestly,

5    Your Honor, I have no idea why he's on the table at this

6    point.

7            I think it's important to note that defendants

8    have at times claimed, as I alluded, claimed that the whole

9    value of their services should be deducted from the consumer

10   redress, but they have no authority whatsoever for that

11   point.  I mean it's like Bernie Madoff saying to his

12   victims, well, okay, I took some of your money under fraud,

13   but some of you I gave really good investment advice.  So we

14   should deduct the amount of the investment advice from

15   whatever restitution you get.  That's just not a thing --

16   that's not something that a court should do.  It's not

17   proper.

18           If these services were obtained, as we allege,

19   based on a significant misrepresentation about a major

20   premise underlying the bargain, if you will, as Cashcall

21   says, if that's the case, then whatever benefit -- claimed

22   benefit or value of the services defendants may assert is

23   completely irrelevant.  That's what the Cashcall case held.

24           So here the consumers who signed up -- focusing on

25   Count 1, the consumers who signed up were never told that

1    defendants couldn't charge them until six months had passed

2    and they produced a -- six months had passed and all the

3    services had been provided, and they produced evidence in

4    the form of a consumer report showing the results.  They

5    weren't told that.  They collected the money right away.

6    How many of those consumers would have paid right away if

7    they had known that's what the rule was?

8            And the same thing on the deceptive hotswap side.

9    How many of those consumers that signed up through a hotswap

10   that used the deceptive advertising would have signed up for

11   credit repair if they had known that these products, you

12   know, these rent-to-own houses, these loans, these mortgages

13   were completely illusory?

14           So defendants have offered Dr. Stango for no

15   discernable reason.  They have offered him for no evidence

16   that is admissible.  He admits he's not qualified to give

17   the very testimony they, you know, proffer him for, and we

18   think he should be excluded.

19           Thank you, Your Honor.

20           MR. WHITELEY:  Good afternoon, Your Honor.  Daniel

21   Whiteley on behalf of the defendants, also with Williams &

22   Connolly.

23           The Court's indulgence while I get set up here for

24   a second.

25           Your Honor, the reason that Dr. Stango is relevant

1   is because the Bureau wants to assume that net revenues is

2   the appropriate measure of restitution here.  Bur what we

3   didn't hear at all during their argument is the fact that

4   it's their burden to establish that that is the appropriate

5   measure in the first instance.  They want to skip over that

6   fact and jump straight to shifting the burden to defendants.

7   But that's not the law.  The law is that they have to

8   establish that it's appropriate in the first place.  And

9   what Dr. Stango does is he shows why that's not the case.

10          In his report he lists a number of reasons why net

11   revenues as opposed to some other measures, such as net

12   profits, or setting aside values that -- value that

13   consumers received for what they paid for, not all goes to

14   show that net revenues is not the appropriate measure of

15   restitution.

16          They talked a little bit about the Treasury bill

17   calculation.  What Dr. Stango is illustrating with that

18   point is for Count 1 specifically.  And it's interesting,

19   they talked about this as a deception claim almost, but I

20   want to refer the Court back to the PTO that the parties

21   just submitted.  They make very clear all parties agree that

22   deception is not an element of Count 1.  That's the TSR

23   advanced billing fee provision.  Deception has nothing to do

24   with Count 1.

25          The Bureau's new interpretation of that, under

 1   their theory, says that you have to wait six months after

 2   the completion of the services in order to charge and you

 3   have to show some results in order to charge.  Obviously

 4   defendants vehemently disagree, and we think that's a novel

 5   interpretation of the law that has never been applied

 6   before.

 7             But what Dr. Stango does, he says --

 8             THE COURT:  Well, what's wrong with it?

 9             MR. WHITELEY:  Sorry?

10             THE COURT:  What's wrong with it?

11             MR. WHITELEY:  Wrong with their interpretation?

12             THE COURT:  Their novel interpretation.

13             MR. WHITELEY:  Well, it's contrary to the plain

14   language of the text.  Promised results means promised

15   results.  The history of the enforcement of this statute

16   shows that that's what it's used for.  When there's a credit

17   repair --

18             THE COURT:  How do you define results?

19             MR. WHITELEY:  Well, I would have to define it in

20   the context of promised results, Your Honor, and in that

21   case it would mean that a credit repair company says,

22   Judge Jenkins --

23             THE COURT:  Why does the statute -- or the reg, I

24   should say, talk about promised results?

25             MR. WHITELEY:  Well, that's what the law

1    prohibits.  You have to promise something for it to come

2    into play.

3            THE COURT:  Why don't you read me that again.

4            MR. WHITELEY:  I don't have that in front of me.

5    Give me a second and I can pull it up.

6            As usual, my team is more organized than I am.

7            So we're looking at the telemarketing sales rule.

8    We usually call it the TSR.  It's 16 C.F.R. Section

9    310.4(a)(2), and specifically subsection (a)(2)(ii) -- or

10   just (a)(2) in general, requesting or receiving payment of

11   any fee or consideration for goods and services --

12           THE COURT:  Slow down.  Slow down.  Make a record.

13   Make sure that the court reporter makes a record.  If you

14   talk like a machine, she won't get it.

15           MR. WHITELEY:  Yes, Your Honor.

16           So going back to 310.4(a)(2), requesting or

17   receiving payment of any fee or consideration for goods or

18   services represented to remove derogatory information from,

19   or improve, a person's credit history, credit record, or

20   credit rating until, and it's got the two subsections.  The

21   first, the time frame in which the seller has represented

22   all of the goods or services will be provided to that person

23   has expired.  And, the second subsection, the seller has

24   provided the person with documentation in the form of a

25   consumer report from a consumer reporting agency

1   demonstrating that the promised results have been achieved,

2   such report having been issued more than six months after

3   the results were achieved.

4            THE COURT:  Okay.  And what do you promise to do,

5   if anything?

6            MR. WHITELEY:  We do promise to do certain things

7   for our clients.  We promise to work on their behalfs.  We

8   promise to --

9            THE COURT:  Whatever that means.  Maybe you can

10  define what you mean by work on their behalf.

11           MR. WHITELEY:  The work that we do on our clients'

12  behalfs typically falls into a few things.  One, sending

13  electronic challenges to the credit bureaus.  We promise our

14  clients that we will do that for them, to send those.

15           THE COURT:  And you sent it for some purpose?

16           MR. WHITELEY:  We send it at the client's

17  direction.  The client engages us to send these out in the

18  engagement agreement.  So we're acting at the client's

19  direction.

20           So we agreed to do that on behalf of the client,

21  but we are very, very astute to not promise any results.

22           THE COURT:  Oh, no.  There's some purpose in

23  sending a letter.  The letter isn't sent with no purpose.

24  You're at least calling your attention -- calling attention

25  to the credit bureau of a particular item which appears in

1    the credit report.

2              MR. WHITELEY:  Yes.

3              THE COURT:  And you've promised to do that.

4              MR. WHITELEY:  We do agree to send letters and

5    challenges on behalf of the client.

6              THE COURT:  And you send letters to furnishers as

7    well?

8              MR. WHITELEY:  Yes.  That's another thing we agree

9    to do on behalf of the client.

10             THE COURT:  That's as a result of the conversation

11   the telephone operator has when inquiry is made and

12   information furnished?

13             MR. WHITELEY:  That is what we agree to do.

14             THE COURT:  And it's sent in the client's name?

15             MR. WHITELEY:  Correct.

16             THE COURT:  And the client's address?

17             MR. WHITELEY:  Yes.

18             THE COURT:  Okay.  And you don't ever furnish a

19   credit report to a client six months after the initial

20   contract is entered into?

21             MR. WHITELEY:  I know that we do it at the start.

22   I would have to check on if there is a period.  I know that

23   we send updates about scores.  I am less sure, standing

24   here, if there's a periodic six month, or some period, where

25   we do send an updated report.

1              THE COURT:  A new credit report?

2              MR. WHITELEY:  Yes.  I'm not sure about that,

3      Your Honor, if there is a regular time where we do that

4      after the initial consultation and sign-up.

5              THE COURT:  What are we talking about as far as

6      your services go?  What do you do?  You get paid for

7      something.

8              MR. WHITELEY:  We get paid for the things we just

9      described, sending out these letters and challenges on

10     behalf of the client.

11             And another part they are paying for is

12     convenience.  The CFPB itself has acknowledged and put out

13     studies showing that most people who try this on their

14     own -- I think it's about half the people who try this on

15     their own, they give up.  The system is designed to confuse

16     people, get them to fail.  And they are paying for ease of

17     use and our company's expertise in this area.  We've been

18     doing this for decades and we know how the system works and

19     how to get -- how to do this effectively.

20             THE COURT:  Okay.  And other than the setup

21     charges that people talk about, and the sale of credit

22     report to begin with, what services do you perform before

23     you use a credit card or pull down a bank amount?

24             MR. WHITELEY:  So this is laid out in the

25     engagement agreement.  I'm looking at Bates stamp LEX520, at

1    the top of this page.  It's in the first few pages of the

2    engagement agreement.  It says that Lexington performs one

3    or more of the following services before you pay:  Enters

4    your personal data and one or more credit reports into its

5    secure database -- meaning the company's database; provides

6    you with a login to access your case online and to access

7    certain informative content Lexington offers its clients;

8    collects information and instructions from you regarding

9    your particular circumstances and how you wish to provide;

10   analyzes your case; and prepares and sends one or more

11   credit repair communications on your behalf.  And the credit

12   repair communications is what we were talking about, that go

13   to the bureaus and the furnishers.  So that's what is done

14   before someone pays.

15             THE COURT:  Or most of the cases.  The analysis is

16   done by the telephone operator?

17             MR. WHITELEY:  The telephone operator inputs the

18   data.  They take the customer's data.  And then as my

19   colleague, Mr. Bennett, was talking about earlier --

20             THE COURT:  The machine does the analysis?

21             MR. WHITELEY:  The algorithms have been developed

22   with the help of attorneys.

23             THE COURT:  I understand that, but it's the

24   machine that makes the call.

25             MR. WHITELEY:  The algorithm will take the

1  customer data and analyze it according to what real people

2  have told it to do, and then the communications get sent out

3  according to that.

4       THE COURT:  But the communication is composed by

5  the machine?

6       MR. WHITELEY:  So the letters are actually

7  originally drafted by a -- they are originally drafted and

8  reviewed by attorneys.

9       THE COURT:  I understand that.  But the call is

10  received by the telephone operator.  The information is

11  received by the telephone operator.  The input triggers the

12  machine to turn out a product that is sent in the name of

13  the customer to the credit bureau, calling their attention

14  to matters that are incorrect, or outdated, or should be

15  eliminated.  At that point the creation of the particular

16  letter for a particular customer is the creature of the

17  machine and the algorithms that are set forth.

18       MR. WHITELEY:  The final product that gets mailed

19  out, yes, it is.

20       THE COURT:  It's sent out, and it's sent back, if

21  there's a response, not to the company but to the person?

22       MR. WHITELEY:  Yes, the individual client.

23       THE COURT:  Okay.

24       MR. WHITELEY:  There's a few reasons that it goes

25  back to the client.  If they want to leave Lexington Law or

1   CreditRepair.com for whatever reason, that way it ensures

2   that they've got everything they need.  They don't need to

3   come to us asking for documents because they didn't get

4   their response back directly.  That's part of why it's --

5   you know, it's designed to facilitate a conversation between

6   the individual client and their creditor.

7           THE COURT:  And when you're talking to a client

8   with more than one problem, you set out over a period of

9   months that you'll do two replies the first month, or three,

10  or whatever the number is, a number of replies the second

11  month, a number of replies the third month?

12          MR. WHITELEY:  Yes.  So this is also set out in

13  the engagement agreement on the next page that lays out what

14  they call credit repair communications will be sent out

15  during which time intervals.  This is all assuming that they

16  stay.

17          THE COURT:  Is there, between the first letter

18  that goes out and the second month missiles that are sent,

19  any communication at all between the client and the

20  telephone operator?

21          MR. WHITELEY:  The clients often call in during

22  that time.  And we are sending out notices to the client

23  when a letter or a challenge is sent to the Bureau during

24  that time.  Every time that happens they get a notification

25  from the portal.  And they're always -- you know, we have

1    hundreds of paralegals taking calls.

2              THE COURT:  In your contract do you say we're

3    going to send two letters the second month and three letters

4    the third month, four letters the fourth month?

5              MR. WHITELEY:  The specifics of that is set out in

6    the engagement agreement.

7              THE COURT:  In each contract?

8              MR. WHITELEY:  Yes.

9              THE COURT:  That's what you've promised to do?

10             MR. WHITELEY:  Those are the efforts we've agreed

11   to do on behalf of the client.

12             THE COURT:  But you're interested in collecting

13   for what you've done?

14             MR. WHITELEY:  Yes.  We do bill in arrears.  We

15   only can collect for what we've already done.

16             THE COURT:  We talk about billing, but you don't

17   send a formal bill, do you?

18             MR. WHITELEY:  I think it comes through -- I'm not

19   sure what you mean by formal bill.  They do get

20   notification --

21             THE COURT:  How do I know that you're going to

22   call on my credit card or call on my bank?

23             MR. WHITELEY:  The clients agree to be billed

24   monthly automatically.

25             THE COURT:  By billing automatically, what do you

1    do?

2         MR. WHITELEY:  We charge whatever method of

3    payment the customer has provided.

4         THE COURT:  Okay.  And I have provided you with a

5    credit card.  So on the first of the month, if I've done

6    something the second month, I draw down or I make use of the

7    credit card?

8         MR. WHITELEY:  So you're saying that you did work

9    on month two, then you're going to billing in month three,

10   you're going to charge the credit card automatically?  Did I

11   get that right?

12        THE COURT:  No.  No.  You suggest, counsel

13   suggests that you do something in month two, purportedly to

14   justify your charge.  And at the end of the month you make

15   use of the credit card automatically.

16        MR. WHITELEY:  At the end of month two?

17        THE COURT:  At the end of the month two, because

18   you've done something, supposedly.

19        MR. WHITELEY:  Yes.

20        THE COURT:  And in that month two, as a matter of

21   practice, do you talk again at all with the client?

22        MR. WHITELEY:  If they call in, yes.  And we also

23   send notifications of the work that we have done, every time

24   we're sending out the letters of the challenges.

25        THE COURT:  We sent out two letters and we're

1  going to charge you for it, or we've sent out three letters,

2  but you've promised to send them out over a period of time?

3        MR. WHITELEY:  If they are still engaged, yes, we

4  agree to do it on a certain level.

5        THE COURT:  If they pay you?

6        MR. WHITELEY:  Yes.

7        MR. BENNETT:  Sorry.  I've stuck my colleague,

8  Mr. Whiteley, with explaining my prior answers to the Court.

9  So if I could just pick up for a moment here.

10       I think there are a couple of things that are

11  important to keep in mind.  The first is that in the

12  engagement agreement, it's set out it's a month by month

13  agreement. So there's a --

14       THE COURT:  But you look towards months in the

15  future.

16       MR. BENNETT:  Potentially, if the client stays.

17       So the part of the engagement agreement that

18  Mr. Whiteley read to you is about the first month.  And then

19  there's a paragraph that says subsequently, and it describes

20  what is done in later months if the client signs up.

21       THE COURT:  Well, I've signed up.  I'm interested

22  in your services.  You told me you're only going to send a

23  couple of letters the first month.  And you've told me that

24  you'll send three letters the second month.

25       MR. BENNETT:  Not quite, Your Honor.  What we said

1   is we'll send a few letters the first month.  And if you

2   continue with the service, it starts another service

3   interval.  And in the second service interval, if you're

4   still engaged, we'll send subsequent communications.

5          THE COURT:  Okay.  How do I indicate my

6   willingness to be engaged?

7          MR. BENNETT:  In the engagement agreement it sets

8   out how you can opt out of the system.

9          THE COURT:  Well, that's opting out.  I'm talking

10  about opting in.

11         MR. BENNETT:  By continuing to work with us and

12  pay, and this is what we talk about how people sometimes

13  decide they're going to charge back their last payment

14  because they might have missed their opportunity, because

15  they can call us, they can email, they can write a letter to

16  cancel at any time.  Sometimes they don't do that.  And so

17  they decide, after we've done a month of service, they

18  decide, you know what, I don't want that anymore.

19         THE COURT:  I understand that.  But it's up to

20  them to opt out.

21         MR. BENNETT:  It is up to them to tell us.

22         THE COURT:  If they don't tell you, you assume

23  that your service is continuing?

24         MR. BENNETT:  Well, they're told all along --

25  first of all, they agree on the day on which they'll be

1    billed.  It's usually some days after the end of the service

2    interval.  You'll see in the client files there's some

3    discussion about that, and sometimes they change the date.

4             THE COURT:  But if they don't opt out, they get

5    charged?

6             MR. BENNETT:  If they don't affirmatively opt out

7    and they continue to use the service, they get charged.

8             THE COURT:  What do you mean by continue to use

9    the service?

10            MR. BENNETT:  Continue to keep engaged with us.

11   So they continue to be our clients.  They continue to get

12   the benefit of the intervention.

13            THE COURT:  But I haven't opted out.  I don't want

14   to opt out.  I want to continue the service.  What have you

15   promised to do in the second month?

16            MR. BENNETT:  So it's set forth in the engagement

17   agreement.  After the paragraph that Mr. Whiteley just read,

18   it reads, subsequently, Lexington typically performs one or

19   more of the following, ongoing, and periodic services as

20   appropriate in its judgment and discretion.  It receives and

21   reviews bureau and furnisher correspondence sent to us

22   directly or by you.  Collects and reviews updated

23   information and instruction from you regarding your

24   circumstances, goals, and case.  Monitors and analyzes your

25   case.  Provides you with status updates regarding your case.

```
 1    And prepares and sends one or more additional credit repair
 2    communications on your behalf.  And it goes on.  Regardless
 3    of the service level, Lexington uses its judgment and
 4    discretion to determine the content, number, and frequency
 5    of the credit repair communications.
 6            So that's what happens downstream each service
 7    interval if the client stays engaged.  And then once that
 8    has been done, the client is billed.  And they receive a
 9    notification we're going to bill your credit card that
10    you've given us, or your debit card.
11            THE COURT:  What does the notice say?
12            MR. BENNETT:  I don't have one here, Your Honor.
13    We have client files that should reflect that.  If not, I
14    can provide the Court with one.
15            And the client, of course, throughout the
16    engagement, in perpetuity, has access to and has a copy of
17    the engagement agreement which spells out -- and then it
18    goes on, it talks about the various service levels that have
19    been discussed.  It talks about on average how many
20    communications each of those service levels generates.
21            THE COURT:  But it's your discretion to furnish
22    them if you want to?
23            MR. BENNETT:  It's our discretion to furnish them
24    if it's in the best interest of the client to pace them in a
25    certain way.  This goes back to the work product that went
```

1    into devising how to pace them.  It's a little bit like

2    dealing with motions practice before the Court.  Do we want

3    to file all of our motions to compel on the same day or do

4    we think the Court would be more receptive seeing those

5    motions to compel.

6         THE COURT:  It's your discretion under the terms

7    of the contract, your judgment that makes the call?

8         MR. BENNETT:  It is.  It is.  And if we don't and

9    if in our judgment it's time for this client to change their

10   service level or to terminate with the repair services and

11   go to the monitoring services, then we advise the client of

12   that, and that's what happens.

13        Which actually raises the point, to go back just

14   for a moment to Dr. Frederick.  What the government said

15   about him considering the monitoring products when he did

16   the comparison of first and last credit score, many clients

17   go from a repair product to a long-term monitoring product,

18   and it's undisputed -- the government I don't think will

19   dispute this -- those clients who may have spent months or

20   even a year on a monitoring product, that is not sending out

21   dispute letters, those were baked into his analysis.  And so

22   because their credit score may not change, or it might even

23   go down under a monitoring product, because we're not doing

24   interventions, that gets baked into Dr. Frederick's

25   analysis.

1              But at any rate, the discretion of the attorneys

2    is baked into how the data that is collected by the

3    Teleservices rep is used to determine the content, the

4    recipient, the pacing of the letters that go out, not just

5    in the first service interval, but then as the case

6    develops.  And as responses come in and things are

7    successful or not -- and if we go through the first round

8    and some of those items fall off and some do not, and the

9    client stays engaged, then there are subsequent rounds

10   where, again, with the discretion that's been built into the

11   algorithm, or because the client has talked to a

12   paralegal -- and just keeping in mind, Your Honor, that the

13   Teleservices rep, the employee of Progrexion working as an

14   agent for Lexington Law, that's only the first call.  Every

15   communication after that is a communication with a Lexington

16   Law employee, a paralegal, or an attorney.  Teleservices is

17   only involved at the outset.

18             THE COURT:  Whose discretion are we talking about?

19   Your contract says your discretion.

20             MR. BENNETT:  So I'm reading from the Lexington

21   Law engagement agreement.  It's the discretion of the

22   Lexington Law attorneys as to how we pursue -- now they have

23   worked with --

24             THE COURT:  No.  They don't control what goes out

25   the second month, do they?

```
 1          MR. BENNETT:  They control it in the sense that
 2   they educated the algorithm with the advice of experts on
 3   credit repair and credit reporting, which helps them
 4   understand what are the items that are mostly to come off
 5   and what items have the most impact.  It's the attorneys who
 6   authorize all of that.
 7          THE COURT:  They don't oversee that, do they, at
 8   all?
 9          MR. BENNETT:  They do.  They do.  And if they
10   decide -- if a new clerk -- here's a good example,
11   Your Honor.
12          THE COURT:  We're not connecting.  You've got
13   hundreds or thousands of clients.
14          MR. BENNETT:  Yes, Your Honor.
15          THE COURT:  And the telephone operator does the
16   input to begin with.
17          MR. BENNETT:  That's correct.
18          THE COURT:  And the machine creates and sends the
19   letters in the name of the client, with the address of the
20   client.
21          MR. BENNETT:  And not to quibble over semantics,
22   Your Honor, but the word create is what is causing me
23   problems here, because the letters -- 23,000 letters were
24   drafted and edited by the attorneys, at the attorneys'
25   discretion.  They created the letters.
```

```
 1              THE COURT:  But before my client ever came on
 2   board?
 3              MR. BENNETT:  Correct.
 4              THE COURT:  You've got sample letters.  So what?
 5   How do they fit in with my particular problem?  The
 6   telephone operator does the input and the machine does the
 7   selection.
 8              MR. BENNETT:  How they interact with your problem,
 9   it's a couple of ways.  And I shouldn't have been so quick
10   to say the letters were drafted before you showed up because
11   the letters are changed over time, and I'll give you an
12   example, Your Honor.
13              When the pandemic hit and there became new avenues
14   of relief available to people with credit issues, the
15   attorneys got together and drafted a new letter.  That went
16   into the letter bank.  When laws change, like laws to
17   protect servicemen, or laws protecting people who have been
18   through divorce, those kinds of things happen, the letters
19   are changed.
20              What the attorneys have developed over time, and
21   we're talking about literally millions of touches with
22   clients over two decades, that these cases -- and recalling
23   again that Lexington Law essentially does one thing as a law
24   firm -- the cases fall into categories much in the way --
25              THE COURT:  The first letter that goes out is the
```

1    result of the input received by the telephone operator?

2            MR. BENNETT:  That's correct.

3            THE COURT:  Okay.  Of those clients that start,

4    what percentage ever talk to a lawyer?

5            MR. BENNETT:  A small percentage.

6            THE COURT:  A very small percentage.

7            MR. BENNETT:  A very small percentage.

8            Every single one who wants to talk to a lawyer

9    talks to a lawyer, but very few want to because they have

10   outsourced this work.  They've chosen to do the most

11   efficient and convenient thing for themselves.  Many

12   consumers don't choose to do this.  They choose to do it on

13   their own or not address it at all.  But the ones who choose

14   to engage us, they make a bunch of choices from there on.

15           They choose to go on the website and change their

16   profile.  They choose to tell us to either challenge or not

17   challenge items as they remember that it might be theirs, or

18   they have some other thing happen.  Some of them, as

19   Your Honor can imagine, call all the time and talk to the

20   paralegal for long periods of time.  Some of them never call

21   and talk to the paralegals.  It's up to them.

22           If we have an issue, we reach out to them.  We'll

23   call them, or we'll email them, or both, to reach out if we

24   have an issue that we see with them.  But it's up to -- it's

25   completely up to the client.  And that's how Lexington Law

1   is able to provide services to so many people.

2           If it was required, which it's not by any bar, but

3   if it were required for us to talk physically attorney to

4   client in every engagement, we couldn't provide this service

5   for $119 a month.  And this is an issue that has been, as

6   you can imagine, studied deeply by counsel within and

7   outside the company to make sure we stay on the right side.

8           Now it's interesting, Your Honor, this is an issue

9   that I -- I can tell Your Honor has been a lawyer for a long

10  time, I've been a lawyer, and when I first saw this, I was

11  very interested in how this complies with the normal rules

12  of lawyering.

13          I think it's fascinating where the government has

14  investigated for all these years, and they've drafted a

15  complaint, they've now drafted a second complaint, they had

16  CIDs, they had an army of their internal experts and

17  internal lawyers look at this, the question of whether we

18  provide legal services is not part of their allegations in

19  this case.  It's not because they have come to the same

20  conclusion I think that we have come to and others who have

21  looked at this have come to, which is it's unconventional to

22  be sure, but there's no question that Lexington Law is

23  providing legal services to its clients.

24          THE COURT:  That they have yet to even get

25  acquainted with.

 1              MR. BENNETT:  They what, Your Honor?

 2              THE COURT:  They've never met.

 3              MR. BENNETT:  They may never have met.  They

 4    probably have never met.

 5              It is very different than the functioning of many

 6    law firms but not all law firms.  And courts that have

 7    looked at it -- there's a case actually on point, not for

 8    Lexington Law so much, but the LegalZoom case out of the

 9    Western District of Missouri.  It's a 2011 case, and it's

10    802 F.Supp.2d 1053, and it looks at whether provisions of

11    these kinds of remote legal services was, in fact, legal

12    services, and found that it was.  That was I think in the

13    discovery context.

14              But it's the same notion that -- our law firm

15    operates very differently than Lexington Law.  We have a

16    shiny office.  We've got a lot of lawyers there.  We have

17    very few clients to the ratio of lawyers to clients.  We

18    charge our clients a little bit more than $119 a month.

19    They have chosen -- and John Heath will testify about this,

20    because of his background in working in legal aid where he

21    worked with the most indigent Utahns to help them with their

22    problems, and seeing how many people in the State of Utah

23    and also around the country fall in the doughnut hole

24    between being poor enough for legal aid and being wealthy

25    enough to hire a law firm that has a one client to one

1    lawyer ratio, and it was trying to fill that doughnut hole

2    that developed the business model of Lexington Law.

3           And so all the use of technology, the leveraging

4    of outsourcing, using the Teleservices reps, the letter

5    bank, drafting 23,000 letters over two decades, but not

6    doing it every day, and not doing it for every individual

7    client because, you know, when you've done this long enough,

8    the cases fall into just a handful of categories.

9           You've got a lot of divorced people.  You've got a

10   lot of people who were military.  You've got people with

11   medical bills.  You've got people who might qualify under

12   the -- the new letters go out for people who might qualify

13   for COVID related relief.  You've got people who fall into

14   those categories.

15          So you can develop, through an algorithm, a way to

16   match this client who calls and says I got divorced and my

17   deadbeat husband ran up my credit card bill, and now I've

18   got all these items on my credit report that belong to him,

19   and I need some help.  You get enough of those -- you get a

20   couple of letters, forms of letters that you know I can send

21   this out, and if I send one this month and I wait six weeks

22   later and send another one to Bank of America for the credit

23   card, or whoever it might be, that that's the most likely

24   way to be successful in getting this bank to say, you know

25   what, it's really not fair that we're hitting that person's

1    credit.

2              Same thing with military members.  People call in

3    and say, you know, I just got back from Afghanistan.  Sorry

4    I couldn't pay my bills.  I was in Kandahar.  I need some

5    help telling these people to stop hitting my credit report

6    because it's killing me.  And they have letters for that

7    that invoke the Servicemen's Relief Act.

8              There are literally a handful of ways this comes

9    up, each case being unique in its own way, but it's enough

10   where you can have 23,000 letters in your letter bank, and

11   you ask the right questions of people when they call, and

12   get the right direction from them, that you can provide this

13   service.  And, again, if they have questions about it, they

14   call and talk to a paralegal, they call and talk to an

15   attorney, and they can have those questions answered.  But

16   that's the business model.

17             And what the government wants to do is take away

18   the opportunity of these folks to come in, for a little over

19   100 bucks a month, and have somebody stand up to the credit

20   bureaus, and to the debt collectors, and to the banks to

21   make sure that these people get treated fairly.

22             THE COURT:  You don't comply with the reg, do you?

23             MR. BENNETT:  With which reg?

24             THE COURT:  The reg we've been talking about in

25   Count 1.

1          MR. BENNETT:  We absolutely comply, Your Honor.

2   We comply with the first Romanette i, because we describe

3   what we're going to do in a service interval.  It's defined

4   in the contract.  We provide those services and we bill when

5   they're complete.

6          And on Count 2, we don't promise a result.

7          THE COURT:  Do you furnish a second credit report

8   once changes have been made?

9          MR. BENNETT:  We update people on the status of

10  their credit.

11         I can find out for Your Honor whether we actually

12  pull a second credit report and send it to the client.  If

13  we made promises, we would do that.  We may do it under some

14  of our service intervals.  I don't know standing here today.

15  But the reason we don't make promises are a couple fold.

16         THE COURT:  Well, you promised to write some

17  letters.

18         MR. BENNETT:  That's not a result.  That's a

19  service.  That's under Romanette i.  We promise to write

20  letters and we only bill when the letters are sent, or other

21  services are provided.  So that's Romanette i.

22         Romanette ii is about results.  And this is why,

23  if you look back through 25 years --

24         THE COURT:  Well, you write letters to expect a

25  result.  You write letters to cause the credit bureau to

1    change.

2          MR. BENNETT:  And we are assiduously careful with

3    our clients in the engagement agreement, Your Honor.

4          THE COURT:  Well, I think it's a wonderful

5    engagement letter.  It's really complete.

6          MR. BENNETT:  Well, Your Honor, the very next

7    paragraph after the description of services reads as

8    follows:  Lexington cannot guarantee and you are not paying

9    for a particular credit report outcome or result.  You are

10   paying only for Lexington Law's efforts on your behalf.  The

11   bureaus or furnishers may not respond to initial or

12   subsequent credit repair communications and ultimately may

13   decide not to remove items from your consumer credit file

14   despite Lexington's efforts.

15         That is the opposite of pledging or promising a

16   result.  And we do that because we don't want to be caught

17   in the trap of giving people false hope that if you sign up

18   with us, we're going to get something taken off your report

19   in a way that would make us covered by the TSR.

20         THE COURT:  We're going to write a letter in the

21   hope that something is changed on your report.  You don't

22   guarantee it.

23         MR. BENNETT:  And we make sure that there is no

24   expectation on behalf of the client that that will happen.

25   We couldn't be clearer --

 1              THE COURT:  Why isn't there an expectation?

 2    What's wrong with an expectation?  What kind of services are

 3    you selling if you're not selling an expectation?

 4              MR. BENNETT:  Well, we could hardly be clearer

 5    that we're not selling an expectation.  We don't want the

 6    client to think, oh, I'm paying $120 a month.  Well,

 7    certainly my credit score will go up.

 8              THE COURT:  No.  No.  No.  But you're

 9    advertisements, your websites indicate that somebody expects

10    a change if one asks for an incorrect item to be eliminated.

11              MR. BENNETT:  I don't think anyone can fairly read

12    our literature, look at our engagement letter, listen to our

13    scripts and expect their situation to --

14              THE COURT:  Why write a letter if you don't expect

15    some action?

16              MR. BENNETT:  Because you want the opportunity for

17    it to improve.  It won't improve on its own.  So let's take

18    some action and maybe it will improve.

19              And that's what is so important about the

20    distinction we draw between the efforts we will take on your

21    behalf.  We will do these things for you.  They may not have

22    any result, but it opens up the opportunity that if somebody

23    has been spreading false information about you on your

24    credit report, or unfairly reporting something on your

25    credit report, that that might come off.

1           The CFPB has studied this and they admit that

2   there are these errors.  One-fifth of us -- one-fifth of

3   us --

4           THE COURT:  Lots of errors, I understand that.

5           MR. BENNETT:  And half of the people who know they

6   have an error but do this on their own give up, because they

7   don't have time.  And as Mr. Whiteley said, the whole system

8   is set up against the consumer.  It bogs them down.  They

9   get form letter back after form letter back.  They need to

10  have somebody help them if they want to get it done.

11          So they sign up not expecting that it will

12  improve.  They hope, I'm sure.  Everybody hopes that we're

13  treated fairly.  They sign up to have the opportunity for it

14  to maybe, hopefully get fixed.  We try to be very clear

15  about that.

16          THE COURT:  You want to change something.

17          MR. BENNETT:  Like every business that does well,

18  that has a 20-year history, we rely largely on repeat

19  customers.  A third of our clients at any given time are

20  people who have used the service.  It either helped them, or

21  satisfied them at least, that we had done what we could.

22  They went on with their lives, and then decided to come back

23  at some other time and engage us again.

24          Some of the handpicked -- I'll avoid using the

25  word cherry-picked -- but the handpicked consumers that the

1    government wants to say were misled are people who signed up

2    again and again for CreditRepair.com and/or Lexington Law,

3    because they apparently were satisfied.

4          And so we want people to use our service because

5    they need it, they want it, and they can afford it.  And

6    when they're done, we want them to feel like they got a fair

7    shake, because we know they're going to come back.  That's

8    how we've stayed in business for two and a half decades.

9          So this notion that you could go in and stay in

10   business that long promising somebody through bait and

11   switch, or any other kind of ad, that you're going to get

12   this result, and then not provide that result, we just

13   wouldn't be here today, this long into the life of the

14   company, if we were doing that.

15         And you can look at the 25-year history of the

16   TSR, and look how it's been enforced.  It's only been

17   enforced -- and the government said their two best cases are

18   the Commonwealth Equity case and Prime Marketing.  And in

19   both those cases -- so different than this case -- there

20   were express promises of improvements in your credit score.

21   I think in Prime Marketing the allegation was you get a

22   hundred point increase no matter what.  In Commonwealth,

23   we'll fix unlimited negative items.

24         And the reasons those kinds of promises are really

25   critical, Your Honor, is that going back to the language of

1    the TSR, the promise isn't some ephemeral result, how that

2    may be defined.  It has to be -- for the second Romanette to

3    kick in, in the TSR, the promised result Romanette, for that

4    to kick in, the promised result has to be something that's

5    reflected on a credit report.  Otherwise the provision makes

6    no sense at all.  So you have to be promising this will

7    happen on your credit report, and it will be reflected six

8    months hence.

9            So the promise of sending out letters or the hope

10   that something will change, that's not the kind of promise

11   that is addressed in Romanette ii.  It's the kind of

12   promise, in Prime Marketing and Commonwealth Equity, where

13   there was a promise of a change on your credit report.

14           Lexington Law has been known to the FTC since --

15   it's basically the same time that the TSR was put into

16   effect, in the late '90s.  Our practices, they have evolved

17   over time, but they are basically the same structure of

18   billing and not promising results.

19           We had a case in Tennessee that involved the FTC.

20   They were deeply involved in that case.  They intervened in

21   that case.  They are aware of how we do business.  They are

22   the agency that --

23           THE COURT:  Is that the case where you agreed that

24   you were not selling legal services?

25           MR. BENNETT:  No.  The Tennessee case was one

1  where we agreed that we would bill as in the way we do and

2  we wouldn't promise people results.

3          THE COURT:  I thought that was the -- you had a

4  case where you indicated, by stipulation, that you weren't

5  selling legal services.

6          MR. BENNETT:  I think there was a discovery

7  dispute in South Carolina where counsel took the position

8  that we were not providing legal services and the Court held

9  the other way.

10          But, again, if the government thought legal

11  services should be in this case, they've had 11 years to put

12  it in the case.  They've had complaints now.  The question

13  of legal services is not part of the allegations of this

14  case.

15          But going back to the language of the TSR, if we

16  were violating the TSR, we've been doing it openly and

17  notoriously for 25 years with the FTC's full knowledge.

18  We've been doing it during the entire life of the CFPB.  And

19  here we are in 2022, and for the first time the CFPB and for

20  the no time the FTC is trying to enforce this statute in a

21  new and novel way.

22          That's why this Court will be the first court of

23  any court in America to give this statute -- or this

24  regulation the reading that the government wants it to have

25  where they're going to change the meaning of promised result

1    to mean some sort of implied promise, not an express

2    promise, like in all the other cases, or some sort of hope

3    for a result.  That would be shockingly novel, it would

4    upset the entire credit repair system in America for the

5    last two decades, and it would --

6           THE COURT:  You argue that your provision does not

7    come within the regulation.

8           MR. BENNETT:  We come within the regulation and we

9    comply with the regulation by not making promised results.

10   If we made promised results, I wouldn't be here arguing that

11   we don't need to wait six months until after those results

12   are obtained.

13          THE COURT:  And so you comply with the regulation?

14          MR. BENNETT:  Because we don't make promised

15   results.  If we promised results, Romanette ii would require

16   us to do a bunch of other things.  We comply with the

17   regulation to the extent it applies.  We don't make promised

18   results.  We do promise to provide services, and we've laid

19   out in the engagement agreement to provide those services,

20   and bill only after they have been provided.

21          THE COURT:  You say you're complying with the reg?

22          MR. BENNETT:  We are complying with the reg to the

23   extent it applies to us.

24          THE COURT:  Okay.  Okay.

25          One matter of curiosity.  Who owns the 23,000

1   letters?

2          MR. BENNETT:  That's an intellectual property

3   question, I believe, Your Honor.  I don't know.

4          Obviously the letters that are sent out on behalf

5   of clients become part of a client file.  So the client has

6   control over those.  The letters that are in the letter

7   bank --

8          THE COURT:  You indicate you've got 23,000

9   exemplars that provide a resource for the telephone operator

10  after the input of the machine to make appropriate

11  selections.  I'm just curious who owns the 23,000 letters.

12         MR. BENNETT:  The letters are certainly controlled

13  by Lexington Law.  I don't know if they're owned by an

14  individual or the law firm.  I just don't know, Your Honor.

15  So I can check on that and get back to you.  But they're

16  certainly controlled by Lexington Law.

17         THE COURT:  Well, the trademark Lexington Law is

18  owned by Progrexion, isn't it?

19         MR. BENNETT:  The trademark of Lexington Law is

20  owned by Progrexion and licensed pursuant to a license

21  agreement that's renewed from time to time.

22         THE COURT:  Okay.  But I was just curious as to

23  the resource that you suggest exists in response to the

24  input taken by the telephone operators.  And that's just an

25  ongoing curiosity.  Maybe you'll respond to that the next

 1  time we get together.

 2          MR. BENNETT:  I will be prepared to respond to

 3  that, Your Honor.  I'm sorry I don't have it at hand here.

 4          I will grant you, Your Honor, this is a

 5  fascinating business model, and it's different than one that

 6  I've practiced in for my career, probably different than

 7  ones you've practiced in your career.

 8          THE COURT:  It's an interesting life.  Okay.

 9          MR. BENNETT:  Would you like to talk more about

10  Dr. Stango?

11          THE COURT:  Why is Mr. Stango worth listening to?

12          MR. WHITELEY:  Yes, Your Honor.

13          Getting back to Dr. Stango, as I said before, he's

14  relevant because the Bureau wants to gloss over its initial

15  burden of showing that net revenues is the appropriate

16  amount of restitution.

17          THE COURT:  What do you say is the better

18  methodology?

19          MR. WHITELEY:  We think for Count 1, what

20  Dr. Stango says is that because there's not any deception

21  alleged in Count 1, what they're saying is we should have

22  waited to bill.  We should have waited six months.

23          THE COURT:  That's their argument, among others,

24  sure.

25          MR. WHITELEY:  So it's not saying that these

```
 1    customers should never have paid us.  It's saying that they
 2    should have paid us at a later date.  And Dr. Stango's
 3    testimony on this point is helpful because he gives us an
 4    alternative way to measure that.  He says, well, the harm to
 5    the consumer in that case would be any interest forgone,
 6    because, you know, if they didn't have to -- if they were
 7    waiting to pay us, they could have been putting that money
 8    to work and getting interest.
 9                THE COURT:  Well, what's the right measurement?
10    Does he tell us what the right measurement is?
11                MR. WHITELEY:  He gives us one option of what the
12    right measurement should be.
13                THE COURT:  What does he say it should be?
14                MR. WHITELEY:  As to Count 1, he says it should be
15    calculated as forgone interest.  He takes the -- sorry,
16    forgone interest.  He says we take the money that would have
17    been paid over that short six-month period and instead use
18    it in a safe investment, a T-bill, and that's the
19    measurement of what they actually lost, because, as you
20    said, it's not that this never should have been paid to the
21    defendant.  It's that they should have waited to pay.  So
22    that's what the loss of harm is.
23                THE COURT:  Interest for six months?
24                MR. WHITELEY:  Yes.
25                THE COURT:  Okay.  What else, anything?
```

```
 1              MR. WHITELEY:  Anything that he testifies --
 2              THE COURT:  This is a righteous measurement.
 3              MR. WHITELEY:  Well, another it could be is net
 4    profits instead of net revenues.  We've been talking a lot
 5    about legal versus equitable restitution, but what the
 6    government didn't talk about is why that matters.
 7              THE COURT:  Net profits by whom?
 8              MR. WHITELEY:  Net profits by the defendant
 9    companies.
10              THE COURT:  I'm sorry?
11              MR. WHITELEY:  The defendants.  Their net profits
12    instead of -- instead of the total amount they've brought
13    in, their net profits minus --
14              THE COURT:  Well, the net profits of Progrexion
15    are different than the profits of Heath.
16              MR. WHITELEY:  Yes.  It would be net profits of
17    all defendants.
18              THE COURT:  All of them?
19              MR. WHITELEY:  Yes.
20              THE COURT:  Okay.  Some are more efficient than
21    others?
22              MR. WHITELEY:  Yes.  So this is different
23    depending on Count 1 versus Counts 2 through 5.
24              But the reason that this matters is that the
25    Supreme Court has recently said that equitable remedies
```

1    against a defendant company like this should be limited to

2    net profits, not net revenues, as the government has

3    posited.  That was first decided in the case SEC v. Renew in

4    2020.  And since then some circuit courts have also applied

5    this in the context of the CFPA.

6              THE COURT:  Anything else?

7              MR. WHITELEY:  As to Dr. Stango's opinions?

8              THE COURT:  Why is he helpful to us?  That's all.

9              MR. WHITELEY:  Well, there are --

10             THE COURT:  Provided alternatives he apparently

11   has.

12             MR. WHITELEY:  Yes.  So going to Counts 2 through

13   5, he also points out why the Bureau can't meet their

14   initial burden as to showing why their proposed measure of

15   restitution is appropriate.  And he talks about a few

16   different ways that can better measure restitution because

17   the Bureau just wants to take whatever the consumer paid.

18   They assume that the consumer didn't receive anything of

19   value in response to what they paid.

20             But our position is consumers got what they paid

21   for.  Our services are valuable.  They received the efforts

22   that we agreed to do in the engagement agreement.  And they

23   also received other things like education on credit repair,

24   which all have value.

25             THE COURT:  Well, anything else?

1          MR. WHITELEY:  Those are the chief opinions that

2     he talks about through Count 1 and Counts 2 through 5.

3          I would like to talk a little bit more on the

4     legal versus equitable distinction, if the Court would

5     allow.

6          THE COURT:  Well, history is a wonderful teacher.

7          MR. WHITELEY:  And yes, restitution has

8     historically been considered an equitable remedy.

9          And it was interesting listening to the government

10    come up here and say that they're not actually tracing any

11    money when the parties have done a considerable amount of

12    discovery to figure out how much consumers paid in this

13    case.  We've produced lots of spreadsheets back and forth.

14         THE COURT:  There's a lot of money, a lot of money

15    involved.

16         MR. WHITELEY:  Yes.  And we agree that it is too

17    much, and the Bureau is --

18         THE COURT:  Too much for experts.

19         MR. WHITELEY:  Yes.  But that just shows that they

20    actually are doing -- they are seeking specific funds here.

21    They are seeking what consumers paid.

22         THE COURT:  They say yes, pay us.  We want to make

23    it available to those who supposedly have been taken

24    advantage of.

25         MR. WHITELEY:  Sorry.  I missed that.

1          THE COURT:  Yeah.  We want to collect for those

2     who have been taken advantage of.  That's what their pitch

3     is.

4          MR. WHITELEY:  Yes.  And that fails to meet their

5     burden of showing why returning a total amount paid is

6     appropriate because they fail to account --

7          THE COURT:  You say it ought to be cut way down,

8     for various reasons.  I understand that.  Okay.

9          Well, I don't know what you pay Mr. Victor Stango.

10    Others that you've withdrawn are pretty high priced.  But at

11    any rate thank you.

12         MR. WHITELEY:  Thank you, Your Honor.

13         MS. HILMER:  Your Honor, I'll just address a

14    couple of points and then I'm happy to take any questions.

15    I'm not inclined to get too into the discussion you just had

16    with Mr. Bennett, but obviously we're happy to.

17         THE COURT:  I think that's a useful discussion.

18         MS. HILMER:  Okay.  And we'll be happy to respond

19    because there are certainly things that he has said that we

20    vehemently disagree with.  But let me start with this

21    question of Dr. Stango since that's the matter before the

22    Court on this motion.

23         If defendants are positing a net profits

24    calculation instead of net revenues, first of all, we have

25    already laid out very clearly that that sort of a

1    calculation has not been accepted in these types of cases.

2            And I'll point out that the Cashcall decision is

3    post Liu.  The Ninth Circuit, post Liu, is still saying

4    apply restitution in the form of gross revenues minus

5    refunds where appropriate.

6            Now the defendants say, well, the government

7    hasn't shown that restitution would be appropriate here.

8    Why wouldn't it be?  This is the same kind of case where

9    restitution for consumers -- net refunds have been given to

10   consumers in the form of redress for decades, endorsed by

11   the Tenth Circuit in cases, and explained very clearly and

12   applied by the Ninth Circuit in a number of cases.

13           And a key point of this is that the Tenth Circuit

14   adopts the Ninth Circuit's principle from Figgie

15   International, that when the fraud is in the selling, as it

16   is here, then restitution is an appropriate relief, and

17   restitution should be calculated as the amount the consumer

18   paid minus refunds, with an option and a possibility of

19   allowing certain offsets, but the offsets have to be proven

20   by the defendants, and they haven't done that here.

21           As far as I can tell, all they've done here is

22   given you an interest calculation that you could possibly

23   add on top of the restitution, but they haven't given you

24   any basis to ignore all of this case law.

25           Anyway, Dr. Stango doesn't do a net profits

1    calculation.  He doesn't do any calculation except for

2    here's the three-month T-bill.  Yeah, well, if you find they

3    violated the law, the only thing that they should have to

4    pay back is the three-month T-bill rate, which is not a rate

5    that is available to any of these consumers.

6          There's no precedent whatsoever for limiting

7    consumer redress where there's been such a massive violation

8    of the law.  I mean an ongoing violation of the law.

9    Your Honor, if they wanted to stop the bleeding, they could

10   do it today and fix their business model to conform to the

11   requirements of the regulation.  But there has been

12   absolutely no case law that they can cite or that we found

13   that says, you know, all the consumers need to get back is

14   interest.

15         And we cited a couple of cases under other

16   provisions of the TSR, the debt relief provisions where

17   there's a similar payment delay that the FTC imposed.  And

18   in those cases the net revenue calculation that we proposed

19   was also used.  And the cases that do that, one is a CFPB

20   case called CFPB v. Morgan Drexen.  We've cited this case in

21   our papers, in our motion and reply.  And also a Sixth

22   Circuit decision called FTC vs. E.M.A.  Both of those cases,

23   in a very similar setting, applied this calculus and

24   absolutely reject net profits.  So I think it's important

25   that we just get that legal position straight.

1          I do just very briefly want to point out a couple

2     of things.

3          Mr. Bennett has spoken a lot about the engagement

4     agreements and how the engagement agreements have all these

5     disclosures, after the fact.  Remember, these people are

6     being signed up on the phone and being asked to text, agree

7     on their phone while they're on the call with the person.

8     So there's no way that they are scrolling through all of

9     this documentation while they're sitting there.  They're

10    being told scroll down, scroll down, scroll down, and then

11    hit agree.  And you'll hear that on the calls.

12         But here's what the FTC said about 310.4(a)(2).

13    The FTC stated that it imposed delayed payment requirement

14    on credit repair services because there are no disclosures

15    that could effectively remedy the problems that arise from

16    telemarketing of those illusory services.  The harm to

17    consumers could be averted only by specifying that the

18    seller's performance of these services must precede payment

19    by the consumer.  Let me give you the cite.  67 Federal

20    Register 4492, page 4504, January 30th, 2002.  And this is

21    also something that we have cited to you in our briefing.

22         It may also be instructive that Mr. DelPonti, the

23    expert that they kind of, sort of withdraw today, when he

24    was asked -- I asked him some questions in deposition

25    pertaining to his testimony about Lexington Law removals,

1    and this was the question I asked:  How do you know that

2    Lexington Law caused all these removals?  Here was his

3    answer:  People are hiring them to perform the service.  Do

4    I know that they caused every removal?  No, but that's what

5    they are getting paid to do.  That was their expert who said

6    that.

7             So I think it's important for the Court -- the

8    Court is asking very good and penetrating questions about

9    what Lexington Law does and how they do things, and we would

10   be prepared to address that in more detail if the Court

11   wants.  I think it's very significant that when they sign

12   people up for these subscription services and they know the

13   people have ten or more negative items, they know they're

14   not providing that in a month.  They know it's going to take

15   many months.  They often tell people be patient.  This is

16   going to take months.  At a minimum, they say when we send

17   out the first letters, it's going to be 30 to 45 days before

18   you hear.

19            So it's not a one-month service interval.  The

20   expectation is that the person signs up and stays in until

21   the negative items get removed or they just decide to quit.

22   They get fed up.  Maybe they got what they wanted, whatever.

23   They leave.

24            So there is no basis for saying that the fact that

25   they bill these people monthly, automatically, without any

1    other interaction by the individuals, constitutes

2    satisfaction of the first requirement, that the time frame

3    in which the seller has represented all of the goods -- not

4    some of the goods, all of the goods or services will be

5    provided to that person has expired.

6         That's not happening in a month.  They don't tell

7    people it's going to be a month.  They do their revenue

8    projections on a break-even basis.  Their goal is to keep

9    people in for at least two and a half months in order to

10   break even on them.  So this is not a month to month

11   situation where it's like some new contract every single

12   month.  It's an ongoing service, and the representation to

13   these folks who are signing up for it is I've got ten

14   negative items on my credit report, you're telling me I can

15   only get four letters a month.  So do the math.  That's more

16   than a month.  That's several months.  And if they have more

17   negative items than that, as many do, one can do the math.

18   If they are only going to get four letters out a month, it's

19   going to take many months.

20        And the service interval, whatever the billing

21   interval may be, that does not satisfy the requirements of

22   310.4(a)(2) Romanette i, the time frame in which the seller

23   has represented all of the goods or services will be

24   provided to that person has expired.  They don't do that.

25   They never tell people when it's going to end, because if

1    they did, people would be asking them, you know, why am I
2    still paying you after this time.  They don't do that.  So I
3    think it's important for the Court to hear that.
4            Going back to Dr. Stango, we don't see any reason
5    for him to come into this case.  He has absolutely nothing
6    to offer.  He has no evidence about any issue that's
7    relevant to liability or damages, and, Your Honor, we would
8    ask that he be excluded on that basis.
9            Very quickly, as a housekeeping matter,
10   Your Honor, I would point out that this discussion of the
11   Cashcall case and all of the restitution cases was the
12   subject of a surreply by the defendants, a surreply
13   concerning Dr. Stango, and the Bureau sought leave to file a
14   response to that, a sur-surreply.  I don't believe the Court
15   has ruled on that and we just wanted to make sure that the
16   Court was aware of it.  That document is document 436.
17           So we would very much appreciate if the Court
18   would allow us to file that sur-surreply on the record so
19   the Court will have the benefit of both parties' discussions
20   of the implications of the Ninth Circuit Cashcall decision
21   for relief in this case.
22           Thank you so much, Your Honor.
23           THE COURT:  Okay.  Where does Frederick reside?
24           MS. HILMER:  He's in New Haven.
25           THE COURT:  New Haven at Yale?

 1          MS. HILMER:  Yes.

 2          THE COURT:  Okay.  I'm hesitant to deal with

 3   Mr. Frederick without hearing from Mr. Frederick.  And I'm

 4   wondering when you could present him so that I could listen

 5   to your proffer from his mouth rather than

 6   characterizations.  I'm uncomfortable with dealing with the

 7   record that exists at this point.

 8          MS. HILMER:  Your Honor, we can certainly get in

 9   touch with Dr. Frederick, and, you know, determine what his

10   schedule is.  I don't know whether he has classes that he's

11   teaching in September, but we can certainly get --

12          THE COURT:  Hopefully before pretrial, which is

13   currently set on the 20th and 21st of September.  But if we

14   could get a date, I think it's wise if we all listen to what

15   he has to say from the witness stand as a proffer, with an

16   opportunity for cross-examination, to see if he's worth

17   listening to, and get that determination made before we ever

18   get to a jury if we get to a jury.

19          Would you be in a position to call him tonight,

20   for example?

21          MS. HILMER:  We will -- he's going to be two hours

22   ahead.  So we will certainly get in touch with him

23   immediately to determine his availability.  And if we can

24   reach him tonight, we will report back to the Court tomorrow

25   when we are here in session.

1          THE COURT:  Yes.  Well, why don't I give you a

2     break and let you go home a little early, and we can

3     reassemble at ten o'clock tomorrow.  By then we'll have an

4     opportunity, it would seem to me, to figure a time when we

5     can listen to him from the witness stand to see what the

6     proffer actually is, with opportunity for cross.

7          MS. HILMER:  We're happy to accommodate the

8     Court's request.  We'll do the best we can.

9          THE COURT:  Let's do that.  And I'll think

10    overnight on the other questions.

11         MR. BENNETT:  Your Honor, could I have two

12    moments?  I wanted to make sure that we weren't talking past

13    each other -- that I was not responding properly to your

14    question earlier about whether our experts are in our case

15    in chief or our rebuttal case.  I just wanted to make sure

16    that the Court was clear that if the government calls

17    Dr. Frederick and Mr. Weinberg, that we intend to call

18    Mr. DelPonti, Dr. Maronick, Dr. Barnett.

19         THE COURT:  I understand that.  I thought it would

20    be helpful to you, as well as others, to hear what he has to

21    say directly.

22         MR. BENNETT:  I completely agree with Your Honor

23    on that.

24         THE COURT:  As far as the good Dr. Weinberg is

25    concerned, I don't see how he can be helpful to us at all.

1    I can't jump from his determinations to the suggestion that

2    it demonstrates the existence of misrepresentation.  I think

3    your motion in reference to him is correct.  I will grant

4    the motion.

5            I think Mr. Victor Stango is in the same position.

6    I don't think he's worth listening to at this point on the

7    subjects that he's talked about.  So I'll grant the motion

8    in reference to Mr. Stango.

9            We'll grant the motion in reference to

10   Mr. Weinberg.

11           We'll see you tomorrow at 10:00 and we'll see if

12   we can get Mr. Frederick out here at a convenient date for

13   everybody to listen to what he has to say.  He may or may

14   not.  I can't quite understand what he's going through, the

15   various phases that he has in what he's presented to us.

16           So I will ask the prevailing parties to prepare a

17   little order, simple, in reference to Stango and in

18   reference to Weinberg.  If you will do that and get it to me

19   within ten days, I would appreciate it.

20           MR. BENNETT:  Thank you, Your Honor.

21           THE COURT:  We'll be in recess until 10:00

22   tomorrow.

23           (Whereupon, the proceeding was continued to

24   Wednesday, August 10, 2020 at 10:00 a.m.)

25

1                    C E R T I F I C A T E

2

3

4         I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 8-16-2022
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25