MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
J. TAYLOR MCCONKIE
(202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
taylor.mcconkie@cfpb.gov
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>*Plaintiff*,<br><br>v.<br><br>PROGREXION MARKETING, INC., *et al.*,<br><br>*Defendants*. | Case No.  2:19-cv-00298-BSJ |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MEMORANDUM IN FURTHER OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

On October 7, 2022, Defendants filed a Memorandum in Further Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF 472 ("Defs.' Supp. Br."). Defendants' Supplemental Brief breaks no new ground. It cites no new authority on the Telemarketing Sales Rule (TSR), introduces no salient facts, and does not explain its own relevance to the legal questions presented in the Bureau's summary judgment motion. Instead, it is a hodgepodge of responses to statements made by Bureau counsel and critiques of questions asked by the Court during the last hearing on September 21, 2022. The Bureau respectfully files this response to point out certain analytical, legal, and factual errors in Defendants' brief.

**1. Compliance with 16 C.F.R. § 310.4(a)(2) is neither impossible nor in conflict with the Credit Repair Organizations Act (CROA).** 16 C.F.R. § 310.4(a)(2) does not require (or condone) untrue or misleading sales practices as Defendants argue; it merely requires a credit repair Seller or Telemarketer to satisfy two preconditions before requesting payment. Four courts have considered whether the TSR requirement conflicts in some way with CROA, and all four have agreed that it does not.[1] There is simply no support for Defendants' assertion that

---

[1] *CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022); *CFPB v. Commonwealth Equity Grp.*, LLC, No. 20-cv-10991, 2021 WL 3516690, at *2 (D. Mass. Aug. 10, 2021); *CFPB v. Prime Mktg. Holdings, LLC*, No. CV-16-07111-BRO (JEMx), 2016 WL

the TSR requires what CROA forbids.

Moreover, none of Defendants' arguments demonstrate that compliance with section 310.4(a)(2) is impossible. The regulation specifies that the promised results of the credit repair service must be demonstrated on a "consumer report" before payment is due.[2] Defendants' briefs and oral arguments have repeatedly substituted the term "credit report" for "consumer report" and erroneously stated that the regulation requires proof by a "credit report"—a mistake they repeat in their latest filing.[3] The term "consumer report"—which is the term used in section 310.4(a)(2)—is defined in the Fair Credit Reporting Act and includes not only credit reports, but also credit scores and other communications from consumer reporting agencies.[4] Thus, an improved credit score could satisfy section 310.4(a)(2) just as an improved credit report could.[5] The crux is that section

---

10516097, at *9 (C.D. Cal. Nov. 15, 2016); *Tennessee v. Lexington Law Firms*, No. 96-0344, 1997 WL 367409, at *6 (M.D. Tenn. May 14, 1997).
[2] 16 C.F.R. § 310.4(a)(2)(ii).
[3] Defs.' Supp. Br. 3 (referring to proof by a "credit report"); *see also, e.g.*, Tr. Sept. 21, 2022 Hr'g 52:12-17 (misquoting regulation); Answer to Compl., ECF 65, p. 12; Answer to Am. Compl. ECF 458 p. 6; Tr. Dec. 13, 2019 Hr'g 20:19-25.
[4] 15 U.S.C. § 1681a(d)(1); *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 55 n.6 (2007) ("The parties do not dispute that the credit scores and credit reports relied on by GEICO and Safeco are 'consumer reports' under 15 U.S.C. § 1681a(d)(1).").
[5] Defendants misconstrue a statement made by Bureau counsel at oral argument about verified tradelines. Defs.' Supp. Br. 2. If a service is represented to remove unverified negative tradelines, and payment is conditioned on the removal or

310.4(a)(2) does not prescribe or limit what promised results can be agreed to between the consumer and Seller or Telemarketer, but the results must be able to be documented on a consumer report from a consumer reporting agency before the Seller or Telemarketer may proceed with requesting or receiving payment.

Defendants purport to be able to track consumers' credit score changes over time,[6] and they purport to count millions of tradeline removals among their half-million customers each year.[7] If those claims are true, the results can be demonstrated on consumer reports and compliance is not a "factual impossibility."

**2. The Bureau has not proffered any "safe harbor" under the regulation.** Defendants' brief erroneously states that the government proffered "three 'safe harbors'" at the September hearing.[8] The Bureau did no such thing. Rather, it has stated countless times, both in writing and at argument, that (1) the plain text of the regulation controls and (2) compliance with the regulation can

---

correction of anything that cannot be verified on the consumer's report, then an updated consumer report—one on which unverified tradelines no longer appear—could be used to demonstrate that the promised results have been achieved. Alternatively, by way of example only, payment could be conditioned on delivery of a consumer report showing a tradeline error has been corrected, a specific derogatory item has been removed, or a score has increased.

[6] *E.g.*, Defs.' Opp'n to Pl's Mot. for Partial Summary Judgment, ECF 277, pp. 20-21 (Statement of Additional Undisputed Material Facts ¶¶ 28, 32).

[7] *E.g.*, Heath PC's Mot. for Partial Summary Judgment, ECF 171, p. 11 (Statement of Undisputed Material Facts ¶ 12).

[8] Defs.' Supp. Br. 3.

only be achieved by delaying the request for or receipt of payment until the preconditions set forth in subparts (i) and (ii) are both satisfied.

**3. The regulation conditions payment on the achievement of credit repair results—whatever results were promised in exchange for payment.**
Defendants have repeatedly argued that the regulation is defective (and unenforceable against them) because it uses the phrase "promised results" in subsection (ii), one of the conditions precedent to requesting payment.[9] Defendants argue that the regulation "presume[s] promises that could never be lawfully made in the first place," and that the billing restriction cannot be compared to a contingency fee arrangement because "by definition a company that only charges *if* certain results are achieved does not *promise* those results."[10] But there is no defect in the phrase "promised results" or its use in this regulation. The concept of a contractual promise is well known in the law, including where the promised result is beyond the promisor's control. The Supreme Court advises that "the law of contracts has always treated promises to provide something beyond the promisor's absolute control . . . as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence."[11] As Justice Holmes stated, "One who

---

[9] *E.g.*, Defs.' Supp. Br. 2.
[10] *Id*. at 3.
[11] *U.S. v. Winstar Corp.*, 518 U.S. 839, 868-69 (1996).

4

makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking."[12] Thus, Defendants' inability to control the precise outcome of their credit repair services does not prevent them from entering into a contractual promise—the promise of results in exchange for the promise of payment. The regulation does not purport to eliminate the risk that the credit repair service will fail; rather, it ensures that the Telemarketer "takes the risk" and protects the consumer from the obligation to pay in such event.[13]

      Defendants assert that section 310.4(a)(2) does not "appl[y] to Defendants because they *hope* that, when they send letters to furnishers on clients' behalf, they will receive responses."[14] The Bureau agrees that Defendants' state of mind is not a triggering condition. Rather, section 310.4(a)(2) applies to Defendants because (1) they are Sellers and Telemarketers under the rule; and (2) they offer services

---

[12] *Day v. United States*, 245 U.S. 159, 161 (1917); *see also Winstar Corp.*, 518 U.S. at 869 (quoting Holmes: "[i]n the case of a binding promise that it shall rain tomorrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee").
[13] *Cf.* 75 Fed. Reg. 48458, 48485 (Aug. 10, 2010) ("The [Federal Trade Commission] long has held that consumers are injured by a system that forces them to bear the full risk and burden of sales-related abuses, particularly…where the seller is in a better position to know and understand the risks.").
[14] Defs.' Supp. Br. 4.

represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. By its plain text, application of the provision hinges on the nature of Defendants' services and how they are represented to consumers, not on Defendants' state of mind.

Defendants close their Supplemental Brief with a mischaracterization of the provision's rulemaking history. They argue that the rulemaking history supports their view that the provision does not apply to them because they "merely hoped" their services would work, and they did not assume the risk of the transaction by conditioning their fees on achievement of promised results.[15] But the rulemaking record has been amply briefed already[16] and provides no support for Defendants' argument. The section of the rulemaking record highlighted by Defendants in their Supplemental Brief did not grapple with the meaning of the word "promise," as Defendants inaccurately suggest; it only concerned the Federal Trade Commission's decision to alter the text of the proposed rule so that the final provision expressly encompassed goods or services represented to remove derogatory information from consumer reports, in addition to goods or services

---

[15] Defs.' Supp. Br 4-5.
[16] *E.g.*, Pl.'s Resp. to Heath PC's Mot. for Partial Summary Judgment, ECF 232, pp. 41-45, 51-54; Pl.'s Reply in Support of its Mot. for Partial Summary Judgment, ECF 283, pp. 1-4, 24-25.

represented to improve a person's credit history, credit record, or credit rating.[17]

The reason section 310.4(a)(2) exists is because the Federal Trade Commission concluded, after extensive notice and comment, that telemarketed credit repair services present a high risk of consumer abuse. Contrary to Defendants' argument, the provision does not invite a Telemarketer or Seller to misrepresent the likelihood of a particular outcome. Rather, what the provision's payment preconditions do is protect the consumer by shifting the risk of inadequate results to the Telemarketer and Seller.

Dated: October 17, 2022          Respectfully submitted,

/s/ Maureen McOwen
MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
J. TAYLOR MCCONKIE
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9553
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
taylor.mcconkie@cfpb.gov
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

---

[17] 60 Fed. Reg. 30406, 30415 (June 8, 1995).

7