No. 22-448

# In the Supreme Court of the United States

◆◆

CONSUMER FINANCIAL PROTECTION BUREAU, ET AL.,

*Petitioners*,

V.

COMMUNITY FINANCIAL SERVICES ASSOCIATION OF
AMERICA, LIMITED, ET AL.,

*Respondents*.

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**BRIEF OF *AMICI CURIAE* STATES OF
WEST VIRGINIA AND 15 OTHER STATES
IN SUPPORT OF GRANTING THE PETITION**

PATRICK MORRISEY
  *Attorney General*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
lindsay.s.see@wvago.gov
(304) 558-2021

LINDSAY S. SEE
  *Solicitor General*
  *Counsel of Record*

MICHAEL R. WILLIAMS
  *Senior Deputy Solicitor*
  *General*

GRANT A. NEWMAN*
  *Special Assistant*

*Counsel for* Amicus Curiae *State of West Virginia*
[additional counsel listed after signature page]

## QUESTION PRESENTED

Whether the court of appeals erred in holding that the statute that describes how the Consumer Financial Protection Bureau is funded, 12 U.S.C. § 5497, violates the Appropriations Clause, U.S. Const. Art. I, § 9, Cl. 7, and in vacating a regulation promulgated at a time when the CFPB was receiving such funding.

II

## TABLE OF CONTENTS

Question Presented ............................................................. I

Introduction and Interests of *Amici Curiae* ..................... 1

Summary of Argument ........................................................ 3

Reasons for Granting the Petition ..................................... 4

I.    The Court Should Grant The Petition To
Provide The States Certainty Over Their Role
In Regulating Our Financial System ........................ 4

II.   The Court Should Grant The Petition To
Restore The CFPB's Accountability To The
States ........................................................................... 8

III.  The Decision Below Is Correct ................................ 18

Conclusion ........................................................................ 23

III

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CFPB* v. *All Am. Check Cashing, Inc.*,
  33 F.4th 218 (5th Cir. 2022) ............................... 9, 12, 22

*CFPB* v. *Universal Debt Solutions, LLC*,
  No. 1:15-cv-00859
  (N.D. Ga. Aug. 25, 2017) ............................................ 17

*Cincinnati Soap Co.* v. *United States*,
  301 U.S. 308 (1937) ................................................ 20, 21

*EEOC* v. *Abercrombie & Fitch Stores, Inc.*,
  575 U.S. 768 (2015) ...................................................... 19

*Escoe* v. *Zerbst*,
  295 U.S. 490 (1935) ...................................................... 19

*Geier* v. *Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ...................................................... 10

*Harrington* v. *Bush*,
  553 F.2d 190 (D.C. Cir. 1977) ...................................... 20

*Henson* v. *Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017) ................................................ 20

*Lewis* v. *BT Inv. Managers, Inc.*,
  447 U.S. 27 (1980) ...................................................... 4, 5

*Lewis* v. *United States*,
  680 F.2d 1239 (9th Cir. 1982)...................................... 14

*Metro. Life Ins. Co.* v. *Massachusetts*,
  471 U.S. 724 (1985) ........................................................ 5

*OPM* v. *Richmond*,
  496 U.S. 414 (1990) ................................................... 9, 20

IV

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*PHH Corp.* v. *CFPB*,
    881 F.3d 75 (D.C. Cir. 2018) ...................................... 1, 2

*Ratchford* v. *Gay Lib*,
    434 U.S. 1080 (1978) ( .................................................... 8

*Republic Nat'l Bank of Mia.* v. *United States*,
    506 U.S. 80 (1992) ............................................................ 9

*Ring* v. *Maxwell*,
    58 U.S. 147 (1854) ......................................................... 9

*Salinas* v. *U.S. R.R. Ret. Bd.*,
    141 S. Ct. 691 (2021) ................................................... 19

*SAS Inst., Inc.* v. *Iancu*,
    138 S. Ct. 1348 (2018) ................................................. 19

*Seila Law LLC* v. *CFPB*,
    140 S. Ct. 2183 (2020) ................................................ 1, 2

*U.S. Dep't of Navy* v. *FLRA*,
    665 F.3d 1339 (D.C. Cir. 2012) ...................................... 9

*Watters* v. *Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) ............................................................. 5

**Constitutional Provision**

U.S. CONST. art. I, § 9, cl. 2.................................................. 9

**Statute**

12 U.S.C. § 5497 ...................................14, 15, 18, 19, 20, 22

v

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

**Rule**

Supreme Court Rule 37.2(a)................................................. 1

**Other Authorities**

156 Cong. Rec. S4140 (2010)............................................ 15

Adam C. Smith & Todd Zywicki, *Behavior,
    Paternalism, and Policy: Evaluating
    Consumer Financial Protection*,
    9 N.Y.U. J.L. & Liberty 201 (2015) ........................... 15

Amanda Frost, *Judicial Review of FDA
    Preemption Determinations*,
    54 FOOD & DRUG L.J. 367 (1999) ................................ 10

Authority of States To Enforce the
    Consumer Financial Protection Act of
    2010,
    87 Fed. Reg. 31,940 (May 26, 2022) ............................ 6

Calvin R. Massey, *The Tao of Federalism*,
    20 HARV. J.L. & PUB. POL'Y 887 (1997) ..................... 10

Carlos Berdejó, *Small Investments, Big
    Losses: The States' Role in Protecting
    Local Investors from Securities Fraud*,
    92 WASH. L. REV. 567 (2017) ........................................ 5

Cass R. Sunstein, *Interpreting Statutes in
    the Regulatory State*,
    103 HARV. L. REV. 405 (1989)....................................... 5

VI

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

CFPB, CFPB FINANCIAL REPORT: FISCAL
YEAR 2022 (2022) ........................................... 22

CFPB, CFPB STRATEGIC PLAN: FY2013-
FY2017 (2013) ................................................ 21

THE FEDERALIST NO. 58 ..................................... 9

H.R. Comm. on Fin. Servs., *Committee
Pushes for Accountability and
Transparency at the CFPB*, YOUTUBE
(Mar. 6, 2015) ................................................ 16

Charles Davant IV, *Sorcerer or Sorcerer's
Apprentice?: Federal Agencies and the
Creation of Individual Rights*,
2003 WIS. L. REV. 613 (2003) ...................... 10

Charles Kruly, *Self-Funding and Agency
Independence*,
81 GEO. WASH. L. REV. 1733 (2013) ............ 15

Conrad Z. Zhong, *A New Way to Fund the
Consumer Financial Protection
Bureau*,
18 U.C. DAVIS BUS. L.J. 1 (2017) .................. 9

*Consumer Financial Protection Bureau
Semiannual Report*, C-SPAN
(Oct. 28, 2021) ............................................... 22

Daniel Bloom, *GOP Lawmakers Threaten
Appropriations for Surface Mining
Office*, CQ ROLL CALL (Mar. 23, 2016),
2016 WL 1127891 .......................................... 12

VII

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

Edward A. Fitzgerald, *The Seaweed
    Rebellion: Florida's Experience with
    Offshore Energy Development*,
    18 J. LAND USE & ENVT'L L. 1 (2002) ........................ 12

Elizabeth Warren, *Republicans Remain
    Silent As Mulvaney's CFPB Ducks
    Oversight*,
    WALL ST. J. (Mar. 28, 2018, 5:48 p.m.) ....................... 17

Eloise Pasachoff, *The President's Budget
    As A Source of Agency Policy Control*,
    125 YALE L.J. 2182 (2016) ........................................... 11

Eric Biber, *Too Many Things to Do: How
    to Deal with the Dysfunctions of
    Multiple-Goal Agencies*,
    33 HARV. ENVT'L L. REV. 1 (2009) .............................. 13

The Fair Credit Reporting Act's Limited
    Preemption of State Laws,
    87 Fed. Reg. 41,042 (July 11, 2022) ............................ 6

Gillian E. Metzger, *Agencies, Polarization,
    and the States*,
    115 COLUM. L. REV. 1739 (2015) ................................ 11

Jack M. Beermann, *Congressional
    Administration*,
    43 SAN DIEGO L. REV. 61 (2006) ................................ 11

Jack W. Campbell IV, *Regulatory
    Preemption in the* Garcia/Chevron *Era*,
    59 U. PITT. L. REV. 805 (1998)..................................... 10

VIII

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

JAMES V. SATURNO, ET AL., CONG. RSCH.
SERV., R42388, THE CONGRESSIONAL
APPROPRIATIONS PROCESS: AN
INTRODUCTION (2016) ................................................. 12

Jennifer Nou & Edward H. Stiglitz,
*Strategic Rulemaking Disclosure,*
89 S. CAL. L. REV. 733 (2016) ...................................... 13

Jessica Bulman-Pozen, *Federalism as a
Safeguard of the Separation of Powers,*
112 COLUM. L. REV. 459 (2012) ..................................... 3

Jim Puzzanghera, *CFPB Chief Mick
Mulvaney Says He Could Just
'Twiddle My Thumbs' Before Congress
To Highlight Agency's Flaws,*
L.A. TIMES (Apr. 11, 2018, 11:55 a.m.) ....................... 16

Jonathan H. Adler, *The Ducks Stop Here?
The Environmental Challenge to
Federalism,*
9 SUP. CT. ECON. REV. 205 (2001) .............................. 10

Jonathan Masur, *Judicial Deference and
the Credibility of Agency
Commitments,*
60 VAND. L. REV. 1021 (2007) ........................................ 8

JOSEPH STORY, COMMENTARIES ON THE
CONSTITUTION OF THE UNITED STATES
(1833) ................................................................................ 9

IX

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

Katy O'Donnell, *Appeals Court Finds
      CFPB Funding Unconstitutional*,
      POLITICO (Oct. 19, 2022 7:44 PM) ................................ 2

Laura E. Dolbow, *Agency Adherence to
      Legislative History*,
      70 ADMIN. L. REV. 569 (2018) ..................................... 11

Letter from Patrick Morrisey, Att'y Gen.,
      W. Va., to Rohit Chopra, Dir., CFPB
      (Oct. 24, 2022) ................................................... 17

Letter from Rep. Patrick McHenry, H.R.
      Comm. on Fin. Servs., Republican
      Leader, et al. to Rohit Chopra, Director
      of the CFPB (Sept. 20, 2022) ....................................... 16

Letter from Rep. Randy Neugebauer,
      Chairman, H.R. Comm. on Fin. Servs.,
      Subcomm. on Oversight and
      Investigations, et al. to Richard
      Cordray, Dir., CFPB (May 2, 2012) ........................... 17

Letter from Sen. Mike Enzi, Chairman, S.
      Budget Comm. & Richard Shelby,
      Chairman, S. Comm. On Banking,
      Hous. & Urban Affairs, to Richard
      Cordray, Dir., CFPB (Mar. 9, 2015) ........................... 17

Letter from Sen. Rob Portman, et al. to
      Richard Cordray, Dir., CFPB
      (Oct. 30, 2013) ................................................... 17

x

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

Mathew D. McCubbins & Daniel B.
Rodriguez, *Canonical Construction
and Statutory Revisionism: The
Strange Case of the Appropriations
Canon,*
14 J. CONTEMP. LEGAL ISSUES 669
(2005)............................................................................. 12

Margaret H. Lemos, *State Enforcement of
Federal Law,*
86 N.Y.U. L. REV. 698 (2011)........................................ 5

Markham S. Chenoweth & Michael P.
DeGrandis, *How the Court's Decision
in* Seila Law *Makes CFPB's Unlawful
Structure Even Worse,*
8/27/2020 U. CHI. L. REV. ONLINE 55
(2020)............................................................................. 21

Note, *Independence, Congressional
Weakness, and the Importance of
Appointment: The Impact of
Combining Budgetary Autonomy with
Removal Protection,*
125 HARV. L. REV. 1822 (2012) ..................................... 11

Press Release, CFPB, CFPB Bolsters
Enforcement Efforts by States
(May 19, 2022) .................................................................. 6

Press Release, CFPB, The CFPB
Establishes Framework To Better
Coordinate with State Regulators
(May 21, 2013) .................................................................. 6

XI

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

Press Release, CFPB, CFPB Invokes
    Dormant Authority to Examine
    Nonbank Companies Posing Risks to
    Consumers (Apr. 25, 2022) .......................................... 16

Roberta Romano, *Does Agency Structure
    Affect Agency Decisionmaking?
    Implications of the CFPB's Design for
    Administrative Governance,*
    36 YALE J. ON REG. 273 (2019) ..................................... 15

ROBERT E. CUSHMAN, THE INDEPENDENT
    REGULATORY COMMISSIONS (1972) ........................... 11

S. REP. NO. 111-176 (2010) ................................................. 21

Thomas Arning, *The Consumer Financial
    Protection Bureau: A Novel Agency
    Design with Familiar Issues,*
    24 FORDHAM J. CORP. & FIN. L. 153
    (2018) ................................................................................ 15

Todd Zywicki, *The Consumer Financial
    Protection Bureau: Savior or Menace?,*
    81 GEO. WASH. L. REV. 856 (2013) .............................. 14

*Wagner Questions CFPB Director
    Richard Cordray,* YOUTUBE
    (Apr. 10, 2017) ................................................................ 16

William Simpson, *Above Reproach: How
    the Consumer Financial Protection
    Bureau Escapes Constitutional Checks
    & Balances,*
    36 REV. BANKING & FIN. L. 343 (2016) ........................ 1

# INTRODUCTION AND INTERESTS
## OF *AMICI CURIAE*[*]

The Consumer Financial Protection Bureau is a failed experiment in administrative governance. Conceived as an answer to the problems that led to the Great Recession, Congress endowed the Bureau with an "unprecedented combination of structural characteristics" meant to cloister it from outside accountability. William Simpson, *Above Reproach: How the Consumer Financial Protection Bureau Escapes Constitutional Checks & Balances*, 36 REV. BANKING & FIN. L. 343, 345 (2016). At the same time, Congress gave the agency "enormous power over American business, American consumers, and the overall U.S. economy." *PHH Corp.* v. *CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, J., dissenting). This toxic blend of broad power and unchecked autonomy has been a problem from the start.

The Court has had to address the CFPB's conflict with our Constitution once already. In *Seila Law LLC* v. *CFPB*, 140 S. Ct. 2183 (2020), the Court concluded that the Bureau's leadership structure "violate[d] the separation of powers" because it concentrated authority in the hands of a "single individual" who the President could not remove except in narrow circumstances. *Id.* at 2192. At that time, the Court noted how "the CFPB does not rely on the annual appropriations process for funding"; it need only ask for whatever funds it wants from the Federal Reserve, up to 12% of the Fed's multi-billion-dollar annual operating expenses. *Id.* at 2194-95. This "financial freedom," the Court observed, "makes it even more likely

---

[*] Under Supreme Court Rule 37.2(a), *amici* timely notified counsel of record of their intent to file this brief.

2

that the agency will slip … from [the control] of the people." *Id.* at 2204 (cleaned up).

The appropriations issue that *Seila Law* noted has now come to a head. In the decision below, the Fifth Circuit correctly held that the CFPB's unprecedented funding scheme impermissibly shifts Congress's power of the purse to the Bureau. See Pet.App.45a-46a. But that decision is at odds with one from the D.C. Circuit, which saw no constitutional problem with "the CFPB's budgetary set-up." *PHH Corp.*, 881 F.3d at 95. So now much of the country's financial industry sits in a state of regulatory limbo, wondering whether the CFPB can continue as a going concern without congressional intervention. Meanwhile, the Bureau insists that it will "continue to carry out its vital work" without apparent change—even though a federal appellate court has told the Bureau it *must* change. Katy O'Donnell, *Appeals Court Finds CFPB Funding Unconstitutional*, POLITICO (Oct. 19, 2022 7:44 PM), https://politi.co/3EZh4RK.

The Court should grant the Bureau's Petition for certiorari to resolve this issue quickly. The Bureau is at least right that the country needs a fast answer to a question of this importance. On issues like these, worrying costs arise from letting uncertainty fester. And like the Bureau and private actors, the States need clarity, too. States, after all, have traditionally stood as protectors of the consumer financial markets. They need to know what role federal regulators will play—or not—in this critical area.

But other than accurately assessing the stakes, the Bureau gets it wrong. The Court should grant the Petition to *affirm*. It should reinvigorate the protections of the Appropriations Clause, not weaken them. Through congressional oversight, the Clause ensures a level of

3

state participation that ordinary administrative processes don't allow.  But as the Fifth Circuit's decision correctly explains, text and more confirm that the CFPB is operating with no appropriation at all.

The amici States of West Virginia, Alabama, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Virginia therefore file this brief on behalf of their consumers and regulated businesses, and "as champions of Congress." Jessica Bulman-Pozen, *Federalism as a Safeguard of the Separation of Powers*, 112 COLUM. L. REV. 459, 503 (2012).  They urge the Court to intervene now to "check" another "exercise of federal executive power in an era of expansive executive power." *Id.*  The CFPB experiment has failed.  The Court should return it to the lab.

## SUMMARY OF ARGUMENT

**I.**  States play an important part in protecting consumers and financial markets.  They have longstanding authority to enforce many of the same laws that the CFPB does, as even the Bureau recognizes.  But for this system of federal-state regulation to work, the actors must understand their roles.  The D.C. and Fifth Circuits' division invites confusion about those roles, as the CFPB may not have the present ability to operate.  The Court should grant the Petition to make it clear who can do what when it comes to consumer-financial regulation.

**II.**  The Court should affirm the Fifth Circuit's decision and apply its reasoning nationwide.  The Appropriations Clause serves an important purpose: it allows Congress to supervise and control federal administrative agencies.  Through Congress, States

4

participate in that process, too.  But when an agency like the CFPB operates outside the ordinary appropriations process, States have no opportunity to advise and influence.  And unfortunately, real-world facts have shown that—freed from fear that its budget could be in danger— the CFPB has been willing to ignore Congress and the States.  It evades effective oversight.  Affirming the decision is therefore critical to bringing accountability and transparency to the CFPB's work.

**III.** The decision below is correct.  The Fifth Circuit took Congress at its word—Congress said it was not making an appropriation, and nothing else in the law overcomes that express statement.  The Court should not accept the Bureau's invitation to rewrite or ignore Congress's direction.  And neither history nor practice can save the Bureau, either, especially when the historical record contains many instances of the Bureau describing itself as an agency without an appropriation.  Having correctly found that the CFPB violated the Appropriations Clause, the Fifth Circuit was right to vacate the rule at issue.

## REASONS FOR GRANTING THE PETITION

### I.   The Court Should Grant The Petition To Provide The States Certainty Over Their Role In Regulating Our Financial System.

**A.** It hardly needs saying again: States play a vital role in our nation's economic matters.  "[S]ince the early days of our Republic" the States have tackled "profound local concern[s]" that are "essential to the health of any State's economy and to the well-being of its people." *Lewis* v. *BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980). This long-standing role explains why the Court so often

5

recognizes the States' "great latitude under the police powers" to "protect[] the lives, limbs, health, comfort, and quiet of all persons." *Metro. Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 756 (1985). Indeed, federalism itself rises and falls on the States' "authority to regulate their own citizens and territory." Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 469 (1989).

The States' authority in the world of financial services and consumer protection is especially important. "Consumer protection," after all, "is quintessentially a field which the States have traditionally occupied." *Watters* v. *Wachovia Bank, N.A.*, 550 U.S. 1, 35-36 (2007) (Stevens, J., dissenting) (cleaned up). So is securing "sound financial institutions and honest financial practices" in "banking and [all] related financial activities." *Lewis*, 447 U.S. at 38. Thus, the "competitive mix of state and national banks" and those banks' "divergent treatment" mark our "dual banking system." *Watters*, 550 U.S. at 23, 25 (Stevens, J., dissenting). The mix runs optimally when everyone involved recognizes the States' "better understanding of local conditions and [] better access to the information necessary to detect" wrongdoing. Carlos Berdejó, *Small Investments, Big Losses: The States' Role in Protecting Local Investors from Securities Fraud*, 92 Wash. L. Rev. 567, 592 (2017); see Margaret H. Lemos, *State Enforcement of Federal Law*, 86 N.Y.U. L. Rev. 698, 721 (2011) ("State enforcers also are likely to have a better understanding of local conditions than their federal counterparts, simply by virtue of living and working in the state rather than in Washington, D.C.").

Even the CFPB recognizes that States need to participate in financial regulation. Just this year, the

6

Bureau broadly interpreted the States' authority to enforce various aspects of the Consumer Financial Protection Act of 2010. See generally Authority of States To Enforce the Consumer Financial Protection Act of 2010, 87 Fed. Reg. 31,940 (May 26, 2022). A few months later, the Bureau construed the Fair Credit Reporting Act's express preemption provision to have a "narrow and targeted scope." The Fair Credit Reporting Act's Limited Preemption of State Laws, 87 Fed. Reg. 41,042, 41,042 (July 11, 2022). Whatever the merits of those interpretive rules, they show that everyone knows how intimately involved the States are in consumer financial regulation. Neither the CFPB nor any other federal regulator has occupied the field.

And because States and (multiple) federal regulators often touch on the same sorts of consumer-financial issues, these regulating entities have found formal and informal ways to manage the terrain. Formally, agencies might enter into agreements and understandings about information sharing and investigation coordination. The CFPB did that, for example, when it developed a coordination "framework" with state banking regulators back in 2013. See Press Release, CFPB, The CFPB Establishes Framework To Better Coordinate with State Regulators (May 21, 2013), https://bit.ly/3HnVGXS. As of summer 2022, the CFPB had also signed "memoranda of understanding" with "over 20 state attorney general offices." Press Release, CFPB, CFPB Bolsters Enforcement Efforts by States (May 19, 2022), https://bit.ly/3Y37KUl. Informally, States and federal regulators often try to monitor each other's activities to avoid duplication or spur an appropriate counter-response. (Although, as discussed below, the CFPB's lack of transparency can make this tough.)

7

**B.** As for whether the CFPB can keep working without change, the different approaches of the D.C. and Fifth Circuits complicate state efforts to regulate financial markets and protect consumers and businesses alike.

The States agree with the Bureau that the decision below carries "immense legal and practical significance." Pet.29. Litigants can challenge any past CFPB action on the same basis the court below accepted to invalidate the rule here. Either congressional action or a rethinking of much of the CFPB's existence will need to happen soon. *Id.* The Fifth Circuit's decision was right, see *infra* Part III, but the CFPB's choice not to accept the outcome—combined with the contrary D.C. Circuit decision—has slowed that action. Now, consumer financial markets (banking and non-banking) sit in undeniable and unenviable uncertainty.

The confusion also has real consequences for the States. As co-regulators, States are left to wrestle over how to engage with an agency whose constitutionality is a matter of open dispute. States no longer know whether to engage with the traditional prudential regulators or the CFPB. The Bureau's regulations might present preemption concerns for certain state laws *if* they were still valid, but they don't appear to be—at least outside the District. Should States involve themselves in CFPB enforcement actions, or assume they are void? Should States step in to fill any "gaps" from an absent CFPB, or must they still pretend the agency is constitutionally empowered to handle them? After all, States are hardly willing to stand idly by if an unconstitutional agency tramples their local markets. And how are States supposed to deal with cross-border matters? If a financial transaction implicates Oklahoma and Texas entities, for instance, those States might treat the CFPB as an

8

ordinary regulator on one side of the border and an unconstitutional interloper on the other.

So if the Court does not act to answer the appropriations question soon, States will have to litigate the same issue in other districts and circuits over and over. And this confusion will lead to more than nuisance and big legal bills. Without an answer now, regulated actors will move their focus to activities and places where they can operate with the fewest headaches. Cf. Pet.29 (describing how challenges to the CFPB's structure will shift to the Fifth Circuit). But that split-motivated shift could hardly be expected to produce the most economically efficient outcomes for all. Worse still, some regulated entities might be inclined to just wait it out until more clarity comes before launching big efforts or products. See Jonathan Masur, *Judicial Deference and the Credibility of Agency Commitments*, 60 VAND. L. REV. 1021, 1041 (2007) (describing how "change[s] in the background regulatory rules" can upset investment strategies). In plain English: Any continuing confusion could seriously impede the growth of the consumer-financial services market at a time when the economy is already strained.

The Court has assumed a "responsibility to aid [courts] where confusion or uncertainty in the law prevails." *Ratchford* v. *Gay Lib*, 434 U.S. 1080, 1082 (1978) (Rehnquist, C.J., dissenting). Here, though the legal answer is clear, the confusion below is real. The Court should grant the Petition and rectify it.

## II.   The Court Should Grant The Petition To Restore The CFPB's Accountability To The States.

The Court should grant the Petition and affirm the Fifth Circuit's decision: Doing so would restore the

9

promise the Appropriations Clause holds for *all* States—not just those in the Fifth.

**A.**   Article 1, Section 9, Clause 7 of the Constitution says that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This "straightforward and explicit command" means what it says:   "[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *OPM* v. *Richmond*, 496 U.S. 414, 424 (1990).   The Founders regarded congressional power over the purse "as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." THE FEDERALIST NO. 58 (James Madison). So the Appropriations Clause's restraint is "absolute." *U.S. Dep't of Navy* v. *FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.).   It covers "any sum of money collected for the government." *Ring* v. *Maxwell*, 58 U.S. 147, 148 (1854); accord *Republic Nat'l Bank of Mia.* v. *United States*, 506 U.S. 80, 93 (1992).

The Appropriations Clause is an important way that the Constitution entrusts the "difficult judgments" to Congress.   *Richmond*, 496 U.S. at 428.   Congress is thought to be motivated by the "common good," rather than the "individual favor" that "Government agents" might use to decide an issue.   *Id.*   Appropriations power also provides Congress "a controlling influence over the executive power."   2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 530, at 14 (1833).   Even with "independent" agencies like the SEC, "[s]ubjecting any regulatory agency to the congressional appropriations process places constraint on that agency." Conrad Z. Zhong, *A New Way to Fund the Consumer Financial Protection Bureau*, 18 U.C. DAVIS BUS. L.J. 1, 18 (2017).

10

Attaching the spending power directly to Congress—including power over agencies' budgets—makes the federal government more accountable to the States. Yet the accountability dilutes as agencies seize more independent spending power. That's because, "[u]nlike Congress, administrative agencies are clearly not designed to represent the interests of States." *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 908 (2000) (Stevens, J., dissenting). Rather, the "'political safeguards' that give [S]tates a voice in Congress's lawmaking do not give [S]tates the same voice in the executive branch's activities." Charles Davant IV, *Sorcerer or Sorcerer's Apprentice?: Federal Agencies and the Creation of Individual Rights*, 2003 WIS. L. REV. 613, 640 (2003); see also, *e.g.*, Jack W. Campbell IV, *Regulatory Preemption in the* Garcia/Chevron *Era*, 59 U. PITT. L. REV. 805, 832 (1998). On the other hand, "Congress can be relied upon to respect the States." Calvin R. Massey, *The Tao of Federalism*, 20 HARV. J.L. & PUB. POL'Y 887, 891 (1997). At least in part because they come to Washington from local communities, "[m]embers of Congress are more responsive to … local regional concerns than centralized regulatory agencies." Jonathan H. Adler, *The Ducks Stop Here? The Environmental Challenge to Federalism*, 9 SUP. CT. ECON. REV. 205, 221 (2001).

Tracing accountability back to States in this way produces many positive benefits. For example, agencies may be "too quick" to "displace state law" precisely "because, unlike Congress, agencies are not accountable directly to the States." Amanda Frost, *Judicial Review of FDA Preemption Determinations*, 54 FOOD & DRUG L.J. 367, 368 (1999). The Appropriations Clause supplies a fiscal prophylactic—if agencies overreach, States can speak up, and Congress can hit their pocketbook. Or States might be more aggressive, convincing Congress to

11

attach appropriations riders that "single out a specific regulatory activity and prohibit the expenditure of funds for carrying [it] out." Jack M. Beermann, *Congressional Administration*, 43 SAN DIEGO L. REV. 61, 85 (2006). Congressional *in*action in the appropriations process can likewise check an agency—an especially important constraint during times of political polarization and deadlock. See Gillian E. Metzger, *Agencies, Polarization, and the States*, 115 COLUM. L. REV. 1739, 1749-50 (2015).

In sum, dollars become "the keys to the door of everything." Eloise Pasachoff, *The President's Budget As A Source of Agency Policy Control*, 125 YALE L.J. 2182, 2185 (2016) (describing how budget control constrains agencies); accord ROBERT E. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 674-75 (1972) (explaining that congressional control over an agency's finances is "[t]he most constant and effective control"). The "appropriations monopoly" lets Congress control "agencies by altering total funding, targeting specific programs through earmarks and riders, and using signals and threats." Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 HARV. L. REV. 1822, 1825 (2012).

States can make the pitch for any of these measures. And they are not abstractions—the appropriations process affords States concrete opportunities to influence agency operations that wouldn't otherwise exist. See, *e.g.*, Laura E. Dolbow, *Agency Adherence to Legislative History*, 70 ADMIN. L. REV. 569, 579-80 (2018) (explaining how the appropriations process provides an "effective oversight technique" for agencies).

Passing a budget is necessarily complex: every year the President proposes a detailed budget; relevant

12

committees in the House and Senate hold hearings, make sub-allocations, adopt amendments, and report budget bills out to the chambers; the bills are considered on the House and Senate floors (where members can offer further amendments); the bills are conferenced; and both chambers eventually agree to the complete budgetary package, which the President signs.  See JAMES V. SATURNO, ET AL., CONG. RSCH. SERV., R42388, THE CONGRESSIONAL APPROPRIATIONS PROCESS: AN INTRODUCTION 2-9 (2016).  Each of these steps is a genuine invitation for the States to get involved. Congress's "institutional design" allows for extensive participation by legislators from *all* States.  Mathew D. McCubbins & Daniel B. Rodriguez, *Canonical Construction and Statutory Revisionism: The Strange Case of the Appropriations Canon*, 14 J. CONTEMP. LEGAL ISSUES 669, 697 (2005). And the deliberative way in which the budget wends through Congress gives States plenty of people to speak to, helping to ensure that their interests are heard.

The States have used this process to shape agency behavior many times.  For example, in 2016, lawmakers from West Virginia and Ohio looked to the appropriations process to voice their displeasure with the Department of Interior's Office of Surface Mining.  See Daniel Bloom, *GOP Lawmakers Threaten Appropriations for Surface Mining Office*, CQ ROLL CALL (Mar. 23, 2016), 2016 WL 1127891.  Another: "Florida and other coastal [S]tates" sought "appropriation restrictions" to restrain Interior from leasing in "certain environmentally sensitive areas" of the outer continental shelf.  Edward A. Fitzgerald, *The Seaweed Rebellion: Florida's Experience with Offshore Energy Development*, 18 J. LAND USE & ENVT'L L. 1, 18 (2002).  The appropriations process has "historically been a source of pressure" on the Forest Service, too, from

13

"timber-producing states" favoring more timber production.  Eric Biber, *Too Many Things to Do: How to Deal with the Dysfunctions of Multiple-Goal Agencies*, 33 HARV. ENVT'L L. REV. 1, 28 (2009).  The examples are many, but the point is the same:  Congress stands up for state interests through the appropriations process.

Finally, the appropriations process also provides key information to help States influence agency actions in less direct ways.  For instance, when an agency launches a new enforcement initiative or substantial rulemaking effort, it will likely need to detail its anticipated work publicly to secure the funding to support it.  See McCubbins & Rodriguez, *supra*, at 702 (describing how the appropriations process is "probably more" transparent than "any other legislation").  Disclosure on the front end of the appropriations process can empower affected parties—including the States—to take quick, responsive actions beyond lobbying their representatives (such as suing to stop illegal action, if need be).  But an agency free from the appropriations process can keep critical information out of public view for as long as possible.  As a result, broader enforcement initiatives may become hard to spot until the pattern emerges.  Even rulemakings may lack the transparency that the appropriations process offers, as "many substantive policy decisions happen before the agency publishes the notice of proposed rulemaking."  Jennifer Nou & Edward H. Stiglitz, *Strategic Rulemaking Disclosure*, 89 S. CAL. L. REV. 733, 743 (2016).

So for States, the Appropriations Clause stands as more than just an amorphous constitutional concept.  It serves a critically necessary purpose by giving States insight into agency action and a meaningful way to respond to it.

14

**B.** The question presented is a high-stakes matter because the CFPB's funding structure offers none of the benefits of the ordinary appropriations process. See Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 GEO. WASH. L. REV. 856, 888 (2013) ("The CFPB is insulated from the most effective means of Congressional oversight: annual budgetary appropriations.").

States cannot participate through committee work because the CFPB's hundreds of millions of dollars in funding is "not … subject to review by the Committees on Appropriations of the House of Representatives and the Senate." 12 U.S.C. § 5497(a)(2)(C). As long as the Bureau stays under the statute's automatic funding cap (and it always has), and as long as Congress does not revise the Bureau's enabling statute wholesale, then the CFPB's funding will never reach the floor of Congress because it enjoys a perpetual annual appropriation. The Bureau provides a few minimal reports to the Office of Management and Budget, but it need not "consult with or obtain the consent or approval" of the OMB before it does anything. *Id.* § 5497(a)(4)(E). Instead, the CFPB Director must determine only that funds are "reasonably necessary to carry out the authorities of the Bureau," and the Federal Reserve (which is itself funded by non-appropriated monies levied from banks) *must* transfer those funds. *Id.* § 5497(a)(1). They then become "immediately available" to the Bureau and remain ready until the agency spends them. See *id.* § 5497(c)(1). They are held not by Treasury but in a separate account at a Federal Reserve bank. *Id.* § 5497(b)(1); see also, *e.g.*, *Lewis* v. *United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) (explaining that Federal Reserve banks are "independent, privately owned and locally controlled corporations"). And aside from that ordinary operating fund, the CFPB

15

maintains a separate, unsupervised slush fund where it funnels hundreds of millions of dollars in civil penalties. See 12 U.S.C. § 5497(d)(2).

Thus, the CFPB is its own appropriator. The approach is an anomaly. See, *e.g.*, Charles Kruly, *Self-Funding and Agency Independence*, 81 GEO. WASH. L. REV. 1733, 1735 (2013) ("Congress has utilized self-funding in only a limited number of 'narrowly-focused' independent agencies."). It was also intentional: The Bureau's champions thought this structure would prevent it from being "compromised by political maneuvering." 156 Cong. Rec. S4140 (2010) (statement of Sen. Dodd). Others might call this "maneuvering" "oversight" and "input." Either way, because of the CFPB's structure, accountability and transparency will fall by the wayside. "[S]elf-funding … effectively makes the agency accountable to nobody." Thomas Arning, *The Consumer Financial Protection Bureau: A Novel Agency Design with Familiar Issues*, 24 FORDHAM J. CORP. & FIN. L. 153, 169 (2018).

The result? "[T]here is minimal leverage that Congress," and by extension the States, "can bring to bear to influence the agency." Roberta Romano, *Does Agency Structure Affect Agency Decisionmaking? Implications of the CFPB's Design for Administrative Governance*, 36 YALE J. ON REG. 273, 299 (2019) (explaining that the CFPB is the most insulated agency among those with similar regulatory objectives). The States and the public must depend on voluntary disclosures and a couple semi-annual reports to learn what the agency is up to. But relying on a self-interested CFPB to do the right thing is a "curious assumption," especially when the Bureau has "lack[ed] transparency in much of its decision-making." Adam C. Smith & Todd Zywicki, *Behavior, Paternalism, and Policy: Evaluating Consumer Financial Protection*,

16

9 N.Y.U. J.L. & LIBERTY 201, 236-37 (2015); see, *e.g.*, Press Release, CFPB, CFPB Invokes Dormant Authority to Examine Nonbank Companies Posing Risks to Consumers (Apr. 25, 2022), https://bit.ly/3Fzl5fQ (announcing, after a decade of silence, that the agency was examining "nonbank financial companies"); Letter from Rep. Patrick McHenry, H.R. Comm. on Fin. Servs., Republican Leader, et al. to Rohit Chopra, Director of the CFPB, at 2 (Sept. 20, 2022), https://bit.ly/3PaEYwK (listing various CFPB "initiatives" that "circumvented" Congress and undermined "transparency and accountability").

Indeed, freed from fear of budgetary consequences, the CFPB has repeatedly shown itself indifferent to oversight from just about anyone.

In testimony before Congress, for instance, the CFPB's first director responded, "Why does that matter to you?" when a congressperson asked who had authorized hundreds of millions in renovation costs for the Bureau's headquarters. See H.R. Comm. on Fin. Servs., *Committee Pushes for Accountability and Transparency at the CFPB*, YOUTUBE, at 3:33:19 (Mar. 6, 2015), http://bit.ly/3Y6p9eJ. Another time, the same director refused to *touch* a binder of documents legislators had prepared—let alone review them—when Congress tried to probe into regulatory failures at Wells Fargo. H.R. Comm. on Fin. Servs., *Wagner Questions CFPB Director Richard Cordray*, YOUTUBE, at 1:16 (Apr. 10, 2017), http://bit.ly/3iIxAwy. Later, another director told the House Financial Services Committee that he could "twiddle [his] thumbs while you all ask questions" because the CFPB is "not accountable to anybody but itself." Jim Puzzanghera, *CFPB Chief Mick Mulvaney Says He Could Just 'Twiddle My Thumbs' Before Congress To*

17

*Highlight Agency's Flaws*, L.A. TIMES (Apr. 11, 2018, 11:55 a.m.), http://bit.ly/3PaQJ6o.

Members of Congress have also been forced—repeatedly—to send the Bureau letters complaining about the inadequacy of its responses to budget-related and other requests.  See, *e.g.*, Letter from Rep. Randy Neugebauer, Chairman, H.R. Comm. on Fin. Servs., Subcomm. on Oversight and Investigations, et al. to Richard Cordray, Dir., CFPB, at 1 (May 2, 2012), https://bit.ly/3uHWEX9; Letter from Sen. Rob Portman, et al. to Richard Cordray, Dir., CFPB, at 1 (Oct. 30, 2013), https://bit.ly/3uFK0rT; Letter from Sen. Mike Enzi, Chairman, S. Budget Comm. & Richard Shelby, Chairman, S. Comm. On Banking, Hous. & Urban Affairs to Richard Cordray, Dir., CFPB, at 1 (Mar. 9, 2015), https://bit.ly/3Fx3gwP.  Even Senator Elizabeth Warren has lamented that her brainchild "ignored congressional mandates" and operated as a "politicized rogue agency" when it fell under the control of a political opponent.  Elizabeth Warren, *Republicans Remain Silent As Mulvaney's CFPB Ducks Oversight*, WALL ST. J. (Mar. 28, 2018, 5:48 p.m.), https://bit.ly/3Bh6lQg.

Nor is Congress the only one to note the CFPB's truculence.  In one case, a district court sanctioned the Bureau after it produced non-responsive discovery responses and deposition testimony and "put up as much opposition as possible at every turn."  Order at 21, *CFPB v. Universal Debt Solutions, LLC*, No. 1:15-cv-00859 (N.D. Ga. Aug. 25, 2017), ECF No. 436.  Even this case has shown the CFPB's indifference to outside concerns.  After the Fifth Circuit's decision, West Virginia's Attorney General wrote the Bureau to ask how it intended to respond.  Letter from Patrick Morrisey, Att'y Gen., W. Va. to Rohit Chopra, Dir., CFPB (Oct. 24, 2022),

18

https://bit.ly/3uGG1ew.  The Bureau returned with silence.  In the States' experience, agencies commonly offer at least a pro forma response to letters like these.  The Bureau could not be bothered.

In short, the Appropriations Clause must be given real respect if Congress and the States are to have any meaningful voice in agency decisions that affect the nation's economic security and the day-to-day lives of millions of American consumers.  The Court should grant the Petition, affirm the decision below, and make it so.

## III.    The Decision Below Is Correct.

In fighting to preserve its extraordinary funding scheme, the Bureau mostly attacks the Fifth Circuit's decision.  See Pet.11-27.  But the Fifth Circuit got it right.

This case starts and ends with the text of the CFPB's funding statute.  That statute expressly provides that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies."  12 U.S.C. § 5497(c)(2).  A separate section then describes the "[a]uthorization of appropriations" that is triggered if the Bureau needs more than 12% of the Federal Reserve's operating costs for its own budget.  *Id.* § 5497(e).  Only those funds—which the Bureau has never sought—are subject to the protections that ordinarily apply to congressional spending.  *Id.* Leaving no doubt, Congress set down in the Code that the Bureau's regular funding is not "subject to review" by the congressional appropriations committees.  *Id.* § 5497(a)(2)(C).

So Congress did not intend for the Bureau's ordinary operating budget to be treated as an appropriation.  And the Court "give[s] effect to the text that 535 *actual*

19

legislators (plus one President) enacted into law." *SAS Inst., Inc.* v. *Iancu*, 138 S. Ct. 1348, 1359 (2018) (emphasis in original).

Citing a government treatise, the Bureau mistakenly insists that the statute's language "merely exempts those funds from *statutes* that impose limitations on 'the use of all appropriated amounts.'" Pet.19 (quoting GOV'T ACCOUNTABILITY OFF., PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, 2-22 (4th ed. rev. 2016) (emphasis in original)). But that reading would add words to the statute; the Bureau wants the statute to say that the Bureau Fund shall not be "construed to be ... appropriated monies" *for the purpose of statutes*. Aside from Congress, no one—let alone the GAO—can revise a statute that way. *EEOC* v. *Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). The statute offers an unqualified "shall not," employing "the language of command" to instruct courts how to treat Bureau funds for all purposes. *Escoe* v. *Zerbst*, 295 U.S. 490, 493 (1935).

It is even more misguided to shackle a limiting construction to the text when "Congress conspicuously chose [this] broad language" in one part of the statute and used "limiting references" in another. *Salinas* v. *U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 697-98 (2021). Contrast Section 5497(c)(2)—specifying that the Bureau's ordinary funding stream is not "appropriated monies," full stop—with the more targeted Section 5497(e)(3)—which says that any money Congress appropriates apart from Federal Reserve funding *is* "subject to ... restrictions that generally apply to the use of appropriated funds in title 31 and other laws." If the GAO were right about what Congress meant in Section 5497(c)(2), then it would have made much more sense for Congress to use language that tracks Section 5497(e)(3)'s converse statement. It did not.

20

In an oblique cf. citation, the Bureau seems to say that Congress's disclaimer of any appropriation is beside the point because "statutory labels" cannot decide "matters governed by the Constitution." Pet.19 (citing *Lebron* v. *Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995)). But determining what a particular statute does—including whether it appropriates funds—requires evaluating Congress's intent. So of course the Court looks to the language Congress used, as the Court "presume[s]" that Congress "says what it means and means what it says." *Henson* v. *Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (cleaned up). That is why, for instance, the Court closely read the relevant funding statute when it held that Congress had *not* appropriated funds for certain benefits in *Richmond*. See 496 U.S. at 424. And the Bureau's own authority confirms that "Congress has plenary power to give meaning to the [Appropriations Clause]." *Harrington* v. *Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (quoted at Pet.16). Yet the Bureau asks the Court to second-guess Congress's exercise of that "plenary power" and set aside the express words it wrote into Section 5497(c)(2).

The Bureau also suggests that the Court has already rejected a similar Appropriations Challenge on its merits. See Pet.15-16. False. In *Cincinnati Soap Co.* v. *United States*, 301 U.S. 308, 321 (1937), the Court found the Appropriations Clause was "without significance" because the monies at issue had never left the "Treasury of the United States." Thus, the appropriations question was "premature." *Id.* The Court did not, as the Bureau says, reach the merits of the claim in any way—not even in dicta. Quite the opposite: the Court indulged the possibility that "Congress ha[d] not made an appropriation" and explained that "it [could] still do so."

21

*Id.* But here the CFPB has spent billions in Treasury funds. *Cincinnati Soap* is irrelevant.

The Bureau ultimately devotes much of its Petition to purported customs and practices surrounding appropriations that it thinks are consistent with the Bureau's structure. Pet.12-15, 17-22. No part of that recitation captures this situation: an agency endowed with substantial power, led by a single Director, indefinitely self-funded through another agency that is itself self-funded, in permanent control of any funds it obtains, and expressly exempted from the usual forms of oversight that come with federal appropriations. That *combination* of features is fatal. See Pet.App.37a. It makes the agency undeniably unique. Markham S. Chenoweth & Michael P. DeGrandis, *Out of the Separation-of-Powers Frying Pan and into the Nondelegation Fire: How the Court's Decision in* Seila Law *Makes CFPB's Unlawful Structure Even Worse*, 8/27/2020 U. CHI. L. REV. ONLINE 55, 60 (2020).

Perhaps—assuming history and practice are the right guide—the better course is to look to the Bureau's own (admittedly short) tenure. Time and again, the CFPB and its defenders have treated the Bureau as functioning without "appropriations." A decade back at its founding, congressional supporters thought "the assurance of adequate funding, independent of the Congressional appropriations process," was "absolutely essential." S. REP. NO. 111-176, at 163 (2010). An early strategic plan similarly touted the Bureau's "full independence" because the agency could operate "outside of the congressional appropriations process." CFPB, CFPB STRATEGIC PLAN: FY2013-FY2017 36 (2013), https://bit.ly/3hiawEm. The Bureau's sparse financial reports celebrate its autonomy, too; the 2022 report described the agency as "an

22

independent, non-appropriated bureau." CFPB, CFPB FINANCIAL REPORT: FISCAL YEAR 2022, at 38 (2022), https://bit.ly/3HwmCVq. And the current director told Congress that the CFPB's "base level of funding" is "guaranteed," and the agency would only be "subject to the normal appropriations process" if it needed to ask Congress for more. *Consumer Financial Protection Bureau Semiannual Report*, C-SPAN (Oct. 28, 2021), https://bit.ly/3iGFC93. In its own words, then, the Bureau has repeatedly conceded that it neither has nor needs any congressionally enacted appropriation. Lacking that element, the Bureau can't rightfully call itself constitutional now.

The only remaining question would then be the remedy. The Fifth Circuit was right to vacate a rule enacted without constitutional funding. "An agency's funding is the very lifeblood that empowers it to act." *CFPB* v. *All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (Jones, J., concurring). And the Bureau does not convincingly explain how severing some provision of Section 5497 could provide it with the "proper appropriation" that is "a precondition to every exercise of executive authority by an administrative agency." *Id.* at 242. So the court appropriately vacated the rule before it. No money, no power.

The Fifth Circuit was right in every regard. The Court should grant the Petition and confirm the Fifth Circuit's reasoning. Otherwise, uncertainty will lurk in the financial markets—and States could well be left standing on the sidelines with little power to do anything but watch the chaos unfold.

23

## CONCLUSION

The Court should grant the Petition.

Respectfully submitted.

PATRICK MORRISEY
   *Attorney General*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
lindsay.s.see@wvago.gov
(304) 558-2021

LINDSAY S. SEE
   *Solicitor General*
   *Counsel of Record*

MICHAEL R. WILLIAMS
   *Senior Deputy Solicitor*
   *General*

GRANT A. NEWMAN*
   *Special Assistant*

*admitted in Michigan;
practicing under supervision of
West Virginia attorneys

*Counsel for* Amicus Curiae *State of West Virginia*

24

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

LESLIE RUTLEDGE
Attorney General
State of Arkansas

TODD ROKITA
Attorney General
State of Indiana

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
State of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

JOHN M. O'CONNOR
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARK VARGO
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
State of Virginia