FILED
2023 MAR 10 PM 1:05
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC., et al.,<br><br>Defendants. | **ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>Case No. 2:19-CV-00298-BSJ<br><br>District Judge Bruce S. Jenkins |

## INTRODUCTION

This matter is presently before the court on a Motion for Partial Summary Judgment filed by Plaintiff, the Bureau of Consumer Financial Protection.[1] The court also considered the factual record set forth in the Motion for Partial Summary Judgment filed by Defendant John C. Heath, P.C. d/b/a/ Lexington Law (hereinafter "Heath" or "Lexington Law"),[2] and the Motion for Summary Judgment filed by Defendants Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., EFolks, LLC, and Creditrepair.com, Inc (hereinafter, collectively "Progrexion").[3] The court previously denied both of Defendants' motions without prejudice.[4]

## FACTUAL BACKGROUND

According to Progrexion's September 2014 memorandum seeking a $280,000,000 loan, Progrexion, "through its Lexington Law and CreditRepair.com brands, is the dominant provider

---

[1] ECF No. 257.
[2] ECF No. 171.
[3] ECF No. 288.
[4] *See* ECF No. 287; ECF No. 403.

of credit repair services to consumers in the United States."[5]  Progrexion and Heath market and

sell Lexington Law and CreditRepair.com services over the telephone through inbound and

outbound interstate telephone calls.[6]  While the exact path a customer follows to find Progrexion

and Lexington Law varies, the "vast majority" initially contact a Progrexion agent by calling a

telephone number listed on the internet or some other form of advertisement.[7]  At various times

during the relevant period, Progrexion's website has touted its past results for clients in various

ways.  In a July 2021 entry, the website claimed: "89% of Past Lexington Law clients who saw a

credit score increase had an average of 40 points in six months."[8]  Some portion of customers are

transferred to Progrexion via outside marketing contractors, referred to as "hotswap" partners.[9]

These hotswap partners, who market via inbound and outbound telephone calls, claim to help

people obtain loans or rent-to-own homes.[10]  The hotswap partners then tell prospective

customers that they need to work with Lexington Law to improve their credit to obtain better

rent-to-own or loan opportunities.[11]  Progrexion has instructed these hotswap partners to

advertise Lexington Law as:

> the number one credit repair company in the nation with 25 years of experience
> helping their clients with their credit.  Their clients see an average of 10 negative
> items removed within the first few months.  They can help remove negative items
> like late payments, charge-offs, bankruptcies, and more.  Our clients have seen
> really great results with their services and we have been able to move forward

---

[5] Conf. Info. Mem. at 16 (ECF No. 321, Ex. 5).
[6] Pl.'s Mot. Partial Summ. J. at 9 (ECF No. 257); *see* Def.'s Opp. at 7.
[7] Mots. Hr'g 76:4–23 (Aug. 9, 2022).
[8] Exhibit 24 at DelPonti 0000365 (ECF No. 257, Ex. 9 at 10).
[9] *Id.* at 74:21–75:13.
[10] *See* Progrexion Mot. Summ. J., Exs. 18–21 (ECF No. 292, Ex. 16–19).
[11] *See id.*

with home ownership with those clients once they reach the credit scores needed.[12]

Once the customer agrees to work with Lexington Law, the hotswap partner then patches an agent of Progrexion/Lexington Law into the customer call before the hotswap agent disconnects.

Regardless of the path followed, customers are eventually connected, by direct dial or transfer to Lexington Law or CreditRepair.com.  During the initial phone call to CreditRepair.com, the customer speaks to a Progrexion agent about their free credit report summary and whether any of the information should be challenged as potentially incorrect.[13] Even if the customer calls the number for Lexington Law or is transferred via hotswap to Lexington Law, a Progrexion agent answers the telephone and completes this same process.[14]

Once connected to the Progrexion agent, the customer is offered, for a fee, a full credit report from TransUnion.[15]  The customer and the Progrexion agent then discuss the customer's full credit report and the various items on it.[16]  Based on that conversation, the Progrexion agent offers Lexington Law or CreditRepair.com's services to the customer, and provides the customer a contract that spans over twenty pages.[17]  A portion of that contract states: Lexington [or Creditrepair.com] cannot guarantee and you are not paying for a particular credit report outcome or result; you are paying only for Lexington's [or Creditrepair.com's] efforts on your behalf."[18]

---

[12] Progrexion Mot. Summ. J., Ex. 20 (ECF No. 292, Ex. 18).
[13] Mots. Hr'g 77:23–78:12 (Aug. 9, 2022).
[14] Final Pretrial 56:16–23, 59:14–23 (June 29, 2022).
[15] *Id.* at 57:8–23.
[16] *Id.* at 59:14–23.
[17] *Id.* at 33:8–25; *see, e.g.*, CreditRepair.com Engagement Agreement (stating terms of engagement with CreditRepair.com).
[18] Lexington Law Engagement Agreement at 5 (ECF No. 278, Ex. 5); CreditRepair.com Engagement Agreement at 4 (ECF No. 278, Ex. 20).

If the customer agrees to the contract terms, the Progrexion agent inputs the customer's information. After a written credit report is obtained, and a written contract with all of its exceptions and exclusions executed, a conversation is held with the client and the telephone operator. Based on answers obtained by the Progrexion telephone operator, a letter to a creditor, or an electronic communication to a credit bureau, is automatically written from a reservoir of examples.[19] The letters are signed in the name of the client, not in the name of Lexington Law or its agents.[20] At this point, no lawyer has reviewed the client's case file, nor the client-specific letter before it is sent out.[21] The software program that creates the letters is owned by Progrexion, not the law firm, Heath.[22]

Lexington Law customers only speak to an attorney if the customer expressly requests it.[23] In the absence of a specific request, letters are sent out on the client's behalf without the customer ever speaking to an attorney (and only a "very small percentage" specifically request to speak to an attorney).[24] The vast majority of Lexington Law customers only ever speak to a Progrexion telephone operator.[25] Nonetheless, Defendants suggest that these automated letters constitute legal services only for Lexington Law but not for CreditRepair.com.[26]

---

[19] Mots. Hr'g 165:15–167:2 (Aug. 9, 2022); Mot. Hr'g 49:11–53:7 (Mar. 11, 2022); Final Pretrial 85:14–25, 87:11–88:18 (June 29, 2022).
[20] Mot. Hr'g 48:12–49:3 (Mar. 11, 2022).
[21] Final Pretrial 88:14–90:1 (June 29, 2022).
[22] Final Pretrial 41:7–42:8, 50:21–51:5, 83:3–16, 96:13–23 (June 29, 2022).
[23] Id. at 34:16–24.
[24] Id. at 35:10–36:11; Mots. Hr'g 167:7 (Aug. 9, 2022).
[25] Final Pretrial 40:19–41:6, 56:16–23 (June 29, 2022); Final Pretrial 156:6–19 (June 30, 2022); Mot. Hr'g 36:8–38:17 (Mar. 11, 2022).
[26] Mots. Hr'g 86:24–88:3 (Aug. 9, 2022).

The software program continues to send letters each month, automatically, at a rate determined by the price a customer pays for their plan.[27]  While Defendants initially suggested their experience suggested sending a small number of challenges per month to be a superior strategy, they ultimately conceded the volume of letters is dictated by the price a customer pays.[28]  Generally, more letters are sent for customers who pay a higher price.[29]  While Defendants bill at the end of each month, the service contracts are indefinite, having no set termination date, persisting until a customer affirmatively terminates the agreement (except in jurisdictions that limit contract lengths to some maximum term, such as six months).[30] Progrexion bills Lexington Law's clients by charging their credit card each month; no invoice is ever sent.[31]  The money is then deposited into an account in the name of Lexington Law, but the account is ultimately controlled by Progrexion ASG employee, Jared Hartley.[32]  Progrexion owns the trademark for Lexington Law, which attorney John Heath licenses from Progrexion.[33]

In 2021 Lexington Law paid $135,242,433 to Progrexion Marketing for marketing services, paid $85,166,822 to Progrexion Teleservices for telemarketing services, paid $128,076,546 to Progrexion IP to license software, and $41,051,665 to Progrexion ASG for billing and "back office" services.[34]  As a result of these payments, Lexington Law paid 82.7%

---

[27] *Id.* at 164:24–166:3; *see* Service Feature Matrix (ECF No. 258, Ex. 2).
[28] Mots. Hr'g 83:3–9 (Aug. 9, 2022) ("THE COURT: Well, I'm interested in your use of the word more effective. If I've got 12 possibilities, why shouldn't I have 12 sent the first letter with the algorithm demonstrating that I've got 12 good shots? MR. BENNETT: So you haven't paid to send 12 is the most likely answer to that.")
[29] *See* Service Feature Matrix (ECF No. 258, Ex. 2).
[30] Final Pretrial 20:2–14 (Sept. 21, 2022).
[31] Mot. Hr'g 23:21–24:67 (Jan. 13, 2022); Final Pretrial 46:5–25 (June 29, 2022).
[32] Final Pretrial 49:4–22, 79:1–8 81:14–23 (June 29, 2022).
[33] Mot. Hr'g 28:6–18, 45:21–25 (Jan. 13, 2022).
[34] Final Pretrial 115:3–116:17 (June 29, 2022); Mot. Summ. J. at 9; *see* Opp. at 7.

of its total revenue to Progrexion entities.[35]  Through May of 2022, Lexington Law paid 84.5%

of its total revenue to Progrexion Entities.[36]

## ANALYSIS

Plaintiff seeks partial summary judgment, asking the court to find that Defendants have

violated the advance-fee provision of the Telemarketing Sales Rule ("TSR"), found at 16 C.F.R.

§ 310.4(a)(2), beginning on March 8, 2016, and continuing through the present date.  Plaintiff

leaves the question of damages for this asserted violation for another day.[37]  The court will first

discuss application of the cited provision to Defendants' business before examining whether

Defendants have violated the provision.

### I.     Heath and Progrexion are subject to the Telemarketing Sales Rule because they provide services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating

Defendants are subject to the advance-fee provision of the Telemarketing Sales Rule

("TSR"), which states: It is an abusive telemarketing act . . . to . . . "[r]equest[] or receiv[e]

payment of any fee or consideration for . . . services represented to remove derogatory

information from, or improve, a person's credit history, credit record, or credit rating until [two

conditions, discussed below, are met]." 16 C.F.R. § 310.4(a)(2).  The parties agree Defendants

are telemarketers within the meaning of the TSR.[38]  When making a related argument addressed

below,[39] Defendants' counsel made comments that appear to deny that Defendants offer services

"represented to remove derogatory information from, or improve, a person's credit history, credit

---

[35] Final Pretrial 146:1–10 (June 29, 2022).
[36] *Id.* at 146:4–10.
[37] ECF No. 257 at 1–2.
[38] Final Pretrial 15:13–17 (Sept. 21, 2022).
[39] *See infra* Part II.b.

record, or credit rating."[40]  Any such argument is contrary to the undisputed facts, including

express statements on Lexington Law's website and statements Progrexion made when it

solicited investor funds.

First, the undisputed facts set forth by Plaintiff, which Defendants did not contest,

indicate that "Heath offers credit repair services for a fee." [41]  Also, according to Lexington

Law's website: "Credit repair is the process of improving a poor score by addressing or

removing negative items that could be listed on your reports inaccurately."[42]  "To remove a

negative item, credit reporting agencies require you to work through their complicated online

systems and send a series of formal dispute letters.  To make the disputing process easier,

Lexington Law can identify and challenge questionable negative items on your behalf using our

patented credit repair process."[43]  "Our credit repair service[] levels range from $89.85 to

$129.95 and each option offers you a unique coverage to fix errors on your credit report."[44]

"Our credit repair services are designed to help those who are most in need of negative item

removals from their reports."[45]  Similarly, "Progrexion markets Lexington Law as 'the industry

leaders in credit repair'"[46] and instructed at least one hotswap partner to describe Lexington Law

as "the number one credit repair company in the nation . . . [whose] clients see an average of 10

negative items removed within the first few months . . . [including] negative items like late

---

[40] *See, e.g.*, Mot. Hr'g 68:2–5 (March 11, 2022).
[41] Pl.'s Mot. Summ. J. at 11 (ECF No. 258); *see* Def.'s Opp. at 7 (ECF No. 277); Final Pretrial 119:16–121:4 (June 29, 2022); Mot. Partial Summ. J., Ex. F5 (ECF No. 171, Ex. 12).
[42] Pl.'s Mot. Summ. J. at 11; *see* Def.'s Opp. at 7–8; *see* Mot. Partial Summ. J., Ex. F5 (ECF No. 171, Ex. 12).
[43] Mot. Partial Summ. J., Ex. F5 (ECF No. 171, Ex. 12).
[44] *Id.*
[45] *Id.*
[46] Pl.'s Mot. Summ. J. at 11; *see* Def.'s Opp. at 8.

payments, charge-offs, bankruptcies, and more."[47]  Thus, based on the undisputed facts and

Defendants' own statements, they offer services represented to remove derogatory information

from, or improve, a person's credit history, credit record, or credit rating.

Additionally, Progrexion represented to investors that Progrexion, though Lexington

Law and otherwise, provides a "service . . . to improve a customer's credit history and ultimately

his or her credit score."[48]  Specifically, PGX Holdings, Inc. represented it:

> through its Lexington Law and CreditRepair.com brands, is the dominant provider
> of credit repair services to consumers in the United States.  The company's
> technology-enabled, highly scalable service offerings provide a comprehensive
> approach to improving a customer's credit history and ultimately his or her credit
> score.  The services facilitate a consumer's ability to remove unfair, inaccurate
> and unsubstantiated items from his or her credit report and offer customized
> guidance and information on the ways in which credit scores can be improved.
> Over its 15+ year history, the Company has proven that its services provide a
> compelling customer value proposition by improving the accuracy of its
> customers' credit histories and ultimately enhancing their access to loans,
> employment, insurance and housing.[49]

Accordingly, the undisputed factual record demonstrates Progrexion and Heath offer

services represented to remove derogatory information from, or improve, a person's

credit history, credit record, or credit rating.

## II.    Defendants do not comply with the advance-fee provision of the TSR

The court will first discuss the advance-fee provision of the TSR, as the parties appeared

to disagree about its meaning in their briefing.  The court will then discuss Defendants'

failure to comply with the provision.

---

[47] Progrexion Mot. Summ. J., Ex. 20 (ECF No. 292, Ex. 18).
[48] Conf. Info. Mem. at 16 (ECF No. 321, Ex. 5).
[49] *Id.*

8

### a. The express language of the advance-fee provision of the TSR provides two prerequisites for payment imposed upon telemarketers selling credit improvement services

At the outset, it is helpful to review the language and structure of advance-fee provision of the TSR, which states:

> (a) Abusive conduct generally.  It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> ...
>
> > (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:
> >
> > > (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and
> > >
> > > (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose.

16 C.F.R. § 310.4(1)(2).  The language and structure of the rule demonstrate that it defines, by examples, conduct of telemarketers considered abusive.  Subsection (a) expressly states that conduct described in the numbered subsections to follow constitutes "an abusive telemarketing act or practice."  The rule then provides an example of such conduct, beginning at subsection (2), which states a telemarketer engages in abusive conduct by "[r]equesting or receiving payment" before certain conditions are met.  Finally, the rule lists the payment preconditions in subsections numbered romanettes (i) and (ii).

9

Moreover, even to the extent the plain language is ambiguous, the Discussion of the Rule provided in the Federal Register at the time the Telemarketing Sales Rule was implemented on August 23, 1995, clarifies the intended meaning of the advance-fee provision. The Discussion of the Rule states:

> This section of the Final Rule states that, in selling any goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating, a seller or telemarketer is prohibited from requesting or receiving payment of any fee or consideration until two events occur. First, the time frame within which the seller has represented that all of the goods or services will be provided to the purchaser must have expired. Second, the promised results must have been achieved. In order to ensure the achievement of the promised results, the Final Rule requires the seller to provide the purchaser with a consumer report from a consumer reporting agency that was issued more than six months after the results were achieved.

Telemarketing Sales Rule, 60 FR 43842-01 (footnotes omitted). Accordingly, the advance-fee provision of the TSR prohibits requesting or receiving payment until the prerequisites listed in romanettes (i) and (ii) are met.

While one may think the rule may have need for improvement, it says what it says, and the agency or the Congress are in a position to exercise the power to improve. The court is not.

### b. The undisputed facts show Defendants violate the TSR because they make no attempt to comply with the express payment preconditions

Turning to romanette (ii), it is an abusive telemarking act or practice to request or receive any fee or consideration until: "The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." 16 C.F.R. § 310.4(a)(2)(ii).

Here, it is undisputed that Heath (doing business as Lexington Law) charges fees to clients on a monthly basis, without waiting six months and without providing a consumer report at the six-month mark showing results have been achieved. Heath's Second Supplemental Response to Plaintiff's Requests for Admission states: "Heath PC admits that it has had a routine practice of charging Customers for credit repair services on a monthly basis for services already provided since March 8, 2016."[50] Similarly, Creditrepair.com's Second Supplemental Response to Plaintiff's Requests for Admission states: CreditRepair.com admits that it has had a routine practice of charging members for credit repair services on a monthly basis for services already provided since March 8, 2016."[51] During a pretrial conference, Defendants confirmed that they do not wait six months after providing results before billing clients.[52] Rather, Defendants bill at the end of each month, indefinitely, until a customer affirmatively terminates the agreement (or the agreement expires, in those states prohibiting indefinite contracts).[53] These month bills violate the express language of the advance-free provision.

Defendants advance a creative argument, insisting that they are excused from compliance with the advance-fee provision because they offer no promised results, or "any result whatsoever" to their customers.[54] While creative, the court finds the argument unpersuasive, even assuming Defendants do not promise any results (this assumption is, of course, contradicted

---

[50] ECF No. 258, Ex 25 at 6.
[51] ECF No. 258, Ex. 26 at 3.
[52] Final Pretrial 43:23–44:4 (Sept. 21, 2022).
[53] Final Pretrial 20:2–14 (Sept. 21, 2022).
[54] Final Pretrial 9:17–10:2 (Sept. 21, 2022); *see* Mot. Hr'g 82:11–20 (Jan. 13, 2022); Mot. Hr'g 34:6–35:1 (Mar. 11, 2022); Final Pretrial 21:21–22:6 (June 30, 2022).

by Defendants' advertising online and through hotswap partners, as detailed above[55]).  The rule

text does not offer any exception to the six-month waiting period for telemarketers who do not

offer "promised results."  Rather, romanette (ii) of the advance-fee provision assumes that a

telemarketer promises a result of some sort.  This seems a reasonable assumption on the part of

its drafters.  It is reasonable to presume a practice is abusive if that practice consists of charging

a customer money and then offering them no result of any kind in return.  Close examination

reveals the advance-fee provision requires a particular result: one measurable in "a consumer

report from a consumer reporting agency."  Defendants deny that they provide, or are even able

to provide, any such result.  Rather than finding the lack of promised results somehow absolves

Defendants from compliance with the advance-fee provision, the court finds it evidences

Defendants' failure to comply with the advance-fee provision of the TSR.

Finally, Defendants attempt to create a factual dispute that is immaterial.  Defendants

contend that those customers who remain clients for seven months or more might be billed six

months after they have seen results (which Defendants deny they promise) or a report.[56]  While

perhaps facially appealing, this suggestion does not save Defendants.[57]  Romanette (ii) prohibits

Defendants from requesting or receiving payment until they provide a consumer report created

---

[55] *See supra* nn. 8, 12, 42–48.  Nonetheless, the court makes the assumption here, given Defendants are opposing summary judgment.

[56] Defs.' Opp. Pl.'s Mot. Partial Summ. J. at 10 (ECF No. 277).

[57] Defendants' suggestion also implicates romanette (i) of the advance-free provision of the TSR, which prohibits billing until "[t]he time frame in which the seller has represented all of the goods or services will be provided to that person has expired."  16 C.F.R. § 310.4(a)(2)(i).  Further, the Discussion of the Rule published in the Federal Register states: "If any discrepancy exists between various representations by a credit repair seller, the longest time frame represented will determine when payment may be requested or received."  Telemarketing Sales Rule, 60 FR 43842-01 n.117.  Thus, the first month's bill runs afoul of the TSR when customers receive multiple months of service, even without reference to romanette (ii).

six months after "the promised results have been achieved, such report having been issued more than six months after the results were achieved." 16 C.F.R. § 310.4(a)(2)(ii). Providing a customer a consumer report during month seven of their service, indicating some result from month one, does not cure the violation for receiving payment at the end of month one. The consumer has already been billed for month one at the end of month one, without having received the credit report required by the advance-fee provision and without Defendants observing the six-month waiting period. Similarly, customers billed in month seven are being charged for the services rendered in month seven, without Defendants providing any consumer report created six-months after achieving the results of month seven. Moreover, Defendants deny that they promise or achieve results at any time.

## ORDER

Based on the foregoing, the court GRANTS Plaintiff's Partial Motion for Summary Judgment (ECF No. 257). Defendants have violated 16 C.F.R. § 310.4(a)(2) from March 8, 2016, through the present. Consistent with the request in Plaintiff's Motion, the court makes no determination regarding damages.

DATED this 10th day of March 2023.

Bruce S. Jenkins
United States Senior District Judge