**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, <br><br> Plaintiff, <br><br> v. <br><br> PROGREXION MARKETING, INC., et al., <br><br> Defendants. | Case No. 2:19-CV-00298-BSJ |

## MOTION TO STAY THE EFFECT OF THE COURT'S MARCH 10, 2023 ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Consistent with the plain language of the regulation and decades of enforcement activity, Defendants submit the Advance Fee Provision ("AFP") of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(a)(2), prohibits credit repair organizations from promising results to their customers and then billing those customers before the expiration of six months after those "promised results" are actually achieved. In a March 10, 2023 Order granting partial summary judgment (the "Order"), the Court ruled that "Defendants have violated [the AFP] from March 8, 2016, through the present" not because they "promised results" and billed clients too soon, but reasoning instead that "*the lack of promised results*" somehow "evidences Defendants' failure to comply with the" AFP. Order at 12–13 (emphasis added). Respectfully, that conclusion was error.

Unlike a typical interlocutory event, however, the Order is "injunctive in practical effect," *Hutchinson v. Pfeil*, 105 F.3d 566, 569 (10th Cir. 1997) (quoting 9 *Moore's Fed. Prac.* ¶ 110.21(1) (2d ed. 1996)), because the fact of the Order's issuance potentially exposes Defendants

to aggravated penalties of up to $1.3 million per defendant per day[1] and contempt sanctions if they continue "[r]equesting or receiving payment" from their clients any sooner than six months after demonstrating some undetermined "result" on the client's credit report, 16 C.F.R. 310.4(a)(2); Order at 12.  And the Court already has acknowledged the practical effect of attempting to comply with the rule it announced: "If you have to wait for six months to send somebody a bill, you are not in business very long."  Dec. 13, 2019 Tr. at 37: 13–14.  Absent a stay, the Order strands Defendants between the Scylla of potential multi-billion dollar enhanced penalties and the Charybdis of insolvency and dissolution.

Because the Order is functionally injunctive and compliance would cause imminent, irreparable harm, Defendants have noticed an appeal to the Tenth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(a)(1).  *See Hutchinson*, 105 F.3d at 569 (10th Cir. 1997) ("[I]n the case of orders that do not, as a technical matter, grant or refuse an injunction, but are injunctive in practical effect, . . . appealability depends on the threat of [imminent] 'serious, perhaps irrevocable, harm.'" (quoting 9 *Moore's* ¶ 110.20(1) (first brackets added, second brackets in original)).  If Defendants were to cease all billing to comply with the Order, within a matter of days the harm suffered would become incurable: Defendants would go out of business, their employees and officers would be gone, their client relationships would be severed, their sources of capital would evaporate, and their reputations would be indelibly stained.[2]  And there would

---

[1] *See* CFPB Br., *CFPB v. CashCall, Inc.*, No. 18-55407, Doc. 20 at 11, 49–50 (9th Cir. Oct. 19, 2018) (arguing the existence of enforcement actions and a court ruling outlawing the defendant's practices justified an increased penalty assessment because it indicated their subsequent violations were committed with an aggravated mental state).  In 2023, the maximum tier 2 ("reckless") penalty is $34,065 for every day a violation is ongoing and a tier 3 ("knowing") penalty is $1,362,567 per day.  12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1(a).  By the Bureau's reasoning, noncompliance with the Order could cost Defendants more than $1 million per day.

[2] *See, e.g.*, Mark Maurer, *Arthur Andersen's Legacy, 20 Years After Its Demise, Is Complicated*, Wall Street J. (Aug. 31, 2022), *available at* https://on.wsj.com/3ypmilB (prominent accounting

be no Defendants left to vindicate their appeal rights. The Court should stay the effect of the Order pending the Tenth Circuit's disposition of Defendants' appeal.

Meanwhile, only months ago, the Fifth Circuit Court of Appeals held that, due to its irregular funding structure, the Bureau "lack[s] the wherewithal to exercise [its] power via constitutionally appropriated funds." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 643 (5th Cir. 2022) (*cert. granted*, S. Ct. Dkt. 22-448 (Feb. 27, 2023) ("*Community Financial*"). As a result of that ruling, the Bureau is a legal nullity in a wide swath of the country, and courts within the Fifth Circuit and elsewhere have stayed enforcement actions altogether pending the Supreme Court's resolution of *Community Financial*—sometimes at the Bureau's own request. *CFPB v. Rosen*, No. 21-cv-7492, ECF No. 123 (C.D. Cal. Jan. 3, 2023) (stay granted over Bureau's opposition); *CFPB v. MoneyGram Int'l, Inc.*, No. 22-cv-3256, ECF No. 52 (S.D.N.Y. Dec. 9, 2022) (same); *CFPB v. Populus Fin. Grp., Inc.*, No. 22-cv-1494, ECF No. 30 (N.D. Tex. Dec. 5, 2022) (stay granted at Bureau's request); *see CFPB v. Active Network, LLC*, No. 22-cv-898, ECF No. 59 (E.D. Tex. Nov. 16, 2022) (same); *CFPB v. FirstCash, Inc.*, No. 21-cv-1251, ECF No. 67 at 2 (N.D. Tex. Nov. 4, 2022) (same); *but see CFPB v. Commonwealth Equity Grp., LLC*, No. 20-cv-10991, ECF No. 93 (D. Mass. Dec. 15, 2022) (motion to stay denied without explanation). A stay of the Order, therefore, is additionally appropriate in light of the ongoing and intensifying unconstitutional harm to Defendants occasioned by the Bureau's prosecution of this case. On March 12, 2023, counsel for Defendants contacted the Bureau to seek consent for this application to stay. The Bureau refused to consent.

---

firm "remains a punchline for many" some 20 years after its collapse even though its criminal conviction was overturned unanimously by the Supreme Court).

**ARGUMENT**

In evaluating whether to stay proceedings pending appeal, courts consider four factors: (1) the appellant's likelihood of success on the merits; (2) the threat of irreparable harm in the absence of a stay; (3) harm to the opposing party; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors weigh in favor of a stay of the Order while the appeal is pending.

## I.   Defendants Are Likely to Succeed on Appeal

First, Defendants are likely to succeed on appeal because the Order squarely rejects the plain language of the AFP. The AFP imposes certain billing requirements on credit repair services that are marketed (by telephone) alongside some "promised results." 16 C.F.R. § 310.4(a)(2)(ii). A company that telemarkets credit repair services *and promises* that those services will achieve particular results must wait six months after achieving those results before billing clients, and provide documentation of the results on a client's credit report. The Bureau itself acknowledged in briefing that "application of the provision hinges on the nature of Defendants' services and how they are represented to consumers." ECF No. 475 at 6. The AFP's billing requirements, the Bureau argued, turn on promised results, namely, "whatever results were promised in exchange for payment." *Id.* at 4.

This understanding—that the AFP is triggered when a credit repair organization "promis[es] results"—is supported not only by the text of the regulation and the Bureau's own admissions but also by the FTC's rulemaking record and the AFP's enforcement history. *See, e.g.*, 60 Fed. Reg. 30406, 30415 (June 8, 1995) (the "prohibition on advance payments [would] extend to services that *promise* to remove derogatory information from a consumer's credit record" (emphasis added)); *Tennessee v. Lexington Law Firms*, No. 96-0344, Doc. 82 at 4–5

(M.D. Tenn. Sept. 29, 2000) (consent decree ordering that Lexington Law lawfully could bill clients monthly "provided that no representation of promised results was made").

Contrary to that apparent consensus, the Order faults Defendants for violating the AFP "even assuming Defendants do not promise results" and concludes that "the lack of promised results" itself somehow "evidences Defendants' failure to comply" with the AFP.  Order at 11–12.  That unsupported legal conclusion, which will be reviewed *de novo* on appeal, is unlikely to be sustained.[3]

## II.    Absent a Stay Pending Appeal, Defendants Will Suffer Grave, Irreparable Harm

Second, in the absence of a stay, the Order would doom Defendants' businesses and inflict irreparable harm on Defendants, their employees, and the public in the time it would take to reach a final judgment on the balance of the case.  Heath Decl. ¶¶ 7–12 (attached as Ex. A); Wallace Decl. ¶¶ 10, 21–30 (attached as Ex. B).  Progrexion's sales and marketing efforts have centered on telemarketing for decades, in large part because a real-time, voice-to-voice communication makes it possible for agents to explain the services and answer questions effectively and, in particular, to emphasize that neither Lexington Law nor CreditRepair.com promises any results, and neither entity can control whether a furnisher or credit reporting agency will remove negative information from a client's credit report.  Ex. B (Wallace Decl.) ¶ 8.  Over 80% of Lexington Law and CreditRepair.com's respective clients encounter and sign up for credit repair services through Progrexion's telemarketing campaigns, which field both incoming and outgoing telephone calls.  Ex. B (Wallace Decl.) ¶ 13; Ex. A (Heath Decl.) ¶ 8.

To adhere to the Order's prohibition with respect to billing clients engaged over the

---

[3] The Order's legal conclusion that Defendants' practices "run[ ] afoul" of the AFP's romanette one is also incorrect.  Order at 12 n.57.

telephone, Defendants would have to cease billing more than 80% of their credit repair clients and stop obtaining new clients through telemarketing.  Ex. A (Heath Decl.) ¶ 8; Ex. B (Wallace Decl.) ¶ 13.  This would have staggering domino effects.  More than 80% of Lexington Law's revenue would dry up instantly, while operating costs would remain high.  Ex. A (Heath Decl.) ¶ 8; Ex. B (Wallace Decl.) ¶¶ 14–16.  Defendants have only so much cash on hand, and their access to additional capital in the wake of the Order is dubious.[4]  Ex. A (Heath Decl.) ¶ 8; Ex. B (Wallace Decl.) ¶¶ 17–21.  Based on current cashflow projections, the Progrexion Defendants likely could satisfy their obligations for only about 19 days relying on cash reserves before becoming insolvent while the time frame is even shorter for Lexington Law (12 days).  Ex. A (Heath Decl.) ¶¶ 8, 11; Ex. B (Wallace Decl.) ¶ 22.  Defendants likely would go out of business if, as the Order concludes, they cannot legally "request or receive any fee or consideration" from more than 80% of their credit repair clients in the next six months.  Ex. A (Heath Decl.) ¶¶ 8–9, 12; Ex. B (Wallace Decl.) ¶ 22; Order at 10; *see* Dec. 13, 2019 Tr. at 37 ("If you have to wait for six months to send somebody a bill, you are not in business very long.").  Once Defendants are insolvent, of course, a right to appeal would be meaningless.  In short, the fate of Defendants depends on their ability to stay the effects of the Order pending an appeal.

### III.   The Bureau Would Not Be Prejudiced by a Stay Pending Appeal

Third, a stay pending appeal would not prejudice the Bureau, which has never moved with urgency throughout the investigation and litigation of this case.  In fact, although it identified "injunctive relief" in its complaint, *see* ECF No. 2 at 46, it did not move for a preliminary injunction then or since.  Even when it moved for summary judgment, it purported to

---

[4] Access to capital—to say nothing of Defendants' relationships with vendors and marketing partners—would be further constrained if the effect of the Order is not stayed.  *See* Ex. A (Heath Decl.) ¶ 8; Ex. B (Wallace Decl.) ¶¶ 20, 24.

"reserv[e] the question of . . . injunctive relief . . . for later determination."[5]  ECF No. 257 at 2.

In cases where a litigant "has not sought temporary relief, imminent irreparable injury is

presumptively absent."  *Hutchinson*, 105 F.3d at 570.

Moreover, when the government "delays enforcement" of a given policy, it cannot later

be heard to complain when the effect of its policy is stayed temporarily pending appeal.  *See*

*Kentucky v. Biden*, 23 F.4th 585, 610–11 (6th Cir. 2022) ("[t]he government's actions"

including, for example, a delayed policy rollout, "undercut its representations of great urgency in

implementation of the contractor mandate").  Here, the Bureau and its predecessor, the FTC,

have been aware of Defendants' billing practices at least since the conclusion of Tennessee

litigation in 2000.[6]  Only *19 years* after the conclusion of that litigation did the Bureau choose to

file this lawsuit alleging illegal billing practices.  At a pretrial hearing last year, the Bureau

confirmed that it knew the facts it needed to allege Count 1 more than three years before doing

so.  *See* June 30, 2022 Tr. at 129:7–14.  A temporary stay of a policy that, to date, has never been

in effect and was never pressed with urgency will cause no harm to the Bureau.

## IV.    Public Interest Weighs in Favor of a Stay Pending Appeal

Fourth, although the "public interest" factor is sometimes given minimal consideration,

in this case a concern for the public interest weighs overwhelmingly in favor of a stay pending

appeal.  A stay would preserve the livelihoods of more than 1,600 employees and their families

---

[5] The Order is injunctive in practical effect despite that the Bureau did not strictly request an injunction in its motion for partial summary judgment.

[6] As the parties and the Court have discussed at various points throughout the case, in 1996 the State of Tennessee sued Lexington Law's predecessor entity in federal court, alleging an AFP violation, and the FTC intervened in support of Tennessee.  *Tennessee v. Lexington Law Firms*, No. 96-0344 (M.D. Tenn.).  That litigation concluded with a consent decree to the effect that Lexington Law could bill clients monthly "provided that no representation of promised results was made to the client by" Lexington Law.  *Id.*, Doc. 82 at 4–5 (Sept. 29, 2000).

while the appeal is pending.  Ex. A (Heath Decl.) ¶ 10; Ex. B (Wallace Decl.) ¶¶ 24–26.

Moreover, the Bureau and the FTC routinely underscore the prevalence of errors on consumers'

credit reports, the "devastating" consequences of those errors for consumers' "financial well-

being and life," and the difficulty for consumers to correct those errors; a stay would preserve

needed services to more than 240,000 clients across the country.  FTC, *Report to Congress* 36,

App. D at ii (Dec. 2012), https://bit.ly/2Grma93 (in 2012, more than a quarter of American

consumers' credit reports contained a potentially material error); CFPB, *Advisory Op.*, 87 Fed.

Reg. 64689, 64689 (Oct. 26, 2022) (errors on credit reports can have "devastating"

consequences); CFPB, *Annual Report of Credit and Consumer Reporting Complaints* 37–38

(Jan. 2022), https://bit.ly/3l9tcI7 (many consumers trying to correct inaccuracies simply give up);

Ex. A (Heath Decl.) ¶¶ 4–5, 11; Ex. B (Wallace Decl.) ¶¶ 11–12.  Neither the Bureau nor the

FTC assists individual consumers in correcting errors on their credit reports, and the Defendants

are not aware of any private companies who could serve Lexington Law's or CreditRepair.com's

customers while complying with the Court's Order regarding delayed billing.  Ex. A (Heath

Decl.) ¶ 11; Ex. B (Wallace Decl.) ¶ 29.  If the Court's Order is not stayed pending immediate

appeal, American consumers' access to credit repair services will be seriously and immediately

threatened.[7]  Ex. A (Heath Decl.) ¶¶ 7, 11, 12; Ex. B (Wallace Decl.) ¶¶ 10, 30.

*     *     *

All four factors tilt even further in favor of a stay while the constitutionality of the

Bureau's every action is in doubt.  By the Bureau's own explanation, the Supreme Court in

*Community Financial* is considering whether the Bureau's irregular funding device delegitimizes

---

[7] Further, the immediate effect of the Order could cause a severe disruption in the attorney-client relationships between Lexington Law and its clients, whereas a stay would prevent such uncertainty.  Ex. A (Heath Decl.) ¶ 11.

8

"virtually every action the [Bureau] has taken in the 12 years since it was created." *Certiorari* Pet., ECF No. 496-1 at 10.  This constitutional issue thus presents a potential independent ground for Defendants ultimately to prevail.  Further, this looming question running to the CFPB's authority not only solidifies the risk of irreparable harm to Defendants without a stay but also the absence of any counterbalancing benefit to the Bureau.  In fact, the Bureau itself is requesting to stay other ongoing enforcement actions while the Fifth Circuit's ruling is considered by the Supreme Court,[8] only underscoring the judicial economy and lack of prejudice that a temporary stay would yield in this case.  Finally, the public interest is served by avoiding the "confusion and regulatory chaos" caused by conflicting court decisions while the Bureau's very legitimacy is resolved by the Supreme Court.  ECF No. 499-2 at 1 (amicus brief aligned with the Bureau submitted by 22 states and the District of Columbia in the Supreme Court).

## CONCLUSION

The Court should stay the effect of the Order Granting Plaintiff's Motion for Partial Summary Judgment (ECF No. 508) pending the resolution of Defendants' pending interlocutory appeal of that Order.

Dated:  March 13, 2023                              Respectfully submitted,

                                                    */s/ Edward J. Bennett*
                                                    Edward J. Bennett*
                                                    Edward C. Barnidge*
                                                    Suzanne Salgado*
                                                    Shauna M. Kramer*
                                                    Emma J. Nino*
                                                    Daniel Whiteley*
                                                    Paul A. Hoversten*
                                                    Loryn Helfmann*
                                                    Atticus DeProspo*
                                                    Williams & Connolly LLP
                                                    680 Maine Avenue SW

---

[8] *Populus*, ECF No. 29; *Active Network,* ECF No. 58; *FirstCash*, ECF No. 66 at 2.

Washington, DC 20024
(202) 434-5000
ebennett@wc.com

*admitted pro hac vice*


Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

Attorneys for Defendants

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 13, 2023, I caused a true and correct copy of the foregoing to be filed on the CM/ECF system, which will send notification of such filing to all parties and counsel in this case.

*/s/ Atticus DeProspo*
Atticus DeProspo