**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>PROGREXION MARKETING, INC., et al.<br><br>Defendants. | Case No. 2:19-CV-00298-BSJ<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A STAY PENDING APPEAL** |

If a stay is not granted, Defendants will go out of business and will be denied their right to contest the merits of the Court's March 10, 2023 summary judgment Order (the "Order"). The Bureau's opposition fails to rebut this immutable fact. The opposition ignores the declaration of John Heath, a member in good standing of seven bars in the United States, a longtime lawyer in the Salt Lake community, and an officer of this Court, in which he testified that, absent a stay, Lexington Law will be compelled to disengage from all of its 400,000-plus clients and cease business. ECF No. 510-1 ¶ 11. Instead the Bureau cites months- or years-old financial information about Progrexion, but that evidence only proves that Progrexion was financially sound *before* the Court's Order. The Bureau does nothing to rebut Chad Wallace's sworn declaration that the Order, if it goes into effect, will quickly shutter the company. ECF No. 510-2. As described below, events in recent days have borne that prediction out, as a lender has warned that it will no longer support the company in light of the Order. These devastating effects of the Order are not a surprise; the Court itself has observed that the Defendants could not stay in business if they had to wait six months to bill for their services.

The Bureau's opposition also does not rebut the strength of Defendants' appellate arguments. The Order will be reviewed de novo on appeal, but the Bureau's opposition provides it only tepid support. The Bureau cites no cases or other authority supporting its novel and atextual reinterpretation of this 28-year old regulation. It also ignores a 22-year-old federal court order that, in line with the text of the regulation, expressly allows Lexington Law to bill immediately in arrears for services rendered, so long as "no promised results have been represented to client[s] by" Lexington Law. Ex. 50-1 to Defs' Opp. to MSJ, ECF No. 278-61 at 5. The Bureau's opposition also fails to establish any countervailing harm to the Bureau or the public from a stay. The Order would shut down an entire industry nationwide based on no

judicial or regulatory precedent. Finally, the opposition simply waves off the obvious reality that the Order would upset the decades-long status quo and deny millions of consumers access to credit repair services.

The Order's effect should be stayed until the meaning of the AFP is resolved on appeal once and for all.

**PROCEDURAL HISTORY**

The Bureau began its investigation before 2014 and initiated this suit in 2019, but it never moved for a preliminary injunction, belying its protestations of urgency. Indeed, when it moved for partial summary judgment in December 2021, it "reserv[ed] the question of . . . injunctive relief . . . for later determination." ECF No. 257 at 2. In contrast, Defendants have been clear throughout that if the Court ruled the law meant they "couldn't bill anybody for the next six months or more," they "wouldn't make it two weeks." *E.g.*, June 30, 2022 Tr. at 34:6–8. The Court similarly observed: "If you have to wait for six months to send somebody a bill, you are not in business very long." Dec. 13, 2019 Tr. at 37:13–14.

On March 10, 2023, after 15 months, multiple hearings, and several rounds of briefing, the Court ordered that Defendants have "violated [the AFP] from March 8, 2016, *through the present*"—decreeing Defendants' ongoing billing practices to be unlawful. Order, ECF No. 508 at 13 (emphasis added). Although the Order, at the Bureau's request, did not award injunctive relief or civil penalties, its issuance exposes Defendants to aggravated penalties to the tune of $1.3 million *per day*, along with potential bar sanctions and contempt, if they continue their

ongoing billing practices. Because the Bureau would not consent to stay the effect of the Order, Defendants moved for a stay in this Court and in the court of appeals.[1]

**ARGUMENT**

Because the Order has the practical effect of an injunction, Defendants have noticed their appeal to the Tenth Circuit pursuant to 28 U.S.C. § 1292(a), which imposed an administrative stay. Out of an abundance of caution, Defendants also have sought leave from this Court to file an interlocutory appeal pursuant to § 1292(b). The parties' briefs on § 1292(a) jurisdiction were submitted to the court of appeals as of March 23, 2023 and a decision is pending. Defendants' motion for leave to file an interlocutory appeal will be fully briefed to this Court by April 10, 2023. In the meantime, Defendants are seeking to stay the Order's effect pending appeal. The Court should grant this motion because all relevant factors weigh in favor of a stay: (1) the appellant's likelihood of success on the merits; (2) the threat of irreparable harm in the absence of a stay; (3) harm to the opposing party; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The third and fourth factors merge when the opposing party is the government. *Id.* at 435.

[1] In its opposition to Defendants' motion for leave to appeal under 28 U.S.C. § 1292(b), the Bureau does an about face and notes that it intends to move for entry of judgment and relief in early April. ECF No. 523 at 5 n.1. Just days before, the Bureau had argued to the court of appeals that it could not have sought relief earlier because "the parties disagreed significantly about how remedies should be calculated." Bureau's Opp. in Ct. App., ECF No. 519-2 at 5. That claim is belied by the Bureau's imminent motion. This is all gamesmanship designed to thwart Defendants' practical ability to ever appeal the Order, denying them fundamental due process. The Court should not play along. *Cf. Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673 (1930) (finding due process violation where Missouri effectively denied any chance of appellate review to litigant); *see also id.* ("If the judgment is permitted to stand, deprivation of [defendants'] [entire business] is accomplished without [their] ever having had an opportunity to [appeal] against the exaction" and noting that the state "den[ied] to [the litigant] the only remedy ever available for the enforcement of" that right).

## I. Defendants Are Likely to Succeed on the Merits of their Appeal.

### A. The Court of Appeals Has Jurisdiction.

The court of appeals has jurisdiction over this matter as a direct appeal under 28 U.S.C. § 1292(a)(1). In the alternative, if the court of appeals determines that it lacks § 1292(a) jurisdiction, the circumstances warrant the grant of leave to file an interlocutory appeal under 28 U.S.C. § 1292(b). To evaluate appellate jurisdiction under 28 U.S.C. § 1292(a)(1), the court of appeals must "consider the substance rather than the form" of the order being appealed. *Ditucci v. Bowser*, 985 F.3d 804, 808 (10th Cir. 2021) (citation omitted). As a practical matter, the Order restrains Defendants' conduct as effectively as a formal injunction. The Order itself—not the underlying law—means Defendants "kn[o]w with certainty that they would be subject to liability" for continuing to bill their clients in violation of the Order. *CFPB v. Mortg. Law Grp., LLP*, 366 F. Supp. 3d 1039, 1057 (W.D. Wis. 2018) (evaluating the applicability of penalties for "knowing" violations under 12 U.S.C. § 5565(c)(2)). As a result, each day of continued billing exposes them to an additional $1.3 million daily in civil penalties. *Id.*; *see* 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1(a). Whether or not labeled an injunction, "no litigant would dare violate" a command punishable by more than $1.3 million per day. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1358 (11th Cir. 2008).[2]

The Order effectively enjoins Lexington Law for an additional reason. John Heath and the other attorneys at Lexington Law are members of state bars across the country. As legal

[2] The Supreme Court has explained consistently for decades that inviting "severe punishment" to "test[ ] the validity of [a] law" is not a "meaningful avenue of relief" for regulated entities. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490–91 (2010) (citations omitted). Had the Bureau announced its novel interpretation in a regulation or guidance document at some point during the preceding 20 years (rather than in this lawsuit), Defendants would have had access to pre-enforcement judicial review, including by an appeals court.

ethics expert Professor Bruce Green articulates, it would be "highly imprudent" for these attorneys to "jeopardize their law licenses" by continuing to bill clients contrary to the Order. *See* Ex. C, Decl. of Bruce Green ¶ 20 (as submitted in the court of appeals). The Order itself subjects the lawyers to a risk of professional discipline because continuing to bill clients now could be viewed as inconsistent with an "authoritative interpretation" of the law. *Id.* ¶ 26; *see id.* ¶¶ 20–33. The Order also creates a "reasonable ground for [Defendants] to fear" contempt proceedings in this Court if they continue billing clients, regardless of "fine distinctions" about the label or effect of the Order. 16 Wright & Miller, Fed. Prac. & Proc. § 3922 (3d ed. updated 2022).

The Order also is appropriate for an interlocutory appeal under 28 U.S.C. § 1292(b). As Defendants argued in their motion for certification of appeal, the Order decides controlling questions of law on which substantial ground exists for a difference of opinion, and resolution of those questions would materially advance the termination of this litigation on the merits. ECF No. 512. The Bureau cannot seriously dispute that the questions raised by the Order are novel and dispositive, and would have a monumental, nationwide effect on an entire industry. In advocating for a single, comprehensive appeal after final judgment months down the road (ECF No. 523 at 4–6), the Bureau ignores that Defendants will not remain in business long enough to appeal if the Order is not stayed in the interim.

Regardless, the Bureau's suggestion that the court of appeals might lack jurisdiction over the appeal only highlights the need for a stay in this Court. If the Tenth Circuit were to find it lacks jurisdiction, as the Bureau urges, then it would dismiss the appeal and likely vacate the administrative stay without assessing the merits of the appeal or the equities of a stay. Without

an existing or immediate stay in this Court, Defendants would not remain in business long enough to reach a final judgment.

**B. Defendants' Interpretation of the AFP Is Correct.**

On appeal, the Court's interpretation receives no deference and will be reviewed de novo. But rather than shoring up the Court's reasoning, the Bureau downplays it, dedicating only three sentences of its brief to defending the Order. Like the Order itself, the Bureau fails to cite any case law supporting its reinterpretation of the AFP or to support its view that the AFP imposes draconian billing constraints on all credit repair organizations ("CROs") regardless of whether they "represent" any "promised results." ECF No. 522 at 7; *contra* 16 C.F.R. § 310.4(a)(2). Nor does the Bureau explain or engage at all with the *lack* of authority of any kind supporting its tortured reading, and it ignores the 2000 federal court order that authorizes Defendants' billing practices absent promised results.

The Bureau's failure to provide support for the Order effectively concedes that Defendants are likely to prevail on appeal because Defendants do not make, and in fact disavow, the sorts of deceptive promises that the AFP was targeted to curtail. During the rulemaking process in 1995, the FTC explained the AFP would "limit the telemarketing of *deceptive* credit repair services" that "*promise* consumers . . . they will improve the consumer's credit record." 60 Fed. Reg. 43842, 43853 (Aug. 23, 1995) (emphases added). The following year, Tennessee—as part of a joint task force with the FTC—sued Lexington Law in one of the first lawsuits testing the AFP. That lawsuit culminated in an agreed court order authorizing Lexington Law to bill monthly in arrears provided "no promised results" have been "represented to" consumers. ECF No. 278-61 at 4–5. Defendants thereafter complied, ensuring that their client communications and the engagement agreement signed by each client make clear that Lexington Law "cannot guarantee and you are not paying for a particular credit report outcome

or result" and that clients acknowledge they "are not paying for, and that Lexington does not make, any representation, warranty, promise or guarantee as to any particular outcome or result." Lexington Law Engagement Agreement, ECF No. 278-5 at 5, 12, 18; 2021 Decl. of John Heath, ECF No. 278-3 ¶¶ 25–26.

To date, after decades of the AFP's existence, the FTC and CFPB have advanced exactly one lawsuit—this one—against a CRO that does not "guarantee [ ] a particular outcome" to consumers. *See* ECF No. 523 at 10. To Defendants' knowledge, no federal or state litigant has *ever* attempted to enforce the AFP's billing restrictions while also disclaiming "deceptive guarantees or promises about its credit repair results" by the CRO, as the Bureau has done here. Second Amended Pretrial Statement, ECF No. 462 at 2–3. Indeed, when the Bureau urged in another case (in the alternative) that the "advance fee ban applies to all telemarketers who offer credit repair services," ECF No. 523-3 at 5, the court clarified that it "did *not* hold that 'whether or not' [the] Defendant made a promised result was immaterial" but rather that the Bureau in its complaint had "adequately pleaded facts indicating that [the] Defendant made promises." *CFPB v. Prime Mktg. Holdings, LLC*, No. 16-cv-7111, 2017 WL 2772313, at *8 (C.D. Cal. Jan. 19, 2017) (emphasis in original); *see id.* at *2–3 (detailing alleged promised results).

## II. The Remaining Factors Counsel a Stay.

### A. Defendants Will Suffer Irreparable Harm Absent a Stay.

It is well established that "[d]estruction of [a litigant's] business" is "irreparable harm under [Tenth Circuit] precedent." *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1014 (10th Cir. 2018) (citation omitted). Defendants have submitted unrebutted testimony that if the Order takes effect, Defendants will not survive long enough to appeal from a final judgment. ECF No. 510-1 ¶¶ 8–9; ECF No. 510-2 ¶¶ 10, 21, 23. The Bureau's only response is to cite months- and years-old financial documents that establish that Progrexion *was* a healthy going

concern *before* the Order issued. For example, the Bureau cites lending documents from 2020 and an investor's valuation from 2022. ECF No. 522 at 9. As explained in the attached Supplemental Declaration of Chad Wallace, unfortunately the effects of the Order and ongoing uncertainty while a stay is litigated are proving to be as bad as predicted. While the Bureau cites, for example, a $30 million credit commitment, in the wake of the Order's issuance, that lender has withdrawn the commitment and refused to provide funding. Ex. D, Suppl. Wallace Decl., ¶ 7 and Appendix.[3] That of course makes perfect sense, as the Tenth Circuit's administrative stay could end any day if it determines it lacks jurisdiction at this stage, and without a further stay from this Court there is little chance of the lender being repaid.[4]

**B. The Balance of Equities and Public Interest Weigh in Favor of a Stay.**

The Bureau claims a stay could indirectly harm consumers because it may result in continued billing conduct. ECF No. 522 at 11. That acknowledges the coercive effect of the Order—it effectively enjoins Defendants from continuing to bill for their services. *Id.* The Bureau attempts to dismiss the deleterious effect of the Order on the availability of credit repair services by insisting "the [regulation] does not prohibit credit repair." ECF No. 522 at 11–12. In fact, the Order imposes the AFP's billing requirements on *all* telemarketed CROs in the country,

[3] The Bureau argues that it should be entitled to "take discovery about the companies' financial condition and resources." ECF No. 522 at 10. If the Court were to stay the effect of the Order pending resolution of the appeal, Defendants would be willing to provide reasonable financial discovery to the Bureau. Without a stay, however, the question would become quickly moot. In contrast to Defendants' good faith in this respect, the Bureau is not willing even to agree to a stay during the pendency of the discovery it claims is needed to evaluate the propriety of a stay.

[4] The Bureau's schoolyard taunt regarding creditors' "lack [of] confidence" in Defendants' legal position, ECF No. 522 at 10, evinces a cynicism that is beneath officers of the United States. The livelihoods and careers of well over a thousand people are at stake, as is the creditworthiness of hundreds of thousands of consumers.

and as the Court acknowledged, none can possibly survive if billing is delayed six months. Order, ECF No. 508 at 12; Dec. 13, 2019 Tr. at 37:13–14.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for a Stay Pending Appeal should be granted and the Order should be stayed until an appeal has concluded.

Dated: March 29, 2023

Respectfully submitted,

*/s/ Edward J. Bennett*

Edward J. Bennett*
Edward C. Barnidge*
Suzanne Salgado*
Shauna M. Kramer*
Emma J. Nino*
Daniel Whiteley*
Paul A. Hoversten*
Loryn Helfmann*
Atticus DeProspo*
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
ebennett@wc.com

**admitted pro hac vice*

Karra J. Porter
Christensen & Jensen
257 East 200 South, Suite 1100
Salt Lake City, UT 84111
(801) 323-5000
karra.porter@chrisjen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2023, I caused a true and correct copy of the foregoing to be filed on the CM/ECF system, which will send notification of such filing to all parties and counsel in this case.

*/s/ Paul A. Hoversten*
Paul A. Hoversten