MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
(202) 435-9202
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
1700 G Street, NW
Washington, DC 20552
*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | Case No.  2:19-cv-00298-BSJ |
| *Plaintiff,* | |
| v. | |
| PROGREXION MARKETING, INC., *et al.*, | |
| *Defendants.* | |

## PLAINTIFF'S MOTION FOR AWARD OF
## MONETARY AND INJUNCTIVE RELIEF, ASSESSMENT
## OF CIVIL MONEY PENALTIES, AND ENTRY
## OF FINAL JUDGMENT AGAINST ALL DEFENDANTS ON COUNT I

Table of Contents

Introduction ..................................................................................................1

Argument.....................................................................................................3

I.      The Court should award redress equal to the net amount of illegal fees
Defendants took from consumers. ...................................................................3

    A.   Defendants' violations of § 310.4(a)(2) warrant legal restitution or
         refund of moneys to consumers. ....................................................3

    B.   The Bureau has met its burden to reasonably approximate the
         appropriate amount of consumer redress. ....................................5

    C.   The Court should impose liability for the redress awards jointly and
         severally. .................................................................................11

II.     Injunctive relief is warranted to halt Defendants' ongoing violations. ......12

    A.   Injunctive relief is authorized by the CFPA and appropriate here. ...........13

    B.   The proposed injunctive terms are narrowly tailored to protect
         consumers...............................................................................17

III.    Defendants must forfeit and pay civil money penalties...........................19

    A.   The CFPA mandates that violators pay a civil penalty..............................19

    B.   The Court should award penalties for Defendants' seven years of fee
         violations through each credit repair brand. ...............................21

    C.   The Court should impose penalties at the maximum daily rate for
         First Tier violations. ..................................................................24

IV.     There is no just reason to delay entry of final judgment on Count I. .........27

Conclusion ................................................................................................28

## **Introduction**

On March 10, 2023, this Court granted Plaintiff's Motion for Partial Summary Judgment on Count I Against All Defendants, holding that "Defendants have violated 16 C.F.R. § 310.4(a)(2) from March 8, 2016, through the present."[1] Pursuant to Fed. R. Civ. P. 54(b), and because there is no just reason for delay, the Bureau of Consumer Financial Protection ("Bureau") now moves the Court to award consumer redress, monetary penalties, and injunctive relief against all Defendants and enter final judgment on Count I.

Between March 8, 2016 and March 31, 2023, Defendants took approximately $3.1 billion from more than four million consumers in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(a)(2). The time has come for Defendants to return that money to the consumers they unlawfully charged, cease their illegal billing practices, and pay penalties for their misconduct.

For Defendants' violations of § 310.4(a)(2), and as provided by the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5565, the Bureau respectfully requests that the Court enter judgment in the Bureau's favor on Count I and award relief as follows:

---

[1] ECF 508, Order Granting Pl.'s Mot. for Partial Summ. J., p. 13.

(1) for consumers who paid for Lexington Law's credit repair services on or after March 8, 2016, redress totaling at least $2,745,443,078, imposed jointly and severally against all Defendants;

(2) for consumers who paid for CreditRepair.com's credit repair services on or after March 8, 2016, redress totaling at least $366,733,471, imposed jointly and severally against the Progrexion Defendants;[2]

(3) injunctive relief to prevent Defendants from further violating the TSR;

(4) against defendant John C. Heath, Attorney-at-Law, PC, d/b/a Lexington Law ("Heath PC"), a civil money penalty of at least $17,625,231;

(5) against the Progrexion Defendants, jointly and severally, a civil money penalty of at least $35,250,462;

(6) the Bureau's costs, as allowed by 12 U.S.C. § 5565(b); and

(7) post-judgment interest.

---

[2] The Progrexion Defendants are Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, and CreditRepair.com, Inc.

## Argument

### I.   The Court should award redress equal to the net amount of illegal fees Defendants took from consumers.

#### A.   Defendants' violations of § 310.4(a)(2) warrant legal restitution or refund of moneys to consumers.

Defendants unlawfully charged more than four million consumers for credit repair services when no payment was due because, as the Court found, Defendants never complied with § 310.4(a)(2)'s billing requirements.[3] These consumers are entitled to redress.

The CFPA authorizes the Bureau to seek "any appropriate legal or equitable relief." 12 U.S.C. § 5565(a)(1). As the Ninth Circuit recently observed, "[r]estitution is one of those remedies, and it serves to ensure that consumers are made whole when they have suffered a violation of the statute." *CFPB v. CashCall, Inc.*, 35 F.4th 734, 750 (9th Cir. 2022).[4] Here, Defendants violated the TSR and charged consumers fees that they were prohibited from charging. Those

---

[3] ECF 508, p. 13.

[4] *See also CFPB v. CashCall, Inc.*, No. CV15-7522-JFW(RAOx), 2023 WL 2009938, *7-9 (C.D. Cal. Feb. 10, 2023) (on remand, rejecting argument that restitution should be limited to defendants' net profits and instead awarding legal restitution to "return consumers to their status quo before entering into the [unenforceable] loans"); *CFPB v. Future Income Payments, LLC*, No. 8:19-2950-BHH-KFM, 2020 WL 6162947, at *7 (D.S.C. May 21, 2020) ("restitution is the amount that will restore the victims to the status quo ante"), *report and recommendation adopted*, 2021 WL 672928 (D.S.C. Feb. 22, 2021).

consumers are entitled to recover the fees they were unlawfully charged. More specifically, as authorized by the CFPA, 12 U.S.C. § 5565(a)(2)(B) and (C), the Bureau seeks consumer redress in the form of legal restitution or the refund of moneys for Defendants' violations of § 310.4(a)(2).[5]

In calculating consumer redress, the Bureau bears the initial burden to reasonably approximate the "baseline" amount that is "necessary to compensate injured consumers." *FTC v. Kuykendall*, 371 F.3d 745, 764-66 (10th Cir. 2004) (*en banc*); *accord FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1206 (10th Cir. 2005); *CashCall,* 35 F.4th at 751. This initial approximation may be based on the defendants' gross receipts from consumers. *E.g.*, *Kuykendall*, 371 F.3d at 766 (explaining that "allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose"); *Freecom Commc'ns*, 401 F.3d at 1206; *see also, e.g., FTC v. Wash. Data Res.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (*per curiam*) ("net revenue

_____

[5] Restitution is legal in nature where it imposes personal liability on a defendant "to pay a sum of money," but equitable in nature if it seeks "to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) (citations omitted); *accord Admin. Comm. of Wal-Mart Assocs. Health and Welfare Plan v. Willard*, 393 F.3d 1119, 1121-22 (10th Cir. 2004); *CashCall*, 35 F.4th at 750. Here, the Bureau seeks a judgment requiring Defendants to pay a sum of money, *i.e.*, legal restitution.

(gross receipts minus refunds) … is the correct measure," not the defendant's profits); *CFPB v. Morgan Drexen, Inc.*, No. SACV13-1267-JLS(JEMx), 2016 WL 6601650, *2 (C.D. Cal. Mar. 16, 2016) (awarding as restitution full amount of unlawful upfront fees charged to consumers by debt relief services company in violation of TSR); *FTC v. E.M.A. Nationwide, Inc.*, No. 1:12-CV-2394, 2013 WL 4545143, *8 (N.D. Ohio Aug. 27, 2013) ("Generally, the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid."), *aff'd*, 767 F.3d 611 (6th Cir. 2014).

Once the Bureau has established its reasonable approximation, the burden shifts to Defendants "to put forth evidence showing that certain amounts should offset the [award] assessed against them"; the risk of any uncertainty in the calculation falls on them. *Kuykendall*, 371 F.3d at 765-66; *accord Freecom Commc'ns*, 401 F.3d at 1205-07; *CashCall*, 35 F.4th at 751 (after the Bureau meets its initial burden, "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains") (citations omitted).

## B. The Bureau has met its burden to reasonably approximate the appropriate amount of consumer redress.

The Bureau has met its initial burden by establishing the amount of Lexington Law's and CreditRepair.com's net revenue from illegal advance fees— that is, the total amount of such fees that Defendants collected, minus refunds they

previously provided. Although Tenth Circuit precedent allows an agency to meet its initial burden with "*gross* receipts," *see Kuykendall*, 371 F.3d at 766 (emphasis added), the Bureau has deducted from its baseline number the amounts Defendants already refunded to consumers, and thus the Bureau's figures reflect Defendants' net revenue from illegal fees.

Defendants' credit repair revenues consist of two types of illegal fees: a fee of approximately $15 taken at the time of sign-up ("Initiation Fees") and recurring fees taken 5-15 days after sign-up and monthly thereafter ("Service Fees"). Defendants produced data and information sufficient to calculate those net revenues through July 2020, and the Bureau has used the figures from 2019 and 2020 to calculate a reasonable estimate of the net revenues from August 1, 2020 through March 31, 2023.[6]

Defendants' Service Fees for the period from March 8, 2016 through July 31, 2020 are undisputed. In interrogatory responses, Defendants stated that during that period the gross amount paid by Lexington Law customers for credit repair

---

[6] It is well established that "a just and reasonable estimate of the damage based on relevant data" will suffice because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946).

services, less refunds, was $1,670,563,000[7] and the gross amount paid by

CreditRepair.com customers for credit repair services, less refunds, was

$237,516,000.[8]

Defendants' interrogatory responses, however, exclude the Initiation Fees

they collected from consumers. Defendants' customer transaction data establish

that, during the period from March 8, 2016 through July 31, 2020, Defendants

collected another $47,067,918 from Lexington Law customers and $4,777,215

from CreditRepair.com customers in Initiation Fees.[9]

Defendants excluded the Initiation Fees from their interrogatory responses

because they argue that the Initiation Fees are charges for purchasing consumers'

TransUnion credit reports,[10] not charges for credit repair services. But that

argument is false. Defendants do not dispute that they require new customers to

---

[7] PX-327 (Heath PC's Supp. Resp. to Interrog. No. 1); Ex. 1, Decl. Camille Hinds
¶¶ 7-12 (Apr. 6, 2023) ("Hinds Decl.").

[8] PX-328 (CreditRepair.com's Supp. Resp. to Interrog. No. 1); Ex. 1, Hinds Decl.
¶¶ 7-12.

[9] Ex. 1, Hinds Decl. ¶¶ 13-19.

[10] Defendants' costs for a consumer credit report represent only a small portion of
the Initiation Fee. Defendants' $15 charge reflects a markup of approximately
800% on the credit report. *See* ECF 451, June 29, 2022 Hr'g Tr. 58:17-22; PX-250,
p. 5 (Lexington Law's 2016 contract with TransUnion, stating that ██████████
████████████████████████████████).

pay the Initiation Fee to begin their credit repair services.[11] The Initiation Fee is

therefore a fee for "goods or services represented to remove derogatory

information from, or improve, a person's credit history, credit record, or credit

rating," and is covered by § 310.4(a)(2).

Thirty-two months have elapsed since July 2020. To estimate Defendants'

net revenues from August 1, 2020 through March 31, 2023, the Bureau calculated

the average monthly amount of Service Fees and Initiation Fees Defendants

collected from consumers (less refunds) between January 2019 and July 2020.[12] By

multiplying those monthly averages by 32, the Bureau estimates that from August

1, 2020 through March 31, 2023, consumers paid Lexington Law approximately

$1,002,384,832 in Service Fees and $25,427,328 in Initiation Fees, and during the

same period, consumers paid CreditRepair.com approximately $121,465,248 in

---

[11] ECF 257, Pl.'s Mot. for Partial Summ. J., SUMF ¶¶ 20, 30; ECF 277, Defs.
Opp'n to Pl.'s Mot. for Partial Summ. J., Resp. to SUMF ¶¶ 20, 30; ECF 283, Pl.'s
Reply in Supp. of Mot. for Partial Summ. J., pp. 6, 9-10; *see also* Ex. 10
(Lexington Law Billing Schedule, stating "we bill at three points," including at
Day 1 for "credit report access"); PX-575B at 15:22-16:2 (transcript of Lexington
Law consumer sign-up call stating ███████████████████████████████████
███████████████████████████████████████████████████████████████████████ ");
PX-608B at 11:21-12:18 (transcript of CreditRepair.com consumer sign-up call
stating that ████████████████████████████████████████████████████████████
██████ ).
[12] Ex. 1, Hinds Decl. ¶¶ 20-28.

8

Service Fees and $2,975,008 in Initiation Fees.[13] For every additional month that Defendants continue their unlawful billing practices after March 2023, Lexington Law customers will pay an estimated $32,119,130 and CreditRepair.com customers will pay an estimated $3,888,758 in credit repair fees (Service and Initiation).[14] These figures are sufficient to enable the Court to "make a just and reasonable estimate of the damage." *Bigelow*, 327 U.S. at 264. They should be used as the baseline for determining the full amount of consumer redress due from Defendants for the period from August 1, 2020 until the date of judgment.[15]

Summing Defendants' net Service Fee and Initiation Fee revenue over the entire time period, the Bureau estimates that Defendants collected the following amounts from consumers in violation of § 310.4(a)(2):

- Lexington Law: $2,745,443,078 plus $32,119,130 for each month of unlawful billing after March 2023 (Heath PC and the Progrexion Defendants); and

---

[13] *Id.* ¶¶ 23, 27.

[14] *Id.* ¶ 28.

[15] Through the calculations described herein, the Bureau has met its initial burden to establish a reasonable approximation of the appropriate consumer redress. But if the Court believes more is required, then, in the alternative, the Bureau requests that the Court order Defendants to produce customer payment and refund data for the post-July 2020 time period.

- CreditRepair.com: $366,733,471 plus $3,888,758 for each additional month of unlawful billing after March 2023 (Progrexion Defendants only).[16]

The Bureau has met its burden to establish that these figures reasonably approximate the amounts needed to compensate consumers. The burden now shifts to Defendants to justify any offsets.

The Bureau has established that these baseline amounts are appropriate as legal restitution, and also, in the alternative, as refunds. *See* 12 U.S.C. § 5565(a)(2)(B) (authorizing the "refund of moneys"). The ordinary meaning of "refund" is a "repayment" or "the return of money paid." *E.g.*, Refund, *Oxford English Dictionary* (3d ed. 2009). That is just what the Bureau seeks here: the repayment to consumers of all illegal fees that Defendant took. *Cf. FTC v. Elegant Sols., Inc.*, No. 20-55766, 2022 WL 2072735, at *3 (9th Cir. June 9, 2022) (approving "monetary relief based on a calculation of consumer loss"—*i.e.*, amounts wrongfully taken from consumers—that was awarded under FTC's similar authority in 15 U.S.C. § 57b(b) to secure "the refund of money").

---

[16] Ex. 1, Hinds Decl. ¶¶ 28-29.

## C.   The Court should impose liability for the redress awards jointly and severally.

By stipulation, the Progrexion Defendants are to be treated as a single company for purposes of liability, "and all Progrexion Defendants shall be jointly and severally liable for any monetary relief or civil money penalty and subject to all injunctive provisions, if any are ordered."[17] Thus, the Progrexion Defendants are jointly and severally liable for both CreditRepair.com's and Lexington Law's violations.

Parties may also be held jointly and severally liable for monetary relief when they concurrently cause an indivisible injury. *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996); *see also* Restatement (Second) of Torts § 875 (1979) ("In situations in which all of the tortfeasors are liable for the entire harm, the injured person is entitled to ... obtain judgment against any one or any number for the full amount of the harm….") (internal citations omitted). In such cases, the burden of proof shifts to any defendant resisting joint and several liability to demonstrate that the harm can be apportioned. *Northington*, 102 F.3d at 1569.

Heath PC and the Progrexion Defendants should be held jointly and severally liable for the harm they concurrently caused to Lexington Law customers

---

[17] ECF 462, 2d Am. Joint Proposed Pretrial Order, p. 13; *see also* ECF 258-9, Stipulation.

by their violations of § 310.4(a)(2). Lexington Law is effectively a joint enterprise between Heath PC and the Progrexion Defendants. A subsidiary of Defendant PGX Holdings, Inc., owns the "Lexington Law" tradename and licenses it to Heath PC, and the undisputed record demonstrates that Heath PC collaborated closely with the Progrexion Defendants in marketing and selling Lexington Law's credit repair services. Both sets of Defendants also were engaged in requesting and receiving consumer payments in violation of § 310.4(a)(2), and they shared in the revenues generated through that misconduct.[18] Consequently, Heath PC should be held jointly and severally liable with the Progrexion Defendants for the full amount of redress awarded for Lexington Law's customers.[19]

## II.    Injunctive relief is warranted to halt Defendants' ongoing violations.

The Bureau seeks injunctive relief to prevent Defendants from committing further law violations. That relief is detailed in the attached proposed order and is tailored to the specific wrongdoing proven in this case. It includes barring Defendants from requesting or receiving payment for their credit repair services until the requirements of § 310.4(a)(2) are fulfilled and requiring Defendants to enter into written agreements with each customer clearly setting forth the time

---

[18] ECF 508, pp. 5-6.
[19] Penalties are assessed individually, as discussed below.

frame in which all of the services will be performed, the credit repair results Defendants will seek to achieve, the cost of the services if those results are achieved, and when payment will be due.

**A. Injunctive relief is authorized by the CFPA and appropriate here.**

Under the CFPA, "the Bureau may … seek … a permanent or temporary injunction as permitted by law," 12 U.S.C. § 5564(a), and the Court may order "any appropriate legal or equitable relief," including "limits on the activities or functions" of those that violate the law. 12 U.S.C. § 5565(a)(1), (2)(G). The Supreme Court has long recognized district courts' "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) (citation omitted); *accord McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) ("Decrees [that enjoin violations of statutory provisions] are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown.").

For the Court to grant injunctive relief, the Bureau is required to show only that the violations are ongoing or "there exists some cognizable danger of recurrent violation." *Scalia v. Beantown Painting*, No. 2:19-cv-00353-BSJ, 2020 WL

9256463, *2 (D. Utah, Sept. 25, 2020) (Jenkins, J.) (quoting *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997)). As far as the Bureau can determine, Defendants' violations are still ongoing. An injunction is warranted for that reason alone.

Even if Defendants have recently halted their unlawful billing practices—and there is no evidence that they have—injunctive relief would nonetheless be warranted because there is a sufficient likelihood of recurring violations. As the Tenth Circuit has explained, "current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief." *Metzler*, 127 F.3d at 963 (citation omitted). Rather, "[a] court's power to grant injunctive relief survives the discontinuance of the illegal conduct," and "[i]n assessing the likelihood of recurrence, a court may consider all the circumstances, including the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (citations and quotations omitted).

Defendants have shown no willingness to comply with the law absent an injunction. Defendants never changed their unlawful billing practices despite the straightforward language of § 310.4(a)(2) and despite notice that a federal agency

14

charged with enforcing the rule considered their practices illegal.[20] *See FTC v. F&G Int'l Grp. Holdings., LLC*, No. CV-620-073, 2022 WL 3582493, at *7 (S.D. Ga. Aug. 19, 2022) (permanent injunction awarded where defendants' violations continued after they were notified of the government investigation and after the government sued). Only upon receiving an order that Defendants characterize as "injunctive in practical effect"—an order they claim subjects them to contempt sanctions if they continue to charge advance fees—did they suggest that they might change their fee practices.[21]

When this Court ruled that Defendants' fee practices violate the regulation, Defendants sought stays of the purported "injunctive … effect" of that order in this Court and the Court of Appeals,[22] and relying on the Tenth Circuit's temporary administrative stay, apparently continued to bill consumers in violation of § 310.4(a)(2). Since the temporary stay was vacated on April 3, 2023, and the summary judgment order that Defendants characterize as "injunctive" is again in "effect," it is unknown whether Defendants are continuing to bill consumers in violation of § 310.4(a)(2), but Defendants have made clear that they will, unless enjoined from doing so. As of April 6, 2023, the Lexington Law website still

---

[20] *See, e.g.*, Ex. 3, Heath Dep. 184:20-186:4, 186:8-187:13.
[21] *See* ECF 510, Defs.' Mot. to Stay (D. Utah), pp. 1-2.
[22] *Id.*; ECF 519-1, Defs.' Mot. to Stay (10th Cir.).

stated, just as it did during the temporary stay, that customers are billed for credit repair services on "Day 1," "Day 5-15," and every 30 days thereafter and encouraged consumers to "Call to find a solution that works for you."[23]

Indeed, Defendants have demonstrated an unwillingness to comply even with the extremely narrow (and incorrect) version of § 310.4(a)(2) that they assert. Throughout this litigation, Defendants argued that § 310.4(a)(2) only applies when a seller or telemarketer guarantees specific results.[24] But even when Defendants were aware that their telemarketing agents guaranteed consumers *specific results*, as shown, for example, in PX-284, p. 2 (LEX004920) ████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████, Defendants did not follow the provision's payment requirements.[25] Defendants view the provision as simply incompatible with their business model. An injunction is the only way to secure their compliance.

---

[23] Exs. 9, Decl. Elizabeth Rosario (April 6, 2023), 10 (March 30, 2023 webpage capture), and 11 (April 6, 2023 webpage capture).

[24] *E.g.*, ECF 249, Heath PC's Reply in Supp. of Mot. for Partial Summ. J., p. 1.

[25] *See* Ex. 4, Heath PC's Resp. to Interrog. No. 9.

**B.**     **The proposed injunctive terms are narrowly tailored to protect consumers.**

Given Defendants' history of violations and the need to protect consumers, the concrete and narrowly-tailored provisions proposed here are a necessary guard against future wrongful conduct. The Supreme Court has upheld injunctive provisions where the crucial terms "are as specific as the circumstances will permit." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393 (1965). Notably, the Court is not limited to prohibiting the precise law violation at issue. Rather, it is well established that those caught violating consumer protection laws "must expect some fencing in." *Id.* at 395 (quoting *FTC v. National Lead Co.*, 352 U.S. 419, 431 (1957)); *accord Thiret v. FTC*, 512 F.2d 176, 181 (10th Cir. 1975).

The injunctions proposed here are concrete, specific, and tightly linked to Defendants' billing violations. In summary, they are:

1.  Defendants must conform their fee practices to the specific requirements of § 310.4(a)(2);

2.  For at least ten years, Defendants must have written contracts with their customers that clearly and prominently state what services they will provide and specify a concrete time frame in which all services will be provided; and

17

3. For at least ten years, Defendants must have written contracts with their customers that clearly and prominently state what result will trigger the customer's future obligation to pay and what payment will be due (and when) if that result is achieved and maintained for at least six months.

Together, these provisions ensure that Defendants' compliance can be verified.[26] As the Court noted, Defendants attempted to evade the requirements of the provision by claiming that they "offer no promised results, or 'any result whatsoever' to their customers."[27] Defendants likewise sought to be ████████ ████████ with their customers about the time frame for their services.[28] These practices deprived consumers of the ability to understand what they were actually paying for and police Defendants' performance. Without written agreements clearly setting forth what credit repair results the customer will be charged for, and under what circumstances (and when) Defendants may request payment, there is a high risk that Defendants will continue to market Lexington Law and

---

[26] Other provisions in the proposed order are directed at implementing and administering the monetary relief the Bureau seeks and enabling the Bureau and the Court to monitor and enforce Defendants' compliance with the order. *See United States v. Daniel Chapter One*, 89 F. Supp. 3d 132, 144 (D.D.C. 2015) ("[C]ourts may order record-keeping and monitoring to ensure compliance with a permanent injunction.").

[27] ECF 508, p. 11.

[28] ECF 283, p. 8 (quoting PGX0049225).

18

CreditRepair.com, or some new iteration of this business, as a "solution" to a consumer's credit problems, but provide only vaguely defined services that they "hope" may bring about some change.[29]

The proposed injunctive provisions are appropriate to bring Defendants into compliance with § 310.4(a)(2) and prevent any new variations on Defendants' past violations. As the Tenth Circuit has stated, "if the [government] is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal." *Thiret*, 512 F.2d at 181 (citations omitted). Requiring Defendants to enter into contracts that clearly memorialize their agreements with consumers—including the credit repair services Defendants will perform, the time frame for their performance, the outcomes Defendants will seek to achieve, and the terms of payment—is reasonably related to Defendants' unlawful practices, will encourage future compliance with the law, and will protect consumers.

## III.   Defendants must forfeit and pay civil money penalties.

### A.   The CFPA mandates that violators pay a civil penalty.

The CFPA mandates that "[a]ny person that violates, through any act or

---

[29] ECF 491, Sept. 21, 2022 Hr'g Tr. 12:22-13:17.

omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty…." 12 U.S.C. § 5565(c)(1). The amount of the penalty for any given violation is based upon the violator's scienter, the number of days the violation continued, and the court's consideration of several factors set out in the statute. 12 U.S.C. § 5565(c)(2), (3).

First, the court decides which penalty tier is appropriate. No scienter showing is required for penalties set at the lowest level (First Tier), and the statute authorizes Second Tier penalties for "reckless" violations and Third Tier penalties for "knowing" violations. *Id.* § 5565(c)(2). The maximum daily penalty increases with each tier. For civil penalties assessed after January 15, 2023, whose associated violations occurred on or after November 2, 2015, the maximum civil penalty for each day that a violation continues is as follows:

| CFPA Penalty Tier | Max. Penalty Amount Per Day of Each Violation |
|---|---|
| First Tier | $6,813 |
| Second Tier | $34,065 |
| Third Tier | $1,362,567 |

12 C.F.R. § 1083.1 (2023).

After determining the penalty tier, the Court determines the maximum penalty permitted by assessing the number of violations and, for any given violation, the number of days the violation continued.

Finally, in determining what penalty amount to impose, the court must consider the statutory factors: (A) "the size of financial resources and good faith" of the defendant; (B) "the gravity of the violation or failure to pay"; (C) "the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided"; (D) "the history of previous violations"; and (E) "such other matters as justice may require." 12 U.S.C. § 5565(c)(3).

**B.    The Court should award penalties for Defendants' seven years of fee violations through each credit repair brand.**

Considering the particular facts, circumstances, and posture of this case, the Court should award civil money penalties against the Progrexion Defendants of at least $35,250,462 and a civil money penalty against Heath PC of at least $17,625,231, plus $6,813 for each day that Defendants' violations continue (if any) between April 8, 2023 and final judgment.

The Bureau calculates these penalties under the First Tier, which requires no scienter showing and allows a maximum penalty of $6,813 per violation per day. 12 U.S.C. § 5565(c)(2)(A); 12 C.F.R. § 1083.1.

Regarding the number of violations committed, Defendants' total number of TSR violations since March 8, 2016 is in the millions—each time they requested or received a fee in violation of the regulation—and each such discrete violation

could carry its own independent penalty. But on the specific facts of this case (including the consumer redress amount) and for this purpose only, the Bureau recommends a more conservative approach: calculating the penalty by treating the unlawful Lexington Law fees as a single violation of the TSR that has continued since March 8, 2016, and the unlawful CreditRepair.com fees as a separate, single violation of the TSR that has continued for the same period.[30]

Heath PC, as a telemarketer of Lexington Law credit repair services, owes a penalty for the fees unlawfully charged by Lexington Law in violation of § 310.4(a)(2). The Progrexion Defendants, as telemarketers of both Lexington Law and CreditRepair.com credit repair services, owe a penalty for the fees unlawfully charged by Lexington Law in violation of § 310.4(a)(2), as well as a penalty for the fees unlawfully charged by CreditRepair.com in violation of § 310.4(a)(2).[31]

Regarding the duration of the violations, as of April 7, 2023, the unlawful billing practices continued for 2,587 days. If Defendants continue to violate § 310.4(a)(2) between April 8 and entry of final judgment, that number will increase.

---

[30] Lexington Law and CreditRepair.com are both Progrexion brands and are functionally identical, but they are marketed and sold separately. Many consumers enrolled in both brands at various times during the relevant period and were charged illegal fees, separately, by *both* Lexington Law and CreditRepair.com.
[31] The Progrexion Defendants stipulated that they "shall be jointly and severally liable for any … civil money penalty." ECF 462, p. 13.

Below are the Bureau's proposed civil money penalty awards, calculated as described above.

**Table 1: Penalty Calculation for Heath PC**

| Violation | # Days | Penalty Per Day | Total |
|---|---|---|---|
| Lexington Law fee violation 3/8/2016-4/7/2023 | 2,587 | $6,813 | $17,625,231 |
| Additional days Lexington Law violates § 310.4(a)(2) | To be determined | $6,813 | To be determined |
| *Total award:* | | | *Not less than $17,625,231* |

**Table 2: Penalty Calculation for the Progrexion Defendants**

| Violation | # Days | Penalty Per Day | Total |
|---|---|---|---|
| Lexington Law fee violation 3/8/2016-4/7/2023 | 2,587 | $6,813 | $17,625,231 |
| CreditRepair.com fee violation 3/8/2016-4/7/2023 | 2,587 | $6,813 | $17,625,231 |
| Additional days Lexington Law violates § 310.4(a)(2) | To be determined | $6,813 | To be determined |
| Additional days CreditRepair.com violates § 310.4(a)(2) | To be determined | $6,813 | To be determined |
| *Total award:* | | | *Not less than $35,250,642* |

The Bureau's requested penalty awards are appropriate and judicious, considering all the facts and circumstances of this case.

23

### C.    The Court should impose penalties at the maximum daily rate for First Tier violations.

Considering the statutory factors as the CFPA requires, the Court should order the maximum Tier 1 penalty of $6,813 per day (calculated according to the conservative approach described above).

***Gravity of the violation and severity of the risks or losses to consumers:*** The gravity of Defendants' violations was significant and the harm to consumers severe. The payment preconditions in § 310.4(a)(2) are not mere "technical" requirements, as Defendants have asserted.[32] Rather, § 310.4(a)(2) plays a critical role in protecting consumers from having to pay for credit repair services that do not yield results by empowering them to withhold payment when credit repair is not achieved. By failing to even attempt to comply, Defendants deprived over four million consumers of that ability. Instead, Defendants charged these consumers, many of whom were highly financially vulnerable, hundreds of dollars in illegal upfront fees.

***Good faith and size of financial resources:*** The CFPA does not define the term "financial resources" or limit consideration of this factor to any specific point in time. *See* 12 U.S.C. § 5565(c)(3). In ordering penalties under other statutory

---

[32] ECF 491, Sept. 21, 2022 Hr'g Tr. 28:18-20.

schemes, such as the securities laws, courts consider both the current and future financial condition of the defendant. *SEC v. GenAudio, Inc.*, 32 F.4th 902, 964 (10th Cir. 2022); *SEC v. Harkins*, No. 19-cv-02418-PAB-MDB, 2022 WL 3597453, at *14-15 (D. Colo. Aug. 23, 2022). And where a defendant claims current poverty, courts have taken into account the amount of money gained from the unlawful conduct. *E.g.*, *SEC v. Aletheia Research & Mgmt. Inc.*, No. CV-12-10692-JFW, 2015 WL 13404306, at *5 (C.D. Cal. May 11, 2015) (imposing highest level of penalties despite claim of poor financial condition, given that defendant made almost $3 million from company prior to its bankruptcy), *aff'd*, 689 F. App'x 512 (9th Cir. 2017).

There is no evidence that Defendants have acted in good faith, and the Court should be skeptical of any claims of limited financial resources. Progrexion's former CEO, Jeffrey Johnson, suggested in 2015 that, █████████████████

███████████████████████████████████████████.[33] Around that time, despite having a business model that █████████████████████[34]

---

[33] Ex. 7 (CFPB-PGX-127549) (Progrexion CEO to Progrexion's parent company executives: ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████).

[34] Ex. 2, Johnson Dep. 238:11-13 ████████████████████████
███████████████), 238:20-24 ████████████████████████

Progrexion ████████████████████████████████████████

█████████[35] ████████████████████████████████████████

████.[36] Thus, any lack of cash on Progrexion's balance sheet is by design. And

regardless of whether they have cash on hand, since 2016 alone, Defendants have

made billions of dollars by charging consumers illegal upfront fees. Their illegal

billing scheme was so successful that Mr. Johnson once likened it to ████████

████████"[37] Finally, Progrexion and Heath PC are each capable of future

earnings, as their past financial success demonstrates. *See, e.g.*, *SEC v. Michel*, No.

06-C-3166, 2008 WL 516369, at *3 (N.D. Ill. Feb. 22, 2008) (imposing significant

penalty where the defendant had future earning potential).

*History of previous violations:* Lexington Law has been the subject of



███████████████████████████████████████████████
███████████████████████████"), 243:11-13 ███████████████
█████████); Ex. 8 (CFPB-PGX-128954)
████████████████████████████████████████████████████████);
Ex. 5 (CFPB-PGX-118928) ████████████████████████████████
████████████████████████████████).
[35] Ex. 2, Johnson Dep. 240:7-9.
[36] *Id.* 240:19-242:12.
[37] Ex. 6 (CFPB-PGX-120094).

various state enforcement actions in Maryland,[38] Minnesota,[39] South Carolina,[40] and Tennessee.[41]

>    ***Other matters as justice may require:*** No other factors justify anything less than the maximum daily Tier 1 penalty here.

## IV.   There is no just reason to delay entry of final judgment on Count I.

Fed. R. Civ. P. 54(b) permits "entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." The Court should make that determination here for at least three reasons. First, final judgment on Count I will dispose of the only claim against Heath PC, obviating that defendant's need to await resolution of the remaining counts before appealing. Second, the consumer redress award for Count I substantially subsumes the redress the Bureau would seek under Counts II-V

---

[38] Settlement Agreement and Consent Order, Md. Comm'r of Fin. Regul., *In the Matter of John C. Heath, Attorney-at-Law LLC*, No. CFR-FY2010-048 (Aug. 12, 2017), *available at* https://www.dllr.state.md.us/finance/consumers/pdf/lexington law.pdf.

[39] Consent Order, Minn. Dep't of Com., *In the Matter of the Unregistered Credit Services of John C. Heath, Attorney-at-Law PC*, No. 57383 (Sept. 3, 2021), *available at,* https://www.cards.commerce.state.mn.us/security/search.do?documentId={F3DF5D8A-A385-467F-947C-112FD821E991}.

[40] *Lexington Law Firm v. S.C. Dep't of Consumer Affairs*, 677 S.E.2d 591 (S.C. 2009).

[41] ECF 230-7, Compl., *Tennessee v. Lexington Law Firms*, No. 3-96-0344 (M.D. Tenn. Apr. 10, 1996).

because the Count I affected consumer group includes all consumers who paid for Defendants' credit repair services on or after March 8, 2016, including those who were live-transferred by a hotswap company. Third, entry of final judgment on Count I is likely to expedite resolution of the entire case and potentially avoid the need for trial; as the parties jointly informed the Court, if Count I is resolved, settlement negotiations on Counts II-V would be possible.[42] There is no just reason to delay entry of final judgment on Count I.

## Conclusion

For these reasons, the Court should award the requested relief against Defendants, find no just reason for delay, and enter final judgment against Defendants on Count I, pursuant to Rule 54(b). A proposed order is attached for the Court's consideration.

Dated: April 11, 2023                         Respectfully submitted,

                                              /s/ Jonathan Reischl
                                              MAUREEN MCOWEN
                                              JONATHAN REISCHL
                                              TRACY L. HILMER
                                              ALICIA FERRARA
                                              *Enforcement Attorneys*

---

[42] ECF 462, p. 26.

Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9202
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov

*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

CERTIFICATION OF COMPLIANCE

I, Jonathan Reischl, certify that Plaintiff's Motion for Award of Monetary and Injunctive Relief, Assessment of Civil Money Penalties, and Entry of Final Judgment Against All Defendants on Count I contains 5,934 words and complies with the Court's order dated April 11, 2023, ECF 533.

Dated:  April 11, 2023                    /s/ Jonathan Reischl
                                          Enforcement Attorney
                                          Bureau of Consumer Financial Protection