# Ex. 3
# Heath Dep. Excerpts

# Redacted Public Version

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

------------------------------)

BUREAU OF CONSUMER FINANCIAL

PROTECTION,

        Plaintiff,      Civil Action

  vs.                       2:19-cv-00298-BSJ

PROGREXION MARKETING, et al,

        Defendants.

------------------------------)


REMOTE VIDEOCONFERENCE DEPOSITION OF

JOHN C. HEATH


West Valley City, Utah

Tuesday, April 20, 2021

8:40 a.m. MST


Reported By:

Raymond G. Brynteson, RMR-CRR-RDR

Page 180

1 Q. What records exist?

2 A. Well, there are -- in relation to
3 training?

4 Q. In relation to monitoring use of
5 the training materials.

6 A. Well, we use a platform called
7 Verint in order to monitor credit
8 consultant telephone calls with potential
9 clients. And so we would have -- we'd
10 have -- we would have record of monitoring
11 those telephone calls.

12 Q. What was the purpose of that
13 monitoring?

14 A. The purpose of that monitoring is
15 to -- to make sure that the credit
16 consultants were following the training
17 that they had received and that they were
18 compliant in the execution of their duties
19 in relation to potential clients.

20 Q. How were the training materials
21 revised?

22 A. That's an ongoing process, so it
23 would -- it would depend on a particular
24 set of training materials.

25 Q. How often were training materials

Page 181

1  revised?

2     A.   Again, that's an ongoing process.

3  So I don't have the intervals or don't

4  recall the intervals on how frequently

5  they're revised.

6     Q.   Is that determined by Lexington

7  Law or by Progrexion?

8     A.   Well, it can be determined by

9  both.  It depends on the needs of the law

10 firm in relation to the services being

11 offered by the credit consultants.

12         I would assume that Progrexion can

13 make changes to the scripts where needed,

14 or the training materials, excuse me,

15 where needed.

16    Q.   Why were the training materials

17 revised during this period?

18    A.   For a number of reasons.

19 Sometimes our services change, or what's

20 being offered in the service changes.

21         There may be changes in the law

22 that would need to be updated in the -- in

23 the training materials.  We may see a need

24 for certain items to be emphasized in the

25 training materials.

Page 182

1      So it would be a number of
2  different things.
3      Q.  If one wanted to determine what
4  dates certain training materials were
5  used, how would one determine that?
6      A.  I don't know.  I would have to
7  look at the training materials themselves
8  in order to give an answer to that.
9      Q.  Is the dates the training
10 materials were used on the training
11 materials themselves?
12     A.  Sometimes they are, and I've seen
13 them on the training materials but, again,
14 I would have to look at the specific
15 training material to give that answer.
16     Q.  Would you look anywhere else to
17 determine the dates the training materials
18 were used?
19     A.  Probably on the training materials
20 and maybe in the description of the file
21 that contains the training materials.
22 Those would be places that I would start,
23 so.
24     Q.  Anywhere else?
25     A.  Not right offhand.

Page 183

1  Q. When did you first learn that the
2  CFPB was investigating Heath PC's
3  compliance with Section 310.4(a)(2), which
4  I will refer to as the credit repair
5  billing provision of the Telemarketing
6  Sales Rule?
7  A. I believe it was later, after the
8  CFPB had issued a CID. So it may have
9  been 2017/2018, that. I -- I can't
10 recall. It has been a long time.
11 Q. The CFPB issued a Civil
12 Investigative Demand to your company on
13 October 3rd, 2014.
14    Did you receive that CID around
15 the time it was served?
16 A. I did.
17 Q. Did you review it?
18 A. I did.
19 Q. The Bureau -- are you familiar
20 with the Bureau's Notice and Opportunity
21 to Respond and Advise process, or NORA
22 process?
23 A. Yes.
24 Q. Did the Bureau conduct that
25 process with your company through counsel

Page 184

1  in September of 2017?
2      A.   That is my recollection.
3      Q.   Did it include the 310.4(a)(2)
4  claim, the credit repair billing provision
5  of the Telemarketing Sales Rule?
6      A.   Without looking at the document I
7  can't recall.
8      Q.   What claims did it include against
9  your company?
10     A.   The CID?
11     Q.   No, well, let's begin with the
12 CID, yes.
13          Do you recall what issues the
14 Bureau was investigating when it served
15 the CID on your company in 2014?
16     A.   I don't specifically.  I would
17 have to look at the CID again.  It has
18 certainly been a while.  That was almost
19 seven years ago.
20     Q.   Did the company change any of its
21 policies, practices or procedures for
22 compliance with the credit repair billing
23 provision of the Telemarketing Sales Rule
24 after reviewing the Bureau's CID?
25     A.   Not that I recall.

1     Q.    Are you familiar with the Bureau's
2  2016 lawsuit against another credit repair
3  company called Prime Marketing?
4     A.    I remember reading about it but I
5  do not remember the details.
6     Q.    Do you remember reading about it
7  around the time that the lawsuit was
8  filed?
9     A.    I don't.
10    Q.    Do you recall when you read about
11 it?
12    A.    I don't.  It has been several
13 years, though.
14    Q.    Did the company, Heath PC, change
15 any of its policies, practices or
16 procedures for compliance with the credit
17 repair billing provision of the
18 Telemarketing Sales Rule after learning of
19 the Bureau's lawsuit against Prime
20 Marketing?
21    A.    I don't recall.
22    Q.    After the Bureau went through the
23 NORA process with your company in
24 September and October of 2017, did the
25 company change any of its policies,

1  practices or procedures for compliance
2  with the credit repair billing provision
3  of the Telemarketing Sales Rule?
4      A.   I don't recall.  However, we're
5  always, you know, looking for ways to be
6  compliant in our practices and policies in
7  the law firm.
8      Q.   What kind of compliance policies,
9  procedures or efforts do you make towards
10 compliance with the credit repair billing
11 provision of the Telemarketing Sales Rule?
12     A.   Well, we -- we certainly bill in
13 arrears with our law firm to make sure
14 that our -- the services that are
15 represented are represented in an accurate
16 manner and that they are delivered in a
17 professional manner.
18          We're always monitoring for
19 compliance with our employees, as well as
20 the credit consultants at Progrexion.
21     Q.   Anything else?
22     A.   No, not that I can recall at this
23 time.
24     Q.   Does Lexington Law train any of
25 its employees or agents that the company

Page 187

1  is subject to the credit repair billing
2  provision in the Telemarketing Sales Rule?
3     A.   In the CFR?
4     Q.   CFR, 16 CFR Section 310.4(a)(2).
5     A.   Not that I recall in our training
6  materials.
7     Q.   Why not?
8     A.   It hasn't been part of our
9  training materials.  It just is not part
10 of them right now.
11    Q.   Has it ever been part of them
12 since March 2016?
13    A.   Not that I recall.
14    Q.   I'm going to ask to pull up a
15 previously-marked document.  It has been
16 marked as Exhibit 133.  It's Bates number
17 PGX0049596.
18         And please let me know when you've
19 got that in front of you?
20    A.   It's in front of me.
21    Q.   Thank you.  If you would, please,
22 turn to page 2 of this document.
23         Do you see a document titled "Fact
24 Sheet on CFPB Action" and do you recognize
25 this document, which begins on page 2 of

Transcript pp. 188-191

REDACTED FROM PUBLIC VERSION