MAUREEN MCOWEN
JONATHAN REISCHL
TRACY L. HILMER
ALICIA FERRARA
(202) 435-9202
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov
1700 G Street, NW
Washington, DC 20552
*Attorneys for Plaintiff Bureau of
Consumer Financial Protection*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | Case No.  2:19-cv-00298-BSJ |
| *Plaintiff*, | Redacted Public Version |
| v. | |
| PROGREXION MARKETING, INC., *et al*., | |
| *Defendants*. | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION
FOR AWARD OF MONETARY AND INJUNCTIVE RELIEF,
ASSESSMENT OF CIVIL MONEY PENALTIES, AND ENTRY
OF FINAL JUDGMENT AGAINST ALL DEFENDANTS ON COUNT I**

Table of Contents

Introduction ............................................................................................................1

Argument.................................................................................................................1

I.    Defendants' Unlawfully-Charged Customers Are Entitled to Full Refunds....1

    A. Defendants' abusive practices injured millions of consumers. ........................1

    B. Defendants' net revenues—not net profits—are the baseline for consumer
       redress here. ..............................................................................................5

    C. The Bureau's initial estimates can be reduced by payments from non-
       telemarketed enrollees. ..............................................................................8

    D. Defendants' remaining proposed reductions are invalid and unsupported. ...10

        1. The Bureau's estimate includes only credit repair payments. ...................10

        2. Defendants cannot deduct payments made by consumers "with a
           significant outstanding balance." .................................................................11

        3. Defendants cannot deduct the value of bundled services. .........................12

        4. Defendants have failed to identify "satisfied" customers. ..........................12

II.   Injunctive relief is necessary and appropriate. ...............................................13

    A. There is a clear risk of future violations. .......................................................13

    B. The injunctive terms are specifically tailored to this case.............................16

III.  The Court should adopt the Bureau's suggested penalty. ..............................18

    A. Heath PC and the Progrexion Defendants independently owe penalties. ......18

    B. No mitigation is warranted. ...........................................................................20

        1. Defendants are recidivists and lack good faith. .........................................20

        2. Defendants' poor-mouthing is not credible..................................................20

        3. Defendants' misconduct injured millions. ...................................................21

Conclusion ............................................................................................................22

## Introduction

The Bureau agrees to exclude non-telemarketed customers and their payments from the redress award. Defendants' other objections to the Bureau's request for consumer redress, injunctive relief, and penalties lack merit and should be disregarded.

## Argument

### I.   Defendants' Unlawfully-Charged Customers Are Entitled to Full Refunds.

#### A.   Defendants' abusive practices injured millions of consumers.

The Bureau has proved that Defendants collected billions of dollars from their customers for credit repair services when, by law, Defendants had no right even to ask for those payments. Defendants' denial that their customers suffered redressable harm[1] is contradicted by the decision they rely on most: *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). There, in assessing Article III standing, the Supreme Court confirmed that monetary harm is a concrete injury.[2] The Bureau seeks redress for Defendants' millions of customers who suffered

---

[1] Opp'n 3-5.

[2] Defendants mis-cite *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000), Opp'n 3, which affirmed the finding of redressable consumer harm, but found one defendant not liable for it. Defendants here do not contest joint and several liability.

1

monetary losses in the form of illegal advance fees because of Defendants' abusive practices.

The CFPA expressly provides for monetary redress to victimized consumers. 12 U.S.C. § 5565(a). Defendants cite no persuasive authority for this Court to deny such relief here.[3] Congress passed the Telemarketing and Consumer Fraud and Abuse Prevention Act and the FTC promulgated § 310.4(a)(2) precisely because telemarketers were causing consumers to pay fees for services that were often illusory or sold through deceptive or abusive practices.[4] As this Court recognized, the FTC defines it as "an abusive telemarketing act or practice" to charge consumers for telemarketed credit repair services before fulfilling the requirements of § 310.4(a)(2).[5] The Rule resulted from the FTC's conclusion that a bright line rule was necessary to protect consumers from credit repair telemarketers because consumers, "having no way to know these offered services were illusory, … had

---

[3] *FTC v. Noland*, 2021 WL 5493443 (D. Ariz. Nov. 23, 2021), is of no moment in light of the Ninth Circuit's affirmation in *CFPB v. CashCall, Inc.*, 35 F.4th 734, 751 (9th Cir. 2022), of essentially the same two-step restitution framework that the Tenth Circuit endorsed in *FTC v. Kuykendall*, 371 F.3d 745, 764-66 (10th Cir. 2004) (*en banc*).

[4] 15 U.S.C. § 6101 (enacting statute because consumers "are victimized by… telemarketing deception and abuse" and "lose $40 billion a year" due to it); § 6102(a) (directing FTC to promulgate regulations prohibiting "other abusive telemarketing acts or practices").

[5] ECF 508, Order Granting Pl.'s Mot. for Partial Summ. J., p. 9.

no reasonable means to avoid the harm that resulted from accepting the offer."[6]
Under that bright line rule, telemarketers cannot charge upfront fees for credit
repair services, period—and consumers suffer a harm recognized by the Rule when
they are charged such a fee.

Still ignoring the bright line rule, Defendants claim that, to obtain consumer
redress, the Bureau must show Defendants' services didn't work.[7] But, as this
Court correctly held, § 310.4(a)(2) put the burden on *Defendants* to demonstrate *to
their customers* that they had achieved durable credit improvement by supplying a
consumer report issued six months thereafter; unless and until Defendants fulfilled
that obligation, they were prohibited from charging those customers.[8] Because, as
the Court found, Defendants never did this, every dollar they collected constitutes
monetary injury to their customers and must be returned. The amount of monetary
relief Defendants owe is not the product of the Bureau's "audacity," but rather of
Defendants' audacious disregard of their legal obligations for over seven years.

---

[6] 67 Fed. Reg. 4492, 4511 (Jan. 30, 2002); ECF 257, Pl.'s Mot. for Partial Summ.
J., pp. 2-8.
[7] Opp'n 5. For the vast majority of their customers, Defendants' "solutions" *are*
illusory: only a small fraction of Lexington Law's customers experienced the
advertised "average" score increase over any timeframe, and many saw their score
actually deteriorate.
[8] ECF 508, p. 12.

Neither is the Bureau's relief demand "unprecedented." Defendants acknowledge the extensive caselaw supporting redress equal to net revenues to consumers victimized by deceptive acts and practices. But they offer no reason—and there is none—why consumer redress should be computed any differently for injuries caused by acts and practices that a regulation expressly defines as abusive. In *CFPB v. CashCall, Inc.*, as here, consumers made payments that the defendants were legally prohibited from charging, and the district court concluded that "[a]n award of restitution will compensate consumers for their losses, and will promote future transparency in the markets for consumer financial products and services." 2023 WL 2009938, *6 (C.D. Cal. Feb. 10, 2023). Likewise, the court in *CFPB v. Morgan Drexen, Inc.*, 2016 WL 6601650, *2 (C.D. Cal. Mar. 16, 2016), awarded as restitution the full amount of unlawful upfront fees charged to consumers by a debt relief services company in violation of the TSR.[9]

---

[9] Defendants dismiss this decision as not "adversarially briefed." Opp'n 3, n.1. But the opinion demonstrates the court's scrutiny of the Bureau's proof (even identifying a discrepancy that was later corrected) before awarding restitution.

**B.    Defendants' net revenues—not net profits—are the baseline for consumer redress here.**

The Bureau seeks a sum of money equal to the money that Defendants charged consumers that they had no right to charge; this is fundamentally legal restitution, as the Supreme Court has recognized for many years. *E.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 47-48 (1989), quoting, *inter alia, Gaines v. Miller*, 111 U.S. 395, 397–98 (1884) ("Whenever one person has in his hands money equitably belonging to another, that other person may recover it by assumpsit for money had and received. The remedy at law is adequate and complete.") (citations omitted).

To justify a net profits calculation, Defendants insist that the Bureau is limited to equitable restitution, despite the CFPA's express language and decades of contrary authority.[10] Defendants mischaracterize *Liu v. SEC*, 140 S. Ct. 1936 (2020), and *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), as holding that restitution is *exclusively* equitable unless Congress explicitly says otherwise.[11] To the contrary, the Supreme Court in *Great-West* recognized that restitution is a remedy traditionally available *both* at law *and* in equity, explaining

---

[10] Defendants misleadingly cite a superseded Rule 26 disclosure (Defs.' Ex. 1), which the Bureau duly revised and updated. *See* Ex. 1, CFPB Supp. Disclosures.
[11] Opp'n 5-6.

that restitution is a legal remedy when, as here, the plaintiff seeks "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money," and not "to restore to the plaintiff particular funds or property in the defendant's possession." 534 U.S. at 213-14 (citing, *inter alia*, Restatement (First) of Restitution § 160, Comment a (1936)); *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1224-25 (10th Cir. 2019) (same). *Liu* did not alter the *Great-West* holding.[12] Indeed, the Restatement notes: "The most widespread error is the assertion that a claim in restitution or unjust enrichment is by its nature equitable rather than legal." Restatement (Third) of Restitution and Unjust Enrichment § 4 (2011).[13]

Although restitution has long been regarded as "a remedy available in certain cases at law, and in certain others in equity," the distinction "remains

---

[12] *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161 (10th Cir. 2022), *pet. for cert. filed* Mar. 3, 2023 (No. 22-838), is not to the contrary. There, the Tenth Circuit distinguished the CFPA's authorization of both legal and equitable relief from the exclusively equitable relief authorized by the statute at issue in *Liu* and treated the $38.4 million award as legal restitution, finding defendant had waived its challenge to the Director's designation of the award as such. *Id.* at 1176-77.

[13] The Restatement (*id.* §§ 40, 52) also makes clear that the restitution of a sum of money (*i.e.*, legal restitution) is available for tort-like and other injuries and is not *only* a quasi-contractual remedy, as Defendants claim without support (Opp'n 6). Even were that so, the remedy would still be appropriate here, where Defendants unlawfully charged consumers for services.

important for several reasons." Dan B. Dobbs, Law of Remedies § 1.2, p. 9 (3d ed. 2018). One important reason is that "equitable relief is discretionary," whereas a "legal remedy" is awarded "as a matter of course when the right [is] established." *Id.* Upholding this principle, the Supreme Court has held that legal relief is mandatory when liability has been established and cannot be denied for equitable reasons. *Curtis v. Loether*, 415 U.S. 189, 189-90, 197 (1974).

Refunds are equally appropriate. Defendants barely mention the Bureau's refund claim at all, except to complain that it is "novel."[14] Congress saw fit to include refunds as an available remedy in the CFPA, and Defendants provide no reason or authority for the Court to deny it here. Nor do they offer support for the notion that a "refund" would be limited to whatever profit the wrongdoer made on the deal, rather than requiring a return of the full amount the consumer was wrongfully charged.

Because the relief the Bureau seeks is measured by the amount Defendants wrongfully collected from consumers, not Defendants' profits, Defendants' net profits computation is entirely irrelevant. And, besides, Defendants also failed to produce any of the documents on which they base their calculations, in violation of Fed. R. Evid. 1006 and Fed. R. Civ. P. 26(e). Accordingly, Defendants should be

---

[14] Opp'n at 7.

precluded from offering those calculations in support of their opposition, regardless of relevance. Fed. R. Evid. 1006; Fed. R. Civ. P. 37(c)(1).[15] Further, Defendants have not demonstrated that their figures are reliable. They provide no detail or documentary support for their expenses, which, under *Liu*, they would have to show are "legitimate." *Liu*, 140 S. Ct. at 1950. They do not explain what happened to the ████████████████,[16] or whether their debt expense was merely a vehicle for transferring the unlawful fees to Progrexion's owners. Self-dealing, self-impoverishment, and cash-hiding maneuvers would not be "legitimate expenses." *SEC v. Liu*, 2021 WL 2374248, at *7-8 (C.D. Cal. Jun. 7, 2021).

### C.   The Bureau's initial estimates can be reduced by payments from non-telemarketed enrollees.

Defendants object to the inclusion of payments from non-telemarketed enrollees in the Bureau's restitution calculation, an amount they say totals ████████.[17] Defendants provided the Bureau with the data necessary to validate these calculations on May 3, 2023. The Bureau agrees that this group of consumers and their payments should be excluded from the redress award.

---

[15] Pl.'s Objections to Defendants' Opp'n ("Objections"), pp. 4-7.
[16] *See* ECF 544, Pl.'s Mot., pp. 25-26.
[17] Opp'n Ex. 7.

The Court should reject Defendants' baseless suggestion[18] to throw out the Bureau's entire redress claim simply because Defendants identified one appropriate offset.[19] The Bureau's estimate was reasonable, based on the data Defendants provided during discovery,[20] and if Defendants had more accurate data, they had a duty under Fed. R. Civ. P. 26(e) to supplement or bear the risk of any uncertainty. *FTC v. Freecom Comm'ns, Inc.*, 401 F.3d 1192, 1206-07 (10th Cir. 2005).

Relying on the new customer data Defendants supplied on May 3, which obviate the need for estimates, the Bureau has recalculated the redress figures. The Bureau's revised redress calculations are shown in Exhibit 2, Tables 17 and 18, and, after deducting payments by non-telemarketed customers, have been reduced to $2,398,880,122 for Lexington Law customers and $314,147,043 for CreditRepair.com customers.[21]

---

[18] *Id.* at 8.

[19] Defendants' lone case cite does not support such an extraordinary and unjust result. In *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69-70 (2d Cir. 2006), the court did not dismiss the FTC's restitution claim, but instead remanded it for re-calculation. Likewise, the district court in *CashCall* accepted the Bureau's reduced calculation after the defendant identified consumers who had paid less than they received in loan payments. 2023 WL 2009938, at *9.

[20] Defendants did not produce their " ▮▮▮▮▮▮ " field in discovery, which is necessary to identify online signups. Not until May 3 did they provide any dataset including this field.

[21] Ex. 2, Second Decl. of Camille Hinds (May 9, 2023).

### D.   Defendants' remaining proposed reductions are invalid and unsupported.

#### 1.   The Bureau's estimate includes only credit repair payments.

Defendants contend that the mandatory \$12-\$15 fee they charged consumers at sign-up is not a credit repair fee under § 310.4(a)(2). But as their scripts clearly show, that fee is integral to Defendants' telemarketed credit repair offer.[22] Defendants do not permit consumers to sign up for credit repair without first agreeing to pay for this report.[23] The initial fees collected from telemarketed consumers are thus properly included in the redress award. *CFPB v. Prime Mktg. Holdings*, 2016 WL 10516097, at *1, 11 (C.D. Cal. Nov. 15, 2016) (if "initial fee" purportedly "for a credit report or 'lender report'" was "the first step in the credit repair process," then it was "conduct covered by the TSR").

The Bureau agrees that payments for *purely* monitoring products are not redressable. But such payments are not included in the Bureau's estimate. Defendants' interrogatory responses—which the Bureau relied on—did not include fees for monitoring products, but only "the gross amount paid by [brand] clients

---

[22] Defs.' Ex. 6-C, at PGX0028805-06 ("███████████████████████████████████████████████████████████████████████████████████████████████"); Defs.' Ex. 5-A, at PGX0028684 (CreditRepair.com, same).
[23] *See also* Mot., PX-608B, 11:21-16:7.

*for credit repair services*, less refunds …."[24] Defendants' attempt to deduct these

fees again[25] is double-counting.[26]

### 2. Defendants cannot deduct payments made by consumers "with a significant outstanding balance."

Defendants ask the Court to deduct from the redress award payments that

were made by consumers "with a significant outstanding balance"[27]—that is,

consumers from whom Defendants collected *some amount* of illegal advance fees

but who Defendants claim were required to pay them *more* illegal advance fees.

But Defendants had no legal right to charge these customers any of the fees they

claim are owed, and the unpaid amounts are not included in the Bureau's

calculations. Defendants' claim that they "have already absorbed the costs of

providing those services,"[28] is a thinly-disguised "net profits" argument. The Court

should reject it.

---

[24] Mot., PX-327, PX-328 (emphasis added).
[25] Opp'n 9.
[26] Additionally, Defendants mischaracterize the CreditRepair.com service-levels ███████████████████████████████
Lam Decl. p.3 fn.2. In fact, both include "credit repair features." PX-331.
███████████████████████████████████████
means. Lam Decl., p.3 n.2.
[27] Opp'n 10.
[28] *Id.* 10-11.

### 3. Defendants cannot deduct the value of bundled services.

No authority supports Defendants' proposed deduction for the alleged value of the non-credit repair components of their unlawfully billed services. Indeed, the Tenth Circuit expressly held in *Kuykendall* that "the district court need not offset the value of any product the defrauded consumers received." 371 F.3d at 766 (refusing to deduct value of magazines) (citing *McGregor*, 206 F.3d at 1388-89 (refusing to deduct value of toner cartridges)). Defendants unlawfully charged consumers a single monthly package fee; consumers had no option to decline payment, or obtain a reduced price, for some aspects of the service.

In any event, Defendants failed to meet their burden under *Kuykendall* to support the $12 monthly deduction they claim. Their claimed valuation rests on undocumented and speculative assertions by Messrs. Wallace and Heath, amounting to undisclosed, unqualified, and untimely opinion testimony, in violation of Fed. R. Evid. 701 and 702, Fed R. Civ. P. 26(a)(2) and 37(c)(1), and the Amended Scheduling Order, ECF 138.[29]

### 4. Defendants have failed to identify "satisfied" customers.

Even if fees paid by "satisfied" consumers could properly be deducted (which the Bureau does not concede), no such deduction would be warranted here.

---

[29] *See* Objections, pp. 12-15.

With no proof whatsoever, Defendants ask the Court to assume that any consumer who signed up more than once was "satisfied."[30] To the contrary, repeat customers here are repeat victims. In the absence of proof that any customers were satisfied with making payments they didn't owe, Defendants have failed to justify this offset. *FTC v. Wellness Support Network, Inc.*, 2014 WL 644749, at *20 (N.D. Cal. Feb. 19, 2014) (absent affirmative evidence that customers who reordered the product were not subject to the unlawful activity, restitution amount should include repeat sales).

## II.   Injunctive relief is necessary and appropriate.

### A.   There is a clear risk of future violations.

The record amply demonstrates why injunctive relief is needed to forestall Defendants from violating §310.4(a)(2) now and in the future, notwithstanding their claims of reform.

First, despite telling this Court that they terminated their telemarketed customers' contracts,[31] Defendants sent emails to those customers vaguely referring to "a change in legal requirements" and directing them to re-sign their contracts online, presumably so that Defendants could continue collecting monthly

---

[30] Opp'n 10.
[31] Opp'n 16.

fees from them.[32] But new contracts for the same services change neither the fact

that these customers were induced to sign up for credit repair in the first place

through telemarketing, nor Defendants' obligation—as sellers of telemarketed

credit repair services—to comply with § 310.4(a)(2) before billing them.

Defendants' subterfuge demonstrates their active violation of law and the critical

need for the proposed injunctive provisions to prevent it.

Additionally, it is unclear whether Defendants have ceased telemarketing.

Currently, when consumers access the Lexington Law or CreditRepair.com

websites and navigate through the "sign up online" feature, they are prompted to

submit their name and telephone number to "get started."[33] By clicking the

"submit" button, consumers agree to be "contacted by Lexington Law Firm [or

CreditRepair.com] about credit repair or *credit repair marketing by a live

agent*…at my residential or cellular number."[34] (emphasis added). There is no opt-

out.

Second, Defendants claim that "compliance with the March 10 Order will

---

[32] Ex. 3, Decl. Jonathan Reischl (May 9, 2023).

[33] Ex. 4, Decl. Elizabeth Rosario (May 9, 2023).

[34] *Id*.

put Defendants out of business in short order."[35] Defendants' representations that

they must telemarket to survive unambiguously raise the risk of future violations.

Third, Defendants argue that an injunction is unnecessary because of their

compliance with the consent order in *Tennessee v. Lexington Law* ("Tennessee

Order").[36] But Defendants have not complied with the Tennessee Order. That order

required Defendants to "comply with applicable…federal law."[37] This Court

determined that Defendants violated applicable federal law.[38] Defendants also

claim that the Tennessee Order permitted them "to bill monthly in arrears provided

'no promised results have been represented to client[s] by' Lexington Law."[39] But,

---

[35] ECF 519, Defs.' Mot. to Expedite Hr'g. (D. Utah), p. 1; *see also* ECF 510-1, Decl. John Heath (Mar. 13, 2023) ¶ 9 ("Nor is [Lexington Law] likely to survive if it is unable to use the telephone…").

[36] Opp'n 17. Defendants attack as "absurd" the Bureau's invocation of their continued § 310.4(a)(2) violations during the litigation.  But courts routinely take such conduct into account. *See, e.g., CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("[W]hen a defendant persists in its illegal activities 'right up to the day of the hearing in the district court … the likelihood of future[] violations, if not restrained, is clear.'") (citations omitted); *United States v. Zen Magnets, LLC*, 104 F. Supp. 3d 1277, 1283 (D. Colo. 2019) (same).

[37] ECF 168-29, Tenn. Order, ¶ 7(E)(iii).

[38] ECF 508, p. 13.

[39] Opp'n 12.

as the Court noted, Defendants' claims of not promising results are "contradicted by Defendants' advertising online and through hotswap partners."[40]

### B.     The injunctive terms are specifically tailored to this case

Among other things, injunctions must "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C); *Hetronic Int'l, Inc. v. Hetronic Ger., GmbH*, 10 F. 4th 1016, 1046 (10th Cir. 2021) (an injunction must describe the proscribed activity with particularity and contain "an operative command capable of enforcement."). The Bureau's proposed injunctive relief meets this standard. Rule 65(d) does not, as Defendants argue, forbid injunctions that "exceed[] the regulation at issue."[41] Rather, as Defendants' own cited authority makes clear, "[t]he scope of an injunction generally is committed to the discretion of the district court," and "must…be broad enough to be effective." *CFPB v. Consumer First Legal Grp., LLC*, 6 F. 4th 694, 712-13 (7th Cir. 2021); *see also FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009).

---

[40] ECF 508, at 11-12. Defendants concede that they did not comply with the delayed billing requirement when their agents guaranteed consumers specific results. *See* Mot., p. 16.
[41] Opp'n 18.

The Bureau's proposed order proscribes conduct and requires actions necessary to ensure Defendants' compliance with the law.[42] Specifically, paragraph 51 covers "all … persons in active concert or participation" with the Defendants to avoid evasion. This is necessary, in part, because Defendants have previously used other companies—*e.g.*, hotswap partners—to outsource telemarketing functions. It also intentionally covers all credit repair sales (online and telephone), while Defendants are telemarketers *or* sellers, because allowing two different billing regimes would invite error and encourage misconduct, such as pushing consumers who were subjected to telemarketing pitches to sign up online, just as Defendants apparently have done in response to the Court's March 10 Order. *See AMREP Corp. v. FTC*, 768 F.2d 1171, 1180 (10th Cir. 1985) (remedial orders may cover acts, practices, or products other than those that were the subject of the original complaint when necessary to prevent circumvention). Similarly, paragraphs 52–53 require Defendants to take specific actions that directly address conduct reflected

---

[42] Defendants' attacks on the monitoring, reporting, and recordkeeping provisions of the Bureau's proposed order (Opp'n 19 n. 9), indicate a desire to avoid accountability and detection, thus reinforcing the need for such provisions. *Metzler v. IBP, Inc.*, 127 F.3d 959, 965 (10th Cir. 1997) (affirming injunction where company failed to enter into compliance agreement with government, keep necessary records, or take other efforts to prevent recurrence).

in the record,[43] including their failure to specify the time frame for credit repair services and the outcomes their services seek to achieve.[44]

## III.    The Court should adopt the Bureau's suggested penalty.

### A.    Heath PC and the Progrexion Defendants independently owe penalties.

Defendants wrongly argue that a single penalty should be assessed jointly against all Defendants. The CFPA provides that "*[a]ny person* that violates … any provision of Federal consumer financial law shall forfeit and pay a civil penalty." 12 U.S.C. 5565(c)(1) (emphasis added). Heath PC and the Progrexion Defendants are each "persons" within the meaning of the CFPA, 12 U.S.C. § 5481(19), and they each violated the TSR by requesting or receiving unlawful fees for Lexington Law credit repair services; therefore, they each owe a penalty for their unlawful conduct. *Integrity Advance*, No. 2015-CFPB-0029 (Jan. 11, 2021), p. 38 ("I

---

[43] *See, e.g.,* Pl.'s Reply in Support of Mot. for Partial Summ. J., ECF 283, p. 8 (quoting PGX0049225); ECF 508, p. 12 (Defendants' claim not to offer promised results "evidences Defendants' failure" to comply with the law).

[44] Defendants' vague allusion to possible restraints on lawful or protected conduct (Opp'n 19) has no bearing on the proper scope of the injunction. *See Thiret v. FTC*, 512 F.2d 176, 181 (10th Cir. 1975) ("[A]n order should ordinarily not be modified or narrowed because of hypothetical situations where lawful conduct could conceivably be prohibited….").

conclude that IA and Mr. Carnes are separately liable for civil penalties…"),[45] *aff'd Integrity Advance*, 48 F.4th 1161.

The Progrexion Defendants owe an additional penalty for the fees unlawfully charged by CreditRepair.com. Defendants' assertion that the number of violations is limited by the Counts pleaded is wrong. The CFPA provides that penalties shall be assessed for "any violation" of Federal consumer financial law, 12 U.S.C. § 5565(c)(2)(A). Defendants violated the law each time they requested or received a payment; therefore, each instance of unlawful billing[46] could carry its own penalty. *E.g., Integrity Advance,* No. 2015-CFPB-0029, p. 38 (noting that each of 82,980 loans could carry its own penalty); *CFPB v. Siringoringo*, 2016 WL 102435, at *7 (C.D. Cal. Jan. 7, 2016) (awarding penalty "based on an estimate of 2,400 customers paying advanced fees and being denied loan modifications"). The Bureau's penalty approach is more conservative, but Heath PC and the Progrexion Defendants must be independently assessed a penalty for their specific legal violations, consistent with the penalty provision's deterrent purpose.[47]

---

[45] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_integrity-advance-llc_decision-of-director_2021-03.pdf.

[46] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████

[47] As discussed above, the Court should not credit Defendants' bare assertion that they ceased unlawful billing on April 5, 2023.

**B.      No mitigation is warranted.**

**1.      Defendants are recidivists and lack good faith.**

As the Court noted, Defendants made no attempt to comply with the express language § 310.4(a)(2).[48] Instead, they relied on a "creative"[49] reading of the regulation to excuse non-compliance with the regulation's plain text. Defendants' failure to comply with the Tennessee Order (*see supra* pp. 15-16), and their other state regulatory violations counsel against mitigation. *Cashcall*, 2023 WL 2009938, at *5 ("[A]lthough this action may be Defendants' first violation of the CFPA, CashCall previously engaged in a similar…scheme that it was forced to terminate…by two states and…the FDIC.").

**2.      Defendants' poor-mouthing is not credible.**

Eight weeks ago, Defendants told this Court and the Tenth Circuit that complying with the March 10 Order would render them insolvent within three weeks.[50] Yet they remain in the credit repair business. The only evidence they muster in support of their claimed poverty are the declarations of Messrs. Heath and Wallace—the same declarants who swore two months ago that Defendants would be insolvent by now. Bare, undocumented declarations like these are

---

[48] ECF 508, p. 10-11.
[49] *Id.* at 11.
[50] ECF 510, p. 6; ECF 519-1, Defs.' Mot. to Stay (10th Cir.), p. 24.

insufficient to demonstrate inability to pay. *E.g.*, *SEC v. Spongetech Delivery Sys.*, 2015 WL 5793303, at *11 (E.D.N.Y. Sept. 30, 2015).

Moreover, "[c]ourts considering a defendant's ability to pay a civil penalty look beyond the funds and assets currently in the defendant's possession." *United States v. Daniel Chapter One*, 89 F. Supp. 3d 132, 154 (D.D.C. 2015). Defendants' objections notwithstanding, there is nothing novel about a court considering the money gained from the unlawful conduct in assessing penalties. *See, e.g.*, *SEC v. Narvett*, 2014 WL 5148394, at *4 (E.D. Wis. Oct. 14, 2014) (financial difficulties "not a strong reason to reduce the civil penalty" given, in part, "the substantial amounts of money [the defendant] obtained"). Additionally, the fact that Defendants remain in business, contrary to their prior assertions, demonstrates their ability to access and earn money in the future.

### 3. Defendants' misconduct injured millions.

As shown, Defendants' assertion that no consumers were injured by their illegal conduct is meritless. On average, Defendants collected some ███ unlawful Lexington Law payments—more than $920,000—*per day*. The Progrexion Defendants additionally collected, on average, some ███ unlawful

CreditRepair.com payments—more than $120,000—*per day*.[51] The Bureau's proposed penalties of $6,813 per day against Heath PC and $13,626 per day against the Progrexion Defendants are more than reasonable, given the severity and scope of these violations. Defendants' proposal to whittle this number down to only $3,000 per day for all Defendants jointly is grossly disproportionate to the revenue Defendants illegally generated at the expense of consumers and would undermine the purpose of imposing a penalty.

## Conclusion

For the reasons stated here and in its opening brief, the Bureau requests that the Court grant its motion.


Dated: May 9, 2023                    Respectfully submitted,


                                      /s/ Jonathan Reischl
                                      MAUREEN MCOWEN
                                      JONATHAN REISCHL
                                      TRACY L. HILMER
                                      ALICIA FERRARA
                                      *Enforcement Attorneys*
                                      Bureau of Consumer Financial Protection
                                      1700 G Street, NW

---

[51] The numbers of payments were drawn from Lam's declaration (¶¶ 14, 16, 22) and the payment amounts from Hinds' second declaration (Ex. 2, ¶ 23).

Washington, DC 20552
Telephone: (202) 435-9202
maureen.mcowen@cfpb.gov
jonathan.reischl@cfpb.gov
tracy.hilmer@cfpb.gov
alicia.ferrara@cfpb.gov

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

**CERTIFICATION OF COMPLIANCE**

I, Jonathan Reischl, certify that Plaintiff's Reply in Support of its Motion for

Award of Monetary and Injunctive Relief, Assessment of Civil Money Penalties,

and Entry of Final Judgment Against All Defendants on Count I contains 4585

words and complies with the Court's order dated May 4, 2023, ECF 557.


Dated: May 9, 2023                /s/ Jonathan Reischl
                                         Enforcement Attorney
                                         Bureau of Consumer Financial Protection