IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

BUREAU OF CONSUMER FINANCIAL
PROTECTION,

     *Plaintiff*,

          v.

PROGREXION MARKETING, INC., *et al.*,

     *Defendants*.

Case No.  2:19-cv-00298-BSJ

**[PROPOSED] STIPULATED FINAL JUDGMENT AND ORDER**

## PARTIES' STATEMENT

Plaintiff Bureau of Consumer Financial Protection ("Bureau") commenced this civil action on May 2, 2019, to obtain injunctive and monetary relief and civil penalties. The suit alleges, among other things, that the Defendants violated the credit repair advance fee provision of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.4(a)(2), by billing clients for credit repair services before the timeframes required by the advance fee provision had expired. On March 10, 2023, this Court issued an order agreeing with the Bureau's position.

Credit repair organizations that market or sell their services over the phone, irrespective of whether they promise a specific result to consumers, must follow the TSR, including the advance fee provision. That is, credit repair organizations that market or sell services over the phone may not request or receive payment of any fee for credit repair services until (i) the time frame in which they have represented all of the goods or services will be provided to that person has expired; and (ii) they have provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. And no business may substantially assist a credit repair organization that it knows or consciously avoids knowing is engaged

in an act or practice that violates the TSR, including by doing such things as providing back office support, technical know-how, lead generation, or data that supports their non-complaint credit repair practices or billing.

The Defendants and the Bureau have now agreed to settle the litigation. As part of the settlement, Lexington Law, CreditRepair.com, and Progrexion—the largest credit repair organizations in the United States—have agreed that, among other things, they will not violate the advance fee provision of the TSR, nor will they knowingly assist or support any company that is violating that provision.

Consumers considering using a credit repair company should be aware that it is illegal for a company to charge them for telemarketed credit repair unless it has been six months since the company achieved the promised results. Their consumer report has to show that the promised results were achieved six months earlier than they can be billed. Credit repair organizations accepting clients via inbound or outbound telemarketing must conform their billing practices to the full requirements of the TSR, including the advance fee provision of the TSR.

## **BACKGROUND**

The Amended Complaint, filed on August 17, 2022, names as Defendants PGX Holdings, Inc., Progrexion Marketing, Inc., Progrexion Teleservices, Inc., CreditRepair.com, Inc., and eFolks, LLC (collectively, the "Progrexion

Defendants") and John C. Heath, Attorney-at-Law, PC ("Heath PC") (collectively

with the Progrexion Defendants, "Defendants"). The Bureau and Defendants are

collectively referred to herein as "the Parties" to the above-captioned civil action

("Action").

Count I of the Amended Complaint alleges that Heath PC and the

Progrexion Defendants engaged in abusive telemarketing practices in violation of

the credit repair advance-fee provision of the Telemarketing Sales Rule (TSR), 16

C.F.R. § 310.4(a)(2). On March 10, 2023, this Court granted partial summary

judgment in favor of the Bureau on liability under that claim (the "March 10, 2023

Order"), holding that all Defendants had violated 16 C.F.R. § 310.4(a)(2) since

March 8, 2016. The Court did not reach the question of what relief, if any, is

appropriate under Count I. Defendants disputed the Court's findings in support of

the March 10, 2023 Order and preserved their rights to appeal that order.

Defendants' time for appealing the March 10, 2023 Order has not begun to run. As

part of this settlement and compromise, Defendants neither admit nor deny the

allegations in Count I and waive their rights to appeal the March 10, 2023 Order.

Counts II-V of the Amended Complaint allege that the Progrexion

Defendants engaged in deceptive acts and practices in violation of Sections 1031

and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§

5531 and 5536, and deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R. § 310.3.[1] Specifically, the Amended Complaint alleges that the Progrexion Defendants, in order to generate credit repair sales for Lexington Law and CreditRepair.com, relied on a network of marketing affiliates who advertised a variety of products and services, often related to consumer credit products. The Amended Complaint further alleges that certain of those marketing affiliates, referred to herein as the "Hotswap Companies," used deceptive, bait advertising to generate referrals to Defendants' Credit Repair Services. As alleged in the Amended Complaint, during a "hotswap" telephone call, the Hotswap Company's telephone agent would pitch Defendants' Credit Repair Services to the consumer, and then live-transfer (or "hotswap") the consumer to Defendants' telemarketing agent to attempt to close the credit repair sale. The Amended Complaint alleges that the Progrexion Defendants paid the Hotswap Companies for each credit repair sale that resulted from their efforts, despite knowing that they engaged in deceptive practices. As part of this settlement and compromise, Defendants neither admit nor deny the allegations in Counts II-V.

On June 4, 2023, Defendants filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, in the

---

[1] Plaintiff did not allege Counts II-V against Defendant Heath PC.

United States Bankruptcy Court for the District of Delaware. Defendants' Chapter 11 cases are being jointly administered under the lead case *In re PGX Holdings, Inc.* Case No. 23-10718 (CTG) (collectively, the "Chapter 11 Cases").

Plaintiff and all Defendants, by and through their respective counsel, now jointly request that the Court enter this Stipulated Final Judgment and Order ("Final Order").

## ORDER

### FINDINGS

1.     This Court has jurisdiction over the subject matter of this Action and has jurisdiction over all the parties thereto, and venue in this district is proper.

2.     In the March 10, 2023 Order, the Court granted partial summary judgment to the Bureau on liability on its claim that Defendants violated the advance-fee provision, § 310.4(a)(2) of the TSR.

3.     The Parties now agree to entry of this Final Order, without adjudication of any appeal of the March 10, 2023 Order or of the remaining issues of fact or law pleaded in the Amended Complaint, to settle and resolve all matters in dispute

arising from the conduct alleged in the Amended Complaint through the Effective Date of this Order.

4.     Defendants neither admit nor deny any allegations in the Amended Complaint, except as stated in this Final Order. For purposes of this Final Order, Defendants admit the facts necessary to establish the Court's jurisdiction over them and the subject matter of this Action.

5.     The Parties waive all rights to seek judicial review of, or otherwise challenge or contest, the validity of this Final Order. Defendants waive their right to seek judicial review of the March 10, 2023 Order, and Defendants also waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this Action to the date of this Final Order. Each Party agrees to bear its own costs and expenses, including, without limitation, attorneys' fees.

6.     Entry of this Final Order is in the public interest.

## DEFINITIONS

The following definitions apply to this Final Order:

7.     "Affected Consumers" includes:

> a.  any consumer who, after being subject to telemarketing regarding Defendants' Credit Repair Services, made a

              payment to Defendants for Credit Repair Services purchased via a telemarketing transaction from March 8, 2016 through the Effective Date; and

      b.  any consumer who made a payment to Lexington Law or CreditRepair.com from July 21, 2011 through the Effective Date, after being live-transferred to Lexington Law or CreditRepair.com by one of the Hotswap Companies.

8.     "Bankruptcy Code" means title 11 of the United States Code.

9.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware and any other bankruptcy court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time.

10.     "Board" means the duly-elected and then-acting Boards of Directors of PGX Holdings, Inc. or Heath PC.

11.     "Chapter 11 Cases" has the meaning specified therefor in the preamble hereto.

12.     "Consumer" means any individual or an agent, trustee, or representative acting on behalf of an individual. 12 U.S.C. § 5481(4).

13.   "Consumer Financial Product or Service" means any Financial Product or Service that is described in one or more categories under—

        a.   Paragraph 20 and is offered or provided for use by consumers primarily for personal, family, or household purposes; or

        b.   clause (i), (iii), (ix), or (x) of Paragraph 20, and is delivered, offered, or provided in connection with a Consumer Financial Product or Service referred to in subparagraph (a) of this Paragraph.

14.   "Consumer Information" means information from or about an individual consumer, including, but not limited to (a) first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a telephone number; (e) a Social Security number; (f) a driver's license or other government-issued identification number; (g) a financial institution account number; (h) credit or debit card information; (i) precise geolocation data of an individual or mobile device, including but not limited to GPS-based, WiFi-based, or cell-based location information; or (j) an authentication credential, such as a username and password.

15.    "Credit Repair Service" means any good or service represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating. For clarity, Credit Repair Services do not include legitimate credit monitoring services purchased and billed separately from any credit repair component, feature, or offer.

16.    "Defendants" means Heath PC and the Progrexion Defendants.

17.    "Effective Date" means the date on which this Final Order is entered on the docket.

18.    "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or their delegate.

19.    "Enrolled Telemarketed Credit Repair Customer" means a consumer who, as of April 3, 2023, was enrolled in Defendants' Credit Repair Services pursuant to a transaction that occurred in connection with telemarketing, and re-enrolled in, re-subscribed to, or re-signed up for a Credit Repair Service offered or provided by Defendants between April 4, 2023 and July 4, 2023, and who remains so enrolled as of the Effective Date.

20.    "Financial Product or Service" means

    (i)    extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely

extending commercial credit to a Person who originates consumer credit transactions);

(ii)    extending or brokering leases of personal or real property that are the functional equivalent of purchase finance arrangements, if—

(I)    the lease is on a non-operating basis;

(II)    the initial term of the lease is at least 90 days; and

(III)    in the case of a lease involving real property, at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee, subject to standards prescribed by the Bureau;

(iii)    providing real estate settlement services, except the business of insurance or electronic conduit services as defined by 12 U.S.C. § 5481, or performing appraisals of real estate or personal property;

(iv)    engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer;

(v)    selling, providing, or issuing stored value or payment instruments, except that, in the case of a sale of, or transaction to reload, stored value, only if the seller exercises substantial control over the terms or

11

conditions of the stored value provided to the consumer where, for purposes of this clause—

    (I)    a seller shall not be found to exercise substantial control over the terms or conditions of the stored value if the seller is not a party to the contract with the consumer for the stored value product, and another Person is principally responsible for establishing the terms or conditions of the stored value; and

    (II)    advertising the nonfinancial goods or services of the seller on the stored value card or device is not in itself an exercise of substantial control over the terms or conditions;

(vi)    providing check cashing, check collection, or check guaranty services;

(vii)    providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system or mobile telecommunications network, except that a Person shall not be deemed to be a covered Person with respect to financial data processing solely because the Person—

(I)     is a merchant, retailer, or seller of any nonfinancial good or service who engages in financial data processing by transmitting or storing payments data about a consumer exclusively for purpose of initiating payments instructions by the consumer to pay such Person for the purchase of, or to complete a commercial transaction for, such nonfinancial good or service sold directly by such Person to the consumer; or

(II)    provides access to a host server to a Person for purposes of enabling that Person to establish and maintain a website;

(viii)  providing financial advisory services (other than services relating to securities provided by a Person regulated by the Securities and Exchange Commission or a Person regulated by a State securities commission, but only to the extent that such Person acts in a regulated capacity) to consumers on individual financial matters or relating to proprietary financial products or services (other than by publishing any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation, including publishing market data, news, or data analytics or investment information or

recommendations that are not tailored to the individual needs of a
particular consumer), including—

(I)     providing credit counseling to any consumer; and

(II)    providing services to assist a consumer with debt management
        or debt settlement, modifying the terms of any extension of
        credit, or avoiding foreclosure;

(ix)   collecting, analyzing, maintaining, or providing consumer report
       information or other account information, including information
       relating to the credit history of consumers, used or expected to be used
       in connection with any decision regarding the offering or provision of
       a consumer financial product or service, except to the extent that—

       (I)     a Person—

               (aa) collects, analyzes, or maintains information that relates
                    solely to the transactions between a consumer and such
                    Person;

               (bb) provides the information described in item (aa) to an
                    affiliate of such Person; or

               (cc) provides information that is used or expected to be used
                    solely in any decision regarding the offering or provision

of a product or service that is not a consumer financial

product or service, including a decision for employment,

government licensing, or a residential lease or tenancy

involving a consumer; and

(II)     the information described in subclause (I)(aa) is not used by

such Person or affiliate in connection with any decision

regarding the offering or provision of a consumer financial

product or service to the consumer, other than credit described

in 12 U.S.C. § 5517(a)(2)(A);

(x)     collecting debt related to any consumer financial product or service;

and

(xi)     such other financial product or service as may be defined by the

Bureau, by regulation, if the Bureau finds that such financial product

or service is—

(I)     entered into or conducted as a subterfuge or with a purpose to

evade any Federal consumer financial law; or

(II)     permissible for a bank or for a financial holding company to

offer or to provide under any provision of a Federal law or

15

regulation applicable to a bank or a financial holding company, and has, or likely will have, a material impact on consumers.

21.    "Heath PC" means John C. Heath, PC, Attorney at law, d/b/a Lexington Law, and its successors, transferees, and assigns.

22.    "Heath PC's Executives" means the then-serving Board, Members, shareholders, Directing Attorney(s), and Managing Attorney(s) of Heath PC.

23.    "Hotswap" means the live-transfer of a consumer, by telephone, from a Marketing Affiliate's telemarketing agent to Defendants' telemarketing agent.

24.    "Hotswap Companies" means The H.O.P.E. Program LLC (a/k/a The HOPE Program, Help Renters, Homes with HOPE, and Hope to Own); OLP.com, Inc. (a/k/a One Loan Place and Rocket Daddy); Ascent Mortgage Resource Group (a/k/a Lead Virtue, First Access Rent-to-Own, First Access Mortgage, United Rent-to-Own, Ascent Rent-to-Own, Fileforgrants.net, American Rent-to-Own, Rent to Own Homes, and HOPE Resources); Easyhomeownership.net (a/k/a Easy Home Ownership and Renttoownassistance.com); and YHTBA Corp. (a/k/a Rent2own.house, Rent-2-own.house, Rent Then Own Homes, and Renttoown.house), and each of their successors, transferees, and assigns.

25.     "Live-transfer" means transferring a consumer, by telephone, from one telephone agent to another telephone agent, without terminating the telephone call before the transfer.

26.     "Lead generation" means (a) using marketing techniques—other than passive advertising—to identify or attract prospective customers' interest in a third party's product or service; (b) obtaining, or aiding others in obtaining, Consumer Information about prospective customers for a third party's product or service; or (c) providing any Consumer Information of prospective customers to a third party.

27.     "Marketing Affiliate" means any third party to whom Defendants provide, or offer to provide, any form of consideration for lead generation for any Defendant or to otherwise market, advertise, or offer Credit Repair Services on behalf of any Defendant. For clarity, print, digital, online, social media, broadcast, electronic media, or out-of-home publishers of passive advertisements on behalf of Defendants shall not be considered Marketing Affiliates on that basis alone.

28.     "Person" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

29.     "Progrexion" means PGX Holdings, Inc., and all of its subsidiaries, and their successors, transferees, and assigns.

30.    "Progrexion Defendants" means PGX Holdings, Inc., Progrexion Marketing, Inc., Progrexion Teleservices, Inc., eFolks, LLC, and CreditRepair.com, Inc., and their successors, transferees, and assigns.

31.    "Progrexion Defendants' Executives" means the then-serving Board and the Chief Executive Officer, President, and most senior executive officer in charge of the operations of each Progrexion Defendant.

32.    "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against any Defendant based on substantially the same facts as described in the Amended Complaint.

33.    "Substantially Assisting" means providing "substantial assistance or support" within the meaning of § 310.3(b) of the TSR. Nothing in this definition shall be construed to limit any Defendant's liability after the Effective Date for conduct otherwise prohibited by the CFPA or TSR, including § 310.3(b) of the TSR.

34.    "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.

## CONDUCT RELIEF

## I

### Prohibited Conduct
### Ban on Telemarketing or Selling Telemarketed Credit Repair Services

**IT IS ORDERED** that:

35.    Defendants, whether acting directly or indirectly, are restrained, enjoined, and prohibited for a period of ten years from the Effective Date from:

> a.  Participating in telemarketing of Credit Repair Services, whether directly or through an intermediary; or
>
> b.  Offering for sale, selling, or providing Credit Repair Services that are advertised, marketed, promoted, or sold through telemarketing, whether directly or through an intermediary.

Nothing in this Order shall be read as an exception to this Paragraph 35 or to excuse Defendants from complying with 16 C.F.R. § 310.4(a)(2) or other applicable laws or regulations after the expiration of ten years.

## II

## Additional
## Prohibited Conduct

**IT IS ORDERED** that:

36.     Defendants and their officers, agents, servants, employees, and attorneys, and all other Persons in active concert or participation with them, who receive actual notice of this Final Order, whether acting directly or indirectly, are permanently restrained, enjoined, and prohibited from Substantially Assisting other persons in the offering for sale, selling, or providing of Credit Repair Services that are advertised, marketed, promoted, or sold through telemarketing and for which Defendants know or consciously avoid knowing billing is conducted other than in compliance with the advance-fee provision, 16 C.F.R. § 310.4(a)(2).

37.     Defendants and their officers, agents, servants, employees, and attorneys, and all other Persons in active concert or participation with them, who receive actual notice of this Final Order, whether acting directly or indirectly, are permanently restrained, enjoined, and prohibited from hiring for services, contracting with, or paying the following Persons in connection with advertising, marketing, or lead generation activities for Lexington Law or CreditRepair.com:

a.  Any Marketing Affiliate who Defendants know or should know is engaged in advertising or offering rent-to-own homes in connection with generating Consumer leads for Defendants, unless that Marketing Affiliate is acting as a broker with respect to such homes and maintains any required licenses and registrations in each state where the Person acts as a broker for such homes;

b.  Any Marketing Affiliate who Defendants know or should know is engaged in advertising or offering home ownership education programs in connection with advertising, marketing, or lead generation for Lexington Law or CreditRepair.com, unless that Marketing Affiliate is acting as a potential creditor or broker with respect to homes or home loans and maintains any required licenses and registrations in each state where the Person acts as a potential creditors or broker for homes or home loans in connection with generating Consumer leads for Defendants;

c.  Any Marketing Affiliate who Defendants know or should know is engaged in advertising or offering loans in connection with advertising, marketing, or lead generation for Lexington Law or CreditRepair.com, unless that Marketing Affiliate is acting as a potential creditor or broker with respect to such loans and maintains any required licenses and registrations in each state where the person acts as a creditor or broker for loans advertised or offered in connection with generating Consumer leads for Defendants;

d.  Any Marketing Affiliate who Defendants know or should know is engaged in advertising or offering real estate in connection with advertising, marketing, or lead generation for Lexington Law or CreditRepair.com, unless that person is the seller of such real estate or an authorized attorney, sales agent, or broker of such real estate and maintains any required licenses and registrations in each state where the person acts as a seller, attorney, sales agent, or broker of real estate in

22

connection with generating Consumer leads for
Defendants;

e.  Any of the Hotswap Companies;

f.  Kurt Artecona, Joseph Delfgauw, Christopher Robinson,
Brenda Kemp, and Rostislav Banin; and

g.  Any Marketing Affiliate of which Defendants know or
should know Kurt Artecona, Joseph Delfgauw,
Christopher Robinson, Brenda Kemp, or Rostislav Banin
is an owner, executive, employee, or agent.

38.   Defendants and their officers, agents, servants, employees, and attorneys,
and all other Persons in active concert or participation with them, who receive
actual notice of this Final Order, whether acting directly or indirectly, are
permanently restrained, enjoined, and prohibited from making any material
misrepresentations, whether implicit or explicit, when marketing Credit Repair
Services, including but not limited to material misrepresentations regarding:

a.  The availability of products or services being marketed
by Defendants or their Marketing Affiliates;

b.  The relationship between Defendants, their Marketing
Affiliates, and the originators, owners, sellers, or brokers

of any Consumer Financial Product or Service or real

estate;

c.  A consumer's likelihood of success in obtaining a third-

party product or service;

d.  The past success of Defendants' or their Marketing

Affiliates' customers in acquiring any Consumer

Financial Product or Service or real estate;

e.  The efficacy or any material aspect of Defendants' Credit

Repair Services; or

f.  Any of the material terms or conditions of the products or

services being marketed by Defendants or their

Marketing Affiliates.

39.     Defendants and their officers, agents, servants, employees, and attorneys,

and all other Persons in active concert or participation with them, who receive

actual notice of this Final Order, whether acting directly or indirectly, are

permanently restrained, enjoined, and prohibited from advertising or acquiring

customers through lead generation activities by any Marketing Affiliate unless and

until:

a.  Defendants verify to the fullest extent practicable that the products and services offered or marketed by the Marketing Affiliate in connection with advertising, marketing, or lead generation for Lexington Law or CreditRepair.com are reasonably available from the Marketing Affiliate as described in the Marketing Affiliate's marketing; and

b.  Defendants review the Marketing Affiliate's marketing materials used in connection with advertising, marketing, or generating leads for Lexington Law or CreditRepair.com, including but not limited to online advertisements, websites, landing pages, pop-ups, social media content, and classified advertisements, and verify to the fullest extent practicable that they do not contain any material misrepresentations or otherwise materially conflict with any of the provisions of this Order.

## III

## Affirmative Requirements

**IT IS ORDERED** that:

40.      Defendants must conduct regular compliance reviews of their top 25

Marketing Affiliates (or if Defendants have fewer than 25 Marketing Affiliates, the

top Marketing Affiliates accounting for no less than 75% of total leads), which

reviews must include, at a minimum, repeating each of the requirements in

Paragraph 39 at least two times per year.

41.      Upon determining that any Marketing Affiliate has used material

misrepresentations to induce a consumer to purchase or enroll in Defendants'

products or services, Defendants must immediately: (i) halt the processing of any

payments or charges generated by the Marketing Affiliate; (ii) refund or cause to

be refunded within 45 days all monies paid by each consumer whose sale

originated from the Marketing Affiliate on or after the date the Marketing Affiliate

engaged in deceptive acts or practices or other acts or practices prohibited by this

Order, except those who Defendants determine were not exposed to such deceptive

or prohibited acts or practices; and (iii) immediately terminate the Marketing

Affiliate unless (a) it is the first such misrepresentation by the Marketing Affiliate

in an 18-month period *and* (b) the Marketing Affiliate cures the representation and

refunds all affected customers within 7 days.

42.     For at least three years from the Effective Date, Defendants must retain qualified, independent consultants or auditors with specialized experience in advertising compliance, and acceptable to the Enforcement Director, to conduct an annual independent audit of:

> a.  Defendants' compliance with this Final Order; and
>
> b.  Defendants' use of Marketing Affiliates in connection with advertising, marketing, or generating leads for Credit Repair Services.

43.     Defendants must promptly and completely investigate any complaints that they receive through any source to determine whether any Marketing Affiliate is engaging in deceptive acts or practices or other acts or practices prohibited by this Final Order.

44.     Within 10 days of the Effective Date, Defendants must send a notice of this Final Order to all Enrolled Telemarketed Credit Repair Customers. The notice shall be substantially in the form attached as Appendix A, and in a clear and prominent manner, shall include the following:

> a.  A description of the Bureau's lawsuit against the Defendants;

b.  A description of the March 10, 2023 Order and a
hyperlink to the text of the order;

c.  A statement that the Parties have settled the lawsuit;

d.  A statement that the consumer has the right to cancel
their credit repair services at any time and a hyperlink
directly to a webpage through the which the consumer
can immediately cancel their enrollment, as well as a
phone number that enables the consumer to immediately
cancel their enrollment, free from any retention effort or
other marketing of Defendants' services; and

e.  A statement that if the consumer does nothing, their
services will continue and they will continue to be billed
according to their contract.

Defendants may include in the Notice a statement that they disputed the ruling in
the March 10, 2023 Order and informed the Court that they intended to file an
appeal, before reaching an agreement to instead settle the case.

## MONETARY PROVISIONS

## IV

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

45.     A judgment for monetary redress in compromise of the Bureau's claims under Count I of the Bureau's Amended Complaint is entered in favor of the Bureau and against the Defendants, jointly and severally, in the amount of $2,641,926,481. A judgment for monetary redress in compromise of Counts II-V of the Amended Complaint is entered in favor of the Bureau and against the Progrexion Defendants in the amount of $19,000,000.

46.     Any funds received by the Bureau in satisfaction of the monetary redress portion of this judgment will be deposited into a fund or funds administered by the Bureau or the Bureau's agent according to applicable statutes and regulations to be used for redress for Affected Consumers, including legal restitution or the refund of moneys, and for any attendant expenses for the administration of any such redress.

47.     Defendants must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer.

Defendants must provide such information in their or their agents' possession or control within 14 days of receiving a written request from the Bureau.

48.     If the Bureau determines, in its sole discretion, that providing redress to consumers is wholly or partially impracticable or if funds remain after the administration of redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury. Defendants will have no right to challenge the Bureau's choice of remedies under this Section and will have no right to contest the manner of distribution chosen by the Bureau.

49.     Payment of redress to any Affected Consumer under this Order may not be conditioned on that consumer waiving any right.

## V

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

50.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), in consequence of the March 10, 2023 Order and the Parties' agreement to compromise and resolve the matters at issue in Counts I-V of the Bureau's Amended Complaint, and taking into account the factors in 12 U.S.C. § 5565(c)(3), the Progrexion Defendants must pay a civil money penalty of $45,817,452 to the Bureau.

51.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), in consequence of the March 10, 2023 Order and the Parties' agreement to compromise and resolve the matters at issue in Count I of the Bureau's Amended Complaint, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Heath PC must pay a civil money penalty of $18,408,726 to the Bureau.

52.     The civil money penalties paid under this Final Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

53.     Defendants must treat the civil money penalty paid under this Final Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Defendants may not:

> a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Order; or
>
> b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source (other than any of PGX Holdings, Inc.'s parent companies, shareholders, or former shareholders), including but not limited to

payment made under any insurance policy, with regard to

any civil money penalty paid under this Final Order.

## VI

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

54.    In the event of default on any Defendant's obligations to make payment

under this Final Order, interest, computed under 28 U.S.C. § 1961, as amended,

will accrue on any outstanding amounts not paid from the date of default to the

date of payment, and will immediately become due and payable.

55.    Defendants relinquish all dominion, control, and title to any funds paid

pursuant to this Final Order to the fullest extent permitted by law and no part of the

funds may be returned to Defendants.

56.    Under 31 U.S.C. § 7701, each Defendant, unless it already has done so, must

furnish to the Bureau its taxpayer identification numbers, which may be used for

purposes of collecting and reporting on any delinquent amount arising out of this

Final Order.

57.    Within 30 days of the entry of a final judgment, order, or settlement in a

Related Consumer Action, Defendants must notify the Enforcement Director of the

final judgment, order, or settlement in writing. That notification must indicate the

amount of redress, if any, that the Defendant paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid. To preserve the deterrent effect of the civil money penalties in any Related Consumer Action, Defendants may not argue that they are entitled to, nor may any Defendant benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalties paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund ("Penalty Offset"). If the court in any Related Consumer Action grants such a Penalty Offset to any Defendant, the Defendant must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalties imposed in this action.

## COMPLIANCE PROVISIONS

## VII

## Role of the Board and Executives

**IT IS FURTHER ORDERED** that:

58.     The Progrexion Defendants' Executives will, pursuant to Section IX, below, acknowledge in writing their receipt of this Final Order and responsibility for ensuring that the Progrexion Defendants comply with this Order.

59.    Heath PC's Executives will, pursuant to Section IX, below, acknowledge in writing their receipt of this Final Order and responsibility for ensuring that Heath PC complies with this Order.

60.    The Progrexion Defendants' Executives and Heath PC's Executives must review all reports required by this Final Order, and any submissions to the Bureau prior to such submission.

61.    One year after the Effective Date, and on the same date each year thereafter for the next four years, the Progrexion Defendants must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report), the accuracy of which is declared under penalty of perjury by the Progrexion Defendants' Executives and which, at a minimum:

a.  Describes the steps that the Progrexion Defendants'
    Executives have taken to reasonably assess whether the
    Progrexion Defendants are complying with each
    applicable paragraph and subparagraph of the Final
    Order;

b.  Describes in detail whether and how each Progrexion
    Defendant has complied with each applicable paragraph
    and subparagraph of the Final Order, including the
    manner of verification of such compliance and any
    corrective actions taken to remedy potential non-
    compliance with the applicable requirement, paragraph,
    or subparagraph;

c.  Identifies any Marketing Affiliate with whom any
    Progrexion Defendant contracts to provide advertising,
    marketing, or lead generation services; and

d.  Attaches a copy of each Final Order Acknowledgment
    obtained under Section IX, unless previously submitted
    to the Bureau.

62.     One year after the Effective Date, and on the same date each year thereafter for the next four years, Heath PC must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report), the accuracy of which is declared under penalty of perjury by Heath PC's Executives and which, at a minimum:

      a.  Describes the steps that Heath PC's Executives have taken to reasonably assess whether Heath PC is complying with each applicable paragraph and subparagraph of the Final Order;

      b.  Describes in detail whether and how Heath PC has complied with each applicable paragraph and subparagraph of the Final Order, including the manner of verification of such compliance and any corrective actions taken to remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph;

      c.  Identifies any Marketing Affiliate with whom Heath PC contracts to provide advertising, marketing, or lead generation services; and

    d. Attaches a copy of each Final Order Acknowledgment obtained under Section IX, unless previously submitted to the Bureau.

63. The Progrexion Defendants' Board must:

    a. Authorize whatever actions are necessary for the Progrexion Defendants to assess whether the Progrexion Defendants are complying with each applicable paragraph and subparagraph of the Final Order;

    b. Authorize whatever actions, including corrective actions, are necessary for the Progrexion Defendants to fully comply with each applicable paragraph and subparagraph of the Final Order; and

    c. Require timely reporting by management to the Progrexion Defendants' Executives on the status of compliance obligations.

64. Heath PC's Board must:

    a. Authorize whatever actions are necessary for Heath PC to assess whether Heath PC is complying with each

applicable paragraph and subparagraph of the Final

Order;

b.  Authorize whatever actions, including corrective actions,

are necessary for Heath PC to fully comply with each

applicable paragraph and subparagraph of the Final

Order; and

c.  Require timely reporting by management to Heath PC's

Executives on the status of compliance obligations.

## VIII

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

65.    Each Defendant must notify the Bureau of any development that may

materially affect compliance obligations arising under this Final Order, including

but not limited to, a dissolution, assignment, sale, merger, or other action that

would result in the emergence of a successor company; the creation or dissolution

of a subsidiary, parent, or affiliate that engages in any acts or practices subject to

this Final Order; the filing of any successor bankruptcy or insolvency proceeding

by or against any Defendant; or a change in a Defendant's name or address. The

Defendant must provide this notice, if practicable, at least 30 days before the

development, but in any case, no later than 14 days after the development.

66.     Within 30 days of the Effective Date, each Defendant must:

       a.  Designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with that Defendant;

       b.  Designate at least one telephone number and email, physical, and postal addresses as points of contact for consumers with inquiries related to consumer relief under this Final Order;

       c.  Identify all businesses for which a Defendant is the majority owner, that the Defendant directly or indirectly controls, by all of their names, telephone numbers, and electronic, physical, and postal addresses; and

       d.  Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

67.     Defendants must report any change in the information required to be submitted under Paragraph 66 at least 30 days before the change, or as soon as practicable after learning about the change, whichever is sooner.

## IX

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

68.     Within 7 days of the Effective Date, each Defendant must submit to the Enforcement Director an acknowledgment of receipt of this Final Order, declared under penalty of perjury.

69.     Within 30 days of the Effective Date, each Defendant must deliver a copy of this Final Order to each of its board members, executive officers, attorneys, and Marketing Affiliates, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Final Order.

70.     For five years from the Effective Date, each Defendant must deliver a copy of this Final Order to any business entity resulting from any change in structure referred to in Section VIII, any future board members, executive officers, attorneys, and Marketing Affiliates, before they assume their responsibilities, as well as to any managers, employees, service providers, or other agents and

representatives who will have responsibilities related to the subject matter of the Final Order before they assume their responsibilities.

71.   Each Defendant must secure and retain for five years a signed and dated statement acknowledging receipt of a copy of this Final Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001-7006, within 30 days of delivery, from all Persons receiving a copy of this Final Order under this Section.

72.   Ninety days after the Effective Date, each Defendant must submit to the Bureau a list of all Persons and their titles to whom this Final Order was delivered through that date under this Section and a copy of all signed and dated statements acknowledging receipt of this Final Order under Paragraph 71.

## X

## Recordkeeping

**IT IS FURTHER ORDERED** that:

73.   For at least five years from the Effective Date, Defendants must create, or if already created, must retain the following business records:

> a.   All documents and records necessary to demonstrate full compliance with each provision of this Final Order, including all submissions to the Bureau;

b.  All Marketing Affiliates' marketing materials obtained
    and reviewed by Defendants;

c.  All scripts used by Defendants with consumers
    (including any scripts used for telephonic, chat,
    SMS/text, and artificial intelligence communications);

d.  Any telemarketing registrations and licenses and
    applications for such registrations and licenses;

e.  All contracts with Marketing Affiliates;

f.  Audited financial statements for all Defendants;

g.  All consumer complaints and refund requests (whether
    received directly or indirectly, such as through a third
    party), any documentation concerning any investigation
    of those complaints or requests, and any responses to
    those complaints or requests;

h.  All written compliance materials, instructions, and
    guidance supplied by Defendants to Marketing Affiliates;

i.  Defendants' policies, procedures, training, and written
    guidance provided to Defendants' employees to monitor

and ensure Marketing Affiliates' compliance with federal

consumer financial law; and

j.   Documents sufficient to demonstrate that all statements

Defendants use in marketing Defendants' products and

services, or that Defendants authorize others to use, are

accurate and substantiated. Accurate statements must

have a truthful basis for their claims. Specific claims

must have an objective basis established prior to use.

General statements regarding products or services must

reflect the actual outcomes of prior consumers and must

be verified beyond mere possibility or anecdote. All

quantifiable claims, including, but not limited to, all

claims about prior consumers' performance, or the

likelihood that a consumer will receive a product or

service, must be substantiated with empirical data.

Defendants must make these materials available to the

Bureau within 30 days of the Bureau's request.

# XI

## Notices

**IT IS FURTHER ORDERED** that:

74.     Unless otherwise directed in writing by the Bureau, Defendants must provide all submissions, requests, communications, or other documents relating to this Final Order in writing, with the subject line, "CFPB v. Progrexion Marketing, Inc., et al., Case No. 2:19-cv-00298-BSJ," and send them by email to CFPB_Enforcement_Compliance@cfpb.gov, addressed as follows:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau

# XII

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

75.     Within 14 days of receipt of a written request from the Bureau, Defendants must submit additional compliance reports or other requested information, which must be declared under penalty of perjury; provide sworn testimony; or produce documents.

76.     Defendants must permit Bureau representatives to interview any employee or other Person affiliated with Defendants who has agreed to such an interview

regarding compliance with this Final Order. The Person interviewed may have

counsel present.

77.    Nothing in this Final Order will limit the Bureau's lawful use of compulsory

process, under 12 C.F.R. § 1080.

# XIII

## Transfer or Assignment of Operations

**IT IS FURTHER ORDERED** that:

78.    Should Defendants seek to transfer or assign all or part of their operations

that are subject to this Final Order, Defendants must, as a condition of such a

transfer or assignment, obtain the written agreement of the transferee or assignee to

comply with all of the obligations of the transferor or assignor entity that are

reflected in Sections I, II, III, VII, VIII, IX, X, XI, and XII, above, or if such

transfer or assignment is subject to approval by a court of competent jurisdiction,

any effectuating document submitted to such court for approval shall set forth or

incorporate by reference all obligations of the transferor or assignor that are

reflected in Sections I, II, III, VII, VIII, IX, X, XI, and XII of this Final Order,

which shall be binding upon the transferee or assignee, as such obligations are

applicable to any such transferee or assignee, provided, however, that, for the

avoidance of doubt, (i) any such transferee or assignee shall not be liable, or

otherwise responsible, for any judgment for monetary redress, civil penalty or any

other payment or monetary obligation of the Defendants pursuant to this Final

Order, including those obligations set forth in Sections IV, V, and VI of this Final

Order, and (ii) no such transferee or assignee shall have any direct liability or

obligations under this Final Order except as otherwise provided in this Paragraph.

## XIV

### Bankruptcy

**IT IS FURTHER ORDERED** that:

79.     Any monetary obligations under Sections IV, V, and VI of this Final Order

shall be subject to Bankruptcy Court approval and be considered or entitled to

treatment as an unsecured claim in accordance with the Bankruptcy Code and shall

not be considered an administrative expense claim or other priority claim in the

Chapter 11 Cases or any Successor Cases or be deemed to be assumed by, or be an

obligation of, any purchaser, assignee or transferee of any of the Defendants'

assets or operations in the Chapter 11 Cases or any Successor Cases.

80.     The Bankruptcy Court shall have exclusive jurisdiction over any and all

matters arising from or related to the implementation, interpretation, or

enforcement of any orders approving a chapter 11 plan or sale in the Chapter 11

Cases or any Successor Cases including, without limitation, with respect to the allowance or treatment of such monetary obligations under Sections IV, V, and VI of this Order.

## XV

### Closure of Case

**IT IS FURTHER ORDERED** that:

81.    In accordance with the Parties' agreement to resolve the matters at issue in the Bureau's Amended Complaint, this case shall be and hereby is closed and final judgment is hereby entered.

## XVI

### MISCELLANEOUS

**IT IS FURTHER ORDERED** that:

82.    Notwithstanding the provisions of Section XVII hereof, any time limit for performance fixed by this Final Order may be extended by mutual written agreement of the Parties. Any other modification of this Final Order may be made only by approval of the Court, upon motion by either of the Parties, pursuant to Fed. R. Civ. P. 60.

# XVII

## Retention of Jurisdiction

**IT IS FURTHER ORDERED** that:

83.    The Court will retain jurisdiction of this matter for the purpose of construction, modification, and enforcement of this Final Order.

**IT IS SO ORDERED**.

DATED this ___ day of _____, 20__.

BY THE COURT:

_____

BRUCE S. JENKINS

United States Senior District Judge

# <u>Appendix A</u>
# Notice for Enrolled Telemarketed Credit Repair Customers

The notice shall state as follows:

> On May 2, 2019, the Consumer Financial Protection Bureau ("Bureau") sued Lexington Law, CreditRepair.com, Progrexion Marketing, and several other companies, alleging that they violated various consumer financial protection laws and regulations. The case was filed in Federal District Court in Salt Lake City, Utah, and is captioned *CFPB v. Progrexion Marketing, et al.*, 19-cv-00298-BSJ.

> On March 10, 2023, the Federal District Court issued a ruling finding that Lexington Law's and CreditRepair.com's billing practices for telemarketed credit repair services violated the advance fee provision of the Telemarketing Sales Rule. Specifically, the Court found that Lexington Law and CreditRepair.com charged customers without waiting six months after demonstrating, via a consumer report, that the promised results of the credit repair service had been achieved. The Court's decision and other information about the case is on the Bureau's website here: https://www.consumerfinance.gov/enforcement/actions/pgx-holdings-inc/

> Lexington Law, CreditRepair.com, and the other defendants dispute the Court's partial summary judgment ruling and informed the Court and the Bureau that they intended to appeal, before reaching an agreement to settle the case.

> The Bureau and the defendants have now agreed to settle the case.  As part of that settlement, Lexington Law and CreditRepair.com are reaching out to you to remind you that—as stated in your attached engagement agreement—you have the right to terminate your credit repair services at any time and for any reason (or no reason at all).  If you wish to terminate your credit repair services, please click on the link below (or call XXX-XXX-XXXX between the hours of 1pm and 4pm Mountain if you lack access to a computer or other electronic device).  If you would like to continue to receive credit repair services, no action is necessary and you will continue to be billed according to your contract.